**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEILEE FANT et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-cv-253-AGF |
| | ) | |
| THE CITY OF FERGUSON | ) | (Class Action) |
| | ) | |
| Defendant. | ) | |
| | ) | |

### RESPONSE TO MOTION TO DISMISS

Each of the Plaintiffs was kept in jail indefinitely because of the inability to make monetary payments to the City of Ferguson. Outside of any legal process recognizable in American law, they were left to negotiate amounts of cash that would be enough to buy their release. The City operated a sophisticated scheme to use this basic threat of jail to generate revenue from very poor people. The scheme involved City police, jail guards, prosecutors, officials, court employees, and other City agents. The Plaintiffs alleged this scheme in detail, providing the necessary factual context in which to understand the numerous ways in which this lawless system violated basic legal principles and devastated an entire community. The City's Motion to Dismiss (Doc. 8) and accompanying Memorandum (Doc. 9) fail to cite even the most basic precedent and do not engage with the substance of the Plaintiffs' claims. Instead, the City makes distracting assertions in conclusory fashion and raises irrelevant procedural objections. The Motion should be denied.

## I.     The City Misunderstands Rule 8

The City's Rule 8 argument is difficult to understand. The City's chief problem appears to be with the length and thoroughness of the Plaintiffs' allegations. While a Complaint must

"contain" a short and plain statement of the claim, *see* Rule 8(a)(2), a Complaint need not *be* short or plain.  While the City considers much of the information included to be "extraneous" and "irrelevant," Doc. 9 at 1, the City's disregard for basic constitutional rights was so pervasive and interconnected that capturing the scope of its actions requires providing context for this Court.

It is telling that the City's Rule 8 argument contains not a single citation to any caselaw, let alone argument applying that caselaw to the Plaintiffs' Complaint.  Nor could it.  The City's rhetoric cannot be squared with a reasonable reading of the Complaint or the interpretation of Rule 8 by federal courts.[1]  The City's assertions that it does not understand the constitutional violations alleged because the Complaint is "impossible" to "decipher" because it "devolved" into "wide-ranging" subjects bears no relation to the document filed in this Court.  The only examples cited by the City to support these accusations are clearly relevant facts.[2]

---

[1] *See, e.g.*, *Kadamovas v. Stevens*, 706 F.3d 843, 844-45 (7th Cir. 2013) ("Since a plaintiff must now show plausibility, complaints are likely to be longer—and legitimately so—than before. . . .   Typically complaints are long and complicated."); *Hearns v. San Bernardino Police Dept.*, 530 F.3d 1124, 1129-33 (9th Cir. 2011) ("[The Complaint] set out more factual detail than necessary, but the overview was relevant to Plaintiff's causes of action for employment discrimination."); *Wynder v. McMahon*, 360 F.3d 73, 80 (2nd Cir. 2004) ("Dismissal pursuant to the rule is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.) (internal quotation marks omitted).  As a leading treatise explains: "Rule 8(a)(2) speaks of a short and plain statement of each claim, not a short and plain pleading. Hence, in the context of a multiparty, multiclaim complaint each claim should be stated as succinctly and plainly as possible even though the entire pleading may prove to be long and complicated by virtue of the number of parties and claims."  Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1217 (3d ed.).

[2] The City offers four examples for why it could not understand the Complaint.  Doc. 9 at 4.  First, the City complains about a footnote concerning the number of recent attempted suicides in St. Louis County municipal jails.  But the attempted suicides of multiple people in similar circumstances in the past few months is relevant context.  The Plaintiffs allege that the City is part of a wide-ranging and coordinated scheme involving other neighboring municipalities to jail people for unpaid debts and to shuffle people back and forth between each other's jails, requiring new payments each time.  The use of each other's police forces to arrest people with unpaid debts in other municipalities and the subsequent cycle of being ransomed by each city and shuffled from jail to jail is an integral part of the scheme coordinated by the City and the despair felt by the Plaintiffs.  Moreover, one of the named Plaintiffs herself tried to commit suicide in a municipal jail when she could not pay her way out, Doc. 1 at ¶ 122, as a result of this cycle.  Most importantly, the cycle of debt and hopelessness in which the Class members are trapped, as well as the grotesque jail conditions to which they are subjected, is vital context for understanding the overall atmosphere of fear and coercion engendered by the City's debt-collection and revenue generation scheme.

Second, the City complains about the "emotions" of one of the Plaintiffs' family and employer when they thought she had disappeared but was instead in the Ferguson jail.  Doc. 9 at 4.  That information is relevant to describe the effects of the City's brutality on the Plaintiffs' lives.  It also speaks to the consequences of the illegal jailing, as well as the arbitrariness of a system in which a person can be snatched from the community for unpaid debts without her family or job being able to locate her.  That is a sad reality of daily life for impoverished families in Ferguson.

The Complaint was the product of many months of rigorous investigation and is filled with factual context providing a rich background essential to the claims for relief.  That is the kind of Complaint that is required to describe a byzantine municipal scheme that admittedly violates basic rights in multiple, complex ways.  This Court is free to disregard any information that the Court believes to be extraneous.  *See, e.g.*, *McDaniel v. Loyola University Medical Center*, 2014 WL 4269126, at *8 n.2 (N.D. Ill. Aug. 28, 2014) ("[T]he Court declines to punish Plaintiff for including more than the absolutely essential facts, recognizing that background facts are relevant support for the context of his claims.").  Ironically, the only Rule 8 case cited by the City (albeit in its "Standard of Review" section), was cited by the City for the proposition that Complaints should include *more* factual allegations rather than mere recitations of legal elements.  *See* Doc. 9 at 2 (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  The City is correct that the allegations in the Complaint are "scandalous" and upsetting—but not in the way that concerns the Rules of Civil Procedure.  As discussed below, the City's purported difficulty in understanding the issues has more to do with not citing the relevant constitutional precedent than any factual confusion over the scheme described in the Complaint and openly operated by the City every day for years.

## II.     The City Misunderstands Rule 10

The City's Rule 10(b) argument is devoid of explanation or support.  The City first says that the numbered paragraphs of the Complaint are not limited to a single set of circumstances.  Again, the City provides no citation to any case, discussion of legal authority, or even an example

---

Third, the City complains about teenage children of a Plaintiff who it claims were not named in the Complaint.  Doc. 9 at 4.  But the description of other victims of the City's conduct is relevant to demonstrating a pattern and practice of City conduct.  Moreover, the City ignores that the paragraph makes the important factual allegation that City jail staff repeatedly negotiated with the mother to secure the extrajudicial release of her children in a lawless way.  In any event, the teenage children, who are now adults, are named Plaintiffs in this case.

Fourth, the City complains that the Plaintiffs highlighted the much-publicized sexual assaults by a Ferguson jail guard who is being criminally prosecuted.  The fact that this unlawful behavior occurred in the Ferguson jail is relevant evidence of the City's lack of adequate care and attention to the well-being of its prisoners, and it connects to a pattern of physical and verbal abuse, often of a sexual and sexist nature, throughout the Complaint.

3

of a paragraph that it found objectionable.  Nor does the City explain why such a paragraph would make it impossible to understand the basic legal claims raised.  That should end the matter.  *See* E.D. Mo. L. R. 7-4.01 (requiring "citations to any authorities on which the party relies"); *see also, e.g.*, *United States v. Eddington*, 2012 WL 6971089, at *9 (E.D. Mo. 2012) (noting the requirement of citation to legal authority in E.D. Mo. L.R. 4.01(A)).

Apart from some of the introductory paragraphs that describe the nature of the suit as a whole, the Plaintiffs' numbered paragraphs all attempt to deal with discrete sets of circumstances. That is explicitly what Rule 10 contemplates.  Indeed, by grouping together discrete single facts into a "set of circumstances," Rule 10 envisions that, "as far as practicable," Plaintiffs will juxtapose facts *together* in order to make a coherent point about a *set* of related actions or conduct. This is preferable to far longer documents with many more paragraphs that do not clearly group sets of facts in a way that highlights that the Plaintiffs believe them to be related.  Without being given even one example, it is difficult for the Plaintiffs to respond to this broad accusation, and the Motion should be denied.

The City next appears to make a different argument that it does not understand the counts that identify the separate claims for relief.  The Plaintiffs do not understand this argument. The City cites one example concerning the Plaintiffs' allegations about inadequate medical care in the jail.  Doc. 9 at 5.  The Plaintiffs alleged that the denial of basic medical care was a component of their claim concerning the conditions of confinement amounting to punishment for non-convicted people in violation of the Fourteenth Amendment.  The Plaintiffs also alleged specific instances in which particular Plaintiffs were denied basic medical care, including City officers refusing prescribed mental health medication to Donyale Thomas (who was suffering from schizophrenia, bipolar disorder, and an anxiety attack) and refusing to provide a doctor or medication for Herbert

4

Nelson Jr.'s open, infected wound.  Doc. 1 at ¶¶ 119; 85.  The Plaintiffs allege that Class members were routinely denied basic medical and mental health care, including prescribed medication for physical and mental health illnesses.  Doc. 1 at ¶ 196.  These allegations are sufficient to put the City on notice that its pattern and practice of failing to attend to basic medical needs is at issue in this case, which is all that is required.  *See, e.g.*, *Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002) (observing that "[t]he liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system").  If it is true that the Ferguson jail routinely, as a matter of policy or practice, refused to let seriously ill inmates see a doctor or medical staff and routinely refused to provide needed prescription medication for serious medical and mental health needs, that policy is unconstitutional.[3]  The City's objection appears more properly reserved for a hearing on whether a subclass should be created under Rule 23 and whether some of the named Plaintiffs who did not suffer from serious denials of medical care could properly represent such a subclass, assuming the other requirements of Rule 23 were met.  It is certainly not a Rule 10 defect.  The City cites no authority, let alone authority for its extraordinary request to dismiss the Complaint based on its lack of understanding of the medical conditions factual allegations.

### III.    The City's Motion Fails To Contest the Legal Claims on the Merits

The Complaint describes what happened to each named Plaintiff in detail, making factual allegations clearly sufficient to state the elements of the constitutional claims raised.  The City's argument that the "elements," Doc. 9 at 7, of those claims are not met is actually a different argument that various doctrines like *Heck* and *Rooker-Feldman* apply to bar suit in federal court.

---

[3] Moreover, the policy of not attending to basic medical needs was cited by the Plaintiffs as part of a constellation of evidence of the intent and effect of the City impermissibly to punish detainees outside the context of a valid conviction, which is part of the legal standard for conditions of confinement cases under the Fourteenth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 537 (1979).

The City does not meaningfully dispute, let alone support with argument or citation, that the substantive elements of constitutional violations have been stated.

### A.  The City's Due Process Argument Fails Because *Heck* Is Not Applicable Here

The City's invocation of *Heck v. Humphrey*, 512 U.S. 477 (1994), misunderstands both *Heck* and the circumstances of this case.  The *Heck* doctrine establishes that state convicts cannot use § 1983 as an end run around habeas corpus.  But *Heck* applies when a person challenges a criminal conviction or sentence—when the ruling in federal court would "would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487.  The Plaintiffs in this case do not challenge their conviction or their sentence pursuant to that conviction.  Nowhere in the Complaint do the Plaintiffs seek any relief that would imply that they were improperly convicted of the traffic and other minor offenses for which they owe money, and nowhere do they challenge the fines and fees imposed by the City in those cases.  This case is about subsequent arrests and indefinite detentions the constitutionality of which has no bearing on the validity of guilt in a traffic case or the propriety of the amount of fine originally assessed.  Indeed, one of the central claims of this case is that the Plaintiffs were detained and ransomed entirely apart from any judicial process, let alone pursuant to a valid conviction and sentence.  The City itself, several pages later in a different section, concedes that the "Plaintiffs have not clearly alleged formal adjudications of guilt regarding their incarcerations."  Doc. 9 at 13.  If this Court finds that the City's scheme of collecting unpaid debts on old monetary judgments violates the constitution in the ways alleged in the Complaint, none of the Plaintiffs' original convictions and judgments would be called into question.

### B.  The City's Due Process Argument Fails Because *Rooker-Feldman* Is Inapplicable

The City's *Rooker-Feldman* argument misunderstands that doctrine.  The Supreme Court most recently addressed the doctrine in *Exxon Mobil v. Saudi Basic*, 544 U.S. 280 (2005).  The

Court definitively rejected an expansive reading of the doctrine and admonished that *Rooker-Feldman* is a "narrow" doctrine "confined to … cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284*; see also Sophocleus v. Alabama Department of Transportation*, 605 F. Supp. 2d 1209, 1213-17 (M.D. Ala. 2009) (explaining the history and application of *Rooker-Feldman* doctrine after *Exxon*). Simply put, the doctrine is designed to prevent those who bring a state court case and lose from essentially re-bringing that case in federal court in an attempt to overturn the state-court judgment.

The City's argument is hard to understand, but it appears to be predicated on the City's belief that the Plaintiffs "ultimately state that their damages sustained pursuant to each and every count resulted in unconstitutional judgments." Doc. 9 at 10. This comment is the only explanation offered for the City's *Rooker-Feldman* argument. As the Complaint makes clear, the Plaintiffs are not attacking any state court judgment. Nor have they litigated these civil rights claims in a state forum and lost.

The City's corresponding footnote reveals the City's basic misunderstanding both of the *Rooker-Feldman* doctrine and the Plaintiffs' claims: the Plaintiffs are not seeking "de novo" trials or any kind of review of their municipal convictions. *See* Doc. 9 at 10 n.5. They do not challenge any state court judgments in this case. They raise freestanding civil rights violations committed by the City and its employees and agents arising out of a post-judgment municipal scheme to collect money from old judgments.[4] They are seeking an order protecting them from being unlawfully jailed again and a judgment compensating them for illegal arrests, indefinite detentions

---

[4] As discussed *infra* at Part III.C.5, Missouri law provides that the City has a wide range of civil tools with which to collect money judgments. *See* Mo. Stat. § 560.031 (5). The Complaint alleges that the City instead chose to use its police and jails in a manner that violates federal constitutional rights.

outside of any legal process, and abhorrent jail conditions.  The City's *Rooker-Feldman* argument

fails, then, for similar reasons as its *Heck* argument.

### C.  The City Does Not Meaningfully Contest the Merits of the Plaintiffs' Claims

### 1.  Due Process and Equal Protection

#### a.  Due Process

Although the City does not identify or contest the constitutional principles at issue in this

case, those principles are well-established.  In *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983),

the Supreme Court explained that to "deprive a probationer of his conditional freedom simply

because, through no fault of his own he cannot pay a fine … would be contrary to the fundamental

fairness required by the Fourteenth Amendment."  As a result, *Bearden* held that a court must

engage in a meaningful inquiry into whether the failure to pay was "willful."  *Id*. at 672.  The

Supreme Court criticized the local court's lack of attention to the constitutional principles that

ensure that the poor will not be jailed because they are poor:

> The focus of the [state] court's concern, then, was that the petitioner had disobeyed
> a prior court order to pay the fine, and for that reason must be imprisoned.  But this
> is no more than imprisoning a person solely because he lacks funds to pay the fine,
> a practice we condemned in *Williams* and *Tate*. By sentencing petitioner to
> imprisonment simply because he could not pay the fine, without considering the
> reasons for the inability to pay or the propriety of reducing the fine or extending
> the time for payments or making alternative orders, the court automatically turned
> a fine into a prison sentence.

*Id*. at 674.  While *Bearden* has constituted the definitive articulation of the Supreme Court's

jurisprudence on jailing the poor for nonpayment of fines for over 30 years, it was itself founded

on a long line of precedent.  In *Tate v. Short*, 401 U.S. 395, 398 (1971), the Court held that

imprisoning a defendant who was unable to pay a fine violated the Fourteenth Amendment: "[T]he

Constitution prohibits the State from imposing a fine as a sentence and then automatically

converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the

fine in full." *See Bearden*, 461 U.S. at 667-68 (holding that "if [a] State determines a fine or restitution to be the appropriate and adequate penalty for [a] crime, it may not thereafter imprison a person solely because he lacked the resources to pay it"). These cases and the cases that they rely on articulate some of the most fundamental principles of the American legal tradition. *See Griffin v. Illinois*, 351 U.S. 12, 19 (1956) ("There can be no equal justice where the kind of trial a man gets depends on the amount of money he has.").[5]

The Supreme Court has made clear that the basic principles forbidding jailing people for their poverty constitute a mixture of its equal protection and due process doctrines. *Bearden,* 461 U.S. at 665 ("Due process and equal protection principles converge in the Court's analysis in these cases."). The substance of the legal doctrine forbids a government from jailing a person for nonpayment unless the person had the ability to pay but willfully refused. In *Turner v. Rogers*, 131 S. Ct. 2507, 2520 (2011), the Supreme Court explained the procedural component to these cases: the state must figure out whether the nonpayment was willful in an open and fair way. *Turner* held that South Carolina's incarceration of a man for unpaid child support payments "violated the Due Process Clause" because the court had imprisoned him without complying with sufficient process. Whether the jailing is pursuant to probation revocation proceedings as in

---

[5] The federal courts have scrupulously guarded these rights. In *Frazier v. Jordan*, 457 F.2d 726, 728–29 (5th Cir. 1972), the court held that an alternative sentencing scheme of $17 dollars or 13 days in jail was unconstitutional as applied to those who could not immediately afford the fine. Because those people would be jailed if they could not pay the $17 fine, the city court's order of imprisonment was unconstitutional. *Id*. at 728 (condemning the municipal court scheme because it created a system in which "[t]hose with means avoid imprisonment [but] the indigent cannot escape imprisonment."); *see also, e.g., Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977) ("To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws."), vacated as moot, 439 U.S. 1041, (1978); *De Luna v. Hidalgo County*, 853 F. Supp. 2d 623, 647-48 (S.D. Tex. 2012) ("[T]he Court finds that … before a person charged with a … fine-only offense may be incarcerated by Hidalgo County for the failure to pay assessed fines and costs, this deprivation of liberty must be preceded by some form of process that allows for a determination as to whether the person is indigent and has made a good faith effort to discharge the fines, and whether alternatives to incarceration are available."); *United States v. Waldron*, 306 F. Supp. 2d 623, 629 (M.D. La. 2004) ("It is well established that our law does not permit the revocation of probation for a defendant's failure to pay the amount of fines if that defendant is indigent or otherwise unable to pay. In other words, the government may not imprison a person solely because he lacked the resources to pay a fine.").

*Bearden*, pursuant to formal contempt proceedings as in *Turner*, or pursuant to no recognizable legal process as in Ferguson, the Court explained the basic procedural protections that a government must provide before jailing a person for non-payment:

> Those safeguards include (1) notice to the defendant that his "ability to pay" is a critical issue in the … proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.

*Id*. at 2519.  The Court held that Turner's imprisonment was unconstitutional because the South Carolina court did not comply with the procedures that were essential to "fundamental fairness":

> He did not receive clear notice that his ability to pay would constitute the critical question in his civil contempt proceeding.  No one provided him with a form (or the equivalent) designed to elicit information about his financial circumstances. The court did not find that Turner was able to pay his arrearage, but instead left the relevant "finding" section of the contempt order blank. The court nonetheless found Turner in contempt and ordered him incarcerated. Under these circumstances Turner's incarceration violated the Due Process Clause.

*Id*. at 2520.

The City flagrantly violated these basic principles as a matter of daily routine.  The City locked the Plaintiffs up when they did not pay and told the Plaintiffs and their families—who have no obligation to pay the debts of an indigent relative—that the person would not be released until *someone* came up with some money.  *See generally* Doc. 1 at ¶¶ 20-163.  They then negotiated and bargained with the Plaintiffs and their families, releasing them on smaller amounts of money or, eventually, for free when it became clear that neither the person nor anyone that the person knew could come up with anything.  Doc. 1 at ¶ 174.  That is "extortion," not justice.

Ferguson routinely did not even bother to hold any hearings, let alone to hold the kind of hearing required by the U.S. Constitution.  Indeed, the Plaintiffs' jailing was indefinite precisely because the duration was not pursuant to any revocation finding as in *Bearden* but instead was

determined solely by how much money they could pay and the whim of City officials concerning when they would be released.  When the City did conduct court hearings, people were not provided any meaningful inquiry into their indigence.  *See, e.g.*, Doc. 1 at ¶ 190.  As a result, the City set up a scheme that routinely kept people in jail in cases in which the entire process could be ended by making a monetary payment without providing them any opportunity to demonstrate their inability to pay.  The City does not cite or engage with any of this precedent, and the Motion must be denied.

### b.  Equal Protection

The City fundamentally misunderstands the nature of the equal protection claim and fails to cite any of the relevant case law.  Instead, the City argues that the claim raised by the Plaintiffs requires that "non-indigent plaintiffs were provided an indigency hearing."  Doc. 9 at 11. According to the City, the purported defect of the Complaint is that, even though the Plaintiffs never received any meaningful inquiry into their indigence, the City's failure to provide that inquiry is not an equal protection violation because the Plaintiffs did not allege that wealthier people got indigence hearings.  *Id.*

Aside from the absurdity of giving indigence hearings to wealthier people who paid their fines and fees, this argument can only be made by ignoring the precedent discussed above.  The Equal Protection Clause forbids practices that result in the deprivation of the fundamental right to liberty for those who cannot make a monetary payment.  *See supra* Part III.C.1.a.  The equal protection violation alleged in Count one of the Complaint consists of throwing poor people who owe costs and fines in jail when wealthier people avoid jail solely by virtue of their financial resources.  That is not the kind of legal system that the Constitution envisions.  *See Griffin,* 351 U.S. at 19.  The City's misunderstanding of the equal protection claim stems from its lack of citation to controlling precedent rather than insufficient pleading.  The Motion should be denied.

## 2.  The Right to Counsel

The City's argument with respect to Count 2 lacks any substance.  The Plaintiffs allege that they are entitled to counsel in complicated debt-collection proceedings at which they are jailed and at which the government is represented by an experienced lawyer.  *See Turner*, 131 S. Ct. at 2520 (holding that counsel was not required in a child support proceeding because the civilian adversary was not represented by counsel and expressly relying on the fact that the case did not involve collection of money by the government in a proceeding in which the government was represented by counsel) (citing *Johnson v. Zerbst*, 304 U.S. 458, 462–463 (1938) ("[T]he average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel."); *see also State v. Stone*, 268 P.3d 226 (Wash. App. 2012) (applying *Turner* to require counsel in proceedings for contempt for nonpayment of court debt when the government is represented by a state prosecutor).

The Plaintiffs allege that the City does not provide lawyers to indigent people in debt-collection proceedings pursued by City lawyers in which those people are jailed and which involve complicated state and federal legal and factual inquiries.  Doc. 1 at ¶ 192.  They also allege that the City jails them for allegedly violating payment plan orders or conditions arising from underlying cases in which they were likewise unrepresented by counsel.  *Cf., e.g.*, *Alabama v. Shelton*, 535 U.S. 654, 658 (2002) ("We hold that a suspended sentence that may end up in the actual deprivation of a person's liberty may not be imposed unless the defendant was accorded 'the guiding hand of counsel' in the prosecution for the crime charged.") (quotation marks omitted).  In *Shelton*, even the state conceded that counsel would be required at the moment that it later tried to imprison a person for violating a previously imposed condition.  *Id*. at 672.  Citing

the principles articulated in *Shelton,* the Fourth Circuit expressed doubts about jailing a person for violating conditions imposed in previous proceedings in which she lacked counsel. *United States v. Pollard*, 389 F.3d 101, 105 (4th Cir. 2004) ("We also acknowledge, as did the Fifth Circuit, that the actual imposition of a prison term upon revocation of probation may pose Sixth Amendment problems if the defendant was uncounseled for the underlying conviction that led to probation."); *United States v. Perez-Macias*, 335 F.3d 421, 428 (5th Cir. 2003) ("The actual imposition of a term of imprisonment upon probation revocation may pose a Sixth Amendment problem."); *id.* at 428 n.15 (noting that the Solicitor General and the Department of Justice conceded that "if an indigent misdemeanor defendant neither had counsel nor validly waived the right to appointed counsel, the defendant cannot be sentenced to imprisonment upon revocation of his probation"). But that is essentially what the City does: it collects money from fines after a conviction by requiring people to meet onerous conditions and then jails them when they do not meet them—all without providing counsel either prior to the imposition of the conditions or at the time of the purported violation of those conditions.  The City does not reference these principles and does not move to dismiss based on any disagreement with them.

The City instead makes confusing comments about the purported right to represent oneself. Doc. 9 at 11-12.  Whatever one thinks about a person's waiver of their important right to counsel, the Complaint alleges that the City proceeded without appointing counsel or obtaining valid waivers.  The claim should not be dismissed.

### 3.  Arbitrary and Indefinite Detention

The City does not attempt to make any legal argument justifying its policy, pattern, and practice of holding people in its jail until they come up with enough money to satisfy the City or until City officials decide to let them out for free.  It is not surprising that the City is not able to

find a single case to support the indefinite detention of inmates pursuant to no valid legal process and subject only to the vicissitudes of their families' finances and the whims of City jail staff.  The Motion must be denied for that reason alone.  *See* E.D. Mo. L. R. 7-4.01.

In any event, the arbitrary and lawless detention carried out by the City outside of any formal legal process and indefinite in its duration raises clear constitutional problems.  *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects.   And this Court has said that government detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, in certain special and narrow non-punitive circumstances where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint.") (quotation marks and citations omitted).  Nor can such detention be based solely on a person's access to money.   "At the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible."  *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (*en banc*); *see also id.* at 1057 ("The incarceration of those who cannot [afford a cash payment], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.").

Each of the named Plaintiffs allege that, after they were arrested and taken to the Ferguson jail, they were told that they would be held there indefinitely, unless or until they paid enough money to get out or until their jailors decided to let them go for free.  *See, e.g.*, Doc. 1 at ¶¶ 28, 64, 77, 94, 116, 142.  The Complaint alleges that the City and its employees, officers, and agents have openly practiced this policy for years.  Doc. 1 at ¶¶ 170, 172, 181.  These detailed allegations,

including the standard practice of City officials to thereafter bargain amounts of money to secure release from detention, clearly state a claim for the violation of the Due Process Clause of the Fourteenth Amendment.  The City makes no attempt to confront this claim.

### 4.  Jail Conditions

The City claims that it cannot tell which constitutional provision the Plaintiffs rely on. Citing to ¶ 200, the City argues that the Plaintiffs "invoke" the Eighth Amendment.  Doc. 9 at 13. This is a misreading of the Complaint.  In ¶ 200, the Plaintiffs state that the jail conditions are so deplorable that they "would be" in violation of the Eighth Amendment "even were convicted prisoners treated with such callous disregard to basic health and safety."  Doc. 1 at ¶ 200.  The Plaintiffs allege that the City "forces these conditions on pretrial detainees and post-judgment debtors" and *not* pursuant to any conviction.  *Id*.  In Count Four, the Plaintiffs thus allege that the jail conditions "violate due process" and "constitute impermissible punishment unrelated to serving any criminal judgment," Doc. 1 at ¶ 241, which is the legal standard under the Due Process Clause.  *See Bell v. Wolfish*, 441 U.S. 520, 537 (1979); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989) ("Their confinement conditions are analyzed under the due process clause … rather than the Eighth Amendment's 'cruel and unusual punishment' standard which is used for convicted prisoners.  The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose or those that are rationally related but are excessive in light of their purpose.").  As the Eighth Circuit has explained, the Court must examine the totality of these conditions.  *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010) ("In considering whether the conditions of pretrial detention are unconstitutionally punitive, we review the totality of the circumstances of a pretrial detainee's confinement.").

In any event, the factual allegations in the Complaint, if true, state violations of either the Eighth Amendment's "deliberate indifference" standard or the Fourteenth Amendment's inquiry into whether jail conditions are "not reasonably related to a legitimate goal" or "excessive in light of their purpose" and therefore constitute impermissible punishment.[6]  *Wolfish*, 441 U.S. at 539. The Plaintiffs allege far more than "routine discomfort."  Doc. 9 at 14.  They allege a constellation of conditions, many of which on their own constitute freestanding constitutional violations and the combination of which alleges deliberate disregard of basic human needs and a pervasive system of punishment.  The conditions feed into and reinforce each other: the filthy cells caked with feces, blood, and mucus are exacerbated by the lack of soap or hygiene or cleaning materials, which in turn is exacerbated by the lack of medical care and the lack of access to laundry.  The City's Motion entirely ignores most of these alleged deprivations and many others, such as the undrinkable water, the lack of mental health care, the lack of exercise, the insufficient identical daily diet of a honey bun and two pot pies, the cold conditions causing inmates to huddle together and shiver, and many of the other conditions stated throughout the Complaint and alleged comprehensively in ¶ 196.[7]

---

[6]In *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994), the court considered the case of two cell mates, one of whom was a pretrial detainee and another a convicted prisoner, who complained of a dirty cell for a few hours prior to being given cleaning supplies.  Ignoring the Eighth Circuit's previous decisions, including *Johnson-El*, the court stated that, because it had not yet determined the open question of whether to apply different standards for pretrial detainees and convicted prisoners, it would apply the same standard of "deliberate indifference" in that case. *Whitnack*'s informal application of the Eighth Amendment standard without holding which standard applied is inconsistent with circuit precedent and with the *Wolfish* rule that due process is violated by conditions that amount to punishment of an unconvicted person, including conditions that are not related to a legitimate governmental goal. Other circuits apply that *Wolfish* standard to the claims of non-convicted prisoners.  *See, e.g.*, *Magluta v. Samples*, 375 F.3d 1269, 1277 (11th Cir. 2004); *Hubbard v. Taylor*, 399 F.3d 150, 159 (3d Cir. 2005).  *Whitnack*'s support for stating that the question remained open was a footnote in *Johnson-El* that was limited to *medical* claims and that itself explained that "a more stringent standard should be appropriate in assessing [pretrial detainees'] claims of inadequate medical care" than convicted prisoners.  *Johnson-El*, 878 F.2d at 1055 n.8.  Because no medical standard had yet been "clearly established," it applied the "deliberate indifference" standard *only for the purposes of a qualified immunity inquiry* against individual employees, which is not relevant in this case of municipal liability.  *Id.*

The Eighth Circuit recognized the problematic ambiguity with *Whitnack* more recently.  In *Stickley v. Byrd*, 703 F.3d 421, 423 (8th Cir. 2013), the court left open the issue but stated that pretrial detainees are entitled to "at least as great protection as that afforded convicted prisoners" and stated that the test was whether "the detainee's conditions of confinement amount to punishment."  In any event, *Wolfish* and *Johnson-El* settled the question long ago.

[7]The City claims that the Plaintiffs do not specify "which alleged deprivation listed in their Complaint were experienced by which Plaintiff and which, of these serves as their basis for this cause of action."  Doc. 9 at 15.  The

16

Not only are these serious deprivations of basic human needs callous, but they are entirely unconnected to any legitimate interest of the City's government and shocking in twenty-first century America.

Any reasonable reading of the Complaint reveals that, if true, these conditions make out a constitutional violation and must be stopped.  *See, e.g.*, *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (finding constitutional violations for a cell and mattress covered in filth and human waste, the lack of cleaning supplies or laundry, and a dirty blanket); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (identifying "food, warmth, or exercise" as "human need[s]" and offering "a low cell temperature at night combined with a failure to issue blankets" as an example of a violation); *Stickley v. Byrd*, 703 F.3d 421, 423 (8th Cir. 2013) (holding that pretrial detainees are entitled to "reasonably adequate sanitation, personal hygiene, and laundry privileges"); *Johnson-El*, 878 F.2d at 1052-55 (holding that detainees are entitled to meaningful access to legal materials, basic sanitation, and the "rudiments of medical service"); *Tyler v. United States*, 602 F. Supp. 476, 478 (E.D. Mo. 1984) ("The uncontroverted testimony showed a lack of the most basic sanitary facilities including ordinary bedding, change of clothing, and items such as toothbrushes and toilet paper. Prisoners had no opportunity to wash their hands or to shower….").

---

City is wrong on both fronts.  First, the Plaintiffs alleged standard and routine policies and practices applied by the City jail staff across the board in the management of the jail.  The specific sections pertaining to the named Plaintiffs then listed some of the particular deprivations suffered by each person and alleged that the person suffered "materially the same" conditions described elsewhere in the Complaint.  *See, e.g.*, Doc. 1 at ¶¶ 35, 59, 68, 95, 109, 152.  Had the Plaintiffs copied and pasted the lengthy factual allegations about the City's standard jail conditions into the narrative for *each* Plaintiff, the City would no doubt have complained that the result was too long, "redundant," and "scandalous."  Second, the Plaintiffs made clear that it was the totality of these conditions of confinement that amounted to unlawful punishment of people who had not been convicted of an offense.  Doc. 1 at ¶ 199; *see Zefferi*, 601 F.3d at 810; *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir.1983) ("Our inquiry into whether given conditions constitute 'punishment' must therefore consider the totality of circumstances within an institution"); *Jones v. Diamond*, 636 F.2d 1364, 1368 (5th Cir.1981) ("In determining whether conditions of confinement are unconstitutional under ... the fourteenth amendment, we do not assay separately each of the institutional practices, but look to the totality of the conditions.") (overruled on other grounds).

17

Although the City cites and quotes some cases in this section, the City does not actually argue that the conditions described in the Complaint, if true, are lawful.

**5.  The City's Onerous and Unlawful Methods of Debt Collection**

The City's argument with respect to Count Five is that: "the Plaintiffs simply are not legally similarly situated to individuals owing money to private creditors." Doc. 9 at 16.  The City's three-sentence argument again fails to cite a single legal case, let alone the controlling Supreme Court precedent that directly contradicts the City's argument.  The Motion should be denied.

In *James v. Strange*, 407 U.S. 128 (1972), the Supreme Court confronted Kansas's attempt to collect fees and costs from defendants in criminal cases.  Kansas was attempting to use harsh collection techniques for these court fees and costs, including depriving the indigent defendants of standard available protections under state law for judgment debtors.  For example, Kansas was not allowing criminal defendants to use exemptions relating to the amount of a person's disposable earnings subject to garnishment.  *Id*. at 135.  The Court struck down Kansas's scheme because Kansas was essentially taking advantage of its status as the government to impose stringent debt-collection methods that private creditors could not.  *Id*. at 139.  The Court wrote:

> We recognize, of course, that the State's claim to reimbursement may take precedence, under appropriate circumstances, over the claims of private creditors and that enforcement procedures with respect to judgments need not be identical. This does not mean, however, that a State may impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than to a private creditor.

*Id*. at 138.  The Supreme Court explained the rationale for its decision: "The debtor's wages are his sustenance, with which he supports himself and his family."  *Id*. at 135.  The Supreme Court explained that, for all other debtors in Kansas other than criminal defendants, "the maximum which can be garnished is the lesser of 25% of a debtor's weekly disposable earnings or the amount by which those earnings exceed 30 times the federal minimum hourly wage."  *Id*. at 136.  "For Kansas

18

to deny protections such as these to the once criminally accused is to risk denying him the means needed to keep himself and his family afloat." *Id.* (emphasis added).

This fear is exactly the desperation into which the Plaintiffs have been thrown by the City of Ferguson's scheme. The City's standard practice is to ensnare judgment debtors for years in a cycle of onerous payment plans with standard monthly payment amounts set entirely without reference to their individualized circumstances and in clear violation of Missouri law concerning how creditors can pursue judgments. The City's orders routinely flout state law, *see* Mo. Stat. § 513.430, by requiring money to come from veterans benefits, social security disability benefits, or other public assistance for the needy, and they often amount to over 25% of a person's income. The Complaint vividly describes all of the onerous features of this system that a private creditor could never impose, including jail, threats of jail, repeated monthly court appearances for years, extra fees and surcharges, suspended drivers' licenses, reset debts after missed appearances, ignored exemptions, and more. Doc. 1 at ¶ 243.

Under *Strange*, the City cannot be permitted to collect debts from the Plaintiffs in a manner so wildly out of line with how state law mandates judgments to be collected from other debtors. The Equal Protection Clause requires "more even treatment of indigent criminal defendants with other classes of debtors." 407 U.S. at 141. As the Supreme Court concluded:

> State recoupment laws, notwithstanding the state interests they may serve, need not blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect. The statute before us embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law.

*Id*. at 141-42; *see also, e.g.*, *Fuller v. Oregon*, 417 U.S. 40, 47 (1974) (upholding Oregon scheme when "[t]he convicted person from whom recoupment is sought thus retains all the exemptions accorded other judgment debtors, in addition to the opportunity to show at any time that recovery of the costs of his legal defense will impose 'manifest hardship"); *Olson v. James*, 603 F.2d 150,

19

154 (10th Cir. 1979) ("[T]he Court held that indigent defendants were entitled to evenhanded treatment in relationship to other classes of debtors."); *United States v. Bracewell*, 569 F.2d 1194, 1198-1200 (2d Cir. 1978) (discussing the need for individualized consideration of repayment so as not to require repayment that creates hardship in violation of *Strange* and *Fuller*); *Alexander v. Johnson*, 742 F.2d 117, 124 (4th Cir. 1984) (upholding scheme of payments for appointed counsel costs as long as the indigent defendant is not "exposed to more severe collection practices than the ordinary civil debtor").

This case is far worse than *Strange*.  Kansas's rule of excluding criminal defendants from some garnishment protections did not nearly approach the City of Ferguson's extraordinary use of its police and jail systems to coerce the collection of debt that is often years old.  In Kansas, criminal defendants were merely barred from claiming certain garnishment exemptions (although they still retained other exemptions, such as the homestead exemption).  In Ferguson, by contrast, the City does not merely ignore garnishment protections; it has been using its control over the local jail to collect debt in a way that no private creditor ever could.  By arresting and then jailing people without regard to their ability to pay and without following any of the required procedures for determining ability to pay, and then holding them there indefinitely until they or their families bargain or pay, the City is depriving indigent debtors of every other state and federal legal protection afforded to debtors.  The City has thereby turned debt collection from fees, fines, costs, and surcharges into what looks like a colonial-era debtors' prison system without any of the rules, procedures, statutes, institutions, and principles that distinguish modern American law.

To demonstrate the incongruity of this scheme, consider if an indigent traffic debtor in Ferguson took out a private loan to pay off the City for the old traffic costs and fees, thereby stopping all City debt-collection proceedings.  If the person subsequently was unable to pay back

that loan, the private creditor could not show up at the traffic debtor's home, arrest the debtor, and then throw the debtor in jail until the person paid an arbitrary amount determined and changed each day by the creditor's employees.  But because the City is the creditor here, it has taken it upon itself, with no support in state or federal law, to impose those harsh debt collection practices solely because the debt is to the "public treasury."  *Strange*, 407 U.S. at 138.  This is a far more extreme abrogation of impoverished people's rights than what the Supreme Court condemned in *Strange*.

Unpaid court fines and costs are civil judgments, and Missouri law provides that unpaid fines and costs can be collected in any manner authorized to collect a civil money judgment.  *See* Mo. Stat. § 560.031 (5).  Missouri, like Kansas and other states, provides important protections for civil judgment debtors.  For example, under Missouri and federal law, when a court orders garnishment, it cannot garnish more than 25% of a person's wages.  Mo. Stat. § 525.030; *see also* 15 U.S.C. § 1673 (prohibiting garnishment of more than 25% of a person's wages unless the person's "disposable earnings for that week exceed thirty times the Federal minimum hourly wage").  Moreover, Missouri guards against debt leading to extreme poverty by enshrining important protections of last resort: social security, unemployment, veteran's benefits and all other forms of public assistance benefits are exempt, and household property, furnishings, motor vehicles, and a wide range of other sources of income and property are exempt up to certain monetary thresholds.  Mo. Stat. § 513.430.  These state and federal rules make sense.  They recognize the principle of fundamental fairness embodied in Missouri law and Supreme Court precedent that a person cannot be forced to pay court fees and costs that he or she cannot afford both to pay and to meet the basic necessities of life.  *See Adkins v. E.I. DuPont de Nemours*, 335 U.S. 331, 339 (1948) ("We think an affidavit is sufficient which states that one cannot because of

his poverty pay or give security for the costs and still be able to provide himself and dependents with the necessities of life.").[8]

By ordering onerous payment plans and demanding larger lump sum payments on threat of jail without notifying people about or applying any of the well-established protections for judgment debtors, the City is seeking an end run around well-established state and federal law for the collection of debts.  It is only through this systemic illegality that the City is able routinely to collect money from the veterans' benefits, social security benefits, and minimal food budgets of the Plaintiffs and other Class members, as well as to extort money from their families and friends. This is exactly the kind of system that *Strange* outlawed over 40 years ago.

### 6.  The City's Unconstitutional Warrant Scheme

The Complaint detailed numerous flaws with the City's warrant policies and practices.  For example, the Plaintiffs alleged that the City's routine policy and practice was to issue warrants without probable cause to believe that any offense had been committed.  Doc. 1 at ¶ 203 (describing City policy to issue warrants—often for "failure to appear"—even though the person had not been ordered to appear, had not been given notice of the court appearance, had been known to the City to be in the custody of another jurisdiction, had not failed to appear at any court appearance, or had merely failed to make a payment).[9]  These factual allegations state a clear violation of the

---

[8] Missouri law defines indigence by reference to the federal poverty guidelines. *See* 18 Mo. Code Regs. Ann. 10-3.010.  Missouri's use of the federal poverty guidelines to define indigence is consistent with the baseline standards adopted by other states.  *See, e.g.*, Delaware Chancery Ct. P. X ("When in forma pauperis applicants have income and assets at or below 125% of the poverty level as published in the Code of Federal Regulations, their applications shall be approved."); Ala. Code § 15-12-1 (125%) ; Cal. Gov. Code § 68632 (125%); Minnesota Stat. Ann. § 563.01 (125%); Vermont Rules of Civil Procedure, Rule 3.1 (150%); Idaho Code Ann. § 19-854 (187%); Florida Stat. Ann. § 27.52(2)(a) (200%).  Most of these state standards also provide that a person qualifies if the person receives standard forms of public assistance for the needy.  Most major forms of public assistance also use the federal poverty guidelines. *See* http://aspe.hhs.gov/poverty/faq.cfm#programs.  The theory behind these standards is simple: a person cannot afford both to make payments and to meet the basic necessities of life.

[9] The Complaint provides examples. *See, e.g.*, Doc. 1 at ¶¶ 30, 43, 105.

Fourth Amendment, which requires all warrants to be based on probable cause. Because the City does not make any argument for the dismissal of this claim, the City's Motion should be denied.

Moreover, the Plaintiffs allege that the City's policy of allowing represented people automatically to remove warrants but not allowing unrepresented people to do the same violates equal protection. The City's policy results in the arrest and detention of unrepresented people when those who can hire an attorney would not be arrested and detained. Because freedom from physical confinement is a fundamental right, the City's disparate treatment must meet heightened scrutiny. *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (recognizing the "fundamental nature of this right" to pretrial liberty); *United States v. Montalvo-Murillo*, 495 U.S. 711, 716 (1990) (holding that release prior to trial is a "vital liberty interest"); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) ("[A] statutory classification based upon suspect criteria or affecting 'fundamental rights' will encounter equal protection difficulties unless justified by a 'compelling governmental interest.'").[10] In any event, there is not even a rational basis for allowing represented debtors or debtors who can afford to make monetary payments to remove warrants freedom while arresting and detaining unrepresented and impoverished debtors. *See, e.g.*, *State v. Blake*, 642 So. 2d 959, 966-67 (Ala. 1994) (striking down a rule that forced indigent arrestees to stay in jail for up to 72 hours prior to an initial hearing when wealthier arrestees were allowed to pay bond for their release because the Alabama Supreme Court could find no rational basis for such disparate

---

[10] Following *Salerno*'s heightened scrutiny, federal circuit courts have applied strict scrutiny when considering the government deprivation of bodily liberty. *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 779-81 (9th Cir. 2014) ("We apply heightened scrutiny here because the Proposition 100 laws infringe a 'fundamental' right."); *Pugh v. Rainwater*, 557 F.2d 1189, 1190 (5th Cir. 1977) (vacated on other grounds).

treatment).  The City once again fails to support its conclusory argument with a single citation to any relevant case law.  The Motion should be denied.

## IV.    The Plaintiffs Properly Seek Declaratory and Injunctive Relief

The City argues that the claims for declaratory and injunctive relief should be dismissed because "no actual controversy exists."  Doc. 9 at 19.  The City fundamentally misunderstands each of the legal doctrines that it cites.

First, the City argues that the declaratory judgment request should be dismissed for "lack of ripeness."  Doc. 9 at 19.  The City then appears to shift course and make arguments concerning "mootness."  Doc. 9 at 20.  Both sets of arguments are predicated on the City's belief that any future harms are "entirely speculative" because the Plaintiffs cannot show that they will "violate the law" again or that the City will apply the same policies and procedures to them if they violated the law in the future.  Doc. 9 at 21.  This argument is puzzling.  The point of the Plaintiffs' request for declaratory and injunctive relief is that they *still owe* debts to the City that the City is currently attempting to collect those debts using its unlawful policies and procedures.  But for the relief sought in this case, the City would be free to continue its flagrantly unlawful debt-collection practices.  That is the paradigmatic case for which such equitable relief was designed.  The City concedes as much when it subsequently asserts that it makes this argument because the Plaintiffs have not alleged "pending fines."  Doc. 9 at 21; *see also id.* at 22 (claiming that the Plaintiffs have not alleged that "that they currently owe fines to Defendant.").[11]  As the City knows, named

---

[11] The City argues in a footnote that, if the Plaintiffs were challenging "current confinement," Doc. 9 at 21 n.12, then *Younger v. Harris*, 401 U.S. 37, (1971), would bar jurisdiction.  First, as the City itself argued in the text, none of the plaintiffs are contesting any current confinement.  In any case, *Younger* does not apply here. The Supreme Court recently clarified that *Younger* abstention is confined to three "exceptional" circumstances, none of which are applicable here.  *Sprint Communications. v. Jacobs*, 134 S. Ct. 584, 591 (2013) (limiting *Younger* to when an injunction seeks: 1) to enjoin a pending state criminal prosecution; 2) to enjoin pending state civil enforcement proceedings closely related to and in aid of state criminal statutes, such as nuisance abatement; and 3) to enjoin pending state proceedings "uniquely in furtherance of the state courts' ability to perform their judicial functions," such as ongoing contempt proceedings).

Plaintiffs (as well as the Class that they seek to represent) have pending payment obligations to the City and alleged as much in the Complaint.  *See* Doc. 1 at ¶ 38 ("Ms. Fant still owes significant debts to the City. She is frightened that the City will again jail her indefinitely until she and her family can pay enough to secure her release."); *see also e.g.,* ¶¶ 60; 73; 86; 96; 112; 123; 140.

Second, the City argues that the Plaintiffs should not be issued a "preliminary injunction." Doc. 9 at 21-22.  The City confuses the final injunctive relief requested in the Complaint with a motion for a preliminary injunction.  The Plaintiffs have not made a motion for a preliminary injunction.  The legal factors cited by the City, Doc. 9 at 22, are applicable only to preliminary injunctions seeking immediate equitable relief *prior* to a final decision on the merits.  Should the Plaintiffs make a request for a preliminary injunction, the parties and the Court can engage in an analysis of those factors at that time.[12]

Respectfully submitted,


 */s/ Alec Karakatsanis*
Alec Karakatsanis (E.D.Mo. Bar No. 999294DC)

Equal Justice Under Law

---

Here, none of the Plaintiffs have pending criminal prosecutions.  They merely owe money from civil judgments, and the City of Ferguson is attempting to collect that money.  As the City does not dispute, *Younger* has never been applied to debt-collection proceedings.  Such an expansion of *Younger* to post-judgment debt collection would mark a dramatic departure from *Younger* and *Sprint*. Nothing in this case threatens the validity of any state court conviction or prosecution—it seeks only to ensure that the City complies with federal law as it seeks to collect money judgments for years after the conclusion of previous cases.  As another federal court recently held in the same circumstances in a case against another municipality employing similar tactics to jail court cost debtors: "the declaratory and injunctive relief sought by Plaintiffs is not intended to contradict or overturn the substance of the prior state court proceedings, but instead targets Childersburg's post-judgment procedure, removing the very concern that animates the *Younger* doctrine's concern with improper interference with a pending state proceeding.  *Ray v. Judicial Corrections Service*, 2013 WL 5428360, at *12 (N.D. Ala. Sept. 26, 2013).  Moreover, the City's open and flagrant conduct is such an affront to well-established constitutional rights that it falls within the "bad faith" exception to *Younger*, even if the Plaintiffs were trying to enjoin pending state criminal prosecutions. *See Dombrowski v. Pfister*, 380 U.S. 479 (1965); *Lewellen v. Raff*, 843 F.2d 1103, 1110 (8th Cir. 1988).  The City's debt-collection efforts would be terminated at any moment if the Plaintiffs were simply able to pay enough money—instead they are caught for years in a cycle of extortion and indefinite jailing at which they are forced to beg and bargain for their release.

12 The reference to the First Amendment in the introductory jurisdictional section of the Complaint was an oversight, as reflected by the fact that no other part of the Complaint, including the Claims for Relief section, discusses or mentions the First Amendment.  The Plaintiffs are not making a First Amendment claim.

916 G Street, NW Suite 701
Washington, DC 20001
(202)-681-2409
alec@equaljusticeunderlaw.org


 _/s/ Thomas B. Harvey_____
Thomas B. Harvey (MBE #61734)

 _/s/ Michael-John Voss_____
Michael-John Voss (MBE #61742)

ArchCity Defenders
812 N. Collins
Saint Louis, MO 63102
855-724-2489


 _/s/ John J. Ammann_____
John J. Ammann (MBE #34308)

 _/s/ Stephen Hanlon_____
Stephen Hanlon (MBE #19340)

 _/s/ Brendan Roediger _____
Brendan Roediger (E.D.Mo. Bar No. IL6287213)

Saint Louis University School of Law
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
314-977-2778

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy of this Response in Opposition Brief has, on March 9, 2015, been electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing upon counsel for the Defendant in this matter:

Peter J. Dunne
Robert T. Plunkert

PITZER SNODGRASS, P.C.
100 South Fourth Street, Suite 400
St. Louis, Missouri 63102-1821
(314) 421-5545
Counsel for Defendant – City of Ferguson


*/s/ Alec Karakatsanis*
Alec Karakatsanis

Attorney for the Plaintiffs