**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEILEE FANT, ROELIF CARTER, ALLISON NELSON, HERBERT NELSON JR., ALFRED MORRIS, ANTHONY KIMBLE, DONYALE THOMAS, SHAMEIKA MORRIS, DANIEL JENKINS, RONNIE TUCKER, TONYA DEBERRY, et al., | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:15-CV-00253-AGF |
| THE CITY OF FERGUSON | ) ) | (Jury Trial Demanded) |
| Defendant. | ) ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Introduction**

1.     The Plaintiffs in this case are each impoverished people who were jailed by the City of Ferguson because they were unable to make a monetary payment to the City arising from traffic tickets or other minor offenses.  In each case, the City kept a human being in its jail solely because the person could not afford to make a monetary payment.  Although the Plaintiffs pleaded that they were unable to pay due to their poverty, each was held in jail indefinitely and none was afforded a lawyer or the inquiry into their ability to pay that the United States Constitution requires.  Instead, they were threatened, abused, and left to languish in confinement at the mercy of local officials until their frightened family members could produce enough cash to buy their freedom or until City jail officials decided, days or weeks later, to let them out for free.

2.      Once locked in the Ferguson jail, impoverished people who cannot afford to pay the City endure grotesque treatment.  They are kept in overcrowded cells; they are denied toothbrushes, toothpaste, and soap; they are subjected to the constant stench of excrement and refuse in their congested cells; they are surrounded by walls smeared with mucus and blood; they are kept in the same clothes for days and weeks without access to laundry or clean underwear; they step on top of other inmates, whose bodies cover nearly the entire uncleaned cell floor, in order to access a single shared toilet that the City does not clean; they develop untreated illnesses and infections in open wounds that spread to other inmates; they endure days and weeks without being allowed to use the moldy shower; their filthy bodies huddle in cold temperatures with a single thin blanket even as they beg guards for warm blankets; they are not given adequate hygiene products for menstruation; they are routinely denied vital medical care and prescription medication, even when their families beg to be allowed to bring medication to the jail; they are provided food so insufficient and lacking in nutrition that inmates lose significant amounts of weight; they suffer from dehydration out of fear of drinking foul smelling water that comes from an apparatus on top of the toilet; and they must listen to the screams of other inmates languishing from unattended medical issues as they sit in their cells without access to books, legal materials, television, or natural light.  Perhaps worst of all, they do not know when they will be allowed to leave.

3.      These physical abuses and deprivations are accompanied by other pervasive humiliations.  Jail guards routinely taunt impoverished people when they are unable to pay for their release, telling them that they will be released whenever jail staff "feels" like letting them go.  As described in detail below, jail guards routinely and pervasively laugh at the inmates and humiliate them with discriminatory and degrading epithets.  For example, when filthy and

2

shivering women were forced to share blankets to stay warm, officers shouted at the women that they were "stanky ass dykes" and "dirty whores."

4.      City officials and employees—through their conduct, decisions, training and lack of training, rules, policies, and practices—have built a municipal scheme designed to brutalize, to punish, and to profit.  The architecture of this illegal scheme has been in place for many years.[1]

5.      In 2014, the City of Ferguson issued an average of more than 3.6 arrest warrants *per household* and almost 2.2 arrest warrants *for every adult*, mostly in cases involving unpaid debt for tickets.[2]  The City of Ferguson issues more arrest warrants per capita than any other city in Missouri larger than 10,000 residents.  If the rest of the Saint Louis metropolitan area generated revenue from its courts at the rate done by relatively low-income Ferguson, it would have made nearly $1.3 billion in the past five years.

6.      The City's modern debtors' prison scheme has been increasingly profitable to the City of Ferguson, earning it millions of dollars over the past several years.  It has also devastated the City's poor, trapping them for years in a cycle of increased fees, debts, extortion, and cruel jailings.  The families of indigent people borrow money to buy their loved ones out of jail at rates set arbitrarily by jail officials, only for them later to owe more money to the City of Ferguson from increased fees and surcharges.  Thousands of people like the Plaintiffs take money from their disability checks or sacrifice money that is desperately needed by their families

---

[1] *See, e.g.*, T.E. Lauer, *Prolegomenon to Municipal Court Reform in Missouri*, 31 Mo. L. Rev. 69, 93 (1966) ("Our municipal jails are, in almost every case, nothing but calabooses suited at best for temporary detention. The worst of them are comparable with medieval dungeons of the average class; they are the shame of our cities."); *id.* at 88 ("[I]t seems that many citizens of the state are being confined needlessly in our city jails….."); *id.* at 85 ("[I]t is disgraceful that we do not appoint counsel in our municipal courts to represent indigent persons accused of ordinance violations."); *id*. at 90 ("It is clear that many municipalities have at times conceived of their municipal courts in terms of their revenue-raising ability….").

[2] In 2013, the City again issued more than 3.6 arrest warrants per household and 2.2 arrest warrants for every adult.

for food, diapers, clothing, rent, and utilities to pay ever increasing court fines, fees, costs, and surcharges.  They are told by City officials that, if they do not pay, they will be thrown in jail. The cycle repeats itself, month after month, for years.

7.     The treatment of Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, Shameika Morris, Daniel Jenkins, Ronnie Tucker, and Tonya Deberry reveals systemic illegality perpetrated by the City of Ferguson against some of its poorest people.  The City has engaged in the same conduct, as a matter of policy and practice, against many other impoverished human beings on a daily basis for years, unlawfully jailing people if they are too poor to pay money bonds and debts from traffic tickets and other minor offenses.  The result is a Dickensian system that flagrantly violates the basic constitutional and human rights of our community's most vulnerable people.

8.     By and through their attorneys and on behalf of a class of similarly situated impoverished people, the Plaintiffs seek in this civil action the vindication of their fundamental rights, compensation for the violations that they suffered, injunctive relief assuring that their rights will not be violated again, and a declaration that the City's conduct is unlawful.  In the year 2015, these practices have no place in our society.[3]

### Nature of the Action

9.     It is and has been the policy and practice of the City of Ferguson to jail people when they cannot afford to pay cash bonds and/or debts owed to the City resulting from traffic tickets and other minor offenses without conducting any inquiry into the person's ability to pay and without considering alternatives to imprisonment as required by federal and Missouri law.

[3] The Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.  The Plaintiffs have attempted to obtain basic jail and court records from the City, but have so far been unable to do so.

10.     It is and has been the policy and practice of the City to jail indigent people for debts without informing them of their right to counsel and without providing adequate counsel or a neutral finding of probable cause in a prompt manner.

11.     It is and has been the policy and practice of the City to hold prisoners in the City jail indefinitely unless and until the person's family or friends can make a monetary payment sufficient to satisfy the City.  It is and has been the policy and practice of the City to bargain with inmates and their families on an amount of money that the City will accept for release.

12.     It is and has been the policy and practice of the City to arbitrarily and incrementally reduce the amount of money required for release throughout a person's indefinite detention, eventually releasing the person for free if the City determines that it is unlikely to profit from further detention.

13.     It is and has been the policy and practice of the City to issue and enforce invalid arrest warrants, to threaten debtors that they will be jailed if they do not show up with money, to hold arrestees in jail for days or more than a week without any judicial appearance, and to set and subsequently modify monetary payments necessary for release arbitrarily and without any formal process.

14.     It is and has been the policy and practice of the City to confine impoverished people who cannot afford their release in grotesque, dangerous, and inhumane conditions.

15.     The Plaintiffs seek declaratory, injunctive, and compensatory relief.

## Jurisdiction and Venue

16.      This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq*., and the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

17.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

18.     Plaintiff Keilee Fant is a 37-year-old woman.  Plaintiff Roelif Carter is a 62-year-old man.  Plaintiff Allison Nelson is a 23-year-old woman.  Plaintiff Herbert Nelson Jr. is a 26-year-old man.  Plaintiff Alfred Morris is a 62-year-old man.  Plaintiff Anthony Kimble is a 53-year-old man.  Plaintiff Donyale Thomas is a 36-year-old woman.  Plaintiff Shameika Morris is a 30-year-old woman.  Plaintiff Daniel Jenkins is a 27-year-old man.  Plaintiff Ronnie Tucker is a 50-year-old man.  Plaintiff Tonya DeBerry is a 52-year-old woman.  All of the named Plaintiffs are residents of Saint Louis County.

19.     Defendant City of Ferguson is a municipal corporation, organized under the laws of the State of Missouri.  The Defendant operates the Ferguson City Jail and the Ferguson Municipal Court.

## Factual Background

**A.      The Plaintiffs' Imprisonment**

**i.    Keilee Fant**

20.     Keilee Fant is a 37-year-old woman and single mother.  She works as a certified nurse's assistant and has been trying to support her family by doing similar work on and off for nearly 20 years.  In the past two decades, the City of Ferguson has jailed Ms. Fant more than a dozen times for her inability to make monetary payments on old traffic tickets.

21.     Ms. Fant was arrested while taking her children to school in October 2013.[4]  She was taken to jail in the City of Jennings because of old traffic tickets in that city, and she was told by Jennings jail staff that she would not be released unless she paid $300.  She informed jail

---

[4] As is the case for thousands of people, many of Ms. Fant's traffic tickets have resulted from her inability to afford to pay her *other* tickets, which has prevented her from getting her driver's license back because of a state and municipal government policy and practice of invalidating licenses for those who cannot afford to pay old tickets.

staff that she could not afford to pay $300 to the City of Jennings.  After three days in jail, Jennings let her out for free.

22.     Ms. Fant's supposed "release" from Jennings's custody was just the beginning of a Kafkaesque journey through the debtors' prison network of Saint Louis County—a lawless and labyrinthine scheme of dungeon-like municipal facilities and perpetual debt.  Every year, thousands of Saint Louis County residents, including the Plaintiffs in this case, undergo a similar journey, buying or waiting their way out of jail after jail.

23.     After Ms. Fant was "released" from the Jennings jail, the City of Jennings kept Ms. Fant in its jail until her family could pay the several hundred dollars required for release by City of Bellefontaine Neighbors.  Bellefontaine Neighbors is so small that it does not have its own jail.  Instead, it paid the City of Jennings to confine its inmate debtors in the Jennings jail.  After paying the City of Bellefontaine Neighbors, Ms. Fant was "released" but kept in the Jennings jail for three more days, supposedly, she was then told, in the "custody" of Velda City, until Velda City responded to Jennings officials that it declined to pick her up.  Ms. Fant was then sent to the custody of Saint Louis County for unpaid tickets, where she was kept for three days before being "released" from County custody.  Although Ms. Fant was "released," she was not set free.  Ms. Fant languished eight more days in the County jail because she could not afford the release amounts for unpaid tickets in two other cities too small to have their own jail: the City of Normandy and the City of Beverly Hills.

24.     While confined in the Saint Louis County facility, jail officials coerced inmates who could not afford to pay for phone calls or to buy food by offering free phone calls to family members and candy in exchange for doing the jail laundry without monetary compensation.

25.     After eight days, Ms. Fant was taken to court in the City of Maryland Heights, where the judge "released" her for free.  Nonetheless, Ms. Fant was still not free.  Instead, she was transported to Ferguson.

26.     When she arrived in Ferguson, City jail staff told her that her release amount was $1,400.   They told her that she would be held indefinitely until she paid it.  After three days, Ferguson jail staff came and informed her that they had decided to let her out for free.

27.     Ms. Fant was again arrested and brought to the Jennings jail in January 2014. After she could not afford to pay several hundred dollars initially demanded for her release, she was told by jail staff that they would let her out if she paid $100.  The guard told her that, because Jennings had released her for free last time, he did not want to do that again.  After six days, her family paid $100, and she was again "released."  After her "release," she was kept in the Jennings jail, but shifted to the custody of Bellefontaine Neighbors and thenVelda City.  She was then transferred to the Saint Louis County jail.  After her "release" from Saint Louis County, she was transported to Maryland Heights for several days, and then to Ferguson.

28.     When she arrived at the Ferguson jail, City jail staff told her that she would be held indefinitely unless she paid approximately $1,400.  Again, pursuant to City policy, she was not provided a court date or an attorney.

29.     Demoralized and weary of being transferred from jail to jail, Ms. Fant asked jail staff if they would accept $1,000, which she thought her family could raise from friends and relatives.  The jail officer told her that he wanted to call the Chief of Police to ask if that amount was sufficient.  The Chief of Police approved her release if her family could bring $1,000 to the Ferguson pay window, but jail staff told her that she had to get the cash that night or the deal

8

would be off.  Her family came to Ferguson and bought her release from the Ferguson jail.  She was released from the Ferguson jail immediately after her family paid $1,000.

30.     When she was released from the Ferguson jail, she was told by jail staff that she should not go to court and that she did not have any future court dates.  Instead, she was told to make cash payments at the Ferguson Police Department.  She was told that she would be jailed again if she did not make payments.

31.     During her repeated and indefinite jailings because of her inability to pay, Ms. Fant was fired from several jobs because of absences.  She was indigent and depending on food stamps to supplement her income to feed her children.

32.     Similar experiences happened to Ms. Fant more than a dozen times in the past two decades, including one occasion in which she was held in jail by the City of Ferguson for nearly 50 days without a toothbrush, toothpaste, soap, shower, or change of clothes for unpaid traffic tickets because she could not afford to buy her release.  During that time, Ms. Fant missed her father's funeral.  On that occasion, the City of Ferguson attempted to bargain with Ms. Fant's family to get them to pay several thousand dollars to secure her release.

33.     Ms. Fant was never provided an attorney by the City or brought to court while in custody in 2013 or 2014.  During court appearances on her initial tickets that she attended while not in custody several years before, the City of Ferguson was represented by an experienced prosecutor.  On several occasions, the City judge told her that she needed a lawyer because of the complicated circumstances of her tickets and continued the case several times for her to hire a lawyer.  Each time, she told the judge that she could not afford to hire a lawyer.  Eventually, the City proceeded without providing her an attorney.  At no point did the City conduct any meaningful inquiry into her ability to pay or alternatives to incarceration.

9

34.     On many occasions, Ms. Fant contacted the City in an effort to figure out how to remove her warrants so that she would not be arrested and taken away from her children. Consistent with City policy, she was told that the warrants could not be removed unless she paid cash to the City.

35.     Ms. Fant has endured materially the same inhumane and unsanitary Ferguson jail conditions described in this Complaint.  In addition to enduring overcrowding with other inmate debtors, Ms. Fant was confined in a cell that lacked basic hygiene (for example, she was told that she would not be given feminine products for menstruation), medical care, exercise, and adequate food.

36.     On one occasion, an elderly woman being held because she could not afford a few hundred dollars was shivering because the jail was very cold and because the jail staff refused to give women more than one blanket.  After Ms. Fant allowed the woman to share her blanket with her, the guards began shouting at the women that they were "stanky ass dykes" and "dirty whores."

37.     Ferguson jail guards routinely insulted and verbally abused female inmate debtors.  On numerous occasions, referring to the grotesque conditions and lack of any feminine products, showers, toothbrushes, or soap, guards mocked the impoverished women for the way that they smelled.  Male guards would shout things like: "you hoes stink" and "you need to wash out your coochies."

38.     Ms. Fant still owes significant debts to the City.  She is frightened that the City will again jail her indefinitely until she and her family can pay enough to secure her release.

**ii.  Roelif Carter**

39.     Roelif Carter is a 62-year-old disabled military veteran.  For more than a decade, he has suffered daily from the debilitating and painful effects of a brain aneurism.

40.     Mr. Carter was given tickets by the City of Ferguson more than ten years ago.

41.     After receiving the assistance of a lawyer from the Veterans Administration, Mr. Carter pled guilty and was assessed monetary fines for the traffic violations.  He informed the court that he was unable to afford the fines, and he was told to pay $100 per month.[5]

42.     Mr. Carter was indigent and unable to afford the payments without serious hardship in meeting the basic necessities of life.  Nonetheless, having observed that the City kept people in jail when they could not pay their tickets, Mr. Carter made the payments to the City clerk as often as he could until he was unable to come up with enough money.

43.     Mr. Carter asked the City clerk what to do if he was too poor to make a payment by the first day of the month.  Mr. Carter was told that, if he did not pay by that day, then a warrant would issue for his arrest.  On one occasion, Mr. Carter had not been able to get enough money by the first day of the month and, frightened, he brought the money to the City on the second day of the month.  The clerk refused to accept the money.  The clerk informed him that a warrant had been issued for his arrest and that, in order to remove the warrant, he would now have to pay several hundred more dollars.  Mr. Carter could not afford to pay several hundred dollars.

44.     Mr. Carter was arrested on that warrant in August 2010.  He was informed by the City jail guards that he would not be released from the jail unless he paid $600.  Mr. Carter informed City employees that he was too poor to afford that amount of money.

---

[5] After receiving these initial tickets, Mr. Carter was routinely stopped and arrested by Ferguson police and charged with minor offenses for years, including vehicle citations, not having his dog on a leash, and failure to obey the orders of a police officer.  Each time Mr. Carter was arrested, he was held in jail because he was unable to afford to pay for his release, and each time he was eventually released for free after three days.  Pursuant to policy and practice, at no time was Mr. Carter provided with a prompt neutral determination of probable cause.

45.     Mr. Carter and his wife depended on his disability payments and food stamps to meet the basic necessities of life.

46.     After three days in jail, the City released Mr. Carter without requiring any payment and without bringing Mr. Carter to court.

47.     After Mr. Carter's release, a City official informed Mr. Carter's wife that Mr. Carter's total fines had increased and were now in excess of $1,000.  The City official did not explain why the total amount had increased without any formal process.  Upon his release from jail, the City again required Mr. Carter to pay $100 per month without any process or inquiry into whether he could afford that amount.

48.     On a later occasion, Mr. Carter's wife was informed that a warrant had been issued for her husband's arrest, even though Ms. Carter had made the required monthly payment herself.  After Ms. Carter showed proof of payment, the City recalled the warrant.

49.     With the help of friends and family, Mr. Carter and his wife were able to raise $100 to make payments to the City for a number of months.

50.     Mr. Carter was again unable to make a monthly $100 payment on several occasions in 2012 and 2013.  The City issued warrants for his arrest each time, and Mr. Carter was arrested in August 2012, November 2012, and July 2013.  On each occasion, City officials told Mr. Carter that he would be held in jail unless he paid several hundred dollars.  Mr. Carter told City officials that he could not afford that amount of money.  Because he was too poor to pay the City what it demanded, Mr. Carter remained in jail each time.  On each occasion, Mr. Carter was released for free after three days without being brought to court.  On each occasion, the amount of money that he owed in total was increased by the City of Ferguson.

51.     After his release from jail on each occasion, Mr. Carter and his wife made $100 payments every time that they could for several years until 2014 because they were told by City officials that Mr. Carter would be kept in jail if they did not pay.  The Carters lived in constant fear of not being able to both pay the City and have enough money for utilities, groceries, clothing, and other necessities of life.

52.     The amount Mr. and Ms. Carter paid to the City is a total of several thousand dollars.[6]

53.     The City never conducted any meaningful inquiry into Mr. Carter's indigence and ability to pay, and it never appointed him an attorney.

54.     Mr. Carter and his wife observed numerous people come to court who could not afford their payments.  They observed City employees at the payment window tell numerous people on many occasions that they needed to bring money by a specific date or time or a warrant would be issued for their arrest.

55.     Each time Mr. Carter was held in the Ferguson jail was a humiliating and dangerous experience.  He was not permitted a toothbrush or toothpaste and was not permitted to shower or wash his clothes.  He and other inmates were denied hand soap and forced to live and sleep near an uncleaned toilet with visible excrement and a vile stench.  The floors and walls were also uncleaned and contained what appeared to be mucus and blood.

---

[6] In June 2014, Mr. and Mrs. Carter were both arrested without a warrant by the City for new minor municipal offenses.  Each was told that they would not be released from jail unless they paid $300 in cash.  Both informed the City that they could not afford to pay that amount of money.  After three days, Mr. Carter was again released for free.  Mrs. Carter, however, who complained to jail staff repeatedly about inadequate medical attention, was forced to remain in jail because she could not come up with the money.  The next day, Mr. Carter negotiated a lower release amount and paid $200 to free his wife from jail.  Ms. Carter had to be taken to the hospital a couple of days after her release because the jail refused to give her the blood pressure medication that she needs even though her family had brought her medicine to the jail.

Mr. Carter was arrested again in August 2014 without a warrant.  He was again told that he would not be released unless he paid cash to the City.  Again, after three days, Mr. Carter was released for free.  Pursuant to policy and practice, at no point was Mr. Carter provided with a neutral determination of probable cause.

56.     The water available to inmates, released from an apparatus connected to the top of the toilet, caused Mr. Carter to develop a sore throat whenever he drank it.

57.     Jail staff also refused to allow Mr. Carter to be given the medication that he takes for high blood pressure and the head pain medication that he has needed since his brain aneurism.  Jail staff would not even let Mr. Carter's wife bring him the prescribed medication. As a result, each jail stay for Mr. Carter resulted in enormous physical pain and discomfort.

58.     Each time Mr. Carter was kept in the Ferguson jail, he met many other men who were being held there solely because they were too poor to pay the release amount required by the City.  Many of the men told him that they had also been trapped in a cycle of debt and jailing by the City and that they could not see a way out.

59.     The jail conditions experienced and witnessed by Mr. Carter are materially the same as the conditions described throughout this Complaint and to those described by numerous other witnesses and victims of the City's policies and practices over a consistent period of many years.

60.     Mr. Carter still lives in constant fear of being jailed again because of his inability to make monetary payments.

61.     Mr. Carter has also been kept in custody for old unpaid fines and costs because he could not afford to pay for his release by the City of Berkeley and the City of Cool Valley. Paying for his release from one would sometimes result in transport to another, where he would be held until he could pay once more.[7]

**iii.     Allison Nelson**

62.     Allison Nelson is a 23-year-old woman.  She works now at a clothing store making near minimum wage.

---

[7] Other jails, however, permitted his wife to give him the medication that he needs.

14

63.     Ms. Nelson has been jailed on two occasions by the City because she has not been able to pay fines and costs from traffic tickets.  On each occasion, Ms. Nelson has been held, even though she was indigent, because she could not afford a sum of money set by the City.

64.     In July 2012, Ms. Nelson was arrested and taken to the Jennings jail.  After her family borrowed money to have her released from Jennings, she was transported to Ferguson. Jail officials in Ferguson told her that she would be held indefinitely until she paid approximately $700.  For several days, she was held while her mother attempted to borrow money to buy her out.  Eventually, her mother called the City and told the City that she could raise only $300.  The clerk told her mother to call back so that the clerk could check with a supervisor.  The supervisor agreed to accept $300, and Ms. Nelson was released.

65.     In November 2013, Ms. Nelson was again arrested for non-payment and brought to the Jennings jail.  Ms. Nelson was told by jail staff that she would not be released unless she paid approximately $1,000.  She informed the jail staff that she could not afford to pay.  After four days, the jail staff informed her that her release amount would be lowered to $100.  Her parents came to the jail and paid $100, and she was released immediately in the early morning hours of Thanksgiving Day.

66.     Ms. Nelson was then brought to the Ferguson jail.  Ferguson jail staff told her that she would be held indefinitely and miss Thanksgiving with her family unless she paid several hundred dollars.  In the morning, after shift change, a new guard came and said that, since it was Thanksgiving, they would agree to let her out if she could find someone to pay $100.  Ms. Nelson's family borrowed money and came as fast as they could to Ferguson and brought her home for Thanksgiving.

67.     While in the Ferguson jail, Ms. Nelson was surrounded by other women who were there because they could not afford to pay the amount that Ferguson required for their release.

68.     Ms. Nelson endured materially the same deplorable jail conditions as the other Plaintiffs.  She was kept in a cell and denied access to a toothbrush, toothpaste, and soap.  The walls were moldy and covered in gum, paint chips, blood, mucus, and feces.

69.     The jail did not provide clean floor mats, and also passed dirty blankets from previous inmates to new inmates without cleaning them.

70.     If the inmates wanted water, she and the other women were forced to drink warm water from a mechanism above the toilet, which smelled like a sewer.

71.     Inmates were given a honey bun in the morning and a pot pie for lunch and dinner.

72.     Although Ms. Nelson did not own any significant assets and was indigent, no meaningful inquiry into her indigence was ever made by the City of Ferguson, and the City never appointed an attorney to represent her.

73.     The threat of jail and constant cycle of increasing debts to the City of Ferguson has been a constant fact of daily life for Ms. Nelson for several years.  She has been afraid to leave her own home or even get into a car as a passenger.  Ms. Nelson's dream for years has been to join the Navy.  After passing the relevant tests as a teenager, she was told by her recruiter that she could not join until she fixed all of her unpaid traffic warrants and tickets, which she has not been able to afford to do.[8]

---

[8] Military recruiters routinely refuse to accept applicants with traffic warrants for their arrest.  ArchCity Defenders currently represent five clients who desire to enlist in the military but cannot do so as a result of warrants being issued for their arrest as a result of unpaid fines.

74.     Ms. Nelson has also been kept in custody for old traffic ticket debts because she could not afford to pay her way out by the City of Chesterfield, the City of Pagedale, the City of Florissant, the City of Country Club Hills, and the City of Bellefontaine Neighbors.

**iv.     Herbert Nelson Jr.**

75.     Herbert Nelson Jr. is 26 years old.  Over the past four years, he has been jailed at least four times in the City of Ferguson when he could not afford to pay old fines and court costs.

76.     Mr. Nelson was arrested for non-payment in April 2011 and taken into custody by the City of Jennings.  When he was brought to the Jennings jail, he was told that his release amount was $2,000 based on his unpaid debts.  He informed jail staff that he could not afford to pay.  Each day that he was in jail, his release amount was lowered by jail staff.  On the third day, his release amount was lowered to $300, and he was released after his mother borrowed money to buy him out.  He was then transported to the Ferguson jail because Ferguson had issued a warrant when Mr. Nelson had not made a payment on an old ticket.

77.     Ferguson jail staff informed him that he would be held in jail indefinitely until he paid $400.  Mr. Nelson was scared and panicked.  He felt trapped and did not know how he would be able to get out of jail.  After a day, his mother went to the Ferguson jail with $200 that she had collected from family and friends and said that it was all the family could afford.  City employees decided to accept that amount and let Mr. Nelson out of jail.

78.     Mr. Nelson was arrested again in October 2013.  Again, he was told by Jennings jail staff that his release amount was approximately $2,000.  Again the release amount was incrementally lowered without any formal legal process.  This time, on the fourth day, his release amount was reduced to $200, and his mother again borrowed the money to buy his release.

When he was released from Jennings, he was taken to Ferguson, supposedly because he had outstanding warrants from the same old tickets.

79.    Mr. Nelson was told by Ferguson jail staff that he would be held indefinitely until he paid $400.  After a day, Mr. Nelson was told that his release amount was reduced to $300. His mother then raised $300 from his co-workers, family, and friends, and came to the Ferguson jail and bought his release.

80.    Mr. Nelson was arrested again in February 2014.  After negotiating his release from the Jennings jail after his release amount was incrementally lowered, Mr. Nelson learned that he would be taken again to the Ferguson jail.

81.    Mr. Nelson was told by Ferguson jail staff that he would be held indefinitely until he paid $400.  After a day, Mr. Nelson was told that his release amount was reduced to $300. His mother then again raised $300 from his co-workers, family, and friends, and came to the Ferguson jail and bought his release.

82.    Mr. Nelson was arrested again in September 2014 and taken to the Jennings jail. After his family bought his release from the Jennings jail, he was taken to the Ferguson jail. Again, he was told by jail staff that his release amount was approximately $400.  The next day, the release amount was reduced to $300, and his mother again borrowed the money to buy him out of jail.

83.    Mr. Nelson endured and witnessed the deplorable jail conditions described in this Complaint.  For example, he was forced to remain with other inmate debtors in a filthy, overcrowded cell that reeked of excrement.  He and the other inmates were not given any toothbrush, toothpaste, handsoap, showers, or a change of underwear.  The cells were so overcrowded during his multiple periods of incarceration that men were forced to sleep on the

floor next to the open, uncleaned toilet.  The walls in the Ferguson jail were caked with old food, dust, blood, and mucus.   Blankets and mats were transferred to new inmates without being washed.

84.     The food rations given to Mr. Nelson and other inmates lacked basic nutrition. Inmates were served a honey bun or donut in the morning, a small pot pie for lunch, and another pot pie for dinner.  Mr. Nelson and other inmates were not given drinks and were forced to drink smelly water out of a shared faucet connected to the same apparatus as the toilet.  Inmates were dehydrated because they were afraid to drink out of the faucet.

85.     During one of his periods in the Jennings jail, Mr. Nelson developed two irritated areas on his leg that became infected and turned into boils the size of eggs.  This leg injury has subsequently persisted in various iterations for approximately two years.  On a later period of incarceration in the Jennings jail, his boils flared and popped, and he was in excruciating pain. On his arrival to the Ferguson jail, the jail staff refused to treat him.  They refused to give him antibiotics, painkillers, or a doctor, even though the pants that he was wearing filled with blood and puss.  He found it difficult to sit because of the position of the infection on his legs.  Finally, after his transfer from the Ferguson jail, a nurse in the Saint Louis City Justice Center examined Mr. Nelson and told him that the infection was related to the jail conditions because his skin had been extremely dirty.  The nurse told him that she was amazed at the large size of the boils.  She said that she believed that it was turning into staph infection, although he had not been separated from the inmates in the Ferguson jail.

86.     Mr. Nelson was indigent for the entire duration of his jailings by the City of Ferguson.  Mr. Nelson now works as a painter and is dedicated to supporting his five-year-old son.  Because of his recent jailings—including one while he was in uniform on his way to an

important painting job—he has lost a number of jobs and finds it difficult to be re-hired because painting contractors know that he could be jailed on the way to any painting job. On one occasion, a co-worker had to fill in for Mr. Nelson and then use the money earned from the job to pay for his release from jail. Because of his unpaid ticket debts, Mr. Nelson is not able to grow his own painting business because he cannot obtain his driver's license, which he needs to drive his tools to job sites.

87.     During Mr. Nelson's most recent 2014 incarceration, he finally broke down and cried after he missed an important painting job. The cycle of jail and debt has prevented him from getting on his feet and living any kind of meaningful life with his son. Because of his repeated jailings, it has been difficult for him to maintain steady employment and to meet the basic necessities of life for his family.

88.     Mr. Nelson has been also held in jail because of his inability to make payments in the City of Jennings, the City of Florissant, Saint Louis County, and the City of Maryland Heights.

   **v.**  **Alfred Morris**

89.     Alfred Morris is a 62-year-old man. He is a disabled veteran who relies on a pension from the Department of Veterans Affairs to meet the basic necessities of life. Although Mr. Morris cannot perform physical work because of serious medical problems, he volunteers at the Department of Veterans Affairs hospital to sit with and assist other ill veterans.

90.     Mr. Morris has been jailed on at least four occasions in the past five years by the City of Ferguson when he has been unable to make monetary payments.

91.     The City of Ferguson locked Mr. Morris in a cage because he failed to pay fines and costs associated with violations of a municipal ordinance that purports to prohibit people

from having friends, relatives, or romantic partners stay overnight in their homes without naming the person on a written document in advance.  Ferguson police accused Mr. Morris of violating this ordinance because they searched his home and found women's articles.

92.     In 2011, Mr. Morris was arrested and taken to the Ferguson jail.  He was told that he would not be released from the jail unless he paid $500.  Mr. Morris was eventually released for free.

93.     When Mr. Morris appeared in court, he announced that he wished to plead "not guilty."  The judge told him to sit in a corner while other cases were handled.  Mr. Morris watched as the City prosecutor and City judge jailed and threatened with jail unrepresented people when they could not pay the money that they had been told to pay without any inquiry into their indigence or representation of counsel.  Finally, the judge told Mr. Morris that when he came back for his next court date, he needed to have an attorney with him.  Mr. Morris was not able to afford an attorney, and he was afraid to go back to court because he had been told that he was required to hire an attorney.  A warrant was issued for his arrest.

94.     Mr. Morris was arrested on the warrant in early 2012.  When he arrived at the jail, he was again told that he would be held indefinitely until he paid approximately $500.  Mr. Morris became extremely ill in the Ferguson jail because jail staff, pursuant to their policy, refused to give him his blood pressure or HIV medication.  The jail was so crowded that Mr. Morris, even though seriously ill, was forced to spend the first night sitting on the edge of a bed in which another man was sleeping.  The next night, he was given a space on the floor of the cell to sleep.  When Mr. Morris complained for the entire day about his blood pressure, jail staff threatened to charge him with another offense if he were faking an illness and that they would make sure that he got another case.  After Mr. Morris became dizzy with unbearable head pain,

jail staff were forced to call paramedics.  Two days after his arrest, he was taken to the hospital and let out of the jail for free.[9]

95.     Mr. Morris otherwise endured materially the same unsanitary jail conditions as described in this Complaint.  For example, during each of his stays in the Ferguson jail, Mr. Morris was forced to stay on mats that had bed bugs and lice.  He observed that jail staff would not wash or otherwise sanitize the sleeping mats when they were given from one inmate to another.  On none of his stays in the Ferguson jail was Mr. Morris ever allowed to take a shower, given any handsoap, or allowed to brush his teeth.

96.     Mr. Morris still lives in constant fear of being jailed again because of his inability to make monetary payments.

97.     Mr. Morris has been also held in jail because of his inability to make payments in the City of Cool Valley and the City of Maplewood.

**vi.    Anthony Kimble**

98.     Anthony Kimble is a 53-year-old man.

99.     In the past three years, he has been jailed multiple times by the City of Ferguson for unpaid debt from old traffic tickets.

100.     In February 2012, Mr. Kimble was arrested and brought to the Ferguson jail as a result of his non-payment of costs and fines from traffic tickets.  He was told by jail staff that he would not be released unless he paid $500 dollars to the City.  Mr. Kimble informed jail staff that he could not afford to pay the City.

101.     After several days, Mr. Kimble's family got money from a federal tax refund. Mr. Kimble's family came to Ferguson and paid $500 for his release.

---

[9] Mr. Morris suffered similar blood pressure problems on other occasions in the Ferguson jail.

102.    Mr. Kimble was next arrested and brought to the Ferguson jail in February 2013. When Mr. Kimble arrived at the jail, the booking officer told him that he would be held in the jail until he paid $600 to the City.  After two days, Mr. Kimble was informed that the City would accept $500 for his release.  After two more days, he was informed that the City would accept $400 for his release.  After two more days, Mr. Kimble was informed that the City would accept $300. Each time, Mr. Kimble informed jail staff that he could not afford to pay the City.

103.    Mr. Kimble was not brought to court and not provided an attorney.  No inquiry was made into his ability to pay.

104.    Finally, after it was clear that Mr. Kimble could not pay, he was released by jail staff for free.  He had spent nearly two weeks in jail and had lost approximately 12-15 pounds.

105.    When Mr. Kimble was released, he was told by jail staff that he should not return to court, but that he needed instead to go to the Ferguson police department by March 1 to pay what he owed.

106.    Mr. Kimble was not able to come up with the money that he owed by March 1 and therefore did not go to the police department to bring the money.  At the time, he was working as a machine operator and struggling to survive and to make payments for rent, utilities, food, and court ordered child support.  Despite being told that he should not go to court, Mr. Kimble was later informed that a warrant had been issued for his arrest for failure to appear.

107.    When Mr. Kimble learned of his warrant, he was also informed of a City policy that he could avoid arrest and have the warrant removed if he paid several hundred dollars.  Mr. Kimble was not able to have the warrant removed because he was indigent.  Although the City does not inform unrepresented people of the option, it also has a policy of allowing warrants to be removed for free if an attorney is retained and enters a notice of appearance on a case.

23

108.     During his time in the Ferguson jail, Mr. Kimble and other inmates would ask when they would be released.  Mr. Kimble and other inmates were told repeatedly by Ferguson jail staff to "shut up" and that they would be released "whenever we're ready to release you."

109.     Mr. Kimble endured materially the same grotesque and inadequate jail conditions as described in this Complaint.  During his visits to the jail, he was offered a shower on only one occasion.  He was never provided with soap or a toothbrush and toothpaste.  The cells were overcrowded with men who could not afford to pay for their release, and the ratio of men to beds was often 3 or 4 people for every available bed.  He was forced to sleep next to a dirty toilet without sufficient blankets to keep him warm and surrounded by walls covered with urine, blood, and mucus.  He was denied access to laundry to clean his clothes.

110.     Mr. Kimble and other inmate debtors devised a system of rotation so that the person stuck in jail the longest would rotate to the bed, and the next inmate would take his place when he paid for his release or when he was let out for free.

111.     The City only provided a honey bun for breakfast and pot pie for lunch and dinner. Mr. Kimble was often unable to eat breakfast because guards would offer breakfast at 1:00 a.m. by waking up inmates and telling them that they had to eat breakfast then or not at all.

112.     Mr. Kimble still lives in constant fear of being jailed again because of his inability to make monetary payments.

113.     Mr. Kimble has also been jailed for nonpayment of old traffic tickets in City of Pine Lawn and the City of Berkeley.

**vii.     Donyale Thomas**

114.     Donyale Thomas is a 36-year-old woman.

115.    Ms. Thomas was arrested and brought to the Ferguson jail in 2011 because she had an unpaid balance of old court costs and fines.  Ms. Thomas had been a passenger in a car, and officers had asked for her ID and arrested her when a check on her ID revealed the old case.

116.    Ms. Thomas was given a thin blanket and a mat and taken to a cell with one bed and three women.  Ms. Thomas was told to sleep on the floor.  Ms. Thomas was told by jail staff that she would be held indefinitely.

117.    When Ms. Thomas's mother called the jail, her mother was told that she could get her daughter out of jail by paying several hundred dollars. Ms. Thomas and her mother were indigent and unable to pay.  Ms. Thomas was unemployed and relying on food stamps and SSI disability payments to meet the basic necessities of life for herself and her three children.

118.    Ms. Thomas was kept in the Ferguson jail for over a week.  She was not taken before a judge and was not provided a lawyer.

119.    Ms. Thomas was suffering at the time from a severe anxiety attack, bipolar disorder, and schizophrenia.  Ms. Thomas has difficulty being in small, confined spaces.  Ms. Thomas would begin to hyperventilate and ask jail guards for treatment because she could not breathe.  Her mother, frightened for her daughter's life, attempted to bring her prescription medication for these illnesses, but jail staff refused, and Ms. Thomas was denied medical treatment in the Ferguson jail.

120.    Finally, after more than a week, the City informed Ms. Thomas that it would accept $200 for her release.  Her mother raised $200, and Ms. Thomas was released.

121.    Ms. Thomas has been jailed by the City of Ferguson on many occasions since she was a teenager.  Each time, she has been unable to buy her release because of her indigence.

122.     On a subsequent occasion, Ms. Thomas was struggling with her mental health problems and overcome with depression from being trapped in a cycle of debt and jailing for traffic tickets in several municipalities that took her away from her children repeatedly.  While languishing in jail in the City of Berkeley because she could not afford to pay for her release, Ms. Thomas attempted to commit suicide by strangling herself with her brassiere.  She was taken to the hospital after the other women in her cell started screaming.

123.     Ms. Thomas still lives in constant fear of being jailed again because of her inability to make monetary payments.

124.     Over the years, when Ms. Thomas has appeared in the Ferguson court, she has seen people jailed because they were unable to make monetary payments and without being provided any attorney or any meaningful inquiry into their ability to pay.

125.     Ms. Thomas has also languished in jail for non-payment in the City of Jennings, the City of Berkeley, the City of Pine Lawn, and the City of Dellwood.

**viii.     Shameika Morris**

126.     Shameika Morris is a 30-year-old woman.

127.     When she was 17 years old, Ms. Morris was charged with a minor municipal offense in Ferguson.  When she was brought to the jail, the jail staff refused to let her use the bathroom, and Ms. Morris urinated on herself in the booking area.  Jail staff were upset and retaliated against her by keeping her in jail for more than two weeks without bringing her to court and by telling her that she would not be released unless she paid $900.  After more than two weeks, Ms. Morris was finally released for free.

128.     Since then, Ms. Morris has been arrested and jailed by Ferguson on more than five occasions resulting from that initial offense.

129.    In 2011, Ms. Morris was arrested and jailed by Ferguson.  When she arrived at the jail, she was told that she would not be released unless she paid approximately $800.  Ms. Morris told jail staff that she was too poor to afford that amount.  Each day, jail staff informed her that her release amount was reduced by $100.  When the release amount was reduced to several hundred dollars, jail staff refused to reduce it for several more days.  Because Ms. Morris had not been able to contact her family or her job, her mother and father and her employer were all very worried and thought she had disappeared.

130.    Finally, after more than a week, her mother called around to various cities and learned that she was being held by Ferguson.  The Ferguson clerk negotiated with Ms. Morris's mother, and the clerk agreed after to reduce the amount the City would accept so that the family could use Ms. Morris's tax refund check of $200.  A family friend came to the jail and paid $200 for her release.  Ms. Morris was not brought to court and not given an attorney.

131.    Later in 2011, Ms. Morris was again arrested and jailed by Ferguson.  She was told that she would not be released unless she paid approximately $800.  Jail staff informed her each day that her release amount was reduced.  After two days, jail staff told her that her release amount was reduced to $500.  The following day, jail staff then let Ms. Morris out for free.  Ms. Morris was not brought to court and was not given an attorney.

132.    In 2012, Ms. Morris was again arrested and jailed by Ferguson.  She was told that she would not be released unless she paid approximately $800.  Jail staff informed her each day that her release amount had been reduced.  After two days, jail staff walked around to all of the inmates and told them their new release amounts and let Ms. Morris out for free.  Ms. Morris was not brought to court and was not given an attorney.

133.    At all times that she was jailed, Ms. Morris was indigent and struggling to meet the basic necessities of life for her and her children.  She depends on food stamps to survive.

134.    On many occasions, Ms. Morris has attempted to clear her outstanding warrants in Ferguson, including occasions in which she has attempted to clear the warrants so that she could get a job.  On numerous occasions over the past several years, she has called the City clerk and asked how to remove her warrants.  The City clerk routinely informed Ms. Morris that it is City policy not to remove warrants unless she paid hundreds of dollars, and the clerk told her that she needed to have the money with her if she came to court to turn herself in.  Ms. Morris was not able to come up with enough money to remove her warrants.

135.    As is true for the other Plaintiffs, Ms. Morris's experiences in the Ferguson jail have been among the most humiliating and dangerous experiences of her life.  Every morning, inmates waited in anticipation for jail staff to tell them if their release amounts would be lowered.  They often begged jail staff to lower the amounts and pleaded with them to consider their poverty and their need to be with their children.

136.    In all of her time in the Ferguson jail, she has only been offered a shower on one occasion—during her first stay over ten years ago.  She has never been offered a toothbrush, toothpaste, or handsoap.  During her stays, she and other inmates have routinely noticed blood and mucus smeared on the walls of their cells, and the women were forced to share used blankets and mats because the City jail staff does not launder materials when inmates leave the jail before passing them to other inmates.

137.    Many of the women in the jail became chronically dehydrated because they were afraid to drink the water, which has often been yellow in color.

138.    During her time in the Ferguson jail, Ms. Morris and other women spent many nights crying and hungry.

139.    The guards routinely taunted the female inmates.  Guards told women that they were "nasty" and "fat" and mocked them that they would not get out until guards let them out.

140.    Ms. Morris is so terrified of languishing again in the Ferguson jail on her warrants that she is afraid even to visit her mother, who lives in Ferguson.

**ix.    Daniel Jenkins**

141.    Daniel Jenkins is a 28-year-old man.

142.    Mr. Jenkins has been kept in jail by the City of Ferguson on at least five occasions over the past several years because of his inability to make a monetary payment on old debts from tickets.  On each occasion, he was brought to the Ferguson jail and told that he would be held indefinitely unless he paid several hundred dollars.  He was not appointed an attorney and no meaningful inquiry was made into his indigence.  He was kept in jail until his family could come up with the money to buy his release or until the City decided to release him for free.

143.    Mr. Jenkins is indigent and struggles to meet the basic necessities of life for himself and his two young children.

144.    Like the other Plaintiffs in this case, each arrest and jailing by Ferguson was part of a longer and indefinite journey through the Saint Louis County debtors' prison network for Mr. Jenkins.  On some of his arrests, Mr. Jenkins has been taken to seven different jails.  He is typically held in jail until he either gets family to come up with money or until jail staff decide to release him for free.

145.    Mr. Jenkins has been jailed for non-payment by the City of Bel-Ridge, the City of Bel-Nor, the City of Moline Acres, Saint Louis County, the City of Florissant, the City of

Welston, the City of Dellwood, the City of Maryland Heights, the City of Beverly Hills, the City of Pine Lawn, and the City of Bellefontaine Neighbors.

      **x.**    **Ronnie Tucker**

146.    Ronnie Tucker is a 50-year-old man.

147.    Mr. Tucker was arrested and taken to the Ferguson jail in May 2013.  Ferguson jail staff informed him that he was being kept in the Ferguson jail pursuant to a warrant in traffic cases from the City of Cool Valley, which paid Ferguson to house its inmate debtors.  Ferguson jail staff told him that he would not be released from custody unless he paid $1,000.  After several days, Mr. Tucker was taken to court in Cool Valley, and his sister was able to raise enough money to pay for his release.

148.    When Mr. Tucker was "released" from the custody of Cool Valley, he was returned to the Ferguson jail.[10]  Ferguson jail staff informed him that he was now being held by the City of Ferguson and that he would not be released unless he paid $600.

149.    Mr. Tucker was indigent.  At the time of his jailing by Ferguson, Mr. Tucker was working part time as a roofer and surviving on food stamps to meet the basic necessities of life.  At no point was any meaningful judicial inquiry made into his ability to pay, and he was not provided an attorney.  Having just bought Mr. Tucker's release from Cool Valley custody, his sister could no longer afford to pay any more money to buy his release.

150.    Mr. Tucker spent more than ten additional days in the Ferguson jail because he could not afford to pay the $600 release amount.  Eventually, the City let him out for free and told him to return to court.  He had not been brought to court or given an attorney the entire time.  No inquiry had been made into his indigence.

---

[10] He also spent some time during this period in a holding cell in Cool Valley prior to being transported to Ferguson.

151.     Prior to his next court date, Mr. Tucker was taken to the hospital, where he was admitted to have surgery.  He called the Ferguson clerk from the hospital and said that he would not be able to make his court appearance.  Pursuant to City policy, he was told by the clerk that he would get a warrant for not showing up in court even if he were in the hospital.  He would have to pay several hundred dollars to remove the warrant.

152.     Mr. Tucker experienced materially the same jail conditions as alleged in this Complaint and described by the other Plaintiffs and numerous witnesses.

153.     Mr. Tucker was never allowed to shower and spent the entire period of weeks in the same clothes without washing them. In addition to languishing in the stench of his own sweat and filth, he was not given any handsoap or allowed to brush his teeth.  He and other inmates begged to be allowed to wash themselves, but staff refused.  Instead, multiple inmates were forced to sleep on the dirty floor because there were not enough beds to accommodate all of the debtors.  He was forced to sleep next to a dirty toilet and surrounded by walls covered with urine, blood, and mucus.  He was not given sufficient covering to cope with the cold temperatures in the cell.

154.     Ferguson jail guards also routinely taunted their prisoners for not being able to afford to get out.  Guards told the men that they would stay in the Ferguson jail until the guards were ready to let them out.

155.     Mr. Tucker was not permitted any recreation or exercise, and he spent the entire period without leaving the cell except to go to the court in Cool Valley.

156.     Mr. Tucker and the other men in his cell could hear female prisoners screaming from other cells about not being provided products for hygiene.

157.    Mr. Tucker has also been jailed for debts from unpaid tickets in Saint Louis County, the City of Jennings, the City of Dellwood, and City of Moline Acres.

**xi.  Tonya DeBerry**

158.    Ms. DeBerry is a 52-year-old woman.  She has been jailed on numerous occasions for nonpayment of tickets by the City of Ferguson.

159.    In January 2014, Ms. DeBerry was pulled over for a traffic violation.  She was jailed in Saint Louis County for a day until her family paid $300 to have her released.  When she was released from the custody of the County, she was transported to Ferguson.

160.    When she arrived at the Ferguson jail, staff told her that she would be kept in jail unless she paid several hundred dollars.  After two nights in jail, a guard came around to her cell and asked her how much she could "come up with."  She told the guard that she could probably raise $300, and Ferguson jail staff let her out after her daughter arrived with $300 borrowed from a neighbor.[11]  Ms. DeBerry was then transported to the Jennings jail because of unpaid tickets.

161.    Ms. DeBerry experienced the same unlawful and deplorable conditions in the Ferguson jail as described in this Complaint.  She was denied a toothbrush, toothpaste, and soap, and she was forced to stay in a cell with a vile stench and visible mold.

162.    The City also arrested and kept in its jail for indefinite periods both of her teenage children because they could not afford to pay old debts.  Ms. DeBerry has, on numerous occasions, called the City and negotiated a release amount for her children.  When she offers an amount, the City clerk seeks permission from a supervisor to accept that amount or to reject it. In this manner, she has bought her children out of the Ferguson jail on several occasions in the past several years.

---

[11] Ms. DeBerry was taken to the Jennings jail in April 2011 and told that she would not be released unless she paid $300 to the City of Ferguson.  When her family borrowed money and took it to Ferguson, Jennings released her.

163.    Ms. DeBerry was repeatedly forced to choose between raising money to get her children released from the Ferguson jail or raising money to make her own debt payments to the City and to other neighboring municipalities.

**B.**      **The City's Policies and Practices**

164.    The treatment of the Plaintiffs was caused by and is representative of the City's policies and practices concerning collecting unpaid fines, fees, costs, and surcharges relating to traffic tickets and other minor offenses for at least the past five years.[12]

165.    It is the policy and practice of the City of Ferguson to use its municipal court and its jail as significant sources of revenue generation for the City.  The money to be brought into the City through the municipal court is budgeted by the City in advance.[13]  As a result, the entire municipal government apparatus, including municipal court officials and City jailors, has a significant and corrupting incentive to operate the court and the jail in a way that maximizes revenues, not justice.

166.    Decisions regarding the operation of the court and the jail—including but not limited to the assessment of fines, fees, costs,[14] and surcharges; the availability and conditions of payment plans; the setting and re-setting of amounts required for release from jail; the issuance and withdrawal of arrest warrants; and the non-appointment of an attorney—are significantly influenced by and based on maximizing revenues collected rather than on legitimate penological considerations.  In fact, on only one occasion in the five years preceding the filing of this lawsuit was a person kept in the Ferguson jail pursuant to a sentence.  Every other person held in the jail

---

[12] Unless otherwise mentioned in this Complaint, the policies, practices, and procedures of the City of Ferguson described have been in existence for at least the past five years.

[13] The City uses the money collected through these procedures to help fund the City jail, to pay Municipal Court judicial salaries, to pay City Attorney's Office salaries, and to fund other portions of the City budget.

[14] Missouri Law requires costs to be waived for the indigent, *see* Mo. Code § 479.260, but the City ignores that law.

because of a municipal court case in Ferguson was kept in jail because the person could not afford a monetary payment required by the City for release.  The single person jailed served a sentence of two weekends in jail.

167.    In 2014, the City of Ferguson issued an average of more than 3.6 arrest warrants *per household* and almost 2.2 arrest warrants *for every adult*, mostly in cases involving unpaid debt for tickets.    Between 2009 and 2013, the number of traffic cases filed by the City of Ferguson increased by nearly 50%.

168.    In Ferguson, blacks were significantly more likely to be stopped, searched, and arrested than whites, even though whites were more likely to possess illegal contraband when searched.  Although whites make up more than 29% of the population in Ferguson, they constitute only 12.7% of traffic stops and 6.9% of arrests.  The same financial pressures and corrupting influences thus infect City police decisions, including decisions about conducting traffic stops, issuing tickets, and making arrests.

169.    Over the past five years, the small City of Ferguson has, according to its public records, earned approximately $10 million from its municipal court fines, fees, costs, and surcharges.  A proportional per capita budgetary revenue stream from municipal court fees for the entire Saint Louis metropolitan region would be more than $1,300,000,000.

### i.  Arbitrary and Indefinite Detention of the Indigent

170.    As each of the Plaintiffs' cases illustrates, the City of Ferguson has adopted a policy and practice of arresting people when they owe unpaid debt from old traffic tickets and other minor offenses.  When those arrestees are booked at the Ferguson jail, they are told by jail

staff that they can be released immediately, but only if they pay cash to the City of Ferguson.  If they cannot pay the City, they are told that they will be held indefinitely.[15]

171.    The amount of cash that Ferguson requires for release is based on the total debt owed by the person from their old traffic or other misdemeanor cases.

172.    It is and has been the policy and practice of the City of Ferguson to hold people in jail unless and until they or their families pay the City.

173.    It is and has been the policy and practice of the City of Ferguson to gradually and incrementally reduce the amount of money required to buy a person's release.  The reason for this policy is to generate as much money as possible.  Some people's families are able to borrow and raise significant money up front to buy the release of their loved one within hours or days. The longer a person stays in the Ferguson jail, however, the more it costs the City and the more clear it is that the person's family cannot raise enough money.  Thus, the City's policy and practice is to lower the amount periodically on the assumption that the person can raise at least some money to buy his or her release.

174.    As a matter of policy and practice, City jail staff and supervisors attempt to negotiate or bargain with the person or the person's family concerning the amount of money that they are able to pay.  This bargaining takes place both inside the jail with the inmate and over the phone or in person at the clerk's office with the inmate's family.

---

[15] The City's policies and practices—and the terminology that it uses—are at times difficult to navigate.  For example, many of the monetary debts that the City claims are owed are actually additional fees and surcharges automatically assessed for the issuance of warrants or the recalling of warrants.  These are "assessed" and declared owed entirely independent of any conviction and without any finding of guilt.  Moreover, many of the release amounts (which City employees call "bond" amounts) are purportedly classified as pretrial money bail for new charges, typically the charge of "failure to appear."  Each of the named Plaintiffs was, according to the City, kept in its jail pursuant to cash "bond" relating to new "failure to appear" charges.  In any event, the City applies materially the same money-based post-arrest detention policies to arrestees charged with new offenses as it does to arrestees who owe old debts.  All are kept in jail indefinitely unless and until they make arbitrary monetary payments or unless and until City employees negotiate lower release amounts or ultimately decide to release them for free.  None are held pending any court appearance.  Thus, those arrested for new ordinance violations, such as Roelif Carter, and those arrested for non-payment (which is typically accomplished through a new charge) are all treated the same and are all subjected to the same post-arrest money-based policies and practices.

175.    In many cases, after significant jail time, the City will release the person for free if it is clear that the City cannot extract any money from the person during that jail stay.

176.    Inmates find out about these incremental reductions by asking jail staff every morning what their new required payment is.  Some days they are told that it has remained the same, and other days they are told that it has been reduced.  Inmates are then usually given an opportunity to use the telephone to call family or friends who might be able to come up with enough money to pay for their release.  The reductions do not happen as the result of any formal adversarial process.

177.    The City's incremental reductions of the amount required for release are designed also to punish debtors for non-payment on the theory that time in jail will encourage impoverished people to pay in the future if they know that they will be jailed for non-payment. These threats result in people and families borrowing money at high rates of interest to release a loved one or taking money otherwise needed for food, diapers, rent, clothing, and utilities and giving it to the City of Ferguson instead.  The result has been widespread hardship for the impoverished people of Ferguson, whose local government has decided to make families choose between feeding hungry children and letting a loved one languish in jail.

178.    These policies and practices have created a culture of fear among the City's poorest residents, who are afraid even to go to the City police department or the City court to explain their indigence because they know they will be jailed by the City without any meaningful process.  The same fear motivates many very poor City residents to sacrifice food, clothing, utilities, sanitary home repairs, and other basic necessities of life in order to scrape together money to pay traffic debts to the City.

36

179.    From the perspective of City officials, these coercive threats are successful.  They are successful because the threats and jailings have been crucial to pressuring family members—who have no legal obligation to pay any money to the City on behalf of indigent relatives or friends who owe money from old civil judgments—to come up with money in order to get their loved ones released from jail.  They have also been crucial in getting low-income people to forgo basic necessities of life in order to pay the City in an attempt to avoid jail.  It is only through this illegal confinement and threat of confinement that the City is able to collect that additional money that any normal creditor could not.

180.    The basic scheme of the City of Ferguson is to extort—through the threat of physical confinement—money from debtors who are otherwise unable to afford to pay both the basic necessities of life and their debts to the City.  The City's policies and practices have resulted in the community knowing that impoverished debtors will be arrested and held by the City for days or weeks unless and until they pay enough cash to the City.

181.    When providing information to inmates, the City refers to the amount of cash required for release as the inmate's "bond," even though the amount is set by reference to the amount of outstanding debt.  Moreover, the money is applied automatically toward old unpaid debts and is set, reset, and modified without any process and without consideration of any of the lawful considerations related to Missouri's statutory bail system or consistent with the United States Constitution.[16]  Nor is the amount set in relation to any particular pending charge for

---

[16] In the case of new warrantless arrestees who owe no debts from prior cases, the City uses these release amounts to ensure collection of future not-yet-imposed money judgments from people who will likely be too poor to pay those judgments after conviction absent the threat of jail.  Because it releases people for free after indeterminate periods of time but routinely prior to any court date, the City uses these "cash bond" amounts to ensure that it collects money for ultimate violations in advance rather than for any legitimate pretrial government objective.  The City uses a cash "bail schedule" based on the charge of arrest as determined by City police as the starting point for police and jail officials to negotiate and lower release amounts with arrestees and their families the longer a person remains in jail after an arrest.

which legal proceedings are imminent.  Indeed, inmates routinely do not even have future court dates set and are held indefinitely without being brought to court.  If a person subsequently misses any future payment, the City, without any legal process, confiscates any previous amounts paid by the person to secure their release from jail and resets the person's debts.  The City also adds a "warrant" fee for the person's missed payment without any legal process.[17]  In this way, many impoverished people end up paying thousands of dollars over a period of many years to the City based on a small number of relatively inexpensive initial tickets.

182.    At any moment, any person can end this cycle by paying the balance of her debt. It is and has been the policy and practice of the City of Ferguson to allow any inmate at any time to pay the full amount of the debt owed and to be released immediately, terminating for good all existing previously closed "cases" for which debt is still being collected.[18]

183.    Similarly, at any time, either before an arrest or after an arrest, the policy and practice of the City of Ferguson is to allow all arrest warrants to be removed and inmates to be released immediately if they pay the entire amount of their outstanding balance with the City.   It is also the policy and practice of the City to allow individual warrants to be removed without eliminating the entire debt if the person pays an amount arbitrarily set by City employees, usually several hundred dollars in cash based on the total unpaid balance.

184.    The City employs a materially different set of procedures for those people who retain private counsel.  It is and has been the policy and practice of the City of Ferguson to remove existing arrest warrants and schedule new court dates for those debtors who retain a

---

[17] For example, the person is not arraigned on any new charge for failure to appear prior to the "warrant" fee being added, and the person is not given a meaningful opportunity to present a defense to the elements of such a potential charge.  The money is simply added to the person's debts.

[18] The "cases" for which the City is collecting debts have, for the most part, been closed for years, with civil judgments entered requiring the payment of fines and costs.

private lawyer.  Unrepresented people are told that there is no way to clear their warrants unless they pay the City.

185.    It is and has been the policy and practice of the City of Ferguson to keep some debtors in jail for indefinite periods without bringing them to court.  The City has often kept inmates unable to make monetary payments in its jail without bringing them to court for days or weeks.[19]

### ii.   Debt-Collection Proceedings in the Ferguson Municipal Court

186.    It is and has been the policy and practice of the City of Ferguson to conduct court sessions approximately three times per month.[20]  Inmates brought to the court from the jail (which is rare) are told that they will remain in jail unless they make monetary payments even though it is the policy and practice of the City of Ferguson not to provide them with an attorney and not to conduct any meaningful inquiry into their ability to pay as required by the United States Constitution.[21]

187.    Inmates are not advised of their relevant rights under federal or Missouri law, including applicable constitutional rights and state-law defenses and procedures.

---

[19] The City also follows a policy and practice of holding inmates in jail for days on behalf of other municipalities until the other municipality decides whether it will pick them up or not.

[20] Because the City holds court so infrequently, those arrested on new offenses or warrants who cannot afford the amount of money set by the City have often languished in jail for more than a week before seeing a judicial officer. Inmates arrested on new charges (as opposed to previously unpaid debts) are told that they will not be released from custody prior to trial unless and until they make generically determined monetary payments.  As attention on Ferguson has grown in recent months, the City has begun negotiating with arrestees and often releasing inmates with new charges for free after shorter periods of incarceration if they cannot come up with the money to be released immediately.  As always, arrestees who are not indigent and who can afford the scheduled monetary payment are released immediately after booking.

[21] Because no inquiry is made into ability to pay, no inquiry is likewise made into the reasons for non-payment or alternatives to incarceration.

188.     Those appearing in court from jail are told that they must pay a certain amount of money or be kept in jail.  They are, as a matter of policy and practice, told to make phone calls to family members in an attempt to get family members to pay their debts.

189.     Non-incarcerated people are told either to appear in court at future dates or told not to appear in court but to make monetary payments on old debts at the police department. Both groups are told, as a matter of City policy and practice, that failure to bring money to pay old debts will result in their arrest.  As with confined inmates, a person can end this debt collection process at any time—whether a person has been told to appear in court or told to make payments at the police department—by paying what she owes to the City in full.  If a person is too poor to end this process, her closed "case" can go on for years and years in perpetuity after a civil judgment assessing financial penalties, with the City imposing additional fees and surcharges for missed debt-collection payments.[22]

190.     The City prosecutor and City judge do not conduct indigence or ability-to-pay hearings.  Regular observers of the City court have never once seen an indigence or ability to pay hearing conducted in the past five years.

191.     The City prosecutor and City judge conduct no meaningful individualized process prior to ordering people to make particular monthly payments.  Payment plans are set entirely without any adversarial process and without any individualized inquiry into the circumstances of a debtor.  City jail officials ordering payments upon release from jail similarly follow no formal adversarial process in determining the amount of required payments.  Those jailed for unpaid

---

[22] It is the policy and practice of the City of Ferguson to inform debtors that, if they or their families pay their debt in full, they can be released from jail and have all proceedings terminated at any moment.  At any time, the entire process can be ended by a monetary payment.  If a person can afford to pay, the person will never have another court date set by the City of Ferguson.  The termination of these cases is determined solely by the wealth of individuals.

debts from tickets and other offenses (*e.g.* for not making their ordered payments) are not appointed an attorney, even though the City is represented by an experienced prosecutor.

192.    In addition to the difficulty of mounting constitutional and statutory arguments and defenses in the face of an experienced prosecutor, navigating the origin of the numerous fees and surcharges imposed by Ferguson and determining whether they are even validly assessed by the City in any particular case is a complicated inquiry.  This inquiry involves the application of state law and procedure; local law and practice; multiple court files, accounting documents, and receipts over a period of years; and constitutional law to a person's lengthy case history.

193.    The vast majority of those jailed for violating the payment plan condition imposed by the City court were not represented by an attorney on the underlying traffic or minor charge because of the City's policy and practice of not appointing counsel for the indigent.

194.    The Plaintiffs and many other witnesses have observed numerous other impoverished people jailed by the City for non-payment of debts without a meaningful inquiry into their ability to pay, without the representation of counsel, and without the consideration of whether imprisonment serves legitimate state interests in light of available alternatives as required by federal and Missouri law.  The Plaintiffs and other witnesses have observed numerous other people and families who were told that they or their family member would be held in jail by the City unless and until they brought forward large sums of money to pay off debts supposedly owed for tickets and subsequent surcharges.

### iii.   The Deplorable Conditions in the Ferguson Jail

195.    As described above, inmates jailed for non-payment have, as a matter of City policy and practice, been kept in overcrowded cells with inmates strewn about the floors.  The

City has deliberately and callously ignored basic principles of hygiene, sanitation, medical and mental health care, and inmate safety.

196.    Inmates are denied toothbrushes, toothpaste, and soap; they are kept in cells that reek of visible excrement and surrounded by walls smeared with blood and mucus; they are kept in the same clothes for days and weeks without access to laundry or clean undergarments; they huddle in cold temperatures with a single thin blanket even as they beg guards for warm blankets; they develop illnesses and infections in open wounds that spread to other inmates; they sleep next to an open uncleansed toilet; they endure weeks without being allowed to use the moldy shower; women are not given adequate hygiene products for menstruation; they have on occasion been forced to sleep amidst refuse because of the lack of adequate trash removal; they are routinely denied vital medical care and prescription medication, even when their families beg to be allowed to bring medication to the jail; inmates with serious mental health issues are not provided mental health treatment or prescription medication that they need; they are provided food so insufficient and uniform that inmates lose significant amounts of weight and lack essential nutrients; they suffer from dehydration because their only source of water is a foul apparatus connected to the top of the toilet that produces warm water with an unpalatable stench; and they are deprived of books, legal materials, exercise, television, internet, or natural light.

197.    Inmates have been sexually abused and physically beaten by jail staff in the past several years as a result of a culture of unaccountability and abuse resulting from a lack of adequate training and supervision.

198.    These abuses and deprivations are accompanied by other pervasive humiliations. Jail guards routinely taunt impoverished people when they are unable to pay for their release, telling them that all they have to do in order to be released is to pay money that they do not have.

42

Jail guards routinely laugh at the inmates and humiliate them with degrading epithets, many of which focus on how bad the inmates look and smell after languishing in the Ferguson jail.

199.    The totality of these conditions described by the Plaintiffs and by numerous witnesses amounts to unlawful punishment.  The conditions at the Ferguson jail are deliberately designed to be as degrading and humiliating as possible in order to punish debtors for not paying their debts and to discourage them from missing payments to the City.  The purpose and effect is to coerce debtors to borrow money or use money otherwise needed for the basic necessities of life in order to pay the City to avoid being subjected to the dangerous and humiliating Ferguson jail.

200.    The jail conditions created and perpetuated by the City of Ferguson would be unconstitutional under the Eighth Amendment even were convicted prisoners treated with such callous disregard to basic health and safety.  The City forces these conditions on pretrial detainees and post-judgment debtors jailed long after monetary judgments and solely because of their inability to make monetary payments and not pursuant to any criminal sentence.

201.    The use of the Ferguson jail and its deplorable conditions in discrete spurts of indefinite confinement dependent on incrementally and arbitrarily reduced release amounts or eventual release for free after several days has the purpose and effect of punishing people rather than achieving any other lawful goal.

### iv.   The City's Flawed and Unlawful Warrant Process

202.    It is and has been the policy and practice of the City to issue invalid arrest warrants and to apply arbitrary and illegal policies for the issuance and recalling of warrants.

203.    Among the policies and practices of the City of Ferguson are the following:

a. The City informs people that they can remove outstanding warrants simply by paying a sum of money but does not offer a way for the indigent to remove arrest warrants.

b. The City allows for the removal of existing warrants without paying the City only if the person retains a lawyer.

c. The City issues arrest warrants for the failure to make a payment without probable cause to believe that the person had the ability to make a payment.

d. When impoverished people appear in the courtroom and City payment window, they are told by the judge, courtroom officers, City prosecutor, and City clerk that they will be jailed if they do not bring specific sums of money to the City on designated dates in the future.

e. The City issues arrest warrants for "failure to appear" when people do not pay by certain designated dates even though the person did not fail to appear at any court appearance.  The City routinely gives inmates paperwork crossing out a court date and telling them instead to make payments at the police department or to drop money off at the night deposit slot.

f. The City issues arrest warrants for "failure to appear" at court dates for which the person had not been given adequate notice.  For example, for a hearing to which the person had not been validly summoned or to a hearing whose date the City has moved without ensuring actual notice has been given to the person.  The City does not adequately ensure actual notice of changes in court dates and routinely issues arrest warrants even when it has no probable cause to believe that the elements of a "failure to appear" charge have been met, such as that the person did not intentionally fail to appear because the person was in the custody of another jurisdiction or was in the hospital.

g. After arrest pursuant to a warrant, the City either does not bring the person to court at all or delays presentment unnecessarily and for no legitimate purpose for days or weeks.

h. In cases of warrantless arrest, the City fails as a matter of policy and practice to make a neutral finding of probable cause and thus holds people in jail for longer than 48 hours without a neutral finding of probable cause based on sworn evidence.  Moreover, because the City policy is to negotiate cash bond and then to release people for free eventually, it does not detain new arrestees for the purpose of any kind of court proceeding.  Thus, the City's initial detention period based on warrantless arrest is unrelated to any legitimate government interest and entirely unconnected from any need to prepare for any probable cause or preliminary hearing because the City does not hold probable cause hearings or preliminary hearings or make any formal probable cause findings.

## C.     The Cycle of Debt and Jailing in Other Municipalities

204.    Like the other impoverished people stuck in this broken system, the Plaintiffs have been overwhelmed by the combination of multiplying fines, fees, costs, and surcharges

44

from many different municipalities at once, as well as the cycle of repeated jailings and subsequent transfers to several different jails during each jailing, lost jobs, increased fees, and the inability to renew driver's licenses because of unpaid tickets.  After scraping together cash from family and friends and borrowing money to pay Ferguson, the Plaintiffs and other Class members would simply be jailed by another city.

205.    The hopelessness of trying to navigate this system for years without financial resources and without the assistance of a lawyer who understands the process—never knowing when they left the house if they would be arrested and always confronted with the powerlessness of being kept in jail indefinitely because of their poverty—fundamentally altered the lives of the Plaintiffs and continues to tear at the core of the community.

206.    The fear of having basic rights violated with no recourse is a daily fact of life for the Plaintiffs and thousands of others.  It is this despair that the Saint Louis County debtors' prison network cultivates that leads many impoverished people to avoid the system and some, sadly, to take their own lives while languishing in a jail cell.[23]

### Class Action Allegations

207.    The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

208.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the City's unlawful debt-collection scheme.

209.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

---

[23] At least four suicides and suicide attempts by people held because they were too poor to pay for their release have occurred in local municipal jails just in the past five months.

210.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

211.    Plaintiffs propose three Classes: two Declaratory and Injunctive Classes and a Damages Class.  The first Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur debts to the City of Ferguson from fines, fees, costs, or surcharges arising from cases prosecuted by the City of Ferguson.  The second Declaratory and Injunctive Class is all persons who, either because they owe debts to the City of Ferguson, through warrantless arrest, or for any other reason, will become in the custody of the City of Ferguson and thereby subjected to its post-arrest wealth-based detention procedures.

212.    The Damages Class is defined as: All persons who, from February 8, 2010, until the present, were held in jail by the City because of their non-payment of a monetary sum required by the City.

## A.    Numerosity.  Fed. R. Civ. P. 23(a)(1)

213.    Over the past five years, thousands of people have owed and currently owe the City of Ferguson money from old traffic tickets and other minor municipal offenses.  Pursuant to City policy and practice, thousands of people who have indicated that they are too poor to pay their debts in full have been placed on payment plans by the City.  All of these people are currently being threatened with arrest and jailing pursuant to the City's illegal post-arrest money based detention policies if they do not make the payments in the amount or frequency purportedly required by the City.  Pursuant to City policy, thousands of additional arrestees have been and will be charged by the City with new ordinance violations and kept in jail pursuant to the City's illegal post-arrest money-based detention policies.

214.    The City has kept thousands of people in its jail for non-payment of fines, fees,

and cash "bond" in each of the past five years.  The City retains, and is required by law to retain, records of these instances.

215.    The City followed and follows materially the same post-arrest procedures and debt-collection policies, practices, and procedures to accomplish the jailing of the Class members.  For example, pursuant to the City's policy and practice, those kept in jail by the City when they could not pay did not receive meaningful inquiries into their ability to pay as required by federal and Missouri law.   Pursuant to City policy, no determinations of indigence or evaluations of alternatives to incarceration were made, and the City provided none of the relevant state and federal protections for debtors.   Nor were those jailed by the City provided adequate counsel to represent them.

216.    Those who still owe the City debt payments or who will incur such debts or be arrested for new charges will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**B.    Commonality.  Fed. R. Civ. P. 23(a)(2).**

217.    The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.  The Plaintiffs seek relief concerning whether the City's policies, practices, and procedures violated their rights and relief mandating the City to change its policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

218.    Among the most important, but not the only, common questions of fact are:

- Whether the City has a policy and practice of placing and keeping people in its jail who owe money on old judgments unless and until they can pay a monetary sum;
- Whether the City has a policy and practice of keeping people in its jail after arrest unless and until they can pay a monetary sum;
- Whether the City has a policy and practice of incrementally lowering the amount required to buy a person's release from custody as the person sits in jail;

- Whether the initial amount of money required by the City for release is predetermined and/or set without reference to a person's ability to pay;
- Whether the City has a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before keeping the person in jail for non-payment;
- Whether the City provides notice to debtors that their ability to pay will be a relevant issue at the proceedings at which they are jailed or kept in jail and whether the City makes findings concerning ability to pay and alternatives to incarceration;
- Whether the City provides adequate legal representation to those jailed for non-payment in proceedings that result in their incarceration;
- Whether the City jail conditions are and have been unsanitary, unsafe, and inhumane in the ways described in this Complaint;
- Whether City employees and agents have a policy and practice of threatening debtors and families of debtors with incarceration for unpaid debts without informing them of their rights;
- Whether the City has a policy of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt;
- Whether the City has a policy and practice of failing to make prompt neutral probable cause findings based on sworn evidence for warrantless arrests.

219.    Among the most important common question of law are:

- Whether keeping people in jail solely because they cannot afford to make a monetary payment is lawful;
- Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by the City for non-payment;
- Whether people who cannot afford to pay the City are entitled to the consideration of alternatives to incarceration before being jailed for non-payment;
- Whether it is lawful for the City to keep arrestees in jail after arrest pursuant to predetermined cash bail that does not take into account ability to pay before releasing arrestees for free after indeterminate periods;
- Whether people are entitled to the appointment of and representation by a lawyer in proceedings initiated and litigated by City prosecutors that result in their incarceration if they cannot afford an attorney;
- Whether the City can employ jail, threats of jail, onerous generic "payment dockets," and other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay the monetary judgment to the City in full;
- Whether the City can arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt;

- Whether and how long the City can lawfully hold people in custody on warrantless arrests without any neutral finding of probable cause and without any intention of bringing the arrested person before a neutral judicial officer for such a finding;
- Whether the jail conditions described in this Complaint violate federal law.

220.    These common legal and factual questions arise from one central scheme and set of policies and practices: the City's enormously profitable traffic and ordinance post-arrest detention and debt-collection system.  The City operates this scheme openly and in materially the same manner every day, and all of the ancillary factual questions about how that scheme operates are common to all members of the Class, as well as the resulting legal questions about whether that scheme is unlawful.   The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

**C.     Typicality.  Fed. R. Civ. P. 23(a)(3).**

221.    The named Plaintiffs' claims are typical of the claims of the members of the Classes, and they have the same interests as all other members of the Classes that they represent. Each of them suffered injuries from the failure of the City to comply with the basic constitutional provisions detailed below.  The answer to whether the City's scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

222.    If the named Plaintiffs succeed in their claims that the City's policies and practices concerning post-arrest wealth-based detention and debt collection for fines, fees, costs, and surcharges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.[24]

---

[24] The named Plaintiffs representing the Declaratory and Injunctive Class are Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, Shameika Morris, Daniel Jenkins, Ronnie Tucker, and Tonya Deberry.  The named Plaintiffs representing the Damages Class are: Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, Shameika Morris, Daniel Jenkins, Ronnie Tucker, and Tonya Deberry.

### D.      Adequacy.  Fed. R. Civ. P. 23(a)(4).

223.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes.  There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

224.    Plaintiffs are represented by attorneys from Equal Justice Under Law,[25] who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of the City's scheme and the relevant constitutional and statutory law.  Plaintiffs are also represented by attorneys from ArchCity Defenders, who have extensive experience with the functioning of the entire municipal court system in the City of Ferguson through their representation of numerous impoverished people in the City of Ferguson.[26]  Plaintiffs are also represented by the Saint Louis University School of Law,[27] whose distinguished clinical professors and dedicated students have devoted enormous time and resources to studying the functioning of the municipal court system and the applicable federal and state law, as well as to representing impoverished people affected by the illegalities permeating the City's municipal

---

[25] Equal Justice Under Law is a non-profit civil rights organization based in Washington, D.C.  The organization is funded in part by the Harvard Law School Public Service Venture Fund.

   Counsel from Equal Justice Under Law was recently lead counsel in a landmark federal civil rights class action lawsuit against the City of Montgomery for engaging in similar debtors' prison practices.  In that case, the United States District Court for the Middle District of Alabama issued a preliminary injunction condemning and forbidding the City's similar jailing of impoverished people with unpaid debts, and the case was successfully settled after the City agreed to compensate the Plaintiffs and to the entry of an injunction reforming its entire municipal debt-collection regime.

[26] ArchCity Defenders is a non-profit public interest law firm based in Saint Louis.  It has represented the poor and homeless in municipal court cases for the past five years and is an expert on the ways in which Ferguson's illegal practices and policies make and keep people poor.  ArchCity Defenders also published an extensive report detailing similar practices and policies in the cities of Bel-Ridge and Florissant. The report is available at www.archcitydefenders.org.

[27] Saint Louis University School of Law Clinics have been involved in representing the poor and homeless in municipal courts for many years and have extensive knowledge of and experience with the systemic constitutional violations pervading the City's scheme.  Further, the Clinic and its professors have extensive experience in class action lawsuits.

scheme.

225.     The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, City employees, City jail inmates, families, attorneys practicing in the Ferguson Municipal Court, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and jails.

226.     Counsel have also observed numerous courtroom hearings in the City of Ferguson and in municipalities across the region in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

227.      As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the City's scheme and with all of the relevant state and federal laws and procedures that can and should govern it.   Counsel has also developed relationships with many of the individuals and families most victimized by the City's practices.

228.     The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**E.     Rule 23(b)(2)**

229.     Class action status is appropriate because the City, through the policies, practices, and procedures that make up its post-arrest wealth-based detention and traffic and ordinance debt-collection scheme, has acted and refused to act on grounds generally applicable to the Declaratory and Injunctive Class.  Thus, a declaration that people in the City cannot be held in jail solely because they cannot afford to make a monetary payment will apply to each Class

member.  Similarly, a determination that Class members are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by the City for non-payment will apply to each Class member.  The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at proceedings initiated and litigated by City prosecutors in connection with which they are jailed; that the City cannot collect debts from Class members in an onerous manner that violates and evades all of the relevant protections for other judgment debtors; that the jail conditions to which members of the class are exposed are inhumane and unconstitutional; and that the City cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their liberty.

230.    Injunctive relief compelling the City to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to the City's unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts or be subject to arrest by the City in the future from the same unconstitutional conduct.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**F:      Rule 23(b)(3)**

231.    Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate.  This case turns, for every Class member, on what the City's policies and practices were and on whether those policies were lawful.

232.    The common questions of law and fact listed above are dispositive questions in the case of every member of the Class.  The question of liability can therefore be determined on a class-wide basis.  Class-wide treatment of liability is a far superior method of determining the content and legality of the City's policies and practices than individual suits by hundreds or thousands of City residents.  The question of damages will also be driven by class-wide determinations, such as the policies, practices, and conditions at the City jail.  To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully jailed.  Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration.  If need be, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

233.    The Plaintiffs seek the following relief and hereby demand a jury trial in this cause for all matters so appropriate.

### Claims for Relief

**Count One:  Defendant City of Ferguson Violated the Plaintiffs' Rights By Jailing Them For Their Inability To Pay the City.**

234.     Plaintiffs incorporate by reference the allegations in paragraphs 1-233.

235.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to make a payment to the government if that person is indigent and unable to pay.  Defendant violated Plaintiffs' rights by jailing Plaintiffs when they could not afford to pay the debts allegedly owed from traffic and other minor offenses.  Defendant violated Plaintiffs' rights by imprisoning them, and by threatening to imprison them, without conducting any inquiry into their ability to pay and without considering

53

alternatives to imprisonment as required by the United States Constitution.  At any moment, a wealthier person in the Plaintiffs' position could have paid a sum of cash and avoided arrest and jailing.  Defendant's policy and practice of placing and keeping Plaintiffs in its jail unless and until they are able to pay arbitrarily determined and constantly-shifting sums of money violates the Fourteenth Amendment.  Similarly, the Equal Protection and Due Process Clauses prohibit the City's post-arrest wealth-based detention as a result of the City's use of a cash bond whereby initial cash release amounts are set (and routinely modified by City employees) without any inquiry into a person's ability to pay.  As a result, those arrested for unpaid debts and/or for new offenses who are able to pay the cash bond are released immediately while those who cannot pay the cash bond are detained solely because of their inability to pay without any meaningful legal process to inquire into their ability to pay the amounts demanded by the City.

**Count Two: Defendant City of Ferguson Violated Plaintiffs' Rights By Imprisoning Them Without Appointing Adequate Counsel.**

236.    Plaintiffs incorporate by reference the allegations in paragraphs 1-235.

237.    Defendant violated Plaintiffs' right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution by jailing Plaintiffs during proceedings initiated by City prosecutors at which Plaintiffs did not have the benefit of counsel and did not knowingly, intelligently, and voluntarily waive counsel.  The City's policy of not providing adequate counsel in proceedings in which indigent people are ordered to be imprisoned in the City jail for non-payment, which are, in turn, based on payment plans arising from traffic and other violations at which the person was also unrepresented, violates the Sixth and Fourteenth Amendments to the United States Constitution.

**Count Three: Defendant City of Ferguson's Use of Indefinite and Arbitrary Detention Violates Due Process.**

238.    Plaintiffs incorporate by reference the allegations in paragraphs 1-237 above.

239.    The Due Process Clause of the Fourteenth Amendment prohibits Defendant from jailing the Plaintiffs indefinitely and without any meaningful legal process through which they can challenge their detention by keeping them confined in the Defendant's jail unless or until they could make arbitrarily determined and frequently shifting cash payments, or until City employees decided to release them for free.

**Count Four: The Deplorable Conditions in the Ferguson Jail Violate Due Process and Constitute Impermissible Punishment**

240.    Plaintiffs incorporate by reference the allegations in paragraphs 1-239 above.

241.    The unsafe, unsanitary, inhumane, and dangerous conditions of confinement in the Ferguson jail constitute impermissible punishment unrelated to serving any criminal judgment.  Even if imposed after valid conviction, the conditions would constitute cruel and unusual treatment.  The deplorable and excessively harsh conditions in the Defendant's jail are unnecessary to accomplish any legitimate government objective and shock the conscience of any reasonable person concerned with human dignity and liberty.

**Count Five: Defendant City of Ferguson' Use of Jail and Threats of Jail To Collect Debts Owed to the City Violates Equal Protection Because It Imposes Unduly Harsh and Punitive Restrictions On Debtors Whose Creditor Is the Government Compared To Those Who Owe Money to Private Creditors.**

242.    Plaintiffs incorporate by reference the allegations in paragraphs 1-241 above.

243.    The United States Supreme Court has held that, when governments seek to recoup costs of prosecution from indigent defendants, they may not take advantage of their position to impose unduly harsh methods of collection solely because the debt is owed to the government and not to a private creditor.  Not only does the City place indigent people on generic and overly onerous payment plans lasting years or decades when the cases of wealthier people would be

terminated, but by imposing imprisonment, repeated threats of imprisonment, indeterminate "payment dockets" for many years, extra and invalid fees and surcharges, and other restrictions on Plaintiffs, the City takes advantage of its control over the machinery of the City jail and police systems to deny debtors the procedural and substantive statutory protections that every other Missouri debtor may invoke against a private creditor.  Many people like the Plaintiffs owing money to the City of Ferguson on old judgments have to borrow money and go further in debt in order to pay off the City of Ferguson because other non-government creditors are not permitted to jail them for non-payment of debt.  This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.

**Count Six: Defendant City of Ferguson's Policy and Practice of Issuing and Serving Invalid Warrants, Including Those Solely Based on Nonpayment of Monetary Debt, Violates the Fourth and Fourteenth Amendments.**

244.    Plaintiffs incorporate by reference the allegations in paragraphs 1-243 above.

245.    The City's policy and practice is to issue and serve arrest warrants against those who have not paid their traffic debt.  These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when the City has prior knowledge that the person is impoverished and unable to pay the debts and possesses other valid defenses.  These warrants are regularly sought, issued, and served without any finding of probable cause that the person has committed the elements of any offense.  The City chooses to pursue warrants instead of issuing summons even when it has spoken to people on the phone or in person and has the opportunity to notify them to appear in court.  The City's policy of allowing wealthy residents or residents who can afford to hire an attorney to remove their warrants but refusing to clear warrants for indigent people who cannot afford those options is unlawful.  Moreover, the City's policy and practice of not presenting arrestees in court or unreasonably delaying presentment for days or weeks for no

56

legitimate reason is unlawful.  These practices violate the Fourth and Fourteenth Amendments and result in a deprivation of fundamental liberty without adequate due process.

> **Count Seven: Defendant City of Ferguson's Extended Detention of Warrantless Arrestees Without A Neutral Judicial Finding of Probable Cause Based On Sworn Evidence Violates the Fourth and Fourteenth Amendments.**

246.     Plaintiffs incorporate by reference the allegations in paragraphs 1-245 above.

247.     The Fourth Amendment (as incorporated through the Fourteenth Amendment) prohibits extended detention after a warrantless arrest without a prompt finding of probable cause by a neutral judicial officer based on sworn evidence.  The City routinely fails as a matter of policy and practice to make a neutral finding of probable cause and thus keeps people in jail for longer than 48 hours without a neutral finding of probable cause based on sworn evidence. Because City policy is to negotiate cash bond and then to release people for free eventually if they cannot pay, it does not detain new arrestees for the purpose of any legal proceeding.  Thus, the City's extended initial detention period for those who cannot afford to pay after warrantless arrest is unrelated to any legitimate government interest and entirely unconnected from any need to prepare for any probable cause or preliminary hearing because the City does not hold probable cause hearings or preliminary hearings or make any formal probable cause findings.

## Request for Relief

 WHEREFORE, Plaintiffs request that this Court issue the following relief:

a. A declaratory judgment that Defendant violates Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them because they cannot afford to pay the City and by imprisoning them without conducting any meaningful inquiry into their ability to pay or into alternatives to incarceration;
b. A declaratory judgment that Defendant violates Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without appointing adequate counsel at the proceedings that led to their incarceration;
c. A declaratory judgment that Defendant violates Plaintiffs' rights by holding them indefinitely in jail independent of any formal legal process;

d.  A declaratory judgment that Defendant violates Plaintiffs' rights by subjecting them to unconstitutional jail conditions;

e.  A declaratory judgment that Defendant violates Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

f.  A declaratory judgment that Defendant violates Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause to believe that the elements of an offense had been committed, with unreasonable delay prior to presentment, without requiring a prompt neutral probable cause finding for warrantless arrestees, and without providing pre-deprivation of liberty process where such process is easily available to the City for judgment debtors;

g.  An order and judgment permanently enjoining Defendant from enforcing the above-described unconstitutional policies and practices against Plaintiffs;

h.  A judgment compensating the Plaintiffs for the damages that they suffered as a result of the City's unconstitutional and unlawful conduct;

i.  An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other relief this Court deems just and proper.


Respectfully submitted,


 _/s/ Alec Karakatsanis_____
Alec Karakatsanis (E.D.Mo. Bar No. 999294DC)

Equal Justice Under Law
916 G Street, NW Suite 701
Washington, DC 20001
(202)-681-2409
alec@equaljusticeunderlaw.org


 _/s/ Thomas B. Harvey_____
Thomas B. Harvey (MBE #61734)

 _/s/ Michael-John Voss_____
Michael-John Voss (MBE #61742)

ArchCity Defenders
812 N. Collins Alley
Saint Louis, MO 63102
855-724-2489


 _/s/ John J. Ammann_____
John J. Ammann (MBE #34308)

58

_/s/ Stephen Hanlon_____
Stephen Hanlon (MBE #19340)

_/s/ Brendan Roediger_____
Brendan Roediger (E.D.Mo. Bar No. IL6287213)

Saint Louis University School of Law
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
314-977-2778

_/s/ Sonia W. Murphy_____
Sonia W. Murphy (*Pro Hac Vice*)

White & Case LLP
701 13th Street, NW
Washington, DC 20005
(202) 637-6161

*Attorneys for Plaintiffs*