**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEILEE FANT et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:15-cv-253-AGF |
| THE CITY OF FERGUSON | ) | |
| | ) | (Class Action) |
| Defendant. | ) | |
| | ) | |

<u>**RESPONSE TO DEFENDANT'S PARTIAL MOTION TO DISMISS**</u>

The City seeks partial dismissal of Plaintiffs' First Amended Complaint. Its filing misstates many of Plaintiffs' factual allegations and relies on a fundamental misunderstanding of the law applicable to them. The City's arguments boil down to one central contention: everything that Ferguson's officials, employees, officers, and agents did wrong was the fault of the former Ferguson Municipal Judge (a person immune from civil suit for damages). As a result, the City argues, it bears no responsibility for the constitutional violations that pervaded its lucrative municipal debt-collection scheme for years. This argument is outrageous as a matter of law and fact, and this Court should reject it and continue to allow this case to proceed.[1]

**I.      The Complaint Alleges that *the City* — Not Merely Its Municipal Court Judge — Committed the Constitutional Violations Alleged**

The basic principles of municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), are not disputed in this case. The Complaint alleges a

---

[1] This Court has already ruled that Plaintiffs' allegations, if true, state constitutional violations. *See* Doc. 19 (partly denying the City's first Motion to Dismiss). The City does not advance any new arguments on the merits or challenge the additional claims made in the Amended Complaint on their merits. The City instead makes two general arguments: first, that it cannot be held liable for those constitutional violations because they are the fault of the municipal court (which, it claims, is an arm of the state); and second, that equitable relief is precluded by principles of "standing" and "federalism." Plaintiffs will address only those issues.

coordinated set of municipal policies and practices — devised and executed at every turn by City employees — intended to generate revenue through the policing, prosecution, and jailing functions of the City.  Ferguson now attempts to escape liability for its flagrant constitutional violations by arguing that all but one of the counts in Plaintiffs' Complaint were solely the fault of its former municipal judge.

The City first spends several pages establishing various unremarkable propositions, such as that the municipal courts in St. Louis County are part of a unified judicial system, that various rules of procedure promulgated by higher courts apply to municipal courts, and that decisions of municipal courts are subject to the state judicial review process.  Doc. 58 at 6–8.  The City then asserts that actions taken by "a municipal judge in his or her judicial capacity" are not attributable to the City.  *Id.* at 9.  According to the City, these meager premises are enough to establish that all but one of the counts alleged in the Complaint should be dismissed.  *Id.* at 4.

The problem with this argument is that Plaintiffs are not trying to hold the City liable for the judicial decisions that a municipal judge made in particular cases.  Every allegation in the Complaint is based on *the City's own policies and practices* in arresting people, detaining them in its jail, using its discretion to prosecute them, enacting and enforcing various ordinances, and, in general, choosing to use its prosecutorial and law enforcement discretion to collect debts from previously adjudicated municipal cases in unconstitutional ways.  The City thus mistakes elements of state court judicial review that are necessary in any unified court system for total control over all municipal functions related to law enforcement, prosecution, or the municipal court.  To be clear: the fact that, like any court in Missouri, the Ferguson Municipal Court is subject to certain rules and procedures and that its judge can be reversed by higher courts does not mean that the City plays no role in the policies and practices followed by its police

2

department, its prosecutors, and its jail in processing arrestees and collecting money judgments

owed to the City.

## A.      Count One

The City's arguments on Count One are hard to decipher.[2]  As best Plaintiffs can tell, the

City claims that it is not liable for any of the illegal detentions perpetrated by its prosecutors,

police officers, and jail, because its municipal judge is authorized by state law to set a "bond

schedule."  Doc. 58 at 11-13.  But Plaintiffs have alleged in detail a scheme in which the City

*chooses* to collect debts from money judgments by arresting people for not paying and then

holding them in its jail unless and until they make payments to the City.  Until recently, this

scheme was typically enforced by Ferguson City prosecutors through a "failure to appear"

ordinance (which the City Council has now *chosen* to repeal, see Consent Decree, *United States*

*v. City of Ferguson*, No. 4:16-cv-000180-CDP, at ¶ 37), and discretionary decisions by City

prosecutors and City enforcement officials about how to pursue debt collection from old

municipal court judgments by charging "failure to appear" when a person merely missed a

payment.  City employees and officials are involved in every element of this scheme:  They tell

---

[2] For instance, the City's statement of controlling law regarding municipal liability highlights cases finding that a judge applying state law and subject to state judicial review is not a final municipal policymaker for purposes of *Monell* liability.  *See* Doc. 58 at 8 & nn.4-6.  One might infer that the City intends to argue that the Ferguson Municipal Court is not a final policymaker for the City (with respect to the areas implicated by Plaintiffs' claims).  But the City goes on to assert that "state law dictates the Ferguson Municipal Judge *is* the final policymaker with respect to fines, imprisonment, bonds, and inquiries as to the ability to pay."  *Id.* at 12 (emphasis added).  This is puzzling.  If by "final policymaker" the City means "final *municipal* policymaker," this latter claim would seem to contradict the very argument suggested by the City's statement of controlling law.  One might therefore be tempted to conclude that in calling the Municipal Judge a "final policymaker" the City instead means to assert that he is a final *state* policymaker.  But the City appears to foreclose that reading two sentences later, when it asserts that the Municipal Judge "is subordinate to the supervision of the presiding judge of the circuit court in which he or she sits."  *Id.*; *see also id.* at 7 (noting that Missouri law subjects Municipal Court orders to direct, de novo review in state court); *id.* at 14 (claiming that "the St. Louis County Circuit Court's presiding judge had the right to oversee and review the Ferguson Municipal Court").  It goes without saying that decisions subject to such review are not final.  In this manner, Plaintiffs are repeatedly left to guess at the relevance of the case law that the City purports to apply, and at the argument that this case law is meant to support.

Throughout its brief the City gestures at various legal doctrines in ways that are difficult to understand or respond to.  For example, the City includes a footnote halfheartedly invoking principles of sovereign immunity.  Doc. 58 at 4 n.2.  Should this Court conclude that any of the seemingly irrelevant and unclear arguments raised by the City warrant further explanation, Plaintiffs submit that oral argument or further briefing would be appropriate.

3

people not to show up to court and instead to make payments at the City police department; attorneys representing the City make all case-related decisions concerning whether to pursue debts from old money judgments and, if so, by what methods; City employees accept monetary payments to withdraw arrest warrants or as a courtesy to defendants able to purchase a defense attorney, and City jail officers negotiate payments funneled into the City treasury from arrested inmates and their families using the threat of continued imprisonment.  Doc. 53 at ¶¶ 105-06, 130, 162, 166, 174, 189, 203.

Thus, the first problem with the City's new argument is that it ignores the facts alleged in the Complaint.  Determining *Monell* liability requires a fact-intensive inquiry, and the Complaint thoroughly alleges that the policies and practices concerning post-arrest wealth-based detention were implemented and enforced at every turn by *City employees in the police department*.  *See, e.g.*, Doc. 53 at ¶¶ 29, 181 n.16.  Nowhere do Plaintiffs allege that the municipal judge played any role in these post-arrest procedures as they were designed and carried out, let alone that the municipal judge played the only decisive role in every single decision.  Indeed, if the allegations are true, one of the central problems with the City's scheme is that it takes place entirely outside of any judicial process recognized in American law.  It is a scheme whereby the City's jailors themselves extort money from people by using their arrest and detention powers to "negotiate" for payments to the City.  *Id.* at ¶¶ 130, 162, 166, 170 n.15, 174, 181 n.16, 203.  If these allegations are true, then it was the City's own officers making the relevant decisions about wealth-based detention and post-arrest procedure disconnected from any formal judicial proceeding.[3]  This alone is reason enough to deny Defendant's Motion.

---

[3] The City's comparison to *Granda v. City of St. Louis*, 472 F.3d 565 (8th Cir. 2007), see Doc. 58 at 13, is therefore beside the point.  The court in *Granda* emphasized that the judge's act challenged there was a "judicial decision," that it was "subject to review or reversal by higher state courts," and that it was not subject to such review in

4

Plaintiffs feel compelled to inform the Court, however, that both parties are now in possession of tangible documents and sworn deposition transcripts exchanged in discovery that establish the City's active role in illegally detaining people on cash bond, contrary to the City's assertions to this Court.  The City's lawyers are also in possession of overwhelming evidence that City officials, including police commanders, clerks supervised by the City finance department, and jail staff, acting according to written and unwritten policies set at the highest levels of Ferguson's government, routinely set and unilaterally modified cash bond amounts entirely outside of any judicial process and without the knowledge or involvement of the municipal judge.  Thus, the arguments advanced by the City in its Motion are not only irrelevant to the factual allegations in the Complaint, but also knowingly misleading.[4]

A second problem with the City's argument is that Count One, like each of the other Counts, describes part of a larger municipal scheme to use the Ferguson Municipal Court and jail to collect revenue.  This scheme pervaded Ferguson's law enforcement apparatus and was enforced openly by City officials every single day.  Every relevant person in the chain of City employees and officials was aware of how these policies and practices worked: for example, that warrants were issued because of nonpayment, and that once arrested, a person was not held in jail until a court appearance but was instead extorted for additional payments and then released *without any judicial proceedings* after indeterminate periods of time *at the discretion of police and jail staff*.  Doc. 53 ¶¶ 11-13, 25-27, 30, 41 n.5, 46-47, 50, 64-65, 76-82, 92, 100-04, 108, 120-21, 127, 129-32, 142, 144, 148-50, 160, 162, 170, 173, 175, 181 n.16, 183, 186 n.20, 191, 201, 203, 239, 247.  All of this resulted from discretionary choices made by the City's

_____

municipal courts.  *See* 472 F.3d at 569.  Whether such a judicial decision can ever be attributed to a municipality has no bearing on the City's liability for non-judicial practices, which is the focus of Count One.  *See* Doc. 53 at ¶ 235.

[4] This Court should reject the City's arguments because they contradict the facts alleged in the Complaint, but Plaintiffs make this proffer in the event the Court wishes to have an evidentiary hearing concerning the City's misleading claims.

prosecutors to use police and jail to collect unpaid debts stemming from previously adjudicated municipal court cases.   None of these debt-collection cases, warrants, arrests, or indefinite detentions would exist without the City's exercise of that prosecutorial discretion.  Not even the City denies that municipalities are liable for the policies and practices of their prosecutors, as the Supreme Court has recognized since *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

The money earned from this scheme went into the City's coffers, see Mo. Stat. § 470.080, and the City allowed the scheme to persist through its prosecutors and police department for years.   The result was a city in which there were 3.62 arrest warrants *per household* and 2.2 arrest warrants *for every adult*, mostly for unpaid debts.  Doc. 53 at ¶¶ 5, 167.   These are policy decisions concerning how to collect money owed to the City.   According to database records produced by the City, Ferguson's law enforcement policies and practices resulted in the detention of over 18,000 people on cash bond in its jail in the five years before this lawsuit was filed,[5] and the former Chief of Police can remember only *one person during that entire period* who was held by Ferguson pursuant to an actual sentencing order issued by the Ferguson Municipal Judge in an individual case.[6]   Doc. 53 at ¶ 166.   This kind of unprecedented perversion of an entire municipal law enforcement system is not something accomplished alone by a rogue municipal judge.

No state law requires Ferguson to have a police force, a jail, or a municipal court.[7]   The City's prosecutors are not required to collect debts using the City jail — indeed, Ferguson has

---

[5] Plaintiffs make this proffer to highlight how discovery conducted since this Court denied the City's first Motion to Dismiss has corroborated the allegations in the Complaint and led to rich swaths of evidence proving municipal liability in ways that make the City's most recent filing both confusing and disingenuous.  *See supra* note 4.

[6] According to the Chief, that person was sentenced to two weekends in jail.

[7] *See, e.g.*, Mo. Stat. § 479.040 (allowing cities of Ferguson's size to choose to have violations of municipal ordinances heard and determined in state circuit court rather than in a municipal court); *id.* § 479.050 (giving each municipality's governing body the authority to direct whichever court hears and determines municipal violations — be it a municipal court or a state circuit court — to establish a traffic violations bureau funded by the municipality).

now agreed with the federal government that it will change its policies to forbid its prosecutors from doing so anymore — nor are its employees required to seek and enforce warrants based solely on non-payment and under circumstances that the Complaint alleges are unconstitutional and fraudulent.[8]  *See, e.g.*, Doc. 53 at ¶ 13, 177, 194, 237, 243.  The City is not required to assess additional fees for each of those arrests and then to arrest debtors later for failure to pay those additional fees (which the City prosecutors and officials add to case balances without even waiting for formal conviction), thereby creating a perpetual cycle of increasing debt and repeated detention.  Doc. 53 ¶ 189; *id.* at 35 n.15.  No municipal judge or state law forced these City employees to design and maintain this unlawful scheme for years.

Ironically, the City attempts to justify dismissal of Plaintiffs' equitable claims by invoking the pending consent decree negotiated by the City with the United States Department of Justice and submitted to another federal judge in this Court.  *See* Consent Decree, *United States v. City of Ferguson*, No. 4:16-cv-000180-CDP.  After arguing for the first half of its brief that the City had no control over anything and nothing to do with anything unconstitutional, the City then points to a consent judgment between it and the federal government and claims that this judgment fixes all of the problems raised by the Complaint.  For example, the negotiated consent decree includes an agreement by the City that it will stop using arrest warrants to collect court debts owed to the City — one of the central violations alleged in this case.  *See id.* at ¶ 347.  The judgment also contains several other relevant provisions disproving the City's claim to this Court that it lacks all control over the violations in this case, provisions by which the City has agreed to new protocols, policies, and actions that were always within its control.  *See, e.g.*, *id.* at ¶ 325

---

[8] *See* Mo. Stat. § 560.031(5) ("Upon default in the payment of a fine or any installment thereof, the fine may be collected by any means authorized for the enforcement of money judgments."); *id.* § 560.031(1) ("When an offender sentenced to pay a fine defaults in the payment of the fine or in any installment, the court upon motion of the prosecuting attorney or upon its own motion may require him to show cause why he should not be imprisoned for nonpayment.").

(removing the Ferguson Municipal Court from the oversight of the City Finance Director); *id.* at ¶¶ 349-50 (eliminating use of money bond); *id.* at ¶ 357 ("[T]he City will develop and implement policies to ensure that the Ferguson Municipal Court operates impartially, independently from the City Prosecutor, and in a manner that eliminates existing and potential unlawful conflicts of interest."); *id.* at ¶ 358 ("The City agrees to ensure that the Municipal Judge appointed to serve on the Ferguson Municipal Court is sufficiently independent to avoid impropriety, the appearance of impropriety, and existing or potential conflicts of interest."); *infra* note 24.

If the City's arguments are correct, then either the City perpetrated a fraud on the Department of Justice, or else both the City and the Department of Justice made a serious mistake by failing to realize that the City actually had no power to make that agreement.  Of course, the United States government and the City were not mistaken: Ferguson and its officers, prosecutors, employees, and agents do control every aspect of these policies and have the power to rid the City's municipal law enforcement system of the flagrant constitutional violations alleged in the Complaint.  By negotiating and signing the decree, the City warranted (consistent with the law and common sense) that it has the power to stop its prosecutors, police officers, and jail guards from committing the constitutional violations alleged.  Inasmuch as the City has the power to keep that promise by discontinuing its lucrative and longstanding collections scheme, it is responsible for the legal consequences of not having exercised that power earlier.

## B.    Count Two

The City next argues that, even if its rampant jailing of impoverished debtors violated the Constitution, it is not responsible for the lack of indigent defense counsel because that is the fault of the municipal judge.  *See* Doc. 58 at 13-15.

This argument fails for all of the reasons stated above, which are applicable to all of the City's arguments. In addition, it is worth making several observations about the City's liability for its failure to provide adequate indigent defense services. First, the City asserts that this case is "against the Ferguson Municipal Judge for his conduct pertaining to advising of or appointment of counsel to indigent individuals." Doc. 58 at 13. Nowhere does the Complaint assert that. What Plaintiffs actually allege is a municipal scheme designed to jail people without any legal process and without the involvement of the Municipal Judge at the constitutionally relevant times. Plaintiffs are thrown into jail by the City without access to a lawyer who could use the tools of state law to challenge those illegal actions. These jailings occur in the purported context of enforcing money judgments in cases in which the City also failed to provide an attorney, a further violation of federal law. *See Alabama v. Shelton*, 535 U.S. 654, 658 (2002) ("We hold that a suspended sentence that may end up in the actual deprivation of a person's liberty may not be imposed unless the defendant was accorded the guiding hand of counsel in the prosecution for the crime charged." (internal quotation marks omitted)); *United States v. Pollard*, 389 F.3d 101, 105 (4th Cir. 2004) ("We also acknowledge, as did the Fifth Circuit, that the actual imposition of a prison term upon revocation of probation may pose Sixth Amendment problems if the defendant was uncounseled for the underlying conviction that led to probation."); *United States v. Perez-Macias*, 335 F.3d 421, 428 (5th Cir. 2003) ("The actual imposition of a term of imprisonment upon probation revocation may pose a Sixth Amendment problem.").[9] Given that one of the major problems with the City's scheme was that it deprived

---

[9] It is thus irrelevant whether "a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker for purposes of § 1983 liability," as the Ninth Circuit held in *Eggar v. City of Livingston*, 40 F.3d 312, 315 (9th Cir. 1994). *Cf.* Doc. 58 at 13-14 (citing *Eggar* to support the City's similarly irrelevant argument that "the Ferguson Municipal Judge's actions regarding advising Plaintiffs of their Sixth and Fourteenth Amendment rights and potentially appointing counsel are not actions or omissions attributable to Defendant for purposes of municipal liability"). Again, Count Two of the Complaint alleges that *the City* "violated Plaintiffs' right to the effective assistance of counsel . . . by jailing Plaintiffs during proceedings initiated by City

arrestee debtors of any formal court proceedings at all, it is difficult to understand the City's argument that the former Municipal Judge is entirely to blame for the deprivation of counsel.

Second, the City chooses to go forward with prosecutions and debt-collection proceedings knowing that it has not provided constitutionally required representation. If the City chooses to operate a municipal court and chooses to institute proceedings litigated by a City prosecutor in the name of the City and resulting in people being jailed by the City after arrests by City officers, then the City is responsible for providing indigent defense to those people if the Constitution requires it. The City's contention that it cannot be held responsible for failing to provide adequate defense services to defendants facing confinement in its jail for violations of its laws prosecuted in its courts by its prosecutors and in its name runs counter to well recognized principles of municipal liability. *See Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1132-33 (W.D. Wash. 2013) (holding city liable for deprivations of plaintiffs' right to effective assistance of counsel caused by public defenders' case management practices); *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 612-13 (6th Cir. 2007) (holding that county public defender office acted under color of state law for purposes of municipal liability under § 1983 in maintaining a policy or custom of failing to seek indigency hearings on behalf of defendants facing jail for non-payment of fines); *Miranda v. Clark County*, 319 F.3d 465 (9th Cir. 2003) (holding county potentially liable for constitutional deprivations arising from training and case assignment policies); *Clay v. Friedman*, 541 F. Supp. 500, 502, 505-06 (N.D. Ill. 1982)

---

prosecutors at which Plaintiffs did not have the benefit of counsel and did not knowingly, intelligently, and voluntarily waive counsel." Doc. 53 at ¶ 237. The same Count charges *the City* with maintaining a "policy of not providing adequate counsel in proceedings in which indigent people are ordered to be imprisoned in the City jail for non-payment, which are, in turn, based on payment plans arising from traffic and other violations at which the person was also unrepresented." *Id.* By focusing on particular judicial decisions made by the Municipal Judge and subject to judicial review in state court, the City misses the thrust of the Complaint.

(holding county potentially liable for policies or customs that may have caused constitutionally harmful administrative decisions by public defender).

How could the City not be responsible for its prosecutors' decision to move forward in cases despite knowing that it was not providing public defenders, that the City had not contracted with any lawyer to represent indigent defendants, and that the City routinely jailed people without providing legal representation?  It is true that judges also have a responsibility to protect against constitutional violations, but that does not absolve the City of its independent responsibility to provide counsel for the indigent in proceedings that it chooses to initiate.  And in any event, much of the complained-of conduct took place outside any courtroom.  The City knowingly circumvented all valid judicial process to collect debts from people whom it could not imprison for non-payment, at proceedings in which they never had counsel.  The City designed this system precisely to avoid the trouble of appointing a lawyer and to profit financially in ways that would never have been possible had Plaintiffs had lawyers to protect their rights.

## C.    Count Three

The crux of Count Three is that people were being held in Ferguson's jail for indeterminate periods of time not pursuant to the order of a judge or in anticipation of some kind of legal proceeding, but until jail commanders decided they had paid enough money or until police officials decided no money could be got from them and unilaterally decided to release them for free.  Doc. 53 at ¶¶ 12, 21, 26, 41 n.5, 50, 52 n.6, 92, 104, 127, 131-32, 142, 170 n.15, 175, 203.  Discovery has confirmed these allegations and has even revealed a common practice among jail officials of detaining a person for several days and then taking all of the cash in her wallet at booking (for example, $17 or $33) and calling it a "cash bond."[10]

---

[10] The City is right not to contest this claim on the merits.  Federal courts across the country have, in a series of recent cases, condemned the practice of requiring the payment of money bond without first inquiring whether the

The City rightly notes that "the purpose of bail is to secure the defendant's appearance." Doc. 58 at 11.  Yet its appeal to this fact is ironic inasmuch as the Complaint alleges — and counsel for both parties possess Ferguson Police General Orders and sworn deposition transcripts of City officials establishing — that Ferguson never used money bail for that purpose.  Instead, the Ferguson Police Chief put in place a new rule directing jail staff to attempt to collect cash bond from arrestees or their families for several days but allowing arrestees to be released for free if they did not pay within 72 hours.  *See* Exhibit 1, Ferguson Chief of Police General Order 416.13, February 14, 2011 (ordering that arrestees be released after 72 hours if they do not pay bond, and providing that the court and police commanders can override this order at their discretion); Exhibit 2, Ferguson Chief of Police General Order 421.03, November 30, 2010 (allowing "any watch commander" discretion to set and reduce bond and to release people on their own recognizance); *see also* Doc. 53 ¶¶ 6; 41 n.5; 46; 52 n.6; 181 n.16; 201.  According to the face of the order, deposition testimony, and the allegations in the Complaint, the order also allowed commanders and jail staff to negotiate with arrestees and their families and to accept lower amounts of money bail at their discretion.  The result was that Ferguson arrestees were not,

---

person has the ability to pay the amount set and enjoined municipalities from engaging in the practice (even when the municipalities were not alleged to have been improperly using their money bail scheme as a cash cow).  *See, e.g., Walker v. City of Calhoun*, --- F. Supp. 3d ---, 2016 WL 361612 (N.D. Ga. Jan. 28, 2016) (granting class-wide preliminary injunction to stop the use of money bond to detain new arrestees without an inquiry into the arrestee's ability to pay); *Rodriguez v. Providence Cmty. Corr., Inc.*, No. 3:15-CV-01048, 2015 WL 9239821, at *7-8 (M.D. Tenn. Dec. 17, 2015) (enjoining Rutherford County, Tennessee from keeping misdemeanor probation arrestees in its jail pursuant to monetary bonds set without an inquiry into their ability to pay); *Cooper v. City of Dothan*, 2015 WL 10013003 (M.D. Ala. 2015) (issuing Temporary Restraining Order and holding that the practice of secured money bond without an inquiry into ability to pay violated the Fourteenth Amendment); *Jones v. City of Clanton*, 2015 WL 5387219 (M.D. Ala. 2015) (declaring secured money bond unconstitutional without an inquiry into ability to pay); *Thompson v. City of Moss Point*, 2015 WL 10322003 (S.D. Miss. 2015) (same); *Pierce et al. v. City of Velda City*, 2015 WL 10013006 (E.D. Mo. 2015) (same).

In a landmark legal filing, the Department of Justice — citing its long commitment to the issue since Attorney General Kennedy led the abolition of wealth-based detention in federal courts with the help of a consensus among federal judges, Congress, and leading academics — announced its position that the use of money bond to keep indigent arrestees in jail without an inquiry into ability to pay "not only violates the Fourteenth Amendment's Equal Protection Clause, but also constitutes bad public policy."  United States Statement of Interest, Varden et al. v. City of Clanton, 15-cv-34 (M.D. Ala. 2015).

as a matter of policy and practice, held until any legal proceeding.  According to the Complaint, officials and employees in the City police, jail, and City executive chain of command knew that they were not using cash bond as that concept is understood in Missouri (or anywhere else).[11] And nowhere does the complaint allege that the judge had anything to do with the day-to-day application of this process.  Doc. 53 at ¶¶ 174-78.  It is troubling for the City to assert to this Court that all of these municipal policies regarding "cash bond" are the work of a municipal judge when the City knows that they were instituted by the City's Chief of Police and executed every day with discretion by jail guards and police department watch commanders.

The Ferguson City government specifically granted this authority to the Chief of Police. Although the City does not mention it to this Court, the City of Ferguson had, for the duration of the allegations in this case, a *City ordinance*, *promulgated by its City Council*, regulating the setting of bond and allowing money bond to be set by the Municipal Judge, the Chief of Police, or the Municipal Court Clerk.  *See* Exhibit 3, City Ordinance § 13-52.  The City's claim that it had no control over any of these processes belies the fact that its own government and chief law enforcement officials exercised such control for years.

The Complaint alleges that City employees used the tools of law enforcement as a cash cow, exploiting cash bail to extract revenue through collusion at every level of City government. These facts are unlike those presented in the cases the City cites for the shocking proposition that an entire municipal scheme can be blamed on a single judge.  The "bail schedule" that served as a starting point for jail and police negotiations — a schedule that the Complaint alleges was a creation of coordinated City policy, *see* Doc. 53 at 37 n.16, 39 n.20 — was just one link in a long

---

[11] Given that the police department had decided to release every person for free after three days, the initial detention for three days served no legitimate government purpose (and certainly not the purpose of ensuring appearance at a future hearing).  The City was releasing people anyway without ever having brought them to court.  The only conceivable purpose for such a policy was to extract as much money as possible from arrestees before releasing them once it became clear that they and their families could not pay anything.

chain of City decisions, including the decision by City prosecutors to charge those who simply

did not pay enough money with violating a special "failure to appear" ordinance created (and

later repealed) by the City Council.  *See, e.g.*, Doc. 53 at 35 n.15.  Discovery has confirmed the

Complaint's allegations and the United States Department of Justice's findings that these were

City policies designed to generate revenue through the setting of money bond.[12]

---

[12] *See* United States Department of Justice, Civil Rights Division, *Investigation of the Ferguson Police Department* (March 4, 2015),  *available at* https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf:

> The practices for setting bond are similarly erratic.  The Municipal Judge advised us that he sets all bonds upon issuing an arrest warrant.  We found, however, that bond amounts are mostly set by court staff, and are rarely even reviewed by the Judge.  While court staff told us that the current bond schedule requires a bond of $200 for up to four traffic offenses, $100 for every traffic offense thereafter, $100 for every Failure to Appear charge, and $300 for every criminal offense, FPD's own policy includes a bond schedule that departs from these figures.  In practice, bond amounts vary widely.  See FPD General Order 421.02.  Our review of a random sample of warrants indicates that bond is set in a manner that often departs from both the schedule referenced by court staff and the schedule found in FPD policy.  In a number of these cases, the bond amount far exceeded the amount of the underlying fine.

> The court's bond practices, including the fact that the court often imposes bonds that exceed the amount owed to the court, do not appear to be grounded in any public safety need.  In a July 2014 email to Chief Jackson and other police officials, the Court Clerk reported that "[s]tarting today we are going to reduce anyone's bond that calls and is in warrant[] to half the amount," explaining that "[t]his may bring in some extra monies this way."  The email identifies no public safety obstacle or other reason not to implement the bond reduction.  Notably, the email also states that "[w]e will only do this between the hours of 8:30 to 4" and that no half-bond will be accepted after those hours unless the Court Clerk approves it.  Thus, as a result of this policy, an individual able to appear at the court window during business hours would pay half as much to clear a warrant as an individual who is actually arrested on a warrant after hours.  That Ferguson's bond practices do not appear grounded in public safety is underscored by the fact that the court will typically cancel outstanding warrants without requiring the posting of any bond for people who have an attorney enter an appearance on their behalf.  Records show that this practice is also applied haphazardly, and there do not appear to be any rules that govern the apparent discretion court staff have to waive or require bond following an attorney's appearance.

> It is not uncommon for an individual charged with only a minor violation to be arrested on a warrant, be unable to afford bond, and have no recourse but to await release.  Longstanding court rules provide for a person arrested pursuant to an arrest warrant to be held up to 72 hours before being released without bond, and the court's recent orders do not appear to change this.  Records show that individuals are routinely held for 72 hours.  FPD's records management system only began capturing meaningful jail data in April 2014; but from April to September 2014 alone, 77 people were detained in the jail for longer than two days, and many of those detentions neared, reached, or exceeded the 72-hour mark.  Of those 77 people, 73, or 95%, were black.  Many people, including the woman described earlier who was charged with two parking code violations, have reported being held up until the 72-hour limit—despite having no ability to pay.

*Id.* at 59-60 (footnote omitted).

Ferguson warns that disaster will result if cities are held responsible for their own unconstitutional post-arrest detention policies.   Doc. 58 at 17.   But this case involves very particular allegations concerning the creation and exploitation of a municipal scheme designed to enrich the City through illegal cash bonds and executed by City employees at every level. Holding Ferguson liable on the facts alleged would do nothing to make cities and counties generally liable for the bad decisions made by judges in individual criminal cases.   On the contrary, it is the City's argument that threatens disaster: on its view, a municipality could avoid liability for the decisions of its own city attorneys, prosecutors, police, and jailors simply by blaming all of their own policies and practices on a local judge who, though appointed by the City, is absolutely immune from suit under 42 U.S.C. § 1983.

In any event, the Complaint specifically alleges that it was the City's employees — not a municipal judge — who, as a matter of policy, made the decisions about how to set the amount of money required for release, when and why to reduce that bond, and when to release arrestees. Both parties know from the thousands of records produced in discovery that the cash bonds ultimately required by the City bear no correspondence to the bail schedule that served as an initial starting point for the City's demands.[13]

### D.     Count Five

Count Five concerns the entire architecture of the City's practice — developed by City officials and supervised and executed by City prosecutors — of seeking warrants and using the

---

[13] Even if City were merely following and never deviating from a Municipal Court standing order concerning money bail amounts, that standing order would not be a discrete judicial decision but an administrative order that sets post-arrest processing policy for the City.   Moreover, the City's use of cash bond to extort money from people by detaining them indefinitely without formal judicial proceedings is so contrary to well-established constitutional law that its predication on a purported judicial standing order would be objectively unreasonable. *Cf., e.g.*, *Malley v. Briggs*, 475 U.S. 335, 346 (1986) (applying "objective reasonableness" test to determine whether individual police officers would be liable for following a facially valid court order); Doc. 20 at 4-8 (citing cases establishing that even individual government officials ordinarily entitled to qualified immunity are not immune if they know or should know that reliance on a judicial order is objectively unreasonable).

City's police and jail systems to collect old debts stemming from closed municipal court cases. Plaintiffs allege that the City of Ferguson itself chose to exert its control over its police and jail functions to collect money judgments in a way not authorized for private creditors.  The Court has already allowed this claim to proceed, and discovery is generating rich (and disturbing) information supporting Plaintiffs' claims about the City's intentional use of illegal debt-collection techniques.  The City's arguments fail for all of the reasons discussed above.

The City betrays its misunderstanding of this fact-intensive claim by citing *Harris v. City of Austin*, No. A-15-CA-956, 2016 WL 1070863, at *6 (W.D. Tex. Mar. 16, 2016), which has little more in common with the present case than the general topics of "indigence and the imposition of fines and fees."  Doc. 58 at 18-19.  The named plaintiff in *Harris* based her § 1983 claims, which were declaratory and injunctive, solely on alleged actions of the Austin Municipal Court judges during formal judicial proceedings at which the judges themselves ordered people jailed for not making payments.  2016 WL 1070863 at *3.  Because the court concluded that the Austin municipal judges' determination at a judicial proceeding of "whether an individual should be jailed for failure to pay" was a judicial function pursuant to Texas state law (even "if those judges [we]re flouting the law"), it followed that Harris's § 1983 claims warranted dismissal.  *Id.* at *7.  In *Harris*, the unconstitutional judicial actions were taking place outside the control of the City — indeed, the case contains no allegations of involvement by City prosecutors and no allegations of the involvement of City law enforcement, officials, or jailors in the scheme.  No such conclusion follows in this case, let alone with respect to Count Five in particular, which squarely alleges wrongdoing on the part of the City itself, beyond the activities of its Municipal Judge.

To be clear: Plaintiffs do not challenge the initial issuance of fines or the concept of payment plans.[14]  Instead, they challenge the unconstitutional methods by which City officials attempted to collect those debts for years after the conclusion of the underlying municipal court case.  The Municipal Judge's discretion to set initial fines and fees or to hold people in contempt after formal proceedings does nothing to shield the City from liability for its collection scheme.

### E.      Count Six

The City's arguments on Count Six fail for all of the reasons stated above.  Although the City cites cases in which cities were found not to be liable when a municipal judge improperly issued an arrest warrant, Doc. 58 at 20-21, those cases are obviously inapplicable here.  As Plaintiffs explained in their response to the City's previous motion to dismiss and in the briefing on their motion for reconsideration granted by this Court, they allege *City* policies and practices regarding the acquisition and execution of warrants that the City knew or should have known to be invalid.  *See* Doc. 13 at 22-23; Doc. 20 at 4-8; Doc. 23 at 4.  The case law is clear that those responsible for obtaining and executing constitutionally invalid warrants are liable for their actions.  *Id.*  Warrants were sought and executed based solely on non-payment (although the City prosecutors improperly charged them as "failure[s] to appear") without the prior inquiry into ability to pay that the Constitution requires.  They were also based on fraudulent statements that the person had failed to appear under a City ordinance when City employees knew that the person had not been summoned to appear for any court hearing and had merely failed to pay a designated amount of money.  Furthermore, the City had a policy of instructing its personnel to remove and not to enforce warrants for those people who paid for their own lawyer or paid

---

[14] This distinguishes the present action from the pending state court challenge brought by ArchCity Defenders and noted by the City in its Memorandum.  Doc. 58 at 20 n.11.  Whereas the state suit challenges the initial issuance of fines, the present one challenges the City's collection methods.  For that reason, there is absolutely no basis for an application of the doctrine stemming from *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

money to the City to have a warrant removed.  Doc. 53 at ¶¶ 107, 183-84, 203.  Contrary to the City's suggestion, these pervasive and longstanding unlawful City practices are in no way analogous to a judge's allowing his clerk to rubber-stamp an arrest warrant, as in *Ledbetter v. City of Topeka*, 318 F.3d 1183 (10th Cir. 2003), or to a magistrate's retaliating against a city council member for protected speech, as in *Woodard v. Town of Oakman*, 885 F. Supp. 2d 1216 (N.D. Ala. 2012).

###### F.    Count Seven

Plaintiffs amended their Complaint to include this claim because discovery in this case has revealed that City officials were utterly unaware of the constitutional principles announced in *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).  Thus, for years, the City of Ferguson was keeping new arrestees in its jail for longer than 48 hours without any neutral determination of probable cause.  Doc. 53 ¶¶ 10, 41 n.5, 52 n.6, 203.  As noted above, this extended detention was particularly unjustified because the City was not detaining people with the expectation of bringing them to *any court proceedings at all*, but rather for the purpose of extracting cash bond or releasing them for free prior to any court date.[15]  The City now suggests, vaguely, that this flagrant violation of Supreme Court precedent is also the fault of the Municipal Judge alone because "the openness of courts is not within the City's control, but a measure of the state court system."  Doc. 58 at 22.

This argument misses the point.  Detaining people in its jail *is* within the City's control and, under Supreme Court precedent, the City cannot keep people in its jail after arrest if it does not afford them prompt probable cause proceedings. As the Supreme Court explained when holding another municipality liable for the same violation:

---

[15] The extraction of cash bond from warrantless arrestees who did not yet owe money to the City was still lucrative for the City because the City treated it not as pretrial bail to be returned upon appearance, but as a down payment on any fines and costs later assessed.

Everyone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail.  One way to do so is to provide a judicial determination of probable cause immediately upon completing the administrative steps incident to arrest . . . [and] several States, laudably, have adopted this approach.  The Constitution does not compel so rigid a schedule, however.  Under *Gerstein*, jurisdictions may choose to combine probable cause determinations with other pretrial proceedings, so long as they do so promptly.  This necessarily means that only certain proceedings are candidates for combination.  Only those proceedings that arise very early in the pretrial process — such as bail hearings and arraignments — may be chosen.  Even then, every effort must be made to expedite the combined proceedings.

For the reasons we have articulated, we conclude that Riverside County is entitled to combine probable cause determinations with arraignments.  The record indicates, however, that the County's current policy and practice do not comport fully with the principles we have outlined.  The County's current policy is to offer combined proceedings within two days, exclusive of Saturdays, Sundays, or holidays.  As a result, persons arrested on Thursdays may have to wait until the following Monday before they receive a probable cause determination.  The delay is even longer if there is an intervening holiday.  Thus, the County's regular practice exceeds the 48-hour period we deem constitutionally permissible, meaning that the County is not immune from systemic challenges, such as this class action.

*Riverside*, 500 U.S. at 58–59 (citations omitted).  As with each of the claims discussed above, once the City adopts an unlawful policy of having its police officers arrest people and its jailors keep them in custody while its prosecutors prepare charges, it cannot immunize itself by blaming the knowing constitutional violations vaguely on its municipal court judge.

## II.   The Ferguson Municipal Court Need Not Have Final Policymaking Authority in Order for Its Unconstitutional Practices to Render the City Liable Under *Monell*

Throughout this Response, Plaintiffs have focused on the extent to which their claims turn on the City's conduct considered separate from that of the Ferguson Municipal Judge.  That is the most blatant respect in which the City has misconstrued the Complaint, and the reasons articulated in Part I suffice to establish that the City's motion to dismiss should be denied.  This Court need go no further.

None of that is to concede, however, that the City cannot be liable for certain actions of its Municipal Court.  As one court noted in discussing the very same collection of U.S. Court of Appeals cases cited by the City in its statement of controlling law, those cases do not "establish the overarching principle that judicial action can never give rise to municipal liability," but only the "much more limited proposition" that a municipality is not liable for actions taken by a judge pursuant to state law.  *Singletary v. Dist. of Columbia*, 685 F. Supp. 2d 81, 92 & n.7 (D.D.C. 2010) (discussing, inter alia, *Johnson*, *Granda*, *Ledbetter*, *Eggar*, and *Woods v. City of Michigan City*, 940 F.2d 275 (7th Cir. 1991)).  These cases leave open the possibility that other actions by the Municipal Court help establish a custom that is attributable to the City, either because the Municipal Court itself has final policymaking authority in the relevant area, or because those who do have such authority have, through acquiescence, tacitly authorized an open and well-known practice of the Court.

Plaintiffs allege that the City is liable under § 1983 because it maintained policies or customs that caused their constitutional injuries.  *Cf. Monell*, 436 U.S. at 694 (holding that a municipality is liable under § 1983 for constitutional injuries inflicted by the execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy").  Plaintiffs can establish a "policy or custom" by pointing to a practice that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation marks omitted).  The municipal officials or employees who practice such a custom need not themselves have final policymaking authority on the relevant matters; it is enough if the actions or omissions of those who do have final policymaking authority amount to deliberate indifference toward the

20

plaintiff's rights or to tacit authorization of the offensive acts.  *See, e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (holding that liability turns on whether official policymakers "caused the deprivation of rights at issue by policies which affirmatively command that it occur, . . . *or by acquiescence* in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity"); *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998) ("A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy' or misconduct so pervasive *among non-policymaking employees* of the municipality 'as to constitute a "custom or usage" with the force of law.'" (emphasis added)).[16] A plaintiff need not establish that the municipality's final policymakers knew that the alleged custom or practice was unconstitutional.  *Anela v. City of Wildwood*, 790 F.2d 1063, 1067 n.4 (3d Cir. 1986), *cert. denied*, 107 S. Ct. 434 (1986); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  It is enough if they had actual or constructive knowledge of its existence, which can be inferred from open and longstanding practice.  *See Powers*, 501 F.3d at 607; *Johnson*, 958 F.2d at 94; *Webster*, 735 F.2d at 842; *Wolf-Lillie v. Sonquist,* 699 F.2d 864 (7th Cir. 1983).

It is therefore misleading for the City to claim that "unofficial custom or practice" is "usually shown through the repeated acts of the *final* policymaker of Defendant."  Doc. 58 at 6 (emphasis added).  And it is unsurprising that the cases the City cites do not support this claim. *Praprotnik* and *Marchant v. City of Little Rock*, 741 F.2d 201 (8th Cir. 1984), involved not customs or practices but "isolated" unconstitutional acts, for which the critical question *is* whether the municipal actor had final policymaking authority.  *See* 485 U.S. at 123 (explaining the conditions under which "a decision on a single occasion may be enough to establish an

---

[16] *See also Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 817 (7th Cir. 2001); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992); *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981); *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980).

unconstitutional municipal policy"); 741 F.2d at 204.  *Ware* and *Mettler v. Whitledge*, 165 F.3d 1197 (8th Cir. 1999), made clear that a municipal custom is "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees," whether or not they possess final policymaking authority.  150 F.3d at 880; 165 F.3d at 1204.  To state a claim upon which relief can be granted, Plaintiffs need not allege that there was an unconstitutional custom or practice among Ferguson's final policymakers.  In particular, therefore, it would not follow, from the fact that the Ferguson Municipal Judge is not a final policymaker for the City with respect to a given area, that his actions in that area do not render the City liable.[17]

It is worth noting in this connection that Missouri state law authorizes but does not require the Ferguson Municipal Court to issue arrest warrants for non-payment,[18] and that the City, which supervises the Municipal Court[19] (including its extraordinarily powerful Clerk),[20]

---

[17] *Cf. Coleman v. Watt*, 40 F.3d 255, 262 (8th Cir. 1994) ("We need not decide whether a municipal court judge acts as an official policymaker for the City of Little Rock because Coleman has alleged that both the City and its chief of police 'adopted' Judge Watt's general order as an official policy governing the conduct of the Little Rock Police Department.").

[18] Mo. Stat. § 560.031 reads as follows (emphases added):

1.  When an offender sentenced to pay a fine defaults in the payment of the fine or in any installment, the court upon motion of the prosecuting attorney or upon its own motion *may* require him to show cause why he should not be imprisoned for nonpayment.  The court *may* issue a warrant of arrest or a summons for his appearance.

2.  Following an order to show cause under subsection 1, unless the offender shows that his default was not attributable to an intentional refusal to obey the sentence of the court, or not attributable to a failure on his part to make a good faith effort to obtain the necessary funds for payment, the court *may* order the defendant imprisoned for a term not to exceed one hundred eighty days if the fine was imposed for conviction of a felony or thirty days if the fine was imposed for conviction of a misdemeanor or infraction.  The court may provide in its order that payment or satisfaction of the fine at any time will entitle the offender to his release from such imprisonment or, after entering the order, may at any time reduce the sentence for good cause shown, including payment or satisfaction of the fine.

3.  If it appears that the default in the payment of a fine is excusable under the standards set forth in subsection 2, the court may enter an order allowing the offender additional time for payment, reducing the amount of the fine or of each installment, or revoking the fine or the unpaid portion in whole or in part.

[19] United States Department of Justice, *Investigation of the Ferguson Police Department*, *supra* note 12, at 8:

Ferguson's municipal court operates as part of the police department.  The court is supervised by the Ferguson Chief of Police, is considered part of the police department for City organizational purposes, and is physically located within the police station.  Court staff report directly to the

appoints the Municipal Judge,[21] and pays his and other Court employees' salaries,[22] had considerable power to control the Municipal Court's practices through municipal ordinances and executive control.[23]   The decision not to exercise this power to prevent the Municipal Court's open and longstanding unconstitutional practices thus amounted to "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.

## III.   The Claims for Equitable and Declaratory Relief Should Not Be Dismissed

The City's arguments on what it calls "standing" and "ripeness" are frivolous and demonstrate a thorough misunderstanding of those terms.   To the extent Plaintiffs can discern what the City is arguing, it appears make four main claims: (1) *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), somehow undermines Plaintiffs' allegation of an injury in fact; (2) the City has

---

Chief of Police.  Thus, if the City Manager or other City officials issue a court-related directive, it is typically sent to the Police Chief's attention.

[20] *Id.*:

While the Municipal Judge presides over court sessions, the Court Clerk, who is employed under the Police Chief's supervision, plays the most significant role in managing the court and exercises broad discretion in conducting the court's daily operations.  Ferguson's municipal code confers broad authority on the Court Clerk, including the authority to collect all fines and fees, accept guilty pleas, sign and issue subpoenas, and approve bond determinations.  Ferguson Mun. Code § 13-7.  Indeed, the Court Clerk and assistant clerks routinely perform duties that are, for all practical purposes, judicial.  For example, documents indicate that court clerks have disposed of charges without the Municipal Judge's involvement.

[21] *Id.* ("The Municipal Judge is . . . nominated by the City Manager and elected by the City Council.").

[22] Mo. Stat. § 479.060.

[23] United States Department of Justice, *Investigation of the Ferguson Police Department*, *supra* note 12, at 8 (emphasis added):

The court officially operates subject to the oversight of the presiding judge of the St. Louis County Circuit Court (21st Judicial Circuit) under the rules promulgated by that Circuit Court and the Missouri Supreme Court.  *Notwithstanding these rules, the City of Ferguson and the court itself retain considerable power to establish and amend court practices and procedures.*  The Ferguson municipal code sets forth a limited number of protocols that the court must follow, but the code leaves most aspects of court operations to the discretion of the court itself.  *See* Ferguson Mun. Code Ch. 13, Art. III.  The code also explicitly authorizes the Municipal Judge to "make and adopt such rules of practice and procedure as are necessary to hear and decide matters pending before the municipal court."  Ferguson Mun. Code § 13-29.

not "caused" Plaintiffs' injuries and has no power to "redress" them; (3) Plaintiffs' claims are not "ripe"; and (4) *Rizzo v. Goode*, 423 U.S. 362 (1976), somehow suggests that considerations of federalism weigh against injunctive relief here.  *See* Doc. 58 at 25-45.

The City completely misreads *Lyons.*  The plaintiff there had been the victim of a previous illegal police chokehold.  The Court held that he lacked standing to seek a prospective injunction because, understandably, he could not show that he would decide to commit a crime in the future and be subject to another police chokehold.  As the Supreme Court later explained, "the constitutionally objectionable practice ceased altogether before the plaintiff filed his complaint."  *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (distinguishing *Lyons* from cases in which plaintiffs are suffering the alleged harm when they file suit).  But here, the named Plaintiffs were all subject to the City's illegal debt-collection and post-arrest procedures at the moment they filed suit, because the City was attempting to collect debts against them pursuant to the very policies that they challenged.  Like the plaintiffs in *Riverside* and unlike Lyons, "Plaintiffs alleged that they were suffering a direct and current injury as a result of" the City's unconstitutional procedures, and they stood to continue suffering that injury (and were imminently likely to sustain future injuries) absent the injunctive relief they sought.  *Riverside*, 500 U.S. at 51.  Like the plaintiffs in *Riverside* and unlike Lyons, they faced a "real and immediate" threat of further harm from the policies they challenged.  *Cf. Lyons*, 461 U.S. at 102.  They sought injunctive relief to protect themselves from the enforcement of those policies, alleging injuries that were "at that moment capable of being redressed through injunctive relief." *Riverside*, 500 U.S. at 51.

The City's arguments against causation and redressability appear to be nothing more than a reprise of its earlier argument that it is not at all responsible for Plaintiffs' constitutional

injuries.  *See* Doc. 58 at 31 (implying that the only "alleged misconduct" that could befall Plaintiffs would be committed by someone other than the City); *id.* at 31-32 (trivially inferring a lack of redressability from an assumed lack of injury and causation).  For the reasons set forth in Parts I and II above, Plaintiffs have clearly alleged that the City caused their injuries and that those injuries can be redressed by an order (not unlike portions of the Consent Decree that the City has already agreed to) enjoining the City from continuing those violations as it collects debts from them going forward.

Although Ferguson's arguments regarding ripeness are nonsensical, it appears the City might be attempting to argue that Plaintiffs' claims are moot: that the issuance of a consent decree in a different case has mooted Plaintiffs' claims for injunctive relief.  *See* Consent Decree, *United States v. City of Ferguson*, No. 4:16-cv-000180-CDP.  The court in that case accepted the Consent Decree on April 19, 2016.  But the agreement is replete with future deadlines by which the City government must complete many of the reforms that would address the problems raised in the Complaint.[24]  Once it has been determined whether the City will be able to change its policies and practices in time to meet these deadlines, the City might later raise a mootness argument to this Court.  At that time, the City would need to meet its burden under the voluntary

---

[24] *See, e.g.*, *id.* ¶ 38 (30 days to amend certain sections of the Municipal Code), ¶ 40 (120 days to "develop and implement a plan for the comprehensive reassessment and revision of remaining Code provisions in order to ensure that they are consistent with the United States Constitution and other laws and provide clear and appropriate guidance to the public and law enforcement officers"), ¶ 325 (60 days to "remove the Ferguson Municipal Court from the oversight of the City Finance Director and ensure the Finance Director has no involvement in court operations"); ¶ 328 (90 days to "develop and implement all necessary ordinances and policies to ensure that the practices of the Ferguson Municipal Court are grounded in the fair administration of justice and comport with all constitutional and other legal requirements"); ¶ 340 (60 days to "ensure that defendants are provided with appropriate ability-to-pay determinations"); ¶ 348 (60 days to "establish and implement protocols, through policy or ordinance, to ensure that arrest warrants related to municipal code violations will be issued, if at all, only after all other mechanisms available for securing a person's appearance in court have been exhausted. Such protocols will also ensure that arrest warrants are not being issued in response to a person's financial inability to pay a fine or fee."); ¶ 350 (60 days to "develop and implement a plan to eliminate the use of a fixed monetary bond schedule"); ¶ 357 (60 days to "develop and implement policies to ensure that the Ferguson Municipal Court operates impartially, independently from the City Prosecutor, and in a manner that eliminates existing and potential unlawful conflicts of interest").

cessation doctrine — a task complicated by the City's continued insistence that its behavior was constitutional, *see Parents Involved v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (declining to find mootness where "the [defendant] vigorously defends the constitutionality" of its policy and "nowhere suggests that if this litigation is resolved in its favor it will not resume" its former policy) — by identifying particular aspects of the consent decree that obviate the need for injunctive relief here, explaining how those new processes have actually been fully implemented such that the illegal practices could not be reasonably expected to recur, and explaining how those changes address every aspect of Plaintiffs' claims.  But those deadlines have yet to be met, and for that reason at least, any mootness argument based on the Consent Decree is premature.[25]

Finally, the Supreme Court's discussion of federalism in *Rizzo v. Goode* addressed the "novel claim . . . . that given the citizenry's 'right' to be protected from unconstitutional exercises of police power, and the 'need for protection from such abuses,' respondents have a right to mandatory equitable relief in some form when those in supervisory positions do not institute steps to reduce the incidence of unconstitutional police misconduct."  423 U.S. 362, 377-78 (1976).  In response to this novel claim, the Court noted that "the principles of federalism which play such an important part in governing the relationship between federal courts and state governments . . . have applicability where injunctive relief is sought . . . against those in charge of an executive branch of an agency of state or local governments."  *Id.* at 380.  Plaintiffs here do not make this novel claim.  They do not assert a general right held by the citizenry; they assert

---

[25] Of course, insofar as Plaintiffs' claims for injunctive relief are not eventually rendered moot by the consent decree, this Court should not dismiss them, as it clearly has the power to enjoin the City from constitutional violations under *Ex parte Young*, 209 U.S. 123 (1908).  *See, e.g.*, *Strawser v. Strange*, 44 F. Supp. 3d 1206, 1207 (S.D. Ala. 2015) (enjoining Alabama state officials from enforcing Alabama's laws against same-sex marriage); *United States v. Brittain*, 319 F. Supp. 1058, 1060 (N.D. Ala. 1970) (enjoining the state and all those acting in concert with it, including the Calhoun County probate judge who issued marriage licenses, from enforcing anti-miscegenation laws).

their own constitutional and statutory rights.[26]   For that reason, their well-established right to equitable relief does not implicate the concerns about federalism that arose in *Rizzo*.

Respectfully submitted,

*/s/ Alec Karakatsanis*
Alec Karakatsanis (E.D.Mo. Bar No. 999294DC)

Equal Justice Under Law
601 Pennsylvania Avenue, NW Suite 900
Washington, DC 20004
(202)-681-2409
alec@equaljusticeunderlaw.org


*/s/ Thomas B. Harvey*
Thomas B. Harvey (MBE #61734)

*/s/ Michael-John Voss*
Michael-John Voss (MBE #61742)

ArchCity Defenders
812 N. Collins
Saint Louis, MO 63102
855-724-2489


*/s/ John J. Ammann*
John J. Ammann (MBE #34308)

*/s/ Stephen Hanlon*
Stephen Hanlon (MBE #19340)

*/s/ Brendan Roediger*
Brendan Roediger (E.D.Mo. Bar No. IL6287213)

Saint Louis University School of Law
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
314-977-2778

*/s/ Sonia W. Murphy*
Sonia W. Murphy (*Pro Hac Vice*)

---

[26] For the same reason, Plaintiffs have no mere generalized grievance, as the City suggests.  Doc. 58 at 33-34.

27

White & Case LLP
701 13th Street, NW
Washington, DC 20005
(202) 637-6161


*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy of this Motion has, on May 18, 2016, been electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing upon counsel for the Defendant in this matter:

Peter J. Dunne
Robert T. Plunkert

PITZER SNODGRASS, P.C.
100 South Fourth Street, Suite 400
St. Louis, Missouri 63102-1821
(314) 421-5545
Counsel for Defendant – City of Ferguson

*/s/ Edward Hall*
Edward Hall

Attorney for the Plaintiffs

29