**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| KEILEE FANT, ROELIF CARTER, ALLISON NELSON, HERBERT NELSON JR., ALFRED MORRIS, ANTHONY KIMBLE, DONYALE THOMAS, SHAMEIKA MORRIS, DANIEL JENKINS, RONNIE TUCKER, TONYA DEBERRY, et al., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>)    Case No. 4-15-CV-00253-AGF |
| THE CITY OF FERGUSON, | )<br>) |
| Defendant. | )            (Class Action) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

I.      THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)..............15

A.      Numerosity...................................................................................................... 16

B.      Commonality ................................................................................................... 19

C.      Typicality ........................................................................................................ 23

D.      Adequacy ........................................................................................................ 27

II.     The PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)...............28

A.      The Declaratory and Injunctive Class Satisfies Rule 23(b)(2)................................. 28

B.      The Pretrial and Post-Judgment Classes Satisfy Rule 23(b)(3) ................................ 30

        1.      The Common Questions of Law and Fact Predominate .............................. 31

        2.      The Class Action Is a Superior Vehicle for Adjudicating This Dispute .................... 34

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## FEDERAL CASES

*Abdullah v. Gunter*, 949 F.2d 1032 (8th Cir. 1991)......................................................33

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)............................................13, 27

*Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763 (8th Cir. 1971)....................................14

*Atkins v. United States*, 2016 U.S. Dist. LEXIS 92891 (E.D. Mo. July 18, 2016).......................17

*Augustin v. Jablonsky*, 819 F. Supp. 2d 153 (E.D.N.Y. 2011)......................................33

*Barnes v. District of Columbia*, 278 F.R.D. 14 (D.D.C. 2011)......................................33

*Boswell v. Panera Bread Co.*, 311 F.R.D. 515 (E.D. Mo. 2015)...................................... passim

*Bouaphakeo v. Tyson Foods Inc.*, 765 F.3d 791 (8th Cir. 2014) *aff'd*, 136 S. Ct. 1036 (2016)......................................................................................21, 32

*Burton v. Armontrout*, 975 F.2d 543 (8th Cir. 1992)....................................................28

*De Bremaecker v. Short*, 433 F.2d 733 (5th Cir. 1970)................................................28

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ..........................................21, 22, 23

*Dellums v. Powell*, 566 F.2d 167 ..............................................................................33

*Downing v. Riceland Foods, Inc.*, 2015 U.S. LEXIS 34154 (E.D. Mo. Mar. 19, 2015) ..................................................................................22, 29, 30, 33

*Earnest v. GMC*, 923 F. Supp. 1469 (N.D. Ala. 1996)................................................28

*Ellis v. O'Hara*, 105 F.R.D. 556 (E.D. Mo. 1985) ......................................................21, 27, 31

*Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997) ................................................35

*Gerardo v. Quong Hop & Co.*, 2009 U.S. Dist. LEXIS 60900 (N.D. Cal. July 7, 2009) ................................................................................................16

*Griffin v. Illinois*, 351 U.S. 12 (1956)......................................................................23

*H&R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 546 F.3d 937 (8th Cir. 2008) ............................................................................................17

*Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773 (8th Cir. 2013)..............................................29

*Hood v. Gilster-Mary Lee Corp.*, 2016 U.S. Dist. LEXIS 135475 (W.D. Mo. Sept.
    30, 2016) ......................................................................................................................16

*Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332 (S.D. Iowa 2013)...................................27

*In re Retek Inc., Sec. Litig.*, 236 F.R.D. 431 (D. Minn. 2006)......................................34

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549 (D. Minn. 2010) ...........34

*Jackson v. Foley*, 156 F.R.D. 538 (E.D.N.Y. 1994) ................................................16, 33

*Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999)......................................35

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128 (2d Cir. 2015) ..................................32

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) .............................................32

*Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859 (11th Cir. 1986) ...................................15

*Labrier v. State Farm Fire & Cas. Co.*, 315 F.R.D. 503 (W.D. Mo. 2016) ............31, 32

*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577 (7th Cir.
    2000) ............................................................................................................................35

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) .........................................32

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ....................................28

*Morgan v. United Parcel Serv. of Am., Inc.*, 169 F.R.D. 349 (E.D. Mo. 1996) .....14, 18

*Mosley v. Gen. Motors Corp.*, 497 F.2d 1330 (8th Cir. 1974)......................................17

*Ortega v. Uponor Inc.*, 716 F.3d 1057 (8th Cir. 2013)..................................................22

*Paxton v. Union Nat'l Bank*, 688 F.2d 552 (8th Cir. 1982)..........................................14

*Perrin v. Papa John's Int'l, Inc.*, U.S. Dist. LEXIS 181749 (E.D. Mo. Dec. 31,
    2013) ......................................................................................................................31, 34

*Rattray v. Woodbury Cty.*, 253 F.R.D. 444 (N.D. Iowa 2008) .....................................14

*Rentschler v. Carnahan*, 160 F.R.D. 114 (E.D. Mo. 1995) .........................................22

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th. Cir. 2016).......31

*Sherman v. Griepentrog*, 775 F. Supp. 1383 (D. Nev. 1991) .......................................16

4

*Thomas v. Byrd*, 2016 U.S. Dist. LEXIS (E.D. Ark. Nov. 10, 2016) ............................................35

*Tinsley v. Covenant Care Servs., LLC*, 2016 U.S. Dist. LEXIS 11988 (E.D. Mo. Feb. 2, 2016) ........................................................................................14, 17, 18, 34

*Tinsley v. Kemp*, 750 F. Supp. 1001 (W.D. Mo. 1990)...............................................................14

*Turner v. Rogers*, 131 S. Ct. 2507 (2011)...........................................................................23, 26

*United States v. City of Ferguson*, NO. 4:16-cv-000180-CDP (E.D. Mo. Mar. 17, 2016) .........................................................................................................................................7

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)..............................................17

*Van Orden v. Meyers*, 2011 U.S. Dist. LEXIS 113478 (E.D. Mo. Sept. 30, 2011).............. passim

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...............................................................17

*Williams v. Mohawk Indus.*, 568 F.3d 1350 (11th Cir. 2009).......................................................35

## STATE CASES

*Phillips v. District of Columbia*, 458 A.2d 722 (D.C. 1983) ........................................................32

## CONSTITUTION

Fourth Amendment ................................................................................................................20, 24

Sixth Amendment ......................................................................................................................9, 21

Fourteenth Amendment .................................................................................................................20

First, Fourth, and Fourteenth Amendments ..................................................................................13

Fourteenth and Eighth Amendments ............................................................................................21

## FEDERAL STATUTES AND REGULATIONS

City's Failure to Appear Ordinance ..............................................................................................24

## RULES

Fed. R. Civ. P. 23(a) ............................................................................................................ passim

Fed. R. Civ. P. 23(a)(2)................................................................................................................17

Rule 23 ..................................................................................................................25, 28, 32

Rule 23(a)(1) .................................................................................................................................14

Rule 23(a)(3) ...........................................................................................................22, 25

Rule 23(a)(4) ...................................................................................................................25

Rule 23(b) .........................................................................................................13, 26, 32

Rule 23(b)(2) ..........................................................................................................26, 27, 28

Rule 23(b)(2) and Rule 23(b)(3) ....................................................................................35

Rule 23(b)(2) and Rule 23(c)(4) .....................................................................................35

Rule 23(b)(3)................................................................................................................ passim

## OTHER AUTHORITIES

MOORE'S FEDERAL PRACTICE § 23.43(1)(b) (3d ed. 2014) ..........................................27

NEWBERG ON CLASS ACTIONS § 1:3 (5th ed. 2011) ......................................................27

Order, ECF No. 84 ............................................................................................................13

## PRELIMINARY STATEMENT

The named Plaintiffs and thousands of others were jailed by the City of Ferguson because they could not make monetary payments arising from traffic tickets or other minor offenses. They were jailed for indeterminate periods without any legal proceedings, without a lawyer, and without the inquiry into their ability to pay that the Constitution requires.  Instead they were threatened, extorted, and left to languish in jail under deplorable conditions until their family members could produce enough cash to buy their freedom or until City jail officials decided to let them out for free.  On behalf of the many other people subjected to Ferguson's illegal scheme, the named Plaintiffs challenge the City's debt-collection and post-arrest policies and practices, which have no place in the American legal system.

For the reasons that follow, this Court should certify three classes of plaintiffs in this case: one class pursuing declaratory and injunctive relief to protect class members from continued violations of their constitutional rights, and two classes pursuing damages to compensate class members for the constitutional violations that they have already suffered. Plaintiffs propose three classes and one subclass:

(i)        A Declaratory and Injunctive Class consisting of all persons who currently owe or who will incur debts to the City of Ferguson from fines, fees, costs, or surcharges arising from judgments in cases prosecuted by the City;[1]

(ii)        A Pretrial Class consisting of all persons who have, at any time since February 8, 2010, been kept in jail by the City of Ferguson because they could not pay a

---

[1] The Declaratory and Injunctive Class is represented by Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson Jr., and Donyale Thomas.  *See* Tsier Decl. Exs. A– E showing Plaintiffs' respective debts to the City.

cash bond amount in connection with an alleged municipal ordinance violation for which they had not been convicted;[2]

(iii)    A *Gerstein* Subclass of the Pretrial Class, consisting of all persons who have, at any time since February 8, 2010, been held in jail by the City of Ferguson after a warrantless arrest for longer than a reasonable period of time, 48 hours at a maximum, prior to a finding of probable cause by a neutral magistrate for their arrest and continued detention;[3] and

(iv)    A Post-Judgment Class consisting of all persons who have, at any time since February 8, 2010, been jailed by the City because of their non-payment in connection with a prior judgment.[4]

## BACKGROUND

---

[2] The Pre-Trial Class is represented by Roelif Carter (*see* Tsier Decl. Exs. F–K ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Donyale Thomas (*see* Tsier Decl. Exs. L ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Keilee Fant (*see* Tsier Decl. Exs. M–N ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Anthony Kimble (*see* Tsier Decl. Ex. O–P ▮▮▮▮▮▮▮▮▮▮▮); Alfred Morris (*see* Tsier Decl. Exs. Q–T ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Allison Nelson (*see* Tsier Decl. Exs. U–W ▮▮▮▮▮▮▮▮▮▮▮▮▮); Herbert Nelson (*see* Tsier Decl. Ex. X ▮▮▮▮▮▮▮▮▮▮▮▮▮; Ronnie Tucker (*see* Tsier Decl. Ex. Y ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Daniel Jenkins, and Tonya Deberry.  Unfortunately, the arrest records of Daniel Jenkins and Tonya Deberry have not yet been produced by the City.  *See* First Amend. Compl. ¶¶ 141–145, ECF No. 53 (describing how Daniel Jenkins was held in Ferguson jail multiple times, and that on some of these arrests, he was taken to as many as seven different jails throughout St. Louis County); *id.* at ¶¶ 158–160 (noting that Tonya Deberry was held in the Ferguson jail in 2014 until she paid $300.00, only to be transported to a jail in Jennings).

All of the abovementioned arrests involved: (1) only non-FTA offenses, including fugitive warrants from other jurisdictions; or (2) both FTA and non-FTA offenses together.

[3] The *Gerstein* subclass is represented by Roelif Carter (*see* Tsier Decl. Ex. Z ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Tsier Decl. Ex. AA, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  During these arrests Mr. Carter was held without a finding of probable cause by a neutral magistrate for his arrest and continued detention.

[4] The Post-Judgment Class is represented by Keilee Fant (*see* Tsier Decl. Ex. AB, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Anthony Kimble (*see* Tsier Decl. Ex. AC, ▮▮▮▮▮▮▮▮▮▮▮▮); Alfred Morris (*see* Tsier Decl. Exs. AD–AF, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Shameika Morris (*see* Tsier Decl. Exs. AG–AI, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); and Herbert Nelson (*see* Tsier Decl. Exs. AJ-AL, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

The City of Ferguson (the "City") has designed and implemented an enforcement system that treats its poorest residents as a source of profit.  The City's scheme began with the Ferguson Municipal Code, which authorized police to arrest people for minor offenses such as failing to provide information to a police officer, walking in the road (rather than on the sidewalk), failing to list a member of their household on an occupancy permit, or failing to comply with an officer's orders.[5]   These ordinances, taken together, gave Ferguson police officers broad discretion to issue tickets for municipal ordinance violations.

The City's highest ranking officials then pressured the police department to drive up citations numbers, independent of any public-safety need, in order to finance the City's budget. For example, in 2010, the City's Finance Director wrote to the Police Chief, that "unless ticket writing ramps up significantly before the end of the year, it will be hard to significantly raise collections next year . . . . Given that we are looking at a substantial sales tax shortfall, it's not an insignificant issue."[6]   In 2013, the Finance Director wrote to the City Manager: "Court fees are anticipated to rise about 7.5%.  I did ask the [Police] Chief if he thought the PD could deliver 10% increase.  He indicated they could try."[7]

Communications among City officials make clear that the City's purpose in driving up citations and arrests was to raise as much revenue as possible by extracting money from those funneled into the City's courts and jails.  For example, in early 2011, ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5]  The Department of Justice concluded that many of these ordinances are unconstitutional, and the City has since consented to amend or repeal them.  *See* Consent Decree, *United States v. City of Ferguson*, NO. 4:16-cv-000180-CDP, at 10 ¶¶ 37–38(d), (e) (E.D. Mo. Mar. 17, 2016) [*hereinafter* Consent Decree].

[6]  *See* Tsier Decl. Ex. AM, at 2; Ex. AN.

[7]  Tsier Decl. Ex. AM, at 2.

███████████████████████████████████████████████████████████████████████

██████████████████[8]   These measures were taken in collaboration with the City's Chief of

Police.[9]  In another email addressed to the City's Police Chief, ███████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[10]   In yet

another email, the Finance Director wrote to Police Chief Jackson and the City Manager,

recommending immediate implementation of a traffic enforcement initiative in order to "begin to

fill the revenue pipeline."[11]

The workings of this extortion scheme are now a matter of public record and are not in

meaningful dispute.  Individuals charged with minor, non-criminal municipal offenses were kept

in jail after arrest unless they could pay a predetermined amount of cash.[12]  During their

imprisonment the City did not hold hearings to demonstrate that there was probable cause for

their arrests.[13]  They were then prosecuted by the City prosecutor, usually without the benefit of

counsel,[14] and they were assessed a fine and court costs.[15]  At no point did the City inquire into

these individuals' ability to pay a cash bond or fines, or consider alternatives to payment.  To the

---

[8] Tsier Decl. Ex. AO.

[9] Tsier Decl. Ex. AM, at 11

[10] Tsier Decl. Ex. AP.

[11] Tsier Decl. Ex. AM, at 13.

[12] The predetermined bond amounts for certain offenses are outlined in the City's General Orders.  *See* Tsier Decl. Ex. AQ, at § 421.02(A).

[13] Indeed, the City's actions show that it had no intention of holding such hearings.  *See* Tsier Decl. Ex. BM, at 39:16-21 (noting that officers did not make sworn probable cause statements after arrests).

[14] *See* Def.'s Reply Supp. Mot. Dismiss Pl.'s First Am. Compl. 5–6, ECF No. 64; *see also* Tsier Decl. Ex. BN, at 69:17-22 ("Q: . . . . Are most of the people who appear on a docket day when you were there represented by counsel? A: No."); 71:18-21 ("Q: Do you have a sense of about how many people would be represented by counsel? A: The attorneys that I saw were a pretty small number."); Tsier Decl. Ex. BO, at 121:3-14 ("[W]e didn't . . . appoint any public defenders for people held on ordinance violations."); Tsier Decl. Ex. BP, at 146:5-19 █████████████████████████████████████████████████████████████████████████████████████████████████████████████

[15] *See* Tsier Decl. Ex. AM, at 9.

contrary, when the City Prosecutor resolved several cases by imposing a form of probation that allowed the individuals to avoid paying a fine, this was flagged for the Police Chief as a problem because the City needed to keep up its revenue.[16]  Nor did the City provide notice to those arrested that, while they were not going to be sentenced to imprisonment *for the violation itself*, they could be, and generally were, imprisoned for failing to pay the full sum of the money assessed.[17]  This staggered approach enabled the City to effectively circumvent the right to counsel required under the Sixth Amendment.

When people failed to pay, City clerks issued warrants for their arrest.  These warrants were not issued based on probable cause — indeed no City official considered the facts or circumstances to determine whether to issue the warrant.  Instead, the warrants were generated by a computer program that *automatically* issued a warrant when victims missed a payment date.[18]  As a result, the City of Ferguson issued 3.6 arrest warrants *per household* and 2.2 warrants for *every* adult—more arrest warrants per capita than any other city with more than 10,000 residents in the state of Missouri.  *See* First Amend. Compl. ¶ 5, ECF No. 53.  When people were arrested on those warrants, they were kept in the City's jail until they or their families could pay cash amounts negotiated with City jail officials, or until City jail officials decided to let them out for free when it was clear that no cash was forthcoming.

The pressure on families to find the money to pay the City was enormous because the City kept arrestees in deplorable conditions.  According to William Catanzaro, a City police

---

[16] *Id.* at 15, 53; Tsier Decl. Ex. AR.

[17] The arrest records of the Named Plaintiffs are illustrative.  For example, Keilee Fant was arrested and held in jail several times.  Tsier Decl. Exs. M–N, AB.  However, Ms. Fant's warrants show that the underlying charges would not, in and of themselves, lead to imprisonment.  *See* Tsier Decl. Ex. AS ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).

[18] Tsier Decl. Ex. BQ, at 70:17-22.

officer, jail cells were dark, dirty, foul-smelling, and cold.[19]   Arrestees were not provided with soap, toothbrushes or toothpaste, deodorant, or access to a shower.[20]   With few exceptions (such as men who defecated on themselves and women who were naked or nearly naked) the prisoners could not access clean clothes.[21]   The only source of water in the jail cells was connected to the toilet.[22]   Prisoners were denied adequate food[23] or access to necessary medication.[24]   And in addition to these conditions, prisoners were subject to taunts and humiliation by the prison guards.[25]   Unsurprisingly, family members would go to great lengths to obtain the money to buy their loved ones out of jail.

Plaintiffs are among the many people in Ferguson whose fundamental rights were violated by the City's collection scheme.   Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, Shameika Morris, Daniel Jenkins, Ronnie Tucker, and Tonya Deberry (together "Named Plaintiffs" or "Representative Plaintiffs") have been arrested and imprisoned by the City for no reason other than an inability to pay money that the City demanded.   The City's unconstitutional scheme interfered with their jobs, affected every aspect of their daily lives, and inflicted profound suffering on them and their families.

The stories of Keilee Fant and Alfred Morris are illustrative.   Ms. Fant, a 37-year-old single mother and nurse's assistant, has been jailed over a dozen times for her inability to pay old

---

[19] *See* Tsier Decl. Ex. BR, at 102:16-18, 103:24-25; 104:1-16.

[20] *See id.* at 117:9-18.  Indeed the officer could recall only few instances of prisoners being allowed to shower, and all but one involved prisoners who had defecated themselves.  *See id.* at 136:16-25; 137:1-25; 138:1-8.

[21] *Id.* at 115:3-25; 116:1-20.

[22] *Id.* at 102:5-15.

[23] Tsier Decl. Ex. BS, at 60:6-10 ("A pot pie is not a lunch for a grown person. . . . One pot pie is not going to fill you up in a jail all day.").

[24] *See* Tsier Decl. Ex. BT, at 64:6-20.

[25] *See* Tsier Decl. Ex. BP, at 197:24-25; 198:1-16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

traffic tickets.[26]  During the many days she was imprisoned – totaling over fifty – Ms. Fant was subjected to continued verbal abuse and denied basic toiletries, sanitation, and adequate food.[27]  In January 2014, for example, she was arrested and transferred between *six different* jails before ending up in Ferguson.  Once there, she was forced – without the aid of counsel – to negotiate her release directly with Ferguson jail officers.  A jail officer told her she would be released only if she paid an arbitrary, negotiated sum that night, in cash, lest the so-called "deal" be called off.[28]  As a consequence of her repeated incarceration, Ms. Fant – who relied on food stamps to eat – lost her job[29]  On one occasion, she was forced to miss her father's funeral because she could not afford to pay her way out of jail.[30]

Mr. Morris is a 62-year-old military veteran.  He is disabled and relies on payments from the Department of Veteran Affairs for basic necessities of life.  Mr. Morris has been jailed on at least four occasions for failing to pay the fees associated with violating a municipal ordinance that prohibited residents from having friends, relatives, or romantic partners stay overnight in their homes without informing the City in advance (an ordinance that obviously was unconstitutional on many levels).  The police searched Mr. Morris' home and, upon finding women's clothing – but no other person – accused him of violating the ordinance.[31]  Mr. Morris was arrested and taken to the Ferguson jail.[32]  No lawyer was appointed to assist him.  Each time

---

[26] *See id.* at 158:20-24; First Amend. Compl. ¶ 20.

[27] *See id.* at 105:2-3; 134:22-23; 197:24-25; 198:1-16; First Amend. Compl. ¶¶ 32, 35.

[28] *See id.* at 161:19-21 ██████████████████████████████████████████████████████████████; First Amend. Compl. ¶ 29.  The jail official's actions were a direct consequence of City policy, as the General Orders afforded the Watch Commander on duty unlimited discretion to set and alter bond amounts for prisoners.  *See* Tsier Decl. Ex. AQ, at § 421.03.

[29] Tsier Decl. Ex. BP, at 145:3; First Amend. Compl. ¶ 31.

[30] *Id.* at 166:14-25; 167:1-24; First Amend. Compl. ¶ 32.

[31] Tsier Decl. Ex. BT, at 46:12-25; 47; 48:1-13.

[32] *Id.* at 48:3-20.

Mr. Morris was jailed, City employees told him that he would be jailed indefinitely unless he paid $500.00.  Each time, because nothing could be squeezed out of him, he was eventually released "for free."[33] ████████████████████████████████████████

████████████████████████ [34] During one of his arrests, Mr. Morris became seriously-ill because jail officers refused to provide him access to needed medication.[35]  The jail also was so crowded that Mr. Morris was forced to spend his first night sitting on the edge of a bed in which another man was sleeping because there was only one bed in a cell with three men.[36]  The next day Mr. Morris' was in considerable pain, but jail staff threatened to charge him with another offense if they—and not a doctor—decided he was faking his illness.[37]  Eventually the pain became so bad that jail officers had to call paramedics, who determined that Mr. Morris needed to be in a hospital.[38]  Only then was he released "for free."

Unfortunately, thousands of people have similar stories.  On behalf of these individuals, Plaintiffs respectfully ask this Court to grant this motion to certify class proceedings.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on February 8, 2015, alleging that the City engaged in a widespread scheme of jailing individuals when they could not pay small debts arising from municipal ordinance violations.  Plaintiffs' Complaint, ECF. No. 1.  The City moved to dismiss the Complaint on March 2, 2015 (ECF No. 8), which was denied with respect to each of the

---

[33] *See, e.g.*, *id.* at Tr. 48:14-21. During one of Mr. Morris's arrests he negotiated with City employees to pay twenty-one dollars because he had that amount on him when he was arrested.  *Id.* at 161–63.

[34] *See* Tsier Decl. Exs. Q–T, AD–AF (arrest records of Alfred Morris).

[35] *See* Tsier Decl. Ex. BT, at 64:6-20.

[36] *Id.* at 96:10-16; *compare id.* and *supra* notes 25, 28 *with* Tsier Decl. Ex. *compare supra* note 25 *with* Tsier Decl. Ex. AT, § 454 (outlining City's asserted holding facility procedures) *and* Ex. BA, § 416 (outlining prisoner conveyance and holdover procedures).

[37] *Id.* at 99:10-13.

[38] *Id.* at 46:6-20.

Plaintiffs' claims.  ECF Nos. 19 and 27.  Plaintiffs subsequently filed an Amended Complaint on April 13, 2016.  ECF No. 53.  Defendant moved to partially dismiss the Amended Complaint on April 27, 2016.  ECF. No. 57.  On November 15, 2016, this Court denied Defendant's Motion to Dismiss in its entirety.  ECF No. 79.

Plaintiffs' Complaint focuses on the devastation that the City's scheme has caused the City's residents.  To support the allegation that Plaintiffs were jailed solely on the basis of their inability to make monetary payments, Plaintiffs subsequently filed a motion to compel production of email communications from the City (ECF No. 73), which was granted by this Court on December 2, 2016.  *See* Order, ECF No. 84.[39]  Plaintiffs now move this Court to grant Plaintiffs' Motion to Certify Class.

## ARGUMENT

Plaintiffs seeking to certify a class must satisfy each of the four requirements of Fed. R. Civ. P. 23(a) and at least one of the three criteria for certification under Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

## I.      THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

Rule 23(a) requires that: *first*, the class must be so numerous that joinder of all members would be impracticable; *second*, there must be questions of law or fact common to the class; *third*, the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and *fourth* the representative parties must fairly and adequately protect the

---

[39] Evidence cited throughout this Memorandum and attached hereto as Exhibits is based, in part, on the documents and email communications produced by the City pursuant to the Plaintiffs' requests for production and the Court's Order on the Plaintiffs' motion to compel.  In addition, Plaintiffs rely on evidence summarized in a report concerning the City's Police Department issued in March 2015 by the Civil Rights Division of the United States Department of Justice (the "DOJ").  *See generally* Tsier Decl. Ex. AM, *supra* note 9.  The investigation produced extensive amounts of evidence of the City's inner-workings, including police records, emails and other electronic materials, which ultimately revealed a pattern and practice of unlawful conduct in violation of the First, Fourth, and Fourteenth Amendments, and other federal statutory violations.

interests of the class.  *See* Fed. R. Civ. P. 23(a).  As discussed below, the proposed classes meet these prerequisites – known respectively as numerosity, commonality, typicality, and adequacy.

### A.  Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable."  To be impracticable does not mean that joinder must be impossible, but rather, that it would be extremely difficult or inconvenient.  *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982); *Morgan v. United Parcel Serv. of Am., Inc.*, 169 F.R.D. 349, 355 (E.D. Mo. 1996).  Courts in this Circuit have found that joinder is impracticable where the class exceeds forty members, *Boswell v. Panera Bread Co.*, 311 F.R.D. 515, 527 (E.D. Mo. 2015), where identifying potential plaintiffs is difficult, *Rattray v. Woodbury Cty.*, 253 F.R.D. 444, 453 (N.D. Iowa 2008), or where class members lack the financial resources, knowledge or sophistication to pursue individual claims.  *See Tinsley v. Kemp*, 750 F. Supp. 1001, 1005 (W.D. Mo. 1990) (finding numerosity where, "the putative class members are, by definition, low-income persons who could not afford to prosecute their own actions").  The proposed classes satisfy the numerosity requirements for four separate reasons.

First, the number of people in each class is well-beyond the forty-person threshold for presuming that the numerosity requirement has been met.  *See Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 766 (8th Cir. 1971) (twenty members sufficient); *Tinsley v. Covenant Care Servs., LLC*, 2016 U.S. Dist. LEXIS 11988, at \*20 (E.D. Mo. Feb. 2, 2016) ("It has been consistently held that joinder is impracticable where the class is composed of more than 40 persons.").  The Declaratory and Injunctive Class includes the thousands of individuals who continue to owe the City money, as well as people whom the City assesses for fines every day in connection with cases it prosecutes.  The Pretrial Class contains at least 9,076 people, all of whom have been held in jail by the City in connection with an alleged offense for which they have not been

convicted.[40]   The *Gerstein* Subclass of the Pretrial Class contains at least eighty-four people.[41] The Post-Judgment Class contains at least 2,733 people who have been jailed by the City solely on the basis of warrants arising from nonpayment of debts[42] (although the City's flawed record-keeping does not permit a precise measure for the Post-Judgment Class).[43]

Second, it would be practically impossible to join each putative class member to the action individually.  By definition, Plaintiffs could not join the future stream of class members because their number changes every day as the City assesses new debts.  *See Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (finding impracticability of non-class joinder for a class including future members, who could not yet be identified).

Third, the vast majority of potential plaintiffs lack the resources to bring separate lawsuits.  *See Jackson v. Foley*, 156 F.R.D. 538, 541–42 (E.D.N.Y. 1994) (joinder impracticable when the majority of class members came from low-income households, greatly decreasing their ability to bring individual lawsuits); *Sherman v. Griepentrog*, 775 F. Supp. 1383, 1389 (D. Nev.

---

[40] *See* Tsier Decl. Ex. AU which includes 100 sample arrest records intended to show that the Pre-Trial Class is well within the numerosity requirement. The estimate of 9,706 class members is likely to be significantly under-inclusive as it accounts for only the first of two sets of arrest records produced by the City, the second of which includes more than 1,600 additional records not reflected in this total.

[41] *See* Tsier Decl. Ex. AV (arrest records of 84 *Gerstein* Class members excerpted from City of Ferguson Arrest Records).  Note that some class members were illegally held for over forty-eight hours several times.  *See e.g.*, Tsier Decl. Ex. AW ███████████████████ *id.* Ex. AX ████████████████████████████████████████████ .  Plaintiffs will demonstrate at trial that, because the City never intended to hold standard pretrial proceedings, even warrantless detention of less than forty-eight hours was unreasonable.

[42] *See* Tsier Decl. Ex. AY (arrest records of 100 sample Post-Judgment Class members excerpted from City of Ferguson Arrest Records).  The estimate of 2,733 class members is likely to be significantly underinclusive as it accounts for only the first of two sets of arrest records produced by the City, the second of which includes more than 1,600 additional records not reflected in this total.

[43] The City produced arrest records for more than 11,809 people. However, flaws in the City's record-keeping system make it difficult to determine with certainty which people belong in the Pre-Trial Class and which belong in the Post-Judgment Class without engaging in an extensive manual review of individual municipal court files and other records.  Plaintiffs have done their best to estimate the aggregate numbers without conducting that time-consuming review because the large number of class members easily meets the numerosity requirement.  Moreover, this number is likely significantly underinclusive because it appears to exclude certain arrestees transferred to Ferguson from other jurisdictions.  Even with these limitations, Plaintiffs have already identified at least 9,076 Pre-Trial, 88 *Gerstein*, and 2,733 Post-Judgment class members from the records produced by the City.

1991) (finding joinder impracticable because the proposed class consisted of poor and elderly or disabled plaintiffs who could not bring individual lawsuits without hardship).  Indeed, the members of each proposed class are among the most marginalized and economically desperate members of the community, unable to find a lawyer to represent them after their arrest, let alone to investigate and develop their constitutional claims.[44]  Many may not even be aware that they have a valid constitutional claim against the City, since many people are not aware of the constitutional precedent condemning jailing of the poor for the inability to make a monetary payment.  *See Hood v. Gilster-Mary Lee Corp.*, 2016 U.S. Dist. LEXIS 135475, at *23 (W.D. Mo. Sept. 30, 2016) ("In balancing the relative merits of class action versus alternative methods of adjudicating the controversy, courts should consider the inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually.") (citation and internal alterations omitted); *Gerardo v. Quong Hop & Co*., 2009 U.S. Dist. LEXIS 60900, at *6 (N.D. Cal. July 7, 2009) (certifying class where "potential class members are not legally sophisticated," making it difficult for them to bring individual claims).

Fourth and finally, adjudicating this case individually through separate lawsuits against the City would cause an enormous drain on judicial resources.  Separate lawsuits would result in duplicative discovery (including numerous depositions of the same City officials and repetitive document productions), repeated adjudication of similar controversies in this Court (with the resultant risk of inconsistent judgments), and excessive costs for all parties.  *See Covenant Care Servs.*, 2016 U.S. Dist. LEXIS 11988, at *31 (class action superior because mechanism allows

---

[44] Tsier Decl. Ex. BT, at 51:8-10 (explaining he did not contest a "no occupancy permit" charge after being arrested because he did not have money for a lawyer).  Moreover, in light of their negative experiences with the courts, many class members may be fearful of involving themselves further in the justice system by pursuing lengthy litigation. *See Id*. at 53:10-22 (explaining that he did not see the judge to request a lawyer because he was afraid of getting arrested).

more efficient allocation of judicial resources); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (class action superior when "classwide litigation of common issues will reduce litigation costs and promote greater efficiency").

### B.    Commonality

The second Rule 23(a) requirement is that "there [be] questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this commonality requirement, the factual or legal questions must "generate common answers apt to drive the resolution of the litigation."  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis and citation omitted). However, the threshold for this requirement is not demanding.  *See Atkins v. United States*, 2016 U.S. Dist. LEXIS 92891, at *7 (E.D. Mo. July 18, 2016).  Rather, commonality merely requires that one or more question of law or fact be common among the class members.  *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974) (plaintiffs must show common questions of law or fact, but need not show all issues raised by the dispute are common).  It is generally satisfied when it can be demonstrated that class members have been injured "by the same wrongful act or acts."  *H&R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 546 F.3d 937, 942 (8th Cir. 2008).  Courts have also found the commonality requirement to be satisfied where there is a uniform policy or conduct that applies to all class members.  *See Covenant Care Servs.*, 2016 U.S. Dist. LEXIS 11988, at *23; *Morgan*, 169 F.R.D. at 355–56 (same).

The proposed classes satisfy the commonality requirement because class members were injured by the same wrongful policies and practices.  The City operated its post-arrest detention and debt-collection system in a routine and consistent way which applied indiscriminately to all class members.  For example, all individuals were subject to the City's policy of allowing jail

officials to set bond orders and reduce them as the jail officials saw fit.[45]  *See Morgan*, 169 F.R.D. at 356 (finding that commonality was satisfied where class members were subject to a uniform personnel policy that included a subjective, decentralized system of decision-making). Similarly, all individuals who were assessed for fees received a blank form – created by the Court Clerk – that instructed them not to attend court and to pay the fees at the Ferguson Police Department.[46]  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.[47]

The proposed classes also satisfy the commonality requirements because, as shown below, this case is pervaded by critical common issues of both law and fact, the resolution of which will determine whether the members of each class are entitled to relief.  The factual issues common to all members of the Pretrial Class include, but are not limited to:

- Whether the City had a policy and practice of keeping new arrestees in its jail before any conviction unless they can pay a predetermined cash sum, without inquiring into their ability to pay or considering non-financial alternatives;

- Whether arrestees who could not pay the predetermined cash sum could be released through a cash negotiation process with City jail employees; and

- Whether the City had a policy and practice of keeping warrantless arrestees who could not pay cash bonds in jail with no intent to prepare for a probable cause or preliminary proceedings, and then failing to make prompt neutral probable cause findings based on sworn evidence.

---

[45] Tsier Decl. Ex. AQ, at § 421.03 ("Any Watch Commander having custody of a person is authorized to set Bond as prescribed in this General Order.  The Watch Commander **may authorize a reduction in the prescribed bond to an amount obtainable by the arrested subject**, or may authorize a recognizance if the circumstances require such action.") (emphasis added).

[46] Tsier Decl. Ex. BQ, at Ex. 1 (Standard Bond Receipt and Form, telling all recipients "DO NOT ATTEND COURT" and that recipient "must pay at the Ferguson Police Department") (emphasis in original).  *See also id.* at 60:15-64:1 ("Q: Why does it say do not attend court? A: Because you are now on our payment docket, you don't have to go into court, check in, have a seat and wait. . . . Q: So one of the things you said before was that, so you had a payment docket that, but the judge and prosecutor weren't there, it was really to accept payment? A: Yeah. I call it a docket because I printed it out on paper like a docket.").

[47] *See* Tsier Decl. Exs. AO, AZ.

The factual issues common to all members of the Declaratory and Injunctive Class, as well as to all members of the Post-Judgment Class, include:

- Whether the City had a policy and practice of issuing and executing warrants for the arrest of debtors who owe money on old judgments solely for non-payment, without any prior notice or opportunity to be heard concerning their ability to pay or the validity of the debt and without probable cause that any offense had been committed;

- Whether the City's employees and agents had a policy and practice of threatening debtors and their families with incarceration for unpaid debts without informing them of their state law and federal law rights;

- Whether the City had a policy and practice of jailing people who owe money on old judgments and keeping them in jail until they could pay or until City jail officials decided arbitrarily to release them for free;

- Whether the City provided adequate legal representation to those jailed for non-payment in proceedings that could result in their incarceration;

- Whether the City had a policy and practice of automatically recalling arrest warrants for people able to afford an attorney or people able to afford to pay the City clerk a predetermined fee; and

- Whether the City provided notice to debtors that their ability to pay will be a relevant issue at legal proceedings at which they are jailed or kept in jail.

And the factual issues common to all members of each of the three classes include:

- Whether the City had a policy and practice whereby police and jail officials incrementally lowered the cash amount required to purchase a person's release from custody outside of any formal legal proceedings;

- Whether the City had a policy and practice of automatically releasing prisoners after a certain period of time if they were not able to pay the amount of cash required for their release; and

- Whether the City maintained its jail in unsanitary and dangerous conditions, such that inmates suffered from a lack of proper nutrition and dehydration, were forced to drink water from a mechanism attached to the toilet, were denied access to medication brought by family members, were forced to sleep on the floor in overcrowded cells next to unclean toilets, were forced to share unwashed blankets, were denied access to toothbrushes, toothpaste, soap and showers, and were humiliated by prison guards.

Among the questions of law common to all members of the Pretrial Class are:

- Whether the City's post-arrest wealth-based procedures of declaring every arrestee immediately eligible for release but jailing only those arrestees who cannot pay a

predetermined amount of cash without any inquiry into their ability to pay or consideration of non-financial alternatives violates the Fourteenth Amendment's Equal Protection and Due Process Clauses;

- Whether the City violates the Fourth Amendment by keeping people in custody after warrantless arrests without any neutral findings of probable cause and without any intention of bringing the arrestees before a neutral judicial officer for such a finding.

Among the legal issues common to all members of the Declaratory and Injunctive Class, as well

as to all members of the Post-Judgment Class, are:

- Whether the City violates the Fourth Amendment's requirement that all arrest warrants be based on probable cause by (i) issuing arrest warrants for individuals when they do not make payments on their debts to the City by certain dates, (ii) issuing these arrest warrants without probable cause to believe that the individual is able to pay and is willfully refusing to do so, and (iii) issuing these arrest warrants for "failure to appear" (although the individuals did not fail to appear at any court appearance);

- Whether the City violates the Fourteenth Amendment by jailing people for non-payment and depriving them of their fundamental right to bodily liberty without providing any pre-deprivation notice or opportunity to be heard;

- Whether the City violates the Equal Protection Clause by only removing arrest warrants and setting new court dates for those debtors who retain private counsel or pay the City clerk a predetermined fee;

- Whether the City violates the Supreme Court's prohibition on government use of unduly harsh methods of collection that would be unavailable to private creditors by (i) placing indigent people in generic and onerous payment plans lasting years or decades, (ii) using jail, threats of jail, and other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors, and (iii) denying debtors the procedural and substantive statutory protections that every other Missouri debtor may invoke against a private creditor; and

- Whether, the City violates the Fourteenth Amendment's Due Process and Equal Protection Clauses by jailing people for failure to pay the debts owed from minor traffic tickets, without inquiring into their ability to pay and considering alternatives to imprisonment.

And among the legal issues common to all members of each of the three Classes are:

- Whether the City violates the Fourteenth Amendment's proscription against arbitrary detention by (i) keeping people in jail after arrest due to their inability to pay predetermined cash bail amounts, (ii) shifting these bail amounts frequently without any formal legal process, (iii) failing to provide arrestees with any process to

22

challenge their wealth-based detention, and (iv) prolonging the jail term until the arrestees can pay or until City employees decide to release them for free;

- Whether the City violates the individuals' Sixth Amendment right to effective assistance of counsel and Due Process by failing to appoint any attorney for people who cannot afford one and subsequently imprisoning them after proceedings initiated and litigated by City prosecutors; and

- Whether the City violates the Fourteenth and Eighth Amendments by keeping individuals in jail in unsafe, unsanitary, inhumane and dangerous conditions which include (i) filthy, overcrowded cells, (ii) a lack of access to medical care, mental health care, hygiene products, laundry, fresh air, sunlight, clean drinking water and adequate nutrition, and (iii) routine humiliation by guards.

Although potential class members may have entered the system through different charges, suffered different *degrees* of harm, and experienced different lengths of confinement that does not diminish the commonality among them. *See Bouaphakeo v. Tyson Foods Inc.*, 765 F.3d 791, 797 (8th Cir. 2014) (holding that factual differences between individual claimants do not preclude class certification when there is evidence of consistent policy) *aff'd*, 136 S. Ct. 1036 (2016); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (varying strength of individual claims does not impact commonality); *Van Orden v. Meyers*, 2011 U.S. Dist. LEXIS 113478, at *19–20, 23 (E.D. Mo. Sept. 30, 2011) ("[N]ot every class member need be affected by a statute, administrative practice, or institutional condition in an identical manner."); *Ellis v. O'Hara*, 105 F.R.D. 556, 561 (E.D. Mo. 1985) (finding the allegation of a pattern of bad faith enforcement of relevant law sufficient to meet commonality despite factual differences among plaintiffs). Given the need to resolve these central issues before the City's liability to each plaintiff is assessed, the proposed classes meet the commonality requirement.

## C.    Typicality

Rule 23(a)(3) requires that class representatives' grievances be typical of other class members. Fed. R. 23(a)(3). This typicality requirement can be satisfied in one of two ways: (i)

if the class representatives and the putative class members are subjected to the same policies, conditions, or unlawful treatment; *see Downing v. Riceland Foods, Inc.*, 2015 U.S. LEXIS 34154, at *12 (E.D. Mo. Mar. 19, 2015) or (ii) if their claims are based "on the same legal theories, [and] the same arguments of unconstitutionality." *Rentschler v. Carnahan*, 160 F.R.D. 114, 116 (E.D. Mo. 1995). Typicality does not, however, require *identical* interests among all class members. *Ortega v. Uponor Inc.*, 716 F.3d 1057, 1064 (8th Cir. 2013). Rather, class members' claims need only share some essential characteristics and "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims *similar* to the named plaintiff." *DeBoer*, 64 F.3d at 1174 (emphasis added). As explained below, each of the proposed classes satisfies the typicality requirement.

The representatives of the Declaratory and Injunctive Class satisfy the typicality requirement for three reasons. First, Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson Jr., and Donyale Thomas were all subjected to City's illegal debt collection scheme and accumulated debt pursuant to that scheme. *See Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *24 (finding typicality satisfied when members were subjected to the same allegedly unlawful policies and conditions). Second, Representatives make the same claims for declaratory and injunctive relief as the other class members. *See Boswell*, 311 F.R.D. at 528. Third, the legal theories that underpin Representative Plaintiffs' claims for injunctive relief are the same as those of the putative class members. *See DeBoer*, 64 F. 3d at 1174–75 (finding typicality satisfied where plaintiffs sought the same injunctive relief as other class members, despite each being subject to different operative agreements).

The Pretrial Class – represented by Roelif Carter, Donyale Thomas, Keilee Fant, Anthony Kimble, Alfred Morris, Allison Nelson, Herbert Nelson, Daniel Jenkins, Ronnie

Tucker, and Tonya Deberry – also satisfies the typicality requirement on three grounds.  First, Representative Plaintiffs were subject to the same unlawful treatment as the other members of the Pretrial Class as they were kept in jail by the City in connection with a new arrest prior to any conviction for that arrest.  Second, Representative Plaintiffs' claims are typical of the claims of other class members.  *See* First Amend. Compl. ¶¶ 234–243 (Counts 1–5), ECF No. 53.  Finally, Representative Plaintiffs make the same legal arguments as the other members of the Pre-Trial Class.[48]

The *Gerstein* Subclass – represented by Roelif Carter – equally satisfies the typicality requirement.  First, like other members of the Subclass Mr. Carter was subject to the City's unlawful practice of holding arrestee's for longer than a reasonable period of time, forty-eight hours at a maximum, prior to a valid finding of probable cause by a neutral magistrate.  In June 2014, Mr. Carter was arrested by the City for a municipal offense and was told that he would be held in jail until he paid $300.00 in cash.  Mr. Carter was unable to pay and was held for three days, after which point he was released for free.[49]  Mr. Carter was subsequently arrested in August 2014 and was told that he would not be released unless he paid cash to the City – only to be released for free after three days.[50]  On neither occasion did the City conduct a probable cause hearing.[51]  Second, Mr. Carter makes the same claims as the other members of the *Gerstein* Subclass.  *See* First Amend. Compl. ¶¶ 234–35, 246–247 (Counts 1, 7).  Third, the constitutional

---

[48] Representative Plaintiffs' Due Process and Equal Protection claims stem from their detention for their non-willful inability to pay a cash bond.  In failing to inquire into their indigent status, the City's failed to protect the Representative Plaintiffs' Constitutional liberties. *See Turner v. Rogers*, 131 S. Ct. 2507, 2518–19 (2011); *Griffin v. Illinois*, 351 U.S. 12, 18–19 (1956).

[49] *See* Tsier Decl. Ex. AA; *see also* First Amend. Compl. ¶ 52 n.6.

[50] *See* Tsier Decl. Ex. Z; *see also* First Amend. Compl. ¶ 52 n.6.

[51] Indeed, both times the City released Mr. Carter as a result of overcrowding in the jail (a fact that underscores the conclusion that the City never planned to hold a probable cause hearing for him in the first place).  *See* Tsier Decl. Ex. AB.

arguments at the heart of Mr. Carter's claim are the same as those of the other members of the *Gerstein* Subclass.  *See* Pl.'s Resp. to Def.'s Mot. Dismiss 8–24, ECF No. 62.[52]

Likewise, the Post-Judgment Class satisfies the typicality requirement on three grounds. First, Representative Plaintiffs (Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, and Shameika Morris) suffered from the same illegal City scheme as the other post-judgment debtors.  They were all arrested and jailed under deplorable conditions by the City because of their non-payment of a cash sum in connection with a prior judgment.[53]  Second, Representative Plaintiffs make the same claims as the other members of the Post-Judgment Class.  *See* First Amend. Compl. ¶¶ 234–37.  Finally, Representative Plaintiffs' claims against the City turn on same legal theories as those of the other class members, as outlined in the Complaint and in Plaintiffs' Opposition to the City's Motion to Dismiss.  *See e.g.*, *id.*; Pl.'s Resp. to Def.'s Mot. Dismiss 8–24.

In sum, because Representative Plaintiffs suffered from the same City scheme that has harmed and continues to harm other members of the proposed classes, and because their claims for relief and legal arguments are the same as those of other members of their respective classes, the proposed classes satisfy the typicality requirement of Rule 23(a)(3).  If they succeed in their claims that the City's policies and practices concerning post-arrest procedures and debt collection for fines, fees, costs, and surcharges violate the law as alleged in the Complaint, that

---

[52] Mr. Carter's constitutional claim is rooted in the protections guaranteed by the Fourth Amendment.  As the Supreme Court held in *Gerstein v. Pugh*: "To implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the Court has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible."  420 U.S. 103, 112–113 (1975).  Mr. Carter, like other members of the *Gerstein* Subclass was held without such a hearing within forty-eight hours of his detention, and therefore argues that the City violated his Fourth Amendment rights.

[53] *See* Tsier Decl. Exs. M–N, AB (arrests of Keilee Fant pursuant to the City's Failure to Appear Ordinance); F–I (Roelif Carter); U–W (Allison Nelson); X, AK–AL (Herbert Nelson, Jr.); Q–T, AD–AF (Alfred Morris); O–P, AC (Anthony Kimble); L (Donyale Thomas); AG–AI (Shameika Morris). *See e.g.*, *supra* note 38 and accompanying text.

ruling will likewise benefit every other member of their respective classes.  That is the essence of Rule 23 typicality.

### D.    Adequacy

It is clear that Representative Plaintiffs will "fairly and adequately protect the interests of the class[es]," as required by Rule 23(a)(4).  The adequacy analysis encompasses two separate inquiries: (1) whether the named plaintiff has common interests with the other class members; and (2) whether the representatives will adequately prosecute the action through qualified counsel.  *See Boswell*, 311 F.R.D. at 529 (citing *Paxton*, 688 F.2d at 562–63).

Representative Plaintiffs are adequate representatives because they entirely share their classmates' interests in establishing the illegality of the City's policies and practices concerning post-arrest procedures and debt collection.  Their injuries arise from policies that all class members were subjected to, and their legal challenges to the City's policies are shared among the members of their respective classes.   There are no known material conflicts of interest among members of the proposed classes, all of whom have a similar interest in vindicating their constitutional rights in the face of their unlawful treatment by their local government.

Representative Plaintiffs and proposed classes are represented by attorneys who are "qualified, experienced and able to conduct the proposed litigation."  *Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *27 (internal citations omitted) (quoting *Hedge v. Lyng*, 689 F. Supp. 884, 890 (D. Minn. 1987)).  Plaintiffs are represented by counsel from Civil Rights Corps, ArchCity Defenders, Saint Louis University School of Law Legal Clinics, and White & Case.  Each organization has experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of post-arrest wealth based detention schemes and the relevant constitutional law.  *See* Karakatsanis Declaration, June 7, 2017.  Counsel for Plaintiffs has also

been the lead attorney in a number of materially similar class actions resulting in system wide reforms of wealth-based detention systems across the country.  *Id.* ¶¶ 5–6.  The interests of the class members will thus be fairly and adequately protected by Representative Plaintiffs and their attorneys.

## II.    THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(b)

In addition to the threshold requirements of Rule 23(a), Plaintiffs must also meet the requirements of Rule 23(b).  *See Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *27.  For the reasons discussed below, the Declaratory and Injunctive Class satisfies Rule 23(b)(2), and the Pretrial and Post-Judgment Classes satisfy Rule 23(b)(3).

### A.    The Declaratory and Injunctive Class Satisfies Rule 23(b)(2)

A class action is appropriate under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) applies only "when a single injunction or declaratory judgment would provide relief to each member of the class . . . [and not] when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 131 S. Ct. at 2557.  However, this "cohesiveness" requirement is "easily met . . . in cases where . . . the class members were subject to the very practice or policy of the defendant that is being challenged in the lawsuit." *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 345 (S.D. Iowa 2013) (collecting cases); *see also Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *28 (finding defendant's implementation of an unconstitutional program and enforcement of an unconstitutional reimbursement scheme sufficient to satisfy Rule 23(b)(2)); *Ellis*, 105 F.R.D.at 563 (noting that Rule 23(b)(2) requirement is met when defendant "acted in a consistent manner towards members of the class so the actions may be viewed as part of a pattern of activity").

The Declaratory and Injunctive Class satisfies Rule 23(b)(2) on two grounds.  First, by implementing and enforcing an unconstitutional debt-collection scheme, the City "has acted or refused to act on grounds generally applicable" to all of its current and future debtors.  For example, the City's uniform practice of threatening debtors with arrest for late payments is evident in the text of the standard forms given to all individuals who were given fines.  *See* Tsier Decl. Ex. BQ, at Ex. 1 ("You are now on our payment docket . . . Any late payments are subject to additional fines and/or a warrant being issued for your arrest.").[54]  Solely on this basis, the City's widely-applied, unconstitutional debt collection scheme is particularly well-suited to a Rule 23(b)(2) class action.[55]

Second, Representative Plaintiffs' request for relief satisfies 23(b)(2) because the remedy they seek would provide relief to all current and future debtors of the City.  For example, the Court's declaration that the City cannot place and hold people in jail solely because they cannot afford to make a monetary payment will affect every person who has outstanding debts to the City and thereby lives with the ever-present fear of being swept up in the City's jails.  A declaration that all people who owe a debt to the City are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration would similarly affect all Class members.[56]  The injunctive relief that Representative Plaintiffs

---

[54] *See also* Tsier Decl. Ex. BQ, at 61:2-9.

[55] Rule 23(b)(2) arose out of experience "in the civil rights field," *Amchem Prods.*, 521 U.S. at 614 (quoting Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 HARV. L. REV. 356, 389 (1967)), in which the government typically treats a whole class in an unconstitutional manner based on law or government policy.  "Rule 23(b)(2) was promulgated in 1966 essentially as a tool for facilitating civil rights actions."  MOORE'S FEDERAL PRACTICE § 23.43(1)(b) (3d ed. 2014); *see also Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *16–17; NEWBERG ON CLASS ACTIONS § 1:3 (5th ed. 2011) ("Rule 23(b)(2) authorizes a class action when a party has taken or refused to take action with respect to a class. . . .  This category is typically employed in civil rights cases and other actions not primarily seeking money damages.  The (b)(2) class action is often referred to as a 'civil rights' or 'injunctive' class suit.") (emphasis added).

[56] Indeed the declaratory relief Plaintiffs seek is particularly important given that the Consent Decree between the City and the Department of Justice specifically states that the Consent Decree is not to be taken as an admission by

seek would also protect each member of the Class from being subjected to the City's unlawful policies and practices with respect to the debts that they still owe.[57]  It would also protect those who will incur such debts or be subject to arrest by the City in the future from the same unconstitutional conduct.  The relief that Representative Plaintiffs seek thus plainly meets the requirements of Rules 23(b)(2).

Because the City's unconstitutional debt collection policies apply against all members of the Declaratory and Injunctive Class, and because the declaratory and injunctive relief Representative Plaintiffs seek would apply to all its members, the Declaratory and Injunctive Class meets the requirements of 23(b)(2).  Having already met the threshold requirements of Rule 23(a), the Declaratory and Injunctive Class fulfills all the prerequisites for certification.[58]

### B.    The Pretrial and Post-Judgment Classes Satisfy Rule 23(b)(3)

To certify a class under Rule 23(b)(3) plaintiffs must show that "the questions of law or fact common to the members of the class predominate over any questions of law or fact affecting only individual members," and that "a class action is superior to other available methods for

---

the City that it has engaged in unconstitutional, illegal or otherwise improper conduct.  *See* Consent Decree, *supra* note 5, ¶ 7.

[57]  Plaintiffs have asked this Court to issue "[a]n order and judgment permanently enjoining Defendant from enforcing the . . . unconstitutional policies and practices against Plaintiffs" as well as "any other relief this Court deems just and proper."  First Amend. Compl. 58, ECF No. 53.  In exercising its broad discretion to fashion injunctive relief, *Burton v. Armontrout*, 975 F.2d 543, 544 (8th Cir. 1992), this Court may avail itself of any relevant language from the Consent Decree entered between the City and the DOJ.  Doing so would provide plaintiffs with an effective means of enforcing reforms that the City has already agreed to on a classwide basis, should shifting priorities in the DOJ jeopardize continued enforcement of the Consent Decree.

[58]  At least with respect to a damages class under Rule 23(b)(3), courts have held that "ascertainability" is, in essence, a fifth Rule 23 prerequisite.  A class must be "adequately defined and clearly ascertainable."  *De Bremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).  "In other words, the class must meet a minimum standard of definiteness which will allow the trial court to determine membership in the proposed class," although "it is not necessary that the members of the class be so clearly identified that any member can be presently ascertained."  *Earnest v. GMC*, 923 F. Supp. 1469, 1473 & n.4 (N.D. Ala. 1996) (quoting *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970)).  Although it is doubtful that such a requirement exists with respect to a purely declaratory and injunctive class under Rule 23(b)(2), see, e.g., *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-593 (3d Cir. 2012) (noting that the rule has been applied to Rule 23(b)(3) *damages* classes), that requirement is easily met here.  The parties have already identified each and every person who owes the City money based on a case prosecuted by the City, who has been held in custody by the City for failure to make a monetary payment, or who is currently being held for that reason.  And by necessity, the City will come to know the identity of each person falling into these categories in the future.

fairly and efficiently adjudicating the controversy."   The Pretrial and Post-Judgment Classes satisfy both requirements.

**1.      The Common Questions of Law and Fact Predominate**

The Rule 23(b)(3) predominance inquiry considers "whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member."  *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013).  This inquiry, however, "does not require . . . [proof] that each element of [plaintiff's] claim is susceptible to classwide proof."  *Boswell*, 311 F.R.D. at 529 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013)).  Instead, determining whether common questions predominate requires only a limited preliminary inquiry into the pleadings to determine "whether, if the plaintiffs' allegations are true, common evidence could establish a prima facie case for the class."  *Downing*, 2015 U.S. Dist. LEXIS 34154, at *13–14 (citing *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2015)).

The elements of a prima facie case that the City is liable for its unconstitutional debt-collection scheme is the same for all purported members of the Pretrial and Post-Judgment Classes.  To establish the City's liability, Representative Plaintiffs must show (i) that the City engaged in the policies and practices alleged in the complaint,[59] and (ii) that these policies and practices are unlawful.

The dispositive questions of fact in this case are susceptible to resolution through common evidence because they center on the procedures and practices that are routine to the City and its agents.  For example, the evidence establishing that the City had policy and practice

---

[59] For example that the City issued warrants solely for nonpayment as a matter of policy; that it jailed people for non-payment of money without any inquiry into or findings concerning ability to pay; that it kept people in jail after arrest based on predetermined amounts of cash set without any inquiry into ability to pay or consideration of alternatives; and that City police and jail officials arbitrarily acted as negotiators to modify and lower the amounts of money required for release from indefinite detention outside of any recognizable legal process.

of issuing arrest warrants solely for nonpayment comes from standard documents used by City clerks (Tsier Decl. Ex. BQ, at Ex. 1) and from the testimony of City employees.  *Id*. at 61:2-9. Similarly, the evidence relevant to whether the City had a policy of negotiating with individuals to modify and lower the amounts of cash required for release, comes from the City's internal written and oral directives to court and jail employees,[60] the City's jail records,[61] the testimony of numerous City court and jail officials,[62] as well as from class member witnesses.[63]  Because the evidence relevant to establishing that the City engaged in the alleged policies and practices is common to all of the members of Pretrial and Post-Judgment classes, both classes clearly meet the standard for predominance.  *See e.g.*, *Boswell*, 311 F.R.D. at 529–30 (finding predominance where class members' claims could be proven through common evidence and the defendant's "intent and action with respect thereto"); *Labrier v. State Farm Fire & Cas. Co.*, 315 F.R.D. 503, 517 (W.D. Mo. 2016) (finding predominance where plaintiff "presented facts and law that establish[ed] a prima facie claim . . . for herself and the class"); *Perrin v. Papa John's Int'l, Inc.*, U.S. Dist. LEXIS 181749, at *17 (E.D. Mo. Dec. 31, 2013) (finding predominance and certifying

---

[60] *See, e.g.*, *supra* note 32.

[61] *See, e.g.*, Tsier Decl., Exs. BC-BL.

[62] *See* Tsier Decl. Ex. BR, at 27:11-25; 28:1-25; 29:1-25; 30.1-15 (noting that if a prisoner did not have enough money to meet bond the officer would suggest that he or she make a call to someone who could bring money to pay their bond); *id*. at 31:4-25; 32:1-11 (noting that a supervisor could approve a bond reduction based on what an inmate indicated he or she was able to pay); *id*. at 126.21-25; 127.1-4 ("Q. (By Mr. Strode) I believe you told me earlier that bonds would sometimes be reduced when a person communicated to you that they didn't have enough to pay the full amount; is that right?"  A. Correct.  Q. And is it correct that it would be reduced sometimes to the amount that they had available?  A. Correct."); *id*. at 33.11-20 (stating that during the daytime, correctional or police officers would take booking sheets to the court clerk and "whatever arbitrary process she had of deciding reductions in bond, she granted bond reductions."); 36.2-24 (confirming that only the court clerk was involved and she did not contact anyone else while reducing the bond); *see also* Tsier Decl., Ex. BM, at  17: 6-25; 18:1-25; 19: 1-25 ("Q: Did that bond ever change from the time they came in until they were released? A: Yes. . . . Q: Okay.  So you said both that the court sometimes would lower the bond and that you sometimes would lower the bond?  A: Correct."); *id*. at 37:19-25; 38:1-11 (confirming that his supervisors were aware that he was involved in lowering bonds at his discretion).

[63] *See, e.g.*, Tsier Decl. Ex. BP., at 137:4-6 ██████████████████████████

class where class members alleging state wage law violations were all subject to defendant's vehicle reimbursement policy).

Similarly, the dispositive questions of law in this case are susceptible to resolution through common legal analysis because establishing that the City's practices were unlawful does not require the consideration of individual circumstances. *See e.g.*, *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th. Cir. 2016) (finding predominance in an unsolicited advertising case where main questions of law – concerning whether a given fax constituted an advertisement – were common to all class members).  For example, once Plaintiffs establish that the City had a policy of keeping people in jail after a warrantless arrest without a neutral finding of probable cause, the question of whether such conduct is unconstitutional can be resolved in one hearing rather than through thousands of proceedings.  *See Ellis*, 105 F.R.D. at 560–61 (finding challenge to statute's constitutionality sufficient to certify class of plaintiffs seeking declaratory judgment, among other things, as a means of altering defendants' conduct and pattern of enforcement).  The same is true of the City's policies of keeping people in jail after arrest on the basis of predetermined cash bonds without any inquiry into ability to pay or consideration of non-financial alternatives, its practice of recalling warrants only for those people who hired an attorney, its practice of arresting people for non-payment of fees with no prior notice or opportunity to be heard, and so on.  Because the dispositive issues of law and fact can be resolved through common evidence, the Pretrial and Post-Judgment Classes meet the requirements of Rule 23(b).

The fact that the City's unconstitutional policies and practices may have injured different people to different degrees does not alter the commonsense conclusion that common issues of law and fact predominate.  *See Tyson Foods*, 765 F.3d at 798 n.5 (holding individual damage

calculations "permissible if they do not 'overwhelm questions common to the class'" (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013))); *Labrier*, 315 F.R.D. at 521 (noting that "[c]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations"); *see also Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) ("Common issues—such as liability—may be certified, consistent with Rule 23, even where other issues—such as damages—do not lend themselves to classwide proof."); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."). For example, while two Plaintiffs may each have been jailed, without an inquiry into their ability to pay, until jail staff gave up on squeezing additional funds from them and decided to release them for free, one of them may have served three days in City jail while another may have served only two. This difference in the number of days spent in jail, which may raise or lower damages proportionally, does not in any way affect the critical factual and legal issues common to both of their claims.[64]

### 2.    The Class Action Is a Superior Vehicle for Adjudicating This Dispute

Rule 23(b)(3) also considers whether class resolution is the superior mechanism for the fair and efficient adjudication of the controversy. *See Downing*, 2015 U.S. Dist. LEXIS 34154, at *24. Specifically, Rule 23(b)(3) requires courts to consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and

---

[64] In cases involving improper incarceration, courts have consistently found that general damages for the loss of liberty "per se" are separately calculable from any individualized special damages also caused by such illegal confinement (such as loss of a particular person's job or medical problems). *See, e.g.*, *Kerman v. City of New York*, 374 F.3d 93, 125–26, 130–31 (2d Cir. 2004) (holding that a person held illegally is entitled to general damages simply for the loss of liberty—an amount separable from any special damages); *Phillips v. District of Columbia*, 458 A.2d 722, 725 (D.C. 1983) (loss of liberty itself requires damages per se).

In class action cases, these general damages for loss of liberty are tried on a class-wide basis through a number of commonly used methods. *See, e.g.*, *Dellums v. Powell*, 566 F.2d 167, 174 n.6, 188 n.56 (D.C. Cir. 1977) (damages in mass arrest case tried and determined "for the class as a whole or by subclass" based on number of hours or days in custody); *Barnes v. District of Columbia*, 278 F.R.D. 14, 20–21 (D.D.C. 2011) (calculating general, classwide damages for loss of liberty through a sample of the plaintiffs selected by each party); *Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 174, 177 (E.D.N.Y. 2011) (awarding general damages of $500.00 per unlawful strip search and holding that further special damages must be tried on an individual basis).

nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." These factors overwhelmingly favor class adjudication of Representative Plaintiffs' claims.

The interest and ability of individual class members to pursue separate actions is limited here. First, as previously noted, *supra* Part I.A, many of the potential class members lack the resources required to litigate claims of this magnitude and complexity. *See Jackson*, 156 F.R.D. at 544 (certifying class and recognizing that it would be "inconceivable that the class members would bring individual actions considering their financial circumstances"); *cf. Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir. 1991) (establishing factors for determining whether indigent litigants require appointed counsel, which included factual and legal complexity, and the ability of indigent parties to investigate facts and present a claim).

Second, the individual damages sought by each class member are unlikely to be substantial enough for individual plaintiffs to attract their own attorneys willing to devote the time and energy to litigate the legality of the City's debt-collection scheme, especially given the costs associated with the many stages of such litigation. *See Covenant Care Servs.*, 2016 U.S. Dist. LEXIS 11988, at *29 (finding class mechanism superior "[b]ecause litigation costs would likely exceed any gains from . . . recovery, [so that] class members would be unlikely to litigate individually"); *see also In re Retek Inc., Sec. Litig.*, 236 F.R.D. 431, 437 (D. Minn. 2006) (finding class action superior because prohibitive costs and sophistication of case would limit the ability of members to litigate individually).

Third, consolidating the litigation in a single class action is far preferable to the alternative of having proceedings and discovery repeatedly litigated in this Court. Adjudicating

the claims in one forum would avoid duplicative results and eliminate the potential for inconsistent judgments.  *See Perrin*, 2013 U.S. Dist. LEXIS 181749, at *25–26 ("[A] class action fosters judicial economy and helps to ensure that class members who are otherwise unaware that they possess a claim, or are unable to hire a lawyer, will have their rights represented."); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 566–67 (D. Minn. 2010).

Finally, as noted above, a class action does not present any insurmountable difficulties in management.  The proposed classes are ascertainable from public court records and other records already in the City's possession, and they are limited in geographic scope (unlike a nationwide, multi-district class containing millions of members).  *See Perrin*, 2013 U.S. Dist. LEXIS 181749, at *25 (finding class mechanism superior because the proposed classes were discrete and easily identifiable, and because adjudicating similar claims and legal theories together would avoid duplicative trials).  Indeed, requiring separate individual lawsuits would likely result in far greater manageability problems, such as duplicative discovery (including numerous depositions of the same City officials and repetitive production of documents), repeated adjudication of similar controversies in this Court, and excessive costs.[65]  Judicial economy will therefore be better served if the legality of the City's uniform debt-collection scheme is adjudicated in a single class proceeding rather than through a flood of individual suits.[66]

---

[65] The Court also has considerable discretion in designing the most appropriate classes for certification.  For example, instead of certifying separate Rule 23(b)(2) and Rule 23(b)(3) classes, the Court could certify a Rule 23(b)(3) class along with a hybrid class of those seeking equitable relief.  *See Williams v. Mohawk Indus.*, 568 F.3d 1350, 1360 (11th Cir. 2009) (describing process of certifying class under Rule 23(b)(3) and certifying a hybrid class pursuant to Rule 23(b)(2) and Rule 23(c)(4) for those members of the class who have standing to seek equitable relief); *see also Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 581 (7th Cir. 2000); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999); *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997).  Those options may require subtle redefinition of the Classes, which the Court could undertake with the guidance of the parties if it deems such a process appropriate.

[66] Although the City argued in prior pleadings that class status is not preferable because it will require checking whether each person is indigent, courts regularly certify classes of indigent people without such inquiry.  *See e.g.*, *Thomas v. Byrd*, 2016 U.S. Dist. LEXIS (E.D. Ark. Nov. 10, 2016).  It is worth noting that the City only now

36

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully ask this Court to certify the Classes described in this Motion.

Respectfully submitted,

By:      */s/ Andrew Tomback*
         Andrew Tomback (*pro hac vice*)
         (E.D. Mo. Bar No. 2090074NY)
         Alice Tsier (*pro hac vice*)
         (E.D. Mo. Bar No. 5205885NY)
         Dorian Panchyson (*pro hac vice*)
         (E.D. Mo. Bar No. 548582NY)
         Larry Moscowitz

         WHITE & CASE LLP
         1221 Avenue of the Americas
         New York, NY 10020
         (212) 819-8200

                 —and—

         */s/ Sonia W. Murphy*
         Sonia W. Murphy (*pro hac vice*)
         (E.D. Mo. Bar No. 83072DC)
         Margaret Spicer (*pro hac vice*)
         (E.D. Mo. Bar No. 113907FL)
         Vivake Prasad (*pro hac vice*)
         (E.D. Mo. Bar No. 171832015NJ)

         WHITE & CASE LLP
         701 13th Street, NW
         Washington, DC 20005
         (202) 637-6161

                 —and—

         */s/ Alec Karakatsanis*
         Alec Karakatsanis (E.D. Mo. Bar No. 999294DC)
         Civil Rights Corps
         910 17th Street NW, Suite 500

---

expresses concern about the Plaintiffs' "qualifying" as indigent, after many years of studiously ignoring their financial status.

Washington, DC 20006
(202) 681-2409
alec@civilrightscorps.org


*/s/ Thomas B. Harvey*_____
Thomas B. Harvey (MBE #61734)

*/s/ Michael-John Voss*_____
Michael-John Voss (MBE #61742)

ArchCity Defenders
812 N. Collins Alley
Saint Louis, MO 63102
(855) 724-2489


 */s/ John J. Ammann*_____
John J. Ammann (MBE #34308)


*/s/ Brendan Roediger*_____
Brendan Roediger (E.D.Mo. Bar No. IL6287213)

Saint Louis University School of Law
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
(314) 977-2778


*Attorneys for Plaintiffs*