**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| KEILEE FANT, ROELIF CARTER, ALLISON NELSON, HERBERT NELSON JR., ALFRED MORRIS, ANTHONY KIMBLE, DONYALE THOMAS, SHAMEIKA MORRIS, RONNIE TUCKER, JOHN NARAYAN, et al., | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4-15-CV-00253-AGF |
| THE CITY OF FERGUSON, | ) ) | |
| Defendant. | ) ) ) | (Class Action) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

PROCEDURAL BACKGROUND .......................................................................... 11

ARGUMENT ............................................................................................................ 12

I.   The Proposed Classes Satisfy the Requirements of Rule 23(a)................................. 12

    A.   Numerosity............................................................................................... 12

    B.   Commonality............................................................................................ 18

    C.   Typicality ................................................................................................. 25

    D.   Adequacy ................................................................................................. 29

II.   The Proposed Classes Satisfy the Requirements Of Rule 23(b) ................................ 30

    A.   The Declaratory and Injunctive Class Satisfies Rule 23(b)(2) ............................ 31

    B.   The Damages Classes Satisfy Rule 23(b)(3) ........................................................ 33

        1.   Common Questions of Law and Fact Predominate ................................... 33

CONCLUSION ........................................................................................................ 43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abdullah v. Gunter*,
    949 F.2d 1032 (8th Cir. 1991) ......................................................................40

*Alkire v. Irving*,
    330 F.3d 802 (6th Cir. 2003) ........................................................................15

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...............................................................................12, 32

*Ark. Educ. Ass'n v. Bd. of Educ.*,
    446 F.2d 763 (8th Cir. 1971) ........................................................................16

*Atkins v. United States*, No. 4:15 CV 933 CDP,
    2016 U.S. Dist. LEXIS 92891 (E.D. Mo. July 18, 2016) .......................................18

*Augustin v. Jablonsky*,
    819 F. Supp. 2d 153 (E.D.N.Y. 2011) ..............................................................38

*Barnes v. District of Columbia*,
    278 F.R.D. 14 (D.D.C. 2011)...................................................................38, 39

*Betances v. Fischer*,
    403 F. Supp. 3d 212 (S.D.N.Y. 2019)...............................................................37

*Boswell v. Panera Bread Co.*,
    311 F.R.D. 515 (E.D. Mo. 2015) ................................................13, 29, 33, 35

*Bouaphakeo v. Tyson Foods Inc.*,
    765 F.3d 791 (8th Cir. 2014) ..................................................................24, 36

*Burton v. Armontrout*,
    975 F.2d 543 (8th Cir. 1992) ........................................................................32

*Cain v. City of New Orleans*,
    327 F.R.D. 111 (E.D. La. 2018).....................................................................19

*Cooper v. City of Dothan*, No. 1:15-CV-425-WKW [WO],
    2015 U.S. Dist. LEXIS 78813 (M.D. Ala. June 18, 2015) ....................................19

*Covington v. Wallace*,
    No. 2:12-CV-123-DPM, 2014 U.S. Dist. LEXIS 146881 (E.D. Ark. Oct. 15, 2014) ...........37

*Cty. of Riverside v. McLaughlin,*
500 U.S. 44 (1991)......................................................................................14

*Day v. Celadon Trucking Servs.,*
827 F.3d 817 (8th Cir. 2016) ....................................................................33

*DeBoer v. Mellon Mortg. Co.,*
64 F.3d 1171 (8th Cir. 1995) .........................................................24, 25, 29

*Dellums v. Powell,*
566 F.2d 167 (D.C. Cir. 1977) ..................................................................38

*Dixon v. City of St. Louis,*
No. 4:19-CV-0112-AGF, 2019 U.S. Dist. LEXIS 97327 (E.D. Mo. June 11, 2019)............19

*Doe v. Angelina Cty.,*
733 F. Supp. 245 (E.D. Tex. 1990) ............................................................19

*Downing v. Riceland Foods, Inc.,*
No. 4:13CV321 CDP, 2015 U.S. LEXIS 34154 (E.D. Mo. Mar. 19, 2015)..............25, 34, 40

*Ellis v. O'Hara,*
105 F.R.D. 556 (E.D. Mo. 1985) .........................................................24, 31, 35

*Eubanks v. Billington,*
110 F.3d 87 (D.C. Cir. 1997) ....................................................................42

*Flood v. Dominguez,*
270 F.R.D. 413 (N.D. Ind. 2010) ...............................................................37

*Gerardo v. Quong Hop & Co.,*
No. 08- 3953 JF (PVT), 2009 U.S. Dist. LEXIS 60900 (N.D. Cal. July 7, 2009)................17

*Gerstein v. Pugh,*
420 U.S. 103 (1975)...........................................................................14, 27

*H&R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.,*
546 F.3d 937 (8th Cir. 2008) ....................................................................18

*Halbach v. Great-West Life & Annuity Ins. Co.,*
2007 U.S. Dist. LEXIS 24252, at *11 (E.D. Mo. Apr. 2, 2007)...........................33

*Hayes v. Faulkner County,*
388 F.3d 669 (8th Cir. 2004) ....................................................................22

*Hood v. Gilster-Mary Lee Corp.,*
No. 3:14-cv-05012-MDH, 2016 U.S. Dist. LEXIS 135475 (W.D. Mo. Sept. 30, 2016) .......17

*Huyer v. Wells Fargo & Co.*,
    295 F.R.D. 332 (S.D. Iowa 2013) ....................................................................31

*In re Retek Inc., Sec. Litig.*,
    236 F.R.D. 431 (D. Minn. 2006) ....................................................................41

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    267 F.R.D. 549 (D. Minn. 2010) ....................................................................41

*Jackson v. Foley*,
    156 F.R.D. 538 (E.D.N.Y. 1994) .............................................................17, 40

*James v. Strange*,
    407 U.S. 128 (1972) ......................................................................................40

*Jefferson v. Ingersoll Int'l Inc.*,
    195 F.3d 894 (7th Cir. 1999) ........................................................................42

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) ..........................................................................36

*Jones v. City of Clanton, Alabama*,
    No. 2:15cv-34-MHT, 2015 U.S. Dist. LEXIS 121879 (M.D. Ala. Sep. 14, 2015) ...............19

*Kerman v. City of New York*,
    374 F.3d 93 (2d Cir. 2004) ............................................................................37

*Kilgo v. Bowman Transp., Inc.*,
    789 F.2d 859 (11th Cir. 1986) ......................................................................16

*Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*,
    216 F.3d 577 (7th Cir. 2000) ........................................................................42

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ........................................................................36

*Maxwell v. Mason*,
    668 F.2d 361 (8th Cir.1981) ..........................................................................37

*McKeage v. TMBC, LLC*,
    847 F.3d 992 (8th Cir. 2017) ........................................................................33

*Mitchell v. Shearrer*,
    No. 4:10-CV-819 DEJ, 2012 U.S. Dist. LEXIS 36442 (E.D. Mo. Mar. 19, 2012) ...............14

*Morgan v. United Parcel Serv. of Am., Inc.*,
    169 F.R.D. 349 (E.D. Mo. 1996) ..........................................................13, 18, 19

*Murphy v. Piper*,
    No. CV 16-2623, 2017 U.S. Dist. LEXIS 16045 (D. Minn. Sept. 29, 2017) ........................33

*Myatt v. Gladieux*,
    No. 1:10-CV-64-TLS, 2017 U.S. Dist. LEXIS 32001 (N.D. Ind. Mar. 7, 2017) ..................37

*O'Donnell v. Harris Cty.*,
    892 F.3d 147 (5th Cir. 2018) ................................................................................19

*Ortega v. Uponor Inc.*,
    716 F.3d 1057 (8th Cir. 2013) ..............................................................................25

*Paxton v. Union Nat'l Bank*,
    688 F.2d 552 (8th Cir. 1982) ...............................................................................13

*Perrin v. Papa John's Int'l, Inc.*,
    No. 4:09CV01335 AGF, 2013 U.S. Dist. LEXIS 181749 (E.D. Mo. Dec. 31, 2013)......35, 41

*Phillips v. District of Columbia*,
    458 A.2d 722 (D.C. 1983) ...................................................................................37

*Pierce v. City of Velda*,
    No. 4:15-cv-570-HEA, 2015 U.S. LEXIS 176261 (E.D. Mo. June 3, 2015) ........................19

*Postawko v. Missouri Dep't of Corr.*,
    No. 2:16-CV-04219-NKL, 2017 U.S. Dist. LEXIS 117238 (W.D. Mo. July 26, 2017) ........33

*Pugh v. Rainwater*,
    572 F.2d 1053 (5th Cir. 1978) (en banc) ...............................................................19

*Rentschler v. Carnahan*,
    160 F.R.D. 114 (E.D. Mo. 1995) ..........................................................................25

*Rodriguez v. Providence Cmty. Corr., Inc.*,
    155 F. Supp. 3d 758 (M.D. Tenn. 2015).................................................................19

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) ...............................................................................35

*Sherman v. Griepentrog*,
    775 F. Supp. 1383 (D. Nev. 1991)........................................................................17

*Sisneros v. Nix*,
    884 F. Supp. 1313 (S.D. Iowa 1995) ....................................................................37

*Tinsley v. Covenant Care Servs., LLC*,
    No. 1:14-CV-00026 ACL, 2016 U.S. Dist. LEXIS 11988 (E.D. Mo. Feb. 2, 2016)..16, 18, 41

*Tinsley v. Kemp*,
    750 F. Supp. 1001 (W.D. Mo. 1990) ....................................................................13

*United States v. City of Ferguson*,
    NO. 4:16-cv-000180- CDP (E.D. Mo. Mar. 17, 2016)........................................................1

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ........................................................................18

*Van Orden v. Meyers*, No. 4:09CV00971 AGF,
    2011 U.S. Dist. LEXIS 113478 (E.D. Mo. Sept. 30, 2011)............................24, 28, 30, 31, 32

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................18, 31

*Walker v. City of Calhoun, Georgia*,
    4:15-CV-0170-HLM, 2016 U.S. Dist. LEXIS 12305 (N.D. Ga. Jan. 28, 2016) ...................19

*Wayland v. City of Springdale, Ark.*,
    933 F.2d 668 (8th Cir. 1991) ........................................................................14

*Webb v. City of Maplewood*,
    4:16-cv-01703-CDP, ECF 202 (E.D. Mo. Nov. 18, 2021) ............................................19, 20

*West v. City of Santa Fe*,
    No. 3:16-CV-0309, 2018 U.S. Dist. LEXIS 14401 (S.D. Tex. Aug. 16, 2018) ...................20

*Williams v. Mohawk Indus.*,
    568 F.3d 1350 (11th Cir. 2009) ...................................................................42

## STATUTES AND RULES

Rule 23(a)....................................................................................... *passim*

Rule 23(b)....................................................................................... *passim*

## INTRODUCTION

For years, the City of Ferguson maintained an enforcement system that treated its poorest residents as a source of profit. Under financial pressure, City policymakers decided to generate revenue through incarceration. Their decision shaped the policies and practices of Ferguson's police, jail, and court departments, which systematically violated the constitutional rights of Plaintiffs and thousands of other, disproportionately poor and African-American, citizens. In budgetary terms, this scheme meant millions of dollars a year for the City to spend; in human terms, it meant that one traffic stop could lead to thousands of dollars in fines and dozens of days in the Ferguson jail. Plaintiffs now ask this Court to certify their suit as a class action, so that they can pursue relief on behalf of those who suffered as they did.

The foundation of the City's revenue scheme was the Ferguson Municipal Code, which authorized City police to arrest people for minor offenses such as traffic violations, failing to provide information to a police officer, failing to list a member of their household on an occupancy permit, or failing to comply with an officer's orders.[1] Together, these laws gave Ferguson police officers broad discretion to issue tickets for municipal violations.

The City's highest-ranking officials pressured the police department and municipal court to drive up revenue in order to finance the City's budget. For example, in 2010, the City's Finance Director stated that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[2] Thereafter, he wrote to the Police Chief that ██████████████████████████████████████████████



---

[1] The Department of Justice concluded that many of these ordinances are unconstitutional, and the City has since consented to amend or repeal them. *See* Consent Decree, *United States v. City of Ferguson*, No. 4:16-cv-000180-CDP, at 10 ¶¶ 37–38(d), (e) (E.D. Mo. Mar. 17, 2016) [*hereinafter* Consent Decree].

[2] Declaration of John Waldron ("Waldron Decl."), Ex. 1 at CITY_00983724 (███████████████████████████ ███████ (Bates No. CITY_00983724)).

1

███████████████████████████████████████████████████████████

██████████████████████████████████████ [3] In 2013, the Finance Director wrote to the City

Manager: ████████████████████████████████████████████████████

███████████████████████████████████████ [4] And when the Chief of Police

reported ██████████████████████████████████████████████████████

both the City Manager and Finance Director responded █████████ [5] These decisions to increase

revenues from fines and fees were repeatedly made without regard for public safety.[6]

     Communications among City officials make clear that the City's purpose in driving up

citations and arrests was to raise as much revenue as possible by extracting money from those

funneled into the City jail and court system. For example, in early 2011, the City Court responded

to the City Manager's request ██████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ [7] This came mere months after City leadership—including the City

Manager, Finance Director, and City Council—met to discuss ███████████████████████

---

[3] Waldron Decl., Ex. 2 at CITY_00459250 (████████████████████████████ (Bates No. CITY_00459250)).

[4] Waldron Decl., Ex. 3 at CITY_00853204 (███████████████████████ (Bates No. CITY_00853204-05)).

[5] Waldron Decl., Ex. 4 at CITY_00823828-29 (██████████████████████████████ (Bates No. CITY_00823828-29)).

[6] *See, e.g.*, Waldron Decl., Ex. 5 at 63:14-64:6, 200:15-24, 209:22-212:10 (5/18/21 Deposition of Jeffrey Blume) (discussing revenue projections from fines and fees and admitting that public safety was not a consideration).

[7] Waldron Decl., Ex. 6 at CITY_00160983 (████████████████████████████ (Bates No. CITY_00160983)); *see also* Waldron Decl., Ex. 7 at CITY_00488001-003 (███████████████████ ██████████████ (Bates No. CITY_00488001-003)) ███████████████████████████████████ ; Waldron Decl., Ex. 8 at CITY_008922219-23 (████████████████ ████████████ (Bates No. CITY_00892218-24)) ████████ .



[8] The City went so far as to ██████████

██████████████████████████████ [9]

██████████████████████████ [10] These

measures were taken in collaboration with the City's Police Chief. In another email addressed to

the City's Police Chief, the Head Municipal Court Clerk wrote: ██████████

██████████████████████████████

██████████████ [11] In yet another email, the Finance Director wrote to the Police Chief and

the City Manager, recommending ██████████████████████

██████████████ [12]

        The workings of this scheme are now a matter of public record and are not in meaningful

dispute. People arrested on warrants for failing to pay or failing to appear in court were kept in the

City jail in an effort to shake some money out of them; if they failed to pay after some period of

time, they were promptly released for free as though their bond had never existed.[13] Those arrested

---

[8] Waldron Decl., Ex. 9 at CITY_00882924-25 (██████████████████████████ (Bates
No. CITY_00882924-26)); Waldron Decl., Ex. 5 at 216:13-217:3.

[9] Waldron Decl., Ex. 10 at CITY_00926022-23 (██████████████████████████ (Bates No.
CITY_00926022-23)) (███████████████████████████████████████████████ ;
Waldron Decl., Ex. 11 at CITY_00986981 (██████████████████████████ (Bates No.
CITY_00986981-82)) ██████████████████████████████████████████████ .

[10] Waldron Decl., Ex. 12 at CITY_00531323 (██████████████████████████ (Bates No.
CITY_00531323)).

[11] Waldron Decl., Ex. 13 at CITY_00047090 (██████████████████████ (Bates No.
CITY_00047090)) (emphasis added).

[12] Waldron Decl., Ex. 14 at CITY_003990484 (████████████████ (Bates No. CITY_00390484)).

[13] See e.g. Waldron Decl., Ex. 15 at Bates No. 022257 (██████████████████████
██ (Bates No. 022257)) (███████████████████████████████████████
██). In fact, until 2016, a City ordinance authorized the Police Chief to set bonds. Waldron Decl., Ex. 16 at
CITY_00025884 (██████████████████████████████████████████████

3

without a warrant and charged with minor, non-criminal municipal offenses were held unless they could pay a predetermined bond amount or come up with a smaller amount of cash that City jail personnel deemed sufficient for their release.[14] At no point did the City inquire into arrestees' ability to pay their bonds or consider alternative conditions of release.[15] During their imprisonment, the City did not hold hearings or undertake proceedings to demonstrate that there was probable cause to justify arrestees' continued confinement.[16] They were then prosecuted by the City, usually without the benefit of any counsel, as the City provided no counsel and most could not afford to hire their own.[17] And they were assessed fines and court costs.[18] The City gave

▓▓▓▓▓▓ (Bates No. CITY_00025884-86)) (Prior to 2016, Section 13-52 of the Municipal Code read: "Any such bond shall be approved by the municipal judge, *by the chief of police*, or by the clerk of the municipal court." (emphasis added))

[14] The predetermined bond amounts for certain offenses are outlined in the City's General Orders. *See* Waldron Decl., Ex. 17 at § 421.02(A) (General Order 421.00 (Bates No. CITY_00018569)).

[15] Waldron Decl., Ex. 18 at 88:8-89:2 (1/11/16 Deposition of Daniel McDuffie) (when asked if jail staff inquired into people's ability to pay bonds, he answered, "No, I don't ask them if they can afford it or not."); Waldron Decl., Ex. 19 at 59:1-4 (8/24/21 Deposition of Bret Rich) (Q: "Were you aware of any process employed to evaluate someone's ability to pay a fine prior to issuing an arrest warrant?" A: "No.").

[16] Waldron Decl., Ex. 20 at 175:2:176:17 (1/6/16 Deposition of Thomas Jackson) (stating that at no point in the process from arrest to a court date did anyone review a sworn statement from a police officer that probable cause existed). *See also* Waldron Decl., Ex. 21 at 39:16-21 (1/13/16 Deposition of Brian Kaminski) (noting that officers did not make sworn probable cause statements after warrantless arrests).

[17] *See* Def.'s Reply Supp. Mot. Dismiss Pl.'s First Am. Compl. 5–6, ECF No. 64; *see also* Waldron Decl., Ex. 20 at 121:3-14 ("[W]e didn't . . . appoint any public defenders for people held on ordinance violations."); Waldron Decl., Ex. 22 at 69:17-22 (5/13/16 Deposition of Stephanie Karr) (Q: ". . . . Are most of the people who appear on a docket day when you were there represented by counsel?" A: "No."); *id.* at 71:18-21 (Q: "Do you have a sense of about how many people would be represented by counsel?" A: "The attorneys that I saw were a pretty small number."); Waldron Decl., Ex. 23 at 146:5-19 (3/3/17 Deposition of Keilee Fant) (explaining how she advised the municipal judge that she could not afford an attorney, to which he responded, "Well, you need to go find an attorney."); Waldron Decl., Ex. 24 at 115:18-116:5 (3/12/21 Deposition of Christine Lanfersieck) (when asked if the court had a process for appointing counsel to defendants who could not afford one, she responded "it was never . . . jail time that was going to be given [as opposed to fines and fees], so I don't believe we had to hire anyone an attorney. . . .").

[18] City leadership encouraged the assessment of fines and fees. When at one point the City Prosecutor resolved several cases by imposing a form of probation that allowed the defendants to avoid paying a fine, ▓▓▓▓▓▓▓▓ Waldron Decl., Ex. 25 at CITY_00161834 (▓▓▓▓▓▓▓▓▓▓ (Bates No. CITY_00161834)); *see also* Waldron Decl., Ex. 26 at CITY_00262987 ▓▓▓▓▓▓▓ (Bates No. CITY_00262985-89)) (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ . Indeed Ferguson's

no notice to those convicted that, though they were not being sentenced to imprisonment for the underlying violation itself, they would later face repeated imprisonment should they be unable to pay the full sum of the money assessed as scheduled.[19]

When people failed to pay or appear in court, City clerks issued warrants for their arrest. These warrants were not issued based on probable cause—indeed no one considered the facts or circumstances to determine whether to issue a warrant. No one determined whether the nonpayment was willful. Instead, the warrants were generated by a computer program that *automatically* issued a warrant when debtors missed a payment date.[20] As a result, the City of Ferguson, which has a population of approximately 20,000, had 40,569 warrants outstanding as of June 30, 2013, of which 32,975 had been issued in during the 2013 Fiscal Year.[21] In 2011, with the approval of its Head Court Clerk and Police Chief, the City chose to stop sending out notifications to people when arrest warrants were issued against them in order to "save the cost of warrant cards and postage."[22] When people were arrested on those warrants, they, like other



Mayor described ███████████████████████████████████████████████ Waldron Decl., Ex. 27 at CITY_00289269 (█████████ (Bates Nos. CITY_00289269-70)).

[19] The arrest records of the Named Plaintiffs are illustrative. For example, Keilee Fant was arrested and held in jail several times. *See* Waldron Decl., Ex. 28 at Bates No. 002461-62 (████████████████████ (Bates No. 002461-62)); Ex. 29 at Bates No. 018379 (████████████ (Bates No. 018379)); and Ex. 30 at Bates No. 019869-70 (██████████████ (Bates No. 019869-70)). However, Ms. Fant's warrants show that the underlying charges would not, in and of themselves, lead to imprisonment. *See* Waldron Decl., Ex. 31 at Bates No. 022047 (████████ (Bates No. 022047)) ███████████████████████████████████████████ ███████████); *see also* Waldron Decl., Ex. 32 at Bates No. 021936 (███████ (Bates No. 021936) (███████████████████████████). Incarceration as punishment for municipal ordinance violations almost never happened. Waldron Decl., Ex. 20 at 79:10-15.

[20] Waldron Decl., Ex. 33 at 70:17-22 (1/11/16 Deposition of Mary Ann Twitty).

[21] Waldron Decl., Ex. 34 at OSCA_000168 (███████████████████████ (Bates Nos. OSCA_000001-290)) (█████████████████████████████████ .

[22] Waldron Decl., Ex. 35 at CITY_00155809 (████████████ (Bates No. CITY_00155809)).

arrestees held on bond in the City's jail, were detained until they or their families could pay cash amounts negotiated with City jail or police officials[23] or until those officials decided to let them out for free when it was clear that no cash was forthcoming.[24] In addition to the failure-to-appear warrants was a "failure to appear" charge that was implemented by the City Council. One result of this charge was that a simple traffic infraction could spiral into thousands of dollars in fines.[25]

The pressure on families to find enough money to satisfy the City was all the more intense because the City kept arrestees in deplorable conditions. Jail cells were dark, filthy, foul-smelling,

---

[23] Waldron Decl., Ex. 20 at 122:19-123:1 (A: "[F]or example, somebody's being held on a $200 bond but wife shows up and says I can't make that bond but I can, you know, make this, $75. . . ." Q: "[S]o the bond would then be reduced to 75, they would accept the 75." A: "It could be."); Waldron Decl., Ex. 33 at 64:11-65:8 (when asked why bonds would be odd amounts like $67, she answered, "No bond would say you have a $67 bond. Now that number could have come up if there was a prisoner in jail and he had $67 on him. . . . The COs, the judge would know that he had that and the judge would say take his $67, use it as a bond . . . [S]ay they sat there for 72 hours and they didn't post their bond, if they had money on their person it was taken as bond."); Waldron Decl., Ex. 36 at CITY_00190747 (███████████████████████ (Bates No. CITY_00190747)) (████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ; Waldron Decl., Ex. 37 at 27:11-30:15 (5/3/16 Deposition of William Catanzaro) (stating that if arrestees did not have enough money to pay their bond, jail staff would suggest they make a phone call to their friends, family, and associates to collect money to pay the bond), and 33:14-20 (describing the court clerk's process of bond reductions as an "arbitrary process"); Waldron Decl., Ex. 38 at 10-12 (Rebuttal Expert Report of Stephen Demuth) ████████████████████████████████).

[24] Waldron Decl., Ex. 37 at 42:23-43:17 (describing the reasons bond would be reduced to a recognizance bond, by which individuals would be released without making any payment, as "The subject arrested didn't pay, couldn't pay, wouldn't pay. [Or t]here was an overcrowdedness in the jail that called for the release of subjects who were arrested.").

[25] *See, e.g.*, Waldron Decl., Ex. 39 at Bates No.021689 (███████████████████████ (Bates No. 021689)) (████████████████████████████████████████████████████████); Waldron Decl., Ex. 40 at Bates No. 021896 (█████████████████ (Bates No. 021896)) ████████████████████████████████████).

and cold.[26] The jail was overcrowded, with up to five people kept in small cells[27] meant for no

more than two people.[28] Arrestees were not provided with soap, toothbrushes, toothpaste,

deodorant, or access to a shower, even if they spent several days in jail.[29] With few exceptions

(such as men who defecated on themselves and women who were naked or nearly so) the prisoners

could not access clean clothes.[30] The only source of water in the jail cells was connected to the

toilet.[31] Prisoners were denied adequate food[32] and access to necessary medication.[33] Moreover,

---

[26] *See* Waldron Decl., Ex. 37 at 102:16-18, 103:24-25, 104:1-16; Waldron Decl., Ex. 41 at 230:4-13 (5/3/21 Deposition of Eddie Boyd) (describing that inmates would use toilet paper to "supplement their blankets" because of the cold); *see also* Waldron Decl., Ex. 42 at CITY_00190564 (████████████████████████ (Bates No. CITY_00190564)) (█████████████████████████████████████; Waldron Decl., Ex. 43 at CITY_00333930 (██████████████████████████ (Bates No. CITY_00333930)) (████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████).

[27] *See* Waldron Decl., Ex. 44 at CITY_01817661-717 (████████████████████████████ (CITY_01817655-730)) (████████████████).

[28] Waldron Decl., Ex. 45 at 172:22-24 (02/24/20 Deposition of Daniel DeCarli).

[29] *See* Waldron Decl., Ex. 37 at 117:9-18. Indeed the officer could recall only a few instances of prisoners being allowed to shower, and all but one involved prisoners who had defecated themselves. *See id.* at 136:16-25, 137:1-25, 138:1-8; *see also* Waldron Decl., Ex. 20 at 78:12-23 (Police Chief stating that showers "presented a bit of a safety risk" and he "wanted to eliminate that," but "state rules required that a shower be provided [every 72 hours] for persons being held"; as a result, in order to avoid providing showers, he implemented a policy to release prisoners who could not pay their bond after 72 hours); Waldron Decl., Ex. 46 at 106:13-15 (08/6/21 Deposition of James Motzkus) (Q: "[D]id you ever give inmates a chance to shower?" A: "I just told you, not that I remember.").

[30] Waldron Decl., Ex. 20 at 71:1-7 (Q: "[W]as there any point where . . . the outfit that the inmates wore changed?" A: "Not that I remember." Q: "So everyone who's held no matter how long they're held stays in their street clothes." A: "That's my understanding, yes."); Waldron Decl., Ex. 37 at 115:3-25, 116:1-20.

[31] Waldron Decl., Ex. 37 at 102:5-15; Waldron Decl., Ex. 46 at 113:18-25.

[32] Waldron Decl., Ex. 37 at 118:6-7 ("Breakfast was a Honey Bun. Lunch and dinner were a pot pie."); Waldron Decl., Ex. 47 at 60:6-10 (04/19/17 Deposition of Ronnie Tucker) ("A pot pie is not a lunch for a grown person. One pot pie is not going to fill you up in a jail all day."); Waldron Decl., Ex. 48 at 116:3-8 (02/18/20 Deposition of Joseph Craig) (Q: "How would you feed inmates if they were vegetarian or vegan?" A: "Honey buns instead of a pot pie." Q: "And were they any other food options at all?" A: "No.").

[33] *See* Waldron Decl., Ex. 20 at 67:8-13 (Q: "So would it be fair to say that really the only available medical care [at the jail] would be an ambulance to Christian Northeastern [Hospital]?" A: "Yes, sir."); Waldron Decl., Ex. 46 at 112:4-13 (Q: "What kind of medical facilities do you have in the jail?" A: "None. It's a jail. It's a municipal jail. It doesn't have a medical facility." Q: "Did the jail have any onsite medical staff?" A: "No. They had corrections officers because it's a jail." Q: "To your knowledge, what medical supplies did the jail have on hand?" A: "To my knowledge, BAND-AIDs."); Waldron Decl., Ex. 48 at 49:24-51:20 (stating that there were no medical facilities in the jail and that the

prisoners were subject to taunts and humiliation by the City's corrections officers.[34] Unsurprisingly, family members would go to great lengths to obtain the money to buy their loved ones out of jail.

Plaintiffs are among the many people in Ferguson whose fundamental rights were violated by the City's jailing and collection scheme. Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, Shameika Morris, and Ronnie Tucker[35] were arrested and imprisoned by the City for no reason other than their inability to pay money that the City demanded. They were jailed for indeterminate periods without any legal proceedings, without a lawyer, and without the inquiry into their ability to pay that the Constitution requires. Instead, they were threatened, extorted, and left to languish in jail under deplorable conditions until their family members could produce enough cash to buy their freedom or until City jail officials decided to let them out for free as a way to make room in the jail for arrestees who could pay bond. The cycle of wealth-based detention interfered with Plaintiffs' jobs and affected every aspect of their lives, inflicting profound suffering on them and their families. On behalf of the many other people subjected to Ferguson's illegal extortion scheme, the named Plaintiffs challenge the City's debt-collection and post-arrest policies and practices, which fly in the face of the Constitution and have no place in the American legal system.

Plaintiffs allege seven counts against the City: the City violates Plaintiffs' rights by jailing them for nonpayment of monetary sums with no inquiry into their ability to pay (Count One); the

---

[34] only medical care available was a first aid kit or calling paramedics); Waldron Decl., Ex. 49 at 64:6-20 (04/19/17 Deposition of Alfred Morris) (stating he was hospitalized after repeatedly asking for his blood pressure medication while jailed but never receiving it).

[34] *See* Waldron Decl., Ex. 23 at 197:24-198:21 (stating that women in the jail were referred to as "stanky ass dikes" and "stanky whores," and told "you hoes stink" and "you need to wash out your coochies").

[35] Plaintiff Tonya DeBerry passed away during the litigation of this case, and this Court granted a Motion to Substitute her personal representative, John Narayan. ECF No. 242. Mr. Narayan is not being offered as a class representative.

City violates Plaintiffs' right to the effective assistance of counsel (Count Two); the City's indefinite and arbitrary detention of people arrested on warrants violates due process (Count Three); the City jail exposes Plaintiffs to deplorable conditions that violate due process and constitute impermissible punishment (Count Four); the City's use of jail and threats of jail to collect debts owed to the City violates equal protection because it imposes unduly harsh and punitive restrictions on debtors whose creditor is the government compared to those who owe money to private creditors (Count Five); the City's policy and practice of seeking and executing invalid arrest warrants, including those solely issued automatically upon nonpayment of monetary debt, violates the Fourth and Fourteenth Amendments (Count Six); and the City's extended detention of warrantless arrestees without a neutral judicial finding of probable cause based on sworn evidence violates the Fourth and Fourteenth Amendments (Count Seven).

Plaintiffs seek to certify five classes pursuing damages to compensate class members for the constitutional violations they have suffered due to Ferguson's extortionate scheme, and one class seeking prospective relief to protect class members from future violations:

1. *Bearden Class*: All persons who have, at any time since February 8, 2010, been kept in jail by the City of Ferguson for failing to pay a fine, fee, bond, surcharge, or cost, without an inquiry into their ability to pay (Count One).[36]

---

[36] The *Bearden* Class is represented by Roelif Carter (*see* Waldron Decl., Ex. 50 (███████ ████████ (Bates No. 002698-99)); Waldron Decl. Ex. 51 (███████████████████████████ (Bates No. 012113-14)); Waldron Decl., Ex. 52 (███████████████████████████████ (Bates No. 013823-24)); Waldron Decl., Ex. 53 (████████████████████████ (Bates No. 017130-31)); Waldron Decl., Ex. 54 (████████████████████████ (Bates No. 022338)); and Waldron Decl., Ex. 55 (████████████████████ (Bates No. 022413))); Donyale Thomas (*see* Waldron Decl., Ex. 56 (█████████████████████ (Bates No. 003995-97))); Keilee Fant (*see* Waldron Decl. Ex. 28 (█████████████ (Bates No. 002461-62)); Waldron Decl. Ex. 29 (███████████████████████ (Bates No. 018379); Waldron Decl. Ex. 30 (██████ ████████████ (Bates No. 019869-70))); Anthony Kimble (*see* Waldron Decl., Ex 57 (████████████████████████ (Bates No. 002460)); Waldron Decl., Ex 58 (████████ ██████████ (Bates No. 009764-65)); Waldron Decl., Ex 59 (██████████████████ ████████ (Bates No. 014941-42))); Alfred Morris (*see* Waldron Decl. Ex. 60 (██████████ (Bates No. 001513)); Waldron Decl. Ex. 61 (████████████████ (Bates No. 002923-24)); Waldron Decl. Ex. 62 (███████████████████████████ (Bates No. 004596)); Waldron Decl. Ex. 63 (██████████████████████████ (Bates No. 006466-67)); Waldron Decl. Ex. 64 (█████████████████████████████ (Bates No. 010041-42); Waldron Decl. Ex.

2. *Gerstein Class*: All persons who have, at any time since February 8, 2010, been held in jail by the City of Ferguson after a warrantless arrest for longer than a reasonable period of time (48 hours at a maximum or such shorter period of time as the Court may determine) prior to a finding of probable cause by a neutral magistrate for their arrest and continued detention (Count Seven).[37]

3. *Jail-Conditions Class*: All persons who, at any time since February 8, 2010, were held in the City of Ferguson jail (Count Four).[38]

4. *Warrant Class*: All persons who have, at any time since February 8, 2010, been held in jail by the City of Ferguson after being arrested on a warrant issued by the City (Count Three).[39]

5. *Post-Judgment Class*: All persons who have, at any time since February 8, 2010, been jailed by the City of Ferguson because of their non-payment in connection with a prior judgment (Counts Two, Five, and Six).[40]

---

65 (███████████████ (Bates No. 011653-54); Waldron Decl. Ex. 66 (███████████████████████ (Bates No. 014486-87))); Allison Nelson (*see* Waldron Decl. Ex. 67 (██████████████████████ (Bates No. 0011828)); Waldron Decl. Ex. 68 (████████████████ (Bates No. 014541)); Waldron Decl. Ex. 69 (███████████████████ (Bates No. 019026-27))); Herbert Nelson (*see* Waldron Decl., Ex. 70 (███████████████ (Bates No. 005956)); Waldron Decl., Ex. 71 (██████████████████ (Bates No. 008893)); Waldron Decl., Ex. 72 (██████████████ (Bates No. 018307))); Ronnie Tucker (*see* Waldron Decl., Ex. 73 (████████ (Bates No. 012739-40))); and Shameika Morris (*see* Waldron Decl., Ex. 74 (██████████████ (Bates No. 002784-85)); Waldron Decl., Ex. 75 (████████████████ (Bates No. 005156-57)); Waldron Decl., Ex. 76 (████████ (Bates No. 010575))).

[37] The *Gerstein* Class is represented by Roelif Carter (*see* Waldron Decl., Ex. 55 ██████████████ ██████████); *see also* Waldron Decl., Ex. 77 (█████████████████████████ (Bates No. 022369)) (███████████████████████████████████████████████████); Waldron Decl., Ex. 54 (████████████████████████████████████)); Alfred Morris (*see* Waldron Decl., Ex. 62 (███████████████████████████████████████)); and Ronnie Tucker (*see* Waldron Decl., Ex. 73 (██████████████████████████████████)). During these arrests, each plaintiff was held without a finding of probable cause by a neutral magistrate for his arrest and continued detention; this is the case because the City of Ferguson had no process by which such a hearing would *ever* take place.

[38] The arrests noted, *supra*, in note 36 show that the Plaintiffs are representatives of the Jail-Conditions Class. In addition, there are two additional arrests in which Plaintiffs did not have *Bearden* violations but did suffer from the City's inhumane jail conditions: Roelif Carter's arrest on 04/14/14, and Herbert Nelson's arrest on 02/15/14.

[39] Plaintiffs Roelif Carter, Anthony Kimble, Alfred Morris, Herbert Nelson, Allison Nelson, Donyale Thomas, Shameika Morris, and Keilee Fant are all representatives of the Warrant Class, as they were each arrested pursuant to a failure to appear warrant. The only arrests from note 36, *supra*, that are excluded from the Warrant Class are Roelif Carter's 06/1/2014 arrest, 06/28/2014 arrest, 08/1/2014 arrest and Alfred Morris' 01/16/2011 arrest (each of which was without a warrant). Because Plaintiff Ronnie Tucker's sole arrest was warrantless, he is not being offered as a class representative for the Warrant Class.

[40] The Post-Judgment Class is represented by, at minimum, Roelif Carter (*see* Waldron Decl., Ex. 78 (██████

6. *Declaratory and Injunctive Class*: All persons who currently owe or who will incur debts to the City of Ferguson from fines, fees, costs, or surcharges arising from judgments in cases prosecuted by the City (Counts Two, Five, and Six).[41]

As indicated above, Plaintiffs bring Count One on behalf of the *Bearden* Class; Count Seven on behalf of the *Gerstein* Class; Count Three on behalf of the Warrant Class; Count Four on behalf of the Jail-Conditions Class; and Counts Two, Five, and Six on behalf of the Post-Judgment Class and the Declaratory and Injunctive Class.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action in February 2015, alleging that the City engaged in a widespread scheme of jailing individuals when they could not pay sums of money arising from municipal

---

███████████████ (Bates No. 022228)); Waldron Decl., Ex. 79 (███████████████ (Bates No. 022216)); Waldron Decl., Ex. 80 (███████████████ (Bates No. 022204)), showing █████████) and Keilee Fant (*see* Waldron Decl. Ex. 81 (███████████████ (Bates No. 022067)); Waldron Decl., Ex. 82 (███████████████ (Bates No. 0220520); Waldron Decl., Ex. 31, showing ██████████); *see also* (Shameika Morris (*see* Waldron Decl., Ex. 83 (███████████████ (Bates No. 021920)); Waldron Decl., Ex. 84 (███████████████ (Bates No. 021910)); Waldron Decl., Ex. 85 (███████████████ (Bates No. 021900)), showing ███████████████); Alfred Morris (*see* Waldron Decl., Ex.86 (███████████████ (Bates No. 021528)); Waldron Decl., Ex. 87 (███████████████ (Bates No. 021538)); Waldron Decl., Ex. 88 (███████████████ (Bates No. 021558)), showing ███████████████); Herbert Nelson (*see* Waldron Decl., Ex. 89 (███████████████ (Bates No. WC_CTRL_00007534)); Waldron Decl., Ex. 90 (███████████████ (Bates No. WC_CTRL_00007535)), showing ███████████████); Allison Nelson (*see* Waldron Decl., Ex. 91 (███████████████ (Bates No. 021597)); Waldron Decl., Ex. 92 (███████████████ (Bates No. 021628)); Waldron Decl., Ex. 93 (███████████████ (Bates No. 021625)), showing ███████████████); and Donyale Thomas (*see* Waldron Decl. Ex. 39, showing ███████████████) . Ferguson failed to identify a complete court file with warrants for Plaintiff Anthony Kimble, but Plaintiffs expect that records from Ferguson would show that Mr. Kimble would be a member of the Post-Judgment Class along with thousands of other arrestees who sat in jail for failure to pay a debt.

[41] The Declaratory and Injunctive Class is represented by Plaintiffs who were indebted to the City of Ferguson when this lawsuit was filed. This group is Keilee Fant (*see* Waldron Decl., Ex. 94 (███████████████ (Bates No. 021991) (███████████████)); Roelif Carter (*see* Waldron Decl., Ex. 95 (███████ (Bates No. WC_CTRL_00007536) (███████████████)); Allison Nelson (*see* Waldron Decl., Ex. 96 (███████████████ (Bates No. 021579)) (███████████████)); Alfred Morris (*see* Waldron Decl., Ex. 88 (███████████████)); Shameika Morris (*see* Waldron Decl., Ex. 85 (███████████████)); and Donyale Thomas (*see* Waldron Decl., Ex. 97 (███████████████ (Bates No. 021686)) (███████████████)).

ordinance violations. ECF No. 1. The City moved to dismiss the Complaint in March 2015 (ECF No. 8), and the Court denied its motion. ECF Nos. 19 (denying in part) and 27 (reconsidering partial grant). Plaintiffs filed an Amended Complaint in April 2016. ECF No. 53. Since then, Defendant has filed three motions to dismiss all but Count Four of the Amended Complaint, and the Court has denied each one. ECF No. 57 (denied ECF No. 79); ECF No. 150 (denied ECF No. 173); ECF No. 223 (denied ECF No. 261). Defendant filed two interlocutory appeals with the U.S. Court of Appeals for the Eighth Circuit, both of which were dismissed. ECF Nos. 205, 298.

Plaintiffs previously filed a class certification motion in June 2017 (ECF Nos. 112-117). Shortly thereafter, the Court stayed proceedings pending a motion to disqualify Defendant's counsel, which was later granted. ECF Nos. 129, 136. The Court again stayed proceedings pending one of Defendant's motions to dismiss (ECF No. 159), and subsequently denied Plaintiffs' motion for class certification without prejudice, due to the stay (ECF No. 172).

## ARGUMENT

### I.    The Proposed Classes Satisfy the Requirements of Rule 23(a)

Plaintiffs seeking to certify a class must satisfy each of the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure and at least one of the three criteria for certification under Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Rule 23(a) requires: *first*, that the class be so numerous that joinder of all members would be impracticable; *second*, that there be questions of law or fact common to the class; *third*, that the claims or defenses of the representative parties be typical of the claims or defenses of the class; and *fourth*, that the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). The proposed classes meet these requirements.

### A.    Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is

impracticable." To be impracticable, joinder need not be impossible; it is enough if joinder would be extremely difficult or inconvenient. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982); *Morgan v. United Parcel Serv. of Am., Inc.*, 169 F.R.D. 349, 355 (E.D. Mo. 1996). Courts in this Circuit have found that joinder is impracticable where the class exceeds forty members, *Boswell v. Panera Bread Co.*, 311 F.R.D. 515, 527 (E.D. Mo. 2015), or where class members lack the financial resources, knowledge or sophistication to pursue individual claims, *see Tinsley v. Kemp*, 750 F. Supp. 1001, 1005 (W.D. Mo. 1990) (finding numerosity where, "the putative class members are, by definition, low-income persons who could not afford to prosecute their own actions"). Each of the proposed classes here satisfies Rule 23(a)(1).

**Bearden Class.** To determine the size of the *Bearden* Class, Plaintiffs' expert, Dr. Steven Demuth, examined three sets of aggregate data produced by the City. This data included ███████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████.[42] Dr. Demuth began with the list of all arrests in the relevant period, produced by the City of Ferguson, and removed those arrests that were based only on charges from other jurisdictions or on charges that would be pursued in state court.[43] This left a total of ██████ arrests that led to detention due to non-payment of a monetary sum required by the City (be it a fine, fee, bond, surcharge, or cost).[44] Dr. Demuth then used the Social Security Number associated with each arrest (when available) to determine how many distinct individuals

---

[42] Waldron Decl., Ex. 98 at 2-3 (Expert Report of Stephen Demuth) ("Demuth Report") (referring to the *Bearden* Class as the "First Damages Class").

[43] *Id.* at 7, 9. For instance, ████████████████████████████████████████████████████████████ ███████ (*see* Waldron Decl., Ex. 99 (███████████████████████ (Bates No. 019955-56)), ████████████████████████████████████████████████ (*see* Waldron Decl., Ex. 100 (████████████████████ (Bates No. 002514-15)) ██████████████████████████████████████████████████ ████

[44] Demuth Report at 9, 15.

accounted for the total class of qualifying arrests. By that calculation, the *Bearden* Class—those

held by the City of Ferguson because of their non-payment of a monetary sum required by the

City—contains 11,396 arrestees spanning 20,778 arrests.[45]

*Gerstein* **Class.** To determine the size of the *Gerstein* Class, Dr. Demuth began with the

arrests that qualified for the *Bearden* Class—i.e., arrests leading to detention due to non-payment

of a monetary sum required by Ferguson—and removed every arrest made pursuant to a Ferguson-

issued warrant.[46] This ensured that all the remaining Ferguson arrests were warrantless.[47] Dr.

Demuth then determined the length of detention for these warrantless arrests, identifying ████

warrantless arrests leading to detention past booking, ████ warrantless arrests leading to detention

for longer than 24 hours, and ███ warrantless arrests leading to detention for longer than 48 hours

or longer.[48]

Under typical circumstances—cases in which at least *some* arrestees are afforded probable-

cause hearings at *some* point—the doctrine stemming from *Gerstein v. Pugh*, 420 U.S. 103, 112,

114 (1975) would presume that providing a hearing within 48 hours is reasonable. But as the Court

explained in *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) detentions shorter than 48

hours can still be unlawful if arrestees are "delayed unreasonably."[49] Ferguson presents an atypical

---

[45] *Id.* at 16 (████████████████████████████████████████
████).

[46] *Id.* at 9-10. The Demuth Report refers to the *Gerstein* Class as the "Second Damages Class."

[47] *Id.*

[48] *Id.* at 15-16.

[49] *See* 500 U.S. at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or *delay for delay's sake*." (emphasis added)). The Eighth Circuit has held that, after a warrantless arrest, "[a] defendant may be detained only for as long as it takes to process 'the administrative steps incident to arrest.'" *Wayland v. City of Springdale, Ark*., 933 F.2d 668, 670 (8th Cir. 1991) (quoting *Gerstein*, 420 U.S. at 114). Similarly, the Missouri law requiring release of warrantless arrestees within 24 hours, Mo. Rev. Stat. § 544.170.1, recognizes that detentions lasting less than 24 hours may yet be unjustified. *See, e.g., Mitchell v. Shearrer*, No. 4:10-CV-819 DEJ, 2012 U.S. Dist. LEXIS 36442, at *20–21 (E.D.

and extreme case of unreasonable delay in that the City maintained a policy of *never* providing a probable-cause hearing to its warrantless arrestees.[50] Nor would the Municipal Judge come to the jail to give inmates a hearing there.[51] With no hearing ever in the offering, it was unreasonable for the City to detain warrantless arrestees *at all* after booking then, let alone for longer than 24 or 48 hours afterwards.[52]

Whatever this Court ultimately deems reasonable, the relevant class of arrestees will clearly be large enough to warrant class litigation. Dr. Demuth's expert analysis shows that even using the most conservative benchmark of 48 hours, the *Gerstein* Class includes at least ▇ arrestees.[53]

**Jail-Conditions Class.** The Jail-Conditions Class includes all arrestees who were detained in the City jail during the relevant period, even if they were held solely on behalf of another municipality. Even though Ferguson stopped using its own jail in early 2015, Dr. Demuth estimated that there are ▇ distinct arrestees accounting for ▇ arrests in the Jail-Conditions Class.[54]

**Warrant Class.** Because it consists of all individuals held by Ferguson on a warrant (as opposed to those held after a warrantless arrest), the Warrant Class consists of those members of the *Bearden* Class who are not also members of the *Gerstein* Class. In other words, it contains people held in the City jail for failing to pay a monetary sum required by the City, after an arrest on a Ferguson warrant. Each of these arrestees was held by Ferguson upon a warrant without ever

---

Mo. Mar. 19, 2012).

[50] *See supra* note 16.

[51] Waldron Decl., Ex. 107 at 219:23-221:14 (03/21/2020 Deposition of Ronald Brockmeyer).

[52] Demuth Report at 9, n.8; *see also Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (holding that defendant may be liable where it did not hold probable cause hearings as a matter of "course or custom").

[53] Demuth Report at 37.

[54] Demuth Report at 16-17. The Demuth Report refers to the Jail-Conditions Class as the "Third Damages Class."

being brought before a judge for a first appearance. Based on the statistics cited above in connection with the *Bearden* and *Gerstein* Classes, there are ▮▮▮▮ arrests that qualify for the Warrant Class (▮▮▮▮ *Bearden*-qualifying arrests, ▮▮▮▮ of which are warrantless). The number of people in the Warrant Class is the number of distinct arrestees who account for those ▮▮▮▮ qualifying arrests—again, a number clearly large enough to merit class litigation.

**Post-Judgment Class.** The Post-Judgment Class contains thousands of people who have been jailed by the City on the basis of warrants arising from nonpayment of debts. Due to the City's flawed record keeping, a more precise tally of the Post-Judgment Class would require a manual review of the City's existing individual paper court files.

**Declaratory and Injunctive Class.** Finally, the Declaratory and Injunctive Class includes the thousands of individuals who continue to owe the City money, as well as people whom the City assesses for fines every day in connection with cases it prosecutes.

These estimates show the number of people in each of the proposed classes to be well beyond the forty-person threshold for presuming that the numerosity requirement has been met. *See Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765–66 (8th Cir. 1971) (twenty members sufficient); *Tinsley v. Covenant Care Servs., LLC*, No. 1:14-CV-00026 ACL, 2016 U.S. Dist. LEXIS 11988, at *20 (E.D. Mo. Feb. 2, 2016) ("It has been consistently held that joinder is impracticable where the class is composed of more than 40 persons.").

Three additional reasons support the numerosity of the proposed classes under Rule 23(a)(1). First, it would be practically impossible to join each putative class member to the action individually. Plaintiffs could not join the future stream of class members because their number grows every day as the City assesses new debts. *See Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (affirming district court's finding of impracticability of non-class joinder for

a class including future members, who could not yet be identified).

Second, the vast majority of potential plaintiffs lack the resources to bring separate lawsuits. *See Jackson v. Foley*, 156 F.R.D. 538, 541–42 (E.D.N.Y. 1994) (joinder impracticable when the majority of class members likely came from "extremely low-income households, thereby greatly decreasing their ability to bring individual suits"); *Sherman v. Griepentrog*, 775 F. Supp. 1383, 1389 (D. Nev. 1991) (finding joinder impracticable because the proposed class consisted of "poor and elderly or disabled" plaintiffs who could not bring individual lawsuits without hardship). Indeed, the members of each proposed class are among the most marginalized and economically desperate members of the community, unable to find a lawyer to represent them after their arrest, let alone to investigate and develop their constitutional claims.[55] *See Hood v. Gilster-Mary Lee Corp.*, No. 3:14-cv-05012-MDH, 2016 U.S. Dist. LEXIS 135475, at *23 (W.D. Mo. Sept. 30, 2016) ("In balancing the relative merits of class action versus alternative methods of adjudicating the controversy, courts should consider the inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." (citation and internal alterations omitted)); *Gerardo v. Quong Hop & Co.*, No. 08- 3953 JF (PVT), 2009 U.S. Dist. LEXIS 60900, at *6 (N.D. Cal. July 7, 2009) (certifying class where "potential class members are not legally sophisticated," making it difficult for them to bring individual claims).

Finally, adjudicating this case through separate, individual lawsuits against the City would cause an enormous drain on judicial resources. Separate lawsuits would result in duplicative discovery (including numerous depositions of the same City officials and repetitive document

---

[55] Waldron Decl., Ex. 49 at 51:8-10 (explaining he did not contest a "no occupancy permit" charge after being arrested because he did not have money for a lawyer). Moreover, in light of their negative experiences with the courts, many class members may be fearful of involving themselves further in the justice system by pursuing lengthy litigation. *See id.* at 53:10-22 (explaining that he did not see the judge to request a lawyer because he was afraid of being arrested).

productions), repeated adjudication of similar controversies in this Court (with the resultant risk of inconsistent judgments), and excessive costs for all parties. *See Covenant Care Servs.*, 2016 U.S. Dist. LEXIS 11988, at *31 (class action superior because mechanism allows more efficient allocation of judicial resources); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (class action superior when "classwide litigation of common issues will reduce litigation costs and promote greater efficiency"). For all these reasons, each of the proposed classes satisfies Rule 23(a)'s numerosity requirement.

### B.   Commonality

The second Rule 23(a) requirement is that "there [be] questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, the factual or legal questions must "generate common answers apt to drive the resolution of the litigation." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis and citation omitted). The commonality requirement is not "stringent." *Atkins v. United States*, No. 4:15 CV 933 CDP, 2016 U.S. Dist. LEXIS 92891, at *7 (E.D. Mo. July 18, 2016) ("In *Dukes*, the Court acknowledged that a single common question 'will do' for purposes of Rule 23(a)(2)." (quoting *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016))). It is generally satisfied when class members have been injured "by the same wrongful act or acts." *H&R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 546 F.3d 937, 942 (8th Cir. 2008). Courts have found the commonality requirement to be satisfied where there is a uniform policy or conduct that applies to all class members. *See Covenant Care Servs.*, 2016 U.S. Dist. LEXIS 11988, at *23; *Morgan*, 169 F.R.D. at 355–56 (same).

The proposed classes satisfy the commonality requirement because the putative members of each class were injured by the same wrongful policies and practices of the City. Ferguson operated its post-arrest detention scheme as a matter of routine, causing common injuries among the members of each class.

*Bearden* **Class.** For example, Ferguson's detainees were all subject to its written policy of allowing jail officials to modify and reduce bond orders as they saw fit.[56] *See Morgan*, 169 F.R.D. at 356 (finding that commonality was satisfied where class members were subject to a uniform personnel policy that included a subjective, decentralized system of decision-making). Similarly, people jailed by Ferguson did not receive an ability-to-pay determination at any point during their incarceration.[57] The existence of these City policies and practices is a key factual issue common to the Class, and their gross unconstitutionality under the Fourteenth Amendment is a key legal issue common to the Class. As this Court concluded in another case, "detainment solely due to a person's indigency because the financial conditions for release are based on predetermined amounts beyond a person's ability to pay and without any meaningful consideration of other possible alternatives is discriminatory and unconstitutional." *Dixon v. City of St. Louis*, No. 4:19-CV-0112-AGF, 2019 U.S. Dist. LEXIS 97327, at *33-34 (E.D. Mo. June 11, 2019) (citing *O'Donnell v. Harris Cty.*, 892 F.3d 147, 161 (5th Cir. 2018)), *rev'd on other grounds,* 950 F.3d 1052 (8th Cir. 2020); *see also Webb v. City of Maplewood*, 4:16-cv-01703-CDP, ECF 202, at *35 (E.D. Mo. Nov. 18, 2021) ("Any period of detention based solely on a failure to pay without an inquiry into indigency is a common question subject to common proof.").[58]

---

[56] Waldron Decl., Ex. 17 at § 421.03 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added)).

[57] *See supra* notes 15 and 20.

[58] Indeed, numerous courts across the country have recognized that, after arrest, the government may not require secured financial conditions of release that, because of the accused's indigence, operate to detain, unless it demonstrates that alternatives would not serve its purposes. *See, e.g.*, *Pugh v. Rainwater*, 572 F.2d 1053, 1056-57 (5th Cir. 1978) (en banc); *Rodriguez v. Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 768 (M.D. Tenn. 2015); *Walker v. City of Calhoun, Georgia*, 4:15-CV-0170-HLM, 2016 U.S. Dist. LEXIS 12305, at *32-36 (N.D. Ga. Jan. 28, 2016), *vacated on other grounds*, 682 Fed. App'x 721 (11th Cir. 2017); *Jones v. City of Clanton, Alabama*, No. 2:15cv-34-MHT, 2015 U.S. Dist. LEXIS 121879 at *6-7 (M.D. Ala. Sep. 14, 2015); *Cooper v. City of Dothan*, No. 1:15-CV-425-WKW [WO], 2015 U.S. Dist. LEXIS 78813, at *3-5 & n.2 (M.D. Ala. June 18, 2015); *Pierce v. City of Velda*, No. 4:15-cv-570-HEA, 2015 U.S. LEXIS 176261, at *1-2 (E.D. Mo. June 3, 2015). Furthermore, "a putative class member's right to an ability-to-pay inquiry does not depend on indigence; the procedural protections required by the

***Gerstein* Class.** Similarly, the members of the *Gerstein* Class were all held by Ferguson upon a warrantless arrest without *any* prospect of a finding by a neutral judicial magistrate that there was probable cause to justify their continued detention. While the number of hours that each warrantless arrestee was held by Ferguson may vary, what remains constant is that each member of the *Gerstein* Class was held past booking on a warrantless arrest with *no process* by which a neutral judicial official would ever make a finding of probable cause. That is a core factual issue common to the Class. *Cf. Webb*, 4:16-cv-01703-CDP, at \*32-33 (holding that any length of detention, "whether it be for one hour after booking, 7 hours, or 47 hours and 59 minutes" constituted unreasonable "delay . . . merely for delay's sake" when it "served the City's purpose of extracting any monies it could before releasing them.").

The core common legal issue here is whether the City violates the Fourth Amendment by keeping people in custody after warrantless arrests without any neutral findings of probable cause and without any intention of, or procedure for, bringing the arrestees before a neutral judicial officer for such a finding.

**Jail-Conditions Class.** Members of the Jail-Conditions Class are united by their shared exposure to the inhumane conditions in Ferguson's jail. Each Class member was made to eat the same barely edible and nutritionally inadequate food, subject to the same policies barring them from taking showers, and forced to drink water out of the same device connected to their cell's toilet. A finder of fact can therefore resolve questions regarding the constitutionality of the jail conditions for all Class members in one action.

---

Supreme Court . . . apply equally to indigent and non-indigent individuals." *Cain v. City of New Orleans*, 327 F.R.D. 111, 124 (E.D. La. 2018) (citation omitted)*; see also Doe v. Angelina Cty*., 733 F. Supp. 245, 254 (E.D. Tex. 1990) (failure to conduct ability-to-pay hearing is "unlawful *whatever the economic status* of the incarcerated person") (emphasis added); *accord West v. City of Santa Fe*, No. 3:16-CV-0309, 2018 U.S. Dist. LEXIS 14401, at \*24-25 (S.D. Tex. Aug. 16, 2018), report and recommendation adopted, No. 3:16-CV-00309, 2018 U.S. Dist. LEXIS 161130 (S.D. Tex. Sept. 19, 2018).

The factual issues common to all members of the Jail-Conditions Class include: whether the City maintained its jail in unsanitary and dangerous conditions,[59] such that inmates suffered from a lack of proper nutrition and dehydration,[60] were forced to drink water from a mechanism attached to the toilet, were denied access to medication brought by family members,[61] were forced to sleep on the floor in overcrowded cells next to unclean toilets,[62] were forced to share unwashed blankets, and were denied access to toothbrushes, toothpaste, soap and showers.[63]

The legal issues common to all members of the Jail-Conditions Class include: whether the City violates the Fourteenth and Eighth Amendments by keeping individuals in jail under unsafe, unsanitary, inhumane and dangerous conditions, including filthy, overcrowded cells and a lack of access to medical care, mental health care, hygiene products, laundry, fresh air, sunlight, clean drinking water and adequate nutrition.

**Warrant Class.** All members of the Warrant Class were jailed by the City and subject to the same process of indefinite incarceration with no hope of ever (much less, promptly) being

---

[59] *See* Waldron Decl., Ex. 101 at 2-3 (Expert Report of Eldon Vail) ("Vail Report") ███████████ ███████ ).

[60] The Ferguson Jail maintained punitive practices that deprived every detainee of adequate food, offering only honey buns for breakfast and potpies for lunch and dinner, regardless of dietary or religious restrictions. *See* Vail Report at 10, 12-13 ( ███████████████████████████████ ███████████████████████████████ ; *see also*, *supra* note 32.

[61] The Ferguson Jail's failure to provide an adequate medical assessment of each detainee at intake, an on-site medical staff, and basic medical supplies denied each prisoner their fundamental right to medical treatment. Waldron Decl., Ex. 102 (Rebuttal Expert Report of Eldon Vail) at 14 ( ████████████████ ); *see also supra* note 33.

[62] Vail Report at 17 ████████████████ ); *see supra* note 27.

[63] Vail Report at 10-19 ████████████████ ); *see also supra* note 29.

brought before a judge for an arraignment and bond hearing. Each member of the Warrant Class was arrested pursuant to a Ferguson warrant.[64] Further, it is undisputed that Ferguson jail and police employees failed to bring each member of the Warrant Class before a judge promptly after arrest for one simple, common reason: *no such process existed*. Each putative member of the Warrant Class was held pursuant to Ferguson's practice of jailing arrestees indefinitely in order to determine if they were able to pay their bond; from the first minute of their detention, it was certain that an arrestee would not be brought before the court and afforded the process required by the Constitution. When the arrestee proved him or herself unable to pay her bond, he or she was released as though the warrant had never existed. While the duration of detention may vary, what does not vary is the fact that each arrestee was jailed without hope of the requisite process, and thus with deliberate indifference to their right to that process.

---

[64] Ferguson arrested thousands of Warrant Class members each year on warrants and subsequently failed to bring the arrestees before a judge, in violation of their substantive due process right to a prompt court appearance. *See Hayes v. Faulkner County*, 388 F.3d 669, 673–74 (8th Cir. 2004) (holding that "the Due Process Clause forbids an extended detention, without a first appearance, following arrest by warrant" and that a County's deliberate indifference to this standard "shocked the conscience").

      Here, there is again no dispute that Ferguson violated the Constitution by failing to promptly bring forward arrestees to be dealt with by the Court. As a matter of custom, Ferguson's police and jail employees detained people in the jail after arrest on a warrant with no system in place by which the arrestee could be brought before the court. Indeed, Ferguson's jailing process anticipated the fact that a person arrested on a warrant would never actually be brought before the court. Waldron Decl., Ex. 45 at 95:20-96:18 (stating that "to his knowledge," there were never any "circumstances where an individual [held in jail] would be brought before a judge," including "[i]f someone was brought on an outstanding warrant"); Waldron Decl., Ex. 46 at 73:15-74:2 (stating that, as a general matter, individuals held in jail were never brought to court to see the judge, and the judge never came to the jail), 128:2-7 (Q: "How long would you hold an inmate in jail before they were allowed to appear in court?" A: "We didn't take them to court."). And that was for good reason: the purpose of detention was *not* so that the arrestee could eventually be brought before the court, nor was it because they were considered a danger to the community. Rather, the purpose of their detention was to attempt to squeeze money from them. Ferguson's own booking documents demonstrate the way in which its police and jail officers held detainees for random periods of time in order to induce them to pay *some* amount of money that would fill the City's coffers. *See, e.g.*, Waldron Decl., Ex. 103 at City_Jail_0009292 (█████████████████████████████████████████ (Bates No. City_Jail_0009290-305)) (█████████████████████████████████████████████████████████). Rather than bringing the arrestees before a judge, Ferguson's jailers and police officers essentially appointed themselves as judges: *they* determined the amount of the bond, and *they* decided when a person was released. This arbitrary process, which did not involve the Ferguson municipal court judge, led to situations where some individuals would be jailed for as long as five days while others were released within mere hours. *Compare* Waldron Decl., Ex. 104 at 001704 (███████████████████████████████ (Bates Nos. 001703-4)) (█████████████████████████) *with* Waldron Decl., Ex. 105 at City_Jail_0008208 (██████████████████████████████ (City_Jail_0008206-11)) (█████████████).

**Post-Judgment Class and Declaratory and Injunctive Class**. The factual issues common to all members of the Post-Judgment Class (seeking damages on Counts Two, Five, and Six), as well as to all members of the Declaratory and Injunctive Class (seeking prospective relief on the same Counts), include:

- Whether the City had a policy and practice of issuing and executing warrants for the arrest of debtors who owed money on old judgments solely for non-payment, without any prior notice or opportunity to be heard concerning their ability to pay or the validity of the debt and without probable cause that any offense had been committed;

- Whether the City's employees and agents had a policy and practice of threatening debtors and their families with incarceration for unpaid debts without informing them of their state law and federal law rights;

- Whether the City had a policy and practice of jailing people who owe money on old judgments and keeping them in jail until they could pay or until City jail officials decided arbitrarily to release them for free;

- Whether the City provided legal representation to those jailed for non-payment in proceedings that could result in their incarceration;

- Whether the City had a policy and practice of automatically recalling arrest warrants for people able to afford an attorney or people able to afford to pay the City clerk a predetermined fee; and

- Whether the City provided notice to debtors that their ability to pay will be a relevant issue at legal proceedings at which they are jailed or kept in jail.

Among the legal issues common to all members of the Post-Judgment Class, as well as to all members of the Declaratory and Injunctive Class, are:

- Whether the City violates the Fourth Amendment's requirement that all arrest warrants be based on probable cause by (i) issuing arrest warrants for individuals when they do not make payments on their debts to the City by certain dates, (ii) issuing these arrest warrants without probable cause to believe that the individual is able to pay and is willfully refusing to do so, and (iii) issuing these arrest warrants for "failure to appear" (although the individuals did not fail to appear for any proceeding);

- Whether the City violates the Fourteenth Amendment by jailing people for non-payment and depriving them of their fundamental right to bodily liberty without providing any pre-deprivation notice or opportunity to be heard;

- Whether the City violates the Equal Protection Clause by only removing arrest warrants and setting new court dates for those debtors who retain private counsel or pay the City clerk a predetermined fee;

- Whether the City violated Plaintiffs' right to the effective assistance of counsel under the Sixth and Fourteenth Amendments by jailing them as a result of debt-collection proceedings during which they were unrepresented by counsel and did not knowingly, intelligently, and voluntarily waive counsel;

- Whether the City violates the Supreme Court's prohibition on government use of unduly harsh methods of collection that would be unavailable to private creditors by (i) placing indigent people in generic and onerous payment plans lasting years or decades, (ii) using jail, threats of jail, and other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors, and (iii) denying debtors the procedural and substantive statutory protections that every other Missouri debtor may invoke against a private creditor; and

- Whether, the City violates the Fourteenth Amendment's Due Process and Equal Protection Clauses by jailing people for failure to pay the debts owed from minor tickets, without inquiring into their ability to pay and considering alternatives to imprisonment.

That putative Class members may have entered the system through different charges and experienced different periods of confinement does not diminish the commonality among them. *See Bouaphakeo v. Tyson Foods Inc.*, 765 F.3d 791, 797 (8th Cir. 2014) (holding that factual differences among individual claimants do not preclude class certification when there is evidence of consistent policy), *aff'd*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (varying strength of individual claims does not impact commonality); *Van Orden v. Meyers*, No. 4:09CV00971 AGF, 2011 U.S. Dist. LEXIS 113478, at *19–20, 23 (E.D. Mo. Sept. 30, 2011) ("[N]ot every class member need be affected by a statute, administrative practice, or institutional condition in an identical manner."); *Ellis v. O'Hara*, 105 F.R.D. 556, 561 (E.D. Mo. 1985) (finding the allegation of a pattern of bad faith enforcement of relevant law sufficient to meet commonality despite factual differences among plaintiffs). Given the need to answer these central questions before the City's liability to each plaintiff is assessed, and given the power of those answers to drive the resolution of this litigation,

the proposed classes meet the commonality requirement.

### C.     Typicality

Rule 23(a)(3) requires that class representatives' claims or defenses be typical of those of the class. This typicality requirement can be satisfied in one of two ways: (i) if the class representatives and the putative class members are subjected to the same policies, conditions, or unlawful treatment (*see Downing v. Riceland Foods, Inc.*, No. 4:13CV321 CDP, 2015 U.S. LEXIS 34154, at *12 (E.D. Mo. Mar. 19, 2015)); or (ii) if their claims are based "on the same legal theories, [and] the same arguments of unconstitutionality." *Rentschler v. Carnahan*, 160 F.R.D. 114, 116 (E.D. Mo. 1995). Typicality does not, however, require *identical* interests among all class members. *Ortega v. Uponor Inc.*, 716 F.3d 1057, 1064 (8th Cir. 2013). Rather, class members' claims need only share some essential characteristics and "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims *similar* to the named plaintiff." *DeBoer*, 64 F.3d at 1174-75 (emphasis added). As explained below, each of the proposed classes satisfies the typicality requirement.

The representatives of each of the proposed classes satisfy the requirements because each of their claims are based upon the same legal theories and underlying facts as those of the other putative class members.

**Bearden Class.** Each Plaintiff is a typical member of the *Bearden* Class because each was held by the City of Ferguson for failing to pay a monetary sum and without an inquiry into their ability to pay. Like each putative member of the *Bearden* Class, each of the Plaintiffs was held in the City jail for one reason: because he or she was not able to immediately make a monetary payment to the City. Plaintiff Shameika Morris is an illustrative example. Ms. Morris was arrested and jailed by the City of Ferguson on three separate occasions during the given class period: in 2010, she was held for nearly three full days; in 2011, she was held for just over one day; and in

25

2012, she was held for more than a day and a half.[65] In each instance, Ms. Morris was held by Ferguson solely because she was unable to pay a sum of money at the time of her incarceration, and in each instance, when it became clear that she was unable to pay the money demanded by the City, she was summarily released.[66] Ms. Morris' claims are typical of the other Plaintiffs and all class members who were held by the City of Ferguson pursuant to the payment of a monetary sum.

*Gerstein* **Class.** The *Gerstein* Class—represented by Roelif Carter, Ronnie Tucker, and Alfred Morris—also satisfies the typicality requirement. First, like other members of the *Gerstein* Class, the named Plaintiffs were subject to the City's unlawful practice of holding arrestees beyond booking without a finding of probable cause by a neutral judicial official. For instance, twice in June 2014, Mr. Carter was arrested by the City for a municipal offense and was held in jail without a warrant. In each instance, he was detained for more than 24 hours after his arrest.[67] Later that summer, in August of 2014, Mr. Carter was again arrested without a warrant and held for nearly 72 hours.[68] In each instance, pursuant to Ferguson custom, he was held without any judicial finding of probable cause to justify his arrest.[69] Second, Mr. Carter, Mr. Tucker, and Mr. Morris make the same claim (Count Seven) as the other members of the *Gerstein* Class, all of whom were held by the City without any procedure in place by which a judge could find probable cause to justify their detention. Third, the constitutional arguments at the heart of the *Gerstein* Plaintiffs' claim are the

---

[65] *See* Morris documents in *supra* note 36.

[66] Ms. Morris's case is further illustrative of the manner in which Ferguson used fines and fees to profit off of those most unable to afford their fines. While she initially had two charges with a total cost of $375, because she was unable to pay these fines, she eventually ended up owing the City of Ferguson at least $1,647 in fines and fees. *See* Waldron Decl., Ex. 106 at Bates No. 021879-80 (███████████████████████ (Bates No. 021879-80)).

[67] *See* Waldron Decl., Ex. 54 at Bates No. 022368-9 (██████████████████████████████████████ .

[68] *See* Waldron Decl., Ex. 55 at Bates No. 022413 (█████████████████████████████████████ ██████████).

[69] *See*, *e.g.*, Waldron Decl., Ex. 107 at 219:23-221:14 (Q: "So somebody could be held 72 hours without any finding of probable cause from a neutral judicial official, correct?" A "Correct.").

same as those of the other members of the *Gerstein* Class. *See* Pl.'s Resp. to Def.'s Mot. Dismiss, ECF No. 62, at 18-19; *Gerstein*, 420 U.S. at 112-13.

**Jail-Conditions Class**. The named Plaintiffs also bring claims that typify those of the Jail-Conditions Class. Each named Plaintiff, like each putative Class member, was subject to the deplorable conditions of Ferguson's jail. For instance, Plaintiff Keilee Fant was jailed during the class period at least three times by the City of Ferguson.[70] During these periods of incarceration, Ms. Fant was denied basic toiletries, sanitation, and adequate food.[71] Like all members of the Jail-Conditions Class, she was subjected to the City's deliberately indifferent practices regarding jail maintenance and inmate welfare, and, for that reason, she and the other Plaintiffs are typical class representatives.

**Warrant Class**. Like every putative member of the Warrant Class, Plaintiffs suffered a due process violation because they were arrested by the City of Ferguson on a warrant without ever being brought before a judge for a prompt arraignment. Ms. Fant's July 2010 arrest again presents an illustrative example. According to Ferguson's records, Ms. Fant was arrested by City police late Friday night, July 16, 2010, on the authority of a failure to appear warrant. She was subsequently held all of Saturday the 17th, Sunday the 18th, and Monday the 19th, and then finally released around noon on Tuesday, July 20th. During none of the nearly 85 hours of Ms. Fant's incarceration was there ever a method by which Ms. Fant would be brought before a judge in order to be arraigned.[72] Rather, she was simply held indefinitely, and when she showed herself unable to pay her bond after more than three days, she was summarily released by a jailer, with no judicial

---

[70] *See supra* note 36.

[71] *See* Waldron Decl., Ex. 23 at 105:2-3 (no shower); 134:22-23 (cold).

[72] *See* Waldron Decl., Ex. 46 at 128:2-7 (Q: "How long would you hold an inmate in jail before they were allowed to appear in court?" A: "We didn't take them to court.").

involvement.[73] Ms. Fant and all other Plaintiffs are typical class representatives, as each of them was held under the City's established custom of never bringing arrestees like them before a judge.

**Post-Judgment Class.** Likewise, the Post-Judgment Class satisfies the typicality requirement on three grounds. First, the named Plaintiffs (Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, and Shameika Morris) suffered from the same illegal City scheme as the other post-judgment debtors. They were all arrested and jailed by the City because of their non-payment of a cash sum in connection with a prior judgment.[74] Second, named Plaintiffs make the same claims as the other members of the Post-Judgment Class (Counts Two, Five, and Six). Finally, named Plaintiffs' claims against the City turn on the same legal theories as those of the other class members, as outlined in the Complaint, ECF No. 53 at ¶¶ 236-37, 242-45, and in Plaintiffs' Opposition to the City's Motion to Dismiss, ECF No. 62 at 8-11, 15-18.

**Declaratory and Injunctive Class.** Named Plaintiffs Keilee Fant, Roelif Carter, Alfred Morris, Shameika Morris, Allison Nelson, and Donyale Thomas bring claims typical of those of the Declaratory and Injunctive Class. All incurred debt arising from judgments in cases prosecuted by the City; all were then subject to the City's illegal debt-collection practices. *See Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *24 (finding typicality satisfied when members were subjected

---

[73] *See* Waldron Decl., Ex. 108 at Bates No. 022066-67 (███████████████████ (Bates No. 022066-67)) ██████████).

[74] *See* arrests of Keilee Fant (*see* Waldron Decl., Ex. 28; Waldron Decl., Ex. 29; Waldron Decl., Ex. 30); Roelif Carter (*see* Waldron Decl., Ex. 109 at Bates No. 020663 (█████████████████ (Bates No. 020663)); Allison Nelson (*see* Waldron Decl., Ex. 67; Waldron Decl., Ex. 69); Herbert Nelson (*see* Waldron Decl., Ex. 71); Alfred Morris (*see* Waldron Decl., Ex. 60; Waldron Decl., Ex. 61; Waldron Decl., Ex. 63; Waldron Decl., Ex. 64; Waldron Decl., Ex. 65; Waldron Decl., Ex. 66); Anthony Kimble Bates (*see* Waldron Decl., Ex. 57; Waldron Decl., Ex. 58; Waldron Decl., Ex. 59); Donyale Thomas (*see* Waldron Decl., Ex. 56); Shameika Morris (*see* Waldron Decl., Ex. 74; Waldron Decl., Ex. 76).

to the same allegedly unlawful policies and conditions). And, all make the same claims for declaratory and injunctive relief as do the other putative class members. *See Boswell*, 311 F.R.D. at 528. Finally, the legal theories that underpin Plaintiffs' claims for injunctive relief are the same as those of the putative class members. *See DeBoer*, 64 F. 3d at 1174-75 (finding typicality satisfied where plaintiffs sought the same injunctive relief as other class members, despite each being subject to different operative agreements).

In sum, because the named Plaintiffs suffered from the same policies and customs that have harmed other members of the proposed classes, and because their claims for relief and legal arguments are the same as those of other members of their respective classes, the proposed classes each satisfy the typicality requirement of Rule 23(a)(3). If the named Plaintiffs of each Class succeed in their respective claims that the City's policies and practices concerning post-arrest procedures and debt collection for fines, fees, costs, and surcharges violate the law as alleged in the Complaint, that ruling will likewise benefit every other member of their respective classes. That is the essence of Rule 23 typicality.

### D.    Adequacy

It is clear that the named Plaintiffs will "fairly and adequately protect the interests of the class[es]," as required by Rule 23(a)(4). The adequacy analysis encompasses two separate inquiries: (1) whether the named plaintiff has common interests with the other class members; and (2) whether the representatives will vigorously prosecute the action through qualified counsel. *See Boswell*, 311 F.R.D. at 529 (citing *Paxton*, 688 F.2d at 562-63).

Plaintiffs are adequate representatives because they entirely share their classmates' interests in establishing the illegality of the City's policies and practices concerning post-arrest procedures and debt collection. Their injuries arise from policies that all class members were subjected to, and their legal challenges to the City's policies are shared among the members of

their respective classes. There are no known material conflicts of interest among members of the proposed classes, all of whom have a similar interest in vindicating their constitutional rights in the face of their unlawful treatment by their local government.

The named Plaintiffs and proposed classes are represented by attorneys who are "qualified, experienced and generally able to conduct the proposed litigation." *Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *27 (internal citations omitted) (quoting *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975)). Plaintiffs are represented by counsel from Civil Rights Corps, ArchCity Defenders, Saint Louis University School of Law Legal Clinics, and White & Case LLP. Each organization has experience litigating complex class action matters in federal court and extensive knowledge of both the details of post-arrest wealth-based detention schemes and the relevant constitutional law.[75] Counsel for Plaintiffs have also led a number of materially similar class actions resulting in systemic reforms of wealth-based detention schemes across the country.[76] The interests of the class members will thus be fairly and adequately protected by the named Plaintiffs and their attorneys.

## II.    The Proposed Classes Satisfy the Requirements of Rule 23(b)

In addition to the threshold requirements of Rule 23(a), each proposed Class must also satisfy one of the criteria under Rule 23(b). *See Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *27. For the reasons discussed below, the Declaratory and Injunctive Class satisfies Rule 23(b)(2), and each of the five proposed damages classes satisfies Rule 23(b)(3).

---

[75] *See* Waldron Decl., Ex. 111 (ACD Class Certification Declaration); Waldron Decl., Ex. 112 (CRC Class Certification Declaration); Waldron Decl., Ex. 113 (SLU Class Certification Declaration); Waldron Decl., Ex. 114 (WC Class Certification Declaration).

[76] *See* Waldron Decl., Ex. 111; Waldron Decl., Ex. 112; Waldron Decl., Ex. 113.

## A.    The Declaratory and Injunctive Class Satisfies Rule 23(b)(2)

A class action is appropriate under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) applies only "when a single injunction or declaratory judgment would provide relief to each member of the class . . . [and not] when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. However, this "cohesiveness" requirement is "easily met . . . in cases where . . . the class members were subject to the very practice or policy of the defendant that is being challenged in the lawsuit." *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 345 (S.D. Iowa 2013) (collecting cases); *see also Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *28 (finding defendant's implementation of an unconstitutional program and enforcement of an unconstitutional reimbursement scheme sufficient to satisfy Rule 23(b)(2)); *Ellis*, 105 F.R.D.at 563 (noting that Rule 23(b)(2) requirement is met when defendant "acted in a consistent manner towards members of the class so the actions may be viewed as part of a pattern of activity").

The Declaratory and Injunctive Class satisfies Rule 23(b)(2) on two grounds. First, by implementing and enforcing an unconstitutional debt-collection scheme, the City "has acted or refused to act on grounds generally applicable" to all of its current and future debtors. For example, the City's uniform practice of threatening debtors with arrest for late payments is evident in the text of the standard forms given to all individuals who were given fines.[77] On this basis alone, the City's widely applied, unconstitutional debt-collection scheme is particularly well-suited to a Rule

---

[77] *See* Waldron Decl. Ex. 33, at Ex. 1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) and 61:2-9.

23(b)(2) class action.[78]

Second, Plaintiffs' request for relief satisfies Rule 23(b)(2) because the remedy they seek would provide relief to all current and future debtors of the City. For example, the Court's declaration that the City cannot place and hold people in jail solely because they cannot afford to make a monetary payment will affect every person who has outstanding debts to the City and thereby lives with the ever-present fear of being swept up in the City's jails. A declaration that all people who owe a debt to the City are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration would similarly affect all Class members.[79] The injunctive relief that Plaintiffs seek would also protect each member of the Class from being subjected to the City's unlawful policies and practices with respect to the debts that they still owe.[80] It would also protect those who will incur such debts or be subject to arrest by the City in the future from the same unconstitutional conduct. The relief that Plaintiffs seek thus plainly meets the requirements of Rules 23(b)(2).

Because the City's unconstitutional debt collection policies apply against all members of

---

[78] Rule 23(b)(2) arose out of experience "in the civil rights field," *Amchem Prods.*, 521 U.S. at 614 (quoting Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 HARV. L. REV. 356, 389 (1967)), in which the government typically treats a whole class in an unconstitutional manner based on law or government policy. "Rule 23(b)(2) was promulgated in 1966 essentially as a tool for facilitating civil rights actions." MOORE'S FEDERAL PRACTICE § 23.43(1)(b) (3d ed. 2014); *see also Van Orden*, 2011 U.S. Dist. LEXIS 113478, at *16-17; NEWBERG ON CLASS ACTIONS § 1:3 (5th ed. 2011) ("Rule 23(b)(2) authorizes a class action when a party has taken or refused to take action with respect to a class. This category *is typically employed in civil rights cases* and other actions not primarily seeking money damages. The (b)(2) class action is often referred to as a 'civil rights' or 'injunctive' class suit." (emphasis added)).

[79] Indeed, the declaratory relief Plaintiffs seek is particularly important given that the Consent Decree between the City and the Department of Justice specifically states that the Consent Decree is not to be taken as an admission by the City that it has engaged in unconstitutional, illegal or otherwise improper conduct. *See* Consent Decree, *supra* note 1, ¶ 7.

[80] Plaintiffs have asked this Court to issue "[a]n order and judgment permanently enjoining Defendant from enforcing the . . . unconstitutional policies and practices against Plaintiffs" as well as "any other relief this Court deems just and proper." First Amend. Compl. 58, ECF No. 53. In exercising its broad discretion to fashion injunctive relief, *Burton v. Armontrout*, 975 F.2d 543, 544 (8th Cir. 1992), this Court may avail itself of any relevant language from the Consent Decree entered between the City and the DOJ.

the Declaratory and Injunctive Class, and because the prospective relief Plaintiffs seek would apply to all its members, the Declaratory and Injunctive Class meets the requirements of Rule 23(b)(2). Having already met the threshold requirements of Rule 23(a), the Declaratory and Injunctive Class fulfills all the prerequisites for certification.[81]

### B.      The Damages Classes Satisfy Rule 23(b)(3)

Certification under Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions of law or fact affecting only individual members," and that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." The Damages Classes each satisfy both requirements.

### 1.      Common Questions of Law and Fact Predominate

The Rule 23(b)(3) predominance inquiry considers "whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Day v. Celadon Trucking Servs.*, 827 F.3d 817, 833 (8th Cir. 2016). This inquiry, however, "does not require . . . [proof] that each element of [plaintiff's] claim is susceptible to classwide proof." *Boswell*, 311 F.R.D. at 529 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 468 (2013)). Instead, determining whether common questions predominate requires only a limited preliminary inquiry into the pleadings to determine "whether, if the

---

[81] "The Eighth Circuit does not impose a separate ascertainability requirement for class certification but 'adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class must be adequately defined and clearly ascertainable.'" *Murphy v. Piper*, No. CV 16-2623 (DWF/BRT), 2017 U.S. Dist. LEXIS 16045, at *6 (D. Minn. Sept. 29, 2017) (quoting *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016)). A class is ascertainable when its members may be identified by reference to objective criteria. *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). Plaintiffs are not required to "specify an exact number or to prove the identity of each class member, rather, 'the plaintiffs must only show a reasonable estimate of the number of class members.'" *Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 U.S. Dist. LEXIS 117238, at *19 (W.D. Mo. July 26, 2017) (quoting *Halbach v. Great-West Life & Annuity Ins. Co.*, 2007 U.S. Dist. LEXIS 24252, at *11 (E.D. Mo. Apr. 2, 2007)), *aff'd*, 910 F.3d 1030 (8th Cir. 2018). That standard is easily met here. The parties can already identify every person who owes the City money based on a case prosecuted by the City, has been held in custody by the City for failure to make a monetary payment, or is currently being held for that reason. And by necessity, the City will come to know the identity of each person falling into these categories in the future.

plaintiffs' allegations are true, common evidence could establish a prima facie case for the class."
*Downing*, 2015 U.S. Dist. LEXIS 34154, at \*13-14 (citing *Blades v. Monsanto Co.*, 400 F.3d 562,
566 (8th Cir. 2015)).

The elements of a prima facie case that the City is liable for its unconstitutional debt-
collection scheme are the same across the putative members of each proposed damages class. To
establish the City's liability for any given claim brought on behalf of a damages class, the named
Plaintiffs must show (i) that the City engaged in the policies and practices alleged in connection
with that claim,[82] and (ii) that these policies and practices are unlawful.

The dispositive questions of fact in this case are susceptible to resolution through common
evidence because they center on the procedures and practices that have been routine to the City
and its agents. For example, the evidence establishing that the City had a policy and practice of
issuing arrest warrants solely for nonpayment comes from standard documents used by City clerks
and from the testimony of City employees.[83] Similarly, the evidence relevant to whether the City
had a policy of negotiating with individuals to modify and lower the amounts of cash required for
release comes from the City's internal written and oral directives to court and jail employees,[84] the
City's jail records,[85] and the testimony of numerous City court and jail officials,[86] as well as from

---

[82] For example, that the City jailed people for non-payment of money without any inquiry into or findings concerning
ability to pay; that it issued warrants solely for nonpayment as a matter of policy; that it detained arrestees in its jail
after warrantless arrests without ever obtaining a judicial finding of probable cause to justify the detention; that it kept
people in jail after arrest based on predetermined amounts of cash set without any inquiry into ability to pay or
consideration of alternatives; that, after an arrestee proved herself unable to meet the bond, the City subsequently
released the arrestee as though the bond had never existed; and that City police and jail officials arbitrarily acted as
negotiators to modify and lower the amounts of money required for release from indefinite detention outside of any
recognizable legal process.

[83] *See* Waldron Decl. Ex. 33 at Ex. 1 and 61:2-9.

[84] *See, e.g.*, *supra* notes 23-24.

[85] *See, e.g.*, Waldron Decl., Ex. 15 ( ██████████████████████████████████████████
██████████ ).

[86] *See* Waldron Decl., Ex. 37 at 27:11-30:15 (noting that if a prisoner did not have enough money to meet bond the
officer would suggest that he or she make a call to someone who could bring money to pay their bond); *id.* at 31:4-

class-member witnesses. Because the evidence establishing that the City engaged in the relevant alleged policies and practices is common to the members of each of the respective damages classes, each of them clearly meets the standard for predominance. *See e.g.*, *Boswell*, 311 F.R.D. at 529–30 (finding predominance where class members' claims could be proven through common evidence and the defendant's "intent and action with respect thereto"); *Perrin v. Papa John's Int'l, Inc.*, No. 4:09CV01335 AGF, 2013 U.S. Dist. LEXIS 181749, at *17 (E.D. Mo. Dec. 31, 2013) (finding predominance and certifying class where class members alleging state wage law violations were all subject to defendant's vehicle reimbursement policy).

Similarly, the dispositive questions of law in this case are susceptible to resolution through common legal analysis because establishing that the City's practices were unlawful does not require the consideration of individual circumstances. *See e.g.*, *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th. Cir. 2016) (finding predominance in an unsolicited advertising case where main questions of law—concerning whether a given fax constituted an advertisement—were common to all class members). For example, once Plaintiffs establish that the City had a policy of keeping people in jail after a warrantless arrest without a neutral finding of probable cause, the question of whether such conduct is unconstitutional can be resolved in one hearing rather than through thousands of proceedings. *See Ellis*, 105 F.R.D. at 560-61 (finding challenge to statute's constitutionality sufficient to certify class of plaintiffs seeking declaratory judgment, among other things, as a means of altering defendants' conduct and pattern of

---

32:11 (noting that a supervisor could approve a bond reduction based on what an inmate indicated he or she was able to pay); *id.* at 126:21-127:4 (Q: (By Mr. Strode) "I believe you told me earlier that bonds would sometimes be reduced when a person communicated to you that they didn't have enough to pay the full amount; is that right?" A: "Correct." Q: "And is it correct that it would be reduced sometimes to the amount that they had available?" A: "Correct."); *id.* at 33:11-20 (stating that during the daytime, correctional or police officers would take booking sheets to the court clerk and "whatever arbitrary process she had of deciding reductions in bond, she granted bond reductions."); *see also* Waldron Decl., Ex. 21 at 37:19-38:11 (confirming that his supervisors were aware that he was involved in lowering bonds at his discretion).

enforcement). The same is true of the City's policies of keeping people in jail after arrest on the basis of predetermined cash bonds without any inquiry into ability to pay or consideration of non-financial alternatives, its practice of jailing people without bringing them before a judge to be arraigned, and its practices of jailing people in unconstitutionally inhumane conditions. Because the dispositive issues of law and fact will be resolved through common evidence, the Damages Classes meet the requirements of Rule 23(b).

That the City's unconstitutional policies and practices may have injured different people to differing degrees does not undermine the conclusion that common issues of law and fact predominate. *See Tyson Foods*, 765 F.3d at 798 n.5 (holding individual damages calculations "permissible if they do not 'overwhelm questions common to the class'" (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013))); *see also Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) ("Common issues—such as liability— may be certified, consistent with Rule 23, even where other issues—such as damages—do not lend themselves to classwide proof."); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)."). For example, while two class members may each have been jailed without an inquiry into their ability to pay until jail staff gave up on squeezing additional funds from them and decided to release them for free, one may have served three days in City jail while the other served only two. This difference in the number of days spent in jail, which may raise or lower damages proportionally, does not in any way affect the critical factual and legal issues common to both of their claims.

a.     **Damages are Easily Determined on a Class-Wide Basis**

Class-wide damages can be ascertained from the City's own arrest and jail records with a straightforward calculation based on loss of liberty. The same type of evidence and calculation methodology predominates class-wide. Dr. Demuth has already determined the appropriate

number of hours of incarceration of several of the damages classes and explained his methodology in his expert report.

In cases involving improper incarceration, courts have consistently found that general damages for the loss of liberty "per se" are separately calculable from any individualized special damages also caused by such illegal confinement (such as loss of a particular person's job or medical problems). *See, e.g.*, *Kerman v. City of New York*, 374 F.3d 93, 125-26, 130-31 (2d Cir. 2004) (holding that a person held illegally is entitled to general damages simply for the loss of liberty—an amount separable from any special damages); *Phillips v. District of Columbia*, 458 A.2d 722, 725 (D.C. 1983) (loss of liberty itself requires damages per se). This method has similarly been used within the Eighth Circuit. *See Maxwell v. Mason*, 668 F.2d 361, 365-66 (8th Cir.1981); *see also Sisneros v. Nix*, 884 F. Supp. 1313, 1345 (S.D. Iowa 1995) ("Courts of [the Eighth Circuit] have been willing to award per diem damages for constitutional violations, as long as those awards were not arbitrary and excessive."), *aff'd in relevant part, rev'd in part on other grounds,* 95 F.3d 749 (8th Cir. 1996).

There are a number of commonly used methods for trying such general, loss-of-liberty damages on a class-wide basis. *See, e.g.*, *Covington v. Wallace*, No. 2:12-CV-123-DPM, 2014 U.S. Dist. LEXIS 146881, at *5-6 (E.D. Ark. Oct. 15, 2014) (certifying 23(b)(3) damages class by finding that a per-diem rate is likely to be useful and "[w]hether the City had a will-call custom or practice can be resolved once for all"); *Betances v. Fischer*, 403 F. Supp. 3d 212, 238 (S.D.N.Y. 2019) (holding that "a class-wide daily damages value may be assessed for each day of incarceration or other restraint of liberty"); *Myatt v. Gladieux*, No. 1:10-CV-64-TLS, 2017 U.S. Dist. LEXIS 32001, at *1-3 (N.D. Ind. Mar. 7, 2017) (jury verdict awarding money to class members based on their length of detention without a probable cause hearing); *Flood v.*

*Dominguez*, 270 F.R.D. 413, 422 (N.D. Ind. 2010) (finding, in classwide conditions claim, "[t]hese factual variations, including the length of a particular class member's detention…speak only to damages, not liability"); *Dellums v. Powell*, 566 F.2d 167, 174 n.6, 188 n.56 (D.C. Cir. 1977) (damages in mass arrest case tried and determined "for the class as a whole or by subclass" based on number of hours or days in custody); *Barnes v. District of Columbia*, 278 F.R.D. 14, 20-21 (D.D.C. 2011) (calculating general, class-wide damages for loss of liberty through a sample of the plaintiffs selected by each party); *Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 174, 177 (E.D.N.Y. 2011) (awarding general damages of $500.00 per unlawful strip search and holding that further special damages must be tried on an individual basis).

**Bearden Class.** Reviewing arrest records, Dr. Demuth determined that particular arrests qualified someone for the *Bearden* Class if the arrestees were solely detained by Ferguson for failure to pay a fine, fee, bond, surcharge, or cost demanded by Ferguson. Excluded from this category are arrests that would be charged in state court and those based only on warrants issued by another jurisdiction.[87] With knowledge of the length of incarceration, Dr. Demuth suggested that a jury could easily award damages in the following method: "For each person in the *Bearden* Class: [$ per hour detained] x [number of hours detained for the arrests meeting criteria for *Bearden* Class] = Class-wide damages for *Bearden* Class."[88] For example, Dr. Demuth determined that there were at least ▮▮▮▮ hours of detention that qualified for this class.[89] Using an example award of $50 per hour detained, class-wide damages for all qualifying arrests are: $50/hour x ▮▮▮▮ hours = $▮▮▮▮.[90]

---

[87] Demuth Report at 9.

[88] *Id*. at 35.

[89] *Id*.

[90] *Id*. at 36.

*Gerstein* **Class.** The *Gerstein* Class covers arrests that qualify someone for the *Bearden* Class but also involved no FTA charges from Ferguson (and therefore did not lead to detention by Ferguson on the basis of a warrant). Dr. Demuth calculated the number of hours of potential class members held past booking, past 24 hours, and past 48 hours.[91] As with the *Bearden* Class, the applicable formula multiplies the number of dollars awarded per hour of detention by the total number of detention-hours that followed qualifying arrests, yielding the class-wide damages for the *Gerstein* Class.[92]

Based on the City's records, there are █████ hours of qualifying detention beyond 24 and █████ hours of qualifying detention beyond 48 hours. Below are sample damages calculations:

a.  All warrantless arrestees: $50/hour x █████ hours = $█████.

b.  All warrantless arrestees held beyond 24 hours: $50/hour x █████ hours = $█████.

c.  All warrantless arrestees held beyond 48 hours: $50/hour x █████ hours = $█████.[93]

**Jail-Conditions Class**. The Jail-Conditions Class, covering everyone held in the Ferguson jail at any time since February 8, 2010, is easily ascertained. According to the City's records, there were █████ arrests resulting in detention in Ferguson's jail, with a total detention time of █████ hours. The calculation is similar to those for the *Bearden* Class, using $15 per hour as a sample award: █████ hours x $15/hr = $█████.[94] In short, class damages are easily calculated for all three damages classes from the City's records using the number of hours individuals spent in detention, and the calculation method is the same for the class as a whole and for each member of

---

[91] *Id.* at 37.

[92] *Id.* at 37.

[93] *Id.* (similar to the *Bearden* Class, some arrest records lacked social security numbers and the sample total calculation using persons is thus slightly smaller).

[94] *Id.* at 38.

the class.

**Warrant and Post-Judgment Classes.** The same methods as described above could easily be used by a finder of fact to award hourly or daily damages to any arrestee held by Ferguson and subject to the constitutional violations described in the Warrant and Post-Judgment Classes.[95] Damages for each of the proposed classes can thus be determined on a class-wide basis.

### b.    The Class Action Is a Superior Vehicle for Adjudicating This Dispute

Rule 23(b)(3) also considers whether class resolution is the superior mechanism for the fair and efficient adjudication of the controversy. *See Downing*, 2015 U.S. Dist. LEXIS 34154, at *24-25. Specifically, Rule 23(b)(3) requires courts to consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." These factors overwhelmingly favor class adjudication of Plaintiffs' claims.

The interest and ability of individual class members to pursue separate actions is limited here. First, as previously noted, *supra* Part II.A, many of the potential class members lack the resources required to litigate claims of this magnitude and complexity. *See Jackson*, 156 F.R.D. at 544 (certifying class and recognizing that it would be "inconceivable that the class members would bring individual actions considering their financial circumstances"); *cf. Abdullah v. Gunter*, 949

---

[95] Alternatively, the damages due Post-Judgment Class members for Count Five—which alleges that the City violated equal protection by imposing unduly harsh and punitive measures on debtors whose creditor is the government compared to debtors with private creditors, *see James v. Strange*, 407 U.S. 128 (1972)—could be based on the amount they paid toward their City debt because of the discriminatory coercion employed by the City. Here, that amount can be determined based on City records of how much money each member of the Post-Judgment Class paid while locked in the Ferguson Jail on a qualifying arrest.

F.2d 1032, 1035 (8th Cir. 1991) (establishing factors for determining whether indigent litigants require appointed counsel, which included factual and legal complexity, and the ability of indigent parties to investigate facts and present a claim).

Second, the individual damages sought by each class member are unlikely to be substantial enough for individual plaintiffs to attract their own attorneys willing to devote the time and energy to litigate the legality of the City's debt-collection scheme, especially given the costs associated with the many stages of such litigation. *See Covenant Care Servs.*, 2016 U.S. Dist. LEXIS 11988, at *29 (finding class mechanism superior "[b]ecause litigation costs would likely exceed any gains from . . . recovery, [so that] class members would be unlikely to litigate individually" (internal quotations omitted)); *see also In re Retek Inc., Sec. Litig.*, 236 F.R.D. 431, 437 (D. Minn. 2006) (finding class action superior because prohibitive costs and sophistication of case would limit the ability of members to litigate individually).

Third, litigating the class members' claims in a single class action is far preferable to the alternative of having proceedings and discovery repeatedly litigated in this Court. Adjudicating the claims in one forum would avoid duplicative results and eliminate the potential for inconsistent judgments. *See Perrin*, 2013 U.S. Dist. LEXIS 181749, at *25-26 ("[A] class action fosters judicial economy and helps to ensure that class members who are otherwise unaware that they possess a claim, or are unable to hire a lawyer, will have their rights represented."); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 566-67 (D. Minn. 2010).

Finally, as noted above, a class action does not present any insurmountable difficulties in management. The proposed classes are ascertainable from incarceration records already in the City's possession, and they are limited in geographic scope (unlike a nationwide, multi-district class containing millions of members). *See Perrin*, 2013 U.S. Dist. LEXIS 181749, at *25 (finding

class mechanism superior because the proposed classes were discrete and easily identifiable, and because adjudicating similar claims and legal theories together would avoid duplicative trials). Indeed, requiring separate individual lawsuits would likely result in far greater manageability problems, such as duplicative discovery (including numerous depositions of the same City officials and repetitive production of documents), repeated adjudication of similar controversies in this Court, and excessive costs.[96] Judicial economy will therefore be better served if the legality of the City's uniform debt-collection scheme is adjudicated in a single class proceeding rather than through a flood of individual suits.

---

[96] The Court also has considerable discretion in designing the most appropriate classes for certification. For example, instead of certifying separate Rule 23(b)(2) and Rule 23(b)(3) classes, the Court could certify a Rule 23(b)(3) class along with a hybrid class of those seeking equitable relief. *See Williams v. Mohawk Indus.*, 568 F.3d 1350, 1360 (11th Cir. 2009) (describing process of certifying class under Rule 23(b)(3) and certifying a hybrid class pursuant to Rule 23(b)(2) and Rule 23(c)(4) for those members of the class who have standing to seek equitable relief); *see also Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 581 (7th Cir. 2000); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999); *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997). Those options may require subtle redefinition of the Classes, which the Court could undertake with the guidance of the parties if it deems such a process appropriate.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully ask this Court to certify the Classes proposed in this Motion.

Respectfully submitted,

Dated: November 19, 2021

*Attorneys for Plaintiffs*

**WHITE & CASE LLP**

By: */s/ Angela Daker*
Angela Daker (*pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Phone: 305-371-2700
Email: adaker@whitecase.com

J. Frank Hogue (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Shannon Lane (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
Phone: 202-626-3623
Email: fhogue@whitecase.com
Email: claire.leonard@whitecase.com
Email: shannon.lane@whitecase.com

Hafsa S. Mansoor (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Phone: 212-819-7670
Email: hafsa.mansoor@whitecase.com

**ARCHCITY DEFENDERS**

Blake A. Strode, #68422MO
John M. Waldron #70401MO
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
Phone: 855-724-2489
Email: jwaldron@archcitydefenders.org

—and—

**CIVIL RIGHTS CORPS**

Marco Lopez (*pro hac vice*)
Ryan Downer (*pro hac vice*)
1601 Connecticut Avenue NW, Suite 800
Washington, DC 20009
Phone: 202-844-4975
Email: marco@civilrightscorps.org
—and—

**SLU LAW CLINIC**
Brendan Roediger (MBE #6287213IL)
John Ammann (MBE #34308MO)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
Phone: 314-977-2778
Email:Brendan.roediger@slu.edu