IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEILEE FANT, ET AL.,

                PLAINTIFFS,

  VS.

THE CITY OF FERGUSON,

      DEFENDANT

CAUSE NO.:  4:15-CV-00253-AGF

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO DISQUALIFY AND EXCLUDE
THE REPORTS AND TESTIMONY OF DR. JUSTIN MARLOWE**

The City of Ferguson offers this memorandum in support of its motion to disqualify and exclude the reports and testimony of Plaintiffs' expert Dr. Justin Marlowe, Ph.D.

**I.      Introduction**

Dr. Justin Marlowe is a Research Professor at the University of Chicago, Harris School of Public Policy, after having previously held the position of Professor of Public Policy at the University of Washington.  He was engaged by the Plaintiffs' counsel in a consulting capacity, with the potential for further disclosure as a testifying expert, which potential was ultimately realized when he was disclosed as a testifying expert witness on October 21, 2020.  Dr. Marlowe claims expertise in various fields pertaining to public administration, but his report particularly emphasizes his claim of expertise in "local government budgeting, fiscal policy, accounting, and financial management."[1]  Accordingly, all of Dr. Marlowe's opinions in this case purport to relate to the City of Ferguson's finances.

Unfortunately, notwithstanding his credentials as a finance policy expert, Dr. Marlowe's opinions in this matter do no serve the adjudication of any actual claims at issue, and are not

---

[1] See Exhibit A Expert Report of Justin Marlowe, October 21, 2020 (hereinafter "Report" or "Marlowe Report").

otherwise justified from a procedural standpoint simply because this matter has been pursued as a class action.  Rather, Marlowe's opinions are clearly designed to achieve one end – to supply an ostensibly authoritative explanation for the motive of the City of Ferguson with respect to Plaintiffs' allegations that "the City of Ferguson's budgeting and financial management policies, including the City's enforcement and collection of fines and fees 'maximize[d] revenues, not justice.'"[2]  Marlowe's opinions therefore, at Plaintiffs' direction, directly and impermissibly purport to speak to the state of mind, intent, motive and credibility of the City.

Additionally, as discussed in greater detail in the Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification,[3] the City's "motive" – even a "fiscal motive" constructed by a historical armchair analysis of City financial operation culled from an incomplete and inapposite selection of largely public data – is not probative of any actual issue in this case.[4]  Moreover, every opinion expressed by Dr. Marlowe ultimately embraces unreliable rote speculation, unhelpful and non-expert commentary on evidence invading the province of the jury, or conclusions on matters of law invading the province of the Court.  Dr. Marlowe's expertise in public policy, while perhaps having its place in the greater social or academic conversation about evolving philosophies of fiscal concerns in local governance, offers nothing of value to a jury in resolving the issues presented in this case on behalf of discrete clients.  On the contrary, were his testimony allowed, its purpose and effect would be to improperly supplant the jury's application of its own mind to the evidence in favor of Dr. Marlowe's own philosophical interpretation of data, which amounts to little more than inadmissible argument.

---

[2] Report at p. 2 (quoting the First Amended Complaint (hereinafter sometimes "Complaint", ECF 53, at ¶¶164-166).
[3] (hereinafter "Class Opposition Memo")(ECF 446).
[4] See ECF 446 at pp. 2-3 and Exhibit A thereto, Declaration of Alexis Miller; see also (Mack's Creek Statute, Mo. Rev. Stat. §302.341.2, replaced by Mo. Rev. Stat. §479.359).

Such an affront on the role of the Court and the jury will unquestionably serve an unfair prejudice and impermissible injustice.

## II.      Standard

The Plaintiffs must establish by a preponderance of the evidence that Dr. Marlowe's opinions are admissible under Federal Rule of Evidence 702. *Missouri State Conference of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1030 (E.D. Mo. 2016), *aff'd,* 894 F.3d 924 (8th Cir. 2018).  The Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As with any other evidence, this Court, in the exercise of its sound discretion, serves as the "gatekeeper," screening proffered expert evidence for relevance and reliability. *See Sappington v. Skyjack, Inc.*, 512 F.3d 440, 448 (8th Cir. 2008) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469 (1993)); see also *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 685 (8th Cir. 2001).  This gatekeeping function is invoked when the Court is presented with a motion to exclude expert opinion and testimony such as the one at bar. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015).  It is therefore this Court's charge not only to ensure that Dr. Marlowe's opinions are assessed for scientific validity, but also to test "whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. (citations, quotes omitted).  It cannot.

In performing its gatekeeping role, this Court should apply the various non-exclusive factors set forth in *Daubert*. *See Lauzon v. Seneco Prod., Inc.*, 270 F.3d 681, 686-687 (8th Cir. 2001) (summarizing the nonexclusive factors set forth in *Daubert*, 509 U.S. at 593-594). The Court should also consider additional factors developed in the wake of *Daubert*, including "whether the expertise was developed for litigation or naturally flowed from the expert's research; **whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case**." *Id*. (emphasis added) Even while applying these (and other) factors, the Court must always consider Fed. R. Evid. 403[5] and therefore **"must guard against invading the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion."** *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d at 725 (emphasis added).

## III.   Argument

Dr. Marlowe describes the scope of his assignment in his Report as follows:

> I have been asked to evaluate and explain: (1) the fiscal policies that were in place in Ferguson from 2008-2018 (the "Analysis Period"); (2) a comparison of Ferguson's fiscal policies to other municipalities in the state of Missouri with similar population sizes; (3) whether Ferguson engaged in a policy of "revenue maximization" and, if so, its incentives to install such a policy; (4) how police enforcement and collection of fines and fees affected Ferguson's financial policies and ability to meet both its short-term and long-term spending needs (referred to herein as Ferguson's financial position); and (5) Ferguson's incentive to continue that policy of "revenue maximization" long after it was initially established. I have been asked to evaluate these issues during the Analysis Period, with emphasis on how Ferguson's fiscal policy context and financial position changed across three distinct time periods: (1) the period preceding the Great Recession (Fiscal Years 2008-2009 (FY08-FY09)); (2) the period of recovery from the Great Recession, when Ferguson's revenue from fines and fees increased considerably

---

[5] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

(FY10-FY14); and (3) the period following Ferguson's civil unrest and the "Investigation of the Ferguson Police Department" issued by the U.S. Department of Justice's Civil Rights Division on March 4, 2015 (the "DOJ Report") (FY15-FY18). I understand that counsel has retained other experts to opine on additional allegations outlined in the First Amended Complaint.

Report at ¶4 (internal citations omitted).  Marlowe then summarizes his opinion as follows:

Based on my review of the evidence in this case developed through discovery, my understanding of Ferguson's fiscal policies, and my expertise in municipal finance policies, I am of the opinion that Ferguson's police-enforced collection of fines and fees exceeded, by orders of magnitude, those of a group of 18 of its peer municipalities, **and reflected Ferguson's pursuit of revenue-maximization uncoupled from any public safety policies**.

Report at ¶ 9 (emphasis added).  He also expresses the following ultimate opinions:

"From FY10-14, Ferguson's collections of fines and fees were consistent with, and in my opinion reflected, **a policy of revenue-maximization**."

Report at ¶10(b) (emphasis added).  These opinions, and Marlowe's basis for providing them, fail the test of *Daubert* in at least the myriad ways discussed below.

### A.  Marlowe's Report and Testimony Should Be Excluded Because His Opinions are Irrelevant to any Claim or Defense in This Case

To be admissible under Rule 702, expert testimony must both reliable *and* relevant.  See generally *Pitlyk v. Ethicon, Inc.*, 478 F.Supp.3d 784, 786 (E.D. Mo. 2020).  Thus, even were Marlowe's opinions reliable (they are not), they must still prove relevant.  *United States v. Reynolds*, 77 F.3d 253, 255 (8th Cir. 1996).  Marlowe's opinions do not meet this threshold standard.

Marlowe's voluminous reporting and testimony, despite all of the discussion of financial concepts and methodologies, ultimately distills into a single ultimate opinion – *that the City of Ferguson was at sometimes reliant upon, and therefore motivated by, the collection of money*

*from fines and fees*.[6]  Yet, nowhere has Marlowe opined – nor is he capable of opining – that any of the arrests in the City of Ferguson were illegitimate, i.e., that those subject to fines or fees were not guilty or their charges "concocted" or "trumped up."  Nowhere does he conclude that they intentionally discriminate uniquely against the indigent.  Instead, he simply concludes that the City's fiscal reliance upon fines and fees for some portion of the class period, as compared to other municipalities (using a common set of financial metrics), evidences a bad motive to emphasize revenue generation.  As such motive is not relevant to any claims in this case, Dr. Marlowe's opinions are equally irrelevant this case, regardless of whatever purported expertise or methodology he employed in conducting the financial analysis portion of his Report and opinions.

As this Court has properly noted, this case is about Plaintiffs' constitutional claims of wealth-based discrimination.  *See* ECF 278, p. 5.  Thus, Marlowe's opinions remain inapposite and irrelevant because his opinions speak only to his conclusion that the City had a financial motivation and aim – *not* that the City intentionally and selectively discriminated against the indigent.  See Report and Supplemental Report, *passim*.  According to Marlowe, the City pursued "revenue maximization" and not intentional discrimination against the indigent.  Thus, Marlowe's conclusions and opinions have no relevance to any claim.  This fact alone should be dispositive of this inquiry and result in Marlowe's total disqualification from this case.

Even still, were this Court to decide that the City's motive or intent were relevant, the problem persists that such intent or motive is not the proper subject of expert testimony. Marlowe, under the guise of providing historical perspective on the City of Ferguson's finances, instead essentially propound improper argument.  *Compare In re Rezulin Prod. Liab. Litig.*, 309

---

[6] Marlowe additionally purports to "opine" on the existence of matters of purported fact; these are not expert opinions.

F. Supp. 2d at 551 ("As plaintiffs' . .. 'historian,' therefore, Dr. Gale 'does no more than counsel for plaintiff will do in an argument, *i.e.,* propound a particular interpretation of [defendant]'s conduct.").   In so doing, Dr. Marlowe's opinions ultimately seek to answer questions that are directed to the jury.  They constitute little more than his own commentary on the evidence rather than useful, reliable and scientific, expert guidance, as discussed in the next subsection.

### B.  Marlowe's Opinions Invade the Province of Jury and Would Only Serve to Confuse the Jury, Waste Time and Unfairly Prejudice the City

Assuming *arguendo* that corporate motive of the City were relevant to any claim,  "[t]he question of corporate motive, intent, knowledge or state of mind is one for the jury, not for an expert." *In re Baycol Prod. Litig.,* 532 F. Supp. 2d 1029, 1069 (D. Minn. 2007).  In this respect (and many others), the Plaintiffs' offering of Dr. Marlowe's opinions in this case is similar to their aim in proffering the testimony of their other expert, Colin Gordon, who similarly purports to offer an irrelevant narrative history of the City of Ferguson improperly aimed at proving motive and intent.  Dr. Gordon's testimony is also subject to a motion to disqualify and exclude (ECF 443), which arguments apply equally to Dr. Marlowe.  See ECF 443 at § III.[7]

Marlowe invades the role of the jury repeatedly, beyond simply matters of intent or motive.  That is, he thoroughly substitutes his own observations, comments and conclusions on evidence and facts that are certainly within the grasp of a juror without the assistance of an expert.  Moreover, he substitutes his own judgment for that of the jury in the course of making these observations.

For instance, Marlowe opines that the City of Ferguson had other revenue streams available to it besides fines and fees, such as increases in sales taxes or property taxes, but did

---

[7] The arguments in ECF 443, particularly in §§ II and III, are equally applicable to Dr. Justin Marlowe and are adopted and incorporated herein by reference.

not take full advantage of those options to the extent allowed by law.[8]  Report at ¶29.  Marlowe

then adds:

> Ferguson's leaders were aware of their comparative non-reliance on property taxes and their comparative dependence on fines and fees.  According to Ferguson's FY09-10 budget, in FY08 property taxes accounted for 6.2% of all revenues.

Report at ¶ 29 (footnotes omitted).  Marlowe does the same with respect to utility taxes,

similarly asserting:

> Ferguson's leaders were aware of the potential for additional utility tax revenues at the beginning of the Analysis Period. But despite that potential for additional revenues to address its looming budget shortfall, Ferguson's leaders instead chose to leave utility tax rates unchanged.

Report at ¶ 33.

No doubt, a jury does not need Dr. Marlowe to interpret City emails.  A jury does not

need Marlowe to tell them that the City was aware of the contents of an email between City

officials.  Unquestionably, a juror can read an email                          and deduce

that the author of the email chose to convey                        .  Likewise, a juror can

look at an email circulated among City employees discussing their tax rates relative to other

cities, or a budget indicating the City's sources of revenue and see where the City derives its

revenue – more importantly, a juror can draw her own conclusions from that data.  Not only does

the jury not require Marlowe's assistance in observing this evidence, but also it does not require

his inappropriate commentary and conclusions relating to such emails.

---

[8] (also invading the province of the Court as discussed in subpart (c), *infra*)

Yet, Dr. Marlowe's own motive and intent in offering his construction of evidence is clear – to insist to the jury that Ferguson *should have*, as a matter of duty, law or some unexplored, unarticulated or inapplicable standard, pursued raises in sales, property or utility taxes, and that its reliance on fines and fees was somehow culpably disproportionate  - despite the fact that Missouri state law imposes limits on the amount of revenue a municipality may derive from municipal courts (Mack's Creek Statute, Mo. Rev. Stat. §302.341.2, replaced by Mo. Rev. Stat. §479.359), and the revenue generated by the Ferguson Municipal Court was always well within the limits imposed by these statutes. (ECF 446 at Ex. A, Declaration of Alexis Miller).  Even assuming *arguendo* that the City was actively working to increase municipal fine revenue, there is no prohibition on such practice so long as it complied with state statutes.[9]  Nevertheless, Dr. Marlowe insists on his narrative conclusions and placing his own stamp on the evidence.

Marlowe's agenda is evident in the very title to this section of his report, in which he frames the issue in terms of "neglect" on the part of the City, stating: "Ferguson's Fiscal Policy Response to the Great Recession **Neglected** Voter-Approved Taxes in Favor of Fines and Fees." Report at § IV(B) (emphasis added).  Even assuming that the availability of other revenue streams to the City through taxes or its revenue streams compared to other municipalities is probative of any claim in this case (it is not), and even assuming that the City was not in compliance with the Mack's Creek Statute (it was), it is for the *jury* to conclude for itself the implications and import of this evidence.  Indeed, if anything, Marlowe's Report, Supplemental Report and testimony only belabor much simpler points that a jury could resolve without digesting the inapposite torrent of jargon and historical narrative that Marlowe offers.  "The

---

[9] As Jeff Blume testified, the fines and fees were based on the obvious public safety needs to deter speeders, maintain the quality of life for Ferguson residents, and non-Ferguson residents were the primary violators. "They go hand-in-hand" (Ex. B, Blume Depo, pp. 201, 204).  Thus, the fact that fines and fees likewise generated revenue for the City—revenue that comported with the cap placed by the Mack's Creek Statute—is of no moment.

touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010) (citations omitted).  Simply telling the jury what to conclude from the evidence does not qualify as such assistance. *Id*. at 809.

Moreover, if Marlowe's opinions are allowed, they will sidetrack the case into a mini trial on the issue of the overall propriety of the City's fiscal policies.  Such a  question is so removed from the salient constitutional questions in this case that it would serve only to distract from and confuse the case.   Whether the City of Ferguson could have raised taxes has absolutely nothing to do with whether or not an indigent person received an indigence analysis or was held for a reasonable period of time.  Marlowe's testimony and opinions serve one end – to vilify the City of Ferguson by implanting the suggestion in the jury's minds that its fiscal policies were "wrong."  It does not take much imagination to see how such a suggestion will evolve into supplying the wrongful notion to the jury that these allege failing also amount to constitutional violations.  Such evidence wastes time, misleads the jury, confuses the issues, and unfairly prejudices the City, all in violation of Fed. R. Evid. 403.

## C.  Marlowe's Opinions Invade the Province of the Court

"Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citation omitted).  Yet, Dr. Marlowe repeatedly breaches this role.  As discussed in subpart (B), *supra*, Marlowe offers his own explanation of Missouri Tax law, purporting to educate the jury on the various taxes available to Ferguson pursuant to Missouri statute.  See, e.g., Report at ¶ 22 and FNs 31-36, citing multiple tax statutes.  He also offers an interpretation

of the "Hancock Amendment" to the Missouri constitution in a discussion on property tax revenue limitations.  Report at ¶ 28.

Marlowe's point in discussing these various laws is a continuance of his theme of what Ferguson "could have" done to raise revenue, i.e., what it was *authorized to do at law*.  Not only does he improperly attempt to instruct the jury on interpretation of the law, but he also goes a step further by implying some culpability on the part of the City by not, in his estimation, exercising its rights under such laws; for example:

> The City's "real options to increase revenue" were in fact much broader than the fines- and fees-focused options that the City's leadership emphasized.  Those options included: (1) seeking voter approval of a new sales tax or property tax and/or an increase in the tax rate on existing sales taxes and property taxes; and (2) revenue enhancements that did not require voter approval, such as new utility taxes.  *Ferguson by and large ignored these options*.  From FY10-14, while the City's fines and fees revenue increased by double-digit annual percentages, the tax instruments it employed and the tax rates at which it employed them did not change.

Report at ¶ 13 (emphasis added).  Marlowe's interpretation of law and suggestions of what legal options Ferguson *could have* or *should* have explored confuses the legal issues, invades the province of the Court, and is not the proper subject of expert testimony.

### D.  Marlowe's Methodology is Unreliable

#### 1.   Reliance on Inapposite Data from Other Municipalities; Absence of Connection Between Opinion and Data

Marlowe's methodology essentially consists of comparing Ferguson's financial position to other "peer municipalities" while drawing conclusions about Ferguson's fiscal motivations from, chiefly, any deviations between Ferguson's financial position and those of the "Peer Comparison Group."  Report at § V.  The methodology espoused by Marlowe for this purpose is what he identifies as an industry standard "Ten-Point Test"[10] which generally generates different

---

[10] Marlowe admits that there are multiple versions of this test, applying different ratios.  Report at ¶¶ 47, 48.

ratios of financial data points categorically indicating, among other things, a city's "(1) operating position; (2) profitability (i.e. surplus or deficit); (3) solvency discussed; and (4) capital assets." Report at ¶¶ 51.  In order to make this comparison, Marlowe selected 18 different Missouri municipalities for the Peer Comparison Group, and culled their financial data from publicly available comprehensive annual financial statements ("CAFRs") for the years 2008-2018, as indicated by the following chart from Marlowe's report:

| Jurisdiction | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Belton | X | X | X | X | X | X | X | X | X | X | X |
| Creve Coeur | X | X | X | X | X | X | X | X | X | | |
| Farmington | | | | | | | | X | X | X | X |
| Ferguson | X | X | X | X | X | X | X | X | X | X | X |
| Gladstone | X | X | X | X | X | X | X | X | X | X | X |
| Hazelwood | X | X | X | X | X | X | X | X | X | X | X |
| Kirksville | | X | X | X | X | X | X | X | X | X | X |
| Kirkwood | X | X | X | X | X | X | X | X | | | X |
| Lake St. Louis | X | X | X | X | X | X | X | X | X | X | X |
| Manchester | X | X | X | X | X | X | X | | X | X | X |
| Maryland Heights | X | X | X | X | X | X | X | X | X | X | X |
| Nixa | X | X | X | X | X | | X | X | X | X | X |
| Ozark | | | | | | X | X | X | X | X | X |
| Poplar Bluff | | | | | X | X | X | X | X | X | |
| Raymore | | X | | X | X | X | X | X | X | X | X |
| Sikeston | | | | X | X | X | X | X | X | X | X |
| Warrensburg | X | X | X | X | X | X | X | X | X | X | X |
| Webster Groves | X | X | X | X | X | X | X | X | X | X | X |

Source: Comprehensive Annual Financial Reports, FY2008 - FY2018

Report at ¶ 50.

The criteria for Marlowe's selection of the Peer Comparison Group was driven by population size.  While Marlowe claimed that other factors were reflected, they were clearly not part of any formula, calculus, methodology or scientific technique that he employed, but were only incidental; moreover, they are not, by his own admission, "explicitly reflected" in Marlowe's Report.  Marlowe Deposition (excerpts), Exhibit B at p. 111 line 13 – p. 115 line 19. By relying on vague and oblique references to "a variety of other characteristics" of the "composition of the tax base for a jurisdiction" without actually supplying those characteristics or the methodology for considering them, Marlowe ostensibly places his selection of the Peer

Comparison Group beyond any meaningful critique; but as a consequence, it also lacks support and is clearly unreliable.

Moreover, Marlowe plainly admitted that his criteria did not expressly include obviously relevant data such as crime rate, but instead he took for granted, without any support whatsoever, that it was implied in the financial data.  Marlowe Deposition, Exhibit B at p. 141 line 16 – p. 148 line 4.   Marlowe has failed to scientifically or methodically consider the impact of crime rates and what explanation such obviously relevant data would have on Ferguson's law enforcement efforts, including the collection of fines and fees.  He insists that the Court and jury believe that such considerations are baked into the data simply because he says so.   His avoidance of direct engagement with this data conveniently allows him to avoid discussion of alternative explanations for Ferguson's enforcement data that don't comport with his own narrative.  *See Lauzon v. Seneco Prod., Inc.*, 270 F.3d 681, 686-687 (8th Cir. 2001).  Marlowe has presented no evidence that his selection of the Peer Comparison Group is the product of the application of any reliable scientific or technical methodology; generally, he selected cities based on size.

Marlowe's employment of the "Ten Point Test" certainly supplies a veneer of expertise, but is ultimately merely a mechanism to attempt to arrive at the financial data whereby he compares Ferguson to the "Peer Comparison Group" and supplies his own interpretations of the meaning of such data.  Even were Marlowe's expertise in the assemblage of such financial data beyond any dispute, he nevertheless falls conspicuously short in any attempt to summon his expertise to connect the resulting financial data, and Ferguson's comparison to other cities, to his ultimate opinion that Ferguson pursued revenue maximization uncoupled from any public safety concerns.  Report at ¶ 9.

In large part, Marlowe's report and opinions essentially parrot the DOJ Report and prior studies or publications that he contends support his narrative and, citing deviations from the "Peer Comparison Group, merely asserting or implying that Ferguson's practices were consistent with the findings of those studies. There is no methodological or scientific connection between the data and Marlowe's conclusions – only his own words. "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997). Marlowe has not, through the presentation of any reliable technical or scientific methodology, sufficiently connected his opinions with the data. *Lauzon v. Seneco Prod., Inc.*, 270 F.3d 681, 686-687 (8th Cir. 2001).

## 2. Reliance on the DOJ Report

One of the key premises of Marlowe's reports and opinions is what he advances as a correlation between the issuance of the DOJ Report and a decline in the City's fee revenue. See, e.g., Report at ¶ 10(c) ("After the Michael Brown shooting and the DOJ Investigation, Ferguson's revenue from fines declined by more than 72% from 2013 through 2016"); and Supplemental Report at ¶¶ 14-16. Even assuming this correlation to be not only accurate, but also reliably indicative of the notion that the DOJ Report itself (and not other reforms and circumstances presented at the same time) was the impetus for this change, Marlowe and the Plaintiffs attempt to weaponize this data by advancing that this later remedial measure is indicative of prior culpable conduct by the City. This is expressly prohibited under the rules of evidence. "When measures are taken that would have made an earlier injury or harm less likely

to occur, evidence of the subsequent measures is not admissible to prove…culpable conduct." Fed. R. Evid. 407.

In addition to making the DOJ Report a pivotal temporal juncture in his analysis, Marlowe specifically and repeatedly invokes the DOJ report as support for his own conclusions. For example, Marlowe emphasizes that the "DOJ Report was published in March 2015 and was sharply critical of Ferguson's growing dependence on fines and fees as a source of revenue." Report at ¶ 14.  Marlowe even adopts wholesale characterizations of evidence and conclusions directly from the DOJ report:

> [55.] Ferguson's increase in fines and fees bolstered liquidity by making more discretionary revenues immediately available.  According to the DOJ Report,
>
> Similarly, in March 2011, Ferguson's Police Chief reported to the City Manager that court revenue in February was $179,862.50, and that the total "beat our next biggest month in the last four years by over $17,000," to which the City Manager responded: "Wonderful!" In a June 2011 email from Chief Jackson to the Finance Director and City Manager, the Chief reported that "May is the 6th straight month in which court revenue (gross) has exceeded the previous year."  The City Manager again applauded the Chief's efforts, and the Finance Director added praise, noting that the Chief is "substantially in control of the outcome."  The Finance Director further recommended in this email greater police and judicial enforcement to "have a profound effect on collections."  Similarly, in a January 2013 email from Chief Jackson to the City Manager, the Chief reported: "Municipal Court gross revenue for calendar year 2012 passed the $2,000,000 mark for the first time in history, reaching $2,066,050 (not including red light photo enforcement)."  The City Manager responded: "Awesome! Thanks!" In one March 2012 email, the Captain of the Patrol Division reported directly to the City Manager that court collections in February 2012 reached $235,000, and that this was the first month collections ever exceeded $200,000.  The Captain noted that "[t]he [court clerk] girls have been swamped all day with a line of people paying off fines today. Since 9:30 this morning there hasn't been less than 5 people waiting in line and for the last three hours 10 to 15 people at all times."  The City Manager enthusiastically reported the Captain's email to the City Council and congratulated both police department and court staff on their "great work."
>
> [56.] These quotes demonstrate that Court fines and fees bolster liquidity.

Report at ¶¶55-56 (internal footnotes omitted).  Marlowe also heavily relies on the DOJ report to advance his conclusion that Ferguson's revenue pursuit was "uncoupled from" public safety concerns:[11]

> [89.]  In the aftermath of the Great Recession, Ferguson's financial leaders encouraged municipal court policies and enforcement practices that generated more revenue without subsequent increases in public safety spending.  According to the DOJ Report:
>
> In a February 2011 report requested by the City Council at a Financial Planning session, the Finance Director reported on "efforts to increase efficiencies and maximize collection" by the municipal court. The report included an extensive comparison of Ferguson's fines to those of surrounding municipalities and noted with approval that Ferguson's fines are "at or near the top of the list."  The chart noted, for example, that while other municipalities' parking fines generally range from $5 to $100, Ferguson's is $102. The chart noted also that the charge for "Weeds/Tall Grass" was as little as $5 in one city but, in Ferguson, it ranged from $77 to $102. The report stated that the acting prosecutor had reviewed the City's "high volume offenses" and "started recommending higher fines on these cases, and recommending probation only infrequently."  While the report stated that this recommendation was because of a "large volume of non-compliance," the recommendation was in fact emphasized as one of several ways that the code enforcement system had been honed to produce more revenue.

Report at ¶ 90 (internal footnotes omitted).

Marlowe explicitly relies on conclusions in the DOJ report to bolster his own conclusions.  He requires the jury to adopt certain conclusions of the DOJ report, bolstered by his academic endorsement.  However, as another Court in this District has aptly observed, the DOJ Report "lacks a proper indicium of reliability to be used in support of summary judgment and contains inadmissible hearsay… was clearly prepared in anticipation of litigation and by a biased preparer…. [and] contains inadmissible legal conclusions." See *Watson v. Boyd*, 447 F. Supp. 3d 924, 935 (E.D. Mo. 2020).  Marlowe's clear reliance on the DOJ report renders his own report and opinions that much less reliable.

### 3.  Admitted Unreliability

---

[11] Report at ¶9

16

Marlowe undermines his own reliability.  He repeatedly suggests that the City of Ferguson *could have* raised taxes to generate revenue, and implies that it *should have*. However, he has not demonstrated how raising taxes would have benefitted the Plaintiffs or impacted fine and fee collection.  In fact, when asked directly about this very matter in deposition, Marlowe was conspicuously non-committal:

> Q.    Are you offering the opinion that had Ferguson implemented during the time period discussed in section 4 of your report, that had Ferguson imposed the taxes that you've identified in here, that it would have improved Ferguson's fiscal position or financial health in such a way that it would have resulted in a decrease in reliance on fines and fee revenue?

> A.    I think the best answer I can give is that the opinion that I offered is the opinion that I offered, that in section 4, in particular, describe what Ferguson could have done, what they didn't do, and what they ultimately did.   I do offer an opinion about how Ferguson's imposition of fines and fees and the increase in Ferguson's fines and fees, which was orders of magnitude greater than its peer municipalities, considerably improved its financial position and how, once those fines and fees revenues decreased after the DOJ report and subsequent events, its financial position deteriorated considerably.   A counterfactual about what the imposition of other property sales or other taxes may have done again would depend on the specific tax in question, any other accompanying fiscal policy changes, so on and so forth.   My opinions are about what happened, and if you want to talk about hypotheticals, we can do that with an eye toward maybe some more specificity in the hypotheticals.

Marlowe Deposition, Exhibit B at p. 181 line 20 – p. 182 line 24.  Thus, when asked whether increased taxes would have resulted in a decreased reliance on fine and fee revenue, Marlowe could not answer.  Yet the Plaintiffs intend to present this sort of hopelessly unhelpful testimony to a jury, testimony that was the "best answer" that Marlowe could give.

Marlowe's conclusions and suggestions that Ferguson should have raised taxes is anything but settled in the field of public policy.  Marlowe himself, when not undertaking his charge in this case, much more plainly acknowledged disagreement among scholars over who bears the highest burden of local tax bills in a June 2017 column that he wrote entitled  *"Who*

17

*pays the local tax bill?   There's disagreement over who bears the biggest burden, the poor or the*

*wealthy*."  Marlowe Deposition, Exhibit B at p. 184 line 15 – p. 189 line 24.  Yet, when asked in

deposition "Is it true that there is disagreement among scholars on governmental fiscal policy

over who bears the burden of taxes?" Marlowe responded as follows:

> A.     I wouldn't characterize it as disagreement. There's certainly a broad
> literature on different types of taxes, and there are different theoretical
> perspectives and different empirical methods to try to measure and evaluate the
> incidence of different kinds of taxes, and within that, there are certainly
> disagreements about theories and methods as there is with most other lines of
> academic inquiry.   So again disagreements, it really depends on the specific issue
> at hand or the specific part of the literature or the specific tax, but I think it is fair to
> say that tax policy scholars do have differences of opinion about lots of different
> parts of the things that they study.
>
> Q.     But specifically with respect to local taxes, and let's just use property tax
> as an example, is there a scholarly disagreement among who ultimately bears the
> burden  of those kinds of local property taxes?
> …
>
> A.     Well, we keep talking about this in terms of a disagreement, and again
> there are -- there are subtle differences of opinion and, you know, different types
> of disagreements over methods and conclusions and findings, and some of those
> have to do with, you know, the ultimate conclusion about the relative degrees of
> incidence of different taxes.  So I think it's an oversimplification to say there's a
> disagreement.  Scholars have a variety of opinions on these questions and that
> variety of opinion is around.  They study the issue, some of that variation is
> around.  The conclusions from those studies, there's going to be difference of
> opinion in how to study it and how to interpret conclusions.

Marlowe Deposition, Exhibit B at p. 183 lines 4-23, 25 – p. 184 line 14.

Marlowe was then presented and questioned about his column.  Marlowe Deposition,

Exhibit B at p. 184 line 15 – p. 189 line 24.   Marlowe testified in part that, in his column, he

described how public perception of fairness and affordability impacts public support for taxes,

but again avoided meaningful engagement when he was presented the following hypothetical –

despite having ostensibly specifically welcomed hypotheticals earlier in his testimony:

Q.      If Ferguson had considered the local property tax as you set out in section of your report, would you expect any debate or discussion or effort to entertain such a tax to bring with it the type of considerations or disagreement that are referenced here in your article that's Exhibit L?

…

A.      You know, that's going to depend on how Ferguson and Ferguson's citizens will respond to that, and it would depend on how a tax increase was presented to them.  Again, part of the reason that I wrote that column was because a big part of the trend that I was seeing and that I think we're seeing in public finance generally is that the perception of fairness and the perception of affordability is very important and has a big impact on whether or not citizens ultimately are willing to support different kinds of fiscal policy choices, and so that perception is going to be driven, in part, in large part, by how a tax is presented to taxpayers and whether or not affordability advocates or other kinds of advocates for different ways of thinking about tax policy may or may not engage that debate, again is going to depend in part on the specifics of how that tax increase is or is not presented.  To the extent that Ferguson is like communities where the affordability question is something that citizens are talking about, which again, it's hard to know hypothetically, but that could potentially be something you would see in Ferguson, but again, it would depend entirely on what information they were given to inform those perceptions and ultimately inform those opinions.

Marlowe Deposition, Exhibit B at p. 187 line 5 – p. 188 line 14.  Marlowe could have more concisely answered this question by stating "I don't know."  Ultimately, his suggestion that taxes could or should have been raised is subject to his speculation that taxes subject to voter approval would have been met with public support – which support he admits he cannot forecast.

In sum, despite a report that commits significant effort to explaining Ferguson's financial position, comparing it with other municipalities, and repeatedly suggesting that Ferguson "ignored" or "neglected" its supposed legal option to raise taxes, when presented with the straightforward question of whether such tax would have resulted in a decreased reliance on fine and fee revenue, Marlowe could not answer.  When asked about his own published observations that the burden of such tax increases was the subject of scholarly debate, he hedged.  When asked whether he would expect such debate had Ferguson pursued the path that he so clearly endorsed, he again provided a completely generic "it depends" response, effectively admitting

that he could not provide a reliable response.  Such generic and disengaged testimony serves only a tactical avoidance of the expert to engage challenges to his conclusions or the consideration of alternatives.

While Marlowe so very clearly has no reservation about raising myriad "questions," about what fiscal alternatives Ferguson could have exercised, and implying culpability on the part of the City for not pursuing such alternatives, he certainly offered no answers as to what impact would have resulted if they had – particularly to the benefit of any Plaintiff.  Marlowe's questions and speculations likewise offer no answers, guidance or direction to a jury, and amount to a blaring tacit admission that they are unreliable.

### E.  Marlowe Supplemental "Rebuttal" Report

On October 13, 2021, Plaintiffs produced a "Supplemental Expert Report of Justin Marlowe."[12]  The report was expressly requested by Plaintiffs in response to certain testimony elicited from the former City of Ferguson Finance Director and Interim City Manager Jeffrey Blume:

> "In light of deposition testimony from Jeffrey Blume on May 18, 2021, Ferguson's former Finance Director and Interim City Manager,2 which occurred after my October 21, 2020 Opening Report and November 18, 2020 deposition, Counsel asked me to supplement my previous report."

Supplemental Report at ¶ 3.

Jeffrey Blume had been previously endorsed as a non-retained expert by the City, but that endorsement was expressly withdrawn on March 17, 2021 prior to his May 18, 2021 deposition. Regardless, Marlowe's Supplemental Report suffers the same critical failings as his original Report.  Additionally, it serves not simply to rebut any of Blume's critiques of Marlowe's purported expert methodology, but also Marlowe's attempt to comment upon and undermine the

---

[12] See Exhibit C, "Supplemental Expert Report of Justin Marlowe," dated October 13, 2021 (hereinafter "Supplemental Report").

credibility of Blume's testimony.  Supplemental Report, *passim*.  This is not proper rebuttal, and further invades the province of the jury.  *See, e.g., RightCHOICE Managed Care, Inc. v. Hospital Partners, Inc.*, No. 5:18-cv-06037-DGK, 2021 WL 3627938, at * 3 (W.D.Mo. Aug. 16, 2021); and *Westcott v. Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995) ("[A]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility. Nor may an expert pass judgment on a witness' truthfulness in the guise of a professional opinion.") (citations and quotations omitted).

### F.  Marlowe's Report Should Be Stricken For Its Effort to Interject Issues of Race

Despite the Plaintiffs' repeated efforts to interject race issues into this case, this Court has previously acknowledged and ruled that race is not an issue in this case – rather that Plaintiffs' claims assert "wealth-based" discrimination.[13]  *See* ECF 278, p. 5 ("With respect to the alleged racist search terms, the Court agrees with the City that most of the search terms are minimally, if at all, relevant to Plaintiffs' claims, which assert wealth-based rather than race-based discrimination.").  Yet, Marlowe continues Plaintiffs' inappropriate effort by offering irrelevant opinion and unfounded speculation concerning issues of race.

For instance, as part of Marlowe's broader effort to advance inapposite themes through reference to other studies, none of which are the product of Marlowe's own expertise and some of which themselves consist of purported meta-analysis of yet other studies, Marlowe observes:

> Moreover, other studies have shown that using fines and fees as a revenue generation tool to offset municipal financial challenges can create an environment that is conducive to various forms of discrimination. For instance, a 2019 study found that local fines and fees revenues increase faster with drug-related arrests of blacks and Hispanics than with whites' drug arrests.  That study also found that arrests and asset seizures of blacks and Hispanics increase during periods of local

---

[13] (Notwithstanding the Plaintiffs' efforts to pivot from these claims by including non-indigent individuals in their proposed classes, which is addressed more fully in Defendant's response in opposition to Plaintiffs' motion to certify classes (ECF 446)).

fiscal stress, and when municipal court rules allow local officials to keep more
revenues from forfeited property.

Report at ¶ 93 (citing, among others Akheil Singla, Charlotte Kirschner & Samuel B. Stone,

*Race, Representation, and Revenue: Reliance on Fines and Forfeitures in City Governments*, 56

URB.AFF. REV. 1132, 1134 (2019); and Michael D. Makowsky, Thomas Stratmann & Alex

Tabarrok, *To Serve and Collect: The Fiscal and Racial Determinants of Law Enforcement*, 48 J.

LEGAL STUD. 189, 189 (2019)).  Thus, Marlowe not only merely reports what other studies

have purportedly observed, but then also attempts to draw comparisons to Ferguson with the

obvious purpose of interjecting a racial component into this case.  The Court must once again

reject this transparent effort of the Plaintiffs to stray from the claims at issue, and reject and

strike all testimony, observation or opinion of Marlowe concerning race.

## G.  Conclusion

Dr. Marlowe is a policy-oriented academic, in the business of researching and seeking to

influence policy through his teachings on matters of financial strategy for public managers.

However, it is clear that his use in this case is an attempt to reverse-engineer and assign motive

to the City of Ferguson from an ostensibly academic review of its finances.  However, much of

Dr. Marlowe's opinion and reporting is based on his own characterization of evidence, which is

not the product of a scientific methodology, but his personally held opinion about the state of

mind of the City of Ferguson implied by the data that he curated from largely public sources and

the DOJ Report. [14]  He does not purport to assist the jury, but instead to tell the jury how to feel

about the City of Ferguson, and what conclusions the it should draw from the evidence of the

City's financial position.  While this may be the proper role for a teacher of financial strategy for

---

[14] Marlowe, again with a heavy emphasis on the DOJ Report, invokes Ferguson in the opening chapter of his open-source textbook, "Financial Strategy for Public Managers."  See Exhibit D (a 15-page excerpt) at pp. 8-9.

public managers, it is not the proper role and function of an expert under Rule 702, and in multiple respects violates Rule 403.

For the foregoing reasons, the report and opinions of Plaintiff's expert Dr. Justin Marlowe should be excluded.

Respectfully submitted,

*/s/ Blake D. Hill*
Blake D. Hill          #58926MO
Hellmich, Hill & Retter, LLC
1049 North Clay Avenue
St. Louis, MO 63122
314-646-1110 – Phone
314-646-1122 – Fax
blake@hellmichhillretter.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was filed with the Court's electronic filing system, with notice of case activity to be generated and sent electronically by the Clerk of said Court on the 21st day of January, 2022, to all counsel of record.

*/s/ Blake D. Hill*

23