**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEILEE FANT, et al. | ) | |
| | ) | Case No. 4:15-CV-00253-AGF |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF FERGUSON, | ) | |
| | ) | <u>ORAL ARGUMENT REQUESTED</u> |
| Defendant. | ) | |
| | ) | |

<u>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**</u>

## <u>TABLE OF CONTENTS</u>

I.   Plaintiffs Have Standing to Bring Class Claims ........................................................... 1

II.   The Proposed Damages Classes Satisfy Rule 23 and Are Ascertainable ............................... 3

  A.  *Bearden* Class ....................................................................................................... 3

    1.   Commonality, Predominance, and Superiority of the *Bearden* Class ............................ 3

    2.   Ascertainability of the *Bearden* Class ............................................................... 19

    3.   Typicality of the *Bearden* Class Representatives ................................................. 20

  B.  Gerstein Class ...................................................................................................... 21

  C.  Jail-Conditions Class ............................................................................................. 24

  D.  Warrant Class ...................................................................................................... 27

  E.  Post-Judgment Class ............................................................................................. 29

III.   Plaintiffs' Prospective Claims Are Not Moot ............................................................ 31

IV.   The City Again Misinterprets Plaintiffs' Claims and Misrepresents Its Policymaking Authority in an Attempt to Re-Litigate Its Failed Motions to Dismiss ........................................ 32

 V.   Conclusion ...................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aichele v. City of Los Angeles,*
    314 F.R.D. 478 (C.D. Cal. 2013) ...........................................................................19

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    568 U.S. 455 (2013) ..............................................................................................27

*Anderson v. Mt. Clemens Pottery Co.,*
    328 U.S. 680 (1946) ..............................................................................................14

*Ansoumana v. Gristede's Operating Corp.,*
    201 F.R.D. 81 (S.D.N.Y. 2001) .............................................................................20

*Armstrong v. Squadrito,*
    152 F.3d 564 (7th Cir. 1998) ...........................................................................27, 28

*Avritt v. Reliastar Life Ins. Co.,*
    615 F.3d 1023 (8th Cir. 2010) .................................................................................1

*Ball v. Wagers,*
    795 F.2d 579 (6th Cir. 1986) .................................................................................24

*Barker v. FSC Sec. Corp.,* 133 F.R.D. 548 (W.D. Ark. 1989) .......................................9

*Bearden v. Georgia,*
    461 U.S. 660 (1983) ..........................................................................................5, 16

*Bennet v. Nucor Corp.,*
    656 F.3d 802 (8th Cir. 2011) .................................................................................25

*Brewer v. Chauvin,*
    938 F.2d 860 (8th Cir. 1991) ...................................................................................8

*Bridging Communities Inc. v. Top Flite Fin. Inc.,*
    843 F.3d 1119 (6th Cir. 2016) ...............................................................................13

*Cain v. City of New Orleans,*
    327 F.R.D. 111 (E.D. La. 2018) ..............................................................................5

*Carey v. Piphus,*
    435 U.S. 247 (1978) ............................................................................................5, 7

*Chortek v. City of Milwaukee,*
    356 F.3d 740 (7th Cir. 2004) .................................................................................13

*Cody v. City of St. Louis*,
  No. 4:17-CV-2707, 2021 U.S. Dist. LEXIS 195674 (E.D. Mo. Oct. 12, 2021).......................2

*Cody v. City of St. Louis*,
  No. 4:17-CV-2707 AGF, 2021 U.S. Dist. LEXIS 245380 (E.D. Mo. Dec. 27, 2021) ...........26

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................................................................................7

*Covington v. Wallace*,
  No. 2:12-cv-123-DPM, 2014 U.S. Dist. LEXIS 146881 (E.D. Ark. Oct. 15, 2014).............25

*Cruz v. Dollar Tree Stores, Inc.*,
  No. 07-2050, 2009 WL 1974404 (N.D. Cal. July 2, 2009), *modified in part on other
  grounds*, 270 F.R.D. 499 (N.D. Cal. 2010).........................................................................19

*Cty. of Riverside v. McLaughlin*,
  500 U.S. 44 (1991).....................................................................................................6, 10, 11

*Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595 (8th Cir. 2020), *cert.
  denied sub nom. Cent. Payment Co., LLC v. Custom Hair Designs by Sandy, LLC*,
  142 S. Ct. 426 (2021).........................................................................................................7, 21

*D.C. v. County of San Diego*,
  2017 WL 5177028 (S.D.Cal., Nov. 7, 2017) ...................................................................19, 26

*Day v. Celadon Trucking Servs.*,
  *Inc.*, 827 F.3d 817 (8th Cir. 2016) .................................................................................14, 18

*Dixon v. City of St. Louis*,
  No. 4:19-CV-0112-AGF, 2021 WL 616153 (E.D. Mo. Feb. 17, 2021) ............................4, 21

*Doe v. Angelina Cnty.*,
  733 F. Supp. 245 (E.D. Tex. 1990)........................................................................................5

*Eddleman v. Jefferson County, Ky.*,
  96 F.3d 1448, 1996 WL 495013 (6th Cir. 1996) ..................................................................9

*Eid v. Alaska Airlines, Inc.*,
  621 F.3d 858 (9th Cir. 2010) ................................................................................................9

*Escobedo v. Applebees*,
  787 F.3d 1226 (9th Cir. 2015) .............................................................................................16

*Flood v. Dominguez*,
  No. 2:08 CV 153 PPS PRC, 2011 U.S. Dist. LEXIS 6754 (N.D. Ind. Jan. 21, 2011)...........26

*Galarnyk v. Fraser*,
  687 F.3d 1070 (8th Cir. 2012) ..............................................................22

*Garrison v. Asotin Cty.*,
  251 F.R.D. 566 (E.D. Wash. 2008)........................................................28

*Gerstein v. Pugh*,
  420 U.S. 103 (1975).........................................................................9, 13

*Goings v. Chickasaw Cty.*,
  No. C06-2063-LRR, 2008 WL 11510710 (N.D. Iowa Apr. 8, 2008)....................16

*Granda v. City of St. Louis*,
  472 F. 3d 565 (8th Cir. 2007) ..............................................................37

*Granda, Williams v. City of Sherwood*,
  947 F.3d 1107 (8th Cir. 2020) ..............................................................37

*Hamilton v. City of Hayti, Missouri*,
  948 F. 3d 921 (8th Cir. 2020) ..............................................................37

*Hart v. Rick's NY Cabaret Int'l, Inc.*,
  967 F. Supp. 2d 901 (S.D.N.Y. 2013)......................................................20

*Hendricks v. Total Quality Logistics, LLC*,
  Case No. 10-cv-649, 2015 U.S. Dist. LEXIS 195049 (S.D. Ohio Mar. 30, 2015)................20

*Hutto v. Finney*,
  437 U.S. 678 (1978)...........................................................................25

*In re Nassau Cnty. Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006)................................................................13

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)....................................................................8

*In re Williamson*,
  786 F.2d 1336 (8th Cir. 1986) ..............................................................16

*Johnson v. Lark*,
  365 F. Supp. 289 (E.D. Mo. 1973)..........................................................24

*Lacy v. Cook Cnty.*,
  897 F.3d 847 (7th Cir. 2018) ...............................................................9

*McKeage v. TMBC, LLC*,
  847 F.3d 992 (8th Cir. 2017) ..............................................................29

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ................................................................................................8

*Orvis v. Spokane Cty.*,
    281 F.R.D. 469 (E.D. Wash. 2012)........................................................................28

*Park v. Forest Serv. of U.S.*,
    205 F.3d 1034 (8th Cir. 2000) ................................................................................2

*Portis v. City of Chicago*,
    613 F.3d 702 (7th Cir. 2010) ................................................................................12

*Roy v. Cty. of Los Angeles*,
    No. CV1209012ABFFMX, 2018 WL 3435417 (C.D. Cal. July 11, 2018) ...........18

*Sampson v. Knight Transp., Inc.*,
    No. C17-0028-JCC, 2021 U.S. Dist. LEXIS 104802 at *9–10 (E.D. Tenn. Dec. 3, 2007)....20

*Smith v. Copeland*,
    87 F. 3d 265 (8th Cir. 1996) ................................................................................25

*Stuart v. State Farm Fire & Cas. Co.*,
    910 F.3d 371 (8th Cir. 2018) ..................................................................................8

*Thomas v. Baca*,
    No. CV 04-08448 DDP SHX, 2012 WL 994090 (C.D. Cal. Mar. 22, 2012) .........19

*Thompson v. D.C.*,
    832 F.3d 339 (D.C. Cir. 2016)................................................................................8

*Turner v. Rogers*,
    564 U.S. 431 (2011)................................................................................................5

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)...................................................................................... passim

*Vanke v. Block*,
    No. CV 98-4111 DDP, 1998 U.S. Dist. LEXIS 23488 (C.D. Cal. Nov. 5, 1998).................28

*Walker v. City of Calhoun*,
    901 F.3d 1245 (11th Cir. 2018) ............................................................................11

*Webb v. City of Maplewood*,
    889 F.3d 483 (8th Cir. 2018) ................................................................................32

*Webb v. City of Maplewood*,
    No. 4:16 CV 1703 CDP, 2021 WL 5371248 .................................................. passim

*White v. Nix*,
    7 F.3d 120 (8th Cir. 1993) ........................................................................25

*Woodall v. Wayne Cnty.*,
    No. 20-1705, 2021 U.S. App. LEXIS 34149 (6th Cir. Nov. 15, 2021) .................................26

## STATUTES AND RULES

City of Ferguson Bail and Surety Code 1973 § 9.14 ....................................................32

Fed. R. Civ. P. 23 ................................................................................ passim

Mun. Code Chapter 13, Article II, § 13-29(b) ............................................................33

Mun. Code § 13-52 .......................................................................................32, 33

28 Mo.Crim. Prac. Handbook § 1:7 ......................................................................18

The City's Opposition does not undermine Plaintiffs' demonstration that each of their proposed classes satisfies the requirements of Rule 23.   Indeed, the bulk of the Opposition is dedicated to issues *other than* class certification.   The City spends an inordinate amount of space discussing the merits of Plaintiffs' claims and rehashing an interpretation of those claims that this Court has repeatedly rejected.   When the City does address Rule 23, it posits hypotheticals of marginal relevance and fails to offer evidence or support for its key contentions.   Class certification is warranted here, and Plaintiffs' Motion (ECF No. 425) should be granted.

## I.      Plaintiffs Have Standing to Bring Class Claims

The City argues that none of Plaintiffs' proposed classes can be certified because they each contain individuals who had not yet been injured when this lawsuit began.   *See* Doc. 446 (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Opp.")) at 22–26.   Citing the Eighth Circuit's recognition that "a class cannot be certified if it contains members who lack standing," the City argues that, for any putative class to be certified, each known and unknown member of the class must have suffered a claimed injury as of the date the Complaint was filed.   Opp. at 25–26 (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010)).

This argument mistakes (i) the requirement that class members *have* standing for (ii) a requirement that all class members have *had* standing since the date the class action was filed. *Avritt* recognizes only the first of these.   *Avritt* involved a California statute that had been interpreted as permitting uninjured parties to join a class in state court as long as one representative had statutory standing.   615 F.3d at 1034.   The Eighth Circuit noted that federal standing requirements do not permit "a named plaintiff [to] represent a class of persons who lack the ability to bring a suit themselves," *id.*, which in *Avritt*'s context meant that those who could not have been injured by the defendant's conduct at any time could never bring a suit themselves and thus could

not be part of the class.  The court did not hold that any certifiable class must exclude people injured by a defendant's conduct after the lawsuit is filed.[1]  (Nor *could* it have so held, for such a rule would preclude class periods that run beyond the time a suit begins, contrary to federal courts' routine certification of classes with class periods that overlap with the corresponding lawsuit.)

It is well established that, so long as at least one named plaintiff had Article III standing when the case was filed, a putative class action can proceed on behalf of members who have suffered similar injuries in fact.  *See Webb v. City of Maplewood*, No. 4:16 CV 1703, 2021 WL 5371248, at *5 (E.D. Mo. Nov. 18, 2021) (citing *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017)).  Since, as Plaintiffs have documented, each of their proposed classes is represented by at least one named Plaintiff who had been injured when this suit was brought, *see* ECF No. 430 (Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Memo.")) at 9–11 & n.36–41, those representatives have standing to bring claims on behalf of putative members with similar injuries.[2]

The City cites two additional inapposite cases: *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, (8th Cir. 2000), which never addresses standing in class actions at all, and *Cody v. City of St. Louis*, No. 4:17-CV-2707, 2021 U.S. Dist. LEXIS 195674 (E.D. Mo. Oct. 12, 2021), which addressed only standing in regards to class representatives, not class members.  Neither case supports the City's argument that class members must have had standing on the date of the complaint.  Indeed,

---

[1] *See, e.g.*, *Webb v. City of Maplewood*, No. 4:16 CV 1703, 2021 WL 5371248, at *15 (E.D. Mo. Nov. 18, 2021) ("Contrary to the City's characterization, the effect of *Avritt* was not to deny class status to putative members who were injured in fact by a defendant's conduct after the class action lawsuit was filed.").

[2] For the same reason, it is irrelevant that a lack of standing *at the time of filing* cannot be cured by subsequent developments, as the City notes.  Opp. at 24 (citing *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037–38 (8th Cir. 2000)).  Unlike the individual plaintiff in *Park*, who lacked standing because she sought only prospective relief and could not show that she was sufficiently likely, at the time of filing, to be subjected to an unconstitutional automobile checkpoint in the future, *see* 205 F.3d at 1037–38, Plaintiffs here did not lack standing at the time of filing, so they need no such cure.

this Court confronted—and rejected—an identical argument in regards to class member standing mere months ago.  *See Webb*, 2021 WL 5371248, at *5.

Furthermore, with respect to each proposed class, Plaintiffs have presented significant evidence that, at any given time, anyone who satisfies the class definition has suffered violations giving rise to the claims brought on behalf of that class.[3]  It will therefore be true at all times that, for each claim brought on behalf of each class, every class member has an injury for purposes of Article III standing.

## II.      The Proposed Damages Classes Satisfy Rule 23 and Are Ascertainable

### A.  *Bearden* Class

#### 1.  Commonality, Predominance, and Superiority of the *Bearden* Class

Ferguson challenges the commonality, predominance, and superiority of the *Bearden* Class on three mistaken grounds: that the indigent putative class members must be identified but cannot be, that the merits of the *Bearden* claim depend on an inquiry into "reasonableness" that is too individualized for class-wide resolution, and that damages cannot be determined on a class-wide basis.  Opp. at 28.  As Plaintiffs explain below, the City is mistaken because (i) even if, implausibly, some class members could afford to pay for their release, the *Bearden* claim does not turn on their inability to do so; (ii) the City's policy of holding class members without any prospect of an ability-to-pay determination renders their detention uniformly unreasonable; and (iii)

---

[3] *See e.g.*, Memo. at 19 & Ex. 18–19 (describing the City's policy never to inquire into ability to pay in reference to the common injury of the *Bearden* Class members); Memo. at 20 & Ex. 20–21 (describing the City's policy to never provide a probable cause hearing before a neutral judicial magistrate for warrantless arrestees in reference to the common injury of the *Gerstein* class members); Memo. at 21 & Ex. 101 (describing the unsanitary and dangerous conditions of the jail, which existed throughout the Class period, in reference to the common injury of the Jail-Conditions Class members); Memo. at 22 & n.64 (stating that all members of the Warrant Class were arrested pursuant to a Ferguson warrant and describing the City's policy never to bring such arrestees before a judge post-arrest, in reference to the common injury of the Warrant Class members); Memo. at 23–24 (describing the City's policies for issuance of warrants, collections of bonds, and failures to provide legal representation or an opportunity to be heard, in reference to the common injuries of the Declaratory and Injunctive Class members).

Plaintiffs seek general damages that will vary only according to the length of time each member spent in the Ferguson Jail.

### i.        Ability to Pay

"The City maintains that the only process 'due' to a moneyed individual is the bond set by the Court."  Opp. at 31.  It infers that the proposed *Bearden* Class must exclude anyone who could afford to pay their bond.  *Id.* at 33.  The City then argues that excluding any such people requires an individualized inquiry that precludes commonality, predominance, and superiority.  *See id.* Both arguments are mistaken.

Even if the proposed Class needed limiting to people who could not afford to pay their scheduled bond, the Court could safely conclude that the Class is so limited.  By definition, every member of the *Bearden* Class was "kept in jail by the City of Ferguson for failing to pay a fine, fee, bond, surcharge, or cost, without an inquiry into their ability to pay."  Memo. at 9.  As this Court has recognized, "most people would not willingly remain incarcerated if their financial circumstances permitted them to avoid it."  *Dixon v. City of St. Louis*, No. 4:19-CV-0112-AGF, 2021 WL 616153, at *7 (E.D. Mo. Feb. 17, 2021).  Given this self-evident fact, it is implausible that the proposed *Bearden* Class includes an appreciable number of people who could afford (but simply chose not) to pay the initial bond amount on which they were held.  *Cf. Webb*, 2021 WL 5371248, at *10 (finding, for the reason given in *Dixon*, that a damages class of persons who, inter alia, "paid . . . fines, costs, and/or fees after being arrested and jailed on Maplewood municipal warrants issued for failure to pay or for failure to appear" was "adequately limited to the indigent"); *id.* at *15 (certifying that class under Rule 23(b)(3)).[4]  This Court could stop there.

---

[4] Maplewood's 23(f) petition for review of the class certification decision was denied by the Eighth Circuit.  *See* Judgment, *Webb v. Maplewood*, No. 21-08012 (8th Cir. Dec. 30, 2021), ECF No. 5.

But the Court need not rely on the fact that the overwhelming majority (if not all) of the class members were unable to pay the scheduled bonds on which they were held, as the violation alleged in Count One—the claim Plaintiffs seek to bring on behalf of the *Bearden* Class—does not require an actual inability to pay.  Under the doctrine stemming from *Bearden v. Georgia*, 461 U.S. 660 (1983), the "right to an ability-to-pay inquiry does not depend on indigence; the procedural protections required by the Supreme Court . . . apply equally to indigent and non-indigent individuals." *Cain v. City of New Orleans*, 327 F.R.D. 111, 124 (E.D. La. 2018); *see also Doe v. Angelina Cnty.*, 733 F. Supp. 245, 254 (E.D. Tex. 1990) (holding that the failure to conduct ability-to-pay hearings is "unlawful whatever the economic status of the incarcerated person").  In other words, the right to a procedure cannot depend on the hypothetical outcome of that procedure. *Cf., e.g.*, *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions.").  Regardless of their economic status, all *Bearden* Class members were jailed for nonpayment of a sum of money without the requisite findings as to their ability to pay and without the procedural protections by which such findings must be made. *See, e.g.*, *Turner v. Rogers*, 564 U.S. 431, 447–48 (2011) (specifying such protections).

Contrary to the City's argument, commonality and predominance are not defeated by hypothetical differences between the damages available to people who could *not* pay and those available to anyone who *could* pay. *See* Opp. at 33–38.  Whereas people who could *not* pay can recover substantial damages for the detention they suffered without the required determination of their ability to pay, the City submits that anyone who *could* pay would be limited to nominal damages for any part of their detention that could have been justified by a timely finding of their ability to pay. *Id.* at 34–35 (discussing the framework for procedural violations set forth in

*Carey*).[5]  The City contends that (i) Plaintiffs' proposed damages model does not accommodate this distinction and (ii) accommodating it would require damages inquiries too individualized for class treatment.  *See id.* at 36–38.  Neither contention militates against certification.

Plaintiffs' damages calculations are based on how long each class member spent in the Ferguson Jail beyond an estimated two hours for completing the incidents to arrest.  *See* Memo. at 38 & Ex. 98 (Expert Report of Stephen Demuth, Ph.D. ("Demuth Rep.")) at 35.  Given the City's policy of holding arrestees indefinitely without any prospect of the required ability-to-pay determinations, each class member suffered a violation the moment the City completed the incidents to their arrest and began holding them for nonpayment.  In terms of the *Gerstein* doctrine that the City imports from the context of probable-cause determinations, each class member suffered "delay for delay's sake," which was *per se* "unreasonable" and rendered their prolonged detention unconstitutional.  *Cf. Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); Memo. at 14–15 & n.49.  That is so regardless of their ability to pay at the time.  In this way, the proposed class definition comports with Plaintiffs' proposed damages methodology.[6]

Moreover, Plaintiffs can prevail on their theory of liability even if this Court accepts the City's contention that the proposed damages formula needs adjusting to allow for a showing that a given class member could have paid their initial bond (and thus that a timely ability-to-pay hearing—had such a thing been possible in Ferguson—"would" have justified some amount of their detention after arrest).  *Cf.* Opp. at 36–37.  Even if the City could somehow make such a

---

[5] *Both* types of people could in principle recover particularized damages stemming directly from the lack of process itself.  *Cf.* Opp. at 34 & 36 (noting only the availability of such damages to anyone who could pay).  However, Plaintiffs do not seek such damages here, and any class member who wished to do so could opt out.

[6] *Cf. Webb*, 2021 WL 5371248, at *12 ("The periods of detention for these three named plaintiffs ranged from 3 hours to more than 44 hours.  Regardless of these varied durations and the plaintiffs' eventual release with or without payment of bond, it is the *fact* of their detention without *any* consideration given to their ability to pay to secure their release that is the thread that connects the legal and remedial theories of plaintiffs and the putative class members.").

showing, it would not extinguish the City's liability for the lack of process.  It would only affect the amount of damages.[7]  The fact remains that past ability to pay does not affect whether a class member has a claim for damages in some amount, and the City's liability can be adjudicated on a class-wide basis.

The City's reliance on *Comcast Corp. v. Behrend* (Opp. at 37–38) is therefore inapposite. The plaintiffs there failed to proffer a damages model that comported with the sole theory of liability to survive summary judgment.  *See* 569 U.S. 27, 28 (2013) ("A model that does not attempt to measure only those damages attributable to that theory cannot establish that damages are susceptible of measurement across the entire class for Rule 23(b)(3) purposes.").  Here, by contrast, the same theory of liability applies to all class members alike, and the proposed damages model measures only damages attributable to that theory.

This leads to the problem with the City's second contention—that it would destroy predominance to employ a damages formula based in part on past ability to pay.  Courts have long held that individualized damages do not undermine class-wide predominance.  *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" (citation omitted)); *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 601

---

[7] The City cites nothing to support its assertion that a difference in "type" between nominal and substantial damages precludes commonality and predominance.  *See* Opp. at 33.  Nor can the City support its suggestion that a "non-indigent" person lacks a "cause of action for failure to be afforded a[n ability-to-pay] hearing," *id.* at 31, and lacks "standing to recover damages or seek injunction," *id.* at 32.  *Carey* itself was a § 1983 action, and in holding that nominal damages would be available for procedural violations, the Court there noted that "[a] number of lower federal courts have approved the award of nominal damages *under § 1983* where deprivations of constitutional rights are not shown to have caused actual injury." *Carey*, 435 U.S. at 267 n.24 (emphasis added) (citing cases).

(8th Cir. 2020) (same), *cert. denied sub nom. Cent. Payment Co., LLC v. Custom Hair Designs by Sandy, LLC*, 142 S. Ct. 426 (2021); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) ("The potential need for individualized damages inquiries is not sufficient to overcome the district court's findings of predominance and superiority."); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("It is a 'black letter rule . . . that individual damage calculations generally do not defeat a finding that common issues predominate.'" (quoting 2 Newberg on Class Actions § 4:54 (5th ed.))).

Here, any variation in damages owing to economic status promises to be minimal for the reasons given above.  At the claims-administration phase, class members can submit affidavits attesting to their financial condition at the time of their arrest.  And the City, as defendant, will bear the burden to establish a class member's past ability to pay if it seeks to limit his recovery on that basis.  *See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (holding, in a § 1983 case involving the violation of a public school teacher's First Amendment rights, that the burden is on the defendant to show by "a preponderance of the evidence that it would have reached the same decision" even if the constitutionally protected activity had not been considered in the employment decision); *Thompson v. D.C.*, 832 F.3d 339, 347 & 347 n.3 (D.C. Cir. 2016) (noting "The best reading of *Doyle* and *Carey*—as the Third, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits have held—is that a plaintiff can recover compensatory damages for a defendant's unconstitutional conduct unless the *defendant* shows that the injury would have occurred anyway" and collecting cases (emphasis added)); *Brewer v. Chauvin*, 938 F.2d 860, 864 (8th Cir. 1991) ("[W]e hold that the public employer carries the burden of proving that the plaintiff would have been fired even if procedural due process had been observed.").  In sum, any

hypothetical individualized issues concerning past ability to pay could only arise at the damages phase, where the City would bear the burden to show that they affect recovery.

### ii.        Reasonableness

The City argues that, insofar as there is no constitutional violation until a person's detention without the requisite process becomes "unreasonable," class issues cannot predominate because assessing reasonableness requires too many individualized inquiries. Opp. at 39–44.   This argument, too, overlooks Plaintiffs' class-wide showing of unreasonableness and mistakes a partial limitation on damages for a defense to liability.

The concept of reasonableness, however, is applied throughout a significant portion of the law.  *See, e.g., Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 868 (9th Cir. 2010) ("Reasonableness is a well-established and easily-understood standard, one that American courts are accustomed to applying in a wide variety of situations involving the behavior of individuals.").  Declining to certify a class because a "reasonableness standard" might be related to the merits of some claims would deny class certification in a whole host of cases.  *See, e.g., Lacy v. Cook Cnty.*, 897 F.3d 847, 865 (7th Cir. 2018) (reasonableness of accommodations in ADA Title II class action); *Eddleman v. Jefferson Cnty., Ky.*, 96 F.3d 1448 (6th Cir. 1996) (reasonableness of strip searches of arrestees in Fourth Amendment class action); *Barker v. FSC Sec. Corp.*, 133 F.R.D. 548, 551–52 (W.D. Ark. 1989) (reasonableness of class plaintiffs' individual beliefs concerning defendants' apparent authority in securities fraud class action).  The City further overlooks Plaintiffs' class-wide showing of unreasonableness and mistakes a partial limitation on damages for a defense to liability.

It was *per se* unreasonable for the City to *never* bring class members before a judge for any hearing.  The doctrine stemming from *Gerstein v. Pugh*, 420 U.S. 103, 112–114 (1975), presumes

that a hearing provided within 48 hours of arrest is sufficiently "prompt" for constitutional purposes. *McLaughlin*, 500 U.S. at 55–56. An arrestee who received a hearing within 48 hours can rebut that presumption by a showing that his hearing was nonetheless "delayed unreasonably." *Id.* at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or *delay for delay's sake*." (emphasis added)). Reasonable delays may be due to the time reasonably needed to complete an arrest and the incidents to it (e.g., booking). *Id.* at 56–58. "Where an arrested individual does not receive a . . . determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57.

"[T]o provide some degree of certainty so that States and counties may establish procedures with confidence that they fall within constitutional bounds," the *McLaughlin* Court held that jurisdictions *that provide the required hearing* within 48 hours of arrest will not be subject to "systemic challenges." *Id.* at 56. Riverside County, the defendant in *McLaughlin*, exceeded this safe harbor because its policy forced some people to wait longer than 48 hours for their required hearing. *See id.* at 58–59.

Ferguson's practice is entirely distinct. The City maintained a policy of jailing arrestees without *any* prospect of the required hearing. *See* Memo. at 14–15 & n.50–52. Unlike Riverside County's arrestees, who received the required hearings eventually but sometimes after 48 hours, Ferguson's arrestees *never* received hearings on their ability to pay: they were held without hope of the required process as a matter of uniform practice. That policy places the City entirely beyond the protection of *McLaughlin*'s safe harbor from systemic challenges.

10

Ferguson does not dispute this.  In contrast, in *Walker v. City of Calhoun* (cited extensively by the City), the Eleventh Circuit vacated a preliminary injunction against a Standing Bail Order providing that "those individuals who do not obtain release pursuant to the secured bail schedule . . . *shall . . . be brought* before the [Municipal] Court" *within 48 hours* from their arrest, shall "be represented by court appointed counsel," and "will be given the opportunity to object to the bail amount . . . , including any claim of indigency."  901 F.3d 1245, 1252 (11th Cir. 2018) (emphases added).  Because the Standing Bail Order provided for hearings within 48 hours, the court concluded that the City of Calhoun was entitled to a presumption that the determinations made at those hearings were constitutionally valid.  *See id*. at 1272.  Ferguson had no such practice or hearings at all, which places the City entirely beyond the protection of *McLaughlin*'s safe harbor from systemic challenges.  Thus, Ferguson's practices, too, are unreasonable class-wide and may not rely on the 48 hour safe harbor.

It also establishes the unconstitutionality of Plaintiffs' detention on a class-wide basis.  The City contends that, despite its policy of jailing arrestees without any prospect of the required process, it was nonetheless entitled to 48 hours of presumed-to-be-reasonable detention.  *See* Opp. at 40–41.  That is not the law.  Nor could it be, for it would defy the whole purpose of the *McLaughlin* presumption, which is to give flexibility and guidance to jurisdictions that actually endeavor to provide the requisite process.  *See McLaughlin*, 500 U.S. at 53–54 (citing *Gerstein*, 420 U.S. at 123).  As Judge Perry of this District recently explained in certifying a class challenging the City of Maplewood's *Bearden* practice:

> [T]he City's established policy, practice, or procedure of not considering a person's ability to pay *at all* renders the presumptively reasonable 48-hour period of detention meaningless. . . . [T]he policy of holding these persons without inquiring into their ability to pay served the City's purpose of extracting any monies it could before releasing them—whether it be full bond after 3 hours or a reduced bond or no bond as the 48-hour mark approached.  The City held these persons as long as it

> could until either they could scrounge up some money for bond or an arbitrary decision had to be made to release them without payment of bond. Accordingly, . . . the delay in releasing these persons was merely for delay's sake. Given this alleged purpose for keeping these persons in jail—whether it be for one hour after booking, 7 hours, or 47 hours and 59 minutes—this detention is not "reasonable" as the City argues.

*See Webb*, 2021 WL 5371248, at *12. Where, as here, a city held arrestees in jail without hope of the requisite process, it is liable unless it can show that some emergency or extraordinary circumstance nevertheless excused their detention.

The City's reliance on *Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010) is therefore misplaced. Opp. at 39–41. The court there noted that "the 48-hour burden-shifting approach does not apply when the police don't plan to present the suspect to a magistrate for a probable-cause hearing" and acknowledged that "class treatment might be appropriate if the class sought to establish that a jurisdiction had adopted a policy of deliberate delay." *Id.* at 704-05 (citing *McLaughlin*, 500 U.S. at 59).

Even if it were conceivable that some exigency might end up excusing the entirety of a given arrestee's detention, thereby defending the City from liability as to that person,[8] it would remain well-established that Rule 23(b)(3) allows for "some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453. And the City has offered no evidence to that effect for *any* class member. Instead, the City points to a single, allegedly alcohol-related arrest that led to 4.5 hours of detention and speculates that the arrestee might have "posted bond quickly and [not been] released until she was sufficiently sober to ensure that she did not pose a

---

[8] Again, just as in cases where, unlike here, the required process *was* eventually given, a defendant's demonstration that a timely hearing "would" have established an arrestee's ability to pay and thereby justified some amount of detention is at best a partial limitation on *damages*; it cannot eliminate liability for unreasonably detaining the arrestee without a hearing.

danger to herself or others."  Opp. at 43.  Such speculation cannot destroy predominance.  As the

Sixth Circuit has explained:

> We have recognized repeatedly that the fact that a defense may arise and may affect
> different class members differently does not compel a finding that individual issues
> predominate over common ones. . . .  Here, Bridging Communities and Gamble
> presented evidence suggesting a class-wide absence of consent . . . .  In response,
> Top Flite merely alleged that class members *might* have given consent in some
> other way. . . .  We are unwilling to allow such speculation and surmise to tip the
> decisional scales in a class certification ruling. . . .  Even where defendants point to
> some evidence that a defense will indeed apply to some class members, which is
> more than Top Flite did here, courts routinely grant certification because Rule
> 23(b)(3) requires merely that common issues predominate, not that all issues be
> common to the class.

*Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125–26 (6th Cir. 2016)

(quotation marks omitted) (finding district court abused its discretion by adopting defendant's

speculation); *see also In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 229–30 (2d Cir. 2006)

(finding district court erred in determining that individual issues predominated as to liability where

common issues included the existence of a blanket policy of conducting strip searches and

defendants' responsibility for that policy, and where "[t]he only countervailing, individualized

liability issue was whether, regardless of the policy, some plaintiffs were strip searched based

upon" reasonable suspicion, a defense).

The City argues that, given its authority to arrest people on warrants and on an officer's

possession of probable cause to believe they have committed a crime, the subsequent detention

cannot become unreasonable before the amount of time reasonably necessary to complete the arrest

and process the arrestee has elapsed.  *See* Opp. at 41–42; *cf. Gerstein*, 420 U.S. at 113–14 ("[A]

policeman's on-the-scene assessment of probable cause provides legal justification for arresting a

person suspected of crime, and for a brief period of detention to take the administrative steps

incident to arrest."); *Chortek v. City of Milwaukee*, 356 F.3d 740, 746–47 (7th Cir. 2004) ("Thus,

under *Gerstein* and *County of Riverside*, the length of time taken to complete administrative steps incident to arrest must be reasonable.").  The City suggests that because the brief time reasonably necessary to complete these administrative steps may vary among class members, the proposed *Bearden* Class cannot be certified.  Opp. at 41–42.  The City states that Plaintiffs have arbitrarily excluded people held for less than two hours after arrest, in an attempt to mask what it says is a predominantly individualized standard.  *Id.*

The two-hour estimate for the administrative arrest process provides a principled way to determine liability and measure damages on a class-wide basis.  To conservatively estimate the size of the Class and to demonstrate one way in which damages can be determined on a class-wide basis, Plaintiffs' expert, "[r]ecognizing that a reasonable amount of time might be required to release any person arrested, . . . subtracted 2 hours from the detention time of each arrest based on the median detention time for arrests in the 2015–2019 time period that qualified for the [*Bearden*] Class."[9]  The City does not come forward with any evidence (or even argument) that a different time period better accounts for the length of the administrative arrest process.  Insofar as the City did not record when it completed the steps incident to each arrest, this Court may find it necessary to employ representative evidence estimating the length of time from initial arrest to the completion of booking.  The use of representative evidence is permissible where, as here, the defendant has failed to keep the necessary records.  *See, e.g.*, *Tyson Foods*, 577 U.S. at 455–57; *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 834–35 (8th Cir. 2016).

To determine liability and measure damages on a class-wide basis, this Court can employ Dr. Demuth's estimate—which is based on the median detention time during a period in which,

---

[9] Demuth Rep. at 35.

according to the City,[10] there was no undue delay—as representative evidence of the time it took to complete the administrative steps incident to arrest during the Class period.  As in *Tyson Foods*, "[r]eliance on" such evidence will not "deprive" the City "of its ability to litigate individual defenses."  577 U.S. at 457 ("Since there were no alternative means for the employees to establish their hours worked, petitioner's primary defense was to show that [the expert's] study was unrepresentative or inaccurate.  That defense is itself common to the claims made by all class members.").  Since the City does not (and cannot credibly) claim that its lengthy detention of class members was generally necessary to complete administrative steps incident to their arrests, it can, at best, hope to show that the incidents to certain particular arrests reasonably took long enough to account for the subsequent detentions.  But since it has no record of the time spent on those incidents to arrest, mounting such a defense in particular cases would require the City to challenge the reliability of any estimate proffered by Plaintiffs and adopted by this Court.  In other words, like the plaintiffs in *Tyson Foods* and *Mt. Clemens*, Plaintiffs here offer representative evidence "to fill an evidentiary gap created by [the defendant's] failure to keep adequate records," so that "[r]ather than absolving" Plaintiffs "from proving individual injury, the representative evidence" is "a permissible means of making that very showing."  577 U.S. at 456–57 (citing *Mt. Clemens*, 328 U.S. at 687).

It is irrelevant whether "a substantial percentage" of the proposed *Bearden* Class posted some amount of bond, as the City asserts.  Opp. at 42.  The City appears to misunderstand the relevant sense of "indigency," assuming that being unable to pay in the relevant sense means lacking money entirely.  *Id*.  Having some money for basic life necessities, necessities one will sacrifice to avoid being held in jail indefinitely (and all the destructive consequences of such

---

[10] *See* Opp. at 44–45 & 49 n.40 (asserting "that no one was incarcerated for an unreasonable time after" December 31, 2014).

jailing), does not make one "able to pay" that amount, such that one's nonpayment is necessarily "willful" under *Bearden*, 461 U.S. at 672. *Cf. Goings v. Chickasaw Cty.*, No. C06-2063-LRR, 2008 WL 11510710, at *1 (N.D. Iowa Apr. 8, 2008) ("[T]he ability to pay does not require that plaintiffs contribute their 'last dollar' or 'make themselves and their dependents wholly destitute.'" (quoting *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 339 (1948))); *Escobedo v. Applebees*, 787 F.3d 1226, 1234 (9th Cir. 2015) ("An affidavit in support of an [in forma pauperis] application is sufficient where it alleges that the affiant cannot pay the court costs and still afford the necessities of life."); *In re Williamson*, 786 F.2d 1336, 1339 (8th Cir. 1986) ("As with any other litigant, indigency for a prisoner under section 1915 is not synonymous with absolute pennilessness."). The City is therefore wrong to assume that "by definition, an indigent cannot afford to pay *any* bond." Opp. at 42. For the same reason, paying a given amount of money, either by oneself or by asking others for money, does not imply that one is *able to pay* that amount (in the relevant sense of "able to pay") because one may have to sacrifice basic life necessities in order to make the payment.[11] Thus, from the mere fact that a person eventually paid some amount of bond the City cannot infer that their detention without hope of the required process was reasonable (potentially providing the City a defense), nor can it infer that a hypothetical, timely ability-to-pay determination "would" have justified their detention (potentially limiting that plaintiff to nominal damages).

The small percentage of people who eventually paid for release, just like those eventually released without paying, were jailed for some length of time because they did not pay an amount of money, without hope of the requisite protections concerning their ability to pay that amount.

---

[11] *See, e.g.*, Waldron Decl. Ex. 115 at 193:22-194:4 (12/19/2016 Deposition of Allison Nelson) (explaining that she was bonded out from Ferguson's jail on Christmas Eve where there was feces on the wall of her jail cell—by a $200 payment from her mother).

Both groups belong in the *Bearden* Class, and the City has given no reason why the duration of their jailing need be measured any differently.[12]

The City speculates that it would have released "many" class members sooner but for outstanding warrants from other jurisdictions. Opp. at 44. The City offers no evidence that outside warrants account for the full duration of any class member's detention and thus no evidence that they eliminate the City's liability for even one plaintiff's claim under Count One. For the bulk of the proposed Class, this issue concerns the calculation of damages at most.[13] And the existence of outside warrants is a matter of record. At the damages phase, the City can seek to limit recovery for select class members by showing that some portion of their detention is attributable to another jurisdiction's warrant.[14]

Finally, the City argues that changes in state and local law beginning in 2015 preclude commonality for a class including people arrested after those changes were instituted. Opp. at 44–

---

[12] Should this Court wish, it could exclude from the Class any persons shown by the City to have paid the full amount of their scheduled bond immediately upon completion of booking. That would likely exclude a number of people who could not afford the scheduled bond for purposes of *Bearden* but who somehow arranged to pay it before being detained for nonpayment.

[13] It is worth noting that a significant number of people jailed by the City came there having already spent some length of time in another jurisdiction's jail, awaiting transport to Ferguson on a Ferguson warrant.

[14] The definition of the proposed *Bearden* Class already excludes people held solely on the basis of warrants from other jurisdictions. *See* Memo. at 9 (including only those who have "been kept in jail by the City of Ferguson *for failing to pay* a fine, fee, bond, surcharge, or cost, without an inquiry into their ability to pay" (emphasis added)). And Dr. Demuth's analysis of the *Bearden* Class reflects this exclusion. *See* Demuth Rep. at 9. If the Court is nonetheless concerned that the City will be "overcharged" at the damages phase for detention based *partly* on outside warrants (and partly on Ferguson-imposed grounds), the Court can employ representative evidence to estimate how long such arrestees were held on behalf of other jurisdictions, and then subtract that amount from their total detention time to get an estimate of the period of detention attributable exclusively to the City.

Dr. Demuth's analysis supplies a basis for this estimate. He calculates a median detention time of 5 hours for arrests based solely on outside warrants. Demuth Rep. at 27 (Table 14). Given the estimated 2 hours it took Ferguson to complete the arrest and booking process, *see id.* at 35, it would follow that the median arrest based solely on outside warrants led to 3 hours of detention after booking. This yields an estimate of how long Ferguson held people on behalf of other jurisdictions. Applying that 3-hour estimate to arrests based partly on outside warrants, the Court can, if necessary, adjust Plaintiffs' proposed damages formula to subtract 3 hours from the detention time of each arrestee held partly on outside warrants. (Since the City had its own reasons for arresting each of these people, the Court can assume that the City would have detained them for at least the estimated 2 hours regardless of the outside warrants because that is a reasonable approximation of the length of the arrest process.) As explained above, this use of representative evidence would be appropriate given the City's failure to keep records as to when an arrestee held partly on outside warrants was otherwise eligible for release. *See id.* (discussing *Tyson Foods*, et al.).

45.[15]   Aside from its municipal court's 12-hour rule and its bare assertion that "no one was incarcerated for an unreasonable time after" December 31, 2014 (*id.* at 49 n.40), the City offers only statistical evidence purportedly showing that it stopped detaining people unconstitutionally as of 2015.  *See id.* at 45 ("No one was detained more than 48 hours and only 1% of the post-2014 detainees were held longer than 24 hours.  The median detention time was 2 hours." (citing Demuth Rep. at 19)).  Should the Court come to find such a change in policy, it can modify the definition of the proposed *Bearden* Class to exclude people arrested after the relevant date.  *See, e.g.*, *Day*, 827 F.3d at 830 ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982))); *Roy v. Cty. of Los Angeles*, No. CV1209012ABFFMX, 2018 WL 3435417, at *4 (C.D. Cal. July 11, 2018) (citing *Falcon* and concluding that "[b]ecause those commonality issues are no longer present, . . . the Court finds it appropriate to modify the Post-48 Hour *Gerstein* Subclass to conform to the definition of the original *Gerstein* Damages Class.").  At present, the proposed Class remains more than sufficiently united by the common issues of law and fact to warrant certification.

### iii.    Damages

The City cites a single, unpublished case to cast doubt on the propriety of Plaintiffs' proposed per-diem damages methodology.  Opp. at 46–47 (citing *Thomas v. Baca*, No. CV 04-08448, 2012 WL 994090 (C.D. Cal. Mar. 22, 2012)).  *Thomas* is inapposite because it involved the decertification at the damages stage, seven years after certification, based on the court's

---

[15] As mentioned earlier, the City's arguments that "new" laws in place regarding warrantless arrests in 2015 borders on disingenuous *because such a statute had been part of Missouri law for years prior to 2010.  See* RSMO 544.170; *see also* § 1:7. Twenty-four hour rule, 28 Mo. Prac., Mo. Criminal Practice Handbook § 1:7 ("Effective August 28, 2005, persons arrested without a warrant must be released unless a warrant is issued by a judge within 24 hours of the arrest.").

conclusion that the plaintiffs' "theory of damages" had proved "difficult to ascertain" (2012 WL 994090 at *1), and it would require highly individualized questions of proof as to particularized damages (*id.* at *3).  As a later court noted, "the plaintiffs in *Thomas* sought individualized pain and suffering damages, whereas Plaintiffs in this case seek only general damages." *Aichele v. City of Los Angeles*, 314 F.R.D. 478, 496 (C.D. Cal. 2013).  Like the plaintiffs in *Aichele*, Plaintiffs here seek only general damages (for loss of liberty).  *See* Memo. at 36–37.  Such damages are commonly subject to class treatment.  As Judge Perry explained in *Webb*:

> The damages recoverable for the loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering. . . .  General damages for the loss of liberty need not be specifically proved—it may be inferred from the circumstances of the arrest or imprisonment and would include at least the value of the time lost by the plaintiff during the period of detention.  Thus, these damages do not turn on any individual characteristics of any class members.

2021 WL 5371247 at *2–3 (quotation marks omitted) (collecting cases).  As Plaintiffs seek general, loss-of-liberty damages, the per-diem methodology applies class-wide for the reasons already explained.  *See* Memo. at 37–38.[16]

## 2.  Ascertainability of the *Bearden* Class

The City challenges ascertainability on the ground that Plaintiffs have not proposed an end-date for the *Bearden* Class period.  Opp. at 49.  The proposed Class definition follows that offered for the damages class in the First Amended Complaint (ECF No. 53 ¶ 212), when the City's violative practices were clearly ongoing with no realistic end in sight.

A commonly used objective criterion is the date of class certification.  *See, e.g.*, *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050, 2009 WL 1974404, at *2 (N.D. Cal. July 2, 2009)

---

[16] For the same reasons, *D.C. v. County of San Diego*, No. 15cv1868, 2017 WL 5177028 (S.D. Cal., Nov. 7, 2017), cited by the City (Opp. at 36), where class certification failed due to individualized issues pertaining to the assessment of damages for emotional distress resulting from the deprivation of required procedures, are irrelevant.  Any class member who wishes to control their own litigation and pursue such damages may opt out of the class.

(redefining class to include the date of class certification as an end-date), *modified in part on other grounds*, 270 F.R.D. 499 (N.D. Cal. 2010); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001) (fixing end-date of class period as date of decision certifying class).[17] However, in the interest of providing a factual benchmark tied to the record, Plaintiffs propose that the Court set the class period to end on the date discovery closed: December 3, 2021.  This is a commonly used criterion as well.  *See, e.g.*, *Hendricks v. Total Quality Logistics, LLC*, Case No. 10-cv-649, 2015 U.S. Dist. LEXIS 195049, at *11–12 (S.D. Ohio Mar. 30, 2015) (redefining unascertainable class period end-date as the date discovery closed); *Hart v. Rick's NY Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 949 (S.D.N.Y. 2013) (setting the class period end-date as the date the fact discovery ended).[18]

### 3.   Typicality of the *Bearden* Class Representatives

The City challenges typicality on the alleged ground that Plaintiffs have not shown the class representatives to have been indigent.  Opp. at 49–50.  For the reasons explained *supra*, § II.A.1, the *Bearden* Class is unified by common questions of fact and law that do not depend on the economic status of its members.  As such, the class representatives' economic status does not affect the typicality of their claims.  In any event, there is a slew of evidence that they could not afford to pay the respective amounts the City initially demanded for their release.[19]  Again, this

---

[17] *See also, e.g.*, *Sampson v. Knight Transp., Inc.*, No. C17-0028-JCC, 2021 U.S. Dist. LEXIS 104802, at *9–11 (W.D. Wash. June 3, 2021) (fixing the end-date as the date of class certification after weighing the interests of fixing a class period early enough to allow class members to consider the class notice and decide whether to opt out prior to the filing of dispositive motions, but not so early that plaintiffs are "unable to fully vindicate the full scope of the alleged damages suffered by ongoing unlawful behavior" (citing *Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 U.S. Dist. LEXIS 88866, at *9–10 (E.D. Tenn. Dec. 3, 2007))).

[18] A still earlier end-date would be the date Ferguson closed its jail in 2017, which would reflect an objectively salient change in at least the locus of the City's detention practices.  Should the Court later conclude that the City's policies changed sufficiently upon its signing of the DOJ Consent Decree on April 19, 2016, or upon the promulgation of the new bond schedule and 12-hour rule on December 14, 2014, it could amend the end-date of the class period accordingly.

[19] *See, e.g.*, Waldron Decl., Ex. 115 at 25:4-26:7 & 27:8-14 (stating that she had only $1 in her bank account and was entirely dependent on her parents' income); Waldron Decl., Ex. 116 at 8:9-9:13 & 13:5-21 (07/13/2021 Deposition of

comports with the commonsense understanding that "most people would not willingly remain incarcerated if their financial circumstances permitted them to avoid it." *Dixon*, 2021 WL 616153 at *7; *see also Webb*, 2021 WL 5371248 at *10.  In any event, regardless of their economic status, the claims of the class representatives typify those of absent class members for purposes of Rule 23 because their claims are based on the same course of conduct and legal theories.  *See* Memo. at 25–26; *see also Custom Hair Designs by Sandy*, 984 F.3d at 604  ("Typicality is fairly easily met so long as other class members have claims similar to the named plaintiff.  Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." (internal citations omitted)).

## B.  Gerstein Class

The City's arguments concerning the commonality or predominance of the *Gerstein* Class mirror those it raised against the *Bearden* Class, but with the existence of probable cause in place of an arrestee's ability to pay.  *See* Opp. at 50–56.  Those arguments are equally unavailing here.

Here too, the 48-hour presumption applies only to jurisdictions that endeavor to provide the requisite process at some point, unlike the City, which had a policy of holding people in jail with absolutely no prospect of a probable cause hearing.[20]  Plaintiffs' argument would look very different if their Class consisted of a small class of individuals who did not receive a probable

---

Donyale Thomas) (stating that she was on Section 8 housing and working on minimum wage); Waldron Decl., Ex. 117 at 21:2-15 (07/13/2021 Deposition of Shameika Morris) (stating that she was in low income housing and did not pay rent); Waldron Decl., Ex. 118 at 44:16-45:8 (04/19/2017 Deposition of Alfred Morris) (stating that his only income was disability pension from the VA); Waldron Decl., Ex. 119 at 32:9-16 (03/03/2017 Deposition of Keilee Fant) (stating that she was in Section 8 housing and her only income was child support payments); Waldron Decl., Ex. 120 at 19:4-21:5, 31:5-33:4, 38:18-40:22, & 46:3-6 (12/19/2016 Deposition of Roelif Carter) (stating that the only source of income for his family, including his wife and daughter, was disability payments from the VA and social security; the family lived in Section 8 housing; and he had no personal possessions greater than $200).

[20] Again the City cannot claim the protection of a safe harbor against systemic challenges.  *See* Opp. at 51.  That safe harbor exists only for jurisdictions that, unlike the City, actually provide the required process and do so within 48 hours.

cause hearing within a larger system in which most people did.  In such a situation, the particular reasons why each unlucky person did not receive a finding might be quite individualized.  Not so here, where it is undisputed that the City's arrestees were uniformly denied such hearings.  Again, the City bears the burden to show that some emergency or extraordinary circumstance excused its detention of putative class members.  And, again, it offers no evidence of such an excuse as to any arrestee.  *See* Opp. at 51–52.  Insofar as the Court requires a way to manageably estimate the time reasonably needed for arrest and booking to determine liability and damages on a class-wide basis, Dr. Demuth's analysis provides a ready class-wide estimate of two hours using appropriate representative evidence, any exceptions to which may be addressed at the damages stage.

Again, the City mistakes a potential limitation on damages—here, the possibility that, had a timely probable cause hearing been conducted, it "would" have resulted in a finding of probable cause—for a defense to liability.  *See id.* at 53–54.[21]  Here, too, even if the City were entitled to the benefit of this limitation on damages (which Plaintiffs contest), it would bear the burden to establish the probable-cause counterfactual for select class members at the damages phase, and the variation in damages would not destroy predominance or commonality.[22]  Again, the City conflates the general damages Plaintiffs seek on behalf of the Class with more particularized damages that require more individualized inquiry. *Id.* at 50.

Here, too, the Court can supply an end-date to the class period based on objective criteria.  Plaintiffs submit that the same end-date the Court selects for the proposed *Bearden* Class will also be appropriate for the proposed *Gerstein* Class.

---

[21] The City goes so far as to suggest that a lack of probable cause is an "element" of Plaintiffs' *Gerstein* claim.  Opp. at 54 (citing *Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012)).  *Galarnyk* says no such thing, of course.  What it says is that a lack of probable cause is an element *of a First-Amendment retaliatory arrest claim*.  687 F.3d at 1076.

[22] With respect to the three proposed class representatives, the City claims "there is no evidence concerning whether there was probable cause for their various charges," Opp. at 56.  So it appears the City despairs of establishing that they ought to be limited to nominal damages.

The City repeats its argument that new "rules" promulgated between December 2014 and April 2016 preclude certification of a Class including arrestees from that point onward. *Id.* at 53–54. But the City provides no evidence that it stopped holding people in jail without any prospect of the requisite process. So long as the *Gerstein* and *Bearden* violations continued, both proposed Classes remain unified by the same common questions of law and fact that unified them before.

The three representatives of the proposed *Gerstein* Class satisfy typicality because, like every putative member of the Class, they were arrested without a warrant and held beyond booking with absolutely no prospect of ever receiving a probable cause hearing. *See* Memo. at 26–27.[23] As a result, they all suffered detention that was unreasonable under *Gerstein* and thus unconstitutional under the Fourth and Fourteenth Amendments. *See id.* How long that detention lasted for each class member only affects the amount of damages due them. *See Webb*, 2021 WL 5371248, at *12-13. Contrary to the City's argument (Opp. at 55), the length of the class representatives' unreasonable detentions is immaterial to the typicality of their claims as warrantless arrestees held without hope of the required process. Moreover, whether or not the representatives eventually posted bond in some amount is irrelevant to their claims under Count Seven (the claim they seek to bring on behalf of the Class), and thus immaterial to the typicality of those claims, again contrary to the City's argument (*see id.* at 56). Finally, whether a timely hearing (the like of which was never available in Ferguson) "would" have established probable cause for their respective arrests is relevant, if at all, only to the amount of damages due them. So the lack of evidence as to the past existence of such probable cause (*see id.*)—evidence missing

---

[23] A typo in Plaintiffs' opening brief caused some immaterial confusion about the date of one of Class Representative Roelif Carter's arrests. *See* Opp. at 56 n.46 (stating that "Plaintiffs mistakenly allege that ███████████ ██████"). The correct date is ███████. *See* Memo. at 10 n.37 ("Ex. 77 ( ████████ (Bates No. 022369)) ( ████████████ )." (emphases added)).

because the City never made judicial probable cause determinations—does not weigh against typicality either.

### C.  Jail-Conditions Class

Nothing in the Opposition undermines Plaintiffs' demonstration that the Jail-Conditions Class satisfies Rule 23.  *See* Memo. at 15, 20–21, & 27.  The City erroneously contends that commonality fails because the Class includes three distinct constitutional claims.  *See* Opp. at 56–59.  But Plaintiffs do not bring an excessive force claim or a stand-alone denial of medical care claim.  *See id.* at 57–58.  Rather, Plaintiffs bring only a conditions-of-confinement claim, which incorporates lack of access to medical care as one of the numerous deplorable conditions in the City's jail.  *See* Memo. at 21 & 7–8 n.33 (citing testimony that Ferguson's jail lacked medical equipment, the officers lacked medical training, and there was no policy in place to address medical concerns when they arose).  The medical-care deficiencies, in combination with the other dreadful conditions of the jail, violated the substantive due process rights of everyone confined in the jail. *See Johnson v. Lark*, 365 F. Supp. 289, 293 (E.D. Mo. 1973) (holding that the court need not "make detailed findings with respect to what medical supplies, equipment and personnel are appropriate for the operation of a jail" because the court will instead "consider whether the facilities available to the class were so inadequate as to constitute, separately or *in conjunction with other inadequacies*, a deprivation of constitutionally protected rights" (emphasis added)); *Ball v. Wagers*, 795 F.2d 579, 580 (6th Cir. 1986) (reversing district court's decision not to certify a class alleging "constitutionally deficient and inadequate jail conditions," including "overcrowding, lack of adequate water and toilet facilities, *and lack of medical treatment*" (emphasis added)).

The City's argument about the length of exposure to jail conditions (Opp. at 59–61) is irrelevant.  What length of confinement constitutes a constitutional violation is a merits issue, as

the City's own cases demonstrate. *See Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (reviewing district court's remedial orders and supervisory jurisdiction after it had held that plaintiffs had suffered unconstitutional conditions of confinement); *Smith v. Copeland*, 87 F. 3d 265, 269 (8th Cir. 1996) (reviewing summary judgment decision); *White v. Nix*, 7 F.3d 120, 121 (8th Cir. 1993) (reviewing district court decision affirming outcome of magistrate's bench trial).   The City misplaces reliance on *Covington v. Wallace* (Opp. at 60) because that court found the evidentiary record on the jail conditions "too thin" to satisfy commonality.  No. 2:12-cv-123, 2014 U.S. Dist. LEXIS 146881, at *6 (E.D. Ark. Oct. 15, 2014).   By contrast, Plaintiffs here have proffered sufficient unrebutted evidence that class members experienced sufficiently similar jail conditions to satisfy the commonality requirement.  *See* Memo. at 7–8 n.26–34, & 21 n.59–63.  Moreover, this same evidence demonstrates that the inhumane conditions "posed a substantial risk of harm" to class members as required by the model jury instructions cited by the City.  *See id.*  The City's argument to the contrary (Opp. at 62–63) is hollow, as it offers nothing to rebut Plaintiffs' evidence.

Contrary to the City's suggestion (Opp. at 59–60), at the class-certification stage, Plaintiffs need only demonstrate that class members suffered the same kind of injury, not that the extent of their injuries was identical.  *See Tyson Foods*, 577 U.S. at 460–61 (discussing that the extent to which a class member is injured is a question for the damages stage, not class certification); *see also Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011) (noting that plaintiffs can show they suffered the same injury if their injuries resulted from the same underlying harmful policy, like "discriminatory bias on the part of the same supervisor").  The City's flippant argument about typicality should be disregarded, as it cites not a single case in support.  *See* Opp. at 62.  Any

concern about ascertainability (*id.*) is addressed by ending the Class on the date Ferguson's jail ceased operations in 2017.

Notwithstanding the City's contention to the contrary (*id.* at 60–62), damages classes for conditions-of-confinement claims can certainly be certified. *See, e.g.*, *Flood v. Dominguez*, No. 2:08 CV 153, 2011 U.S. Dist. LEXIS 6754, at *8 (N.D. Ind. Jan. 21, 2011) ("[C]ourts routinely certify classes of plaintiffs seeking money damages for unconstitutional conditions of confinement in jails and prisons. This is especially true when the plaintiffs are challenging conditions of confinement that are the result of policies or practices uniformly applied to the entire class." (citations omitted)). This Court has explained that "[c]ommon questions may predominate where 'the plaintiffs are challenging conditions of confinement that are the result of policies or practices uniformly applied to the entire class,' notwithstanding the need for individual damages determinations." *Cody*, 2021 U.S. Dist. LEXIS 245380, at *18–19 (citations omitted). Such is the case here, where the City had a practice of jailing people in unconstitutionally inhumane conditions. *See* Memo. at 7, 21, & 36.

The very cases cited by the City make clear that even the need for individual damage determinations does not defeat class certification. *See Woodall v. Wayne Cnty.*, No. 20-1705, 2021 U.S. App. LEXIS 34149, at *19 (6th Cir. Nov. 15, 2021) ("[I]ndividual damages determinations alone do not make individual issues predominate over common ones."); *County of San Diego*, 2017 U.S. Dist. LEXIS 185548, at *45 ("[T]he black letter rule is that individual damage calculations generally do not defeat a finding that common issues predominate." (citation omitted)). Here, common issues of law and fact predominate for the Jail-Conditions Class (*see* Memo. at 34–36), and class members' damages can be calculated using a common methodology (*id.* at 39–40).

### D.  Warrant Class

The City's discussion of the proposed Warrant Class focuses almost entirely on the *merits* of the claim Plaintiffs seek to bring on behalf of that Class: Count Three, which alleges that the indefinite and arbitrary detention of people arrested on warrants violates due process.  *See* Opp. at 63–66.  The City describes a number of merits decisions in which lengthy periods of detention were held not to "shock the conscience" under the Fourteenth Amendment.  *See id.* (citing *Baker v. McCollan*, 443 U.S. 137 (1979); *Coleman v. Franz*, 754 F.2d 719 (7th Cir.1985); *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir.1998); *Hayes v. Faulkner Cnty.*, 388 F.3d 669 (8th Cir. 2004); *Martz v. Simmons*, No. 4:18-cv-04040, 2019 WL 2110576 (W.D. Ark. May 14, 2019)).

The merits of the claim, however, are irrelevant as to whether the Class should be certified. The Supreme Court has made clear, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013); *see also id.* at 460 ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" (quoting Fed. R. Civ. P. 23(b)(3))).

Here, as in *Amgen*, the core of Plaintiffs' claim is objective and provable by evidence common to the proposed Class: whether it shocks the conscience for a municipality to hold people in jail on minor municipal infractions without any hope of an appearance before a judge.  *See* Memo. at 21–22.  A jury could find that the thousands of days collectively endured in the City's inhumane jail—only because people could not pay some small amount of money, and never because they were a threat to public safety—did in fact shock the conscience.  Other common evidence would include the City's practice of allowing its corrections and police officers to

unilaterally determine when an arrestee could be released—generally after they finally became convinced that a person was unable to pay some amount of a bond.  Whether this deprivation violates substantive due process is a merits issue common to the entire Class, and it predominates over any individual issues.  *See id.* at 21–22 & 36.  And, as in *Amgen*, every class member's claim will fail if the answer to this common question is "no."  Further, if a jury were to award damages only to those jailed longer than some number of hours, it would be entirely capable of doing so, as the name and hours of incarceration of every member of this class are known.  For these reasons, the Court need not resolve this merits question in order to certify the proposed Warrant Class.

When the City finally turns to the requirements of Rule 23, it focuses on the "shocks the conscience" standard, arguing that it necessitates "analysis of all the circumstances surrounding each detainee's incarceration."  Opp. at 66 (quoting *Armstrong*, 152 F.3d at 570).  But *Armstrong* was not a class action and did not address Rule 23's requirements.  Moreover, the City's argument, if credited, would preclude outright any class action pursuing a substantive due process claim. And it cites nothing to support such a sweeping rule.[24]  Indeed, courts have certified classes bringing a claim for a substantive due process violation.  *See, e.g.*, *Orvis v. Spokane Cty.*, 281 F.R.D. 469, 475–76 (E.D. Wash. 2012) (certifying class of individuals who were arrested without an inquiry into ability to pay in violation of their substantive due process rights under the Fourteenth Amendment); *Garrison v. Asotin Cnty.*, 251 F.R.D. 566, 572–73 (E.D. Wash. 2008) (certifying class of detainees alleging that County Jail's "booking fee policy" violated their substantive due process rights under the Fourteenth Amendment); *Vanke v. Block*, No. CV 98-

---

[24] Nor does the City cite any case law to support its contention that a detainee's indigence is "very important" for determining whether the Warrant Class can be certified.  Opp. at 66.  Again, the proposed Class is united by the common circumstance that every one of its members has been jailed for nonpayment by Ferguson, on a Ferguson warrant, without any possibility of a first appearance or bail hearing.  *See* Memo. at 21–22.

4111, 1998 U.S. Dist. LEXIS 23488, at *6, 20 (C.D. Cal. Nov. 5, 1998) (certifying class of detainees pursuing a substantive due process claim under the Fourteenth Amendment).

Finally, the City's concern about ascertainability (Opp. at 67) can be addressed by ending the class period when the City closed its jail in 2017. Insofar as bail hearings, probable cause determinations, and first appearances have remained equally unavailable to the City's arrestees, the end-date this Court selects for the class periods of the *Bearden* and *Gerstein* Classes will also serve as an appropriate end-date for the Warrant Class period.[25]

### E.  Post-Judgment Class

The City challenges the proposed Post-Judgment Class on two alleged grounds concerning ascertainability. The first is that, as Plaintiffs noted in their opening brief, Memo. at 16, not all class members can be identified without inspection of the City's existing paper court files. *See* Opp. at 67 & n.56. The files in question contain information about each putative class member's debts and payments to the City, information that will enable the Court to determine which arrestees have been jailed by Ferguson "because of their nonpayment in connection with a prior judgment." Memo. at 10 (definition of Post-Judgment Class). Given access to these records, the determination can be made in a straightforward manner according to objective criteria, which is all that ascertainability requires. *See McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). The City suggests that it is somehow too late to make these determinations because "discovery is

---

[25] The City asserts that "there is no mention" in the Complaint "of an alleged constitutional violation of failing to cause Plaintiffs to be taken for a first appearance." Opp. at 64 n.53. On the contrary, Count Three states: "The Due Process Clause of the Fourteenth Amendment prohibits Defendant from jailing the Plaintiffs indefinitely and *without any meaningful legal process through which* they can challenge their detention by keeping them confined in the Defendant's jail unless or until they could make arbitrarily determined and frequently shifting cash payments, or until City employees decided to release them for free." ECF No. 53 ¶ 239 (emphasis added). The alleged lack of "meaningful legal process" includes the lack of any prospect of a first appearance and bail hearing, which is detailed throughout the Complaint.

closed." Opp. at 67 n.56. But courts and litigants routinely make such determinations after a class has been certified.

The City's second objection is that the proposed class definition is "impermissibly vague and ambiguous" because it raises questions that cannot be resolved by reference to objective criteria. Opp. at 67–68. "For example," asks the City, "*if the arrestee has a Ferguson FTA warrant and a warrant from another municipality, is that person included in the class?* Similarly, *what if a person who is arrested for one of the more serious (warrantless) crimes on the bond schedule and has a Ferguson FTA warrant?*" *Id.* at 68. But these questions have straightforward answers. The people arrested on warrants from both Ferguson and another municipality can be readily identified from the data already analyzed by Dr. Demuth.[26] In every such case, it is undeniable that the City held the person on its own warrant for a certain length of time during which the City would have held the person irrespective of the other municipality's warrant. The City is liable for that period of detention. If, in certain cases, the City believes it can show that it held the person for even longer solely on account of the other municipality's warrant, then the City can present that evidence at the damages phase. Such a showing could lower (but not zero-out) the amount of damages owed to that person. And the Court could, if necessary, adjust the damages formula to incorporate a representative estimate of how long the City held such arrestees solely on behalf of another jurisdiction.

As for the City's second set of putative class members—those who have an FTA warrant and are also arrested on suspicion of a new offense—they too can be identified based on Dr. Demuth's analysis.[27] Again there is guaranteed to be an amount of time during which Ferguson

---

[26] *See* Demuth Rep. at 11, Table 1 (putting the number of arrests involving both FTA warrants and warrants from other jurisdictions at ███ ).

[27] *Id.* (putting the number of arrests involving both an FTA warrant and warrantless charge at ███ ).

would have held each of these people on their warrant irrespective of the "warrantless" offense, and thus some amount of damages owed to the person as a member of the Post-Judgment Class (assuming Plaintiffs win their relevant claims—Counts Two, Five,[28] and Six—on the merits).  If, in select cases, the City can show that it held the person for even longer solely on account of a warrantless offense, then that person's damages may be limited accordingly.  And the Court could, if necessary, adjust the damages formula to incorporate a representative estimate of how long Ferguson held such arrestees solely on account of a warrantless offense. In sum, because membership in the proposed Post-Judgment Class can be determined by reference to objective criteria, the Class is ascertainable.

### III.    Plaintiffs' Prospective Claims Are Not Moot

Plaintiffs described the contours of the prospective relief sought and specific policies and practices to be remedied throughout the Complaint and Memorandum.  *See, e.g.*, Memo. at 19–24, 31–32, Ex. 18–21, & Ex. 101; ECF No. 53 at 57–58.  The record thus enables the Court, in its equitable discretion, to craft an injunction and decree that will remedy Plaintiffs' injuries.

Quoting Plaintiffs' description of potential declaratory relief—a "declaration that the City cannot place and hold people in jail solely because they cannot afford to make a monetary payment" and a "declaration that all people who owe a debt to the City are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration"—the City tellingly dismisses this language as "virtually meaningless." Opp. at 69. The City's failure to give these truths meaning (it calls them "rote, overbroad platitudes") is the reason Plaintiffs brought this suit.  And the City's continued failure to take this law seriously shows why prospective relief is still appropriate.

---

[28] *But cf.* Memo. at 40 n.95 (articulating an alternative measure of damages under Count Five, based on the amount people paid toward their City debts while locked in the Ferguson Jail on a qualifying arrest).

The City asserts that Plaintiffs' prospective claims are moot (*id.* at 69–70) but cites nothing specific to substantiate this claim.  It merely points to its proposed expert's conclusory report and asserts that the DOJ Consent Decree "*mandates* even more and greater changes to the Municipal Court and incarceration practices that are precise subject [sic] of Plaintiffs' requested declaratory/injunctive relief."  *Id.* at 70 (emphasis added).  Gesturing at promises made is not enough, however.  To begin to make a case for mootness, the City would need to map particular reforms to each of Plaintiffs' claims, identifying which reforms would, if faithfully implemented, moot which claims.  The City would then need to show that it actually has faithfully implemented the relevant reforms in such a way as to moot the corresponding claims.  The City has not met that burden.

## IV.    The City Again Misinterprets Plaintiffs' Claims and Misrepresents Its Policymaking Authority in an Attempt to Re-Litigate Its Failed Motions to Dismiss

The Opposition paints a picture of an independent municipal court that belies the evidentiary record.  Although the City claims that it has never exercised control over its municipal court, the record—including statements of the City's own counsel—indicates otherwise. The City's Opposition also ignores this Court's repeated that Plaintiff's claims are against the *City* rather than its municipal court considered as a division of the Missouri State Judiciary.[29]

The City exercised control of the actions at issue in this case independent of the actions of the municipal court.  For instance, the City's has long maintained a Municipal Code provision governing "Bail and Surety."  Ferguson Municipal Code § 13-52.  Until it was amended in 2016,

---

[29] *See, e.g.*, ECF No. 79 at 13 ("Plaintiffs' complaint is replete with allegations that each of the injuries alleged was caused by *the City's own unconstitutional policies* and by the *continuing and pervasive unconstitutional practices of a wide range of City employees.*" (emphasis added)); ECF No. 173 at 3 ("Although the City attempts to limit potential liability to individual actors…the amended complaint alleges that it was the City's unconstitutional policies, practices, and procedures that drove the unlawful conduct."); *Webb*, 889 F.3d at 486 ("Even if the [Maplewood municipal]court were entitled to immunity—an issue we do not opine on—that immunity *would not shield the City from its separate liability if any.*" (emphasis added).

§ 13-52 authorized the Chief of Police to authorize and approve bonds for people incarcerated in the Ferguson Jail.[30]  This ordinance codifies the fact that the City gave power over bond to its own police chief, irrespective of whatever power existed with the municipal judge.   Moreover, the current version of § 13-52, amended by the City Council in 2016, maintains the City's control over arrestees held upon warrants or after warrantless arrests.[31]  The ordinance provides that that "[a]ll individuals arrested by the Ferguson Police Department for an initial violation of an ordinance or an outstanding municipal warrant will receive a court date and be released on their own recognizance as soon as practicable after booking."[32]

The amended ordinance, enacted by the City Council, goes on to *require* the municipal judge to establish conditions of release in compliance with state and federal law.[33]  This reflects the City's power to control its municipal court by ordinance and supervision, as Plaintiffs have noted repeatedly in this case.  *See* ECF No. 62 at 19–23; ECF No. 169-1 at 5–9; ECF No. 171 at 4–5.  In particular, Ferguson Mun. Code Ch. 13, Art II, § 13-29(b) provides that "[a]ny and all rules made" for the municipal court by the municipal judge "may be annulled or amended by any ordinance limited to such purpose," consistent with state law, and that the municipal judge shall "[h]ave such other powers, duties and privileges as are or may be prescribed by state law, *this*

---

[30] Memo. Ex. 16.

[31] *Id.* at (a).  The preamble to the ordinance reads:

> *Whereas*, Section 13-52 of the Municipal Code addresses "bail and surety" in the Municipal Court and has not been revised since prior to 1973; and
>
> *Whereas*, the City seeks to ensure that the conditions of release imposed on individuals arrested by the Ferguson Police Department for ordinance violations or pursuant to a municipal arrest warrant issued by the Ferguson Municipal Court are consistent with the requirements of the United States Constitution, the rules of the Missouri Supreme Court, and other binding legal authorities, and that such conditions advance the City's interests in protecting public safety

*Id.*  Again, the City's longstanding regulation of bail, through its Municipal Code, reflects its general power, noted above, to control its municipal court by ordinance.

[32] *Id.*

[33] *Id.* at (d).

*Code or other ordinances of the city*" (emphasis added).  *See also id.* Art. I § 13-7 (providing similar City control over the municipal court clerk).  The City's own bail provisions—from the beginning of the class period in 2010 to today—have long demonstrated that the City itself has exercised authority over setting bond and controlling who sits in its jail.

Other actions of City officials further demonstrate the City's control over its municipal court.[34]  This control is most obviously documented in the DOJ Consent Decree,[35] which the City cites repeatedly here.[36]  The Consent Decree shows the City continuing to exercise independent control over its municipal court, completely independent of any other judicial power or involvement of the 21st Judicial Circuit.[37]  Among the provisions of the Consent Decree which assert City control over supposedly "Municipal Court" functions are the following:

- An agreement that the City would adopt six separate amendments to the Municipal Code "regarding the administration of the Ferguson Municipal Court."[38]

- An agreement that the City would "ensure that no person is held in custody after arrest because the person cannot afford to post a monetary bond."[39]

- An agreement that, within 60 days, the City would "remove the Ferguson Municipal Court from the oversight of the City Finance Director and ensure the Finance Director has no involvement in court operations."[40]

---

[34] *See, e.g.*, Waldron Decl., Ex. 121 at KNOWLES_00000016-17 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████t).

[35] Plaintiffs do not attempt to identify herein every piece of evidence that demonstrates the City's control over the municipal court but instead highlights only a few examples that confirm the City exercised such control.

[36] Opp. Ex. D

[37] *Id.*

[38] *Id.* ¶ 38(a).

[39] *Id.* ¶ 349.

[40] *Id.* ¶ 325.

In each of the above provisions agreed to by the City, and approved of by a federal district court, the City exercised significant control over its own municipal court—which it now claims to lack. *See* Opp. at 16 ("[T]he City cannot establish policy concerning Court functions such as those alleged in this lawsuit."). Notably, the City entered into this Consent Decree without any approval whatsoever from the 21st Judicial Circuit, the entity that the City now claims "exclusively" controls the Municipal Court. *Id.* The reason for this is simple: the City had for years exercised significant control over its municipal court,[41] whether in the ability to set bond,[42] the modification of bond by its police officers,[43] or the exercise of "oversight" of the municipal court by the City's finance director.[44]

In addition, statements made by the City's own lawyers show that the City continued to maintain—or at the very least, maintained from 2010-2015—significant control over its court. For instance:

- In a March 27, 2017 hearing, the City's own counsel told Judge Perry, "[W]e removed oversight of the court from our City Finance Director, right, and so the City has done that, and the City now reports directly to the St. Louis County Circuit Court and the Missouri Supreme Court." The City's counsel also confirmed that, although the municipal court now reported to the circuit court, it previously reported "to the City structure."[45]

---

[41] *See, e.g.*, Memo. Ex. 10 & Waldron Decl., Ex. 121 (describing ███████████████████████████████ ).

[42] *See* Memo. Ex. 16 (describing provisions of the City's bail ordinance which governs the practices of the municipal judge).

[43] *See, e.g.*, Memo. Ex. 20, Ex. 33 & Ex. 36–38 (describing City jail and police officials' authority to unilaterally reduce bonds).

[44] *See, e.g.*, Memo. 1-3, Ex. 5, & Ex. 9 (describing ████████████████████████████████ ██ ).

[45] *United States v. City of Ferguson*, Case No. 4:16–cv–00180–CDP (E.D.Mo.), ECF No. 63 at 24:8–17.

- On the same day, the City's counsel said the following regarding the overlap between prosecutorial and court functions: "[O]ne of the requirements of the Consent Decree was that we needed to separate the prosecutor from the municipal court, and so what we have done is that we have, you know, gone through and made sure that the municipal court staff is not performing prosecutorial duties."[46]

- In a January 8, 2020 hearing, Mayor James Knowles told this Court of the City's actions to reform the municipal court: "After the events of 2014 and the ensuing unrest, I along with our council and staff engaged in an introspective look at our city government and operations, with a strong focus on our police and courts. . . . *I asked the council to consider several significant reforms to our court system*."[47]

Last, the City invokes typical divisions of executive and judicial powers while completely ignoring the manner in which the City had—for years—run roughshod over these divisions. For instance, its Opposition is silent on the fact that City police and corrections officers unilaterally reduced bond as an inducement to extract payment from arrestees rather than actually inquiring into their ability to pay the bond.[48] And though the City attempts to claim that this unilateral police practice was somehow authorized by the municipal court, it ignores the fact that the police

---

[46] *Id.* at 26:23–27: 16.

[47] *United States v. City of Ferguson*, Case No. 4:16–cv–00180–CDP (E.D.Mo.), ECF No. 129 at 29:1-16 (emphasis added). *See also* Jason Rosenbaum, *On the Trail: The Year-Long Education of Ferguson Mayor James Knowles*, ST. LOUIS PUBLIC RADIO (Aug. 5, 2015), https://news.stlpublicradio.org/government-politics-issues/2015-08-05/on-the-trail-the-year-long-education-of-ferguson-mayor-james-knowles (quoting Mayor Knowles as saying, "[W]ithin weeks of the beginning of the unrest, we really took a serious look at ourselves. Both of our policing, our courts, how we do our fines and fee schedules, how our court functions.")

[48] *See, e.g.*, Memo. at 6, Ex.20, Ex. 33 & Ex. 36–38 (describing City jail and police officials' practices to reduce bonds to the small amount of money arrestees or their family was able to produce or just the money they had on their person when arrested to maximize bond recovered from indigent arrestees).

department's own policies—signed by the chief of police—authorize a modification in bond without any reference to a supposed authorization by the municipal court.[49]

The City offers up several inapplicable cases that ignore the unique scheme created by the City to extract revenue from arrestees.  Though the City rehashes its argument from several years ago that it is the municipal court that should be sued (or actually has been), this contention ignores the fact that neither the State nor the 21st Judicial Circuit has sought to intervene in this action or in the years of court reform that the City's lawyers and other officials have carried out in *United States of America v. City of Ferguson*.  The City's rehashed appeal to *Granda v. City of St. Louis*, 472 F. 3d 565 (8th Cir. 2007) (Opp. at 16–17) fails for the same reason it did almost six years ago: as this Court recognized then, Plaintiffs' claims do not challenge the municipal judges' adjudications under state law in particular cases.  *See* ECF No. 79 at 13 ("But Plaintiffs do not seek to hold the City liable for the judicial decisions made by a municipal court judge in particular cases.").[50]

Similarly, the City's reliance on *Hamilton v. City of Hayti*, 948 F. 3d 921 (8th Cir. 2020) (Opp. at 16–18) is misplaced.  *Hayti* involved a city government that solely followed a judge's orders regarding bond settings, and the court there relied on the premise that a "municipality cannot be liable for judicial conduct it lacks the power to require, control, or remedy," 948 F.3d at 930 (city not responsible for setting a bond alleged to be excessive).  In Ferguson, by contrast, it is undisputed that throughout the period relevant to this case, the City Council had in place ordinances giving the City's own officials authority over bond processes—authority borne out by

---

[49] *See, e.g.*, Memo. Ex. 16–17.

[50] Like *Granda*, *Williams v. City of Sherwood*, 947 F.3d 1107 (8th Cir. 2020), discussed by the City (Opp. at 19–20) concerned a judicial decision in a particular case, where the Eighth Circuit recognized that the mere fact that a local judge was paid by a municipality and required to make reports to it did not suffice to make that judge a municipal policymaker or an implementer of municipal policies.  Plaintiffs here do not and need not contend otherwise.

the Police Department's own general orders.  *That*, to borrow the City's words (Opp. at 16) is the "fundamental reality" of state and local law, and it is the City that persists in willful "ignorance" of it.

## V.     Conclusion

For the reasons set forth above and in their Memorandum, Plaintiffs ask this Court to grant their Motion and certify the proposed Classes.


Respectfully submitted,

Dated: March 4, 2022

*Attorneys for Plaintiffs*

**WHITE & CASE LLP**
By: */s/ Angela Daker*
Angela Daker (*pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Phone: 305-371-2700
Email: adaker@whitecase.com

J. Frank Hogue (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Shannon Lane (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
Phone: 202-626-3623
Email: fhogue@whitecase.com
Email: claire.leonard@whitecase.com
Email: shannon.lane@whitecase.com


Hafsa S. Mansoor (*pro hac vice*)
Cvetiva Popa (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Phone: 212-819-7670
Email: hafsa.mansoor@whitecase.com
Email: iva.popa@whitecase.com

**ARCHCITY DEFENDERS**
Blake A. Strode, #68422MO
John M. Waldron #70401MO
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
Phone: 855-724-2489
Email: jwaldron@archcitydefenders.org
—and—
**CIVIL RIGHTS CORPS**

Marco Lopez (*pro hac vice*)
Ryan Downer (*pro hac vice*)
1601 Connecticut Avenue NW, Suite 800
Washington, DC 20009
Phone: 202-844-4975
Email: marco@civilrightscorps.org
—and—
**SLU LAW CLINIC**
Brendan Roediger (MBE #6287213IL)
John Ammann (MBE #34308MO)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
Phone: 314-977-2778
Email:Brendan.roediger@slu.edu