Case: 4:15-cv-00253-AGF   Doc. #: 495-4   Filed: 04/12/22   Page: 1 of 12 PageID #: 10589

**FIXING FEES, FINES & BAIL:**

# toward a fairer system of justice

4/01/21 D. Moore
**Exhibit**
**4**

Judicature

VOLUME 103  NUMBER 3  FALL/WINTER 2019

Judicature

Published by the Bolch Judicial Institute at Duke Law. Reprinted with permission. © 2019 Duke University School of Law. All rights reserved.
JUDICATURE.DUKE.EDU

# STATE CHIEF JUSTICES AND COURT ADMINISTRATORS DISCUSS WHAT'S WORKING — AND WHAT'S NOT — AS COURTS STRIVE TO REFORM FEES, FINES, AND BAIL PRACTICES

Long ignored and highly localized, abusive fees, fines, and bail practices have created de-facto debtors' prisons throughout the country. Fines for minor infractions, such as speeding or illegal parking, are often compounded when the defendant can't pay on time. The result is that defendants who start out receiving a $35 ticket can end up facing hundreds of dollars of fines and other fees and often jail time simply because they couldn't afford to pay the ticket in the first place. But fees and fines produce revenue for courts, law enforcement, and state budgets, which creates perverse incentives for states and local governments to increase fees and fines and complicates efforts to ameliorate the problem.

The Department of Justice drew national attention to fees and fines abuses in its 2015 report on policing practices in Ferguson, Missouri. The DOJ cited the police department's focus on revenue as a driving factor behind overly aggressive policing and the public's lack of faith in the justice system. Since then, several states have overhauled bail and pretrial practices, created new systems to waive fees, and abolished the practice of suspending drivers' licenses for unpaid traffic fees. Many other courts and states are considering similar steps.

Scholars and judges came to a conference at Duke Law School in September to discuss — and find ways to mitigate — the problems stemming from the disproportionate impact of court fees, fines, and bail processes on poor and minority communities. The conference, "Fees, Fines, Bail and the Destitution Pipeline," sponsored by the Bolch Judicial Institute in collaboration with the *Duke Law Journal*, showcased emerging research and facilitated conversation among scholars and state court leaders on what is working and not working in the courts and where more study is needed.

Following are excerpts of a roundtable discussion of these issues among state high court justices and administrators, including the **HON. SCOTT BALES** (*former chief justice, Arizona*); **HON. DOUGLAS BEACH** (*senior judge, retired, Missouri Circuit Court*); **HON. MARK MARTIN** (*former chief justice, North Carolina*); **HON. JUDITH NAKAMURA** (*chief justice, New Mexico*); **HON. STUART RABNER** (*chief justice, New Jersey*); and **MARTIN HOSHINO** (*administrative director, Judicial Council of California*). Professor **DAVID F. LEVI** (*director, Bolch Judicial Institute*) and **MARY MCQUEEN** (*president, National Center for State Courts*) served as moderators.

---

**LEVI**: Thank you all for joining us. This is an important topic. The problems generated by unduly large fees, fines, and money bail plague poor people and alienate them from their local courts, and that can create a general distrust of the justice system. All of you are here today because you are actively and creatively working to address these issues in your courts. We want to hear what you have been up to, and we want to share ideas so that we can more effectively support court and state leaders as they work to identify and end this unfairness.

Chief Justice Rabner, let's start with you. How do you see the problem, and how has New Jersey approached it?

**RABNER**: Judges' work falls into different categories. In one area, we do our best to study the record and figure out the right answer in a particular case. We also get involved in initiatives, like bail reform and municipal court reform, where we try to improve the quality of justice in the state.

I'll speak briefly about the bail reform effort that's been ongoing in New Jersey for six years. What we saw, which so many other states have seen as well, was too many poor defendants sitting in jail for weeks or months on end because they couldn't afford to post even modest amounts of bail. Those individuals did not present a serious risk of danger or flight, which are the kinds of issues that should influence pretrial release decisions. On the other hand, there were defendants who did present significant levels of risk but were able to be released if they had access to money because the state ▸

Case: 4:15-cv-00253-AGF   Doc. #: 495-4   Filed: 04/12/22   Page: 3 of 12 PageID #: 10591

constitution at the time guaranteed them a right to bail.

After a study of the pretrial jail population was released, which showed the extent of the problem in our state, we set out to do something about it. It's easy sometimes to lose sight of an issue if you look at what's happening elsewhere. But if it's in your own backyard, and 12 percent of the pretrial jail population is in custody because they can't post relatively small amounts of bail, the problem can't easily be overlooked.

We created a large committee with stakeholders from across the legal spectrum — advocates, practitioners, judges, prosecutors, defense counsel, the ACLU, and others — and asked them to work together and come up with suggestions about moving to a risk-based system, in which low-risk defendants would be released and monitored, and defendants who presented the highest level of risk could be detained. Many of the proposals were later adopted into a new law, and the voters approved a constitutional amendment. For the past two years, we've been working under this new system to try to ensure a better and fairer system of justice.

What we are seeing now is that monetary bail is hardly being used anymore. It's still part of the statute, but in only one in a thousand cases, on average, is bail imposed. Instead, most defendants are being released. Slightly more than 80 percent of those arrested were released with no conditions or some conditions. If we look at the entire pool of defendants arrested on a complaint or issued a summons, 94 percent were released. The remaining, highest-risk defendants were detained.

We've also closely monitored the data to compare results under the current and former systems. People released under supervision are still showing up in court at a comparable rate and people are not committing crimes at a rate that is significantly higher than what had been going on before. We still have a lot of work to do in this area — including tweaking the risk-assessment tool with respect to domestic violence and responding to criticism from community groups — but it has been a worthwhile journey so far, and an important one.

**LEVI**: Chief Justice Bales, what is Arizona's perspective?

**BALES**: Before I turn to that, I'd like to put this in a broader context. On any given day in the United States, about 2.2 million people are incarcerated. Another 4.4 million people are under some kind of penal supervision — like probation, parole, or community supervision. And those facts relate to fines, fees, and bail because fines, fees, and bail not only contribute to cycles of poverty, they can also contribute to cycles of criminalization. According to the Bureau of Justice April 2019 Report *Jail Inmates in 2017*, of the 2.2 million people incarcerated, about 750,000 are in jails, and something like half of them are people who haven't yet been convicted. They're awaiting the disposition of their charges.

We know from studies in Arizona and from national studies, if you unnecessarily hold a person in jail, even for a day, it increases the likelihood that they're going to commit a crime once they're ultimately released. So if you care about fairness, if you care about public safety, if you care about saving public money, you want to reduce the unnecessary incarceration of people, and that's tied in to fines, fees, and bail.

So what we've done in Arizona, through a series of rulemaking, administrative orders, and some legislative changes, is to direct the judges who are

> In 2016, 87 percent of our voters approved giving judges the ability to deny bail to the truly dangerous and still provide bail to everyone else. And we're using a risk-assessment tool to determine who falls into which category. That means that no longer should anyone in New Mexico be held in jail solely because of their inability to pay to get out. —HON. JUDITH NAKAMURA

making the determination whether a person will be detained or not, pending the disposition of their case, to identify the least onerous condition that is consistent with ensuring their appearance and preserving public safety, and to require that they not impose bail unless there's no effective alternative, which is essentially what is codified at Ariz. R. Crim. P. 7.2(a)(2) and 7.3(c).

So, having adopted those changes, the challenge that we're now facing in Arizona is changing the culture among judges. Judges, for a long time, had relied on things like bond schedules. If a person appeared before them for their initial appearance, they would simply look at the bond schedule, and it would be like going to a restaurant: The menu said that for this offense of disturbing the peace, the price was $200 if you want to get out of jail, and you'd languish if you couldn't come up with it. But it's very important that we implement these new changes. As I said, if you care about fairness,

Case: 4:15-cv-00253-AGF   Doc. #: 495-4   Filed: 04/12/22   Page: 4 of 12 PageID #: 10592



LEFT TO RIGHT: PROFESSOR DAVID F. LEVI, MARY MCQUEEN, HON. JUDY NAKAMURA, HON. SCOTT BALES. PHOTO BY LES TODD.

if you care about public safety, if you care about saving public money, we shouldn't be holding people unnecessarily in jail just because they can't come up with a bond.

**LEVI**: Chief Justice Nakamura, what have you been working on in New Mexico?

**NAKAMURA**: I'd like to add to what Justice Bales said. In addition to being more likely to commit a crime once they are released, people who sit in jail are losing their jobs — employers aren't waiting. And we found, also, that folks who went into jail without a drug problem came out with one. In some cases, their first experience with drugs was happening while they were in jail, because, as we all know, there's a proliferation of drugs in jail.

So, in New Mexico, our constitution required that everyone be bailable, but it didn't allow dangerous people to be held without bond. Judges were interpreting that to give them the authority to say, "Great, you're dangerous, so I am going to set a million-dollar bond. Go bail yourself out." So in 2016, 87 percent of our voters approved giving judges the ability to deny bail to the truly dangerous and still provide bail to everyone else. We're using a risk-assessment tool to determine who falls into which category. That means that no longer should anyone in New Mexico be held in jail solely because of their inability to pay to get out. If you're truly a danger, you're being held. If you're a flight risk, bail can be set. And judges have to articulate in writing why they're setting bail for someone — the presumption is release on your own recognizance now in New Mexico.

Prior to this constitutional amendment, 33 percent of our jail population was being held on bond. That has now dropped to 4.2 percent. And we are studying, individually now, who are those people in that 4.2 percent. I believe it's going to prove to be the truly homeless, the people that could not even pay a one dollar bail. So the detention rate has dropped — but so has crime. This is what's really interesting, because everyone was worried about all of these people getting out on ROR [release on one's own recognizance]. In fact, crime has been plummeting in our jurisdictions. Now that we're using risk-assessment tools, we're able to hold the truly dangerous and release the poor back into the communities before they need to appear in court.

**LEVI**: What is the view from California?

**HOSHINO**: The California experience might not be all that different from all other states. But let me start by giving you the short version of a 30-year history.

In California, over time, some 300 programs at state and local levels have come to be funded off of the fine, fee, and assessment surcharges, or the forfeiture system, whatever you want ▶



LEFT TO RIGHT: HON. MARK MARTIN, HON. DOUG BEACH, MARTIN HOSHINO, PROFESSOR DAVID F. LEVI. PHOTO BY LES TODD.

> In California . . . we've put people on payment plans. And if you go on these payment plans, we restore your driver's license. A driver's license suspension is another part of this destitution pipeline . . . because we know Americans generally drive to work. The ability to work is the ability to get paid in order to pay off my fine and my fee and my infraction.
>
> —MARTIN HOSHINO

to call it. This is a phenomena that occurred over the course of 20 or 30 years. It starts in the 1990s or so, when the state set base fines for every infraction that occurred. In addition to base fines, there are also a series of what we refer to as "add-ons," and those were all of the fines and fees that I suggested to you previously. These were well-intentioned retail add-ons to fund brain injury, to fund medical support, and to fund DNA identification. These get piled on over the course of time such that you now have a revenue system, based in large part on fees and fines, that is generating about $2 billion a year in the system. This kind of funding is what is used instead of the traditional methods used to fund government services — usually in the form of an array of taxes and other kinds of assessments that people are used to. But now there is a debt problem in California. Ten years ago, there was $5 billion of what we called "uncollectible delinquent debt" — or the money that the state is owed under the law from these fees and fines but that it has not been able to collect. And today that number is $10 billion. So these forfeitures are still generating $2 billion, but we've got a problem where the amount of debt is rising. Now, why is that happening? It's likely because we've crossed the threshold of really what's affordable for the people who are fined and caught in this particular machinery and cycle. Now the challenge is: How do you go about unwinding all of that at this time?

I'll illustrate this with an example. You get a traffic ticket. Let's say it's speeding. The base fine in 1990 is set at $35. When it arrives in your home, it's $238. Running a red light, $35. And then it arrives in your mailbox, it's $490. Those increases reflect all of the add-ons. Now you have to appear in court. If you fail to appear in court, we then add on a $300 civil assessment. You miss your court date again, we add another $300 civil assessment. At some point, we might suspend your driver's license, too. Then you miss it again, and then here comes a bench warrant for your arrest. And then during that arrest, other things potentially happen, and that's how it becomes the destitution pipeline — even though it started as this macro public policy on how it is you'll actually fund government services.

So in California, we've attempted to do a number of things: We've done two amnesty programs in an attempt to forgive debt, but more importantly, we've put people on payment plans. And if you go on these payment plans, we restore your driver's license. A driver's license suspension is another part of this destitution pipeline, and it is another part of bad public policy because we know Americans generally drive to work. The ability to work is the ability to get paid in order to pay off my fine and my fee and my infraction. So I think you can see the point.

The other thing we're doing in California right now is working on abil-

ity to pay. Because this system built up over those 20 or 30 years, one piece of legislation at a time, it's hard to unwind that in a wholesale fashion, because while you're doing that you're trying to solve a $2 billion revenue problem. And so our attempt is to make a defendant's ability to pay a part of the judicial decision-making process, so that we can right-size now what is actually affordable for folks with the amount that they actually owe. So if you owe $500, but we determine that you can only pay $250, that becomes the amount you owe. If you need to pay with a payment plan, we put you on the payment plan. It is our best attempt at this stage in order to deal with the proportionality problem and restore fairness in a system that didn't intend to end up in this wholesale manner, but that has. We hope one day we will get to a bigger discussion about how we will actually address the tax revenue structures for government services. That structure was formed in the 1950s, so how will we make that work for a 21st-century economy? So that part is a high-level piece of it, but this is how it gets down to the ground and how it actually results in a pipeline to destitution.

**LEVI**: A lot of these issues came to light following the rioting in Ferguson, Missouri, when the Department of Justice issued a report that essentially found that the courts had lost the confidence of the minority community, who tended to view the courts as a tax collector, and as a very unfair one. You've been dealing with this, Judge Beach.

**BEACH**: Yes. I was lucky enough to be elected as the presiding judge for St. Louis County on a Wednesday, and on Friday, the Supreme Court decided that all presiding judges would be responsible for the municipal divisions, which are part of the court system in a circuit. I had 89 cities to be added, one of which was Ferguson. So it's an administrative issue because these courts, as well-intended as they may have been, had never been supervised. They ran pretty much themselves. We found that the clerks ran most of the courts because the judges for those kind of "limited jurisdiction" courts (as they are called in Missouri) were only part time. The judges came in three or four hours and did a docket.

So everything that you've just heard is very true, but on a little bit higher level than my experience — which has been boots-on-the-ground. I'm supposed to go in there and I'm supposed to implement some of these required changes. We came up with Supreme Court minimum operating standards, which were really not new — we just codified them in a way so we could see where they were. And then I was trying to get each judge to run their court according to these rules. And most of the time, the judges said, "Well, you need to ask the clerk," or "I have no idea what you're talking about there."

And in Ferguson, the Justice Department literally found an email where the mayor said to the chief of police, "Our revenues are down. Can you write tickets and get us up by 10 percent?" And his response, in writing, was, "I think we can do better than that." Well, that, of course, applies to the court system — the court system is part of generating that kind of money.

And then you start having fines that people can't pay: When you have a $500 fine and you make $1,347 a month in gross pay, which in Missouri is the minimum wage, $500 is not going to happen. So what did the people who got tickets do? Well, they didn't come to court. And when they failed to appear in court, then the judge would issue a warrant for their arrest initially. There was no, "Hey, did you miss your court date? Did you forget?" We didn't send text messages reminding you at that time. If you got another failure to appear, that would be $300.

And then, another issue we were having was there weren't always judges present to deal with folks who had been arrested. If you're arrested, only the judge can let you out or set bond or determine whether you're going to stay in jail. Well, if the judge only worked on Tuesdays and you got picked up on Thursday, you stayed until next Tuesday. As you heard earlier, one day in jail is bad enough. When you have a week in jail for no reason but because you violated a traffic ticket and you can't pay, or you didn't show up in court, there are real problems.

We did not address those things. We are addressing them now. It is a cultural change. Since England in the 1200s, we've been dealing with dollars and cents as a way to bring the public into following the law. And somewhere we may have gotten lost with that.

For the guy who was a professional football player, $500 to him is different than to somebody else. But about four out of seven people in the country don't have $500 of expendable income for a sudden thing like a $500 bail. So that could snowball. Failure to appear goes on your record. And now you get picked up for something in the state court. In the state court, you can't get out of jail because you have a warrant for your arrest for failure to appear in some small municipality.

In St. Louis County, we found, looking at people who were confined over a seven-year period, 62 percent were there for pretrial confinement or a probation violation. And we set up a committee to look at why these people were being held for more than a hun- ▶

Case: 4:15-cv-00253-AGF   Doc. #: 495-4   Filed: 04/12/22   Page: 7 of 12 PageID #: 10595

dred days. It was, time after time after time, their bond. Even if it was reduced from a thousand down to $200, they could not raise $200 to get out of jail. They're only there because they couldn't come up with that money.

Some of our judges started saying, "Well, you can get out with an ankle bracelet." So we'd let them out, with the condition that you had to go over and get an ankle bracelet. But the ankle bracelet cost $300. You couldn't afford that, so you didn't buy one. You violated your condition of release, so you went back to jail.

And so there was this cycle that just continues. It's a very large problem, and there are a lot of good things being done about it. But when you get right down to it, what I have found in my 89 courts that I have been responsible for, is that what matters is the judge and the culture that that judge establishes in terms of following the rules of the law and taking into consideration somebody's ability to pay. If you have 200 people on your docket tonight, and you started at 6 p.m., if you want to get home before midnight, you're not going to be spending a lot of time on each defendant.

Lastly, we have looked at alternatives to jail time, like community service. So in some cases we have been offering community service. We cannot order it. We offer it. Very seldom does anyone want to take us up on that. Instead, they'll say, "Judge, I think I can pay that fine," or, "Can I pay that fine over time?" Well, maybe today that person can pay $20 a month, but two months later, that person may not have that job. And we need, then, to follow back up with that person and say, "What is your ability to pay?" These are efforts which are ongoing in every state.

Ferguson was the heart of that. We had a judge on duty 24 hours a day who was on duty when the riots occurred. So I had firsthand accounts of what really happened and how it affected people that night in their real lives. And it's a very telling and a very meaningful thing when you start seeing people whose lives are unraveled for doing silly little things and they just get caught up in the cycle.

**LEVI**: Mark Martin, our beloved former chief justice, can you tell us how North Carolina is addressing these issues?

**MARTIN**: I'd like to break this down into good news and bad news. The good news is North Carolina has what's called a uniform court system. That means that when a fine or a fee is imposed, the proceeds go right to the general fund for the state. So you don't have the same perverse incentives that can arise in a Ferguson situation or a municipal court system where fines and fees might be used for employee bonuses or new furniture or what the case may be at that local courthouse. Secondly, over the last few years, we were very successful in moving forward with juvenile justice reform. Sixteen- and 17-year-olds are no longer automatically tried in adult court for 97 percent of the type of offenses that teenage defendants were confronting. And so that is positive.

> When you get right down to it . . . what matters is the judge and the culture that that judge establishes in terms of following the rules of the law and taking into consideration somebody's ability to pay.
>
> —HON. DOUGLAS BEACH

And last, but not least, we've also made great progress on expunction reform. I don't think it's a mystery to anybody in here that the overwhelming majority of criminal defendants that have active confinement will be released. And so rehabilitation always has to be a part of the equation. Because if you aren't dealing with rehabilitation, you're likely releasing someone — as the chief justice alluded to earlier — who may just have simply learned new skills in prison that are really not the type of skills that we were hoping that they would learn. People can emerge from prison with, for example, an addiction to drugs, or having had interactions with a more senior offender who has had a lot of experience committing crimes. So in order to bring people back on the street in an era of online pervasive background checks, you have to have a mechanism for breaking that cycle and allowing defendants to fully participate in the marketplace again.

So what's the bad news? Well, this state is ground zero for major problems with fines and fees, and we have to acknowledge that. One of the problems is driver's license revocations: We have 1.2 million citizens who do not currently have a valid license. It's either in a state of suspension or revocation for failure to comply with court obligations or failure to appear. And I want you to think about that. One out of seven North Carolinians unable to legally drive a car. So what happens? Well, more often than not, they have to drive a car, right? You've got to get to work. We don't have readily available mass transit in many parts of the state. So you have to have the ability to get to work to be able to support yourself, at least if the goal is to keep you in the legitimate side of the marketplace, correct? So all too often, we are forcing drivers to operate cars illegally, or if

Case: 4:15-cv-00253-AGF   Doc. #: 495-4   Filed: 04/12/22   Page: 8 of 12 PageID #: 10596

they follow the law, they lose their job, or even worse, engage in criminality.

So we need to look at several areas to make the system work better for people who find themselves generally in the criminal justice system for a relatively minor matter, like something as basic as speeding or parking in the wrong place. And we need to address the aggregation of penalties, as Martin [Hoshino] shared, where somebody does not seasonably respond to the financial penalty and it grows over time because of certain ways in which the system is operated.

We generally have a system here in North Carolina where failure to pay results in a notification being sent to DMV and a mandatory revocation without any opportunity for the driver to contest that in a judicial forum. So there are two reforms that are very much needed here. The first is an individualized determination of ability to pay when you're still in criminal court for an infraction or misdemeanor. The second is to rewrite the letter DMV sends you. Instead of automatic revocation, and a letter that says your license has been revoked, the letter says, "You're in default. You have an opportunity to appear and explain why you're in default." And then we would consider a number of options. Are they able to pay? Will installments work? And will payment work in a practical way to make sure that we're not punishing people when they are utterly incapable of paying?

**LEVI**: I wouldn't have asked you this last year when you were still chief justice, but most of what we're talking about is the product of state legislation, and it's the legislature that is the ultimate authority here. What's it like working with the state legislature on these problems?

**MARTIN**: Well, first let me admit my failure. In 2016, I made a public plea that we would have more individualized discretion by our trial judges to waive or remit penalties. Just as in California, where you have stakeholders who rely on the revenue produced by these fees and fines, you have the same here. You don't really want to say that government actors have a vested interest, right? But you do have people that are typically used to having that revenue. Because the reality is that, if you don't have that individualized assessment of ability to pay, and you require a bond that the defendant cannot post, it can be akin to denial of bond, practically speaking.

> North Carolina has what's called a uniform court system. That means that when a fine or a fee is imposed, the proceeds go right to the general fund for the state. So you don't have the same perverse incentives that can arise in a Ferguson situation or a municipal court system where fines and fees might be used for employee bonuses or new furniture or what the case may be at that local courthouse.
>
> —HON. MARK MARTIN

And so what I would share with the legislature is the same data metrics that we did on juvenile justice reform and expunction reform. And that is that reforming the fines and fees process, number one, is going to remove a lot of unnecessary clerk entries. Think about how many entries are made by clerks of court around the state and all the paperwork, and we know in advance that none of it will ever be collected. It's just form over substance. So that's point one. Point two is that we really need to come up with economic impact information so we can go to the general assembly and say, "Look, we're not talking about being easy on people who aren't driving well." I mean, we can have safe driving training. We can use GPS technology to make sure that a driver is just driving to work and back. And third, we can use other forms of community service in lieu of financial obligations to really meet critical needs in the community, and in a situation where we know the money's not going be collected anyway. So I think that's the approach that I would use with the general assembly.

**LEVI**: State courts do not have a command structure with the chief justice as a CEO who can tell lower courts and administrators what to do. So I want to ask our panelists: What can we do within the judicial system to make sure that trial judges embrace the kind of recommendations we've been discussing?

**NAKAMURA**: Judicial education, judicial education, judicial education. In New Mexico, judicial education is funded by fees on tickets! And by the way, about half of our judges are nonlawyer judges. About half of the nonlawyer judges are in our municipalities, not our state system. So, ▶

Case: 4:15-cv-00253-AGF   Doc. #: 495-4   Filed: 04/12/22   Page: 9 of 12 PageID #: 10597

although the Supreme Court is responsible for their discipline, that's about it. They're paid for, they're funded, they're operated day-to-day by the local municipality. So if you get stopped for a traffic ticket in New Mexico, you get three bucks added on to help fund judicial education. Well, traffic tickets dropped pretty significantly in part because our biggest police department was under DOJ investigation. Some people believe tickets have declined because officers feared stopping people. Our judicial education budget for the whole state, including the municipal judges who we are responsible for educating, was about $1.5 million. And over the past several years, it's dropped to about $800,000. So rather than going in the direction of providing more education about this destitution pipeline, we've been cutting back on judicial education. We did go to the legislature last year and got down on our knees and begged, and they're starting to supplement the judicial education fund now with some general fund money. But we need to educate our judges that when people do not pay, it's not an affront to their authority. There are other factors, such as poverty, that are driving the inability to pay. And so, I do agree, one of the most important things we can do is educate our judges, but not on a fee-based system.

**BALES**: I think the educational role for state courts, particularly for supreme courts, goes beyond just the judicial branch. I think in those states where you've seen successful reforms, it's often in part been a consequence of leadership within the courts, but leadership that helped enlist the support of the legislature and the executive branches, too. It's effective to explain to people, "Look, someone can get cited for a traffic violation. They fail to show up. Their license is suspended. They then get stopped for driving with a suspended license. And in some states, that could result in their arrest on the spot and the impoundment of their vehicle. So you've just created basically a self-perpetuating cycle of poverty, if not criminalization, that many people can't get out of because by that point, the fines have mounted to a level that are unpayable."

It's easy to make the case to other branches of government that such a process just makes no sense at all. And you just have to explain that whether your priorities are public safety, fiscal responsibility, or basic fairness, you need to change the system. Oliver Wendell Holmes once said, "The law is civilized only to the extent that it's conscious of what it's doing." And with respect to fines, fees, and bail, for decades we weren't really paying attention to what we were doing. And I think it's critical that courts be part of that education process, but not just with respect to judges.

> I think in those states where you've seen successful reforms, it's often in part been a consequence of leadership within the courts, but leadership that helped enlist the support of the legislature and the executive branches, too.
>
> —HON. SCOTT BALES

**MCQUEEN**: I know that the Judicial Council in California develops tools for the courts to use, and one of the things California is a leader in is income calculators. Martin [Hoshino], perhaps you could address that.

**HOSHINO**: Sure. Right now we are working on building a calculator to help determine ability to pay. We're working with your National Center for State Courts and others on it, hoping to scale it statewide and make it available to others. It attempts to restore proportionality by looking at a defendant's financial data. There's [data from] the Department of Social Services. We can get information that we see we're modeling off of the expansion of healthcare in America.

So there are ways to get there. The key is not only does this tool have to be fair and proportional, it also has to be operational. Because of the volume of cases that we are talking about, if we are asking judicial officers to make this calculation, they have to have a calculator that is rapid, valid, and reliable so that they can have confidence in it. And in order to get to the individualized assessment that a fair decision requires, you can't add more processing time to a system that already requires a lot of decisions in a short amount of time. We're in the early stages of just allowing people to prove up where they are financially, mostly based on whether or not they're on public assistance and what their benefits are, while we build out the infrastructure to link things together to have something that's a little bit more robust and a little bit more reliable. We're not going let the perfect be the enemy of the good.

**LEVI**: Judge Rabner, you were tremendously successful in radically changing

Case: 4:15-cv-00253-AGF   Doc. #: 495-4   Filed: 04/12/22   Page: 10 of 12 PageID #: 10598

the bail law in New Jersey. How did you work with the legislature?

**RABNER**: We brought the legislature and the governor's office into the conversation right at the beginning, just as we've done for other policy-type committees focused on foreclosure, mental health, and municipal court. We included legislative leaders or their key aides as members of the committee, and the same for the governor's office. That helped educate people from the start, and it created allies who, in turn, were interested in advancing legislation.

We also broadened the conversation, which helped us with the legislature and other groups. For example, some people cared passionately that no drug kingpins should be released on bail, even if they had access to half-a-million dollars, because they might intimidate witnesses once they were out. Others cared passionately that poor people not sit in jail for all the reasons we've talked about. And government officials, like county administrators and others, asked, "Why are we spending $100 a night for weeks for somebody who can't make $200 bail?" By broadening the conversation, we were able to make advances and propose a package of recommendations.

I have to add that we were lucky. We had a governor who cared strongly about detention, and legislators who cared passionately about other issues as well. They thought of the forum the judiciary created as a neutral place where we could work together. We also provided the other branches with a steady stream of information about the data and the results — in order to educate and teach, which is critical, as so many have stressed. We did the same for our judges, who want to do the right thing.

**AUDIENCE MEMBER**: Can you say more about the kinds of risk-assessment tools these systems are using, including their potential for bias?

**MCQUEEN**: I would say that the biggest change that's taken place, I think, in the legal and the court system over the last 50 years, is moving from concentrating on cases to concentrating on people, and actually using kind of a triage approach when somebody comes into the court system. So there's a lot of attempts to look at ability to pay, to look at some of those issues about the individual, not just about the severity of the crime that was committed. Those are taken into account. So I think some of these risk-assessment tools are being used for that, for judges.

I'll give an example. Somebody will come in and say, "Well, I really can't pay." And somebody will look at them and say, "Well, where'd you get those Nike tennis shoes?" That's not okay. Justice really is supposed to be blind to those types of issues. And so I don't know if that gets to it directly, but yes, there are efforts in almost every state to look more at the individuals. That's why you see this emphasis on drug courts or problem-solving courts or veterans courts and mental health courts — it's because we've learned over time that this is about people. It's not just about cases and how many cases did we dispose of or how fast did we dispose of them. So I would say that's been one of the biggest changes that I've seen, and it is based on looking at the individual.

**BALES**: The assessment tools focus on the risk that the defendant either does not appear or is arrested for another crime on release. But the tools — and it's a carefully chosen word, "tool" — they don't answer the question whether a person is held or not. That's still a decision for the judge. And this makes it all the more important that those individuals have access to counsel who can advocate on their behalf and explain why, perhaps for reasons not reflected in the tool, there isn't really a risk that the defendant will fail to show up because, in fact, they have a job, they have a family, they have support in the community. So that's the way that we're getting at those personal characteristics of the defendant that might complement the information that comes from the tool, but it puts a premium on their having effective representation.

**HOSHINO**: And to clarify, calling risks "low," "medium," and "high" are just the derivative outcomes. Behind that is information about your criminogenic needs, your past, your background, or your mental health issues. Do you have housing? Are you employed? Are there anger management issues? It depends on the type of tool, but some of them will go that far, that deep, and that information becomes important to a judicial officer. If an office is going to make a decision on release — whether it's ROR or some conditions or supervision or monitoring or tying release to drug treatment — then that kind of information is available to the officer if they choose to dig for it. I hope that answers your question.

**BEACH**: But as we go in that direction, towards more individualization, the other part to consider is whether you actually have services to provide this person. So unless the social services and the rest of the government are bringing the services together, then the judge is limited. I've heard judges say, "I'm keeping him here to protect him. He has nowhere to go. He's not ▸

necessarily going to commit another crime and he doesn't quite fit our criteria for harming himself." So you begin to get all kinds of issues about doing the correct thing that is going to help that society and that individual when they go out on bond.

**HOSHINO**: To address the part of the question about bias, I think the systems are struggling with risk-assessment tools, because one of the central elements of many of these tools is prior convictions or prior arrests. And if you believe that the criminal justice system has, already embedded in it, institutionalized levels of racism, then that's how it gets derivative into the tool. So back to education and training — we need to make sure the judicial officers are aware of both the strengths of the tools, but also of these kinds of limitations, when a judge is making a decision. And at the same time, as a system embarks on this, you can ask questions about the data sets, as we do in California: Do black males come out "high risk" more often than white males on the same charge, and where and why? And if you go into it, you can actually test and plumb for the thesis, and again, make adjustments as you go forward. But there's a healthy debate — that's probably the best way to put it — indeed, a very robust and a raucous debate, going on in criminal justice and the court system about risk-assessment tools.

**BALES**: It's important to recognize that there's not just one risk-assessment tool out there. Some have been, I think appropriately, criticized for explicitly building in socioeconomic factors and, in some instances, gender and race. Others keep that out. And any time you're going have preventative detention — that is, any time you're going

> Why are so many diverse individuals in custody to begin with? That's a fair question that goes beyond the judiciary and beyond risk-assessment tools. Judges respond to cases that are brought into the system, and we need to together discuss the impact of race on the decision-making process at different stages with other stakeholders in the criminal justice system.
>
> —HON. STUART RABNER

hold people pending the disposition of their charges — you're going to have some kind of risk assessment. It might be a judge looking at a defendant and sizing up whether they think that person will behave themselves if they're released or not. What a risk-assessment tool does, if it's done properly, is it gives you a tool that is uniform, potentially validated, and potentially transparent, if you're very open about what the factors are and how the calculations are made. And it gives you the opportunity to be fairer in those respects by tamping down the opportunities for an individual decision maker to exercise biases, whether implicit or explicit. But those are fair concerns that we need to be conscious about as we're both developing the tools and assessing how they're actually working.

**RABNER**: The potential for bias is something that we need to continue to watch closely, and we will. Look at the numbers from our experience these past two years. The pretrial jail population in our state is now down more than 40 percent — 6,000 individuals altogether: 3,000 black, 1,500 white, and 1,500 Hispanic. One can look at that in two ways. First, why are so many diverse individuals in custody to begin with? That's a fair question that goes beyond the judiciary and beyond risk-assessment tools. Judges respond to cases that are brought into the system, and we need to together discuss the impact of race on the decision-making process at different stages with other stakeholders in the criminal justice system. Second, if one looks at the data in terms of the effect of the new system on judges' decisions, which are now aided by risk-assessment tools, the large majority of the advance has been for people of color. That is some good news to consider as well.

**BALES**: New Jersey, Arizona, Kentucky, and several other jurisdictions use a risk-assessment tool called the PSA, which was developed by the Arnold Foundation. One of its key virtues is its transparency. They're quite open about how they've identified the factors that are considered. They're open to continual reevaluation. There are some proprietary entities out there that have developed risk-assessment tools, and it's kind of a black box. And I would be very wary, as a court leader, of wanting to adopt that kind of system. I think that's kind of antithetical to the way courts should work.

**Watch a video of this discussion and read more about the Bolch Judicial Institute conference on fees, fines, and bail at judicialstudies.duke.edu.**

