UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEILEE FANT, et al.,

|                                            |                               |
| ------------------------------------------ | ----------------------------- |
|                   Plaintiffs,              | CASE NO. 4:15-CV-00253-AGF    |
| v.                                         |                               |
| THE CITY OF FERGUSON, MISSOURI,            |                               |
|                   Defendant.               |                               |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant City of Ferguson offers this memorandum in support of its Motion for Summary Judgment ("Motion").

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

ARGUMENT ....................................................................................................................... 1

I. APPLICABLE LAW; HISTORICAL DEVELOPMENTS IN THE MISSOURI MUNICIPAL COURTS ........... 1

A. Summary Judgment Standard ...................................................................... 1

B. Plaintiffs' Burden to Prove Municipal Liability ............................................ 2

i. Must Prove Predicate Constitutional Violation for Each Claim ................. 2

ii. Must Prove Unconstitutional City Policy or Custom of Deliberate Indifference as Moving Force Behind Each Violation ................................. 2

iii. Must Prove Deliberate Action or Inaction by the Ferguson City Council .... 3

C. History and Evolution of Municipal Courts in Missouri ................................. 4

D. Municipal Courts Cannot Act for a City ........................................................ 7

II. COUNT ONE: CLAIMS OF JAILING PLAINTIFFS FOR THEIR INABILITY TO PAY THE CITY ............ 9

A. "Equal Process" for the Indigent Under the Fourteenth Amendment ............... 10

B. Setting and Reviewing Bond and Determining Length of Incarceration and Conditions of Release are Judicial Functions and Policies ............................................. 17

C. Undisputed Evidence Concerning the Role of the Ferguson Municipal Court and the

Oversight of the 21st Judicial Circuit of the State of Missouri.....................................22

D. No Class Can Prevail on Count One..............................................24

    i. No Proof of Class Wide Indigence .................................................24

    ii. No Proof that All Class Member Detentions Were Unreasonable ..............26

    iii. No Proof of Damages for Each Class Member............................................28

III. COUNT TWO: CLAIMS OF IMPRISONING PLAINTIFFS WITHOUT APPOINTING ADEQUATE COUNSEL

.......................................................................................................................31

A. The Right to Appointment of Counsel Has Limited Application in Municipal Cases .31

B. The Responsibility to Appoint Counsel Lies Solely With the Judiciary .....................33

C. The Uncontroverted Evidence Defeats This Claim .....................................33

IV. COUNT THREE:   CLAIMS OF INDEFINITE AND ARBITRARY DETENTION IN VIOLATION OF

[SUBSTANTIVE] DUE PROCESS...............................................................................33

A. Substantive Due Process Right to be Free from Indefinite and Arbitrary Detention ...33

B. Plaintiffs' Inability to Make Submissible Case on the Uncontroverted Record...........38

V. COUNT FOUR: CLAIMS OF DEPLORABLE CONDITIONS IN THE FERGUSON JAIL IN VIOLATION OF

DUE PROCESS AND CONSTITUTING IMPERMISSIBLE PUNISHMENT ............................................40

A. The Law: Jail Conditions Claims of Pretrial Detainees................................................40

B. Plaintiffs' Evidence of the Ferguson Jail Conditions....................................................42

C. The Record Does Not Support a Submissible Conditions Claim .................................43

VI. COUNT FIVE: CLAIMS OF USE OF JAIL AND THREATS OF JAIL TO COLLECT DEBTS OWED TO THE

CITY IN VIOLATION OF EQUAL PROTECTION.................................................................46

A. Equal Protection for Indigent Judgment Debtors.........................................................46

B. Enforcement of Judgments is a Judicial Function; The Record Does Not Support

    Liability Against the City ...........................................................................49

VII. COUNT SIX: CLAIMS OF ISSUING AND SERVING INVALID WARRANTS IN VIOLATION OF THE

FOURTH AND FOURTEENTH AMENDMENTS ...............................................................51

A. Probable Cause As Condition for Any Significant Pretrial Restraint on Liberty; Satisfied

    by Bench Warrant; Judicial Function........................................................51

B. The Record Does Not Support Liability Against the City ............................................52

VIII. COUNT SEVEN: CLAIMS OF EXTENDED DETENTION OF WARRANTLESS ARRESTEES WITHOUT A

NEUTRAL JUDICIAL FINDING OF PROBABLE CAUSE BASED ON SWORN EVIDENCE IN VIOLATION

of the FOURTH and FOURTEENTH AMENDMENTS ................................................................52

      A. *Gerstein* and Probable Cause ..........................................................................53

      B. Judicial Findings of Probable Cause Are Judicial Functions........................56

      C. The Record Does Not Support Liability Against the City ............................56

IX. ALTERNATIVE MOTION FOR SUMMARY JUDGMENT AFTER JUNE 30, 2015 ............................57

## **TABLE OF AUTHORITIES**

## **Cases**

*Alabama v. Shelton,* 535 U.S. 654 (2002)................................................................31,32

*Albright v. Oliver*, 510 U.S. 266, 271 (1994) .................................................................9

*Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998)...........................................35,37,38

*Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201(8th Cir. 2013)........................3

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) .....................................................27

*Baker v. Florissant*, 4:16-cv-01693-NAB (E.D.Mo. 2023)........................................21

*Baker v. McCollan*, 443 U.S. 137 (1979) ................................................34,35,36,40,51

*Bearden v. Georgia*, 461 U.S. 660 (1983) ........................................................12,13,49

*Beaulieu v. Ludeman*, 690 F.3d 1017 (8th Cir. 2012)...........................................40,42

*Bell v. Wolfish*, 441 U.S. 520 (1979) ..........................................................................40

*Board of County Com'rs of Bryan County*, Okl. v. Brown, 520 U.S. 397 (U.S. (Tex.), 1997) .......3

*Branson v. O.F. Mossberg & Sons, Inc*., 221 F.3d 1064 (8th Cir. 2000) ......................20

*Brenizer v. Cnty. of Sherburne*, 2022 WL 1110203 (D. Minn. Feb. 1, 2022) ..............41

*Brockinton v. City of Sherwood*, 503 F. 3d 667 (8th Cir. 2007) ..................................2

*Butler v. Fletcher*, 465 F.3d 340 (8th Cir. 2006) .......................................................41

*Cain v. City of New Orleans*, 327 F.R.D. 111 (E.D. La. 2018) .............................10,21

*Carey v. Piphus,* 435 U.S. 247, 98 S. Ct. 1042 (1978) .......................................29,30,31

*Chruby v. Global Tel Link Corporation*, 2017 WL 4320330 (W.D. Ark. Sept. 28, 2017)...........50

*City of Stanberry v. O'Neal*, 150 S.W. 1104 (1912) ..............................................11,47

*Coleman v. Franz,* 754 F.2d 719 (7th Cir. 1985).........................................................35

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ...........................................................2

*Connick v. Thompson*, 563 U.S. 51.................................................................................................2

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).....................................16,26,27,36,53,54

*Daves v. Dallas County, Texas*, 2022 WL 72201 (5th Cir. Jan. 7, 2022)..................................9,16

*Dixon v. City of St. Louis*, 2021 WL 616153 (E.D. Mo. Feb. 17, 2021) ..................................10,24

*Eggar v. City of Livingston*, 40 F.3d 312 (9th Cir. 1994) ...........................................................33

*Endres v. Wells Fargo Bank*, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008) ..................................50

*Farmer v. Brennan*, 511 U.S. 825 (1994)..............................................................................40,41

*Fuller v. Oregon*, 417 U.S. 40 (1974)..........................................................................................48

*Gerstein v. Pugh*, 420 U.S. 103 (1975)............................................................................16,36,53

*Goldman v. Forbus*, 17 Fed. Appx. 487 (8th Cir. 2001).............................................................57

*Granda v. City of St.* Louis, 472 F. 3d 565 (8th Cir. 2007) ...........................................................7

*Hall v. Black*, 2006 WL 2959459 (W.D. Ark. Oct. 17, 2006).......................................................25

*Hamilton v. City of Hayti, Missouri*, 948 F.3d 921 (8th Cir. 2020)............................7,8,19,33,51

*Harris v. Missouri Court of Appeals, Western Dist.*, 787 F.2d 427 (8th Cir. 1986)....................19

*Hayes v. Faulkner County, Arkansas*, 388 F.3d 669 (8th Cir. 2004)…………………….35,36,38,39

*James v. Strange*, 407 U.S. 128 (1972)................................................................................47,48,49

*Kayser v. Caspari*, 16 F.3d 280 (8th Cir. 1994) .........................................................................43

*Klinger v. Dep't of Corr.*, 107 F.3d 609 (8th Cir. 1997)................................................................48

*Luckes v. County of Hennepin,* 415 F.3d 936 (8th Cir. 2005) .....................................................40

*Martz v. Simmons*, 2019 WL 2110576 (W.D. Ark. May 14, 2019).............................................35

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) .............................1

*McKlintic v. 36th Judicial Circuit Court*, 508 F.3d 875 (8th Cir. 2007).....................................19

*Memphis Community School Dist. v. Strachura*, 477 U.S. 299 (1986) ........................................31

*Monell v. Department of Soc. Servs.,* 436 U.S. 658 (1978)..................................................... *passim*

*Morris v. Zefferi*, 601 F.3d 805 (8th Cir.2010).............................................................................40

*Museitef v. United States*, 131 F.3d 714 (8th Cir. 1997) ...........................................................10

*Ness v. City of Bloomington,* 11 F.4th 914, 922 (8th Cir. 2021).................................................22

*ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018)....................................................14,16,17

*Pearson v. Callahan*, 555 U.S. 223 (2009).................................................................................42

*Portis v. City of Chicago, Ill.*, 613 F.3d 702 (7th Cir. 2010)........................................................16

iv

*Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978)...........................................................11,14,25

*Reynolds v. United States*, 80 S. Ct. 30 (1959)...................................................................11

*Ricketts v. City of Columbia, Mo.*, 856 F. Supp. 1337 (W.D. Mo. 1993)....................................11

*Roubideaux v. N. Dakota Dept. of Corr. & Rehab.*, 523 F. Supp. 2d 952 (D.N.D. 2007) ............15

*Schulz v. Long*, 44 F.3d 643 (8th Cir. 1995)..........................................................................50

*Scott v. Illinois,* 440 U.S. 367 (1979)..................................................................................31,32

*Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773 (8th Cir. 2001) ......................................................3

*Slaven v. Engstrom*, 710 F.3d 772, 781 (8th Cir. 2013) .....................................................20,22

*Smith v. Copeland*, 87 F.3d 265 (8th Cir. 1996)................................................................41,43

*Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941(8th Cir. 2017)  ...........................................4

*State v. Jackson*, 384 S.W.3d 208 (Mo. banc 2012) ..............................................................18

*Stickley v. Byrd,* 703 F.3d 421 (8th Cir.2013) ......................................................................40

*Stearns v. Inmate Services Corp.*, 957 F.3d 902 (8th Cir. 2020)..............................................41

*Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991) ..............................22

*Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385 (8th Cir. 2007)..................21,40,59

*Temple v. Cleve Her Many Horses*, 163 F. Supp. 3d 602 (D.S.D. 2016) ...............................12,15

*Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833 (D. Minn. 2021)  ........................................3

*Troupe v. St. Louis Cnty.*, 2022 WL 782325 (E.D. Mo. Mar. 15, 2022) ......................................3

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .........................................................10

*United States v. Clary*, 34 F.3d 709 (8th Cir. 1994) ..............................................................17

*U.S. v. Cunningham,* 866 F.Supp.2d1050 (S.D.Iowa 2012)....................................................48

*United States v. Higgins*, 987 F.2d 543 (8th Cir. 1993)..........................................................11

*United States v. Owen*, 854 F.3d 536 (8th Cir. 2017)..........................................................32,33

*United States v. Spenceri,* 684 F.2d 220 (2d Cir.1982) ...........................................................51

*Veatch v. Bartels Lutheran Home*, 627 F.3d 1254 (8th Cir. 2010)..........................................21,59

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ..............................11

*Walker v. City of Calhoun, GA*, 901 F.3d 1245 (11th Cir. 2018) .........................13,14,15,16,26,27

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ..........................................................2,44

*Walton v. Dawson,* 752 F.3d 1109 (8th Cir.2014)..................................................................41

*Ward v. Acoustiseal, Inc.*, 129 S.W.3d 392 (Mo.App. W.D. 2004)............................................51

*Ware v. Jackson County,* Missouri, 150 F.3d 873 (8th Cir. 1998).  ............................................3,41

*Weed v. Jenkins*, 873 F.3d 1023 (8th Cir. 2017)...........................................................................4

*Williams v. City of Sherwood*, 947 F.3d 1107 (8th Cir. 2020)........................................................8

*Williams v. Delo,* 49 F.3d 442 (8th Cir.1995)..............................................................................43

*Wood v. Wooten*, 986 F.3d 1079 (8th Cir. 2021) ........................................................................51

*Youngbear v. Thalacker*, 174 F. Supp. 2d 902 (N.D. Iowa 2001) .................................................17

## **Rules**

Fed.R.Civ.P. 12(b)(6).....................................................................................................17

Fed.R.Civ.P. 23 ...........................................................................................................2,

Fed.R.Civ.P. 56 ........................................................................................................1,2,10

Mo. Sup. Ct. Operating Rules ...........................................................................................5

Mo. Sup. Ct. Rule 31.02 .................................................................................................33

Mo. Sup. Ct. Rule 33.01 .................................................................................................18

Mo. Sup. Ct. Rule 37 ............................................................................................. *passim*

Mo. Sup. Ct. Rule 37.04 ...................................................................................................5

Mo. Sup. Ct. Rule 37.15 .................................................................................................18

Mo. Sup. Ct. Rule 37.16 .................................................................................................18

Mo. Sup. Ct. Rule 37.17 ..........................................................................................18,55,56

Mo. Sup. Ct. Rule 37.19 ...........................................................................................18,27

Mo. Sup. Ct. Rule 37.22 .................................................................................................18

Mo. Sup. Ct. Rule 37.26 .................................................................................................18

Mo. Sup. Ct. Rule 37.43 .................................................................................................18

Mo. Sup. Ct. Rule 37.47 ....................................................................18,19,27,33,37,39

Mo. Sup. Ct. Rule 37.50 ...........................................................................................18,33

Mo. Sup. Ct. Rule 37.62 .................................................................................................18

Mo. Sup. Ct. Rule 37.65 .................................................................................................19

## **Statutes**

42 USC § 1983........................................................................................................ *passim*

Mo. Rev. Stat. § 82.020 ..............................................................................................4

Mo. Rev. Stat. § 221.510 (Jake's Law)......................................................................20

Mo. Rev. Stat. § 477.600 ............................................................................................5

Mo. Rev. Stat. § 479.010 ............................................................................................4

Mo. Rev. Stat. § 479.070 ......................................................................................11,18

Mo. Rev. Stat. §479.360 (2016)................................................................................20

Mo. Rev. Stat. §544.170 ......................................................................................55,56

Mo. Rev. Stat. §560.026 ............................................................................................18

Mo. Rev. Stat. §560.031 ......................................................................................18,48

Mo. Rev. Stat. §558.004 ............................................................................................18

Mo. Rev. Stat. §558.006 ......................................................................................18,48

Mo. Rev. Stat. §575.180 ............................................................................................20

## Other Law

Mo. Const..........................................................................................................*passim*

Mo. Const. art. I § 11 ................................................................................................48

Mo. Const. art. I § 20 ................................................................................................18

Mo. Const. art. I § 32 ................................................................................................18

Mo. Const. art. V § 5..................................................................................................5

Mo. Const. art. V § 27.2(d)......................................................................................4,11

Mo. Const. art. V § 27.5............................................................................................34

U.S. Const. amend. XIV ....................................................................................*passim*

"Senate Bill 5" ("SB 5") ..................................................................................*passim*

Ferguson Charter..........................................................................................................4

Ferguson Municipal Code..........................................................................................4,11

ARGUMENT

Though a class action, this case remains simply one seeking municipal liability that must satisfy *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978) and its progeny. This means proving that the injuries claimed by Plaintiffs and each class member were directly caused by a deliberate policy or custom of the City and not another entity. This Court has never been poised to decide whether Plaintiffs can proceed to trial on the evidence in light of *Monell*; indeed, class certification avoided the merits.[1] Such moment is now presented for the first time.

Ferguson will initially address the standards, law of municipal liability, and historical developments in the Missouri municipal courts, exposing the absent State's role in judicial oversight and the constitutional dichotomy between the municipal division operating within the City of Ferguson and the municipal corporation that is the City itself. It will then turn to each count and Plaintiffs' failure to preserve a submissible case on the uncontroverted record, including the failure of the classes, and conclude with additional dispositive issues applicable to all classes.

## I. APPLICABLE LAW; HISTORICAL DEVELOPMENTS IN THE MISSOURI MUNICIPAL COURTS

### A. Summary Judgment Standard

"[T]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). Facts and inferences are viewed most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The moving party must establish the absence of a genuine issue of material fact and right to judgment as a matter of law. Fed.R.Civ.P. 56(a),(c). Once that burden is met, the non-moving party may not rest on its pleadings, but by affidavit or other evidence must set forth specific facts showing that a

---

[1] ECF 519 p. 13.

genuine issue of material fact exists. Fed.R.Civ.P. 56(e). Nothing in Rule 23 alters this standard or Plaintiffs' burden of proof at trial - even on class issues, and even if certification included merits inquiries. See *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013) (Plaintiffs' burden to prove class-wide damages at trial); and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352, n. 6 (2011) (noting during certification a merits question that remained "an issue [plaintiffs] will surely have to prove *again* at trial in order to make out their case on the merits.") (emphasis original).

### B.  Plaintiffs' Burden to Prove Municipal Liability

#### i.  Must Prove Predicate Constitutional Violation for Each Claim

Municipal liability under 42 USC § 1983 requires that "individual liability first must be found on an underlying substantive claim." *Brockinton v. City of Sherwood,* 503 F. 3d 667, 674 (8th Cir. 2007). Plaintiffs must prove that the class representatives *and* each class member suffered actual violation of his constitutional rights before the City may be held liable on each claim.

#### ii.  Must Prove Unconstitutional City Policy or Custom of Deliberate Indifference as Moving Force Behind Each Violation

A City may only be liable for *its own* unconstitutional policy or custom that is the moving force behind a constitutional violation. *Monell.,* 436 U.S. at 694. Thus:

> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. These are action[s] for which the municipality is actually responsible.

*Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (citations omitted, cleaned up). Plaintiffs may establish an actionable "custom or usage" by demonstrating:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking

officials after notice to the officials of that misconduct; and (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.,* [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (citations omitted); see also *Troupe v. St. Louis Cnty.*, 2022 WL 782325, at *18 (E.D. Mo. Mar. 15, 2022) (failure to train claims are simply extensions of policy and custom claims, requiring deliberate indifference).

Proving municipal liability upon a custom requires Plaintiffs to meet "stringent" and "rigorous" standards of "culpability and causation" in order "to prevent § 1983 liability from collapsing into state tort law or into respondeat superior liability, an intent not contemplated by § 1983." *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 778 (8th Cir. 2001) (citations omitted). "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability," but Plaintiffs must also prove "that the defendant 'made a deliberate choice' to ignore alleged violations." *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 843 (D. Minn. 2021) (citations omitted). "The 'deliberate indifference' requirement ensures that the city's conduct was the 'moving force' behind the constitutional violation." *Id*. at 843 (citation omitted). To constitute a "moving force," the municipality's conduct must be deliberate, and "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (U.S. (Tex.), 1997).

### iii.  Must Prove Deliberate Action or Inaction by the Ferguson City Council

*How* the City can act deliberately is a necessary threshold question, exclusively a matter of state law, and must be identified by this Court. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013) (determination of a final policymaker is not a jury question). "The need for the trial judge to identify a final policymaker—and not submit the issue to the jury—is beyond

debate." *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017) (citations omitted). "Only after the judge identifies an official as a final policymaker is it appropriate for the jury to determine whether [that official's] decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur." *Id*. (citation omitted). Further, "federal courts are not justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id*. (citations, internal quotation marks omitted).

The final policymaker for Ferguson, a home rule charter city, is its council. See § 82.020 R.S.Mo.; and Ferguson Charter, Art. III, § 3.1.[2] Ferguson's code of ordinances also provides that the original jurisdiction of the municipal court extends to all ordinance violations and that:

> The municipal court shall be subject to the rules of the circuit court of which it is a part, and to the rules of the state supreme court. The municipal court shall be subject to the general administrative authorities of the presiding judge of the circuit court, and the judge and court personnel of the municipal court shall obey his directives.

Ferguson Municipal Code §§ 13-2, 13-3. At law, Ferguson's final policymakers have no authority to create policy for the municipal court, or vice versa. Ferguson can only act deliberately through its council; no action or inaction may be attributable to the City without the knowing participation of its council. To hold otherwise ignores state law fixing the City's policymakers, and the Supreme Court law mandating that a City be held responsible only for *its own* deliberate actions.

### C.  History and Evolution of Municipal Courts in Missouri

Since 1979, municipal courts have been a division of the Circuit Courts, and exclusively within their control. Mo. Const. Art. V, §27.2(d); and §479.010 R.S.Mo. ("violations of municipal ordinances shall be heard and determined only before divisions of the circuit court"). Under the

---

[2] "Except as this charter provides otherwise, all powers of the city shall be vested in the council. The council shall provide for the exercise of these powers and the performance of all duties and obligations imposed on the city by law." See *Weed v. Jenkins*, 873 F.3d 1023, 1028 (8th Cir. 2017) (court may take judicial notice of ordinances and charters).

Missouri Constitution, Ferguson has no authority over the municipal court. SOF 43-44.

Pursuant to its authority under Mo. Const. Art. V, sec. 5, in 1985 the Missouri Supreme Court adopted Supreme Court Rule  37  governing the operation of the municipal courts. Under those Rules, the presiding judge of the circuit has general administrative authority over the municipal divisions of the circuit court, their municipal judges and court personnel. Rule 37.04. The Supreme Court has ultimate authority over the circuit courts and the municipal divisions. This is true even in those areas where the municipalities have separate responsibilities. For example, just as counties must fund their circuit courts, municipalities must fund their municipal divisions (i.e., pay the salaries of the judges and clerks and other expenses of court operation). However, if there is a budget dispute between a municipality and the municipal division, it is adjudicated first by the presiding judge and, ultimately by the Missouri Supreme Court. See, Mo. Sup. Ct. Operating Rules 13.01 and 13.02 and Mo. Rev. Stat. sec. 477.600. SOF 45-51.

Until the events in Ferguson in August 2014 and the resulting scrutiny of, *inter alia,* the municipal court system, the circuit presiding judges' and Supreme Court's oversight of this system was virtually non-existent. In May 2015, the Missouri Supreme Court formed a Municipal Division Work Group of nine judges and attorneys tasked with "assist[ing] the Court by reviewing all matters relevant to practice in the municipal divisions of the circuit court and make recommendations concerning any appropriate changes to court rules or practices that can be implemented by the Court as well as any suggestion that may require legislation or action by other entities." Ex. V. Mo. Sup. Ct., *en banc,* Order dated May 14, 2015. That Work Group issued an interim report in September 2015 and a final 140-page report on March 1, 2016. SOF 52-57.

The Work Group's report and recommendations to the Supreme Court were wide-ranging. It included topics such as: (a) warrants, incarceration, and bonds; (b) enforceability of

municipal court judgments; and (c) providing for adequate supervision of municipal courts in St. Louis County. The Work Group issued about 35 Recommendations that specifically noted to whom the recommendation was directed. The overwhelming majority of these Recommendations suggested actions to be taken by the Supreme Court, presiding circuit judges and/or municipal courts.  A few  included suggestions to the Missouri General Assembly. Tellingly, only a couple involved the municipalities, and none related to the issues in this case. SOF 58-61.

At the same time as the Supreme Court was studying the issues, effective August 28, 2015, the General Assembly enacted significant changes to various aspects of the law in this area with Senate Bill 5 ("SB 5") (This statute was amended in 2016). With respect to the issues pertinent to this case, this legislation repealed and re-wrote portions of what is known as the Macks Creek law concerning maximum permissible municipal court revenue (substantially reducing it) and enacted (a) reporting requirements for the circuit court presiding judge; (b) limits on incarceration; and (c) requirements that defendant's financial condition be considered in certain instances. SOF 62.

In September 2016 and thereafter, following receipt of the Work Group Report, the Supreme Court enacted wide-sweeping revisions to Rule 37 that addressed many of the Recommendations that it had received. Of relevance here, effective January 1, 2017, the Court adopted Appendix B (a code of conduct for municipal division personnel), and later that year, Appendix C (a notice of defendants' rights in municipal court), Appendix D (standards for enforcement of court-ordered legal financial obligations and bench card for judges), and Appendix E (protocols for presiding court judges in supervising municipal division judges). In addition, the Court amended a number of other Rules over the next three years. SOF 60.

While the operation of the Court is independent of the City, the Defendant will nonetheless outline the court's compliance with these vast new requirements in the last section of this Memorandum.

### D.  Municipal Courts Cannot Act for a City

Because Ferguson's final policymaker is its council, it cannot be held to have acted deliberately through another entity, including the municipal court. The 8th Circuit preserves this dichotomy. For instance, in *Granda v. City of St. Louis*, 472 F. 3d 565 (8th Cir. 2007) a mother sued the City of St. Louis for an alleged practice of illegally incarcerating the parents of truant children. The 8th Circuit upheld summary judgment for the city because the policy emanated from the judge of the municipal court who, despite being appointed by the mayor and required by ordinance to provide reports to the city about case data for effective ordinance enforcement, was not a municipal policymaker and could not make city policy. *Id.* at 568.

Similarly, in *Hamilton v. City of Hayti, Missouri*, 948 F. 3d 921 (8th Cir. 2020), the 8th Circuit affirmed summary judgment and dismissal of certain claims involving the municipal judge, court clerk, and municipality based on setting cash-only bond. The plaintiff in that case claimed that the "unconstitutional bond practice is fairly attributable to the City of Hayti." *Id*. The 8th Circuit flatly rejected this claim holding as follows:

> Under Missouri law, municipal courts are divisions of circuit courts that are state entities. If a municipal court judge sets an "excessive" condition for release, the person accused may file an application in the circuit court, which can "make an order setting or modifying conditions for the release." Judge Ragland's judicial order establishing a bond schedule was not a City of Hayti policy. And the setting of Hamilton's bond in his arrest warrant was a judicial act subject to review or reversal by higher state courts. Therefore, we agree with the district court that neither the adoption of the bond schedule nor the setting of Hamilton's bond was a final decision by a municipal policymaker establishing municipal policy with respect to the action ordered.

*Id.* at 929 (citations omitted). The Court further rejected plaintiff's argument that the judge's bond practice was attributable to the City because it was "adopted" by the city's police chief. The Court succinctly stated: "A municipality cannot be liable for judicial conduct it lacks the power to require, control, or remedy, *even if that conduct parallels or appears entangled with the desires of the municipality*." *Id.* at 930 (citations and quotation marks omitted, emphasis added).

In *Williams v. City of Sherwood*, 947 F.3d 1107 (8th Cir. 2020), as in this case, the plaintiff alleged that she got "caught in a never-ending cycle of court proceedings" resulting in numerous fines, arrests, and days in jail. *Id.* at 1108. She alleged that her civil rights were violated because the city jailed her without inquiring into her means to pay the fines imposed and without appointing counsel. *Id.* The district court dismissed her claims and the 8th Circuit affirmed, again relying on *Granda* and expounded upon that ruling as follows:

> We explained, however, that even though the mayor appointed the judge, who was required by ordinance to report data to the mayor about ordinance violations and confer with city officials about ordinance enforcement, the judge was not a final municipal policymaker, if he was a municipal policymaker at all. We explained that the municipal court was a division of the state circuit court, where decisions of the municipal court could be reviewed. We also emphasized that the judge's jailing of the plaintiff "was a judicial decision made in a case that came before [the judge] on a court docket," and the plaintiff failed to cite a single case where a municipality had been held liable for such a decision.

*Id.* at 1109-10 (internal citations omitted).

The plaintiff sought to distinguish her claim, alleging that the judge was an agent carrying out the city's unconstitutional policies. *Id.* at 1110. The 8th Circuit rejected this argument, holding:

> We recognize that the city paid the judge's salary and funded the Sherwood District Court. But the judicial decisions of a duly elected judge are not the kind of decisions that expose municipalities to §1983 liability. Neither the city council nor the mayor has the power to set judicial policy for Arkansas district court judges or the power to ratify their judicial decisions, even if the city's "policymakers knew of the judge's conduct and approved of it." Or as another circuit court has held, "[a] municipality cannot be liable for judicial conduct it lacks the power to require,

control, or remedy, even if that conduct parallels or appears entangled with the desires of the municipality."

*Id.* (internal citations omitted). The court further stated that "any connection between the judicial acts and [city officials] is too chimerical to be maintained." *Id.* (citation omitted).

These cases leave no room for debate about the relationship between the City of Ferguson and the municipal division of the Circuit Court operating within its borders. As the Fifth Circuit recently observed, judges exercising state judicial power act for the state; the "geographic limit of their action does not define the level of government for which the judges act[]." *Daves v. Dallas Cnty., Texas*, 22 F.4th 522, 540 (5th Cir. 2022). What is commonly known as the "Ferguson Municipal Court" is in fact an arm of the State of Missouri that cannot act for the City.

## II.   COUNT ONE: CLAIMS OF JAILING PLAINTIFFS FOR THEIR INABILITY TO PAY THE CITY

The first step in evaluating a §1983 claim is to identify the exact constitutional right allegedly violated. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiffs ultimately articulate their claim in count one as one on behalf of *indigent persons* denied an indigence hearing and thereby disadvantaged in comparison to "a wealthier person in Plaintiffs' position." Complaint ¶ 235. They unambiguously invoked the rights of the indigent to due process and equal protection under the Fourteenth Amendment, claiming they were wrongfully incarcerated because the City failed to review their ability to post bond. The contours of those rights are discussed in the following subsection A. Subsection B then identifies the Municipal Court as the entity responsible at law for the processes of which Plaintiffs complain. Subsection C summarizes the undisputed evidence that, in fact, the Ferguson Division of the Municipal Court set policy and controlled all aspects of setting bond and detention length. The final section discusses Plaintiffs' inability to prove their claims class-wide.

### A.  "Equal Process" <u>for the Indigent</u> Under the Fourteenth Amendment

Despite the fact that Plaintiffs bring Count I expressly on behalf of the "indigent," they contend that moneyed individuals are also entitled to recover. Accordingly, beyond the role of the judiciary, a key issue in count one is whether Plaintiffs' claims extend to the non-indigent.  This Court previously expressed that it was "not convinced that an inmate's right to an ability-to-pay inquiry, which courts have considered under both the Equal Protection and Due Process Clauses, depends on his or her indigence"[3] but ultimately deferred ruling on the question by assuming, as an "evidentiary consequence" of "the City's failure to conduct indigency hearings or create a record from which to otherwise determine an individual's indigence," that the class was "sufficiently limited to the indigent."[4] The City maintains this inferential leap and evidentiary imposition improperly shifts the burden of proof to Defendant and is not the law.

Particularly if the City is not required by law to provide an indigency inquiry for all people, then it should not be held to "consequences" for not generating a record of such hearing. Moreover, the question of Plaintiffs' own indigence is unquestionably answerable by evidence in possession of Plaintiffs themselves. Regardless, no law places a burden on the City to have kept such records – certainly no greater than Plaintiffs, particularly as to *their own* financial condition. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016), cited by the Court, is inapplicable because it dealt specifically with employers failing to comply with a statutory duty to keep records required by the Fair Labor Standards Act. There is no comparable requirement placed on the City to create a record

---

[3] ECF 519 p. 20 (citing *Cain v. City of New Orleans*, 327 F.R.D. 111, 124 (E.D. La. 2018)).

[4] In its certification order (ECF 519 p. 20), this Court seems to have assumed that the entire *Bearden Class* is indigent based on the supposition that it previously expressed in *Dixon v. City of St. Louis*, No. 4:19-CV-0112-AGF, 2021 WL 616153, at *7 (E.D. Mo. Feb. 17, 2021) that "most people would not willingly stay incarcerated if their financial circumstances permitted them to avoid it." Defendant submits that Plaintiffs are not entitled to that conclusive supposition in the motion at bar, which requires that Plaintiffs oppose this motion with admissible evidence. Fed. R. Civ. Proc. 56. See also *Museitef v. United States*, 131 F.3d 714, 716 (8th Cir. 1997) (discussing burden of proof on an individual asserting his inability to pay court costs for court appointed attorney).

of an individual's indigence, and it should not be burdened with any "consequence" for not having records of *Plaintiffs' own* financial conditions. Furthermore, any records regarding an indigence hearing are, as a matter of law, *records of the Circuit Court of St. Louis County*. See Mo. Const. Art. V, §27.2(d) and Ferguson Municipal Code § 13-29 and §479.070 R.S.Mo.

Nevertheless, assuming indigence requirement remains an open question, and further that the indigence of the class has not yet been decided, the City commits the remainder of this subsection to the law providing why Plaintiffs *must prove indigency in order to recover damages*.

"[I]mprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978). Plaintiffs invoke this law and expressly identify the discriminatory treatment of the indigent as the claim alleged, specifically contrasting their experience as alleged indigents with that of the "person with financial resources in Plaintiffs' position." *Id*. Their burden is thus to prove an unconstitutional policy of the City's final policymakers that was intentionally discriminatory *to the indigent*. *Ricketts v. City of Columbia, Mo.*, 856 F. Supp. 1337, 1341 (W.D. Mo. 1993).[5]

Count I treats "debts" and "bonds" indistinctly.[6]  Defendant submits that "debts" in this context are Municipal Court judgments upon ordinance violations,[7] and by definition do not include bonds, i.e., security to ensure appearances.[8]  The difference must not be ignored, as it is germane to understanding the application of Equal Protection and Due Process in the binding

---

[5] See also *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

[6] ECF 53 ¶ 235.

[7] Such judgments are not civil judgments, nor are they "debts" in the civil sense. See *City of Stanberry v. O'Neal*, 166 Mo. App. 709, 150 S.W. 1104, 1105 (1912). Rather, they are fines owed pursuant to judgments of the Municipal Court judge. For shorthand, the term "judgment debt" is occasionally used in this memorandum but should not be confused with that term as it is used in the civil or private context.

[8] A "bond" refers to the setting of money bail, which purpose is "to insure the defendant's appearance and submission to the judgment of the court." See *Reynolds v. United States*, 80 S. Ct. 30, 32, 4 L. Ed. 2d 46 (1959). Once that purpose is served, bonds are released to the arrestee or, per the *court's* discretion, disbursed to "those with superior claims on the funds." See *United States v. Higgins*, 987 F.2d 543, 548 (8th Cir. 1993).

authorities, and how the rights among the various Plaintiffs markedly differ. A bond is imposed under different circumstances and procedural posture than a judgment, directly impacting *what process might be "due"* to the detainee. That is, "due process ... is not a technical conception with a fixed content unrelated to time, place and circumstances, but rather is flexible and calls for such procedural protections *as the particular situation demands*." *Temple v. Cleve Her Many Horses*, 163 F. Supp. 3d 602, 624 (D.S.D. 2016) (citations omitted, cleaned up, emphasis added).

In the case of the collection of a judgment, the Supreme Court outlined the process due in the particular situation of the state seeking to revoke probation for nonpayment of that judgment in *Bearden v. Georgia*, 461 U.S. 660, 671 (1983). In that case, unlike the instant case, rather than entering judgment and sentencing the defendant to imprisonment, the court deferred such judgment pending completion of a probation term and payment of a fine and restitution. When the defendant failed to pay the fine, the state instituted proceedings to revoke his probation. The very aim and end of the state in pursuing the revocation petition was to revoke the probation and incarcerate the defendant as a sentence, notwithstanding that a fine or restitution had been previously determined to sufficiently serve the State's penological interest. In *Bearden*, the petitioner was jailed despite demonstrating bona fide efforts to find a job and pay his fine. Thus, it was held that the *sole* justification of the trial court for imprisoning the petitioner was his indigence. The Supreme Court reversed and required that before probation could be revoked and a petitioner imprisoned for that nonpayment, the trial court must determine that he had not made sufficient bona fide efforts to pay his debt and that adequate alternative forms of punishment do not exist. *Id*. at 662. A probation revocation hearing is necessary for all judgment debtors facing revocation because revocation

converts a fine into a jail term without any other process available to secure their freedom.[9] This case does not present a true *Bearden* situation, as no class member was jailed for failing to pay a fine; rather, every class member was jailed either (a) pursuant to a warrant for failing to appear in court; or (b) without a warrant upon initial arrest for certain, more serious offenses. As such, the issue in Count I is inability to post bond after incarceration.[10]

The procedures required in consideration of a bond differ, although they partake in elements of *Bearden*. Such claims have been described by the Eleventh Circuit as *Bearden*-style claims because, in broad strokes, they concern incarceration and indigence. See *Walker v. City of Calhoun, Ga.*, 901 F.3d 1245, 1260 (11th Cir. 2018). However, there is a critical distinction between the probation revocation proceedings in *Bearden* and procedures relating to bond: *Bearden* recognized that the *sole* process available before penal incarceration was the probation revocation hearing. If indigency was not adjudicated in that hearing, there was *no other process* to protect the indigent from the automatic conversion of his fine to a sentence of imprisonment.

By contrast, when an arrestee does not face probation revocation, but is arrested on a failure to appear warrant (or more serious offense without warrant), there exists an *additional process* to secure his immediate release: that process is the bond that has been set by the Municipal Court, whether by bond schedule or by the judge upon issuance of the warrant. Bond schedules are

---

[9] N.B. that in the case of probation revocation, the probation is given in lieu of the imposition of an actual prior sentence of jail time on the underlying offense. This further distinguishes *Bearden* from this case where Plaintiffs were only fined and not sentenced to imprisonment, even upon a suspended imposition of sentence; thus, no Plaintiffs' prior sentence was converted from a fine to jail, but any post-judgment jailing was the result of a Plaintiff's failure to appear and the issuance of a bench warrant from the Municipal Court. See SOF 14.

[10] Plaintiffs will no doubt contend that the members of the Post-Judgment class were incarcerated for failing to pay a judgment. The evidence shows otherwise. These individuals were incarcerated based on a warrant issued for <u>failure to appear in court</u>, not failure to satisfy a judgment. SOF 22, 23, and 24. However, even were the Court to adopt Plaintiffs' characterization of the Post-Judgment Class, such class amounts to less than 15% of the *Bearden* Class (In his Supplemental Report, Plaintiffs' expert identifies 10,327 *Bearden* Class members compared with 1510 Post Judgment Class Members. Ex. X, pp. 8 and 17.).

constitutionally permissible. *Id*. at 1258. "After all, the accused also stands to benefit from efficient processing because it allows for his or her expeditious release." *O'Donnell*, 892 F.3d at 159 (citation omitted). The *only* process "due" to a moneyed individual in this circumstance is the bond set by the Court because that individual can post bond and secure his release at any time; he is due no further process. That is, the moneyed individual has received his due process by virtue of the bond that he can afford.

However, process must not end merely with the availability of a bond or bond schedule *in the case of an indigent detainee*. The reason is simple: a bond, or bond schedule, is effectively useless to an indigent who, by definition, cannot afford to pay it.[11] Therefore, *another process* is required to ensure that the indigent person is not placed in an unfair posture compared to that of the moneyed person; this additional process is an indigence review, and is necessitated by the application of the Equal Protection clause. Accordingly, the convergence of these concepts has been appropriately called "equal process." It is the claim of "categorically worse treatment of the indigent" that gives rise to the need to employ this "hybrid analysis of equal protection and due process principles." *Walker v. City of Calhoun, GA*, 901 F.3d at 1260.

Such process is not "due" to a non-indigent even if, *systemically*, such a procedure may need to be practically implemented *in order to identify the indigent*. The non-indigent is simply not a member of the protected class of individuals who require additional process as a component of their equal protection guarantee. The non-indigent individual is due no additional process because he is not categorically disadvantaged.[12] This remains true regardless of whether the

---

[11] "By definition an indigent is incapable of meeting *any* money bail requirement." *Pugh v. Rainwater*, 572 F.2d at 1057 (emphasis added).

[12] Moreover, as discussed *infra*, the non-indigent is not entitled to damages (or, without question, the same damages as the indigent) for not receiving the indigency hearing because such hearing would <u>not</u> have resulted in his release.

14

Constitution practically requires his participation in the mechanical process of identifying the indigent individual whose rights *are* at stake. To hold otherwise would relegate due process to a mere technical conception, rigidly applied without respect for circumstance, and corrupting its inherent and necessary flexibility. *Cf. Temple v. Cleve Her Many Horses*, 163 F. Supp. 3d at 624.

Count I is an equal protection claim brought solely by allegedly indigent Plaintiffs. Even where concepts of due process are invoked, equal protection drives the inquiry, requiring a determination of indigency: "The first step in an equal protection analysis is determining whether Plaintiffs have demonstrated that they were treated differently than others who were similarly situated simply *because they belong to a particular protected class*." *Roubideaux v. N. Dakota Dept. of Corr. & Rehab.*, 523 F. Supp. 2d 952, 966 (D.N.D. 2007), *aff'd,* 570 F.3d 966 (8th Cir. 2009) (emphasis added). As the Eleventh Circuit recognized:

> The *sine qua non* of a *Bearden*- or *Rainwater*-style claim, then, is that the State is treating the indigent and the non-indigent categorically differently. Only someone who can show that the indigent are being treated systematically worse solely because of [their] lack of financial resources—and not for some legitimate State interest—will be able to make out such a claim. *Those who simply find their own bail conditions too onerous must proceed under the Eighth Amendment's Excessive Bail Clause unless they can point to a separate due process violation.*

*Walker v. City of Calhoun, GA*, 901 F.3d at 1260 (emphasis added).

Once the alleged indigency of each Plaintiff is determined, the process due them becomes clear: where the satisfaction of bond is the only barrier to release, an indigence inquiry is required as a matter of right *for the indigent person*.  It is not required as a matter of right for the non-indigent, for whom bond is no barrier to release from jail. Only those that fall within the protected class of indigent detainees may advance such equal protection claims. However, where mere satisfaction of a bond will not secure release because the arrestee faces *revocation,* a hearing is due all, indigent and non-indigent alike; no true *Bearden* claims are presented in this case, as bond

15

was available to all.

Once the right to an indigence hearing is established, the question of whether that right has been violated necessarily turns to *when* the process is due, which, as a practical matter, means *after what duration of detention is it due to prevent unjustifiably prolonged detention?*[13]   Certainly the standard is *not more stringent* than the *reasonableness* standard employed in Fourth Amendment claims based on warrantless arrest as set forth in *Gerstein v. Pugh*, 420 U.S. 103, 113 (1975) and *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (providing that jurisdictions holding probable cause hearings within 48 hours will generally satisfy the reasonableness requirement of *Gerstein* and provide immunity from systemic challenge). See *ODonnell v. Harris County*, 892 F.3d at 160[14] (adopting a 48-hour rule for due process claims of indigent arrestees and concluding that "[o]ur review of the due process right at issue here counsels against an expansion of the right already afforded detainees under the Fourth Amendment by *McLaughlin*.").

The "reasonableness" standard is not a fixed period of time; however, indigency determinations are presumptively reasonable and constitutional if made within 48 hours. *Walker v. City of Calhoun, GA*, 901 F.3d at 1266. Still, because "reasonableness is a standard rather than a rule, and because one detainee's circumstances differ from another's," it is not amenable to an inflexible, bright-line application, but must be considered on an individual basis. *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 704 (7th Cir. 2010).

In sum, Count I invokes the Fourteenth Amendment to vindicate the equal protection and attendant due process rights of allegedly indigent Plaintiffs to obtain an indigence hearing within a reasonable time of arrest pertaining to the imposition of bond. It advances no claims on behalf

---

[13] The City rejects outright any suggestion that an arrestee is entitled to a hearing before *any* arrest. *Gerstein* recognized that requiring such process would constitute an "intolerable handicap." *Gerstein v. Pugh*, 420 U.S. at 113.
[14] (*overruled on other grounds by Daves v. Dallas County, Texas*, 22 F.4th 522 (5th Cir. 2022)).

of the non-indigent.[15]   Each and every Plaintiff must therefore prove, *inter alia*, that he was indigent at the time of the imposition of bond; that he was detained for an unreasonable period of time without an inquiry into his ability to pay the bond; and that such denial of process resulted in a loss of liberty *not suffered by other similarly situated individuals who were not indigent. See, e.g., ODonnell v. Harris County*, 892 F.3d at 163 (discussing and endorsing the district court's equal protection analysis based on disparate treatment of indigent people in the administration of bond).

Finally, because the claim in Count One is rooted in the equal protection clause, Plaintiffs must also prove that the City had a discriminatory purpose, not merely a disproportionate impact. See *United States v. Clary*, 34 F.3d 709, 713 (8th Cir. 1994). "There can be no 'negligent' violations of an individual's right to equal protection. Rather, only deliberate discrimination violates the equal protection clause." *Youngbear v. Thalacker*, 174 F. Supp. 2d 902, 916 (N.D. Iowa 2001) (cleaned up). The discriminatory purpose required to sustain an equal protection claim "implies more than an intent as volition or intent as awareness of consequences.... It implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id*. (citations omitted).

There remains a final and dispositive threshold inquiry. As Plaintiffs have alleged a *denial of equal protection in the form of a discriminatory denial of process*, this Court must first determine the source of responsibility for the provision of the rights so denied, and thus from where that denial ultimately emanates. *Monell* requires it.

### B.   Setting and Reviewing Bond and Determining Length of Incarceration and Conditions of Release Are Judicial Functions and Policies

---

[15] To the extent that Plaintiffs maintain otherwise, and the Court deems it procedurally necessary, the Defendant moves for dismissal of any claims on behalf of non-indigent plaintiffs for failure to state a claim. Fed. R. Civ. Proc. 12(b)(6).

Plaintiffs contend that, notwithstanding the various state judicial actors that they have alleged to have violated their constitutional rights, the policies resulting in such deprivations, driven by a profit motivation, emanate from the City. This is belied by the record. More importantly, it contradicts black letter law. It is not within the City's power to assume responsibility for the *processes* that Plaintiffs contend they were denied – all related to the setting and review of bond and conditions of release which, by law, are judicial functions.

"Missouri law is clear that the purpose of bail is to secure the defendant's appearance." *State v. Jackson*, 384 S.W.3d 208, 215 (Mo. banc 2012). Only the *courts* set or deny bail or impose other conditions of release. See MO. CONST. ART. I, § 32.2;[16] Mo. Sup. Ct. R. 33.01, 37.15, and 37.16. It is solely within the municipal judge's power and purview to imprison or fine an individual who committed an ordinance violation. *See* § 479.070 R.S.Mo.; § 558.004 R.S.Mo. (formerly § 560.026 R.S.Mo.); and § 558.006 R.S.Mo. (formerly § 560.031 R.S.Mo.)

State law dictates that a municipal judge exclusively controls procedure relating to post-arrest detention, length of incarceration, bonds, and inquiries as to the ability to pay. See Mo. Sup. Ct. R. 37.15 (the court shall set and impose conditions of release); 37.16 (the court, or clerk at the court's direction issues warrants); 37.17 (the court furnishes a bond schedule for use for arrests made without warrant); 37.19 (the court may modify conditions of release); 37.22 (defendant may apply for modification or elimination of bond/terms of release and the court shall rule on same); 37.26 (the court may declare a forfeiture of a bond); 37.43 (the court determines probable cause and issues arrest warrants); 37.47 (the court shall hold an Initial Appearance and, *inter alia,* determine whether a defendant is unable to meet the conditions of release); 37.50 (it is the duty of

---

[16] "Notwithstanding section 20 of article I of this Constitution, upon a showing that the defendant poses a danger to a crime victim, the community, or any other person, the court may deny bail or may impose special conditions which the defendant and surety must guarantee." Mo. Const. art. I, § 32. (emphasis added).

the judge to advise defendant of right to counsel and appoint such counsel); Rule 37.62 (judge pronounces judgment); 37.65 (when a fine is assessed, *if the defendant states that he is unable to pay the amount due*, the judge shall inquire as to the defendant's ability to pay and determine alternative punishment if the defendant has no ability to pay). While prior versions of these rules differ, the role of the court persists throughout.

Mere collection of bonds or operation of a jail by peace officers does not implicate the Constitutional provisions alleged by Plaintiffs because the final policymaker for the issues asserted in Count I remains the judge.  Stated simply, jailers act under the rules established by the Court. The judge has independent power and is subordinate only to the presiding judge of the circuit court in which he sits, the municipal judge and the divisions are a part of the Missouri Circuit Court and arms of the state. *See McKlintic v. 36th Judicial Circuit Court*, 508 F.3d 875, 877 (8th Cir. 2007); *Harris v. Missouri Court of Appeals, Western Dist.*, 787 F.2d 427, 429 (8th Cir. 1986)).

Even if conduct undertaken pursuant to the policy of the Municipal Court paralleled or was entangled with the desires of the City,[17] it cannot be held liable for that conduct. See *Hamilton v. City of Hayti, Missouri*, 948 F. 3d at 921. Even where Plaintiffs have contended that Ferguson is responsible only for "its part" of what they have characterized as a "scheme"[18] involving a municipal division of the Circuit Court, their claims nevertheless fail because *responsibility for the process that Plaintiffs claim they were denied* lies with that separate municipal division, an arm of the state.  Causation fails. The same is true for policies embodied in state rules and statutes.

Throughout the relevant time period and to this day there have existed Missouri Supreme Court Rules and Statutes permitting detention of arrestees for *some period of time*, even up to 72

---

[17]  This includes Plaintiffs' inapposite allegation that the City harbored a profit motivation.
[18] See ECF 53 ¶¶ 4,6.

hours. For instance, Mo. Sup. Ct. Rule 37.47, until 2020, provided that an initial appearance on detention pursuant to warrant take place "as soon as practicable," which was subsequently revised to its current form providing for such appearance "forthwith"…but "no later than 48 hours, excluding weekends and holidays." Even §479.360 R.S.Mo., in force since August 2015 as a product of "Senate Bill 5" ("SB5"), currently requires adoption of procedures including that arrestees in custody on warrant issued by the municipal court be provided an opportunity to be heard "as soon as practicable and not later than *forty-eight hours* on minor traffic violations and not later than *seventy-two hours* on other violations." On warrantless arrests, the limit is 24 hours. *Id*.

Also, by statute, when an arrestee is subject to outstanding warrants in other jurisdictions, Missouri state law *requires* the arresting jurisdiction to detain the arrestee. Known as "Jake's Law," §221.510.3 R.S.Mo. provides, in pertinent part that such arrestees:

> *shall not be released except* to the custody of the jurisdictional authority that had issued the warrant, unless the warrant has been satisfied or dismissed, or unless the warrant issuing agency has notified the correctional facility or jail holding the prisoner that the agency does not wish the prisoner to be transferred or the warrant to be pursued.

*Id*. (emphasis added). An officer failing to perform a warrant check required by this statute with the intent to release the detainee is guilty of a class A misdemeanor. §221.510.4 R.S.Mo. Similarly, failure of an officer to execute an arrest warrant may constitute a class E felony. §575.180 R.S.Mo.

Where state law (not independent City policies) causes constitutional violations, there can be no city liability. See e.g., *Slaven v. Engstrom*, 710 F.3d 772, 781 (8th Cir. 2013) (affirming county dismissal upon allegations concerning state law judge's application of state law).  Even if the City adopted and enforced a policy consistent with a constitutionally deficient statute, state statutes are presumed constitutional. *Branson v. O.F. Mossberg & Sons, Inc.*, 221 F.3d 1064, 1065

n. 4 (8th Cir. 2000). Moreover, there has been a significant evolution in the state-wide administration of the municipal courts in Missouri, brought about by the Missouri Legislature and Supreme Court with the passage of SB 5. SOF 62. That presumptively constitutional Missouri Law only recently changed, *even after the filing of this very action*.[19]  Certainly it is not unreasonable for a City to act consistent with presumptively constitutional state law and Supreme Court rules.

Moreover, "[w]hile a municipality does not enjoy qualified immunity from damages liability that results from a policy that is itself unconstitutional or from an unconstitutional decision by municipal policymakers…a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 393–94 (8th Cir. 2007) (internal citations omitted, emphasis in original); see also *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1259 (8th Cir. 2010).  Unquestionably there are aspects of the presumptively constitutional laws in the State of Missouri that were subject to change based on evolving understandings of law. Such "lack of clarity in the law precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of *deliberate* indifference to constitutional rights that were not clearly established." *Id*. at 394. Even this very Court's reluctance to resolve with certainty whether or not an inmate's right to an ability-to-pay inquiry depends on his or her indigence,[20] and reliance on a Louisiana District Court opinion published nearly *three and a half years after the filing of this case*,[21] bespeaks at least a lack of clarity on that specific question.

---

[19] The changes brought about by SB 5 went into effect in August 2015. This action was filed on February 8, 2015.
[20] ECF 519 p. 20. This reluctance was shared with at least one another judge of this district as recently as February 1, 2023. See Baker v. Florissant, 4:16-cv-01693-NAB, ECF 253 at p. 22.
[21] *Cain v. City of New Orleans*, 327 F.R.D. 111 (E.D. La. 2018) was published August 2, 2018.

Even while the question of whether a municipality may *ever* be liable under §1983 for enforcing state law has been the product of "extensive debate in the circuits,"[22] the 8th Circuit recently declined to make the "conceptual leap" that police enforcement of state statute constitutes adoption of those statute as City policy. See *Ness v. City of Bloomington*, 11 F.4th 914, 922 (8th Cir. 2021). When the policy causing the injury is not that of the municipality, the requisite causal "moving force" is absent. Appropriately then, invoking language from the 7th Circuit, the 8th Circuit in *Ness* observed that it "is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and *whose causal connection to the alleged violation is more attenuated*, than the 'policy' of enforcing state law." *Id*. (quoting *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791 (7th Cir. 1991)) (emphasis added).

The process at the heart of count one is one implemented by divisions of the Circuit Courts, expressed through the Missouri Supreme Court by its rules, and further controlled by the Missouri legislature through its statutes. The City has no legal control over policy instituted, governed, and implemented by arms of the state. This alone entitles the City to summary judgment.

### C.  Undisputed Evidence Concerning the Role of the Ferguson Municipal Court and the Oversight of the 21st Judicial Circuit of the State of Missouri

Though the separate, policy-making role of the Municipal Court is a matter of law that no evidence could change, the record also confirms that role in this case. Moreover, those practices evolved as a result of the Missouri Judiciary and legislature taking a more active role in fulfilling its constitutional obligations to direct and oversee its Municipal Division. Judge Brockmeyer was solely responsible for setting bond for defendants who failed to appear in court. SOF 17. He would

---

[22] See *Slaven v. Engstrom*, 710 F.3d at 781 n. 4 (acknowledging "extensive debate in the circuits" without resolution).

do so directly on the arrest warrant. SOF 18. Failure to Appear warrants were generally not issued until an offender failed to appear for at least two court appearances. SOF 19-20. Likewise, for warrantless arrests, he set bond by way of a Bond Schedule that he provided to the police department. SOF 21.

Judge Brockmeyer was the only person who could recall an arrest warrant; neither his clerk nor anyone else was authorized to recall a warrant. SOF 25-26. If a person subject to warrant appeared in court, Brockmeyer would almost always recall the warrant. SOF 27. At any time, a municipal defendant (whether incarcerated or not) could file a motion seeking to have his bond reduced or warrant recalled pursuant to the then applicable Supreme Court Rule, and Judge Brockmeyer would hear and rule on that motion. SOF 28.

Judge Brockmeyer was solely responsible for determining the length of time that an individual would or could be incarcerated in the Ferguson Municipal Jail if he was unable to post bond. SOF 29.  In that regard, he established maximum permissible incarceration terms as follows: From some point prior to February 1, 2010 through December 18, 2014, Brockmeyer directed the Police Department to hold jail inmates for a maximum of 72-hours. SOF 30. Per his December 18, 2014 Order, Brockmeyer rescinded the 72-hour rule and directed that any individual who could not post bond be released on his own recognizance within 12 hours. SOF 31. That Brockmeyer authorized Ferguson Police Supervisors to *reduce* bonds or *release* detainees without posting bond after the incarceration limit (or sooner when it was necessary because of (a) jail overcrowding; (b) medical needs of an inmate; (c) jail staffing issues, or other good reason) does not change that it was the court which determined length of confinement – indeed, the police supervisors could release detainees under these limited circumstances *only because the Judge authorized it.* SOF 32. At no point did any Ferguson officer *increase* the amount of any bond. SOF 33. Thus, if there was

23

any unconstitutional practice during Judge Brockmeyer's tenure, it was a practice and policy of the court, not the City. Accordingly, the City is entitled to summary judgment.

The evidence supporting the City's right to summary judgment is even more clear for the period following Brockmeyer's tenure because (a) the Missouri Supreme Court and legislature initiated comprehensive reforms; and (b) the evidence is uncontradicted that subsequent judges faithfully implemented these reforms.  SOF 36-42. As such, and as discussed in the last section of this Memorandum, Defendant contends that, at a minimum, it is entitled to summary judgment for the period of time after June 30, 2015.

### D.  No Class Can Prevail on Count One

At trial, Plaintiffs will have the burden of proving their claims and the elements of Rule 23 *on a class wide* basis. See *Wal-Mart Stores, Inc. v. Dukes*, *supra*. The class claims fail for all of the reasons identified in the previous sections. The claims of this class must also fail on a class-wide basis because Plaintiffs have not proven and cannot prove the indigence of each member, making it impossible for this Court to enter judgment based on a denial of an indigence hearing. Not only is the very right sought to be vindicated questionable, but there is also no accounting for the reasonableness of the length of each detention or damages for non-indigent class members.

### i.  No Proof of Class Wide Indigence

It is axiomatic that one cannot be jailed "for being indigent" without *being indigent*. The law therefore requires that *each class member* prove their indigence at trial. However, they cannot. In granting class certification this Court ultimately cited *obitur dictum* proposing that "most people would not willingly stay incarcerated if their financial circumstances permitted them to avoid it."[23] The City respectfully submits that such a statement is not a matter of evidence or judicial notice,

---

[23] ECF 519 p. 20. (citation omitted).

and is not a matter of law; rather, indigence must be *proven* and not presumed.[24] It certainly cannot be presumed from the mere fact of *any* duration of jailing, which is the *only* data point suggested by the class definition approved by the Court.[25]   Again, that the class includes all arrestees *regardless of how long they were jailed* is crucial. There are myriad examples of class members held for a matter of *mere minutes* who posted bond or were booked and released. See SOF 10, Ex. J.[26]   Beyond the fact that such brief detention is obviously not unreasonable, it simply cannot be presumed or inferred that these class members were indigent simply because they were jailed at all. In fact, the class contains individuals who are demonstrably *not* indigent.

First, as a general proposition, a person who can afford to pay *any* bond is not indigent since, "[b]y definition an indigent is incapable of meeting *any* money bail requirement." *Pugh v. Rainwater*, 572 F.2d at 1057 (emphasis added). The uncontroverted evidence demonstrates that of the 18,527 arrests in the *Bearden* Class, bonds were paid on 6,409. See SOF 11, Ex. J (filtered). These individuals are, by definition, not indigent, and Plaintiffs have not proven that these individuals *are* indigent, which remains *their* burden.

While not the Defendant's burden, the City provides the Court with a sample of individuals within the *Bearden* Class demonstrating that the class unquestionably contains *non-indigent* individuals, **including class representative Kimble**. SOF 4(C). St. Louis County tax records showing home ownership and real estate tax history for 29 class members demonstrate that, in each instance, the jailed detainee resided at or owned substantial real property at the time of their

---

[24] As discussed *supra*, there can be no "consequence" to the City for not creating or keeping records that the law does not obligate it to create or keep. Even if the City were somehow responsible at law for keeping such records, such is not evidence of any constitutional culpability of the City. See, e.g., *Hall v. Black*, 2006 WL 2959459, at *11 (W.D. Ark. Oct. 17, 2006) ("laxness in record keeping does not necessarily translate into deliberate indifference.").

[25] See SOF 10-11, Exhibit J, list of potential class members from Demuth demonstrating no accounting for indigence.

[26] For example, column AE of Exhibit J can be sorted to reveal over 500 arrests of fewer than 30 minutes.

detention. SOF 11(b). Given the assessed values and taxes paid on these properties, these individuals were clearly not indigent at the time of their incarceration. The mere fact that they spent *any* duration of detention in jail does not make them indigent. That any of the Class Representatives may themselves prove indigent is immaterial to these class members who clearly are not. For this lack of proof, summary judgment must be entered for the City.

### ii.   No Proof that All Class Member Detentions Were Unreasonable

"[I]ndigency determinations for purposes of setting bail are presumptively constitutional if made within 48 hours of arrest." *Walker v. City of Calhoun, GA*, 901 F.3d at 1266.[27]   Plaintiffs argue that such presumption is inapplicable if there is no intent to bring a detainee before the Municipal Court Judge within their detention period. However, even the absence of a presumption of reasonableness *does* not establish unreasonableness. Plaintiffs cannot prove that all detentions were unreasonable, and, as described below, they've abandoned their effort to quantify what portion of their detentions are unreasonable – instead arguing that the *totality* of *every* detention was unreasonable because no detainee ever received a bail review hearing while they were detained.

Earlier in the case, Plaintiffs themselves recognized the inherent problem in including **all** arrestees in the class. At the class certification stage, Plaintiffs conceded that any judgment must recognize and exclude time for "completing the incidents to arrest". See, e.g. Plaintiffs' Reply in Support of Motion for Class Certification, ECF 469, pp. 6 and 14 citing to Plaintiffs' expert's

---

[27] "Under *McLaughlin*, the City can presumptively hold a person for 48 hours before even establishing probable cause—that is, without even proving that it has evidence that he has committed a crime. It stands to reason that that the City can take the same 48 hours to set bail for somebody held *with* probable cause." *Id.*

report.[28] Yet, Plaintiffs now advocate for a judgment that would compensate even for time spent in the booking process. This is not the law.

Moreover, Plaintiffs' *unreasonableness per se* theory is incompatible with Mo. Sup. Ct. Rule 37.47(a), (c), which contemplates that individuals may be held and subsequently released without first having been brought before the judge for bond review:

> If the defendant is appearing **after release from custody** on a warrant, the court shall inform the defendant of the conditions of release and that a warrant may be issued immediately upon any violation of a condition of release. The court shall also advise the defendant of the right to apply for a modification of any conditions of release at a hearing pursuant to Rule 37.19.

*Id.* (emphasis added). That rule goes on to specify a maximum period of confinement to be 48 hours, excluding weekends and holidays, again clearly contemplating a period of confinement, followed by release, and *then* an appearance before the court. *Id.*

Further, Plaintiffs' theory that there can be *no* reasonable period of detention unless there is a concomitant intent to take the detainee before the Municipal Judge for an indigency analysis is an inflexible, impractical, and untenable proposition in light of the fact that the Constitution does not require an indigency analysis *before* any detention. *Walker v. City of Calhoun, GA*, 901 F.3d at 1266. The law also recognizes that even individuals who are arrested and immediately released will experience *some* period of detention attendant to their booking and processing. See *County of Riverside v. McLaughlin*, 500 U.S. at 55. Certainly, a reasonable time required for such booking, processing, and release, is not "zero." To so hold would effectively outlaw *any arrest*, an affront to the long-standing law that a police officer has an absolute authority to arrest anyone he has probable cause to believe committed a crime (no matter the severity). *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Any other broadly applied threshold would be arbitrary and have

---

[28] Plaintiffs estimated that time to be two hours. *Id.* The City does not concede that this is correct.

no basis in any controlling law. Moreover, Plaintiff make no effort to account for any other factors influencing the detention period for each individual, such as whether they were the subject of other warrants or too intoxicated to be released.

The uncontroverted evidence shows that, of the 18,527 arrests in the *Bearden* Class, 15,522 arrests (almost 84%) were of a duration of 48 or fewer hours, a presumptively reasonable time period. SOF 11, Ex. J (filtered).  As with all other durations of detention, there is no evidence of *why* such individuals were held for that length of time. The individual circumstances of such detentions are absent. While the record shows that class members posted bond, it says nothing of *why* bond was posted by any individual. *Id*.

The record also says nothing about any of the individual circumstances that may have even driven a *choice* by the detainee to remain detained for any length of time. There is no way to know from the record whether any particular 3-hour detention was the product of a homeless detainee avoiding bad weather, or an intoxicated person "sobering up." There is no way from the record to know if a detainee, represented by an attorney and capable of posting bond, has chosen to remain in jail out of protest, knowing he would eventually be released on his own recognizance. There is no way of knowing if the detainee is or is not indigent. The record contains only general facts, not individual facts, and is insufficient to prosecute a trial on a theory of deliberate indifference premised on intentional and discriminatorily unreasonable detention of indigent people. Summary judgment for the City is proper on Count I against the entire *Bearden* Class.

### iii.  No Proof of Damages for Each Class Member

Damages are a necessary component of Plaintiffs' claim. Plaintiffs' expert proposes that such damages may be distilled down to an hourly rate applied equally to all class members.[29]  While

---

[29] See the Demuth Report, ECF 439-1 p. 34 § V.

the City continues to reject such methodology,[30] that dispute is not germane to the specific failing now before this Court, which is that there is *no evidence of which class members suffered actual damages* because there is *no evidence of which class members are indigent*.

As set forth above, the non-indigent members of the *Bearden* Class, who are not all identifiable, cannot maintain Plaintiffs' equal protection and due process claim in Count I. Even were the non-indigent entitled to maintain such a claim, their recovery would likely be limited to nominal damages. The applicable law is set forth in the seminal case of *Carey v. Piphus*, 435 U.S. 247 (1978).

*Carey* involved students who claimed that they had been suspended without due process. The District Court found that the students' rights had been violated but awarded no damages. *Id.* at 251-52, 1046. The Seventh Circuit Court of Appeals reversed holding that the District Court erred in not considering evidence of the pecuniary value of each day of school missed by the students. *Id.* at 252, 1046. The 7th Circuit further held that the students could not recover such damages if it was determined that "there was just cause for the suspension(s) and that therefore [the students] would have been suspended even if a proper hearing had been held" *Id.* (citation omitted). Finally, the court held that even if the suspensions were justified, the students would be entitled to recover substantial "nonpunitive" damages simply because they had been denied procedural due process... "even if... there is no proof of individualized injury to the plaintiff, such as mental distress." *Id.* at 252-53, 1046 (citations omitted). The Supreme Court granted certiorari to consider whether a plaintiff must prove that he was actually injured by the deprivation before he may recover substantial "nonpunitive" damages. *Id.*

---

[30] As more particularly set forth in ECF 439, 510.

The Supreme Court began its analysis with a review of the concept of damages quoting with approval the *Law of Torts* handbook that "[t]he cardinal principle of damages in Anglo-American law is that of *compensation* for the injury caused to Plaintiff by defendant's breach of duty." *Id.* at 254-55, 1047 (citations omitted) (emphasis in original). The court went on to discuss (a) injury caused by the suspensions; versus (b) injury caused by the denial of the procedural due process right itself. The court upheld the Seventh Circuit's ruling that, if the proof established that the students would have been suspended even if a proper hearing had been held, the students would not be entitled to recover damages to compensate for injuries *caused by the suspensions*. *Id.* at 260, 1050. The failure to accord procedural due process in such an instance simply could not properly be viewed as the cause of the suspensions. Accordingly, any compensation awarded for injuries caused by the suspensions would be a windfall. *Id.*

The court next addressed the issue of damages brought about *as a result of the denial of procedural due process itself.* It rejected the notion that actual damages can be presumed. However, it recognized the possibility that such damages (e.g., mental distress) might be recoverable if proven by admissible evidence. *Id.* at 263, 1052. [31]  Again, however, proof of such injury is necessary in order to recover actual damages, and no such proof exists in this case.

Finally, the court recognized that there are instances when the deprivation is justified (even had there been a hearing) and the plaintiff did not suffer any actual injury. In such instances, because of the importance that procedural due process be observed, the denial of due process should nonetheless be actionable for nominal damages. *Id.* at 266-67, 1053-54.

---

[31] The court aptly pointed out that in most instances the damages, if any, result not from deprivation of the procedural due process right (i.e., the hearing), but rather from the underlying deprivation (in *Carey*, the suspensions). If that deprivation was justified (i.e., would have occurred even with a hearing), any distress resulting from the deprivation is not compensable. Indeed, the Court recognized that the person will often not even know that procedures were deficient and, therefore, have no damages attributable to the denial of the due process right. *Id.* at 263, 1052.

Applying *Carey* to this case presents three (3) potential scenarios relating to class members' damages:

1. Indigent class members have a right to seek actual damages to compensate them for hours in jail when, had they been afforded a bail review hearing, they would have been released. Non-indigent class members cannot recover such damages.

2. Some non-indigent class members, if proving emotional distress or other actual injury resulting from the deprivation of a bail review hearing, might recover a different type of actual damages (stemming solely from denial of the hearing); or

3. Most non-indigent class members cannot prove any actual damages but may still possibly recover nominal damages of $1.00.

Each requires individual inquiry, and so damages cannot be proven class wide. *See also Memphis Community School Dist. v. Strachura*, 477 U.S. 299, 308 (1986) ("*Carey* thus makes clear that the abstract value of a constitutional right may not form the basis for sec. 1983 damages").

## III.   COUNT TWO: CLAIMS OF IMPRISONING PLAINTIFFS WITHOUT APPOINTING ADEQUATE COUNSEL

In Count Two, Plaintiffs summarily allege that indigent arrestees were denied appointment of counsel by the City. Complaint ¶ 237. However, even in the limited circumstances when the right to appointment of counsel might be implicated in municipal cases, the law is clear that the responsibility for the appointment of counsel lies with the court, and Plaintiffs cannot prove such claim against the City.

### A. The Right to Appointment of Counsel Has Limited Application in Municipal Cases

Generally, the right to appointment of counsel under the Sixth Amendment is implicated when an *indigent defendant* in a criminal proceeding is subject to a sentence of imprisonment, including imprisonment following a suspended sentence that may end in an actual deprivation of liberty. See generally *Scott v. Illinois,* 440 U.S. 367 (1979); and *Alabama v. Shelton,* 535 U.S. 654,

658 (2002). However, as this Court previously acknowledged, Plaintiffs do not allege that they were jailed as a sentence for an underlying ordinance violation, including any suspended sentence; rather that they were allegedly sentenced *only to pay fines* on those underlying violations. No right to appointment of counsel is implicated in proceedings on such charges under *Scott*.

Further, "the right to counsel does not automatically attach to all proceedings involving the possibility of imprisonment. For example, the Supreme Court has held that there is not an automatic right to counsel in probation revocation hearings or in civil contempt proceedings; instead, the right to counsel in these proceedings is evaluated on a case-by-case basis, according to due process principles." ECF 19 p. 24 (citations omitted). There is no Sixth Amendment right to counsel in probation revocation hearings, as "the Sixth Amendment right to counsel applies only in a criminal prosecution, and a revocation hearing is an entirely different type of proceeding." *United States v. Owen*, 854 F.3d 536, 541 (8th Cir. 2017) (citations omitted).

Plaintiffs claim their jailing was for nonpayment of fines, but do not allege that their jailing resulted from a sentence or the revocation of any probation or delayed imposition of sentence: "The Court notes that because Plaintiffs allege they were only fined, not sentenced to imprisonment, at their initial hearings for their traffic and other offenses, a right to counsel may not have attached at that time."[32]  While this observation was made to the original Complaint, the operative Complaint changes nothing. See ECF 53 ¶¶ 200. No jailing in this case can be regarded as a sentence on the underlying ordinance violation to which the Sixth Amendment right to counsel would automatically attach. It is also not a revocation proceeding wherein some restrictions of a "conditional liberty interest" are under review. *United States v. Owen*, 854 F.3d at 541. Rather, the

---

[32] ECF 19 p. 24. (denying motion to dismiss on an earlier iteration of the Complaint).

jailing alleged, and as borne out in the uncontroverted evidence, is only the product of a warrant issued by the Municipal Court Judge for failure to appear. SOF 17-20.

### B.  The Responsibility to Appoint Counsel Lies Solely with the Judiciary

The responsibility to advise of the right to counsel and ultimately to appoint counsel to an indigent defendant facing possible confinement upon conviction lies solely with the municipal judge. This has been provided by Rule 37.50 since July 1, 2004.[33] See also Mo. Sup. Ct. R. 37.47 (governing initial proceedings before a judge, including under warrant). The municipal judge's treatment of indigent defendants, including advising of their right to counsel and appointing such counsel, are obligations of the judiciary and cannot form the basis of municipal liability; the municipal judge simply cannot make policy for the City. *Hamilton v. City of Hayti, Missouri*, 948 F. 3d 929 (8th Cir. 2020). The 8th Circuit is not alone in recognizing the role of state law in such cases. For instance, in *Eggar v. City of Livingston*, 40 F.3d 312, 315 (9th Cir. 1994), the Ninth Circuit held that even where a municipal judge allegedly failed to follow state law and made a "mockery" of the rights of indigent defendants, his "obligation to address the rights of defendants arises from his membership in the state judiciary" and therefore cannot be transformed into municipal policymaking despite his "lamentable" and "miserable" failures to fulfill those obligations, as "he simply is not a municipal decision maker" under applicable state law. *Eggar v. City of Livingston*, 40 F.3d at 315. Moreover, not only could the municipal judge not make policy for the city, but "because [the judge] was functioning as a state judicial officer, his acts and omissions were not part of a city policy or custom. A municipality cannot be liable for judicial

---

[33] This rule applies to ordinance violations. See also Mo. Sup. Ct. R. 31.02, applying to "Misdemeanors or Felonies."

conduct it lacks the power to require, control, or remedy, even if that conduct parallels or appears entangled with the desires of the municipality." *Id*. at 316 (citations, footnotes omitted).[34]

The Municipal Court judge's actions or omissions in advising Plaintiffs of their rights and potentially appointing counsel are not attributable to Defendant under 42 U.S.C. § 1983. See also Mo. Const. Art. V, § 27.5 (right to de novo review of appealable order by municipal judge). This claim is disposed purely at law. Nonetheless, the evidence also supports the City.

### C.  The Uncontroverted Evidence Defeats This Claim

The uncontradicted evidence shows that no class member was sentenced to jail, nor did any judge of the Ferguson Municipal Court even consider sentencing anyone to a jail term. SOF 34. Moreover, Judge Brockmeyer concedes, as he must, that if a jail term was being considered as a sentence, it was **his obligation** to appoint counsel. *Id.* Accordingly, Defendant is entitled to summary judgment on Count II.

### IV.  COUNT THREE: CLAIMS OF INDEFINITE AND ARBITRARY DETENTION IN VIOLATION OF [SUBSTANTIVE] DUE PROCESS

In Count Three, pursued through what has been defined as the "Warrant Class (a subclass of the *Bearden* Class)," Plaintiffs summarily allege indefinite and arbitrary detention following arrest on warrant.  Complaint ¶ 239. This count turns on substantive due process rights of those detained after arrest on warrant to an initial appearance before the Municipal Court Judge. This is a function of the court, and the record does not support municipal liability.

### A.  Substantive Due Process Right to Be Free From Indefinite and Arbitrary Detention

Beyond circumstances contemplated by the Fourth Amendment, indefinite and arbitrary detention may be challenged as a matter of due process under the Fourteenth Amendment. In *Baker*

---

[34] Accordingly, any "profit" motivation asserted by Plaintiffs is irrelevant.

*v. McCollan*, 443 U.S. 137 (1979), the Supreme Court held that a sheriff's three day detention of a misidentified suspect did not rise to the level of a constitutional violation, but assumed in dicta that "depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will *after the lapse of a certain amount of time* deprive the accused of 'liberty . . . without due process of law.'" *Id*. at 145. (emphasis added). Following *Baker*, the 7th Circuit considered the issue in *Coleman v. Franz,* 754 F.2d 719 (7th Cir. 1985) and, noting the Supreme Court's emphasis on duration of detainment, applied the substantive due process standard and held that an 18-day detention under the circumstances of that case "shocks the conscience."[35]  The 8th Circuit thereafter adopted that standard. *Hayes v. Faulkner County, Arkansas*, 388 F.3d 669, 674 (8th Cir. 2004). In *Hayes*, under the "totality of circumstances," the 8th Circuit held that a 38-day detention without an appearance "shocks the conscience." *Id.* at 675. Apropos to this case, the county defendant's policy in *Hayes* required arrestees to be taken before the court within 72-hours of arrest, a benchmark with which the court expressed no concern. *Id*.

Courts applying the "shocks the conscience" standard in the case of claims of indefinite and arbitrary detention following arrest on warrant have emphasized the *duration of detention* as the thing to be measured against that standard. In *Martz v. Simmons*, 2019 WL 2110576 (W.D. Ark. May 14, 2019), an Arkansas district court surveyed several cases concerning length of detentions that do or do not violate due process. In those cases, some courts found that as many as seventeen days did not shock the conscience, while others found that it did. *Id*. Whatever the holding, each court made the necessary inquiry into the *individual facts* of the arrestee's detention.

---

[35] See also, *Armstrong v. Squadrito*, 152 F.3d 564, 582 (7th Cir. 1998) (57-day detention shocks the conscience).

This Court previously opined that the City's reliance on these cases is misplaced in that the cases cited in *Martz* are inapposite because the "Warrant Class members do not merely challenge the length of their detention prior to receiving a first appearance. They allege that, as a matter of the City's uniform policy and practice, they were *never* provided a first appearance because no process for such appearance existed."[36]  The implication is that *every detention* – of any length - must necessarily "shock the conscience" because there was never a first appearance or process for such appearance before release.  This view is incompatible with controlling law.

The 8th Circuit, citing to *Gerstein*, specifically framed the substantive due process issue of pretrial detention following arrest by warrant as one gaged by *excessive l*ength, stating that "the Due Process Clause forbids an *extended detention*, without a first appearance, following arrest by warrant." *Hayes v. Faulkner Cnty., Ark.*, 388 F.3d at 673 (emphasis added). Thus, the 8th Circuit recognized the Supreme Court's concerns with "*extended* restraint of liberty following arrest" in light of the "consequences of *prolonged* detention," as opposed to the less serious consequences of "interference occasioned by arrest." *Id*. (citing *Gerstein* and *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)) (emphasis added). Thus, at a minimum, some consideration must be given for "interference occasioned by arrest."

 The law recognizes that all arrestees will necessarily experience *some* period of detention related to their booking and processing. See *County of Riverside v. McLaughlin*, 500 U.S. at 55. Such detention cannot be regarded as per se unreasonable simply because there is no fixed process to bring that detainee before a judge *before their release*, and it certainly cannot reach the much higher standards of "shocks the conscience." Thousands of the potential class members posted bond or were otherwise released within a few hours of arrest. They would never have been brought

---

[36] ECF 519 p. 34.

before the court for an initial appearance and are clearly not entitled to recover under Plaintiffs' theory in this count.

Indeed, current Mo. Sup. Ct. Rule 37.47 contemplates that individuals arrested on warrant may be held, released, and only thereafter appear:

> If the defendant is appearing **after release from custody** on a warrant, the court shall inform the defendant of the conditions of release and that a warrant may be issued immediately upon any violation of a condition of release. The court shall also advise the defendant of the right to apply for a modification of any conditions of release at a hearing pursuant to Rule 37.19.

Mo. Sup. Ct. R. 37.47(c) (emphasis added). Where the detainee remains confined while awaiting an initial appearance, the Missouri Supreme Court has determined that, on a systemic basis,[37] "48 hours, excluding weekends and holidays," is reasonable. Mo. Sup. Ct. Rule 37.47(a).   The governing rule contemplates detentions as long as 48 hours or longer without an initial appearance (37.47(a),(c)). Given such rules, it cannot "shock the conscience" in every case – particularly when thousands of detentions lasted less than 12 or even 24 hours, including many of the class representatives. SOF 10, Ex. J; SOF 1-9. That is, simply because detainees are not taken for an initial appearance *during their detention* does not render every detainment *per se* unconstitutional.

Moreover, like the "reasonableness" standard, the "shocks the conscience" standard necessarily requires analysis of all the circumstances surrounding *each detainee's incarceration*.

> [A]n investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements: "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in light of other considerations, fall short of such denial."

---

[37] Again, "reasonableness" remains an individual inquiry.

*Armstrong v. Squadrito*, 152 F.3d at 582 (citations and quotations omitted). The discussion of the necessarily individual nature of a "reasonableness" standard *supra* is therefore equally, indeed more, applicable with a "shocks the conscience" standard.

Certainly, the indigence of a detainee and the choices that he makes are factors which this court *must* consider in the totality of any given circumstances before it may conclude that a detention "shocks the conscience." For instance, if a detainee is not indigent and had the ability to post bond (thus availing himself of that process which is clearly available to him) but chose not to do so for 3-days (for any number of reasons), it is inconceivable that his detention could "shock the conscience." Plaintiffs' efforts to recover for all detainees by way of the class mechanism, regardless of length of detainment, paints with too broad of a brush and must fail.

**B.      Plaintiffs' Inability to Make Submissible Case on the Uncontroverted Record**

The record demonstrates no substantive due process violation in this case. Unlike the *Hayes* case (in which jailers were held liable)*,* Judge Brockmeyer made the decision that jail detainees would not get an initial appearance during their incarceration. SOF 35. Rather, initial appearances would take place at the individual's first court appearance. Obviously, this was a *Court policy* and Ferguson jailers were not responsible for it. Simply put, because of Brockmeyer's policy, there was no court before which to bring detainees. Any Constitutional violation arising from such a practice lies at the feet of the Municipal Court.

Moreover, of the 13,248 arrests in the Warrant Class, bond was posted in 3,952 of them. Ex. J (filtered). Again, for at least the overwhelming majority of these individuals, their length of incarceration cannot be said to shock the conscience – and this is true even though the Court had determined that it would never hold initial appearances. The early policy and practice of the municipal court, per Judge Brockmeyer was to hold detainees for no more than 72 hours. SOF 30.

Beginning in 2015, that changed to 12 hours. SOF 31. When detainees were released, they were provided notice to appear. SOF 31 (Ex. L, Brockmeyer Order of 12-18-14). Of the 13,248 arrests within the potential Warrant Class, only 2,456 were held for more than 48 hours. (Ex. J (filtered)), and there is no evidence of record that even those detentions were "conscience shocking" because the individual circumstances of those detentions are unknown. It is clear that none of the class representatives can meet this burden since all but a few detentions fell clearly within the limits imposed by state law. SOF 1-9. Plaintiffs have a virtually insurmountable burden to prove that *any* plaintiff or *any* member of the Warrant Class had their substantive due process rights violated, let alone *all* in the class.

Finally, the evidence establishes that Plaintiffs cannot prove that the City acted with deliberate indifference to the rights of the named Plaintiffs or the class members. The procedures in place complied with existing Missouri law, and all deference was rightly given to rules established by the judge who implemented them under (what was supposed to have been) the watchful eye of the Circuit Court. SOF 17-35; 40-42. To whatever extent the City played any role in such detentions, that role was consistent with then-existing Missouri law and the directives of the Municipal Court judge. Certainly, it is a "reasonable officer" who observes and follows timelines and practices established by the Municipal Court judge. *Cf. Hayes v. Faulkner Cnty., Ark.*, 388 F.3d at 675 (officer was "unreasonable" to hold detainee for 38 days under circumstances including a rule requiring appearance without unnecessary delay and policy requiring detainees be brought before judge within 72 hours of arrest); compare to Mo. Sup. Ct. R. 37.47.

As this Court  noted back in 2015: "The Eighth Circuit has not delineated with precision 'the duration and circumstances of detention that might result in a substantive due process

violation.'"[38]  Even were this Court to conclude that any of the foregoing procedures, despite being within the exclusive purview of the judiciary, constituted a policy or custom of the City, it cannot be said that the law was clear that *any period of detention whatsoever* would "shock the conscience" under the circumstances -  particularly when the body of law establishing the relevant standard was premised on "*the lapse of a certain amount of time*." *Baker v. McCollan*, 443 U.S. 137 (1979). Under such circumstances, there can be no deliberate violation and no municipal liability. See *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d at 393–94.

**V.   COUNT FOUR: CLAIMS OF DEPLORABLE CONDITIONS IN THE FERGUSON JAIL IN VIOLATION OF DUE PROCESS AND CONSTITUTING IMPERMISSIBLE PUNISHMENT**

In their fourth count, Plaintiffs summarily allege deplorable conditions in the Ferguson jail. Complaint ¶ 241. In certifying the Jail Conditions Class, this Court accepted Plaintiffs' characterization at oral argument of this claim as "a general conditions-of-confinement claim requiring proof that the conditions of confinement 'posed a substantial risk of serious harm' to the plaintiffs, and that the defendant was aware of the substantial risk of harm and deliberately indifferent to it." *Id*. (citing, e.g., *Beaulieu v. Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012)). Defendant therefore addresses this claim as it has been so characterized.

**A.  The Law: Jail Conditions Claims of Pretrial Detainees**

The Fourteenth Amendment rights of pretrial detainees are violated if, under the "totality of the circumstances," their conditions of confinement amount to punishment. See *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); and *Morris v. Zefferi,* 601 F.3d 805, 810 (8th Cir.2010). Pretrial detainees are entitled to at least as great protection afforded to prisoners under the Eighth Amendment. See *Stickley v. Byrd,* 703 F.3d 421, 423 (8th Cir.2013); and *Farmer v. Brennan*, 511

---

[38] ECF 19 p. 27. (quoting *Luckes v. County of Hennepin,* 415 F.3d 936, 939 (8th Cir.2005)).

U.S. 825, 832 (1994). Thus, "pretrial detainees are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Stickley v. Byrd*, 703 F.3d at 423 (internal citations, quotes omitted).

"Regardless of their constitutional grounding, conditions-of-confinement claims are evaluated under a deliberate-indifference framework." *Brenizer v. Cnty. of Sherburne*, 2022 WL 1110203, at *9 (D. Minn. Feb. 1, 2022).[39]  "[D]eliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006); *see also Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir.2014) ("[A]s applied to a municipality in the Fourteenth Amendment context, deliberate indifference is purely objective: liability may be premised on obviousness or *constructive* notice."); compare *Ware v. Jackson Cnty., Mo.*, 150 F.3d at 880 (articulating the deliberate indifference standard as a component of municipal liability based on custom). "[T]he length of time a prisoner is subjected to harsh conditions is a critical factor in [the] analysis." *Stearns v. Inmate Services Corp.*, 957 F.3d 902, 909 (8th Cir. 2020) (quoting *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996)).

When this Court considered the City's first motion to dismiss, it acknowledged, citing several authorities, that "[a]lthough Plaintiffs have alleged they were exposed to materially the same conditions,[] the length of exposure differed among Plaintiffs and among different instances of incarceration, and these differences **may impact the merits of each Plaintiff's claim**."[40]  The Court then seemingly contradicted this well-established legal maxim in its class certification Order when it stated that "any variations in the length of time of detention may "speak … to damages,

---

[39] (*report and recommendation adopted,* 2022 WL 703212 (D. Minn. Mar. 9, 2022)) (citations omitted).
[40] ECF 19 p. 29.

not liability". (ECF 519, p. 41). Defendant respectfully disagrees with this latter statement, as the duration of exposure to condition is a crucial component of the **liability determination.**

This is particularly apparent with the conditions asserted by Plaintiffs. SOF 1-9 (subpart (B)). A diet of a particular food may be insufficient over a matter of weeks but is not unconstitutional for detentions of a day or two. The same is true of hygiene issues such as tooth care and showers. Likewise, unsanitary jail conditions or overcrowding could be actionable if experienced over a long period of time, but a short duration is not actionable.

The nature of the condition is also relevant. Plaintiffs must prove that every class member was exposed to a "substantial risk of serious harm" and was injured as a result of the condition, that is he suffered objectively serious harm. *Beaulieu v. Ludeman*, 690 F.3d at 1045.[41]  In its denial of Defendant's Motion to Dismiss, the Court emphasized that "at [that] early stage" that "allegations of repeated detentions lasting days, weeks, and in one case, nearly two months, during which Plaintiffs allege they were forced to sleep on the floor in dirty cells with blood, mucus, and feces; were denied basic hygiene and feminine hygiene products; were denied access to shower, laundry, and clean undergarments for several days at a time; were denied medications; and were provided little or inadequate food and water, are sufficient to state a plausible claim for a due process violation attributable to the City." *Id*. However, the record does not bear out these claims - either for the individual Plaintiffs, or for "…[A]ll persons who were, at any time from February 8, 2010 through September 30, 2017 held in the City of Ferguson jail."

### B.  Plaintiffs' Evidence of the Ferguson Jail Conditions

Plaintiffs' claims are summarized in the Statement of Facts. SOF 1-9 (subparts (B)). They fall into two broad categories: (1) conditions that were transitory in nature such as filthy cells,

---

[41] (overruled in part on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009).)

blankets with holes, undercooked meals, cold, dusty and, possibly, overcrowding. Even if actionable (which Defendant vigorously disputes), these claims cannot be proved on a class-wide basis; and (2) conditions that were more permanent in nature such as placement of the drinking fountain on top of and as part of the toilet unit (and resulting unpotable water),[42] non-nutritious diet,[43] and certain hygiene issues (tooth care and showers). While, for purposes of summary judgment, these conditions can be assumed, *arguendo,* to have existed throughout the claims period for all class members, they do not amount to constitutional violations particularly given the short duration of detainment experienced by virtually all of the class members.

### C.  The Record Does Not Support a Submissible Conditions Claim

Even assuming *arguendo* that the conditions complained of by the class representatives existed during every instance in which that individual was detained, none is of a duration or type that satisfies the deliberate indifference threshold required to make a submissible constitutional claim against the City. On the undisputed record, not a single condition complained of by any of the class representatives was endured for more than 3.5 days, the single longest detention – and among the earliest detentions - of any of the class representatives (Keilee Fant July 16, 2010 – July 20, 2010). SOF 1(A)(1). The Eighth Circuit has repeatedly found no constitutional violation where alleged unsanitary conditions lasted fewer than four days. *See Smith v. Copeland,* 87 F.3d at 268– 69 (finding no constitutional violation where pretrial detainee was subjected to overflowed toilet for four days); and *Williams v. Delo,* 49 F.3d 442, 444–47 (8th Cir.1995) (finding inmate's deprivation of clothes, running water, hygiene supplies, blanket, and mattress for four days did not

---

[42] One Plaintiff alleges that the water made him sick. This is an expert conclusion that no expert has given and should not be admissible. See, e.g., *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (prisoner self-diagnosis cannot establish existence of medical problem).

[43] This is also an expert conclusion that no expert has given and should not be admissible.

violate Eighth Amendment). Such cases did not even preserve a question of fact and were decided as a matter of law. *Id.* In this case, not even the worst condition claimed over the longest duration established is enough to surpass that threshold as a matter of law.

Moreover, the record demonstrates a failing of class representatives to maintain the requirements of Rule 23 throughout all stages of this litigation as contemplated in *Wal-Mart Stores, Inc. v. Dukes*. The class representatives' collective experience in the Ferguson jail accounts for barely 1.5% of the class period and their worst complaints are predominately based on single, discrete, and transitory moments, none of which posed any actual risk to health or safety, and none of which lasted for more than barely 3.5 days. Compare SOF 1-9 to SOF 11, Ex. J. They simply are not typical of a class whose rights have been violated by exposure to conditions in a jail.

The same is true of at least the overwhelming majority of the class members. Of the 24,329 arrests among the members of the Jail Conditions Class over the seven-year class period, 23,625 were held for 72 hours or less and 21,132 were for a duration of 48 hours or less. SOF 11, Ex. J (filtered). None of these individuals experienced any complained-of condition for a sufficient length of time to have a claim. As such, recovery cannot be had class wide.

Moreover, the transitory conditions are not actionable in a class setting because, by their very nature, they were sporadic and there is no evidence that they were experienced by all, or even most of the class members. The (assumed) fact that a few individuals experienced holes in their blankets, undercooked meals, dirty cells, or cold temperatures simply does not suffice to prove the existence of such conditions over a 7 ½ year class period. This is particularly true in light of the

fact that the last date on which any class representative was detained was August 4, 2014. SOF 11. Over three years of the class period is completely unaccounted for by the class representatives.[44]

Beyond the length of exposure to the conditions, none are of a quality that can be considered to create a "substantial risk of serious harm" or that caused Plaintiffs more than *de minimus* injury, certainly not based on the testimony of the class representatives. Again, the only conditions which could be regarded as *arguably* uniform include those related to hygiene, i.e., denials of toothbrush and toothpaste, showers, diet, and the configuration of the toilet. SOF 1-9 (subparts (B)). There is simply no evidence that any of these conditions posed any substantial risk of serious harm, without which there can be no deliberate indifference. Likewise, there is no competent, admissible evidence whatsoever of any injury resulting from these conditions.

For example, detainees were fed honey buns for breakfast and pot pies for lunch and dinner. There is no evidence that this diet is nutritionally deficient, particularly when eaten for only a period of a day or two, or even three.[45] With respect to showers, the standard cited by Plaintiffs' expert is at least once per week, a duration longer than any detention of any class representative. ECF 441-1 (Vail Report, ¶ 67); compare to SOF 1-9 (subparts (A)). There is no evidence that going without a shower for a day or two or three creates a substantial risk of serious injury or that any detainee was injured because of it. The same holds true for tooth care. Even if detainees were not provided toothbrushes and tooth paste for a couple of days[46], Plaintiff offers no evidence from which it can be concluded that this poses a "substantial risk of serious harm". Likewise, there is

---

[44] Indeed, of the 2,791 days that make up the class period, the named Plaintiffs account for only a little over 41 days total, with no class representative being incarcerated during the final 1,153 days of that period. SOF 1-11.
[45] Obviously, the named-Plaintiffs cannot offer such an opinion. Plaintiffs' jail expert, Eldon Vail, does not so opine and, indeed, cannot so testify because he is not a nutritionist. His primary complaint is that there is no evidence that the diet was approved by a dietician. A jail conditions claim cannot be established based solely on this evidence.
[46] Again, Defendant disputes this "fact" and accepts it as true only for purposes of this Motion.

no evidence that any named Plaintiff *actually* suffered any harm whatsoever from this condition. There is simply no evidence that the drinking fountain and toilet being part of one apparatus somehow made the drinking water unhealthy. Finally, to the extent it is even an issue, there is no competent evidence of overcrowding. Plaintiffs offer no evidence of the jail population on any given day, let alone throughout the class period.  Their expert mentions the issue only in passing in his report. Indeed, the only evidence is a few snippets of testimony offered by a few of the class representatives in which they guess at the number of people in their cells.

Plaintiffs' evidence of unconstitutional jail conditions amounts to little more than the select gripes of nine individuals. Many of the conditions were temporary in nature. Of those conditions that were less transitory, there is no evidence that they created a substantial risk of serious injury or caused any injury at all. Likewise, they were not experienced for a sufficient duration to be actionable under governing 8th Circuit law. Accordingly, summary judgment should be granted for the City on all claims in Count Four of both the class representatives and the class.

## VI.   COUNT FIVE: CLAIMS OF USE OF JAIL AND THREATS OF JAIL TO COLLECT DEBTS OWED TO THE CITY IN VIOLATION OF EQUAL PROTECTION

In count five, Plaintiffs summarily allege that the City engaged in unfair and coercive debt collection practices against the indigent in the collection of judgments. Complaint ¶ 243.

### A.  Equal Protection for Indigent Judgment Debtor

As in count one, Plaintiffs assert "invidious discrimination" against "indigent defendants" based on alleged processes that favors "wealthier people." Complaint ¶ 243. Plaintiffs burden on to prove membership in a protected class of indigents thus remains a threshold issue. Plaintiffs also allege that they, as indigent judgment debtors, are treated unfairly differently from private debtors, violating equal protection. This presents an additional threshold issue.

Plaintiffs' theory derives from *James v. Strange*, 407 U.S. 128 (1972), wherein an indigent criminal defendant sought a declaration that a statute providing for the recoupment of expenses for state-provided counsel was unconstitutional, as it *specifically applied only to persons who had been found indigent* and received defense services from the state. *Id*. at 128 -129, n. 3. The Supreme Court found that the statute violated equal protection because it specifically stripped indigent debtors who availed themselves to the constitutional right to counsel of the exemptions available to other civil judgment debtors by rule. *Id*. at 135. However, it also recognized that many states had statutes providing for the recoupment of fees and expenditures paid on behalf of indigent defendants. *Id*. at 132. Observing that "state recoupment laws and procedures differ significantly in their particulars," the Supreme Court recognized that "any broadside pronouncement on their general validity would be inappropriate," and limited its view accordingly. *Id*. at 133.

*James* involved plaintiffs who were regarded as similarly situated to private judgment debtors because they owed the State of Kansas reimbursement of legal fees for public defender expenses rather than punitive fines and court costs. See *James v. Strange*, 407 U.S. at 139 (noting also that 'the Kansas statute provides for recoupment whether the indigent defendant is acquitted or found guilty"). By contrast, at issue in this case are not civil judgments, but judgments on municipal charges for ordinance violations.[47]  Missouri law regards these judgments not as "debts," but criminal fines, the end-product of a judicial process that partakes in some civil features as to form of pleading, but is quasi criminal in its character, effects, and consequences. See *City of Stanberry v. O'Neal*, 150 S.W. at 1105 (discussing the character of the prosecution of a municipal ordinance violation in the burden of proof context). Prosecution of a municipal ordinance is "not

---

[47] Plaintiffs allege they "are each impoverished people who were jailed by the City of Ferguson because they were unable to make a monetary payment to the City arising from traffic tickets or other minor offenses." ECF 53 ¶ 1.

an ordinary civil action" and "*the fine which is imposed for a municipal offense is not a debt*, and therefore imprisonment may follow its nonpayment without violating the Constitution forbidding imprisonment for debt." *Id*. at 709 (emphasis added); see also Mo. Const. art. I, § 11 ("That no person shall be imprisoned for debt, except for nonpayment of fines and penalties imposed by law").[48]

This Court earlier noted that "Plaintiffs bear the burden to demonstrate [they] are similarly situated to private judgment debtors,"[49] following its recognition that "at least one district court evaluating *James*[50] has held that 'discriminating against criminal judgment debtors by denying them state law exemptions does not violate ... equal protection' because criminal judgment debtors are not similarly situated to civil judgment debtors."[51]  It also expressed "some question whether Plaintiffs can meet that burden in this case because…their complaint does not describe in any detail their underlying offenses and does not allege whether the nature of the fines imposed for these offenses was such as to render Plaintiffs similarly situated to private judgment debtors."[52]  Upon the record, Plaintiffs remain unable to satisfy this threshold condition.

Additionally, *James* focused on a uniquely harsh, deliberate denial of equal protection to proven indigents by a statute expressly targeting those indigents. See *Fuller v. Oregon*, 417 U.S. 40, 47 (1974) (observing that the offending object of the Kansas legislation stricken in *James* was

---

[48] As this Court noted, §560.031(2) R.S.Mo. previously authorized imprisonment for nonpayment of fines "unless the offender shows that his default was not attributable to an intentional refusal to obey the sentence of the court, or not attributable to a failure on his part to make a good faith effort to obtain the necessary funds for payment." Effective January 1, 2017, this statute was transferred to §558.006 R.S.Mo., and effective August 28, 2019, it was revised to remove, among other things, enforcement by imprisonment. The substantive statutory changes were made long after any relevant class period in this case.

[49] ECF 27 p. 5. (citing *Klinger v. Dep't of Corrs.,* 31 F.3d 727, 731(8th Cir.1994))

[50] *James v. Strange,* 407 U.S. 128 (1972).

[51] ECF 27 p. 5. (quoting *U.S. v. Cunningham,* 866 F.Supp.2d 1050, 1058 (S.D. Iowa 2012).

[52] *Id*. (citing *United States v. Cunningham,* 866 F.Supp.2d at 1058 (distinguishing *James v. Strange* and holding that prohibiting a criminal judgment debtor from invoking exemptions afforded private judgment debtors did not violate equal protection)). While the Court was then referencing Plaintiffs' initial complaint (ECF 1), the Amended Complaint (ECF 53) is not meaningfully different in this respect.

"the elimination of the exemptions normally available to judgment debtors"). No such deliberately discriminatory law, rule or policy is presented in this case. Rather, Plaintiffs merely characterize any effort to enforce the judgments against them as somehow uniquely harsh simply because they are subject to judicial enforcement. But this is not supported by the law.

*James* did not justify a wholesale avoidance of any payment of expenses by, or preferential treatment to, judgment debtors merely because of indigence. Nowhere does *Strange* support Plaintiffs' underlying thesis that it is unconstitutional to impose or collect fines, fees, costs, or surcharges from indigent defendants or to enforce judgments against such defendants simply because it is burdensome on them, *even if more so than a moneyed individual*. In fact, the Supreme Court has specifically recognized the State's "fundamental interest in appropriately punishing persons-rich and poor-who violate its criminal laws," and a judge is not precluded from "imposing on an indigent, as on any defendant, the maximum penalty prescribed by law." *Bearden v. Georgia*, 461 U.S. at 670 (citation omitted). *Strange* is simply inapplicable to this case.

## B.  Enforcement of Judgments is a Judicial Function; The Record Does Not Support Liability Against the City

The enforcement of judgments, including the issuance of warrants and the imposition of conditions for release, is purely a judicial function as a matter of law.  Even assuming *arguendo* that Plaintiffs' theory of liability is viable *and* the role of the judiciary in the enforcement of municipal judgments is instead attributed to the City, the record nevertheless does not support presenting this claim to a jury. Again, Plaintiffs cannot prove class wide indigence, the *sine qua non* of this equal protection claim. Second, there is no evidence in the record that Plaintiffs are similarly situated to private judgment debtors, since the record is clear that the judgments were entered by the Municipal Court on municipal offenses. See, e.g., SOF 22, 23, 34, 40. These fines,

unchallenged by Plaintiffs, were authorized by Missouri Law. Plaintiffs also rely on an unprovable assumption that every person paid every fine, fee, cost, or bond because they were under threat of jailing. See, e.g., Complaint ¶¶ 177- 80. Yet, even if such a threat were actionable, Plaintiffs cannot prove that any threat of jailing targeted only the indigent.[53]  Many bonds, fines and fees, are paid perfectly voluntarily, and Plaintiffs cannot separate those payments from any allegedly coerced payments; the voluntariness of payments is an inherently individualized inquiry.[54]  Thirdly, Plaintiffs cannot prove discriminatory intent by the City, as the issuance of warrants was always authorized by the Municipal Court judge and always under the circumstance of non-appearance. SOF 17-24.

Finally, the record is clear that *nobody* in the City of Ferguson was ever jailed for the nonpayment of a judgment debt. Rather, the undisputed record demonstrates that every person (whether or not indigent) whose sentence was mere imposition of a fine was also provided a court date for appearance in the event that payment was not made. SOF 23. Only after the individual failed to appear (multiple times) was a warrant issued by the judge for their arrest. SOF 24, 39. Those who did appear were always given more time by the court to satisfy their fine. SOF 23. Those who appeared were not jailed for nonpayment; rather their warrant was recalled. SOF 27.

Plaintiffs' have repeatedly alleged that the City of Ferguson jailed individuals for nonpayment of fines. See Complaint, *passim*. That tired accusation is no longer entitled to any deference or liberal inference, as the unassailable record demonstrates it is untrue. The City is therefore entitled to summary judgment on Count Five.

---

[53] Moreover, a "threat of incarceration" alone does not support a viable constitutional as "threatened seizure" is not colorable under the Fourth Amendment. *Schulz v. Long*, 44 F.3d 643, 647 (8th Cir. 1995).
[54] See, e.g., *Chruby v. Global Tel Link Corporation*, 2017 WL 4320330 (W.D. Ark. Sept. 28, 2017) and *Endres v. Wells Fargo Bank*, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008).

## VII.  COUNT SIX: CLAIMS OF ISSUING AND SERVING INVALID WARRANTS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS.

In count six, Plaintiffs summarily allege, on behalf of the Post-Judgment Class, that they were subjected to the issuance and service of arrest warrants without probable cause, discrimination against the indigent, and delayed presentment. Complaint ¶ 245.[55]

### A.  Probable Cause As Condition for Any Significant Pretrial Restraint of Liberty; Satisfied By Bench Warrant; Judicial Function

The Fourth Amendment, by way of the Fourteenth Amendment, "requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. at 142 (citation omitted). This requirement may be satisfied by a warrant issued by a magistrate on a showing of probable cause. *Id*. A "valid bench warrant provides probable cause for an arrest." *Wood v. Wooten*, 986 F.3d 1079, 1081 (8th Cir. 2021) (citation omitted). Again, the issuance of warrants is a judicial function. *Hamilton v. City of Hayti, Missouri*, 948 F. 3d at 926. A bench warrant may be issued by a defendant's failure to appear. See, e.g., *Ward v. Acoustiseal, Inc.*, 129 S.W.3d 392, 394 (Mo.App. W.D. 2004). Its issuance is the equivalent of a judicial determination of probable cause. *See United States v. Spenceri,* 684 F.2d 220, 223 (2d Cir.1982).[56]

---

[55] There is no law requiring an inquiry into an ability to pay prior to the issuance of a warrant. Additionally, any claim in this count sounding in equal protection is defeated for the same reasons set forth *supra*.

[56] "The decision of the New York City Criminal Court Judge to issue a bench warrant constituted a finding made by a neutral magistrate that Spencer had failed to appear in a pending criminal matter. We recognize that its issuance did not amount to a judicial finding of probable cause to arrest in the traditional sense-with respect to the bank robberies (i.e., that a crime had been committed and that defendant had committed it). Nonetheless, the police, armed with the warrant, had authority to find and seize Spencer anywhere they could find him for his failure to appear in court. Thus, the presence of the police in the defendant's room was pursuant to a direction made by a neutral magistrate. Defendant's rights under the Fourth Amendment require no more." *Id*. (citations omitted).

### B.  The Record Does Not Support Liability Against the City

Plaintiffs have thus far benefited from their mere suggestion that a municipality may be found liable for a violation of the Fourth Amendment on a theory that it had "a policy that leads to the issuance of warrants based on knowingly or recklessly false information, or by having a policy that causes systemic invalidity in issuing and executing warrants." ECF 27 pp.6-7. This Court was "not convinced that Plaintiffs have sufficiently pleaded that their warrants were based on knowingly or recklessly false information," but allowed the claim to proceed on the theory that "the City has a policy of issuing warrants for 'failure to appear' without probable cause" based primarily on allegations that "as a matter of routine, the City issues arrest warrants for a person's 'failure to appear' after City officials have given the person paperwork crossing out their court date or have moved the court date without informing the person." *Id*. p. 7 (citations omitted). The Court further noted that "Whether Plaintiffs can prove that such practices are 'so persistent and widespread' as to have the force of law may be determined at a later stage." *Id*.

Warrants relative to any failure to appear were issued by the Municipal Court Judge. SOF 24. The warrants were not sworn on an affidavit but were made solely by the Court upon its own determinations. *Id*. There is simply no evidence of any widespread City practice of issuing warrants without probable cause, and summary judgment should be granted to the City.

### VIII.  COUNT SEVEN: CLAIMS OF EXTENDED DETENTION OF WARRANTLESS ARRESTEES WITHOUT A NEUTRAL JUDICIAL FINDING OF PROBABLE CAUSE BASED ON SWORN EVIDENCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

In Count Seven, Plaintiffs summarily allege that they were subjected to unconstitutional extended detention following warrantless arrests, specifically complaining of a practice of holding

detainees "for longer than 48 hours without a neutral finding of probable cause based on sworn evidence." Complaint ¶ 247.  Again, the reasonableness of the duration of detention is at issue.

## A. *Gerstein* and Probable Cause

The standard governing the timing of a Fourth Amendment probable cause determination was established in *Gerstein v. Pugh* and *County of Riverside v. McLaughlin*. In *Gerstein*, Florida prisoners brought a class action against various judicial and prosecutorial officials claiming a right to a judicial hearing on the issue of probable cause in the event of pretrial detention. The Supreme Court held that "as a condition for any significant pretrial restraint of liberty," the State must provide a fair, reliable, and prompt determination of probable cause by a judicial officer. *Id*. at 188.

*County of Riverside* then clarified the required timing of this determination and the definition of a "prompt" hearing under *Gerstein*. Initially, the Court recognized that *Gerstein* did not compel an immediate determination of probable cause upon completing the administrative steps incident to arrest. *County of Riverside*, 111 S. Ct. at 1668. Rather, the Court held as follows:

> Taking into account the competing interests articulated in *Gerstein*, we believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*. For this reason, such jurisdictions **will be immune from systemic challenges**.

*Id*. at 1670 (emphasis added). This time frame was established "to provide some degree of certainty so that States and Counties may establish procedures with confidence that they fall within constitutional bounds" *Id*. However, the 48-hour standard is not an automatic safe harbor, but each situation must be reviewed under a "reasonableness" standard. *Id*.  The Court recognized that in some instances unreasonable delay may be less than 48 hours, while in other circumstances, more

53

than 48 hours might be reasonable. The 48-hour standard was established to *immunize states and counties from systematic challenges* - such as the one now before this Court.

Plaintiffs have proffered the theory that *all detentions* of *every Plaintiff* are "uniformly unreasonable" because "the Ferguson police 'don't plan to present [persons arrested without a warrant] to a magistrate for a probable-cause hearing'—at least they did not **until Senate Bill 5 was made effective**." Certification Memorandum at pp. 24, 29-30 (citations omitted).[57] Accordingly, this Court has previously opined that "[t]he success or failure of every class member's claim turns on proof that no process existed by which those arrested without a warrant would have an opportunity for a probable cause determination." *Id*. at p. 30. The net impact of this theory is that *every detention* of *any duration* is deemed unreasonable. The City respectfully submits that such theory is wrong, having no support in the controlling law.

As discussed *supra*, such a rule is untenable in light of the fact that there is no requirement for a probable cause determination by a neutral magistrate *before* a warrantless arrest, nor is it unreasonable to hold an individual for at least a period of time to process their arrest even if the intent is to release them, not holding such individual for long enough to see a magistrate. To hold otherwise would outlaw any arrest under circumstances where a suspect is merely processed and released where there was no opportunity to see a magistrate, even if he was released before he would have ever seen a magistrate. See *County of Riverside v. McLaughlin*, 500 U.S. at 55; *Atwater v. City of Lago Vista*, 532 U.S. at 354.

Plaintiff's theory that *all detentions* of *any duration* are per se unreasonable without a process "by which those arrested without a warrant would have an opportunity for a probable cause

---

[57] SB 5 was made effective August 2015. The class period ends long after that, on September 30, 2017.

determination," does not account for the process specifically contemplated by relevant Missouri statute, which provided as follows for warrantless arrests:

> All persons arrested and confined in any jail or other place of confinement by any police officer, without warrant or *other process*, for any alleged breach of the peace or other criminal offense, or any suspicion thereof, shall be discharged from said custody within twenty-four hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of some credible person, and be held by warrant[58] to answer to such offense.

§544.170.1 R.S.Mo. (emphasis added).[59]  This statute worked in conjunction with Mo. Sup. Ct. Rule 37.17 which, prior to January 1, 2019, contemplated that a bond schedule may provide such "other process" (rendering the 24 hour limit inapplicable), stating:  "When an arrest is made without a warrant, the peace officer may accept bond in accordance with a bail schedule furnished by the court having jurisdiction."[60]  Thus, Missouri statute, throughout the relevant class period, always contemplated and allowed for some period of detention prior to either a probable cause determination or release following a warrantless arrest.

Nevertheless, even if Plaintiffs' theory holds true, it cannot be said that such law was clearly established, certainly not in the pre-SB 5 era. Clearly it was not established before such time that a practice which provided "other process" and observed the time limits articulated by the Missouri legislature in §544.170 R.S.Mo. and deferred to bond schedules fixed by municipal court judge in accordance with the direction of the Missouri Supreme Court in Rule 37.17 could be

---

[58] The use of the term "warrant" necessarily encompasses a probable cause determination.

[59] The statute also provided avenues for allowing a detainee to seek a probable cause hearing by ensuring that "[i]n any confinement to which the provisions of this section apply, the confinee shall be permitted at any reasonable time to consult with counsel or other persons acting on the confinee's behalf." §544.170.2 R.S.Mo.

[60] Plaintiffs' theory does not even permit the *current process* established by the current iteration of the rule, providing: "When an arrest is made without a warrant, the peace officer may accept bond within 24 hours of arrest in accordance with a bond schedule furnished by the court having jurisdiction. If the judge has not issued an arrest warrant within 24 hours of arrest, the peace officer shall release the defendant from custody." Mo. Sup. Ct. R. 37.17 (2023).

considered *deliberately* indifferent to any detainee's right, much less *all* detainees' rights. Surely such conforming practices are insufficient to establish municipal liability under *Monell*.

### B.  Judicial Findings of Probable Cause Are Judicial Functions

Even if this Court adopts Plaintiffs' theory that they may yet level a systemic challenge based on a previously unrecognized *unreasonableness per se* theory, it previously stated that "Whether the City*, rather than another entity*, was the moving force behind this alleged constitutional violation is a merits question that would impact the class uniformly…" Certification Memorandum p. 30, n. 13 (emphasis added). Here again, there is such another entity, and it is the State of Missouri through the Municipal Division of the Circuit Court of St. Louis County. Setting bonds is a judicial function. See § II(B), *supra.* Setting conditions of release is a judicial function. *Id*. Making neutral probable cause determinations after warrantless arrest is a judicial function. *Id*.

### C.  The Record Does Not Support Liability Against the City

The record establishes both that practices (a) largely comported with existing state law and supreme court rules and (b) were matters entirely within the purview of the judiciary. SOF 16-35. Further, of the 5,279 arrests of members of the "Modified *Gerstein* Class," 423 were of a duration over 48 and up to 72 hours (per Brockmeyer's policy); 1051 were of a duration over 24 and up to 48 hours; and 3,679 were of a duration of 24 hours or less. See SOF 11, Ex. J (filtered). In fact, 2,432 for 12 hours or less. *Id*. The record establishes that there was no practice in Ferguson whereby it can be determined that every member of the class was uniformly held for an unreasonable period of time - clearly not as a result of a policy of the City in violation of the Fourth Amendment – certainly not one upon which class wide damages may be awarded.

To the extent the record reveals any systemic shortcoming, it was attributable to the Municipal Judge, not the City. As with initial appearances, Judge Brockmeyer did not make

probable cause determinations while individuals were incarcerated. This was *the Court's policy*. From the standpoint of the police/jailers, there was no Court practice of reviewing charges for probable cause and, thus, no avenue available to obtain such review. Rather, Brockmeyer directed that those who could not post bond should be held up to 72-hours (later 12-hours) and then released.

Moreover, such a systematic shortcoming (if any) is at best (as in *Gerstein*) amenable to *injunctive* relief only; a moot point in light of both the reforms that have been in place since 2016 and Plaintiffs' agreement to dismiss the injunctive and declaratory classes. Even if Plaintiffs could establish that each class member suffered a *Gerstein* violation, they cannot prove actual damages because Plaintiffs do not contest the probable cause for their arrest. Accordingly, as with indigency hearings, Plaintiffs are limited to recovering only nominal damages to compensate for the *failure to receive the hearing* as opposed to damages for wrongful incarceration. See *Goldman v. Forbus*, 17 Fed. Appx. 487, 489 (8th Cir. 2001) (only nominal damages available when judge found probable cause supporting arrest and plaintiff failed to show actual damages). Simply put, if probable cause hearings had been held, it would not have resulted in release from incarceration. Accordingly, the damages associated with any violation are nominal to compensate solely for the failure to receive the hearing. See Section II(D)(iii) *infra*.

For all of these reasons, Defendant is entitled to summary judgment on this count as well.

## IX.   ALTERNATIVE MOTION FOR SUMMARY JUDGMENT AFTER JUNE 30, 2015

To the extent that counts I, II, III, V, VI, and VII are not disposed on the arguments above, Defendant is nonetheless entitled to partial summary judgment on such claims because all practices of which Plaintiffs complain had ceased by June 30, 2015. Accordingly, Defendant is entitled to summary judgment on claims concerning incarceration after that date.

Judge Brockmeyer's tenure as Municipal Judge ended in March 2015. SOF 36. Even before he resigned, Judge Brockmeyer had reduced the maximum potential incarceration time from 72-hours to 12-hours. SOF 31. On March 9, 2015, Judge Roy Richter, Eastern District, Missouri Court of Appeals was temporarily transferred to the 21st Judicial Circuit and assigned to the Ferguson Municipal Court.  SOF 37.  Judge Richter operated the Ferguson Municipal Court until June 2015 when Judge Donald McCullin took over. SOF 38, 41. The reports and certifications issued by Judges Richter and McCullin establish that the complained-of practices had ceased no later than June 30, 2015. SOF 40, 42.

On April 13, 2015, the Office of State Courts Administrator ("OSCA") issued a report concerning operations of the Ferguson Municipal Court summarizing more progress in instituting reforms, including implementation of Brockmeyer's 12-18-14 Municipal Court Order; and utilization of arrest warrants only as a last resort to enforce appearance. SOF 39. A May 11, 2015 report was provided to the Missouri Supreme Court by OSCA and Judge Richter confirming the above-described findings of the 4-13-15 OSCA report including implementation of the 12-18-14 Order. SOF 40. The report further noted that certain DOJ findings concerning the issuance of warrants for missing a single payment could not be substantiated and that, in fact, **"arrest warrants are issued because of missed court appearances only**." *Id*. (Emphasis added). The report noted that "Judge Richter reports that he conducts the courts in accordance with Supreme Court of Missouri's Rule 37 governing municipal court divisions as well as applicable state statutes." *Id*.

On August 25, 2015 and again on December 15, 2015, Judge McCullin certified to the Missouri State Auditor that, as of June 30, 2015, the Ferguson Municipal Court was in full compliance with the requirements of the newly enacted Senate Bill 5. SOF 42. Those changes

include initial appearance and bond review hearings within 48/72 hours as well as probable cause

determinations within 24 hours.

The evidence bears out that these mandates were being followed and Plaintiffs can present

little more than a few isolated instances where they were not.  Indeed, Plaintiffs' expert confirms

that beginning in 2015 just over 1% of detainees were held in excess of 24-hours, with none being

held longer than 48-hours. Demuth Report, ECF 439-1 p. 8. Accordingly, the City, being in

compliance with presumptively constitutional state law and the rules of the Missouri Supreme

Court, cannot be said to have been deliberately indifferent to any violation of constitutional rights

accruing after that date per *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d at 393–94 and

*Veatch v. Bartels Lutheran Home*, 627 F.3d at 1259. The City is entitled to summary judgment at

least for all claims accruing after June 30, 2015.

Respectfully Submitted,

**HELLMICH, HILL & RETTER, LLC**

By: */s/ Blake D. Hill*
Blake D. Hill #58926MO
William A. Hellmich, #31182
1049 N. Clay Ave.
Kirkwood, MO  63122
Phone: 314-646-1110
Fax:    314-646-1122
E-mail:blake@hellmichhillretter.com

**LEWIS RICE LLC**
Ronald A. Norwood, #33841MO
600 Washington Avenue, Suite 2500
St. Louis, MO 63101
(314) 444-7759
(314) 612-7759 (facsimile)
rnorwood@lewisrice.com

**REICHARDT NOCE, LLC**
Tim Reichardt, #57684MO
12444 Powerscourt Dr., Suite 370
St. Louis, MO 63131
314-789-1199 Tel 314-754-9795 fax
tjr@reichardtnoce.com

*Attorneys for Defendant City of Ferguson*

**<u>Certificate of Service</u>**

I hereby certify that a copy of the foregoing filed electronically with the Clerk of the Court this 13th day of March, 2023 to be served by operation of the Court's electronic filing system upon all parties through their counsel registered with CM/ECF.

*/s/  Blake D. Hill*

60