**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEILEE FANT, ROELIF CARTER, ALLISON NELSON, HERBERT NELSON JR., ALFRED MORRIS, ANTHONY KIMBLE, DONYALE THOMAS, SHAMEIKA MORRIS, RONNIE TUCKER, et al., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4-15-CV-00253-AGF |
| THE CITY OF FERGUSON, | ) ) | |
| Defendant. | ) ) | (Class Action) |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO
THE CITY'S LIABILITY ON COUNTS ONE, TWO, AND SEVEN**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................. 1

II.   FACTS ................................................................................................................. 4

      A.    Procedural Background ........................................................................... 4

      B.    Ferguson's Arrest and Detention Policies and Practices ....................... 5

            1.    The City Structure ....................................................................... 5

            2.    The City Detained Individuals Pursuant to Warrantless Arrests and Did Not Provide Probable Cause Determinations ................................................... 6

            3.    The City Did Not Provide Notice or a Hearing Before Automatically Issuing Warrants and Jailing Its Debtors for a Failure to Pay ................................. 8

            4.    The City Held Individuals in Jail When They Could Not Afford to Pay Bond, Without Ability-to-Pay Hearings in Front of a Judge ................... 10

            5.    The City's Practices of Jailing Plaintiffs for Failure to Pay Continued After the Department of Justice Issued its Investigation Report ....................... 11

III.  LEGAL STANDARDS APPLICABLE TO ALL COUNTS ........................................... 12

IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON LIABILITY FOR COUNTS ONE, TWO, AND SEVEN ........................................................................... 12

      A.    *Bearden* Class Members Suffered the Violation Alleged in Count One ............. 12

            1.    The Fourteenth Amendment Prohibits Jailing People for Failure to Pay Without an Inquiry and Findings Concerning Their Ability to Pay ......... 13

            2.    Members of the *Bearden* Class Were Jailed for Failure to Pay Without an Inquiry and Findings Concerning Their Ability to Pay ........................... 18

      B.    Post-Judgment Class Members Suffered the Due Process Violation Alleged in Count Two ................................................................................................... 20

            1.    Absent Adequate Procedural Safeguards Concerning Ability to Pay, Due Process Provides a Right to Counsel Prior to Jailing for Nonpayment .... 21

            2.    Post-Judgment Class Members Were Jailed for Nonpayment Without Counsel or the Benefit of Adequate Alternative Safeguards ................... 22

C. *Gerstein* Class Members Suffered the Violation Alleged in Count Seven ........... 25

    1. The Fourth Amendment Prohibits Detaining a Warrantless Arrestee Without Any Prospect of a Judicial Determination of Probable Cause .... 25

    2. *Gerstein* Class Members Were Detained After Warrantless Arrests Without Any Prospect of a Judicial Determination of Probable Cause ................. 27

V. THE CITY IS LIABLE FOR VIOLATIONS OF PLAINTIFFS' RIGHTS UNDER COUNTS ONE, TWO, AND SEVEN AS A MATTER OF LAW .................................. 30

  A. Legal Standard for Municipal Liability ................................................................. 30

  B. Ferguson's Policymakers ...................................................................................... 32

    1. The Police Chief was a final policymaker for Ferguson's jailing practices ................................................................................................................. 33

    2. The City Manager has final policymaking authority over Ferguson's jail and jailing practices ....................................................................................... 34

    3. The City Councilmembers have final policymaking authority over Ferguson's jail and jailing practices ........................................................ 35

  C. The City's Policies, Practices, and Customs Caused the Violations Alleged in Counts One, Two, and Seven ............................................................................... 36

    1. The City held *every* arrestee on predetermined bond without inquiring into the person's ability to pay ...................................................................... 37

    2. The City did not provide probable cause determinations to warrantless arrestees.................................................................................................... 40

  D. The City's Policymakers Were Fully Aware and Deliberately Set Up, Maintained, and Encouraged the Unconstitutional Processes to Maximize Revenue .............. 41

  E. The City was deliberately indifferent in its failure to implement constitutional processes ................................................................................................................ 51

  F. The City's policymaking officials directed and accepted the system of jailing indigent individuals and did so to raise revenue for the City .............................. 53

  G. The City Council could have enacted ordinances to prevent the constitutional violations under Counts One, Two, and Seven.................................................... 58

VI. CONCLUSION............................................................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003) ................................................................14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................12

*Angarita v. St. Louis Cnty.*, 981 F.2d 1537 (8th Cir. 1992) ............................................34

*Atkinson v. City of Mt. View*, 709 F.3d 1201 (8th Cir. 2013) ..........................................34

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) ......................................42

*Barone v. City of Springfield, Or.*, 902 F.3d 1091 (9th Cir. 2018) ..................................34

*Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997) ...............................31, 32, 51

*Bearden v. Georgia*, 461 U.S. 660 (1983) .................................................................13, 15

*Beck v. Ohio*, 379 U.S. 89 (1964) .....................................................................................25

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ..............................................44, 46

*Brand v. Nat'l Union Fire Ins. Co. of Pittsburg*, 934 F.3d 799 (8th Cir. 2019) .............12

*Brewington v. Keener*, 902 F.3d 796 (8th Cir. 2018) ......................................................37

*City of Canton v. Harris*, 489 U.S. 378 (1989) .........................................................42, 51

*Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ..............................................26, 27

iv

*Colson v. Joyce*, 646 F. Supp. 102, 105 (D. Me. 1986), *aff'd*, 816 F.2d 29 (1st Cir. 1987) ....21, 24

*Cooper v. City of Dothan*, 2015 WL 10013003 (M.D. Ala. June 18, 2015)..................................16

*Corwin v. City of Independence,* 829 F.3d 695 (8th Cir. 2016)......................................................30

*Davison v. City of Minneapolis*, 490 F.3d 648 (8th Cir. 2007)........................................................32

*Dixon v. City of St. Louis*, 2019 WL 2437026 (E.D. Mo. June 3, 2015), *rev'd on other grounds*,
    950 F.3d 1052 (8th Cir. 2020) ..............................................................................................15

*Doe v. Angelina Cnty., Texas*, 733 F. Supp. 245 (E.D. Tex. 1990) ..................................................14

*Estate of Vela v. County of Monterey*, 2018 U.S. Dist. LEXIS 145698 (N.D. Cal. Aug. 27,
    2018) .......................................................................................................................................51

*Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089 (8th Cir. 2004) ............................................32

*Gerstein v. Pugh*, 420 U.S. 103 (1975)............................................................................................26

*Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987).................................................32, 34, 58

*Hayes v. Faulkner Cnty.*, 388 F.3d 669 (8th Cir. 2004) .................................................................60

*Hollins v. Powell*, 773 F.2d 191 (8th Cir. 1985)..............................................................................36

*Howard v. Adkison*, 887 F.2d 134 (8th Cir. 1989)..........................................................................51

*In re Oliver*, 333 U.S. 257 (1948)....................................................................................................21

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)..................................21

*Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642 (8th Cir. 1990)...................................................31

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989)...........................................................31, 32

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .................................................................................22

*Jones v. City of Clanton*, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015)....................................16

*Larson v. Miller*, 76 F.3d 1446 (8th Cir. 1996) (en banc) ...........................................................51

*Lawson v. Dallas Cnty.*, 286 F.3d 257 (5th Cir. 2002)..................................................................42

*Manuele v. City of Jennings*, 2012 WL 113538 (E.D. Mo. Jan. 13, 2012)....................................35

*Mathews v. Eldridge*, 424 U.S. 319 (1976).................................................................................17

*McMillian v. Monroe Cnty.*, 520 U.S. 781 (1997)........................................................................32

*McNeil v. Community Probation Services,* 2019 WL 633012, at *16 (M.D. Tenn. Feb. 14, 2019),

    *aff'd*, 945 F.3d 991 (6th Cir. 2019)...................................................................................16, 17

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)..............................................................30, 31

*Moyle v. Anderson*, 571 F.3d 814 (8th Cir. 2009) ......................................................................32

*ODonnell v. Harris Cnty.*, 251 F. Supp. 3d 1052 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147

    (5th Cir. 2018)..............................................................................................................15, 17

*Parker v. Town of Swansea*, 270 F. Supp. 2d 92 (D. Mass. 2003) ...............................................46

*Parrish v. Luckie*, 963 F.2d 201 (8th Cir. 1992)..........................................................................58

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)................................................................31, 60

*Pierce v. City of Velda* City, 2015 WL 10013006, *1 (E.D. Mo. June 3, 2015) ..........................15

*Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002)..............................................................42

*Plamp v. Mitchell Sch. Dist*. No. 17-2, 565 F.3d 450 (8th Cir. 2009) ...........................................43

*Porter v. City of Philadelphia*, 975 F.3d 374 (3d Cir. 2020)........................................................31

*Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010)........................................................27, 41

*Pugh v. Rainwater*, 72 F.2d 1053 (5th Cir. 1978) (en banc).........................................................15

*Reilly v. City of Providence ex rel. Napolitano*, 2013 WL 1193352 (D.R.I. Mar. 22, 2013)........46

*Robinson v. City of Sikeston,* 2020 WL 588606 (E.D. Mo. Feb. 6, 2020)....................................36

*Rodriguez v. Providence Cmty. Corr., Inc*., 155 F. Supp. 3d 758 (M.D. Tenn. 2015).................16

*Russell v. Hennepin Cty*., 420 F.3d 841 (8th Cir. 2005).............................................................51

*Sanchez v. Young Cnty*., 956 F.3d 785 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901 (2020)........37

*Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941 (8th Cir. 2017) ......................................32, 33

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987)........................................................................43

*St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .......................................................................33, 36

*State v. Stone*, 268 P.3d 226 (Wash. App. 2012) (applying *Turner* to require counsel in proceedings for contempt for nonpayment of court debt when the government is represented by a state prosecutor) ...................................................................................................22

*Tate v. Short*, 401 U.S. 395 (1971) ..........................................................................13

*Thelma D. v. Board of Educ.*, 934 F.2d 929 (8th Cir. 1991) ........................................43

*Thompson v. Moss Point*, 2015 WL 10322003 (S.D. Miss. Nov. 16, 2015) ................16

*Tilson v. Forrest City Police Dept.*, 28 F.3d 802 (8th Cir. 1994)..................................51

*Turner v. Rogers,* 564 U.S. 431, 448–49 (2011).........................................14, 21, 22, 24

*United States v. Anderson*, 553 F.2d 1154 (8th Cir. 1977).........................................21

*United States v. Salerno*, 481 U.S. 739 (1987) ..........................................................15

*Walker v. City of Calhoun*, 2016 WL 361612 (N.D. Ga. Jan. 28, 2016), *vacated on other grounds*, 901 F.3d 1245 (11th Cir. 2018) ....................................................................16

*Ware v. Jackson Cnty.*, 150 F.3d 873 (8th Cir. 1998)..................................................32

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)....................................42

*Webb v. City of Maplewood*, 340 F.R.D. 124 (E.D. Mo. 2021)....................................27

*Webster v. Gibson,* 913 F.2d 510 (1990) ...................................................................41

*Wedemeir v. City of Baldwin, Mo.*, 931 F.2d 24 (8th Cir. 1991)..................................37

*Williams v. Illinois*, 399 U.S. 235 (1970) ...................................................................13

*Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015) ...........................................12

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................13

## STATUTES AND RULES

Ferguson Mun. Code...........................................................................9, 35, 57, 58, 59

Mo. Rev. Stat. § 560.026 ..............................................................................................8

Ordinance § 13-52........................................................................................................38

## MISCELLANEOUS

Fourth Amendment .......................................................................25, 26, 27, 30

Fourteenth Amendment .................................................12, 13, 15, 16, 18, 20, 22, 25

Fourth and Fourteenth Amendments ...........................................................................2

Department of Justice Issued Its Investigation Report ..............................................11

Expert Report of S. Demuth, Ph.D ............................................................................43

Fed. Rule Civ. Proc. 56(a) .........................................................................................12

General Order 111.02...................................................................................................45

General Order 417.00, § 417.13....................................................................................7

General Order 421.00...................................................................................................38

General Order 421.03....................................................................................................................19

Mo. Const. Article VI, § 19(a).....................................................................................................58

MO Ord. 2104-3566, § 1...............................................................................................................57

U.S. Const. Amendment IV..........................................................................................................25

## I.    INTRODUCTION

The undisputed material facts in this case demonstrate that the named Plaintiffs (and the class members they represent) were jailed by the City of Ferguson ("the City") pursuant to monetary payments arising from traffic tickets or other municipal ordinance violations. Indeed, through the policies and practices of the City's police, jail, and court departments, the City systematically violated the constitutional rights of the class members. On the grounds set forth herein, Plaintiffs now ask this Court to grant them partial summary judgment on the issue of the City of Ferguson's liability for violations of Plaintiffs' constitutional rights under Counts One, Two, and Seven of the First Amended Class Action Complaint ("FAC"). ECF No. 53.[1]

Plaintiffs are class representatives of the many people whose fundamental rights were violated by the City's jailing and collection scheme. Keilee Fant, Roelif Carter, Allison Nelson, Herbert Nelson, Jr., Alfred Morris, Anthony Kimble, Donyale Thomas, Shameika Morris, and Ronnie Tucker (collectively, "Plaintiffs")[2] were arrested and held in the City's jail for no reason other than their inability to pay money that the City demanded. They were jailed for indeterminate periods without any legal proceedings, without a lawyer, and without the inquiry into their ability to pay that the Constitution requires. Instead of being provided Constitutional safeguards, they were threatened, extorted, and left to languish in jail until their family could produce enough cash to buy their freedom or until City jail officials decided to let them out for free to make room in the jail for arrestees who could pay bond. Because of the City's scheme, a single ticket could result

---

[1] Plaintiffs maintain their other claims (Counts Three, Four, Five, and Six) and preserve for trial the issue of damages on all Counts.
[2] Plaintiff Tonya DeBerry passed away during the litigation of this case, and this Court granted a Motion to Substitute her personal representative, John Narayan. ECF No. 242 (Order to Substitute Pl. T. DeBerry). Plaintiff Daniel Jenkins was dismissed with prejudice because the incidents of his incarceration occurred prior to the class period in this suit. ECF No. 417 (Mot. to Dismiss Pl. D. Jenkins).

in jailings that would recur for over a decade, and fines and fees that would balloon in excess of a thousand dollars.  The cycle of wealth-based detention affected every aspect of their lives, inflicting profound suffering on them and their families.

Plaintiffs now move for summary judgment on the issue of the City of Ferguson's liability on the following causes of action:

- **Count One:**  (Brought on behalf of the *Bearden* Class):  Alleging the City violates Plaintiffs' rights by jailing them for nonpayment of monetary sums with no inquiry into their ability to pay;

- **Count Two:**  (Brought on behalf of the Post-Judgment Class):  Alleging the City violates Plaintiffs' right to the effective assistance of counsel; and

- **Count Seven:**  (Brought on behalf of the Modified *Gerstein* Class):  Alleging the City's extended detention of warrantless arrestees without a neutral judicial finding of probable cause based on sworn evidence violates the Fourth and Fourteenth Amendments.

The City's unconstitutional jailing scheme that resulted in the constitutional violations underlying these claims worked as follows.  Based on a desire to "fill the revenue pipeline," City officers wrote thousands of tickets per year to area citizens.  At times, those individuals would be immediately arrested and held in jail on bond for several days, without officers so much as seeking a warrant to justify their detention.  Most were later assessed fines and court costs.  Although those convicted of these municipal offenses (or who, more likely, pleaded guilty) were not sentenced to imprisonment for the underlying conviction itself, all would later face repeated imprisonment should they be unable to pay the full sum of the money assessed as scheduled.

When people failed to pay or appear in court, court clerks supervised by the Ferguson Chief of Police ("Chief of Police" or "Police Chief") issued warrants for their arrest.  These warrants were not issued based on probable cause—indeed no one considered the facts or circumstances to determine whether to issue a warrant.  No one determined whether the nonpayment was willful. Instead, the warrants were generated by a computer program operated and procured by the City

2

that *automatically* issued a warrant when debtors missed a payment date.  The police then arrested people and jailed them in the City's jail pursuant to a bond requiring payment of a sum of money.  But at no point did the City inquire into arrestees' ability to pay their bonds.  Thousands of people were held during the class period for days at a time.  For every minute they were held, City employees had the authority to release them on a recognizance bond.  Indeed, once a detained person sat in jail for long enough to show they could not pay, City employees released them on their own recognizance, as though the bond that had kept them jailed never existed to begin with.

During their imprisonment, the City did not hold hearings or undertake proceedings to demonstrate that there was probable cause to justify the arrest of those held without a warrant.  The City also knowingly jailed individuals without the benefit of counsel, as the City provided no counsel and most individuals could not afford to hire their own.  Because individuals were no more able to pay the additional fines and court costs assessed with each subsequent arrest and jailing than the original monetary payments that originally brought them to court, they would be trapped in a vicious cycle of nonpayment, arrest, and jailing.

As demonstrated in detail in Section IV below, the record here establishes the constitutional violations alleged in Counts One, Two, and Seven.  As shown below in Section V, because there remain no factual questions as to the City's liability for these violations, the Court should grant summary judgment in favor of Plaintiffs as to the City's liability under Counts One, Two, and Seven.  In the alternative, to the extent the Court finds that there is a genuine dispute of material fact on the issue of the City's municipal liability, the Court should grant partial summary judgment finding violations of Plaintiffs' constitutional rights under Counts One, Two, and Seven.[3]

---

[3] At a minimum, the Court should enter summary judgment in favor of the named Plaintiffs on those counts.

## II.     FACTS

### A.  Procedural Background

On February 8, 2015, Plaintiffs filed the Class Action Complaint ("Complaint"), bringing six counts against the City in connection with its unconstitutional debt collection and jailing.  *See* ECF No. 1 ¶¶ 233–45.  A year later, Plaintiffs filed the First Amended Class Action Complaint, which is the operative complaint, including all six claims in the Complaint and adding a seventh. *See* FAC ¶¶ 233–46.

On June 9, 2022, this Court granted Plaintiffs' motion for class certification, certifying five 23(b)(3) damages classes, defined as follows, and one 23(b)(2) declaratory and injunctive class[4] and designating class representatives:

- ***Bearden* Class (Count One):**  "All persons who have, at any time since February 8, 2010, been kept in jail by the City of Ferguson for failing to pay a fine, fee, bond, surcharge, or cost, without an inquiry into their ability to pay."

- **Modified *Gerstein* Class (Count Seven):**  "(a subclass of the *Bearden* Class), defined as follows: All persons who have, at any time since February 8, 2010, been held in jail by the City of Ferguson after a warrantless arrest with no finding of probable cause by a neutral magistrate for their arrest and continued detention."

- **Jail-Conditions Class (Count Four):**  "All persons who, at any time since February 8, 2010, were held in the City of Ferguson jail."

- **Warrant Class (Count Three):**  "(a subclass of the *Bearden* Class), defined as follows: All persons who have, at any time since February 8, 2010, been held in jail by the City of Ferguson after being arrested on a warrant issued by the City."

- **Post-Judgment Class (Counts Two, Five, and Six):**  "(a subclass of the *Bearden* Class), defined as follows: All persons who have, at any time since February 8, 2010, been jailed by the City of Ferguson because of their non-payment in connection with a prior judgment."

---

[4] The Court has preliminarily approved Plaintiffs' voluntarily dismissal of the claims of the Modified Declaratory and Injunctive Class.  ECF No. 540 (Order Prelim. Approving Voluntary Dismissal of Class).  A final hearing regarding the request to voluntarily dismiss those claims is set for July 5, 2023.  ECF No. 584 (Order Setting Hr'g on Voluntary Dismissal of Class).

ECF No. 519 ("Class Cert Order") at 45–48 (emphasis in original).  This Court amended all classes

to have an end-date of September 30, 2017.  ECF No. 535 (Order Granting Joint Mot. for Entry of

Stip. Order); ECF No. 573 (Order Am. Class Def. and Dir. Class Notice).

### B. Ferguson's Arrest and Detention Policies and Practices

#### 1. The City Structure

The City Charter gave the Chief of Police control over the jailing processes of the City.

Statement of Uncontroverted Material Facts ("SUMF") ¶¶ 196–201.  The City Manager supervised

the City's Police Chief, who supervised the City's public safety department and municipal court.

SUMF ¶¶ 192, 194, 238.  The City Manager was responsible for evaluating the Police Chief and

would consider whether the Chief increased revenue as part of the Chief's performance evaluation.

SUMF ¶ 254.  The Police Chief attended City Council meetings and would report to the City

Council on revenue generation.  SUMF ¶¶ 30, 247, 254, 263–64, 266.  The Police Chief set policies

for all officers, jailers, and other staff in the public safety department; and the Police Chief

approved General Orders, which contained the "rules and policies for operating the correctional

facilities" with which officers were expected to comply.  SUMF ¶¶ 196–201.  Among other

responsibilities, the City's police department also provided security for the municipal court and

Ferguson City Council meetings.  SUMF ¶ 231.

The Police Chief was also responsible for the budget and had supervisory responsibilities

for the personnel of the court, e.g., court clerks.  SUMF ¶¶ 205–06.  The Police Chief was in

regular contact with the court clerks and would ask court clerks to attend regular staff and

command meetings.  SUMF ¶ 216.  As supervisor of the court clerks, the Chief of Police made

recommendations for their salary levels and increases.  SUMF ¶ 212.  The judge did not supervise

court clerks and was not involved in day-to-day operations of the court or provide instruction on

how the court clerk's office was supposed to run.  SUMF ¶ 213.

The court clerks shared duties with the judge, prosecutor, and police department.  SUMF ¶ 220.  In many cases, the clerks performed the duties of the prosecutor herself:  for instance, the court clerks were the City employees who reviewed complaints of the police officers and applied the prosecutor's stamp, filing the charges with the Court.  SUMF ¶¶ 222–23.  The court clerks also issued and mailed out recommendations from the prosecutor on traffic violations, entered warrants for the judge and prosecutor, and issued failure to appear violations as though they were police officers.  SUMF ¶¶ 219–28.  The Head Court Clerk and other court and jail staff regularly provided written updates directly to both the Police Chief and City Manager regarding court revenues, delineating revenues from fines and bonds.  SUMF ¶¶ 260–62, 265.  All fines and fees collected from violations of City Ordinances were credited to the City's General Fund.  SUMF ¶ 232.

The City Manager and City Councilmembers reviewed monthly and quarterly reports from the Finance Director detailing revenue from various City departments.  SUMF ¶ 248.  These monthly financial reports included information about revenue from the municipal court and jail.  SUMF ¶¶ 248–49.  As the jail was included under the Chief of Police's budget, the Chief had the authority to make changes at the jail, including detention times, remodels, record-keeping, and organizing events for employees.  SUMF ¶¶ 239–40.  The Chief also had intimate knowledge of day-to-day jail operations.  SUMF ¶ 241.

The City Manager hired and fired the City Prosecutor.  SUMF ¶ 202.  Councilmembers and the Mayor appointed the City's judge, chose whether to renew the judge's contract every two years, and set the judge's compensation.  SUMF ¶ 204 (designated 30(b)(6) testimony).

### 2. The City Detained Individuals After Warrantless Arrests With No Chance of Probable Cause Determinations

For years, the City of Ferguson maintained an enforcement system that treated its poorest residents as a source of profit.  Under financial pressure, the City's policymakers including the

City Council and City Manager chose to generate revenue through ticketing and incarceration. SUMF ¶¶ 1–36.  The City's process was to detain warrantless arrestees without a judicial finding of probable cause, even though state law and Ferguson's own policies required the City to obtain a warrant within 24 hours.  SUMF ¶¶ 43–47.  Analysis of the City's data indicates that nearly 4,534 people were detained on a warrantless arrest during the class period, and those individuals spent at least 107,334 hours in the City's jail.  SUMF ¶ 309–10.

If a Ferguson police officer had probable cause to believe a person was violating a criminal ordinance, the officer had the choice whether to arrest the individual, write a ticket with a summons for a court date in the future, or let the individual off with a warning.  SUMF ¶ 37.  Following either an arrest or ticket, City officers wrote up tickets or complaints and filed those with the court clerks.  SUMF ¶ 38.  The court clerks were authorized by the City Prosecutor and the City's judge to use their signature stamps, and the court clerks would issue charges by stamping the prosecutor's signature and entering the charges into a computer system.  SUMF ¶¶ 39–40.

City police officers then did not obtain a judge's finding of probable cause for those arrested without a warrant.  SUMF ¶ 43.  In fact, officers were not even required to know the process for filing a warrant.  SUMF ¶ 44.  The City's own judge and police chief agreed that there was not a process by which to make a judicial finding of probable cause to justify a person's arrest. SUMF ¶¶ 45–46.  Instead, the City would hold the individual in jail until the person had paid a bond, or City employees decided to release them.[5]

---

[5] The City's official policy stated:  "if an arrest is made without a warrant and a warrant is not issued within twenty-four hours, the prisoner must be released at or prior to the twenty-four hour mark."  Hanlon Decl., Ex. 36 (SUMF ¶ 42), 4/8/10 General Order 417.00, § 417.13  However, until 2010, the City allowed indefinite detentions in practice, after which the *Police Chief* limited detention after any arrest, including on warrants, to 72 hours.  SUMF ¶¶ 61–62. Yet even though the detention was limited to 72 hours, the City still failed to have any process to seek warrants and thus detained individuals in violation of their own policy and state law.  SUMF ¶¶ 89, 94, 382.

### 3. The City Did Not Provide Notice or a Hearing Before Automatically Issuing Warrants and Jailing Debtors for a Failure to Pay

If individuals pleaded or were found guilty, they owed the City fines and fees associated with those violations and were placed on what the court clerks called "a payment docket."  SUMF ¶¶ 104, 117–23.  The City's judge testified he referred to this as a "payment schedule" rather than a docket because he was not there to see people or hold hearings.  SUMF ¶ 118.  Once a person was on this payment schedule/docket, they were directed not to come back to court, but instead to the City's police department to pay.  SUMF ¶¶ 120–22.  In fact, people were expressly told in writing, in all caps, bolded and underlined:  "**DO NOT ATTEND COURT.**"  SUMF ¶ 121.

If a person did not pay the entire amount by the date of the payment docket, the court clerks would issue a failure to appear ("FTA" or "Failure to Appear") warrant automatically generated by Ferguson's computer system.  SUMF ¶ 131.[6]  City employees never confirmed that individuals had actually received notice of court or payment dates before issuing FTA warrants on failures to appear in court or auto-generated FTA fines.  SUMF ¶ 145–47.  No records show any judicial inquiry into ability to pay.  *See, e.g.*, SUMF ¶¶ 106, 140, 321, 326, 360–61.  Despite the fact that Missouri law requires courts to determine if individuals can afford their fines,[7] the City gave no instructions on what debtors should do if they could not pay.  SUMF ¶ 107.  As a result, those who could not pay the City were not provided a new court date or even told they could see the judge to explain their situation.  SUMF ¶¶ 110–11.  Numerous records show that some individuals attempted to inform various City employees that they were unable to pay, and yet the court clerks would issue warrants regardless, as there was no process to adjust debtors' payments.  SUMF

---

[6] The computer program similarly but separately automatically issued warrants if a person failed to appear for two court dates.  SUMF ¶ 132.

[7] Mo. Rev. Stat. § 560.026.

¶¶ 125, 128, 144, 326–27, 360–61, 414–19.  In fact, as discussed in the preceding paragraph, the City actively told people *not* to appear in court but to rather pay at the police station.

The City's established practice was to have, not a judge, but the Head Court Clerk—from 2000 to 2015, Mary Ann Twitty ("Head Court Clerk Twitty")—a City employee who alternately reported to the Police Chief and Finance Director, review and sign warrants using the judge's signature stamp.  SUMF ¶¶ 39, 134, 136, 139, 219.  No new court date would be issued after a person was in warrant, so they were not provided a date when they could inform the judge of their inability to pay.  SUMF ¶ 142.  For a period before 2015, the City also failed to provide notice that active warrants existed in the first place.  SUMF ¶ 145.  In fact, the Head Court Clerk decided to stop issuing warrant notices to defendants entirely, as a cost-saving measure.  SUMF ¶¶ 146–47.

City Ordinance 13-58, enacted by the City Council, also made Failure to Appear its own municipal violation.  Ferguson Mun. Code Ch. 13, Art. 111, § 13-58 (repealed Sept. 23, 2014); SUMF ¶ 166.  Failure to appear violations were issued automatically by a computer without any involvement of the municipal prosecutor or judge, who theoretically would be the person reviewing probable cause to issue such warrants.  SUMF ¶¶ 149, 153.

An individual could accrue seven or eight Failure to Appear violations (each with attendant fines) that would stem from a single speeding ticket.  *See e.g.*, SUMF ¶¶ 412–21 (documenting Ms. Thomas, whose record includes nine Failure to Appear violations incurring $943.50 of fines and costs and a bond of $1,800, all mounting upon two traffic offenses).  This was entirely different from the process for City employees, City Councilmembers, and their friends, who were able to get their tickets dismissed by the court clerk without attending court.  *See, e.g.*, Hanlon Decl., Ex. 78 (SUMF ¶ 116), 8/15/13 Email from M. Salant to M. Twitty) (councilmember asking Head Court Clerk "can you help on this one ??" to which she responds "U owe me Its gone!").

### 4. The City Held Individuals in Jail When They Could Not Afford to Pay Bond, Without Ability-to-Pay Hearings

After an FTA warrant was issued, people could be arrested by Ferguson police and jailed for a failure to "appear."  SUMF ¶¶ 150, 159, 338–39, 343, 345–48, 369, 374, 379, 391, 392, 398, 421–22, 439, 442.  If a person was unable to pay the bond, they remained in jail until they could negotiate a lower amount or were released.  *See, e.g.*, SUMF ¶¶ 81, 83, 87, 372, 376, 462.  Once arrested, the City has admitted it never brought debtors before a municipal judge for any reason, meaning there was never even a process to conduct a hearing to determine whether the Plaintiffs could actually afford to pay the bond.  SUMF ¶¶ 65–66, 322, 437.

The City's General Order 421.00 ("Bond Procedures") set a schedule for bond amounts, which was used to set the Plaintiffs' initial bonds.  SUMF ¶¶ 69–74.  A Plaintiff or their family would attempt to gather the money, which was often prohibitively expensive given the high bond amounts and administrative fees the City charged.  SUMF ¶¶ 397, 437.  The bond policy had no specifications about inquiring into ability to pay and explicitly authorized deviations.  SUMF ¶ 73.  The policy held that City employees were authorized to set bond and could authorize either a reduction in bond or release on recognizance.  SUMF ¶¶ 79–80.  Pursuant to this policy, the City regularly departed from the set schedule and negotiated bond amounts with prisoners who remained imprisoned when they were unable to pay bond—all without the municipal court's involvement.  SUMF ¶¶ 79–98.  City employees would sometimes take any money the individual had with them when they were arrested as payment for the bond, even without consent.  SUMF ¶ 91.  These bond negotiations are documented in thousands of individual booking sheets from the

City's jail, showing how debtors' bond amounts decreased during debtors' negotiations with City employees while the City held them in its jail.  *See e.g.*, SUMF ¶ 94.[8]

### 5.  The City's Practices of Jailing Plaintiffs for Failure to Pay Continued After the Department of Justice Issued Its Investigation Report

Following the Ferguson uprising in 2014, the City's leadership (acknowledging they long had control over their municipal court and jailing processes) decided to take some immediate steps to quell criticism.  This included drafting a new bond schedule that provided for only 12-hour detentions, repealing the ordinance allowing for an additional Failure to Appear violation.  SUMF ¶¶ 167, 175.  Court clerks also began to send, for the first time, show cause letters, which notified individuals who did not make payments of opportunities to appear in court.  SUMF ¶¶ 169–71.  The Department of Justice ("DOJ") issued an Investigation Report on Ferguson Police Department (the "DOJ Report") in March of 2015, which, among other things, detailed the City's unconstitutional practices.  SUMF ¶¶ 311–31.  On April 19, 2016, the City of Ferguson agreed to enter into a consent decree with the DOJ, where the City agreed to make changes to its municipal court processes, municipal court warrants, and jailing practices, among other things.  SUMF ¶¶ 175–76.  As part of this agreement, the City passed an ordinance repealing the prior ordinance allowing for a cash bond schedule.  SUMF ¶ 178.

As these changes were implemented, Ferguson continued to hold individuals on cash bond in its City jail.  For example, City data shows examples of class members such as Anthony Speed, who was held on a $7800 bond for 20 hours and then released, and Jaquan Thomas, who was held by Ferguson for 23 hours on a $1,100 bond.  SUMF ¶ 180.  Finally, in September 2017, Ferguson closed its jail permanently.  SUMF ¶ 181.

---

[8] The City recorded reduced bond amounts, at times using the initials of Head Court Clerk Twitty.  SUMF ¶¶ 84, 94.

## III.   LEGAL STANDARDS APPLICABLE TO ALL COUNTS

"A party is entitled to summary judgment if there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"   *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015) (citing Fed. Rule Civ. Proc. 56(a)).   "A genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   *Brand v. Nat'l Union Fire Ins. Co. of Pittsburg*, 934 F.3d 799, 802 (8th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   As demonstrated below, this standard is met here as to both the constitutional violations alleged in Counts One, Two, and Seven, and the City's liability for those violations.

## IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO THE VIOLATIONS ALLEGED IN COUNTS ONE, TWO, AND SEVEN

The undisputed facts demonstrate that Plaintiffs are entitled to summary judgment that they suffered the constitutional violations alleged in Counts One, Two, and Seven.

### A.   *Bearden* Class Members Suffered the Violation Alleged in Count One

Count One seeks compensation for the City's policy and practice of jailing people for failure to pay without a proper inquiry—indeed, without any *prospect* of a proper inquiry—into their ability to pay, in violation of the Fourteenth Amendment.   The undisputed facts demonstrate that members of the *Bearden* Class were held in the City's jail for as long as it took City officers to extract money for a bond or until those officers made an arbitrary decision to release them without payment.   At no point during their detention did arrestees have any chance of receiving an initial hearing where the constitutionally required findings could be made regarding their ability to pay and non-financial conditions of release.   Their jailing therefore violated equal protection and due process, and Plaintiffs are entitled to judgment as a matter of law on that issue.

### 1. The Fourteenth Amendment Prohibits Jailing People for Failure to Pay Without an Inquiry and Findings Concerning Their Ability to Pay

The right to be free from a jail cell is one of the most fundamental liberty interests in our legal system.  *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, and other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

This fundamental right to bodily freedom cannot be denied for lack of wealth.  The Fourteenth Amendment prohibits jailing a person solely because he or she cannot afford to pay an amount of money.  *See Bearden v. Georgia*, 461 U.S. 660, 665, 667–68 (1983) (holding that "[d]ue process and equal protection principles converge" to bar the government from "impos[ing] a fine as a sentence and then automatically convert[ing] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full," and that, "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it"); *Tate v. Short*, 401 U.S. 395, 398 (1971) (holding that subjecting petitioner to "imprisonment solely because of his indigency" works an invidious discrimination); *Williams v. Illinois*, 399 U.S. 235, 240–41 (1970) (holding that a statute that permitted imprisonment resulting "directly from an involuntary nonpayment of a fine or court costs" is "an impermissible discrimination that rests on ability to pay").

Most fundamentally, when the government contemplates whether to imprison someone for nonpayment, it "must inquire into the reasons for the failure to pay."  *Bearden*, 461 U.S. at 672. Unless a court finds the nonpayment to be willful after appropriate notice and opportunity to be heard in an adversarial proceeding, it must not resort to incarceration.  *Id.*  For decades, the Supreme Court has required courts to consider alternatives to arrest and incarceration as the appropriate tools for enforcing court-imposed debts owed by the indigent. *See, e.g.*, *Williams*, 399

U.S. at 244–45 n.21–22 (noting the availability of installment plans, work orders, and garnishment, and explaining that any "further burden" to states is outweighed by "constitutional imperative").

The Supreme Court's decision in *Turner v. Rogers* emphasizes the importance of conducting a rigorous inquiry into ability to pay before jailing a person for not meeting a financial condition.  564 U.S. 431, 448–49 (2011).  *Turner* held that South Carolina's incarceration of a man for unpaid child support payments was unconstitutional because the lower court had jailed him without an inquiry into ability to pay.  *Id.*  The Court explained the basic protections that a government must provide before jailing a person for non-payment:

> Those safeguards include (1) notice to the defendant that his "ability to pay" is a critical issue in the . . . proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.

*Id.* at 447–48.  Turner's imprisonment was unconstitutional because the lower court did not provide the inquiry or findings essential to "fundamental fairness."  *Id.* at 448–49.

The Constitution requires these safeguards to protect against an erroneous deprivation of fundamental liberty based on wealth when jailing an arrestee for failing to pay a monetary sum. Thus, where individuals are arrested for failure to pay a monetary sum, their consequent jailing will be constitutional only if they are provided a hearing whereby an individualized inquiry into their circumstances, including ability to pay, is conducted.  *See, e.g.*, *Alkire v. Irving*, 330 F.3d 802, 819 (6th Cir. 2003); *Doe v. Angelina Cnty., Texas*, 733 F. Supp. 245, 257 (E.D. Tex. 1990).

The central lesson of these cases is that the government cannot undertake the fundamental liberty deprivation inherent in locking a person in a jail cell without following rigorous procedures

and making the necessary substantive findings of the arrestee's' ability to pay.[9]   To deprive a person of bodily liberty based solely on economic status is "contrary to the fundamental fairness required by the Fourteenth Amendment."  *Bearden*, 461 U.S. at 672–73.

In accordance with *Bearden* and its brethren, courts have consistently recognized that the Fourteenth Amendment prohibits the government from conditioning a person's release from jail on the payment of a predetermined monetary sum without an individualized inquiry into their ability to pay or consideration of non-financial alternatives.  In *Pugh v. Rainwater*, the Fifth Circuit explained that the use of a "master bond schedule"—whereby a court conditions an indigent defendant's release upon payment of a secured money bond of a fixed amount without "meaningful consideration of other possible alternatives"—violates both due process and equal protection.  572 F.2d 1053, 1056–57 (5th Cir. 1978) (en banc).  Courts in this district and throughout the country are in accord.  *See, e.g.*, *Dixon v. City of St. Louis*, 2019 WL 2437026 at *13-14 (E.D. Mo. June 3, 2015), *rev'd on other grounds*, 950 F.3d 1052 (8th Cir. 2020) (federal precedent prohibits detention on monetary bond where there is no individual inquiry as to a person's ability to pay and alternatives to detention); *ODonnell v. Harris Cnty.*, 251 F. Supp. 3d 1052, 1140, 1160, 1167 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018) (holding that jailing misdemeanor arrestees who are otherwise eligible for release but cannot pay a predetermined money bond violates the Due Process and Equal Protection clauses and that "once the [government] has chosen to impose a financial condition of pretrial release, [it] may not use that condition to imprison defendants before trial because they lack the means to pay it").[10]

_____

[9] The Supreme Court has similarly applied heightened scrutiny to pretrial detention orders because of the "fundamental" interest in pretrial liberty, *United States v. Salerno*, 481 U.S. 739, 749, 750 (1987), requiring basic protections before the government may depart from the "norm" of liberty before trial.  *Id.* at 755.

[10] *See also*, *e.g.*, *Pierce v. City of Velda* City, 2015 WL 10013006, *1 (E.D. Mo. June 3, 2015) (holding that "use of a secured bail schedule to set the conditions for release of a person in custody after arrest" will violate the Fourteenth

The same principle applies when a preset bond is specified on a warrant.  For example, in *Rodriguez v. Providence Cmty. Corr., Inc*., 155 F. Supp. 3d 758, 762 (M.D. Tenn. 2015), individuals were arrested on warrants issued after they failed to pay monetary sums assessed as conditions of their probation; if the arrestee could not immediately afford to purchase their release by paying the bond amount specified on the warrant, they were jailed for days or weeks without an inquiry into their ability to pay or consideration of non-financial alternatives.  *Id.* at 766.  Like the *Bearden* Class members here, each arrestee in *Rodriguez* was determined in advance to be eligible for immediate release and yet denied release if they could not make the required payment.  SUMF ¶¶ 64, 93–94, 371, 392, 394, 399, 440–41.  The court in *Rodriguez* reached the "constitutionally mandated conclusion" that the government cannot subject arrestees to predetermined secured money bonds to secure release without individualized consideration of ability to pay and alternatives, as "[t]he Fourteenth Amendment precludes imprisoning someone because he or she does not have enough money."  *Id.* at 768–69.

Similarly, the court in *McNeil v. Community Probation Services* preliminarily enjoined the county defendant there from detaining people who failed to pay the secured money bail amount written on a violation of probation warrant "if the warrant is not accompanied by a record showing that the . . . bail amount[] was imposed after:  (1) notice to the arrestee and an opportunity to be

---

Amendment where it operates to hold an individual "in custody after an arrest because the person is too poor to post a monetary bond"); *Walker v. City of Calhoun*, 2016 WL 361612 at *11 (N.D. Ga. Jan. 28, 2016), *vacated on other grounds*, 901 F.3d 1245 (11th Cir. 2018) (holding that use of predetermined bond schedule "that did not take into account indigency would fail to pass constitutional muster"); *Thompson v. Moss Point*, 2015 WL 10322003, *1 (S.D. Miss. Nov. 16, 2015) ("No person may, consistent with the Equal Protection Clause of the Fourteenth Amendment, . . . be held in custody after an arrest because the person is too poor to post a monetary bond."); *Jones v. City of Clanton*, 2015 WL 5387219, at *2 (M.D. Ala. Sept. 14, 2015) (declaring that the use of a "bail schedule to detain a person after arrest, without an individualized hearing regarding the person's indigence and the need for bail or alternatives to bail, violates the Due Process Clause of the Fourteenth Amendment"); *Cooper v. City of Dothan*, 2015 WL 10013003 at *1–2 (M.D. Ala. June 18, 2015) (holding that "long standing case law . . . establishes the unconstitutionality of a pretrial detention scheme whereby indigent detainees are confined for periods of time solely due to their inability to tender monetary amounts in accordance with a master bond schedule, while those able to afford the preset bond may quickly purchase their release").

heard by an appropriate judicial officer; and (2) findings by that judicial officer concerning the arrestee's ability to pay, alternatives to secured bail, and whether . . . detention is necessary to meet a compelling governmental interest."  2019 WL 633012, at *16 (M.D. Tenn. Feb. 14, 2019), *aff'd*, 945 F.3d 991 (6th Cir. 2019) (concluding plaintiffs were strongly likely to succeed on the merits of their claim that "[d]etention of these arrestees, who are otherwise deemed eligible for release, solely due to the inability to pay the secured bail amount on the arrest warrant," was an "unconstitutional deprivation of their liberty").[11]

These cases make clear that if an arrestee is otherwise eligible for release, they cannot be held upon nonpayment of a money bond without due consideration of (and findings concerning) their ability to pay and alternative conditions of release.  Of course, due consideration takes into account the government's interests as well as the arrestee's.  Where the government affords *some* meaningful consideration process, the constitutional adequacy of that process can be assessed by balancing the government's interests against the fundamental nature of the liberty interest at stake, the high risk of erroneous deprivation, and the likely value of alternative or additional safeguards. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  But where no meaningful process is ever provided, there is nothing to balance against the high risk of an unlawful deprivation of the arrestee's fundamental liberty interest:  nothing can then excuse the lack of process, and there can be no justification for the resulting detention.  Whatever level of scrutiny one applies, and whatever interest the government could conceivably have in jailing people for nonpayment of a money bond, the analysis is simple where the jailing could bear no rational relation (much less a substantial or narrowly tailored one) to any legitimate (much less important or compelling) interest.  If, as shown

---

[11] *See also, e.g.*, *ODonnell*, 251 F. Supp. 3d at 1165–66 (extending preliminary injunction against enforcement of unaffordable secured money bonds to protect misdemeanor defendants arrested on a warrant who were ineligible for preventive pretrial detention).

below, the government never intended to afford the requisite process, routinely pressured detainees for payment, and eventually released everyone who went long enough without paying, then the detention can only have served an illegitimate interest in the extraction of revenue or detention for its own sake, in violation of the Fourteenth Amendment.

### 2. Members of the *Bearden* Class Were Jailed for Failure to Pay Without an Inquiry and Findings Concerning Their Ability to Pay

Ferguson officers undisputedly jailed *Bearden* Class members upon nonpayment of predetermined money bonds and without any prospect of the constitutionally required inquiry into and findings concerning their ability to pay.  When *Bearden* Class members were arrested—either on or without a warrant—City officers brought them to the City's jail, where City personnel imposed a preset bond according to the warrant being executed (in the case of warranted arrestees) or set a bond themselves in consultation with a bail schedule (in the case of warrantless arrestees).  SUMF ¶¶ 79–98.  Payment of this predetermined bond amount was imposed as a condition of release without an adequate individualized inquiry or involvement of a judge.  SUMF ¶¶ 60–78.

Once jailed for nonpayment of the preset bond amount, *Bearden* Class members were held until they paid enough money to satisfy the City officers, who would often offer to accept reduced bond amounts in order to extract as much money from them as possible, or until those officers gave up on any effort to extract money from them and released them without payment.  *See* Hanlon Decl., Ex. 70 (SUMF ¶ 87), 3/3/17 K. Fant Dep. Tr. at 234:12–235:1 ("Q. You also testified that while you had spent time in jail during this time period from 2010 to 2014, that the jailers would bargain or negotiate with you, correct? A: Yes. . . .  I remember him saying, 'That's almost half of what it is,' you know.  'Something is better than nothing.'"); Hanlon Decl., Ex. 48 (SUMF ¶ 95), 2/18/20 J. Craig Dep. Tr. at 76:12–14 (designated 30(b)(6) testimony) ("Q. [I]n 72 hours, if

someone hadn't paid their bond, they would be released?  A. Normally."); SUMF ¶¶ 79–98;  *see also* Section II(B)(4) *supra*.[12]

Many arrestees' bond sheets bear evidence of this ransoming; they are marked with arbitrary, handwritten adjustments to the bond, culminating either in the arrestee's release on some negotiated portion of the original bond or without any payment at all.  SUMF ¶ 89; Section II(B)(4) *supra*.  Class Representative Mr. Carter, for instance, was arrested four times in 2010, 2012, and 2013 on FTA warrants after he was unable to pay the preset $100 per month payment plan amount and was each time held between 8 and 55 hours until being ultimately released without making any payment.  SUMF ¶¶ 476–83; *see* Hanlon Decl., Ex. 63 (SUMF ¶ 479), 7/18/13 R. Carter Arrest Record.  Class Representative Ms. Nelson was held for 31 hours on a $600 bond and only released when a guard called out to her "[h]appy Thanksgiving to you, if you all can come up with $100, then you can get out."  Hanlon Decl., Ex. 71 (SUMF ¶ 383), A. Nelson Dep. Tr. at 122:25–123:6.

Throughout each class member's detention, City officers had authority to release them without payment.  *See* Hanlon Decl., Ex. 54 (SUMF ¶ 79), 11/30/10 General Order 421.03 from the Office of the Chief of Police regarding "Bond Procedures" ("The Watch Commander may authorize a reduction in the prescribed bond to an amount obtainable by the arrested subject, or may authorize a recognizance if the circumstances require such action."); SUMF ¶ 80.  Ferguson's Municipal Judge shared this understanding of City officers' authority:

> Q: So in the situation that we've drawn up, two people could be jailed at the exact same time, okay?
> A: Right.
> Q: One person has money and one person is poor.  They're both there on a $500 bond. . . . [A] police officer of the City of Ferguson could have released both of them at the same time for -- within five minutes, correct?

---

[12] Detainees were sometimes released without payment to make room for new arrestees, who might cough up more money to the City officers.  *See* Hanlon Decl., Ex. 58 (SUMF ¶ 86), 7/26/21 E. Ballard Dep. Tr. at 21:17-21 (designated 30(b)(6) testimony) (stating that bonds would be reduced to make room and "to open the jail to house [new] people").

> A: Correct.
> Q: Okay.  And they wouldn't have been breaking any of your rules, right?
> A: Correct.

Hanlon Decl., Ex. 30 (SUMF ¶ 64), 2/21/20 R. Brockmeyer Dep. Tr. at 223:17–224:4.  That, but for City officers' demand for payment, *Bearden* Class members were eligible for immediate release shows, among other things, there was no public safety rationale for detaining them.

No class member's bond—including those of class representatives—was ever reviewed by a court in light of procedurally sound, individualized findings regarding their ability to pay and non-financial alternatives.  SUMF ¶¶ 75; 77–78; 458; Section II(B)(4) *supra*.  Indeed*, at no point would arrestees ever be brought before a court for a hearing to determine whether they could pay the bond amount on which they were held.*  SUMF ¶¶ 65–66.  Instead, the City has admitted there would be no point at which officers would bring confined individuals before a judge, nor a time where he would come to the jail.  *Id.*  In other words, *Bearden* Class members languished in the City's Jail with absolutely *no hope* of receiving the procedural protections required by the Fourteenth Amendment.  There was thus no legitimate reason to delay their release once the incidents to their arrest had been completed.

The undisputed facts demonstrate, therefore, that City officers jailed *Bearden* Class members for failure to pay without due consideration of and findings concerning their ability to pay (not to mention alternatives to secured bond or the need for detention).  These jailings violated the Fourteenth Amendment, and Plaintiffs are entitled to judgment on that score as a matter of law.

### B.  Post-Judgment Class Members Suffered the Due Process Violation Alleged in Count Two

Count Two seeks compensation for the City's policy and practice of jailing people on warrants issued automatically when they failed to make timely payment of debt assessed in connection with a prior judgment, when the debtors had neither been represented by counsel nor

20

waived their right thereto prior to incarceration, in violation of the Fourteenth Amendment's Due Process Clause.  The undisputed facts demonstrate that, prior to their detention for nonpayment in the City's Jail, members of the Post-Judgment Class received "neither counsel nor the benefit of alternative procedures" like those described by the Supreme Court in *Turner*, 564 U.S. at 449.  As a result, both their jailing and the failure to appoint them counsel (or obtain waivers thereof) violated due process, and Plaintiffs are entitled to judgment as a matter of law on that issue.

### 1.   Absent Adequate Procedural Safeguards Concerning Ability to Pay, Due Process Provides a Right to Counsel Prior to Jailing for Nonpayment

Because "freedom from bodily restraint lies at the core of the liberty protected by the Due Process Clause. . . . its threatened loss through legal proceedings demands due process protection." *Turner*, 564 U.S. at 445 (internal citation and quotation marks omitted).  In assessing this protection in the context of failure to pay, the Supreme Court has held that due process forbids incarcerating a debtor who received "neither counsel nor the benefit of alternative procedures" that "ensure a fundamentally fair determination of the critical incarceration-related question" whether the debtor had the ability to pay.  *Turner*, 564 U.S. at 435, 448.  Alternative procedures that can substitute for counsel include "adequate notice of the importance of ability to pay, fair opportunity to present, and to dispute, relevant information [about the debtor's financial status]," and "an express finding by the court that the defendant has the ability to pay."  *Id.* at 447–48.  Absent such safeguards, the debtor has a due process right to counsel before being jailed for nonpayment.[13]

---

[13] By recognizing the possibility of procedural substitutes for counsel in civil contempt proceedings that could lead to incarceration, *Turner* modified what had been a longstanding doctrine that due process affords a right to counsel in any contempt proceeding—civil or criminal—at which incarceration can be imposed.  *See, e.g.*, *United States v. Anderson*, 553 F.2d 1154, 1156 (8th Cir. 1977) (holding "that the Constitution requires that counsel be appointed for indigent persons who may be confined pursuant to a finding of civil contempt"); *Colson v. Joyce*, 646 F. Supp. 102, 105 (D. Me. 1986) (citing cases), *aff'd*, 816 F.2d 29 (1st Cir. 1987).  However, the right to counsel in *criminal* contempt proceedings remains absolute aside from a "narrow exception" for certain misconduct in open court.  *In re Oliver*, 333 U.S. 257, 275 (1948); *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833 (1994).

Independently, the presence of opposing government counsel also weighs in favor of a right to counsel. *See id.* at 449. The *Turner* Court noted that this potential asymmetry was likelier to arise where the payment in question is owed to the government. "Those proceedings more closely resemble debt-collection proceedings. The government is likely to have counsel or some other competent representative." *Id.* (citing *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938) ("[T]he average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel."); *see also State v. Stone*, 268 P.3d 226, 235 (Wash. App. 2012) (applying *Turner* to require counsel in proceedings for contempt for nonpayment of court debt when the government is represented by a state prosecutor).

Before being jailed for nonpayment, then, a debtor who has had no adequate opportunity to be heard concerning their ability to pay has a due process right to counsel, a right all the more critical when they owe the money to a competently represented government entity. Failure to advise unrepresented debtors of this right, and to appoint or obtain waiver of counsel, violates the Fourteenth Amendment, as does jailing them based on any unrepresented proceedings that result.

### 2. Post-Judgment Class Members Were Jailed for Nonpayment Without Counsel or the Benefit of Adequate Alternative Safeguards

It is undisputed that City officials neither advised Post-Judgment Class members of their right to counsel nor appointed them counsel during the debt-collection proceedings that began with the automatic seeking of arrest warrants for nonpayment and continued through people's eventual detention on those warrants, including any bond negotiations with City officers in the Ferguson Jail. Chief Jackson himself testified that the City did not appoint counsel to anyone jailed for municipal ordinance violations. *See* Hanlon Decl., Ex. 28 (SUMF ¶ 161), 1/6/16 T. Jackson Dep. Tr. at 121:3–14 (designated 30(b)(6) testimony) ("[W]e didn't . . . appoint any public defenders

for people held on ordinance violations."). The City admitted it "did not appoint counsel to Ms. Fant in 2013 or 2014," ECF No. 56 (Answer to FAC) ¶ 33, and did not appoint counsel to Mr. Carter, *id.* ¶ 53, Ms. Nelson, *id.* ¶ 72, or to Ms. Morris in 2011 or 2012, *id.* ¶¶ 130–32. The City also admitted that "Ms. Jenkins was not appointed an attorney," *id.* ¶ 142, and neither was Mr. Tucker, *id.* ¶ 149. All are members of the Post-Judgment Class.

Indeed, no process even existed for appointing counsel to indigent defendants, and the City did not budget for counsel to represent indigent defendants. Hanlon Decl., Ex. 67 (SUMF ¶ 161), 2/25/20 M. Ciaravino Dep. Tr. at 152:8–11 ("Q: Do you know if there was a process for appointing a lawyer for a defendant who could not afford one? A. Not in municipal court."). Moreover, Post-Judgment Class members were not advised of their right to counsel during any proceedings prior to or during their jailing, and were often denied access to counsel. Hanlon Decl., Ex. 37 (SUMF ¶ 159), 2/24/20 D. DeCarli Dep. Tr. At 99:24–100:6 ("Q: And so to your knowledge, [arrestees] were not advised of their right to an attorney? A: Yes sir.").[14]

This lack of counsel was not offset by any alternative procedural safeguards of the sort required by *Turner*. First, as shown above in Sections II(B)(4) & IV(A) *supra*, the undisputed facts show that *Bearden* Class members did not receive ability-to-pay hearings of any kind between the time they were arrested by City officers and the time they were released, having either come up with enough money to satisfy City officers or simply been released for free. The same therefore goes for members of the Post-Judgment Class, which is a subclass of the *Bearden* Class. Second, members of the Post-Judgment Class were arrested on warrants sought and issued automatically when they missed payments on debt owed to the City in connection with prior

---

[14] These practices reflected the experiences of the Post-Judgment Class representatives, who could not afford, did not waive, and were not appointed counsel. *See, e.g.*, SUMF ¶¶ 455–58 (outlining Ms. Fant's inability to pay for an attorney); SUMF ¶ 342 (outlining Mr. Morris's inability to pay for an attorney); Section IV(B)(1) *supra*.

23

judgments.[15]   At no point between the time they missed a payment and the time City officers arrested them on a nonpayment warrant did they receive an ability-to-pay hearing of any kind, much less one comporting with the procedural protections set forth in *Turner*.   As such, the undisputed facts thus show that Post-Judgment Class members were jailed for nonpayment *both* without counsel *and* without the benefit of a constitutionally adequate procedural substitute.

In fact, the Post-Judgment Class members were even worse off than Mr. Turner himself, who, despite receiving no counsel or adequate notice of a hearing or a proper finding that he was able to pay, at least got *a* hearing in which he could try to show cause for his nonpayment.   *See Turner*, 564 U.S. at 436–37.   In this respect Post-Judgment Class members were also worse off than the petitioner in *Colson v. Joyce*, 646 F. Supp. 102 (D. Me. 1986).   A fortiori, Post-Judgment Class members, who received no hearing at all, were also entitled to counsel before incarceration.[16]

Because the undisputed facts demonstrate that Post-Judgment Class members were not advised of their right to counsel and received neither counsel nor the benefit of alternative

---

[15] City court clerks operated a computer program through which they sought arrest warrants for municipal debtors who missed payments.  SUMF ¶ 131.  This program would automatically generate so-called "FTA" warrants when a person did not make a required payment on time.  *Id.*  Assistant Court Clerk Machelle Ciaravino testified that "After the payment is missed, if there wasn't a payment that's in the computer after the court clerk would close out that docket, [an FTA warrant] would automatically generate."  Hanlon Decl., Ex. 67 (SUMF ¶ 131), 2/25/20 M. Ciaravino Dep. Tr. at 74:13–21, 74:24–75:2).  The same process was used for FTA warrants generally, according to Head Court Clerk Twitty.  *See* Hanlon Decl., Ex. 33 (SUMF ¶ 132), 1/11/16 M. Twitty Dep. Tr. at 67:17–20 ("Q. So if they missed their second date that, it's my understanding that triggered the warrant. A. Correct"), 68:2–19 ("Q. And how would the software issue the warrant?  A. By the code that the girls [clerks] put in. . . . After every court we balance the docket but the system was set up so we did not have to go through every single case.  If it had an SL [entry code] before and they did not appear and we didn't put a different code in there for that person then they would generate itself the warrant.") (designated 30(b)(6) testimony).

    After the arrest warrants generated automatically, City court clerks then stamped them with the signature of the City's judge.  SUMF ¶¶ 136, 219.  Post-Judgment Class members were ultimately arrested on these rubberstamped warrants.  SUMF ¶¶ 43–47, 310.  This was true for the class representatives, Ms. Fant, Mr. Carter, Ms. Nelson, Mr. Nelson, Jr., Ms. Thomas, Mr. Morris, and Ms. Morris.  SUMF ¶¶ 332–509; Section IV(B)(2) *supra* (establishing that FTA warrants were issued for each named Post-Judgment Class member).

[16] As explained above, *supra* note 13, the right to counsel in *criminal* contempt proceedings does not admit of procedural substitutes and so is not subject to the sort of *Mathews v. Eldridge* balancing employed in civil contexts. If this Court were to conclude, as a matter of law, that the City's debt-collection proceedings are more akin to criminal than to civil contempt, the violation alleged in Count Two would follow that much more readily from the undisputed facts as a matter of law.

procedural protections before being jailed because of their nonpayment in connection with a prior judgment, their Fourteenth Amendment rights were violated, and Plaintiffs are entitled to judgment as a matter of law on that issue.[17]

### C.   *Gerstein* Class Members Suffered the Violation Alleged in Count Seven

Count Seven seeks compensation for the City's policy and practice of jailing warrantless arrestees without any prospect of a probable cause determination by a neutral magistrate, in violation of the Fourth Amendment. The undisputed facts demonstrate that Mr. Carter, Mr. Morris, and Mr. Tucker—the *Gerstein* class representatives—and all members of the *Gerstein* class were held in the City's jail for as long as it took City officers to extract money for a bond or until those officials made an arbitrary decision to release them without payment. At no point was there any chance that a judge would determine whether probable cause existed to justify their continued detention. Their jailing—and the total lack of any process for determining probable cause— therefore violated the Fourth Amendment.

### 1.   The Fourth Amendment Prohibits Detaining a Warrantless Arrestee Without Any Prospect of a Judicial Determination of Probable Cause

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. A reasonable arrest requires a finding of probable cause, understood in terms of facts and circumstances "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

The finding of probable cause must be made by a judge. "To implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the [Supreme] Court

---

[17] As this Court stated in denying the City's first motion to dismiss Count Two, "the City does not dispute that appointment of counsel, or waivers thereof, were required in this case." ECF No. 19 (Mem. & Order) at 26. In its second motion to dismiss, the City did not dispute that appointment or waivers were required, nor did it dispute that neither happened. ECF No. 58 (Def.'s Mem. in Support of its Mot. to Partially Dismiss Pls.' FAC) at 13–15.

has required that the existence of probable cause be decided *by a neutral and detached magistrate* whenever possible."  *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975) (emphasis added).  Although probable cause is best assessed *prior to* an arrest, it is sometimes infeasible for law enforcement officers to secure a warrant beforehand.  *See id.* at 113.  "Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate.  There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate."  *Id.* at 114.  "And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly.  The consequences of prolonged detention may be more serious than the interference occasioned by arrest."  *Id.*  Thus, when an individual is arrested without a warrant, "the Fourth Amendment requires a *judicial* determination of probable cause as a prerequisite to extended restraint of liberty following arrest."  *Id.* (emphasis added).

The Court has recognized that it may take some amount of time for police to process an arrestee, submit their evidence to a judge and have the judge assess probable cause.  *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 58 (1991).  A determination must therefore be made "promptly," *id.*, which allows for "reasonable postponement," *id.* at 55.  If detention without a judicial probable cause determination is prolonged *unreasonably*, however, then it constitutes an unreasonable seizure under the Fourth Amendment.

The Supreme Court has provided guidance in the form of a presumption that a probable cause determination provided within 48 hours of arrest is sufficiently "prompt" for Fourth Amendment purposes and thus that it was reasonable to detain the arrestee until that determination was made.  *McLaughlin*, 500 U.S. at 55–56.  "Where an arrested individual does not receive a . . . determination within 48 hours, the calculus changes.  In such a case, the arrested individual does

not bear the burden of proving an unreasonable delay.  Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57.  However, a hearing provided to an arrestee within 48 hours can nonetheless be "delayed unreasonably." *Id.* at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or *delay for delay's sake*." (emphasis added)).[18]

Notably, "the 48-hour burden-shifting approach does not apply when the police don't plan to present the suspect to a magistrate for a probable-cause hearing." *Portis v. City of Chicago*, 613 F.3d 702, 704 (7th Cir. 2010).  If there is no process in place by which *any* warrantless arrestee could *ever* receive a judicial determination of probable cause, then any delay of their release is unreasonable.  *See Webb v. City of Maplewood*, 340 F.R.D. 124, 142 (E.D. Mo. 2021) (finding "one hour after booking, 7 hours, or 47 hours and 59 minutes" constitutes unreasonable "delay . . . merely for delay's sake" if no process exists whereby those arrested without a warrant can be afforded a probable cause determination).

The undisputed facts show the City detained individuals on warrantless arrests without *ever* providing determinations of probable cause by a neutral magistrate.  Partial summary judgment is therefore proper for Plaintiffs on Count Seven for this violation of their Fourth Amendment rights.

### 2. *Gerstein* Class Members Were Detained After Warrantless Arrests Without Any Prospect of a Judicial Determination of Probable Cause

As demonstrated above, Section IV(A)(2) *supra*, City officers detained *Bearden* Class members on unpaid bonds until those members scrounged together enough money to satisfy their

---

[18] *Cf. McLaughlin*, 500 U.S. at 70 (Scalia, J., dissenting) ("[A]bsent extraordinary circumstances, it is an 'unreasonable seizure' within the meaning of the Fourth Amendment for the police, having arrested a suspect without a warrant, to delay a determination of probable cause for the arrest . . . for reasons unrelated to arrangement of the probable-cause determination or completion of the steps incident to arrest. . . .").

jailers or until their jailers eventually decided to release them for free. The same showing applies to members of the *Gerstein* Class, which, by definition, contains all members of the *Bearden* Class arrested without a warrant. *See* Class Cert Order at 45. The undisputed facts show that City officers detained each *Gerstein* Class member for some period of time after a warrantless arrest without any hope of a finding of probable cause.[19]

Throughout the Class period, however, there was absolutely no process whereby a person arrested by Ferguson police without a warrant and booked into the City's jail could ever receive a judicial determination of probable cause.[20] This is made plain by the simple fact that, while warrantless arrestees sat in the City's jail, no judge had *anything whatsoever* to do with them or the constitutionality of their continued detention. Warrantless detainees were neither brought before a judge nor visited by one. SUMF at ¶ 61; Hanlon Decl., Ex. 37 (SUMF ¶ 66), 2/24/20 D. DeCarli Dep. Tr. at 96:5–7 (designated 30(b)(6) testimony) ("Q. Did the judge ever come to the jail, to your knowledge? A. Not to my knowledge."); SUMF ¶ 241. Nor did a judge so much as communicate with police or jail staff during the detentions to gather input for a probable cause assessment. *See* Hanlon Decl., Ex. 28 (SUMF ¶ 241), 1/6/16 T. Jackson Tr. at 103:19–104:1 ("Q. Did the judge ever call you about a detained person? A. Not that I remember. Q. Did it ever come to your attention that the judge had called another employee of yours about a detained person? A.

---

[19] Like all other members of the *Gerstein* Class, Class Representatives Mr. Carter, Mr. Morris, and Mr. Tucker were each arrested by the City without warrants: Mr. Carter was arrested by the City twice in June 2014 for a municipal offense and held in jail without a warrant. SUMF ¶¶ 476–83. Mr. Carter was arrested in August 2014 without a warrant for failing to comply with a police officer's order and resisting arrest. *Id.* Likewise, Mr. Morris was held in Ferguson jail without a warrant in 2011 on the charge of a "No Occupancy Permit." SUMF ¶¶ 337–48. Mr. Tucker was similarly arrested in 2012 without a warrant on the charge of making a false police report and held for 23 hours. SUMF ¶¶ 498–502. None of them received probable cause hearings after their warrantless arrests. SUMF ¶ 43.

[20] As this Court stated regarding the *Gerstein* Class, "The success or failure of every class member's claim turns on proof that no process existed by which those arrested without a warrant would have an opportunity for a probable cause determination." Class Cert Order at 30.

Not that I can think of.  No, I don't remember any."), 102:25–103:1 (testifying that "the judge wouldn't communicate with jail employees that I'm aware of").

Even if, contrary to fact, a judge ever *had* undertaken to assess probable cause for the warrantless arrest of a Ferguson detainee, there would have been nothing adequate for the judge to rely upon to do so.  At no point did a judge review sworn statements of probable cause from City officers.  *See* Hanlon Decl., Ex. 28 (SUMF ¶ 46), 1/6/16 T. Jackson Dep. Tr. at 176:11–17 ("Q. At any point in that process does anyone review a sworn statement from a police officer that there is probable cause? . . . A. A sworn statement for a police officer, not that I'm aware of."), 177:12–18.

Moreover, the City's municipal judge from 2003 to 2015, who admitted that he would not even *learn* of a given warrantless arrest until he went to court on a date that would only take place *after* the arrestee had already been released from the City's jail following their initial, post-arrest detention.  *See* Hanlon Decl., Ex. 30 ( SUMF ¶ 45), 2/21/20 R. Brockmeyer Dep. Tr. at 221:2–10 ("Q: Okay. What steps did you take in that 72 hour period to determine whether there was probable cause for that arrest?  A: I didn't see the charge until I went to court, but they were never still in jail when I went to court.  Q: So that I understand, is it right to say that -- that the court made no steps to determine probable cause?  A: Not within that three days, right."), 221:11–14 ("Q: So somebody could be held 72 hours without any finding of probable cause from a neutral judicial official, correct?  A: Correct.").  It is important to understand that, when Judge Brockmeyer testified that a warrantless arrestee "could" go 72 hours without a probable cause finding, this does not imply that another warrantless arrestee "could" receive a probable cause finding *within* 72 hours.  Judge Brockmeyer did not even *learn* of them until a court date that took place *after* the

29

arrestee had already been released from post-arrest detention.[21]  He could not have even begun to *assess* probable cause—much less find that it existed—in time to justify any part of a warrantless arrestee's post-arrest detention.

Where a municipality has no system to provide probable cause hearings for detainees, courts have found this "course or custom" leads to *Gerstein* liability.  Given the utter lack of any process for providing judicial determinations of probable cause to warrantless arrestees held in the City's Jail, the release of those arrestees was delayed for delay's sake, and their detention was therefore unreasonable under the Fourth Amendment.  Because the undisputed facts demonstrate that *Gerstein* Class members suffered the violation alleged in Count Seven, Plaintiffs are entitled to judgment as a matter of law on that issue.

## V.   THE CITY IS LIABLE FOR THE VIOLATIONS UNDER COUNTS ONE, TWO, AND SEVEN AS A MATTER OF LAW

The undisputed facts demonstrate that Plaintiffs are entitled to summary judgment not only as to the existence of the constitutional violations under Counts One, Two, and Seven, but also as to the City's liability for those violations.

### A.   Legal Standard for Municipal Liability

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."  *Corwin v. City of Independence,* 829 F.3d 695, 699 (8th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  Official

---

[21] Even at that later court date, Judge Brockmeyer testified, he would not review the City's file regarding a warrantless arrestee's arrest and detention.  *See* Hanlon Decl., Ex. 30 (SUMF ¶ 138), R. Brockmeyer Dep. Tr. at 217:3–22 ("A: Well, usually they're on the docket.  And if they weren't there, there would be a warrant issued.  If they were, I'd review them.  *I wouldn't review the City's file.  I reviewed the charge.  The City's file the attorney had.  I didn't look at their file.*"  (emphasis added)).  When asked how, at those post-release court dates, he would "determine probable cause for the arrests," Judge Brockmeyer answered, "Based upon the information on the summons ticket."  *Id.*

policy can take the form of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by" officers "whose edicts or acts may be fairly be said to" be those of the municipality.  *Monell*, 436 U.S. at 690, 694.  It "need not be passed by a legislative body, or even be in writing."  *Porter v. City of Philadelphia*, 975 F.3d 374, 383 (3d Cir. 2020).

"Official policy involves a 'deliberate choice to follow a course of action . . . made from among various alternatives' by an official who has the final authority to establish governmental policy."  *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 645 (8th Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  A municipality is liable when a single action, decision, or order by a final policymaker violates a constitutional right.  *See Pembaur*, 475 U.S. at 469 (". . . it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.").  Different officials can wield policymaking authority with respect to different issues, areas, or actions.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (". . . the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue").  And policymaking authority can be delegated by one official or body to another.  *Pembaur*, 475 U.S. at 483 ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.").

Having identified a policy attributable to the municipality, a plaintiff "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind" the constitutional violation.  *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  These elements of fault and causation follow immediately where a municipal policy "itself violates

federal law, or directs an employee to do so." *Id.*  In that case, "no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability." *Moyle v. Anderson*, 571 F.3d 814, 818 (8th Cir. 2009).  If a policy is instead "facially lawful" and does not require the federal violation, then the municipality is liable if it adopted or maintained the policy with "deliberate indifference to its known or obvious consequences." *Id.* at 817–18.

A municipality is also liable for constitutional violations caused by its acquiescence in a custom—a pattern, practice, or course of conduct by the City's employees that is widespread and persistent enough to have the "force of law." *Harris v. City of Pagedale*, 821 F.2d 499, 50 n. 7, 506 (8th Cir. 1987).  Acquiescence requires "[d]eliberate indifference to or tacit authorization of [the customary] conduct by the governmental entity's policymaking officials after notice" of it. *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998).  The policymaker's notice can be "actual or constructive." *Gatlin ex rel. Est. of Gatlin v. Green*, 362 F.3d 1089, 1094 (8th Cir. 2004).

### B.       The City's Policymakers

"District courts should consult two sources to identify the final policymaker" on a given issue:  "(1) 'state and local positive law' and (2) state and local 'custom or usage having the force of law.'" *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017) (quoting *Jett*, 491 U.S. at 737).  In looking at positive law, courts "consult the applicable city charter, code or ordinances." *Davison v. City of Minneapolis*, 490 F.3d 648, 661 (8th Cir. 2007).  A court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *McMillian v. Monroe Cnty.*, 520 U.S. 781, 786 (1997).  An official need not have final policymaking authority on all issues in the municipality to find liability, merely "on the 'particular issue' that . . . caused the constitutional violation." *Ware*, 150 F.3d at 887 (citing *Jett*, 491 U.S. at 737).

1.   **The Police Chief Was a Final Policymaker as to the City's Jailing Practices**

The Police Chief was a final policymaker for the City's jailing practices based on the City Charter and the unchecked authority that the City Council and City Manager Shaw delegated to him. The City Charter gives the Police Chief control over the members of the police department and the jail. Hanlon Decl., Ex. 117 (SUMF ¶ 196), Charter § 33-18(a) ("The chief of police shall have general supervision and control of the police department, including the enforcement of discipline among the members thereof and the instruction of the members in their duties"); Hanlon Decl., Ex. 117 (SUMF ¶ 197), Charter § 33-18(c) ("The chief of police shall have charge of the city jail and shall be responsible for the proper care and condition thereof.").

In exercise of this original policymaking authority, Chief Jackson set certain policies for the City's jail and police by drafting and approving General Orders. SUMF ¶¶ 198–201. Chief Jackson also had control over jail personnel and facilities. SUMF ¶¶ 196–97. Finally, Chief Jackson had supervisory authority and control over the court clerks and the court budget. SUMF ¶¶ 205–06, 210–18 (detailing specifics of Police Chief's relationship to the court and the court clerks). There is no evidence that the Police Chief's authority in enacting these new orders was subject to the City Council or the City Manager's review. SUMF ¶¶ 196–201. Thus, even if this Court were to conclude, as a matter of law, that the Chief's General Orders were not exercises of original final policymaking authority, they would then constitute exercises of delegated authority. *See Soltesz*, 847 F.3d at 946 ("A subordinate official possesses delegated final policymaking authority when that official acts (1) free of review and (2) without any constraints imposed as a matter of policy by the original policymaker."). The Police Chief's exercise of these powers, consistent with his broad authority over the police and jail, and unaccompanied by any reservation of authority to review his decisions, would constitute a delegation of final policymaking authority. *See St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) ("If, however, a city's lawful policymakers

could insulate the government from liability simply by delegating their policymaking authority to others, §1983 could not serve its intended purpose."); *see also Atkinson v. City of Mt. View*, 709 F.3d 1201, 1215–16 (8th Cir. 2013) (holding that a police chief can be delegated final policymaking power through state and local custom or usage).

Courts have found municipalities to have delegated policymaking authority to police chiefs under similar circumstances. *Pagedale*, 821 F.2d at 507 (finding police chief's final authority over disciplining officers established municipal custom of deliberate indifference to a known pattern of unconstitutional police misconduct); *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1547 (8th Cir. 1992) (finding police chief had final policymaking authority as "the highest ranking police official . . . responsible for the entire department . . . and for drafting and approving many of the department's General Orders").

### 2. The City Manager Also Had Final Policymaking Authority Over the City's Jail and Jailing Practices

The City Manager also had final policymaking authority over the City's jail and jailing practices. According to the City's Charter, the City Council appointed the City Manager to administer the Council's policy (through the various City departments). SUMF ¶ 184. The City Manager also had the power to *direct and supervise* City employees. SUMF ¶ 188; *see also* Hanlon Decl., Ex. 113 (SUMF ¶ 190), Charter § 4.4(h) ("Except for the purpose of investigations . . . and inquiries, the council and its members shall deal with all city officers and employees . . . who are subject to the direction and supervision of the manager solely through the manager"). Thus, the City Manager was a final policymaker as to the supervision of City officers and employees carrying out the City's practices and policies. *See e.g.*, *Barone v. City of Springfield, Or.*, 902 F.3d 1091, 1108 (9th Cir. 2018) (finding city manager possessed final policymaking authority as to

employee discipline because such decisions were "within the purview of the City Manager under the City Charter").

The City Manager also had authority to "enforce all laws and ordinances and see that all contracts and franchises are faithfully performed," including setting City policy with respect to warrants."  Hanlon Decl., Ex. 113 (SUMF ¶ 187), Charter § 4.4(h); *see also* SUMF ¶¶ 187–95 (detailing powers of City Manager).  The City Manager had final policymaking authority over all matters of City administration except where the City Council retained specific powers outlined.  City Councilmember testimony states the City Manager had extensive authority and control over creating and executing City policy independent of the Council.  *See* Hanlon Decl., Ex. 113 (SUMF ¶¶ 184, 188), Charter § 4.4(h); *see also* Hanlon Decl., Ex. 29 (SUMF ¶ 184), 2/17/21 M. Byrne Dep. Tr. at 31:4–16 ("[a]rguably, those are the two main responsibilities of the [City Council], is we can hire and fire the City Manager and the City Clerk.  And that was, in essence, it.").

### 3. The City Councilmembers Had Final Policymaking Authority Over the City's Jail and Jailing Practices

Finally, the City Councilmembers[22] also had final policymaking authority over the City's jail and jailing practices.  It is undisputed that the City uses a "council-manager" form of government, where the City Council (one Mayor and six Councilmembers) formulate municipal policy.  Hanlon Decl., Ex. 113 (SUMF ¶ 182), Charter § 4.4(h) ("Except as this charter provides otherwise, all powers of the city shall be vested in the council.").  Courts routinely find City Councilmembers to be final policymakers for § 1983 claims in cities with forms of government similar to Ferguson's.  *See, e.g., Manuele v. City of Jennings*, 2012 WL 113538, at *9 (E.D. Mo.

---

[22] The Mayor serves on the City Council and otherwise plays an essentially ceremonial role.  *See* SUMF ¶ 183; City Charter, Art. II § 2.1 ("The mayor shall have no regular administrative duties.  The mayor shall preside at all meetings of the council and shall be recognized as head of the city government for all legal and ceremonial purposes and by the Governor for purposes of military law.")).

Jan. 13, 2012) (finding "the Councilmembers and/or Mayor Sutphin had final policymaking authority for the City"); *see also Robinson v. City of Sikeston,* 2020 WL 588606, at \*9–10 (E.D. Mo. Feb. 6, 2020) (concluding that the city council was a final policymaker pursuant to the statute governing third class cities, but also noting it was possible that the city council delegated final policymaking authority to other city employees, such as the director of public safety).

Where more than one City official has final policymaking authority on an issue, the action of *any one* of them constitutes an "official policy."  *See Praprotnik*, 485 U.S. at 126 ("Assuming that applicable law does not make the decisions of the Commission reviewable by the mayor and alderman, or vice versa, one would have to conclude that policy decisions made either by the mayor and aldermen or by the Commission" are sufficient); *Hollins v. Powell*, 773 F.2d 191, 195 (8th Cir. 1985) ("Nor do we think that a mayor and a city council must act together in committing a constitutional violation before a city will be held liable under § 1983.  For purposes of liability, it is sufficient if the city council or mayor acts alone[.]").

## C. The City's Policies, Practices, and Customs Caused the Violations Alleged in Counts One, Two, and Seven

As established above in Sections IV(A)–(C) *supra*, there is no genuine dispute of material fact that class members' rights were violated as alleged in Counts One, Two, and Seven.  Under § 1983 and *Monell*, the City is liable for those violations.  The City's official actions, decisions, orders, and customs established systems and practices without the barest due process protections. As shown above, City employees caused the violations of Plaintiffs' rights.  The City deliberately set policies and accepted practices that caused unconstitutional jailing and denial of process.

To establish the City's liability, Plaintiffs are not required to show a single "policy or practice [was] the exclusive cause of the constitutional deprivations," as "[c]ourts may consider

36

how individual policies or practices interact with one another within the larger system." *Sanchez v. Young Cnty.*, 956 F.3d 785, 795-96 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901 (2020).

The Eighth Circuit has not directly addressed the extent of "continuing, widespread, and persistent" conduct a plaintiff must show to survive summary judgment, though it has held that isolated incidents do not suffice, and evidence of "many" incidents does establish liability. *Wedemeir v. City of Baldwin, Mo.*, 931 F.2d 24, 26 (8th Cir. 1991). This is not a case where a few individuals claimed their constitutional rights were violated by rogue employees in a broader system of otherwise constitutional practices. Rather, as shown below, this is the rare case where the testimony of City officials, employees, plaintiffs, and witnesses alike describe in almost identical words systemic practices underlying each of the three constitutional violations discussed above. Clearly, the evidence here shows that the unconstitutional policies, practices, and customs of the City's employees were so "pervasive and widespread as to have the effect and force of law." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (internal citations and quotation marks omitted).

While the ubiquitous and egregious practices are described in full above in Sections IV(A)–(C) *supra*, the evidence establishes that the specific actions of City employees which led to the constitutional violations against Plaintiffs were done pursuant to widespread, ubiquitous, and deliberate policies, customs, and practices set up, maintained, and accepted by the City.

### 1. The City Held *Every* Arrestee on Predetermined Bond Without Inquiring into the Person's Ability to Pay

Pursuant to the City's policies and practices, City employees held in jail any arrestee who could not pay the predetermined, secured financial condition of release with no judicial inquiry into their ability to pay or consideration of non-financial alternatives. All class members were eligible for release if they paid a predetermined, secured financial condition of release. It is

37

undisputed that for every individual arrested, bond was set at booking without any inquiry into ability to pay.  SUMF ¶ 75.  Furthermore, it is undisputed that for every individual who was held on bond, a Ferguson police officer or corrections officer could decide to release the person at any time, as though the bond had never existed to begin with.  SUMF ¶ 64.  Eventually, City employees would choose to release the person, suddenly transforming the monetary bond into a recognizance bond.  SUMF ¶¶ 64, 79, 94, 392, 394, 399, 502.  Those who could not afford to pay sat until a City employee decided they could leave.  SUMF ¶¶ 85–95.

The City's own written records support the undisputed facts that City employees controlled who was detained and for how long.  From November 2010 until February 9, 2016, Ordinance § 13-52 expressly gave the Chief of Police the ability to "approve" the bonds for those held by the City's police.  SUMF ¶ 68.  Moreover, pursuant to authority granted by Ordinance § 13-52, City employees had full authority until February 3, 2016, captured in the General Orders issued by the Police Chief, to release detained individuals on a lower bond or on no bond at all.  SUMF ¶ 68.  This same police authority over bonds was reflected in the "bond schedule" within General Order 421.00, which instructed police officers and jail officials to set bond for warrantless arrests according to a bond schedule with predetermined bond amounts based on offense.  SUMF ¶ 69.  The City applied this bond schedule automatically and did not mandate any inquiry into an individual's ability to pay.  *See* Sections II(B)(4), IV(A) *supra*.

The City's 30(b)(6) designated witness stated that for "every prisoner," officers would "let them know their bond amount, [asked] do you want to post a bond, do you want to make a call so someone can post it for you . . . but never asked if they can afford [the bond] or not."  Hanlon Decl., Ex. 50 (SUMF ¶ 76), 1/11/16 D. McDuffie Dep. Tr. at 88:20-89:2 (designated 30(b)(6) testimony).  There was no process for *any* person arrested to have an ability-to-pay hearing with

the City's judge.  SUMF ¶ 75–78.  Once City employees decided the individuals would never be able to produce any money for the City coffers, they released them.  SUMF ¶¶ 64, 79, 94, 392, 394, 399, 502.  The individuals sitting in the City jail were there because they could not pay and because a City employee had not yet given up on getting money out of them.

### 2. The City Did Not Provide Counsel to Any Indigent Person Jailed for Municipal Ordinance Violations

The City did not have a process in place to appoint counsel for indigent defendants and did not provide procedures that would have cured this deficiency, namely inquiries into ability to pay. SUMF ¶ 75–78; *see also* Sections II(B)(4), IV(A) *supra*.  The City cannot dispute that it did not appoint counsel or provide alternative procedures to *anyone* jailed for municipal ordinance violations.  Hanlon Decl., Ex. 28 (SUMF ¶ 161), 1/6/16 T. Jackson Dep. Tr. at 121:11–14 (designated 30(b)(6) testimony) ("[W]e didn't. . . appoint any public defenders for people held on ordinance violations.").

### 3. The City Automatically Sought, Issued, and Jailed Debtors on Arrest Warrants Based Solely on Nonpayment

Likewise, the undisputed record shows the City automatically and systematically issued and executed FTA warrants solely based on nonpayment of municipal debt.  The City then jailed individuals on these warrants.  Head Court Clerk Twitty, the City's corporate representative on the process for issuing FTA warrants, and corrections officers testified that for years the City conducted no ability-to-pay inquiries prior to issuing FTA warrants, and that no processes to conduct them existed.  Hanlon Decl., Ex. 33 (SUMF ¶ 107), 1/11/16 M. Twitty Dep. Tr. at 84:9–17 (designated 30(b)(6) testimony) ("A. When they came to court they would bring paperwork before the judge, a lot of times their first court date too.  You know, saying this is what I make, I cannot afford this.  Q. How did they know to do that . . .  A. I really don't know."); Hanlon Decl.,

Ex. 90 (SUMF ¶ 140), 8/24/21 B. Rich Dep. Tr. at 59:1–4 ("Q. Were you aware of any process employed to evaluate someone's ability to pay a fine prior to issuing an arrest warrant? A. No.").

Instead, the *City's employees* described the warrant procedures used from 2010 until early 2015 as such:  there was no process or way for an individual who could not make a payment to reschedule the payment date or even see the judge to explain their situation.  SUMF ¶ 65.  Instead, if the computer system did not have a record of payment, an FTA warrant was automatically issued.  SUMF ¶¶ 131–32, 323.  As explained above, at no point did an officer prepare sworn statements of probable cause, nor did a judge review those statements.  SUMF ¶¶ 45–46, 137; Sections II(B)(2)–(3) *supra*.

The City's employees issued *thousands* of FTA arrest warrants.  SUMF ¶ 307 (City data shows that there were 10,327 individuals held in Ferguson's jail for municipal ordinance violations during the class period because they were not able to pay a fine); *see also* SUMF ¶ 290 (3/13/15 email to C. Lanfersieck providing information from arrest records showing that FTAs were the most common in Ferguson over the prior three years); SUMF ¶ 157 (in September 2015, there were 23,000 active FTA warrants warrant in Ferguson).

### 4.   The City Jailed Warrantless Arrestees Without Any Chance of Providing Probable Cause Determinations

Finally, when the City's police department detained individuals, officers as a matter of custom did not obtain findings of probable cause from the judge.  SUMF ¶¶ 43–46.  Thus, individuals were held in the City's jail for as many as 72 hours without a probable cause determination, unless they were able to pay their bond before.  Hanlon Decl., Ex. 30 (SUMF ¶ 45), 2/21/20 R. Brockmeyer Dep. Tr. at 221:11–14 ("Q. So somebody could be held 72 hours without any finding of probable cause from a neutral judicial official, correct?  A. Correct.").  This was a systemic violation of the City's own General Orders, which mandate that warrantless arrestees be

released within 24 hours if a warrant was not obtained.  SUMF ¶ 42.  No probable cause or preliminary hearings were *ever* provided to warrantless arrestees in Ferguson.  Indeed, there was no process in place to bring an individual held in the City's jail before a judge.  SUMF ¶¶ 46, 65.

There can be no doubt that the constitutional blame for detention without a probable cause finding lies with the City's custom of completely failing to create processes to ensure judicial review of probable cause.[23]

*     *     *

In sum, the City cannot escape the undeniable fact that the constitutional violations suffered by Plaintiffs here are not one-off incidents by individual City employees, but instead consistent and widespread violations resulting from the essential design of the City's policing and jailing practices—and indeed, how the City generated revenue for many years.  Official guidance from the City's policymakers resulted in systems by which City officials jailed indigent individuals to extract money without even a semblance of basic, required legal processes.  The City's policymakers were directly involved in the constitutional violations by directing and approving the conduct of the city's clerks, police officers, and jailers.  At the very minimum, the uniform testimony from plaintiffs, jailers, officers, clerks, and City officials alike as to the City's processes and methods demonstrate that the City's practices constitute a continuing, widespread, persistent pattern of constitutional violations.

**D.      The City's Policymakers Were Aware of and Deliberately Set Up, Maintained, and Encouraged the Unconstitutional Processes to Maximize Revenue**

---

[23] This is why case law nationally holds the jailing entities responsible for *Gerstein* violations.  *See Portis*, 613 F.3d at 705 (finding potential *Gerstein* liability)*; see also Webster v. Gibson,* 913 F.2d 510 (1990) (finding potential liability for *Gerstein* violation against sheriff who ran local jail).

"'Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Deliberate indifference means that, "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). Here, the City's policymakers had notice of the constitutional violations.  Yet, not only were they deliberately indifferent in their failure to remedy these practices, they intentionally encouraged and amplified these practices to raise revenue for the City at the expense of the indigent.

Plaintiffs need not show that the City's policymakers subjectively knew about each piece of the unconstitutional practices:  the question is whether "the City knew or should have known of the risk of constitutional violations, an objective standard."  *Baker v. District of Columbia*, 326 F.3d 1302, 1307 (D.C. Cir. 2003); *see also Lawson v. Dallas Cnty*., 286 F.3d 257, 264 (5th Cir. 2002) ("Unlike the deliberate indifference standard applied to individual employees, this standard is an objective one; it considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights.").  As the following sections demonstrate, the City's policymakers were clearly on both constructive and actual notice.

## 1. The Breadth and Extent of the City's Jailing Scheme Shows that the City's Policymakers Had Constructive Notice

A pattern of tortious conduct can be so widespread as to put policymakers on constructive notice of it.  *See Pineda v. City of Houston*, 291 F.3d 325, 330 n.13 (5th Cir. 2002) ("A pattern may exist without actual or constructive knowledge because the facts of the events are concealed from policymakers.  However, the sheer numerosity of incidents *can* provide evidence of constructive knowledge.").  A policymaker can have constructive notice of a custom or practice

when the conduct is "widespread or flagrant." *Thelma D. v. Board of Educ*., 934 F.2d 929, 933 (8th Cir. 1991); *see also Plamp v. Mitchell Sch. Dist*. No. 17-2, 565 F.3d 450, 461 (8th Cir. 2009) (affirming that constructive notice can be imputed when the underlying unconstitutional misconduct was widespread or flagrant). "Constructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

The scope and breadth of the City's jailing operations, along with the consistency and uniform application across those it detained, demonstrate that the City's policymakers were on constructive notice. From the newest corrections officer to the Police Chief, there is undisputed testimony that the practices enacted by the City described in this brief were in fact the standard operating procedure of the City's police department. Although, as discussed below, the relevant policymakers had actual knowledge, the City's policymakers had every opportunity (and obligation) to be aware of the City's jailing practices—therefore had at least constructive notice—including that tens of thousands of indigent individuals were held ransom, without basic semblances of legal processes, until they paid their last penny to the City's court. The constitutional misconduct at play in the City is indeed flagrant and widespread. ECF No. 430 ("Class Cert Memo") at 14 (citing ECF No. 485, Ex. 1 (10/21/20 Expert Report of S. Demuth, Ph.D) ("Demuth Report") at 16) ("the Bearden Class . . . contains 11,396 arrestees spanning 20,778 arrests"); *see also* Class Cert Order at 19 n. 10 ("the parties do not dispute that the membership in each of the classes ranges from more than 1,000 to more than 10,000 individuals."). It is simply not realistic for any of the relevant policymakers to say they had no knowledge nor obligation to

know who the tens of thousands of individuals cycling in and out of the City's jail were, nor why they were incarcerated.

Further, the Police Chief clearly had the actual opportunity to be informed and was therefore on constructive notice.  Chief Jackson testified he had supervisory responsibility over both the City's court and jail.  SUMF ¶¶ 196, 205.  He had authority to make changes at the jail and testified that he had intimate knowledge of day-to-day jail operations.  SUMF ¶¶ 196–97, 240–41.  As the direct supervisor of the court clerks for most of the peak period of incarceration, Chief Jackson knew the court clerks' main responsibilities included processing payments and issuing FTA warrants generated by a computer after individuals did not appear to pay.  Indeed, during the time court clerks reported to the Police Chief, Chief Jackson described that he and Head Court Clerk Twitty were in daily, ongoing contact.  SUMF ¶¶ 216–17.

Specifically, there is sufficient evidence to prove constructive knowledge when a final policymaker oversees the operations of a department and has a process to review or monitor the conduct of their officers to ensure compliance with the rules of the department.  *See Bordanaro v. McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989) (imputing knowledge of the unconstitutional arrest practice to the Police Chief).  Here, the Police Chief had constructive knowledge by virtue of his oversight of the department and officer conduct.  The Police Chief was responsible for all supervision of staff in the public safety department, including police officers, correctional officers, and municipal court staff prior to 2016.  SUMF ¶¶ 196–97, 205.  He set policies and approved General Orders.  SUMF ¶ 197–201.  Court clerks also wrote to the Police Chief (and to the City Manager) regularly with updates on the "pay docket" (the amount collected at the City's police department window) and the revenue collected from bonds.  SUMF ¶¶ 261–62.  In turn, Chief Jackson regularly updated City Manager Shaw on court revenue from fines and fees.  SUMF

¶¶ 266–67. Likewise, the City Council regularly received updates on revenue collected from fines and bond forfeitures, even approving a part time clerk to deal with the ever-increasing money coming in. SUMF ¶¶ 267–70.

Chief Jackson would observe municipal court once a month, and would monitor the size of the dockets, the number of police officers there, "just to maintain accountability in answering, asking questions [he] might have for the judge or prosecutor." Hanlon Decl., Ex. 28 (SUMF ¶ 251), 1/6/16 T. Jackson Dep. Tr. at 158:13–160:24.

To be clear—the Police Chief's role (particularly in a small department) in setting policies, overseeing daily operations, and monitoring compliance with standard practices implicates his constructive knowledge of the practices used by those responsible for jailing class members.

The same is true for the City Manager. The City Manager was responsible for directing and supervising all work done by the Police Chief. Hanlon Decl., Ex. 116 (SUMF ¶ 193), General Order 111.02 (Police Chief's "Work is performed under the direction of the City Manager"). When evaluating Chief Jackson, City Manager Shaw noted that "Court revenues have increased, along with the number of patrolmen, which is an excellent indicator of the general performance of the officers." Hanlon Decl., Ex. 46 (SUMF ¶ 59), 3/2/21 J. Shaw Dep. Tr. at 80:7–11. City Manager Shaw testified he was in consistent contact with Chief Jackson, routinely receiving emails with updates regarding the City's jail. SUMF ¶ 253.

For example, the City's General Orders clearly say that someone should be released after 24 hours if there is no warrant. SUMF ¶ 42. The City Council and the City Manager should have noticed the glaring discrepancy between the General Orders and the practice. *See* Class Cert Memo at 14 (citing Demuth Report at 15-16) (finding "1,610 warrantless arrests leading to detention longer than 24 hours, and 549 warrantless arrests leading to detention for longer than 48 hours").

45

Finally, notice of unconstitutional customs can be evidenced by the City's policymakers' testimony that officers' unconstitutional actions were in full accordance with their training and common practice.  Hanlon Decl., Ex. 50 (SUMF ¶ 63), 1/11/16 D. McDuffie Dep. Tr. at 79:23–25 ("Q. How were you informed that the policy was to hold people for 72 hours?  A. I was told that during my training"); *see Reilly v. City of Providence ex rel. Napolitano*, 2013 WL 1193352, at *11 (D.R.I. Mar. 22, 2013) (holding there was little question that final policymaker had "constructive, if not actual notice" based on the police chief's testimony affirming that the unconstitutional conduct alleged was "proper uniform practice"); *see also Bordanaro*, 871 F.2d at 1156 (finding municipal liability because the arrest practice was "the way things [were] done and [had] been done."); *see also Parker v. Town of Swansea*, 270 F. Supp. 2d 92, 101 (D. Mass. 2003) (recognizing theory of deliberate indifference arising from inadequate training based on deposition testimony that the officer acted in accordance with the training officers received).  Chief Jackson— in office at the height of the City's jailings—as well as other jail supervisors, confirmed each of the practices underlying Plaintiffs' constitutional claims were simply a matter of course for City employees.  SUMF ¶¶ 46, 61, 77, 161, 242.  Far from a practice the City can claim to have no knowledge of, the notice requirement here is met by the approving testimony of City supervisors.

### 2.  The City's Policymakers Had Actual Notice

While constructive notice is sufficient, the evidence here also establishes that City policymaking officials had actual knowledge and regular involvement in the actions of the court clerks, correctional officers, and police officers.  *See generally* SUMF ¶¶ 238–79.

#### a.  *The City's policymakers knew that City employees jailed individuals who could not pay monetary bonds without inquiries into ability to pay*

As official policymakers, the Police Chief, City Council, and City Manager Shaw also had actual notice of the City's jail policies.

46

Emails to and from Chief Jackson also demonstrate his entrenched involvement in, and full knowledge of, City employees' daily, routine decisions to keep individuals incarcerated for an arbitrary period of time based on that individual's failure to pay a preset monetary bond.  For example, on July 21, 2014, Head Court Clerk Twitty emailed Chief Jackson, Officer Richard Henke, Police Captain from 1978 to 2015, and the rest of the Court Clerks:

> Starting today we are going to reduce anyone's bond that calls and is in warrant t[o] [sic] half the amount . . . *This may bring in some extra monies this way* . . . Also the defendants in jail will apply to this.

Hanlon Decl., Ex. 27 (SUMF ¶ 34), 7/21/14 Email from M. Twitty to T. Jackson, R. Henke, C. Lanfersieck, and other City court and police department employees (emphasis added).; s*ee also* SUMF ¶¶ 238–42, 251, 261–64, 266.

City Councilmembers were also fully aware that the City jailed individuals who could not pay their fines.  For example, the City Council knew that FTAs consistently led to incarceration without an inquiry into ability to pay.  Hanlon Decl., Ex. 160 (SUMF ¶ 274), 3/28/13 Email from D. James to J. Shaw (attaching 3/26/13 Presentation to City Council on the Ferguson Youth Initiative, stating, "the result of [the additional fines for failure to appear or pay their fine] often becomes incarceration wherein a young man or woman, perhaps guilty only of not having the money necessary to pay their traffic fine, is imprisoned").

In a 2013 email, Kim Tihen, Councilmember from 2012 to 2015, wrote to City Manager Shaw and other members of the City Council:

> ***For a few years now we have talked*** about offering community service for those who can't afford to pay their fines, ***but we haven't actually made it happen***.  I think it would be a great benefit to allow people to pay off their fines by cutting grass and trimming bushes at vacant properties, picking up trash, etc.  It would free up some time for the Public Works employees ***and keep those people that simply don't have the money to pay their fines from constantly being arrested and going to jail, only to be released and do it all over again***.

Hanlon Decl., Ex. 161 (SUMF ¶ 275) (emphasis added).

47

> b. *The City's policymakers knew the City did not appoint or obtain waiver of counsel*

It is undisputed that the City failed to provide counsel or implement alternative procedures, such as inquiries into ability to pay.  *See* Section IV(B) *supra* (detailing the City's notice that failure to pay inquiries were not conducted).  Chief Jackson himself testified that he was fully aware the City did not appoint counsel to anyone jailed for municipal ordinance violations.  SUMF ¶ 161.  Moreover, City Manager Shaw and City Councilmembers knew there was no budgetary provisions for counsel or counsel hired.  SUMF ¶¶ 1–7.  In fact, the City Council and the City Manager affirmatively chose year after year to not fund counsel for defendants, unlike the provisions for prosecution services.  This is evidenced by the fact that the City Manager proposes and City Council approves the budget yearly.  SUMF ¶ 186.

> c. *The City's policymakers knew arrest warrants were issued for non-payment*

Chief Jackson, as the direct supervisor of both the court clerks that issued the warrants and the jailers who held people on the warrants, had actual knowledge that arrest warrants were issued when individuals failed to make payments.  Hanlon Decl., Ex. 28 (SUMF ¶ 133), 1/6/16 T. Jackson Dep. Tr. at 80:15–82:21 ("Q. And the other circumstance that I can imagine would be a situation where someone has either been convicted or pled guilty which often happens, and they have a payment date and that date is a day they allegedly don't appear for . . . Would that be another situation where an FTA warrant could go out?  A. Yes.").  City Manager Shaw also testified that he was aware that the City's practice was to issue arrest warrants when individuals did not pay fines.  Hanlon Decl., Ex. 46 (SUMF ¶ 255), 3/2/21 J. Shaw Dep. Tr. at 183:4–5, 8–9 ("Q. Sometimes, when people didn't pay fines they would have warrants issued for their arrest? . . .  A. I'm guessing so, that makes—it sounds right.  It sounds right.).

City Manager Shaw and the City Council also received notice of this custom by email on numerous occasions.  In one harrowing email sent on May 8, 2013 to Mayor Knowles and City Manager Shaw, a mother detailed the experience of her son being held in the Jennings Jail and asked for assistance with his active Ferguson warrants:

> Hello Mr. Knowles I don't know who else I can turn to but, I am desperately seeking help for my son.  My son name [sic] is Tywon Payne, D.O.B. 5-25-95.  My son was a troubled teen growing up but as of right now I have seen a drastic change.  He isn't getting into trouble anymore and he even has a job with the trash company.  My son does have a baby girl on the way so he's changed his life around for the baby.  My son just started working his job last Thursday unfortunately my son was arrested Monday while walking because of traffic warrants and he has been sitting in Jennings ever since.  I am desperately asking you if there's anyway [sic] you can help about a warrant that he has in your community.  I would like if my son can keep his job but if he loose [sic] this job I'm afraid he might start getting in trouble again.  Is there a way you could give him a court date or set him up on a payment plan so he can keep his job and also stay out of trouble.  I am desperately seeking out help please help me.

Hanlon Decl., Ex. 137 (SUMF ¶ 256).

In a June 10, 2010 email, the Assistant City Manager from 2008 to 2011, Saumel Anselm ("Assistant City Manager Anselm") discussed with Head Court Clerk Twitty about a defendant who could not pay her fines and "missed a court date because she was in County jail."  Hanlon Decl., Ex. 138 (SUMF ¶ 257), 6/11/10 Email from S. Anselm to M. Twitty.  There is no evidence that Assistant City Manager Anselm or City Manager Shaw intervened.  Hanlon Decl., Ex. 139 (SUMF ¶ 258), 5/21/21 S. Anselm Dep. Tr. at 76:2-5 ("Q. . . . When you received a call like this [the complaint detailed in the 6/10/2010 email], did you have any other response other than forwarding this to Mary Ann Twitty?  A. No.").  Additionally, on at least one occasion, City Manager Shaw played an active role in a person's arrest for an FTA.  In a June 10, 2014 email, City Manager Shaw wrote: "Mrs. Hunter did not appear in court and a warrant for FTA was issued . . . I have instructed the Sergeant to have his officers arrest Ms. Hunter and, if unsuccessful, to pass this along to the night shift.  They will continue to knock on her door until she is arrested on

the outstanding warrant." Hanlon Decl., Ex. 140 (SUMF ¶ 259). There was no discussion of Ms. Hunter's financial situation, and the complaints against her stemmed from her failure to maintain the appearance of her property.

As this correspondence demonstrates, City Manager Shaw and the City Council took no actions to investigate the treatment of indigent individuals in Ferguson, instead turning a blind eye to their ability to pay, and in fact instructing police officers to be *more* aggressive in the prosecution of FTA warrants.

  d. *The City's policymakers knew that warrantless arrestees were jailed without any chance of a probable cause determination*

Chief Jackson testified that Ferguson had no process to review, much less find, probable cause. Hanlon Decl., Ex. 28 (SUMF ¶ 46), 1/6/16 T. Jackson Dep. Tr. at 176:11–17 (designated 30(b)(6) testimony). 1/6/16 T. Jackson Dep. Tr. at 177:12–18 ("Q: And you would agree that in Ferguson, and once again Ferguson may be just one of 81 that works this way, there's no probable cause statement, no sworn probable cause statement from a police officer. A: Again, that's all in the incident report, correct."). He admitted to this despite knowing that his General Order mandated officers seek a warrant within 24 hours or release individuals. SUMF ¶ 42. In fact, Chief Jackson established a 72 hour rule despite his knowledge there were no probable cause determinations or mechanisms for Ferguson police officers to seek a warrant for municipal offenses. SUMF ¶ 61.

The City Council and the City Manager also approved contracts with the City's judge for a limited number of dockets (four a month), which made no provision for a timely probable cause determination. SUMF ¶¶ 187, 203.

E.     **The City Was Deliberately Indifferent in its Failure to Implement Constitutional Processes**

When there is evidence of widespread and persistent constitutional violations, municipal officials will be liable where they were either deliberately indifferent to or tacitly approved of such conduct.  *Larson v. Miller*, 76 F.3d 1446, 1453 (8th Cir. 1996) (en banc).  Deliberate indifference is established when "inadequacy is both obvious and likely to result in the alleged deprivation of constitutional rights."  *Russell v. Hennepin Cty.*, 420 F.3d 841, 847 (8th Cir. 2005).  "[A]s the number of incidents grow, and a pattern begins to emerge, a finding of tacit authorization or reckless disregard becomes more plausible."  *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989).  "[I]naction or laxness can constitute government custom if it is permanent and well settled."  *Tilson v. Forrest City Police Dept.*, 28 F.3d 802, 807 (8th Cir. 1994).  "[C]ontinued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference'—necessary to trigger municipal liability."  *Brown,* 520 U.S. at 408 (*citing Canton*, 489 U.S. at 390, n. 10).  When such unconstitutional municipal policies or customs exist and final policymakers manifest deliberate indifference, courts have granted plaintiffs summary judgment on the issue of municipal liability.  *Estate of Vela v. County of Monterey*, 2018 U.S. Dist. LEXIS 145698 at *25 (N.D. Cal. Aug. 27, 2018).

As demonstrated above in Sections II & IV *supra*, the practices underlying the constitutional violations of Plaintiffs are widespread and persistent.  However, the City took no steps to ameliorate or otherwise cure the constitutional deficiencies until after national attention was focused on Ferguson due to the Ferguson Uprising following the killing of Michael Brown.  Even then the changes addressed only the length of unlawful incarceration, failing to address the underlying constitutional violations.  As demonstrated in Section V(D) *supra*, the words of City

officials themselves show their focus was, not on fair or constitutional treatment of citizens, but rather on how to use jailing to maximize revenue for the City.

For each of the issues at stake in this summary judgment motion, the "reforms" undertaken by the City only reduce the extent of the constitutional harm suffered, though they do not erase it. For instance, for Count 1, the City Council enacted an ordinance mandating the release of any person held on a monetary bond after 12 hours.  SUMF ¶ 178.  While such a remedy significantly negates the number of hours that people sat in the jail without a probable cause determination, it does not change that fact that people continued to sit in jail because they could not afford their bond, nor the fact that there was no bond hearing.  The City's implementation of the ordinance also contradicts the City's claims that they had no control over the bonds or how long people sat in their jail.  So too, with Count 7.  While the City's intervention may have reduced the length of time that a person was jailed without any prospect of a probable cause determination, nothing in the record indicates that the City *actually started providing probable cause determinations*.

Prior to the death of Michael Brown, neither the Police Chief nor anyone in other City leadership positions took any steps to address the yearly incarceration of thousands of indigent individuals.  Nor did anyone at the City take any steps to implement standard constitutional protections such as probable cause determinations, counsel, or judicial review of arrest warrants. Yet as shown above, this inaction was not the result of unawareness—but rather indifference.  For example, the City Council acknowledged the ill effects of its jailing practices on the indigent by debating (but never implementing) community service programs for non-juveniles.[24]  Likewise,

---

[24] In 2013, the City implemented a community service program for juveniles noting, "Each month approximately 100 Ferguson youth receive misdemeanor fines in Ferguson's municipal court.  Of those 100 youth, approximately 40 are put on warrant for failure to appear or pay their fines."  Hanlon Decl., Ex. 162 (SUMF ¶ 276), 12/31/13 Ferguson Community Service Program.

the Police Chief, City Manager, and City Council all agreed to participate in a community Warrant Amnesty Program—agreeing by email that it would generally be helpful to lift warrants subjecting individuals to arrest and allow them to try to pay their fines.  Yet the emails also show that the policymakers *only* agreed to processes that would ameliorate some effects of the unconstitutional processes if it increased revenue.  Hanlon Decl., Ex. 148 (SUMF ¶ 263), 8/1/11 Email from T. Jackson to J. Shaw (Chief Jackson stating, regarding Family Life Warrant Amnesty Program, "I do not see a downside to trying this program, as it most certainly will increase revenue for August, which is traditionally a lower revenue month.").

Yet emails between City Councilmembers and the City Manager show they were fully aware of their power to act.  In response to pushback from the City Council on other proposed reforms, Mayor Knowles wrote, "we are ending the practice of piling on administrative fees and compounding excess charges. . . . There is nothing in it for the city to stick to the practice of nickel and diming people with these fees.  It is bad practice and bad press."  Hanlon Decl., Ex. 164 (SUMF ¶ 277), 9/11/14 Email from J. Knowles to City Council.

### F.    The City's Policymaking Officials Directed and Accepted the System of Jailing Indigent Individuals and did so to Raise Revenue for the City

There was a reason for this inaction.  The injuries suffered stemmed from an intentional scheme on the part of City officials to extract money from class members.  Policymakers were not oblivious to the violations at hand; instead, they intentionally used mechanisms at their disposal as a way of making money.  Each of the constitutional violations described above arose specifically because the City Council, City Manager Shaw, Chief Jackson, and their employees actively pursued a policy of generating revenue by increasing the fees and fines imposed by the City's court and police department and by using jailing to force indigent individuals to pay fines.  *See generally* SUMF ¶¶ 1–36.

### 1. The City Exercised Control over the Police Department in Seeking to Raise Revenue

The testimony and evidence in this case shows that the City Council and City Manager not only hoped for these increased revenues, but also explicitly demanded that Ferguson employees in the public safety department deliver those results through increased ticketing and jailing. SUMF ¶¶ 13–14. In September 2010, the City Council and City Manager Shaw attended a budget planning session, during which they reached the conclusion that the City should focus on collecting more in fines and forfeitures. Hanlon Decl., Ex. 17 (SUMF ¶ 19), 9/9/10 Email from J. Shaw to S. Anselm, J. Blume, and others.[25] The City's Finance Director from 2008 to 2019, Jeffrey Blume ("Finance Director Blume") admitted he asked the City's police department and Chief Jackson to deliver certain revenue targets. SUMF ¶¶ 13–16 (J. Blume admitting asking Chief Jackson to deliver $1.8M from fine revenue as a way to address the City's overall deficit). The City Council and City Manager Shaw—and the City employees they had the sole authority to appoint and manage—were essential to this revenue-generation scheme.

In March 2010, Finance Director Blume wrote, "[u]nless ticket writing ramps up significantly before the end of the year, it will be hard to significantly raise collections next year. Given that we are looking at a substantial sales tax shortfall, it's not an insignificant issue." Hanlon Decl., Ex. 7 (SUMF ¶ 11), 3/23/10 Email thread between J. Blume and T. Jackson. As a result, the City's police officers were evaluated based on their "productivity" in writing tickets. SUMF ¶¶ 47, 53. These evaluations detailed the exact number of tickets each officer wrote. SUMF ¶ 54.

---

[25] The emails and documents exchanged between City Council and City Manager Shaw show the City explicitly used the City's court to generate revenue to address budget deficit caused by the financial crisis. *See, e.g.*, SUMF ¶ 2 (J. Blume presented financial report noting that revenue was down and deficient was a concern); *see also* SUMF ¶ 9 ("[T]he City again faces a deficit year, provided trends in revenue and expenses continue at their present rates. And because of the national economy, our local business losses and rising expenses, that deficit is expected to increase even more. . . . At this point our real options to increase revenues are to look at raising fees, fines and taxes.").

The City monitored officer productivity and reflected this on a "stat sheet" for each officer.  SUMF ¶ 50.  Failure to perform could result in disciplinary action.  SUMF ¶ 56.  It is clear that the objective was not public safety but instead increasing revenue in any way possible.  When discussing the warrant voucher system the City adopted in 2011 with Head Court Clerk Twitty, City Manager Shaw acknowledged that the City's focus on profits would likely come at the expense of the interests of its citizens.  Head Court Clerk Twitty provided the City's estimated profits from the voucher system to City Manager Shaw and noted that the City "beat everyone," asking if that was "good or bad?"  City Manager Shaw responded:  "*good for us but bad for society?*  Also just to make sure I get this correct, we collected $16,000 and were able to get rid of 167 warrants?"  Hanlon Decl., Ex. 151 (SUMF ¶ 265), 9/2/11 Email thread between M. Twitty and J. Shaw (emphasis added).  These efforts paid off.  SUMF ¶ 30 (Chief Jackson reporting "[t]he court dockets are also at an all-time high" and that the "court dockets have increased 30% over the last three years"); *see also* Hanlon Decl., Ex. 24 (SUMF ¶ 31), 6/28/13 Proposed Annual Operating Budget for the City of Ferguson for the fiscal year beginning July 1, 2013) (sent to Mayor Knowles and the City Council, stating on page 6, "municipal court revenues have risen about 44% or $623,000 from those in FY 2010-2011").

However, the City wanted even more.  In 2013, Finance Director Blume wrote to City Manager Shaw, "Court fees are anticipated to rise about 7.5%.  I did ask the [Police] Chief if he thought the PD could deliver [a] 10% increase.  He indicated they could try."  Hanlon Decl., Ex. 22 (SUMF ¶ 29), 3/16/13 Email from J. Blume to J. Shaw.  Then, in 2014, Finance Director Blume wrote to Chief Jackson and City Manager Shaw, *recommending immediate implementation of a traffic enforcement initiative in order to "begin to fill the revenue pipeline."*  Hanlon Decl., Ex. 26 (SUMF ¶ 33), 4/22/14 Email thread between J. Shaw and J. Blume.

In August 2014, Councilmember Byrne suggested improvements to the City's police department's warrant and warrant recall procedures, in response to negative press coverage of the City.  Hanlon Decl., Ex. 154 (SUMF ¶ 269) 8/26/14 email from M. Byrne to T. Larson ("I would like to have us abolish any warrant recall fees.  *They are seen as nothing more than money-grabs and quite frankly, they are. . . . The same thing could be said for Failure to Appear fees.*  I don't know how much we use them, but if we do, we can either completely abolish them or do some type of temporary stay." (emphasis added)).  Councilmember Byrne's statement highlights what was known amongst the City's policymakers—who proposed and passed those fees—that the ultimate objective was to increase revenue regardless of the harm caused to Plaintiffs and the community.

### 2.   The City Exercised Control over the Municipal Court in Seeking to Raise Revenue

The City also used its control over the City's court to make up for budget deficits.  In January 2010, Finance Director Blume stated, "the big hole to fill [in the City's revenues] is Fines and Forfeitures.  The 'good' thing about this hole is *we actually have a great deal of control* over it . . . ."  Hanlon Decl., Ex. 6 (SUMF ¶ 10), 1/29/10 Email thread between J. Blume, J. Shaw, and others (emphasis added).  The City's scheme to raise revenue through its court was quickly implemented.  For example, in 2009, City Manager Shaw proposed ordinances for (1) a $50 administrative warrant recall fee and (2) a $50 administrative fee in court costs of withdrawal of a complaint.  SUMF ¶ 187.  The City Council approved both these ordinances.  SUMF ¶¶ 32, 156, 187.[26]  In fact, the City Council even passed an ordinance establishing a "letter fee" that charged

---

[26] Other City Ordinances enacted by the City Council also utilized the City's court as a means of raising revenue, compounding the plight of any Plaintiffs who could not afford to pay the penalties imposed by the City.  The City Council also authorized fees for continuing court proceedings, issuing and serving warrants, mileage, and witness fees.  SUMF ¶ 175 (abolishing certain fees associated with municipal court cases).  And the City famously made

defendants $15 every time that the court sent them a letter.  Hanlon Decl., Ex. 103 (SUMF ¶ 103) 8/26/14 Email from J. Shaw to M. Byrne ("[t]he warrant recall fee and the $15.00 letter fee (for failing to appear the first time) is set by ordinance").

The City Council explicitly prioritized revenue generation when considering the reappointment of Judge Brockmeyer.  Hanlon Decl., Ex. 12 (SUMF ¶ 203), 6/7/10 email from Councilmember Byrne to City Manager Shaw and the entire City Council ("*I would like to know that you have spoken with Ron about ways to raise the revenues and to make the court system more financially productive for our city. . . .*").  City Manager Shaw asked both the City's prosecutor and judge to report for the City Council what steps they had taken to improve efficiency and revenue.  SUMF ¶ 22.  Notably, the City Council requested no such report on what the City's judge was doing to protect citizen's constitutional rights.

In June 2011, after Judge Brockmeyer's email to City Manager Shaw outlining the policies the court intended to adopt to increase City revenue, Chief Jackson sent an email to City Manager Shaw and Finance Director Blume stating, "May is the 6th straight month in which court revenue (gross) has exceeded the previous year"—City Manager Shaw responded "Good job!" and Finance Director Blume responded, "In yours and this issue's case 3 months may and 6 months does a trend make because *you are substantially in control of the outcome.*"  Hanlon Decl., Ex. 152 (SUMF ¶ 266), 6/2/11 Email thread between J. Blume, J. Shaw, and others (emphasis added).

---

failure to appear upon arrest or summons a separate offense with its own additional penalties.  Hanlon Decl., Ex. 101 (SUMF ¶ 166), Ferguson, MO Ord. 2104-3566, § 1 (repealing Section 13-58 of the Municipal Code, which read "It shall be unlawful for any defendant who has previously been admitted to bail after arrest or summons to fail to appear before the municipal court at a stipulated time and from time to time as required by the court or to depart from the process of the court without leave.").  These ordinances worked in tandem to extract monies from class members at the expense of their constitutional rights.

Even after the City Council and City Manager Shaw became aware of procedural issues in the City's court under Judge Brockmeyer, they made a conscious decision to reappoint him, citing increased revenue as justification.  SUMF ¶¶ 17, 203.  Judge Brockmeyer remained in his position as the City's judge for *three more years*—until 2015, when the DOJ Report was issued, outlining constitutional violations of which the City Council and City Manager Shaw had notice for years. *See Pagedale*, 821 F.2d at 504 (finding constructive notice through "notice of prior incidents of police misconduct"); *see also Parrish v. Luckie*, 963 F.2d 201, 204 (8th Cir. 1992) (finding constructive notice from prior knowledge of police misconduct).

The above evidence shows that the City's officials were not only well aware of the violations that were taking place but that officials across all levels deliberately chose to maintain their official policy of imprisonment for nonpayment and retained employees who violated proper court procedure—including processes for determining probable cause—because the scheme increased the City's bottom line.  To the City's officials and employees alike, the constitutional deficiencies were intentional– they were part of a deliberate scheme to raise revenue.

### G.    The City Council Could Have Enacted Ordinances to Prevent the Constitutional Violations Under Counts One, Two, and Seven

The Court need go no further to find the City liable, but there is an additional basis for its liability.  As a "home rule" municipality, the City wields maximal authority over its affairs, consistent with state law.  *See* Mo. Const. Art. VI, § 19(a) ("Any city which adopts or has adopted a charter for its own government, shall have all powers which the general assembly of the state of Missouri has authority to confer upon any city, provided such powers are consistent with the constitution of this state. . . ."); Ferguson Mun. Code Pt. I, Art. II, § 2.1.  The City has exercised that power to create the City's court and provide for its funding, housing, and staffing.  Ferguson Mun. Code Ch. 2, Art. IV, § 2-214; *id.* Ch. 13, Art. I, § 13-4.  It has also created the offices of the

58

City's judge and court clerk, providing for their selection and compensation and defining the duties of each. *See id.* Ch. 13, Art. II; *id.* Art. I, § 13-7.

Most importantly, the City controls both the City's judge and court clerks by ordinance. Ferguson Mun. Code Ch. 13, Art. II, § 13-29(b)(3) authorizes the City's judge "to make and adopt such rules of practice and procedure as are necessary to hear and decide matters pending before the municipal court and to implement and carry out the provisions of the rules of practice and procedure for municipal and traffic courts." The Code then provides that "[a]ny and all rules made" for the City's court by the City's judge "may be annulled or amended by any ordinance limited to such purpose," consistent with state law and the rules of practice and procedure set by the State Judiciary. *Id.* The Code also provides that the City's judge shall "[h]ave other powers, duties and privileges as are or may be prescribed by state law, *this Code or other ordinances of the city*," *id.* at § 13-29(b)(5) (emphasis added). Chapter 13, Art. I § 13-7 of the Municipal Code provides similar City control over the City's court clerks.[27]

The City thus has the authority under state and local law to make rules governing the City's court consistent with state law and the rules of the State Judiciary. This is unsurprising given the many municipal court reforms the City promised the United States it would make when it signed the 2016 consent decree with the DOJ.[28] In other words, positive law agrees with the City's earlier-professed understanding that it had the power to address the constitutional problems Plaintiffs

---

[27] These provisions comport with the DOJ's findings that, notwithstanding the oversight of the 21st Judicial Circuit, the City "retains considerable power to establish and amend court practices and procedures" through City ordinances and executive control." Hanlon Decl., Ex. 35 (SUMF ¶ 318), DOJ Report.

[28] Hanlon Decl., Ex. 108 (SUMF ¶ 175), 2/19/15 Finance Memorandum to J. Shaw from J. Blume ("the City will establish and implement protocols, through policy or ordinance, to ensure" adequate process for debtors who cannot pay fines or fees, including that "if a defendant fails to satisfy a subsequent required court appearance, the court will conduct a hearing on why a warrant should not issue, including an assessment of ability to pay any pending fine or fee," and that "[t]he court shall not issue a warrant for any individual who appears at the show cause hearing"); 350(a) (specifying circumstances in which the City promises to "conduct a show cause hearing" regarding bond assessment).

challenge not only through its policies and practices governing police and prosecutors, but also through rules and procedures it could set for the City's court.  There are myriad different ways the City could have pursued this additional avenue of protection.  The City could, for example, have enacted an ordinance directing its court to require (not merely authorize) immediate release of all FTA warrant and ordinance violation arrestees on their own recognizance, or on unsecured bond.  Or it could have enacted an ordinance instituting a procedure for affording prompt judicial determinations of probable cause for warrantless arrests.  Or it could have enacted an ordinance requiring the appointment or waiver of counsel before debtors are jailed for nonpayment.

Thus, in addition to being liable for its policies and practices outside the City's court—changes that on their own could have prevented Plaintiffs' constitutional injuries—the City is independently liable for failing to prevent those injuries (in alternative ways) by exercising its unusually strong power over its court.  Each of these policies and customs constituted "a deliberate choice to follow a course of action . . . made from among various alternatives by" the City's policymakers.  *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 674 (8th Cir. 2004) (quoting *Pembaur*, 475 U.S. at 483).

## VI.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully ask this Court to grant summary judgment as to the City's liability for the constitutional violations under Counts One, Two, and Seven.  In the alternative, the Court should grant partial summary judgment as to the violations of Plaintiffs' constitutional rights alleged in those three counts.[29]

---

[29] Plaintiffs maintain their other claims (Counts Three, Four, Five, and Six) and preserve for trial the issue of damages on all Counts.

Dated: March 13, 2023

**WHITE & CASE LLP**

By:  */s/ Angela Daker*
Angela Daker (*pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Phone: 305-371-2700
Email: adaker@whitecase.com

J. Frank Hogue (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
Phone: 202-626-3623
Email: fhogue@whitecase.com

Ross E. Elfand (*pro hac vice*)
Iva Popa (*pro hac vice*)
Hafsa S. Mansoor (*pro hac vice*)
Luke J. Miller (*pro hac vice*)
Chloe R. Edmonds (*pro hac vice*)
Ariell D. Branson (Law Clerk—not barred)
1221 Avenue of the Americas
New York, NY 10020
Phone: 212-819-7670
Email: relfand@whitecase.com

Respectfully submitted,

**ARCHCITY DEFENDERS**

Maureen Hanlon, #70990MO
Blake A. Strode, #68422MO
John M. Waldron, #70401MO
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
Phone: 855-724-2489
Email: mhanlon@archcitydefenders.org

—and—

**CIVIL RIGHTS CORPS**

Marco Lopez (*pro hac vice*)
Ryan Downer (*pro hac vice*)
1601 Connecticut Avenue NW, Suite 800
Washington, DC 20009
Phone: 202-844-4975
Email: marco@civilrightscorps.org

—and—

**SLU LAW CLINIC**

Brendan Roediger (MBE #6287213IL)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
Phone: 314-977-2778
Email: brendan.roediger@slu.edu

***ATTORNEYS FOR PLAINTIFFS***