**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEILEE FANT, ROELIF CARTER, ALLISON NELSON, HERBERT NELSON JR., ALFRED MORRIS, ANTHONY KIMBLE, DONYALE THOMAS, SHAMEIKA MORRIS, RONNIE TUCKER, et al., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:15-CV-00253-AGF |
| THE CITY OF FERGUSON, | ) ) | |
| Defendant. | ) ) ) | (Class Action) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ v

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARDS APPLICABLE TO ALL COUNTS ....................................... 2

ARGUMENT ............................................................................................................. 2

I. The City Improperly Seeks to Relitigate its failed arguments against Class Certification. 2

II. The City mistates and misapplies the law of Municipal Liability ....................... 3

    A. The City Ignores Delegation and Custom as Bases for Municipal Liability .......... 3

    B. The City Council Is Not the City's Only Final Policymaker.................................. 4

    C. The City Cannot Blame Its Violations on Its Municipal Court ............................ 7

    D. The City Also Had the Power to Regulate Its Municipal Court's Rules and Procedures to Prevent Violations.......................................................................... 11

III. The City is Not Entitled to Summary Judgment on the Violations Alleged by Plaintiffs 13

    A. The City is Not Entitled to Summary Judgment on Count One .......................... 13

        1. The City Is Liable on Count One Regardless of Plaintiffs' Past Ability to Pay........................................................................................................... 14

        2. The City Is Liable on Count One Regardless of How Long It Detained Each Plaintiff After Arrest ................................................................................. 19

        3. The City Cannot Deflect the Blame for Its Count One Violations Onto Its Municipal Judge.................................................................................. 22

    B. The City is Not Entitled to Summary Judgment on Count Two.......................... 24

        1. The City Ignores the Fourteenth Amendment Violation Alleged in Count Two ......................................................................................................... 25

        2. The City Does Not Dispute that It Never Provided Post-Judgment Class Members Who Could Not Afford an Attorney Access to Counsel Prior to Jailing ..................................................................................................... 27

        3. The City Cannot Escape Liability for Jailing Individuals with No Counsel by Pointing to the Judiciary ..................................................................... 28

    C. The City Is Not Entitled to Summary Judgment on Count Three........................ 29

        1. The City Misapplies the Totality of the Circumstances Standard by Relying Solely on the Duration of the Detainment ................................................ 29

        2. Record Evidence Would Enable a Jury to Find that the City, Not the Court, Bears Responsibility ................................................................................. 31

        3. Factual Disputes Remain as to Whether the Lack of Procedure and the Circumstances of Detainment Together Shock the Conscience ............... 33

            a. The City Admits There Was No Process to Bring Detainees Before a Judge or Appear in Court for a Hearing..................................... 33

            b. The City Mischaracterizes the Circumstances of Warrant Class

ii

Members' Detention ................................................................. 33

   c. A Reasonable Jury Could Consider the Abhorrent Conditions in the City's Jail as Evidence the City's Conduct "Shocks the Conscience" ................................................................................................. 34

   d. A Reasonable Jury Could Consider the Financial Motivations for Detention as Evidence the City's Conduct "Shocks the Conscience" ................................................................................................. 34

   e. These Disputes of Fact Create an Issue to Be Tried by a Jury ..... 35

D. The City Is Not Entitled to Summary Judgment on Count Four ......................... 36

  1. The City Misapplies the Totality of the Circumstances Standard by Considering the Length of the Conditions in Isolation ............................ 36

  2. The City Misstates Plaintiffs' Burden of Proof ......................................... 38

  3. Factual Disputes Remain as to Whether Conditions in the City's Jail Created a Substantial Risk of Injury ......................................................... 39

  4. The Corrections Officers and the Correctional Supervisors, Including the Police Chief, Were Deliberately Indifferent to the Squalid Jail Conditions ................................................................................................. 41

E. The City is Not Entitled to Summary Judgment on Count Five ......................... 42

  1. Plaintiffs' Initial Inability to Pay May Explain How They *Became* City Debtors but Is Not an Element of the Equal Protection Violation They Suffered as City Debtors ......................................................................... 42

  2. Plaintiffs Were Civil Judgment Debtors, Not Criminal Ones .................. 43

  3. The City Chose to Jail Its Debtors for Nonpayment ................................ 45

F. The City Is Not Entitled to Summary Judgment on Count Six ............................ 46

  1. Contrary to the City's Claims, FTA Warrants Were Not Valid Bench Warrants That Replaced a Finding of Probable Cause ............................. 47

  2. Contrary to the City's Claims, There Is Evidence of a Widespread City Practice of Issuing and Seeking Arrest Warrants Without Probable Cause ................................................................................................................. 48

   a. The City Admits Warrants Issued Without Sworn Affidavits ...... 49

   b. Warrants Issued Automatically When Post-Judgment Class Members Missed Payments on Debt Owed to the City from Prior Judgments, Without Review by the Municipal Judge .................. 49

   c. Warrants Issued Without Probable Cause for One or More Key Elements of Suspected Offenses ................................................... 50

G. The City Is Not Entitled to Summary Judgment on Count Seven ........................ 51

  1. *Riverside*'s Presumption Does Not Apply Where There Is No Prospect of a Probable-Cause Determination ............................................................... 52

  2. Missouri Law Does Not Excuse the City's Unlawful Detention Practices ................................................................................................................. 54

  3. No Municipal Judge Ruling Required the City's Unlawful Detention Practices ................................................................................................... 56

IV.     The City Is Not Entitled to Partial Summary Judgment For THE PERIOD After June 30, 2015.................................................................................................................................... 57

CONCLUSION......................................................................................................................... 60

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331 (1948)....................................16

*Alabama v. Shelton*, 535 U.S. 654 (2002)..............................................................26, 27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................2

*Argersinger v. Hamlin*, 407 U.S. 25 (1972)...........................................................26, 27

*Atkinson v. City of Mountain View,* 709 F.3d 1201 (8th Cir. 2013) ...............................6

*Bader v. Schaaf*, 2018 WL 6831168 (E.D. Mo. Dec. 27, 2018)...............................40, 41

*Baker v. City of Florissant*, 2017 WL 6316736 (E.D. Mo. Dec. 11, 2017).................45

*Baker v. McCollan*, 443 U.S. 137 (1979) .............................................................30, 31

*Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. June 24, 2011) .............60

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997)...........................6

*Bearden v. Georgia*, 461 U.S. 660 (1983) ............................................................ *passim*

*Beaulieu v. Ludeman*, 690 F.3d 1017 (8th Cir. 2012).............................................38, 39

*Bedford v. Doe*, 880 F.3d 993 (8th Cir. 2018) ........................................................2, 35

*Bell v. Wolfish,* 441 U.S. 520 (1979) ....................................................................36, 37

*Bepple v. Shelton*, 2016 WL 633892 (D. Or. Feb. 17, 2016).....................................2, 26

*Brewer v. Chauvin*, 938 F.2d 860 (8th Cir. 1991) (en banc) .......................................18

*Brown v. City of Detroit,* 2012 WL 4470433 (E.D. Mich. Sept. 27, 2012) ...................54

*Cain v. City of New Orleans*, 327 F.R.D. 111 (E.D. La. 2018) ...................................15

*Carey v. Piphus*, 435 U.S. 247 (1978) .....................................................................15

*City of Dexter v. McClain*, 345 S.W.3d 883 (Mo. App. 2011).....................................44

*City of Stanberry v. O'Neal*, 150 S.W. 1104 (1912).....................................................44

*Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991).............................................................. *passim*

*Collins-Myers v. Triangle Trucking, Inc.*, 2020 WL 1455743 (E.D. Mo. Mar. 25, 2020) .............2

*Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005) .......................................................21

*Doe v. Angelina Cnty.*, 733 F. Supp. 245 (E.D. Tex. 1990) ...........................................15

*Dow v. Baird*, 389 F.2d 882 (10th Cir. 1968)..............................................................47, 49

*Escobedo v. Applebees*, 787 F.3d 1226 (9th Cir. 2015)................................................16

*Evers v. Cnty. of Custer*, 745 F.2d 1196 (9th Cir. 1984) ...........................................21

*Ex parte Hollwedell*, 74 Mo. 395 (Mo. 1881)..............................................................44

*Ford v. City of Boston*, 154 F. Supp. 2d 131 (D. Mass. 2001) .......................................60

*Franks v. Delaware*, 438 U.S. 154 (1978) ...................................................................51

*Garner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993).......................................21

*Gerstein v. Pugh*, 420 U.S. 103 (1975)..........................................................................*passim*

*Goings v. Chickasaw Cnty.*, 2008 WL 11510710 (N.D. Iowa Apr. 8, 2008) ...............16

*Goldman v. Forbus*, 17 Fed. Appx. 487 (8th Cir. 2001)................................................54

*Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028 (1987)..............................................................................................................................56

*Granda v. City of St. Louis.*, 472 F.3d 565 (8th Cir. 2007) .......................................9, 11

*Groh v. Ramirez*, 540 U.S. 551 (2004) ..........................................................................47

*Hall v. Black*, 2006 WL 2959459 (W.D. Ark. Oct. 17 2006) .......................................7

*Hamilton v. City of Hayti*, 948 F.3d 921 (8th Cir. 2020)........................................10, 49

*Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987) ...........................................4, 23

*Harris v. Missouri Court of Appeals, Western Dist.*, 787 F.2d 427 (8th Cir. 1986)...............22, 23

*Hayes v. Faulkner Cnty.*, 388 F.3d 669 (8th Cir. 2004) ...............................30, 31, 33, 34

*Helling v. McKinney*, 509 U.S. 25 (1993).....................................................................39

*In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*, 2003 U.S. Dist. LEXIS 12929 (D. Minn. July 22, 2003)..............................................................................................3

*In re Williamson*, 786 F.2d 1336 (8th Cir. 1986) ........................................................16

*James v. Strange*, 407 U.S. 128 (1972) ..............................................................42, 43, 45

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989) ....................................................4

*Johnson v. Bd. of Police Comm'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005) ....................53

*Johnson v. United States*, 333 U.S. 10 (1948) ..............................................................47

*Kansas City v. Neal*, 122 Mo. 232 (Mo. 1894) ............................................................44

*Lewis v. Wahl*, 842 S.W.2d 82 (Mo. 1992) (en banc) (Thomas, J., concurring in part) ...............44

*Long v. Madison Cnty. Sheriff*, 2020 WL 1876142 (S.D. Ind. Apr. 15, 2020) ............................54

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ........................................................................15

*Mapp v. Ohio*, 367 U.S. 643 (1961) ..........................................................................47

*Martz v. Simmons*, 2019 WL 3431747 (W.D. Ark. May 14, 2019) ............................31, 33

*McGautha v. Jackson Cnty.*, 36 F.3d 53 (8th Cir. 1994) ....................................................4

*McKlintic v. 36th Jud. Cir. Ct.*, 464 F. Supp. 2d 871 (E.D. Mo. 2006) ............................23

*McKlintic v. 36th Jud. Cir. Ct.*, 508 F.3d 875 (8th Cir. 2007) ........................................22

*Mitchell v. Shearrer*, 2012 WL 918803 (E.D. Mo. Mar. 19, 2012) ..................................55

*Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978) ....................................................3, 6

*Morris v. Zefferi*, 601 F.3d 805 (8th Cir. 2010) ......................................................37, 42

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ..................................................................26

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ........................18

*Myers v. Becker Cnty.*, 833 F. Supp. 1424 (D. Minn. 1993) ..........................................47

*Ness v. City of Bloomington*, 11 F.4th 914 (8th Cir. 2021) ............................................21

*Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) ..........................33

*Owens v. Scott Cnty. Jail*, 328 F.3d 1026 (8th Cir. 2003) ..........................................37, 38

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ............................................................39

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ..................................................4, 21

*Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010).....................................................19, 53, 54

*Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978)..................................................................14, 16

*Riis v. Shaver*, 458 F. Supp. 3d 1130 (D.S.D. 2020) .....................................................................6

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .................................................15

*Sanchez v. Young Cty.*, 956 F.3d 785 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901 (2020) ..........12

*Scott v. Illinois*, 440 U.S. 367 (1979)..............................................................................25, 26, 27

*Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773 (8th Cir. 2001) ...........................................................7

*Sleater v. Benton Cnty.*, 812 F. App'x 470 (9th Cir. 2020) ............................................................8

*Smith v. Copeland*, 87 F.3d 265 (8th Cir. 1996)..........................................................................38

*State ex rel. Kansas City v. Meyers*, 513 S.W.2d 414 (Mo. 1974) (en banc) ..............................44

*State v. Muir*, 164 Mo. 610 (Mo. 1901) ......................................................................................44

*Stearns v. Inmate Servs. Corp.*, 957 F.3d 902 (8th Cir. 2020).................................................37, 38

*Stump v. Sparkman*, 435 U.S. 349 (1978)......................................................................................7

*Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007).....................................................6

*Tate v. Short*, 401 U.S. 395 (1971) .............................................................................................15

*Thompson v. D.C.*, 832 F.3d 339 (D.C. Cir. 2016)......................................................................18

*Thurmond v. Ryals*, 2021 WL 885993 (E.D. Ark. Mar. 9, 2021) ..................................................6

*Turner v. Rogers*, 564 U.S. 431 (2011)..........................................................................15, 25, 27, 51

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ..............................................................20

*U.S. v. Clary*, 34 F.3d 709 (8th Cir. 1994)...................................................................................14

*United States v. City of Ferguson*, No. 4:16-cv-00180-CDP (E.D. Mo. Apr. 19, 2016)...............12

*United States v. Cortez*, 935 F.2d 135 (8th Cir. 1991), *cert. denied*, 502 U.S. 1062 (1992).........28

*United States v. Cunningham,* 866 F. Supp. 2d 1050 (S.D. Iowa 2012) .................................44, 45

*United States v. Davis*, 174 F.3d 941 (8th Cir. 1999)...................................................................53

*United States v. McIntyre*, 646 F.3d 1107 (8th Cir. 2011)...........................................................51

*United States v. Oropesa,* 316 F.3d 762 (8th Cir. 2003) ...............................................55

*United States v. Owen*, 854 F.3d 536 (8th Cir. 2017)......................................................26

*United States v. Roberts*, 928 F. Supp. 910 (W.D. Mo. 1996).........................................55

*United States v. Spencer*, 684 F. 2d 220 (2d Cir. 1982) .................................................48

*United States v. Ventresca*, 380 U.S. 102 (1965)............................................................47

*Veatch v. Bartels Lutheran Home*, 627 F.3d 1254 (8th Cir. 2010)....................................6

*Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018)..............................14, 17, 20

*Walton v. Dawson*, 752 F.3d 1109 (8th Cir. 2014) ...................................................37, 41

*Ward v. Acoustiseal, Inc.*, 129 S.W. 3d 392 (Mo. App. W.D. 2004).............................48

*Washington v. Davis*, 426 U.S. 229 (1976).....................................................................15

*Wayland v. City of Springdale*, 933 F.2d 668 (8th Cir. 1991) ........................................56

*Webb v. City of Maplewood*, 340 F.R.D. 124 (E.D. Mo. 2021)................................53, 60

*Williams v. City of Sherwood*, 947 F.3d 1107 (8th Cir. 2020)........................................11

*Williams v. Delo*, 49 F.3d 442 (8th Cir. 1995)...............................................................38

*Williams v. Illinois*, 399 U.S. 235 (1970) ......................................................................15

*Wishon v. Gammon*, 978 F.2d 446 (8th Cir. 1992) .........................................................40

*Wood v. Wooten*, 986 F.3d 1079 (8th Cir. 2021) ...........................................................48

*Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) .....................................30, 36

*Ziesmer v. Hagen*, 785 F.3d 1233 (8th Cir. 2015) .........................................................40

## STATUTES AND RULES

Fed. R. Civ. P. 56(a) ..........................................................................................................2

Ferguson Mun. Code Ch. 13, Art. II, § 13-29(b)............................................................12

Ferguson Mun. Code Ch. 13, Art. II, § 13-52.........................................................13, 23

Ferguson Mun. Code Ch. 13, Art. II, § 13-60................................................................13

Mo. Model Loc. R. 69.01.................................................................................................17

Mo. Rev. Stat. § 544.170 ....................................................................................54, 55, 57

Mo. Sup. Ct. R. 37.17 .............................................................................................54, 55

Mo. Sup. Ct. R. 37.47 .............................................................................................20, 21

## INTRODUCTION

Defendant City of Ferguson (the "City") moves for summary judgment based on distortions of fact and law.  The City would have this Court believe, first, that the Constitution permitted it to jail thousands of people without hope of legal process assessing the conditions of their release, on warrants it caused to be issued invalidly, or without a warrant and without a judicial determination of probable cause, all in squalid jail conditions; and second, that even if some constitutional violations *did* attend these jailings, the municipal judge is solely to blame for them.  Because the material facts and the law say otherwise, Defendant's motion should be denied on all Counts.

As explained below, the City's arguments on Counts One, Two, and Seven do not counter Plaintiffs' own case for affirmative summary judgment on those Counts.[1]  As to Counts Three, Four, Five, and Six, the City has failed to establish the absence of genuine issues of material fact,[2] and failed to understand the applicable law.  As explained below, City policies and practices caused each of the constitutional violations Plaintiffs allege.  With respect to each Count, Plaintiffs have identified the relevant City policymakers and shown how they set unconstitutional policies directly

---

[1] ECF No. 597 (Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment as to the City's Liability on Counts One, Two, and Seven) ("Pl. Mot.").

[2] Plaintiffs have set forth the relevant facts in their memorandum in support of their Motion for Summary Judgment, Pl. Mot., their Statement of Uncontroverted Material Facts ("SUMF"), the Declaration of Maureen Hanlon in Support of Plaintiffs' Motion for Summary Judgment as to the City's Liability on Counts One, Two, and Seven ("Hanlon Pl. Mot. Decl."), and attached exhibits 1–192 in support, all of which Plaintiffs incorporate by reference.  ECF Nos. 597 (Pl. Mot.), 608-1 (SUMF), 591–92 (Pl. Mot. Decl. and exhibits 1–192 ("Pl. Mot. Ex.")).  Plaintiffs have supplemented these factual findings in a Statement of Additional Uncontroverted Material Facts ("SAMF") and have addressed the City's misstatements of the factual record in a Counterstatement of Uncontroverted Material Facts ("CSUMF").  Plaintiffs also file the Declaration of Maureen Hanlon in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Hanlon Opp. Decl.").  The Hanlon Opp. Decl. is attached hereto as Exhibit A, and exhibits to the Hanlon Opp. Decl. are attached hereto as Exhibits 1–37 ("Opp. Ex.").

As Plaintiffs demonstrate below, the City's "statement of facts" is helplessly reliant on a single, last-minute declaration from former municipal court judge, Ronald Brockmeyer, which is contradicted by the City's own employees, Plaintiffs' deposition testimony, the evidentiary record, and Mr. Brockmeyer's own prior testimony.

or were deliberately indifferent to the risk of the violations Plaintiffs suffered as a result of the City's practices.  For these reasons, Plaintiffs ask the Court to deny the City's Motion for Summary Judgment.

## LEGAL STANDARDS APPLICABLE TO ALL COUNTS

The City can prevail on summary judgment only if it satisfies its burden to establish both that "there are no genuine disputes of material fact" and that it "is entitled to judgment as a matter of law."  *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing Fed. R. Civ. P. 56(a)).  Only once the City has met this high burden must Plaintiffs "set forth affirmative evidence and specific facts demonstrating a genuine dispute on the specific issue."  *Collins-Myers v. Triangle Trucking, Inc.*, 2020 WL 1455743, at *1 (E.D. Mo. Mar. 25, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

## ARGUMENT

## I.   THE CITY IMPROPERLY SEEKS TO RE-LITIGATE ITS FAILED ARGUMENTS AGAINST CLASS CERTIFICATION

The City repeats a number of arguments this Court rejected when certifying the classes, including: that the *Bearden* Classes must, but cannot, be limited to the indigent, Def. Mot. at 10–11, 15–18; *but see* ECF No. 519 ("Class Cert Order") at 20 (rejecting this argument); that "damages cannot be proven class wide," Def. Mot. at 28–31; *but see* Class Cert Order at 25–26, 31–32 (holding damages can be so proven); and that Count Four, the jail-conditions claim (*see infra* III.D.), is "not actionable in a class setting," Def. Mot. at 44; *but see* Class Cert Order at 42.[3]  This attempt to re-litigate class certification is out of place here.  *See Bepple v. Shelton*, 2016 WL 633892, at *3 (D. Or. Feb. 17, 2016) (noting "[m]eaningful differences exist between motions for

---

[3] The City attempted to appeal these rulings in a 23(f) petition that the Eighth Circuit summarily denied. *See* Judgment denying petition for 23(f) appeal, No. 22-08012 (8th Cir. June 23, 2022).

summary judgment and motions to certify a class" and declining to consider arguments as to purported impropriety of class certification on a motion for summary judgment).  Moreover, the notion that Plaintiffs must prove, one-by-one, that each of the thousands of class members suffered a violation as to each of the seven counts in this case, as the City suggests, Def. Mot. at 46, betrays the very purpose of class certification.  *See, e.g.*, *In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.*, 2003 U.S. Dist. LEXIS 12929, at \*18–19 (D. Minn. July 22, 2003) ("Plaintiffs are not required to put forward evidence as to each individual class member.").  Thus, the City's attempt to re-litigate class certification in their motion is improper.

## II.   THE CITY MISTATES AND MISAPPLIES THE LAW OF MUNICIPAL LIABILITY

Throughout its brief, the City repeats a number of mistaken arguments about municipal liability that bear on all counts.  First, the City misconstrues the *Monell* standard by ignoring the role of delegated policymaking authority and acquiescence in an unlawful custom in establishing municipal liability.  Second, the City overlooks the relevant final policymakers and misapplies the law to them.  Third, the City wrongly asserts that Plaintiffs must prove it acted through the municipal court.

### A.  The City Ignores Delegation and Custom as Bases for Municipal Liability

Under *Monell v. Dep't. of Soc. Servs.*, the City is liable for its own unconstitutional conduct.  436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").  Plaintiffs have established that the constitutional violations at issue in this case resulted from the decisions of the City's final policymakers as well as their acquiescence in the unlawful practices of City officers.  *See* Pl. Mot. at 32–60.  However, the City mistakenly limits its analysis to the

direct actions of one possible final policymaker, the City Council, and ignores both delegation of policymaking authority and acquiescence in an unlawful custom as additional bases in determining municipal liability. *See* Def. Mot. at 2–9.

As Plaintiffs explained in their memorandum in support of their Motion for Summary Judgment, different officials or bodies can wield policymaking authority with respect to different issues, areas, or actions. Pl. Mot. at 31 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). And policymaking authority can be delegated by one official or body to another. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Moreover, municipalities are liable not only for deprivations of federal rights caused by their express policies but also for violations stemming from its acquiescence in a pattern, practice, or course of conduct by non-policymakers that is widespread and persistent enough to have the "force of law." *Harris v. City of Pagedale*, 821 F.2d 499, 504 n.7 (8th Cir. 1987). Acknowledging these bases "serves to prevent municipal evasion of liability through improper delegation of policy responsibility or acquiescence in pervasive constitutional violations by [municipal] employees." *McGautha v. Jackson Cnty.*, 36 F.3d 53, 56–57 (8th Cir. 1994).

### B.  The City Council Is Not the City's Only Final Policymaker

The City argues "[t]he final policymaker for Ferguson, a home rule charter city, is its council." Def. Mot. at 4. But, the City Council is not the *only* final policymaker for the City. The City's Charter states: "*Except as this charter provides otherwise*, all powers of the city shall be

4

vested in the council." Hanlon Pl. Mot. Decl.,[4] Ex. 113 (SUMF[5] ¶ 182), Charter § 4.4(h) (emphasis added). The Charter thereafter explicitly delegates powers and authorities to individuals outside of the City Council, including the City Manager and the Police Chief. *See* Pl. Mot. at 33–34.

As Plaintiffs established in their memorandum in support of their Motion for Summary Judgment, the City Council, Police Chief, and the City Manager all had final policymaking authority over the City's jail and jailing practices. Pl. Mot. at 32–35. The City Council has broad authority over City policy and administration pursuant to the City's "council-manager" form of government. *See id*. at 35–36; SUMF ¶ 182. The City Council used this authority to pass numerous ordinances pertaining to jail procedures and the issuances and recall of warrants. *See* Pl. Mot. at 38, 56 n.26; SUMF ¶ 175. The Police Chief was also a final policymaker for the City's jail and jailing practices. The City Charter expressly grants the Police Chief control over the City's jail and police department. *See* Pl. Mot. at 33; Hanlon Pl. Mot. Decl., Ex. 117 (SUMF ¶ 197), Charter § 33-18(c); SUMF ¶ 196, Charter § 33-18(a). The Police Chief exercised this authority by drafting and approving General Orders and, in practice, by supervising and exercising control over the jail. *See* Pl. Mot. at 33; SUMF ¶¶ 198–201. Finally, the City Charter gives the City Manager the power to administer the City Council's policy and direct and supervise City officials. *See* Pl. Mot. at 34; SUMF ¶¶ 184, 190; Hanlon Pl. Mot. Decl., Ex. 113 (SUMF ¶ 190), Charter § 4.4(h) ("Except for the purpose of investigations . . . and inquiries, the council and its members shall deal with all city officers and employees . . . who are subject to the direction and supervision

---

[4] References to "Hanlon Opp. Decl." are to the April 19, 2023 Declaration of Maureen Hanlon in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and its referenced exhibits ("Opp. Ex."). References to "Hanlon Pl. Mot. Decl." are to the March 13, 2023 Declaration of Maureen Hanlon in Support of Plaintiffs' Partial Motion for Summary Judgment and its referenced exhibits ("Pl. Mot. Ex."). ECF No. 591-1.

[5] References to "SUMF" are to the March 13, 2023 Statement of Undisputed Material Facts (ECF No. 608-1) filed by Plaintiffs in support of their Motion for Partial Summary Judgment ("Pl. Mot."). ECF No. 597.

of the manager solely through the manager.").

The City is therefore mistaken that Plaintiffs must prove deliberate indifference on the part of the *City Council*. Def. Mot. at 3 (citing *Atkinson v. City of Mountain View,* 709 F.3d 1201, 1214 (8th Cir. 2013)).  *Atkinson* simply reiterates that the identification of a policymaker should consult "state and local positive law" and "state and local 'custom or usage' having the force of law."  709 F.3d at 1215.[6]

Plaintiffs must prove the elements of municipal liability as to a final policymaker for the City jail.  *Supra* Section II.A.  Here, the City Charter names the Police Chief as a final policymaker for the jail, as does the City's own local custom and usage.  Moreover, even if Plaintiffs were required to show deliberate indifference on the part of the City Council, the record shows substantial evidence sufficient to demonstrate this.  *See* Pl. Mot. at 51–53.[7]

Thus, the City has said nothing to counter Plaintiffs' showing in their memorandum in support of their Motion for Summary Judgment that the City's final policymakers were

---

[6] Thus the City misstates the law in claiming that identification of policymakers is "exclusively a matter of state law."  Def. Mot. at 3.

[7] The City relies on *Szbala v. City of Brooklyn Park* for the proposition that "a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not been clearly established."  Def. Mot. at 21 (citing 486 F.3d 385, 393 (8th Cir. 2007)).  *Szbala*, and the cases on which it relies, pertain to establishing deliberate indifference in actions challenging "failures to train" alleged to result in an isolated violation, a theory of liability which Plaintiffs have not advanced.  *See* 486 F.3d at 392 n.3 (noting that the "separate doctrine providing for municipal liability in a case of widespread unconstitutional practices that constitute a custom or usage with the force of law is not at issue in this case").  The same is true for the other Eighth Circuit case the City cites.  *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1258 (8th Cir. 2010) ("The Supreme Court has not foreclosed the possibility that a single violation of a federal right may lead to municipal liability where 'a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997))).  Courts within this Circuit have affirmed this understanding. *See Riis v. Shaver*, 458 F. Supp. 3d 1130, 1201 (D.S.D. 2020) ("[t]he Eighth Circuit's custom test does not require deliberate indifference to a constitutional right.  Instead, the second element of the custom test requires 'deliberate indifference to or tacit authorization' of unconstitutional misconduct by municipal employees."); *Thurmond v. Ryals*, 2021 WL 885993, at *7 (E.D. Ark. Mar. 9, 2021) (following determination that right at issue was not clearly established, dismissing *Monell* failure to train claim but allowing *Monell* custom claim to continue to trial).

deliberately indifferent to the risk of the constitutional violations caused by its customs and practices.  Pl. Mot. at 51–53.[8]

### C.  The City Cannot Blame Its Violations on Its Municipal Court

The City argues that the policies and customs at issue were the actions and responsibilities of former Ferguson municipal judge Ronald Brockmeyer and thus are not attributable to the City.  Def. Mot. at 17–24, 33–34, 38–40, 52, 55–57.  That is incorrect.  Plaintiffs seek to hold the City liable for its own unconstitutional policies and customs related to each of these functions, which were maintained by its final policymakers: the City Council, the Police Chief, and the City Manager.  Pl. Mot. at 32–35.  The City argues "[a] municipality cannot be liable for judicial conduct that it lacks the power to require, control, or remedy, even if that conduct parallels or appears entangled with the desires of the municipality."  Def. Mot. at 8.  But, here, the City did require, control, and eventually attempt to remedy the judicial conduct at issue.  SUMF ¶¶ 12–27, 32, 103, 115, 166, 175, 178, 202–37.  Moreover, the actions the City is liable for are separate from any judicial action.

The acts Plaintiffs attribute to the City are not "judicial actions," *see Stump v. Sparkman*, 435 U.S. 349, 362 (1978) (describing "judicial actions" as "a function normally performed by a judge" and whether the parties had the expectations that "they dealt with the judge in his judicial capacity"), and the conduct they challenge was not performed by the City's judge.  Instead, it was the City's jailing and debt-collection practices *in the absence* of judicial process that led to the violations alleged here.  SUMF ¶¶ 65–66, 213–16, 219–28.  Plaintiffs were held for arbitrary

---

[8] Plaintiffs do not seek to establish liability on the basis of bad acts by a single employee, as in *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 778 (8th Cir. 2001) (cited by the City, Def. Mot. at 3).  Instead, Plaintiffs seek to hold the City liable for its own routine and systemic unconstitutional conduct, and there is a wealth of evidence establishing that the City's policies and customs caused their injuries.  Similarly, Plaintiffs do not rely on the absence of complete records to establish deliberate indifference.  So *Hall v. Black*, 2006 WL 2959459 (W.D. Ark. Oct. 17 2006), cited by the City, Def. Mot. at 25 n. 24, is irrelevant here.

amounts of time determined by City officials with utterly no prospect of ability-to-pay hearings or probable-cause determinations.  They were arrested pursuant to warrants automatically generated by the City's computer software and stamped with a form signature by City's staff without involvement of the judge.  SUMF ¶¶ 107, 131–32, 149, 153, 323.  This case is thus analogous to *Sleater v. Benton Cnty.*, 812 F. App'x 470 (9th Cir. 2020), where the court rejected the argument that because the authority to issue an arrest warrant lies exclusively with Superior Court judges, the County Clerk's actions could not be imputed to the County.  *Id.* at 472 (holding "[a] reasonable juror could conclude that the Clerk's Office issued arrest warrants without reviewing an LFO debtor's ability to pay as a matter of custom").

In support of the judicial function argument, the City asserts, "[i]t is not within the City's power to assume responsibility for the processes that Plaintiffs contend they were denied – all related to the setting and review of bonds and conditions of release . . . ."  Def. Mot. at 18.  However, City officials exercised significant control over the setting, reviewing, reducing, and negotiating of bond and conditions of release.  SUMF ¶¶ 68–69, 71, 74, 79–87.

Moreover, the City's specific arguments regarding Count One hinge on improbable and controverted testimony solely from Mr. Brockmeyer's untimely declaration produced with its motion for summary judgment.  The City's rendition of the operative facts is contradicted by its own employees, Plaintiffs' deposition testimony, the evidentiary record, and prior statements of Mr. Brockmeyer himself.  *See generally* CSUMF.  The City's misstatements include:

- **Who created the 72-Hour Limit:** "Judge Brockmeyer was solely responsible for determining the length of time that an individual would or could be incarcerated in the Ferguson Municipal Jail if he was unable to post bond."  Def. Mot. at 23.  Testimony that the Police Chief, Thomas Jackson ("Chief Jackson") created the 72-hour policy directly contradicts the City's claim.  SUMF ¶¶ 60–63.  Moreover, it is undisputed that police and correctional officers and other City officials negotiated bond reductions and release of detainees without supervision by the municipal court judge.  SUMF ¶¶ 81, 83–88.

- **Why individuals were held or released:**  The City cites Mr. Brockmeyer's declaration

for the claim that its release of detainees was based on his delegated instructions to release Plaintiffs under certain circumstances such as medical needs or other good cause.  Def. Mot. at 23.  But Mr. Brockmeyer's testimony, along with the uniform testimony of the City's officers and Plaintiffs, are that the City's police officers were empowered to immediately release every arrestee on recognizance.  SAMF[9] ¶ 87.

- **Who issued warrants and set bonds:** The City argues that "Judge Brockmeyer was solely responsible for setting bond for defendants" and "[h]e would do so directly on the arrest warrant." Def. Mot. at 22–23.  Testimony from the City's employees, including designated 30(b)(6) corporate representative testimony, shows that Failure to Appear ("FTA") warrants were issued automatically without any input from Mr. Brockmeyer, the City's prosecutor, or the court's clerk.  SUMF ¶¶ 131–32.  In the case of warrants issued when a Plaintiff was unable to pay a fine by the date assigned, Mr. Brockmeyer himself testified that he did not consider the "payment docket" to be a court appearance because there was no opportunity to talk to him or otherwise be heard.  SUMF ¶ 118.  Even though a person had missed no court appearance but was unable to make a payment, the City's computer system would generate form warrants, which were stamped by the court's clerks with the judge's signature stamp and entered into the system without any involvement from Mr. Brockmeyer.  SUMF ¶¶ 131, 134, 136.

- **Who could recall warrants or dismiss cases:** The City also argues, again relying solely on Mr. Brockmeyer's last-minute declaration, that "Judge Brockmeyer was the only person who could recall an arrest warrant, neither his clerk nor anyone else was authorized to recall a warrant."  Def. Mot. at 23.  The evidence, including Mr. Brockmeyer's own testimony, contradicts this statement—when a person came to pay their fine after they were in warrant, the *court clerks* decided whether to recall the warrant.  SUMF ¶ 143.  Indeed, court clerks routinely dismissed cases altogether for friends or family of City Councilmembers.  SUMF ¶ 116.

As such, the City's arguments that Mr. Brockmeyer was the sole policymaker for purposes of Count One are legally and factually wrong.

Because Plaintiffs do not seek to hold the City liable for the judicial decisions of its judge, the cases rejecting such liability do not apply here.  First, the City cites *Granda v. City of St. Louis*. 472 F.3d 565 (8th Cir. 2007).  Def. Mot. at 7.  However, *Granda* is not analogous to this case.  In *Granda*, the plaintiff sought to hold a judge liable for a specific "judicial decision made in a case that came before her on a court docket."  472 F.3d at 569.  The City's rehashed appeal to *Granda*

---

[9] References to "SUMF" are to the March 13, 2023 Statement of Undisputed Material Facts (ECF No. 608-1) filed by Plaintiffs in support of their Motion for Partial Summary Judgment ("Pl. Mot."). ECF No. 597.  References to "SAMF" are to the April 19, 2023 Statement of Additional Uncontroverted Material Facts filed by Plaintiffs in support of their Opposition to Defendant's Motion for Summary Judgment.

(Def. Mot. at 7) fails for the same reason it did almost six years ago in its second motion to dismiss: as this Court found, "Plaintiffs do not seek to hold the City liable for the judicial decisions made by a municipal court judge in particular cases."  *See* ECF No. 79 at 13.

*Hamilton v. City of Hayti,* 948 F.3d 921 (8th Cir. 2020), is equally distinguishable.  *Hayti* involved a city government that solely followed a judge's orders regarding bond settings, and the court there relied on the premise that a "municipality cannot be liable for judicial conduct it lacks the power to require, control, or remedy."  948 F.3d at 930 (city not responsible for setting an allegedly excessive bond).  In the City of Ferguson, by contrast, throughout the relevant period, the City officials were the individuals with authority over jailing and bond processes, who decided how long a person would be jailed and how much a person would ultimately pay to be released— authority vested by the Police Department's own general orders.  SUMF ¶¶ 42, 61, 69, 79–80. In fact, as the City's own employees testified, those in the City's jail never saw the City's judge.  *Id.* ¶¶ 65–66.  The core of Plaintiffs' claims concern the conduct of the City's jailers.

Under the unusual circumstances of this case, there are at the very least questions of fact about the extent to which the municipal court's judicial conduct was required, controlled, and directed by the City.  SUMF ¶¶ 191, 202–37.  Specifically, it is uncontroverted that the City directly supervised and directed the actions of the court clerks, who in practice administered most of the unconstitutional practices.  *Id.* ¶¶ 205, 208–11, 213–14, 216, 219–24, 225, 227–28, 235. Additionally, the City's judge served under the purview of the City Council and City Manager who directly oversaw and directed his practices.  *Id.* ¶¶ 17, 191.  Moreover, the City's disavowal of control is belied by the fact that it eventually *did* alter the judicial conduct at issue, after representing to the United States Department of Justice and another court in this District that it had the full authority to change many of the problematic practices at issue.  *Id.* ¶¶ 12–27, 32, 103, 115,

166, 175, 178, 202–37.

*Williams v. City of Sherwood* is also distinguishable.  Def. Mot. at 8 (citing 947 F.3d 1107

(8th Cir. 2020)).  The court there determined that "[n]either the city council nor the mayor has the

power to set judicial policy for Arkansas district court judges or the power to ratify their judicial

decisions, even if the city's policymakers knew of the judge's conduct and approved of it."  947

F.3d at 1110 (internal citations omitted).  Moreover, this is not a case where Plaintiffs "merely

speculate[] vaguely and conclusorily that the city council and mayor had developed

unconstitutional policies."   947 F.3d at 1110.   Plaintiffs have presented evidence of

unconstitutional customs carried out by the City's employees.  Pl. Mot. at 36–40.  Plaintiffs have

also presented extensive evidence of the City Council, City Manager, and Police Chief's

orchestration and implementation of a scheme to raise revenue using the municipal court and the

City's jail.  Pl. Mot. at 41–51.  Like *Granda*, *City of Sherwood* concerned a judicial decision in a

particular case, where the court recognized that the mere fact that a local judge was paid by a

municipality and required to make reports to it did not suffice to make that judge a municipal

policymaker or an implementer of municipal policies.  Plaintiffs here do not and need not contend

otherwise.

### D. The City Also Had the Power to Regulate Its Municipal Court's Rules and Procedures to Prevent Violations

The fact that the presiding judge of the circuit has general administrative authority over the

municipal divisions does not mean the City itself lacked authority over its municipal court and

judge.  On the contrary, as shown below and in Plaintiffs' memorandum in support of their Motion

for Summary Judgment, the City had such control both pursuant to positive law and by virtue of

delegation and custom.  Pl. Mot. at 37–40, 56–58.

The City's distinct authority over the municipal court is clearly established in the City's

own Charter.  *See* Pl. Mot. at 58–60.  It details that "[a]ny and all rules made" for the municipal

court by the City's judge "may be annulled or amended by any ordinance limited to such purpose,"

consistent with state law and the rules of practice and procedure set by the State Judiciary.

Ferguson Mun. Code Ch. 13, Art. II, § 13-29(b)(3).  Further, the City's Charter details that the

City's judge shall "[h]ave other powers, duties and privileges as are or may be prescribed by state

law, this Code or *other ordinances of the City*."  *Id.* at § 13-29(b)(5) (emphasis added).

It is no surprise, then, that then Mayor/City Council Member James Knowles and then City

Prosecutor Stephanie Karr signed the Department of Justice Consent Decree in in *United States v.

City of Ferguson*, No. 4:16-cv-00180-CDP (E.D. Mo. Apr. 19, 2016), in which the City

affirmatively represented that it had the power to repeal and amend ordinances pertaining to the

function and administration of the municipal court and change the actual practices and procedures

of the court.  SUMF ¶ 175.[10]

Moreover, from 2010 to 2015, Chief Jackson had supervisory authority and control over

the court clerks and municipal court budget.  Pl. Mot. at 33–34, SUMF ¶¶ 205–06, 210–18

(detailing specifics of Police Chief's relationship to the municipal court and the court clerks).  This

was one of the means by which the City exercised control over the municipal court in order to raise

revenue.  Pl. Mot. at 56–58.  The City policymakers were responsible for setting up a contract

which limited the City's judge's availability for only three four night dockets a month, with no

confined docket or other time for the City's judge to make probable cause determinations or review

warrants. SUMF ¶¶ 203, 204; SAMF ¶¶ 91, 96–99.  For example, the City Council passed

---

[10] The City's liability for acquiescing in its court's practices is perfectly consistent with its independent liability for its own jailing and debt-collection practices in the face of the court's defective practices. Plaintiffs need not show that a "policy or practice [was] the exclusive cause of the constitutional deprivation.  Courts may . . . consider how individual policies or practices interact with one another within the larger system."  *Sanchez v. Young Cty.*, 956 F.3d 785, 795–96 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901 (2020) (internal citations omitted).

numerous ordinances pertaining to jailing and the administration of the municipal court. These included § 13-52 (allowing approval of bond by the City's judge, the Police Chief, or the City's clerk), § 13-60 (authoring a fee for "Withdrawal of Complaint"), the $15 letter fee, and many others. SUMF ¶¶ 68 103, 130, 175. Similarly, the City Manager directed the City's judge to raise revenue through the municipal court. SUMF ¶¶ 17, 19, 22–23. In this and other respects, the City's policymakers were not merely deliberately indifferent to the violations the City caused— they orchestrated them. *See* Pl. Mot. at 32–60.

As further explained below, these and other Count-specific misunderstanding of municipal liability doctrine prevent the City from meeting its burden to establish it is entitled to judgment as a matter of law regarding its liability on all Counts.

## III.   THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE VIOLATIONS ALLEGED BY PLAINTIFFS

### A.   The City is Not Entitled to Summary Judgment on Count One

The City argues that (1) Count One can be brought by only indigent Plaintiffs, Def. Mot. at 10–17; (2) that Plaintiffs cannot establish on a class-wide basis that every member of the *Bearden* Class was held for too long after arrest without any prospect of the required process, *id.* at 24–31; and that regardless, (3) the City's judge was solely responsible for Plaintiffs' detention, thereby precluding municipal liability, *id.* at 17–24. Every step of this argument is mistaken.

First, Count One asserts a right that belongs to all *Bearden* Class members regardless of their financial status. Rooted in equal protection and due process, this right provides both procedural and substantive protections against wealth-based detention. To maintain, as the City does, that each *Bearden* Class member's right to a protective procedure depended on what the outcome of that procedure would have been is incoherent on its face and contrary to blackletter law. Second, the City is liable on Count One regardless of how long it detained *Bearden* Class

members after arrest, because no period of post-arrest detention is reasonable when detainees are systematically denied the requisite process.  Third, the City had a policy and practice of jailing *Bearden* Class members with absolutely no chance of receiving the required process, until they managed to scrounge together enough money to satisfy City officers or until those officers eventually released them on recognizance.  The City itself is responsible for jailing *Bearden* Class members without any hope of an ability-to-pay inquiry.  After their arrest, the City chose to place arrestees in jail, and each minute of Plaintiffs' detention occurred because the City chose not to release them.  No ruling by the City's judge stood in its way or forced its hand.  These and various smaller arguments made by the City are disproved below.

### 1.  The City Is Liable on Count One Regardless of Plaintiffs' Past Ability to Pay

"Due process and equal protection principles converge" under the Fourteenth Amendment to prohibit wealth-based imprisonment.  *Bearden v. Georgia*, 461 U.S. 660, 665 (1983); *see* Pl. Mot. at 13–15.  This right against wealth-based detention includes the right to certain procedural protections, including an inquiry into and finding concerning one's ability to pay a monetary sum otherwise required for one's liberty.  *See* Pl. Mot. at 13–17.  This right applies in both post-judgment and pretrial contexts.  *See id.*  This is the right Plaintiffs assert in Count One.[11]

The City is mistaken when it states that "Count I is an equal protection claim," Def. Mot at 15, requiring "intentional" or "deliberate" discrimination," *id.* at 11, 17.[12]  As a hybrid of equal

---

[11] The City fails in its attempt to draw a distinction between Plaintiffs detained on a bond versus on a monetary debt—an argument that is immaterial.  Everyone in the *Bearden* Class is treated similarly—as a detainee being held on an unaffordable bond, whether set by warrant or by schedule.  *See* Pl. Mot. at 13–17.  *See Walker v. City of Calhoun*, 901 F.3d 1245, 1260 (11th Cir. 2018) (quoted in Def. Mot. at 15) (relying on *Bearden* (addressing monetary amounts in the form of fines and fees) and *Rainwater* (addressing bonds as similar claims).

[12] The City's only citation for its claim that "Plaintiffs must also prove that the City had a discriminatory purpose" is *U.S. v. Clary*, 34 F.3d 709, 713 (8th Cir. 1994), which concerned a crack-cocaine sentencing challenge based purely on equal protection.

protection and due process, the *Bearden* right resists "pigeonhole analys[e]s." *Bearden*, 461 U.S. at 666. The Supreme Court has exempted the line of wealth-base detention cases from the doctrine withholding heightened scrutiny from other wealth-based distinctions challenged under equal protection alone. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20–21 (1973) (distinguishing *Bearden*'s predecessors, *Williams v. Illinois*, 399 U.S. 235 (1970) and *Tate v. Short*, 401 U.S. 395 (1971)). Accordingly, violations of the *Bearden* right do not require intentional discrimination. *See, e.g.*, *M.L.B. v. S.L.J.*, 519 U.S. 102, 125–27 (1996) (distinguishing *Washington v. Davis*, 426 U.S. 229 (1976)).

The City is also mistaken in claiming that Count One is "brought solely by indigent Plaintiffs." Def. Mot. at 15. Under the doctrine stemming from *Bearden* and its predecessors, the "right to an ability-to-pay inquiry does not depend on indigence; the procedural protections required by the Supreme Court . . . apply equally to indigent and non-indigent individuals." *Cain v. City of New Orleans*, 327 F.R.D. 111, 124 (E.D. La. 2018); *see also Doe v. Angelina Cnty.*, 733 F. Supp. 245, 254 (E.D. Tex. 1990) (holding that the failure to conduct ability-to-pay hearings is "unlawful whatever the economic status of the incarcerated person"); Class Cert Order at 20. In other words, one's right to a procedure does not depend on the hypothetical outcome of that procedure. *Cf., e.g.*, *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions. . . ."). Regardless of their economic status, *Bearden* Class members were jailed for nonpayment of a sum of money without the requisite finding as to their ability to pay and without the procedural protections by which such findings must be made. *See, e.g.*, *Turner v. Rogers*, 564 U.S. 431, 447–48 (2011) (specifying such protections).

The City's misunderstanding of Count One stems in part from a misunderstanding of the

15

term "indigence" as it applies to the *Bearden* analysis.  Whereas in some contexts "indigence" connotes *destitution* (a *complete* lack of money), in the sense relevant here it connotes an inability to pay a required sum.  The City seizes on language from *Pugh v. Rainwater* that uses "indigence" in the former sense.  Def. Mot. at 14 n.11 (quoting 572 F.2d at 1057 ("By definition an indigent is incapable of meeting any money bail requirement.")).  But the City excludes the remainder of the passage from *Rainwater*, which makes clear that inability to pay, rather than utter pennilessness, is the touchstone of wealth-based detention:

> Similarly disfavored is the non-indigent whose money bail is set in an amount higher than he can provide. . . . The incarceration of those who cannot [pay], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.

572 F.2d at 1057.  Having some money for basic life necessities which one may ultimately sacrifice to avoid being held in jail indefinitely (and the destructive consequences of such jailing), does not make one "able to pay" that amount, such that one's nonpayment is necessarily "willful" under *Bearden*.  461 U.S. at 672.[13]

The City's overly narrow understanding of indigence drives its misbegotten argument that only indigent Plaintiffs are entitled to ability-to-pay hearings.  Def. Mot. at 14.  The City reasons that anyone who eventually paid some amount of bond (after being detained following arrest) must not have been utterly penniless.  *Id.* at 25.  It then infers, mistakenly, that Plaintiffs were never entitled to an ability-to-pay hearing, and thus, the City is not liable for detaining them without the

---

[13] *Cf. Goings v. Chickasaw Cnty.*, 2008 WL 11510710, at *1 (N.D. Iowa Apr. 8, 2008) ("[T]he ability to pay does not require that plaintiffs contribute their 'last dollar' or 'make themselves and their dependents wholly destitute.'") (quoting *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 339 (1948)); *Escobedo v. Applebees*, 787 F.3d 1226, 1234 (9th Cir. 2015) ("An affidavit in support of an [in forma pauperis] application is sufficient where it alleges that the affiant cannot pay the court costs and still afford the necessities of life."); *In re Williamson*, 786 F.2d 1336, 1339 (8th Cir. 1986) ("As with any other litigant, indigency for a prisoner under section 1915 is not synonymous with absolute pennilessness.").

prospect of one.

However, given that the substantive component of the *Bearden* right concerns a class member's *ability to pay the bond initially imposed* after arrest, the flaw in this reasoning is plain: (1) a class member who paid *some* amount for release may yet have been unable to afford that amount for purposes of the Fourteenth Amendment (taking into account an arrestee's income versus essential expenses), and (2) even if the amount they eventually paid was within their means, they may have been held *until the bond was decreased* because they were unable to pay some greater amount. In either eventuality, their detention until payment would be based solely on their lack of wealth, just like the detention of class members who were eventually released on recognizance given their inability to pay any amount to satisfy the City.[14]  To protect against such wealth-based detention, the Fourteenth Amendment requires ability-to-pay hearings for all *Bearden* Class members, whether or not they ended up paying for their freedom.  By holding *Bearden* Class members without any prospect of an ability-to-pay hearing, the City subjected every one of them to a *Bearden* violation.[15]

---

[14] Because *Bearden* Class members were eligible for immediate release throughout their detention (and eventually released on recognizance if they went long enough without paying), the City had no legitimate rationale (such as public safety) for holding them. *See* Pl. Mot. at 20; *cf.* Def. Mot. at 15 (quoting *Walker v. City of Calhoun*, 901 F.3d 1245, 1260 (11th Cir. 2018) ("The *sine qua non* of a *Bearden-* or *Rainwater-*style claim, then, is that the . . . indigent are being treated systematically worse 'solely because of [their] lack of financial resources,' and not for some legitimate State interest . . . .") (internal citation omitted)).

[15] The City suggests that Mr. Kimble and 29 other *Bearden* Class members cannot recover on Count One because they "resided at or owned substantial real property at the time of their detention" and were therefore "non-indigent." Def. Mot. at 25–26. First, the City is incorrect that, by Missouri Model Local Rule 69.01 dated Sept. 19, 2016, Mr. Kimble was presumptively not indigent because his adjusted gross income from 2010 to 2014 was between $25,000 and $35,000, just above 125% of the federal poverty level. Def. Mot. at 25; SOF at 4(C) (citing to Ex. D, R). This argument is belied by the six total days he spent in the City's jail due to his inability to pay a set amount to secure his release. SUMF ¶¶ 391–404. Second, the City is factually inaccurate in its claim that 29 *Bearden* Class members can recover under Count One, as 10 are not *Bearden* Class members, and 8 were not the listed homeowners of the property in question when arrested. CSUMF ¶ 11(b). Third, for the reasons just explained, any class members who could afford to pay for their release still suffered a *Bearden* violation based on their procedurally hopeless detention. In any event, the records do nothing to establish that the people in question could afford to pay the amounts

The City contends a "moneyed individual has received his due process by virtue of the bond that he can afford."  Def. Mot. at 14.  But, without an ability-to-pay hearing, how does the City know what amount of bond he can afford?  Also circular is the City's reasoning that, "*[o]nce the alleged indigency of each Plaintiff is determined*, the process due them becomes clear: where the satisfaction of bond is the only barrier to release, an indigence inquiry is required as a matter of right *for the indigent person*."  *Id.* at 15 (first emphasis added).  Of course, the way to determine "the alleged indigency of each Plaintiff" is *just that*—to conduct "an indigence inquiry."  To use the City's own words: it is undisputed that, for every member of the *Bearden* Class, "satisfaction of bond [was] the only barrier to release."  *Id.*  So for every member, "an indigence inquiry was required as a matter of right."  *Id.*

Finally, the City argues this Court "improperly shifts the burden of proof to Defendant" in light of the City's record-making failure.  *See* Def. Mot. at 10 (citing Class Cert Order at 20).  But this Court placed the burden just where the Supreme Court and the Eighth Circuit do.  *See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (holding in a First Amendment case that the burden is on the defendant to show by "a preponderance of the evidence that it would have reached the same decision" even if the constitutionally protected activity had not been considered in the employment decision); *Thompson v. D.C.*, 832 F.3d 339, 347 (D.C. Cir. 2016); *Brewer v. Chauvin*, 938 F.2d 860, 864 (8th Cir. 1991) (en banc).  The City cannot now complain of class litigation when it was the City's own systemic failure to obtain findings concerning arrestees' ability to pay.

Thus, judgment for Plaintiffs on Count One does not require that the members of the

---

initially required for their release from the City's jail.  Even for Plaintiffs who arguably own the property in question, the records contain no information as to mortgages, liens, or other encumbrances on the properties.  And critically, the City did not allow detainees to post bond using the value of a home.  SUMF ¶ 69, Pl. Mot. Ex. 54 (citing General Order 421.07).

*Bearden* Class were unable to pay for their release from the City's unlawful detention.

### 2. The City Is Liable on Count One Regardless of How Long It Detained Each Plaintiff After Arrest

The City analogizes its detention of *Bearden* Class members without ability-to-pay hearings to its detention of *Gerstein* Class members without judicial determinations of probable cause. Def. Mot. at 16. Drawing on a misunderstanding of the Fourth Amendment analysis applied to the latter, the City assumes (i) that it was presumptively constitutional to hold *Bearden* Class members for some "reasonable" period regardless of whether they had any chance of receiving an ability-to-pay hearing, and argues (ii) that what constitutes a "reasonable" period cannot be established class wide. *Id.* Both steps are mistaken because no period of post-arrest detention can be reasonable—much less presumed to be so—when the requisite process is systematically denied to detainees.

Even if the Fourth Amendment "reasonableness" framework applied in this Fourteenth Amendment context,[16] it would support judgment only for Plaintiffs on Count One. As this Court recognized at class certification and as Plaintiffs explain below, *infra* Section III.G., to hold arrestees in jail for "as long as it took to extract money for a bond, without any consideration of their ability to pay, or until an arbitrary decision was made to release them without payment" is to delay their release "for delay's sake" and thus unreasonably under *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991). *See* Class Cert Order at 23–25. In other words, as analogized to Count One, "reasonableness in this case does not turn on whether class members were held for too long [before a hearing that eventually came] (as in *Riverside* and *Portis*) but whether they were held for reasons unrelated to the arrangement of" an ability-to-pay hearing. *Id.* at 29 (discussing

---

[16] *But see* Class Cert Order at 21–22 ("The City's reliance on Fourth Amendment case law regarding prompt determinations of probable cause after warrantless arrests is . . . inapposite.").

the parallel point regarding probable-cause determinations).  Because, as Plaintiffs have shown, Pl. Mot. at 18–20, "no process existed by which" *Bearden* Class members "would have an opportunity for" such a hearing, Class Cert Order at 30, the City's detention of them after arrest was unreasonably prolonged.

Because City detainees had absolutely no prospect of an ability-to-pay hearing, the unreasonableness of their post-arrest detention is perfectly consistent with *Walker v. City of Calhoun*'s holding that "indigency determinations for purposes of setting bail are presumptively constitutional *if made* within 48 hours of arrest."  901 F.3d 1245, 1266 (11th Cir. 2018) (emphasis added) (quoted by the City, Def. Mot. at 26).  *Riverside*'s 48 hour presumption of "reasonableness" applies only to jurisdictions *that actually provide the requisite process and do so within 48 hours*. *See* Class Cert Order at 23, 29; *infra* Section III.G.  *Riverside* did not get the benefit of the presumption, because its policy made certain hearings come later than 48 hours after arrest.  500 U.S. at 58–59.  The City's post-arrest detentions were uniformly unreasonable because, unlike in *Walker*, no hearings were ever in the offing.  901 F.3d at 1252; *see* Pl. Mot. at 18–20.[17]

The City claims to have relied on Missouri law it reads as "contemplating" that people arrested on a warrant may be held on unpaid bond for up to 48 hours and then released, with a bond review occurring sometime after release.  Def. Mot. at 27 (citing Mo. Sup. Ct. Rule 37.47(a), (c)).  This misreads state law, and even if it did not, it would provide no excuse for the City's

---

[17] The City asserts that, "[a]t the class certification stage, Plaintiffs conceded that any judgment must recognize and exclude time for 'completing the incidents to arrest'."  Def. Mot. at 26.  Plaintiffs made no concession.  Rather, they noted that the Fourth Amendment doctrine the City proposed to import into this Fourteenth Amendment context allowed for some time to complete the arrest, and that two hours would provide a workable (if generous to the City) estimate for that period of time, based on representative evidence reported by their expert, Dr. Demuth.  ECF No. 469 at 14–15.  Given the City's failure to fulfill its constitutional duty to obtain findings (and thus create records) regarding Plaintiffs' ability to pay for their release, this Court concluded that the use of such representative evidence would be appropriate if necessary.  Class Cert Order at 25–26 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016)).

federal constitutional violations.  First, Rule 37.47(a) requires that an initial hearing actually occur, stating that a defendant "*shall* be brought forthwith for an appearance."  *Id.* (emphases added). Arrestees held in accordance with this rule are held by a jailer having every intent (subject to an express requirement) to bring them before a judge within 48 hours of arrest.  Thus, in referring to a "defendant . . . appearing after release from custody on a warrant," Rule 37.47(c) appears to assume a hearing that takes place within the 48-hour period defined in part (a).  Here it is undisputed that Plaintiffs did not receive, and were never intended to receive, ability-to-pay hearings within 48 hours, whether before or after their release.  Second, Plaintiffs maintain that it would be unconstitutional to hold people for nonpayment of bond *with no intent of providing an ability-to-pay hearing until sometime after their release and no other legitimate rationale for holding them* (even if the post-release hearing were to occur within 48 hours of arrest).  The City offers no evidence that Rule 37.47 authorizes such a scheme, let alone mandated the City's actions.[18]

---

[18] And even if it did, state law that merely *authorizes* but does not *require* federal constitutional violations would be no bar to the City's liability for its own policies and customs.  *See, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (municipal liability attaches where policymakers make a "deliberate choice . . . from among various alternatives"); *Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005) (holding municipality could be liable for enforcing an unconstitutional state statute that merely authorized enforcement without requiring it, and where a municipal ordinance prohibited all crimes proscribed by state law); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 366 (6th Cir. 1993) (holding municipality liable for its policy of allowing deadly force in certain situations even though a state statute authorized those uses of force, because the latter did not require them); *Evers v. Cnty. of Custer*, 745 F.2d 1196, 1201 (9th Cir. 1984) (holding that County Board's issuance of a declaration that plaintiff's road was public sufficed to impose liability although state law allowed such a declaration).  The Eighth Circuit's decision in *Ness v. City of Bloomington*, 11 F.4th 914 (8th Cir. 2021), cited by the City, Def. Mot. at 22, is not to the contrary.  The plaintiff there sued a city specifically for its enforcement of an unconstitutional state statute (among other things) without alleging that the city had adopted the statute's policy as its own "or that the City ha[d] a policy or custom of enforcing the statute in an unconstitutional manner."  11 F.4th at 922.  Plaintiffs here seek to hold the City liable for its own policies and customs, and their claims do not rely on the unconstitutionality of any state law.

### 3.   The City Cannot Deflect the Blame for Its Count One Violations Onto Its Municipal Judge

The City argues that, as a matter of state law and local practice, Mr. Brockmeyer was solely responsible for the violations alleged in Count One.  Def. Mot. at 17–20, 22–24.  The fundamental problem with this argument is that it misreads Count One as challenging a judicial failure to afford hearings rather than the City's detention practices in the absence of those hearings.  *See id.* at 18.  But Plaintiffs need not show the City to be liable for the utter lack of ability-to-pay hearings; it is enough to show, as they have, that the City is liable for its prolonged *detention* of its arrestees *given* the utter lack of such hearings.

That is not to say that the City is not responsible for any of its municipal court's failings.  According to the City, "[s]tate law dictates that a municipal judge *exclusively* controls procedure relating to post-arrest detention, length of incarceration, bonds, and inquiries as to the ability to pay."  Def. Mot. at 18 (emphasis added).  But the many state rules the City cites for this claim do not support the asserted exclusivity of the municipal courts' role in these matters.  Def. Mot at 18–19.  The City has cited nothing which precludes a municipality from regulating a municipal judge's performance of those actions, as the City did—and had the power to do—here by ordinance.  Plaintiffs have shown that, because the City had the power under state and local law to "enact[] an ordinance directing its court to require (not merely authorize) immediate release of all FTA warrant and ordinance violation arrestees on their own recognizance, or on unsecured bond," it is also liable for acquiescing in its municipal judge's failure to impose some such requirement given the utter lack of hearings.  Pl. Mot. at 58–60.[19]

---

[19] The City asserts that "[t]he judge has independent power and is subordinate only to the presiding judge of the circuit court in which he sits."  Def. Mot. at 19 (citing *McKlintic v. 36th Jud. Cir. Ct.*, 508 F.3d 875, 877 (8th Cir. 2007), and *Harris v. Missouri Court of Appeals, Western Dist.*, 787 F.2d 427, 429 (8th Cir. 1986)).  But *McKlintic* merely assumes, as the district court had there held, that "[t]he [36th] Judicial Circuit

Moreover, the facts demonstrate that the practice and custom of the City during the class period was that the length of detention and the amount paid to be released was determined by the unfettered discretion of City jailers—not the judge.  The City insists that only Mr. Brockmeyer authorized City officers to lower bonds and release Plaintiffs.  Def. Mot. at 23.  But the City has long maintained Ferguson Municipal Code Section 13-52, which gives parallel authority to City officials to lower bonds or release Plaintiffs on recognizance.  Until it was amended in 2016, Section 13-52 empowered the Police Chief to authorize and approve bonds for people incarcerated in the City's jail.  ECF No. 469 at 32–33.  A Police Department General Order similarly delegated release power from the Chief to subordinate officers.  Pl. Mot. at 19 (citing Ferguson Municipal Code § 13-52).  In its current form, the ordinance requires that "[a]ll individuals arrested by the Ferguson Police Department for an initial violation of an ordinance or an outstanding municipal warrant will receive a court date and be released on their own recognizance as soon as practicable after booking."  *Id.*[20]  The amended ordinance goes on to *require* the City's judge to establish conditions of release in compliance with state and federal law.  § 13-52(d).  This reflects the City's general power to control its municipal court by ordinance, which Plaintiffs noted in their memorandum in support of their Motion for Summary Judgment.  Pl. Mot. at 18–20.  In this way and many others, the City has long exercised control over who sits in its jail and for how long.  *See*

---

is . . . an entity of the State of Missouri."  *McKlintic v. 36th Jud. Cir. Ct.*, 464 F. Supp. 2d 871, 875 (E.D. Mo. 2006).  And *Harris* is similarly unavailing, holding merely that "courts as entities are not vulnerable to § 1983 suits, because they are protected by state immunity under the eleventh amendment [sic].  A court is not a 'person' within the meaning of the Civil Rights Act."  787 F.2d at 429 (internal citation omitted).  Neither case precludes municipal regulation of a local judges' procedures relating to post-arrest detention and conditions of release.

[20] The preamble to the ordinance reads in part: "*Whereas*, the City seeks to ensure that the conditions of release imposed on individuals arrested by the Ferguson Police Department for ordinance violations or pursuant to a municipal arrest warrant issued by the Ferguson Municipal Court are consistent with the requirements of the United States Constitution, the rules of the Missouri Supreme Court, and other binding legal authorities . . . ."  *Id.*

ECF No. 469 at 32–36.

Throughout the post-arrest detention of *Bearden* Class members, City officers had authority to release them without payment, as Mr. Brockmeyer himself testified.  Pl. Mot. at 19–20; SUMF ¶ 64.  The City's policy and practice of holding them as long as it took to extract money for a bond, without any consideration of their ability to pay, or until an arbitrary decision was made to release them without payment, was thus a choice the City is liable for under the Fourteenth Amendment.  It is therefore Plaintiffs, not the City, who are entitled to summary judgment on Count One.

### B.     The City is Not Entitled to Summary Judgment on Count Two

In Count Two, Plaintiffs seek compensation for the City's policy and practice of jailing Post-Judgment Class members on warrants issued automatically when they failed to make timely payments of debts assessed in connection with prior judgments, when Post-Judgment Class members had neither been represented by counsel nor waived their right prior to incarceration. *See* ECF No. 53 (First Amended Complaint ("FAC")) ¶¶ 236–37; Class Cert Order at 9–10.  The City's motion for summary judgment on Count Two should be denied for at least three reasons. First, the City mischaracterizes Count Two as limited to a purely Sixth Amendment right to counsel claim.  As such, the City falls short in meeting its burden for summary judgment by failing to address Plaintiffs' right to counsel claim under the Fourteenth Amendment's Due Process Clause. Second, the City misstates the law under the Sixth Amendment, excluding key findings that support a right to counsel upon imprisonment.  Third, the City does not meet its evidentiary burden, as it misconstrues the nature of Plaintiffs' Count Two claims to avoid the undisputed evidence that the City never provided access to counsel to Post-Judgment Class members prior to jailing.

1.  **The City Ignores the Fourteenth Amendment Violation Alleged in Count Two**

The City tries to recast Plaintiffs' Count Two claim as rooted solely in the Sixth Amendment and outright ignores the Fourteenth Amendment.  But the Fourteenth Amendment is an inextricable part of Plaintiffs' claim.  *See* FAC ¶¶ 236–37.  The Fourteenth Amendment's Due Process Clause is violated when an indigent plaintiff in a civil case is jailed for an inability to pay without an ability-to-pay inquiry or access to counsel.  *See Turner v. Rogers*, 564 U.S. 431, 445, 449 (2011) ("The private interest that will be affected argues strongly for the right to counsel. . . . That interest consists of an indigent defendant's loss of personal liberty through imprisonment. The interest in securing that freedom, the freedom from bodily restraint, lies at the core of the liberty protected by the Due Process Clause.") (internal quotations omitted).  The law is clear: the class members required access to an attorney *prior* to jailing given the absence of any procedural safeguards.  As is explained in Plaintiffs' memorandum in support of their Motion for Summary Judgment, the City provided the Post-Judgment Class neither the required procedural safeguards nor access to counsel prior to jailing and thus violated Plaintiffs' Fourteenth Amendment due process rights.  *See* Pl. Mot. at § IV(B); SUMF ¶¶ 159–65.

The City also mischaracterizes the right to counsel under the Sixth Amendment.  It primarily relies on a mischaracterization of *Scott v. Illinois*, 440 U.S. 367 (1979), stating that "[n]o right to appointment of counsel is implicated in proceedings on [sentences to pay fines on underlying violations] under *Scott*."  Def. Mot. at 32.  The City fails to acknowledge that the indigent petitioner in *Scott* was *never* imprisoned,  440 U.S. at 369, and in doing so, fails to identify that actual imprisonment is when the Post-Judgment Class was afforded the right to counsel.  By contrast, the undisputed evidence shows that the City had a policy and practice of actually jailing Post-Judgment Class members without access to counsel.  SUMF ¶¶ 159–65 (citing Chief

Jackson's designated 30(b)(6) testimony, "A. Okay. My knowledge we didn't . . . appoint any public defenders for people held on ordinance violations."). The central holding in *Scott* is "that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment" and it is therefore "eminently sound" that "actual imprisonment [be] the line defining the constitutional right to appointment of counsel." 440 U.S. at 373.[21]

The City attempts to analogize this case to *United States v. Owen*, 854 F.3d 536 (8th Cir. 2017). The court's logic in *Owen* specifically distinguishes *probation revocation* hearings from imprisonment, in that "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special restrictions." 854 F.3d at 541 (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).[22] Post-Judgment Class members were assessed a monetary sum and then, for non-payment of that assessed monetary sum, jailed and deprived of their "absolute liberty" by the City—something *Argersinger*, *Scott*, and *Shelton* all agree triggers the right to counsel. The City rests its argument on the idea that because the individuals were never *sentenced* to jail time, they do not require counsel.

Plaintiffs' claims, however, are based on the City's practice of jailing indigent Post-Judgment Class members for the purpose of recovering assessed monetary sums from them,

---

[21] Similarly, *Alabama v. Shelton*, 535 U.S. 654, 658 (2002), which the City cites and acknowledges, extended the right to counsel to cases in which the defendant is threatened with imprisonment because it may result in "the actual deprivation of a person's liberty" and therefore "may not be imposed unless the defendant was accorded the guiding hand of counsel in the prosecution for the crime charged." *Id.* at 658 (stating that *Argersinger v. Hamlin*, 407 U.S. 25 (1972) and *Scott* do not allow "actual imprisonment" for an uncounseled indigent defendant).

[22] Because *Owen* decided revocation hearings did not invoke the protections of the Sixth Amendment given there was no absolute liberty deprived, the court spends minimal time discussing the Sixth Amendment right to counsel and spends the near entirety of the case analyzing a statutory right to counsel. 854 F.3d at 541.

26

without providing them counsel.  *See* FAC ¶¶ 236–37; Pl. Mot. at 20–25.  The City is liable for the actual jailing of Post-Judgment Class members without access to counsel after the individual was unable to make a payment when due.  *See Turner*, 564 U.S. at 445, 449 ("[F]reedom from bodily restraint lies at the core of the liberty protected by the Due Process Clause . . . . its threatened loss through legal proceedings demands due process protection.").[23]

   **2.  The City Does Not Dispute that It Never Provided Post-Judgment Class Members Who Could Not Afford an Attorney Access to Counsel Prior to Jailing**

   By purposefully misconstruing the nature of Plaintiffs' Count Two claim, the City avoids addressing the core issue: the City did not appoint counsel to indigent Plaintiffs in proceedings prior to or while jailing them and did not even have a process for appointing counsel, nor resources to do so.  SUMF ¶¶ 161–62, 164.  As such, most detainees, including Post-Judgment Class members, were not represented by counsel despite being jailed for an inability to pay.  *See* SUMF ¶ 165.  Plaintiffs' evidence shows City officials readily acknowledged there was no procedure in place to appoint counsel in municipal court and that the City Council and City Manager did not budget for counsel to represent indigent individuals.  SUMF ¶¶ 159, 161–62, 164, 165.  The City does not once address this.  Rather, the City attempts to distract from unfavorable undisputed evidence by stating that "no class member was sentenced to jail," Def. Mot. at 34, despite the significant evidence that class members were jailed for an inability to pay, without access to counsel.  SUMF ¶¶ 161–65.

   The City contends there is "uncontroverted evidence that the violation alleged in Count

---

[23] *See also Shelton*, 535 U.S. at 672 ("[A]ctivation of a suspended sentence results in the imprisonment of an uncounseled defendant for a term that relates to the original offense and therefore crosses the line of actual imprisonment[.]") (internal citations omitted); *Scott*, 440 U.S. at 373 ("[A]ctual imprisonment [is] the line defining the constitutional right to appointment of counsel."); *Argersinger,* 407 U.S. at 40 ("But in those [cases] that end up in the actual deprivation of a person's liberty, the accused will receive the benefit of 'the guiding hand of counsel' so necessary when one's liberty is in jeopardy.").

Two (as mischaracterized) did not occur, but the City only presents, once again, the declaration of Mr. Brockmeyer.  Def. Mot. at 34.  The City claims that "Mr. Brockmeyer concedes, as he must, that if a jail term was being considered as a sentence, it was his **obligation** to appoint counsel" and that no class member was sentenced to jail time, or that "any judge of the Ferguson Municipal Court even considere[ed] sentencing anyone to a jail term."  Def. Mot. at 34 (emphasis in original).[24]  In any event, as Plaintiffs have established in support of their Motion for Summary Judgment and above, the constitutional right to counsel does not require that the jailing result from a *sentence* of incarceration on the underlying charges.  Pl. Mot. at 20–25.  As such, Plaintiffs do not seek to hold the City liable for any policy or sentence made by Mr. Brockmeyer, but for the City's *actual* jailing of Plaintiffs for nonpayment of fines when there was procedure or means to appointment counsel for those unable to afford it or provide adequate alternative procedures.

The undisputed evidence establishes that the City did not appoint counsel to those who could not afford an attorney prior to jailing and there was no process to do so.  SUMF ¶¶ 161–62, 164.  The City has submitted only insufficient evidence relating to a different claim, that the Plaintiffs are not bringing.  As such, the City has not met its burden and is not entitled to Summary Judgment on the violations alleged in Count Two.

### 3.  The City Cannot Escape Liability for Jailing Individuals with No Counsel by Pointing to the Judiciary

The City argues that the responsibility to appoint counsel lies with the judiciary.  But as

---

[24] The City misstates its own witness, as Mr. Brockmeyer does not concede that it was his *obligation* to appoint counsel, but rather "[i]f [he] *believed* that it was possible that [he] would sentence someone to a jail term, it was [his] sole responsibility to appoint counsel to represent that individual."  SOF ¶ 34, *citing* Def. Ex. L ¶ 13 (emphasis added).  This is not conclusive evidence.  At most, it is improper opinion testimony. *See United States v. Cortez*, 935 F.2d 135, 139–40 (8th Cir. 1991), *cert. denied*, 502 U.S. 1062 (1992) ("Where the lay witness's testimony is based upon perceptions, which are insufficient to allow the formation of an opinion that would be helpful to an understanding of the facts of the case but, instead, merely expresses the witness's beliefs, then the opinion testimony should be excluded.").

discussed above, Plaintiffs are not, as the City seems to concede, alleging the City's judge sentenced individuals to terms of imprisonment. Nor do Plaintiffs seek to hold the City liable for any policy made by Mr. Brockmeyer.  Instead, the violation at issue in Count Two is the jailing by the City of indigent individuals for nonpayment of fines when there was no chance of appointment of counsel or adequate alternate procedures.  *See* FAC ¶ 236–37.  *See also* Pl. Mot. at 20–22.  The City's policies and practices resulted in this jailing.  As such, the City is liable for the violations alleged under Count Two.

### C.     The City Is Not Entitled to Summary Judgment on Count Three

The City misstates and misapplies the Eighth Circuit standard for pretrial detention by focusing solely on the *length* of the detention, rather than the totality of the circumstances.  The City also fails to establish that no genuine disputes of material fact exist.[25]  There is sufficient evidence from which a jury could reasonably find that the jailing of Warrant Class members for indefinite periods of time, to aid in the City's revenue generation and without any hope of a hearing, shocks the conscience.  Therefore, the Court should deny the City's Motion for Summary Judgment on Count Three.

#### 1.  The City Misapplies the Totality of the Circumstances Standard by Relying Solely on the Duration of the Detainment

In Count Three, on which Plaintiffs have not moved for summary judgment, Plaintiffs challenge the City's indefinite jailing of Warrant Class members without any meaningful legal process.  FAC at ¶¶ 238–39.  The Eighth Circuit has held that "the Due Process Clause forbids an extended detention, without a first appearance, following arrest by warrant" and the "consequences of prolonged detention may be more serious than the interference occasioned by arrest [because]

---

[25] The City repeatedly attempts to re-litigate class certification by arguing that the circumstances of each Warrant Class member's arrest were unique.  But Plaintiffs have shown that all class members suffered the particular circumstances described herein.

[p]retrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 673 (8th Cir. 2004) (internal citations omitted).

To determine whether an extended pre-trial detention without an initial appearance violates Fourteenth Amendment substantive due process protections, the Eighth Circuit has adopted a "totality of the circumstances" test which requires consideration of "(1) whether the Due Process Clause prohibits an extended detention, without an initial appearance, following arrest by a valid warrant; (2) whether the defendants' conduct offended the standards of substantive due process; and (3) whether the totality of the circumstances shocks the conscience." *Id.* (internal citations omitted). In analyzing the totality of the circumstances, the Eighth Circuit considers several factors including a municipality's deliberate indifference to prisoner welfare and due process rights, discussed *supra* Section II and Section III.D., the existence of or lack thereof, a policy to bring detainees before a judge, and the general circumstances of detention. *Id.* at 674 (internal citations omitted).

The City misstates the Eighth Circuit test by overemphasizing the length of detention and claiming that a violation can be found only "after the lapse of a certain amount of time." Def. Mot. at 35. This mischaracterizes the standard. In *Young v. City of Little Rock*, the Eighth Circuit found that a brief detention of only a few hours could constitute an unconstitutional detention. 249 F.3d 730, 736 (8th Cir. 2001).

The City's own authority supports this. In *Baker v. McCollan,* the Court notes that "*depending on what procedures* the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due

process of law.'"  443 U.S. 137, 145 (1979) (emphasis added).  In *Faulkner Cnty.*, the court

considered the lack of procedure along with the duration.  388 F.3d at 674 (noting that the guard

"made a conscious decision to do nothing . . . [and that] he would have followed the same course

of conduct even if [the detainee] were held for 99 days").  Similarly, in *Martz v. Simmons*, the

court determined that an extended detention before a first appearance shocked the conscience

considering the length of the detention "in conjunction" with other factors such as the complete

lack of policy to bring detainees to court and plaintiffs' repeated objection to the detention.  2019

WL 3431747, at *8 (W.D. Ark. May 14, 2019).

No court in this Circuit has found a required minimum number of days of incarceration for

a substantive due process claim.  This Court should decline the City's request to impose one.

### 2.   Record Evidence Would Enable a Jury to Find that the City, Not the Court, Bears Responsibility

As with each of the Counts, the City seeks yet again to shift the burden of responsibility to

the municipal court.  Def. Mot. at 38.  As the City acknowledges, *Faulkner* claims are traditionally

brought against the jailing entity, and solely cites cases in which the defendants are consistently

the jailing entities.  *See Faulkner Cnty.,* 388 F.3d at 674 (county jail is defendant); *Martz*, 2019

WL 3431747, at *3 (local sheriff is defendant).

The City is clearly liable here.  The City Council, City Manager, and Police Chief had

broad authority over the conditions in the City jail.  *See* Section III.D.  The City controlled the

timeline of individuals' detention.  SUMF ¶¶ 79–98.  Record evidence also shows that the City

Council, City Manager, and Police Chief's motivation to extract monies in the form of bond

contributed to Plaintiffs being held indefinitely.  SUMF ¶¶ 64, 79–98.

The City first devotes a great deal of space to blaming Mr. Brockmeyer for the practice

that jail detainees would not get an initial appearance.  Def. Mot. at 38.  This is a misunderstanding

of Plaintiffs' claim, which is not so limited.  *See* FAC at 238–39.  The City next attempts to escape liability by advancing the "uncontroverted fact"—based solely on the unsupported testimony from Mr. Brockmeyer—that he set the detention length for all individuals.  Def. Mot. at 38.  This characterization could not be more controverted by every piece of evidence in the record (including Mr. Brockmeyer's own deposition testimony) other than Mr. Brockmeyer's belated opinion in his declaration.  The City's own Police Chief admits that the decision of whether and for how long to jail someone lay with the City's police and jail supervisors and not the City's judge.  Chief Jackson testified in response to a question about how to determine who could be released:

> A. *Well, everybody essentially could be released* if they weren't being held on some state charge, particularly a violent type charge, *but that would be essentially the watch commander's decision,* usually who had been there the longest . . . ."

Hanlon Opp. Decl., Ex. 32 (SAMF ¶ 89) (1/6/16 T. Jackson Dep. Tr. 73:10–74:4) (emphasis added).  In fact, the uniform testimony and evidence from every other source, besides Mr. Brockmeyer's new declaration (including the City's designated 30(b)(6) testimony and the City's own interrogatory answers), states that Chief Jackson implemented the 72-hour policy through a General Order, and police officers under his purview negotiated bonds to extract whatever money possible from those held in the City's jail.  SUMF ¶¶ 60–67; SAMF ¶¶ 86–89.  Moreover, these new statements in Mr. Brockmeyer's declaration are contradictory to his prior deposition testimony that a City employee could "'release[] someone five minutes after arresting them' if the employee determined the individual could not afford their bond."  Pl. Mot. Ex. 30 (SUMF ¶ 74), 2/21/20 R. Brockmeyer Dep. Tr. at 223:1–16.  At the very least, the above creates a genuine dispute of fact as to whether City officials or Mr. Brockmeyer were responsible for when to release detainees.

### 3. Factual Disputes Remain as to Whether the Lack of Procedure and the Circumstances of Detainment Together Shock the Conscience

Even considering the *length* of this unnecessary detention, the record evidence is more than enough for a reasonable jury to find that Plaintiffs' detention shocks the conscience.

### a. The City Admits There Was No Process to Bring Detainees Before a Judge or Appear in Court for a Hearing

The City has admitted that no Warrant Class members were ever going to be brought before the municipal court after their arrest and jailing.  Def. Mot. at 38; SUMF ¶¶ 65–67.  This is confirmed by Plaintiffs' evidence showing Warrant Class members had no hope of ever being brought before a judge and were in fact arrested and jailed for several days without being afforded any form of due process to challenge their detention or the bonds set for their release.  SAMF ¶¶ 91–100; SUMF ¶¶ 65–67.  Courts have found a constitutional violation where, like here, there was no hope of ever receiving a bond hearing.  *See e.g.*, *Faulkner Cnty.*, 388 F.3d at 674 (citing *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)) ("[A] policy was deliberately indifferent where the jail had no internal procedures to track whether inmates had been arraigned"); *Martz,* 2019 WL 3431747 at *15 (denying county defendant's motion for summary judgment and finding that the defendant's complete lack of policy regarding initial appearances was likely to result in a deprivation of constitutional rights).

### b. The City Mischaracterizes the Circumstances of Warrant Class Members' Detention

The City implies that delays in releasing detained Plaintiffs was solely due to booking and processing and therefore constitutional.  Def. Mot. at 27 (citing *Riverside*, 500 U.S. at 55).  But in *Riverside*, the Court simply held it was constitutional to detain arrestees for the period of time necessary to complete administrative steps between a warrantless arrest and a probable-cause hearing, which the City never provided here.  500 U.S. at 53–55.  The City contends that some

period of detention is necessary for booking purposes.  Def. Mot. at 35–37.  This argument has been repeatedly refuted by Plaintiffs.  *See supra* n.17.  A jury could find that all individuals jailed beyond the two hours needed for booking were held without process and for no apparent reason, and award damages correspondingly.  Indeed, record evidence shows that Warrant Class members were not held merely for processing, but detained only to extract a sum of money and their release and court appearance were delayed solely for that purpose.  *See, e.g.*, SUMF ¶¶ 64, 79–98.

Moreover, while the City admits detainees would not get an appearance while incarcerated, it claims they were given a court date after being released.  Def. Mot. at 38, 50.  This admission is telling: the City did not hold individuals based on warrants to bring them before the municipal court.  From the moment of arrest, City officials knew arrestees would not have a court date while detained.  Instead, the City's employees acknowledged the goal of detention was to get the individual to pay some amount of money.  *See* SUMF ¶¶ 85–88, 91–92, 347.  A jury could find this evidence undermines any explanation from the City about the circumstances of detention.

### c.  A Reasonable Jury Could Consider the Abhorrent Conditions in the City's Jail as Evidence the City's Conduct "Shocks the Conscience"

Plaintiffs' evidence regarding the abhorrent conditions in the City's jail is presented below.  *See infra* Section III.D.  A reasonable jury could consider this evidence of poor conditions under the totality of the circumstances, particularly combined with the needlessness of the detention, to find the detention "shocks the conscience."  *See Faulkner Cnty.*, 388 F.3d at 674.

### d.  A Reasonable Jury Could Consider the Financial Motivations for Detention as Evidence the City's Conduct "Shocks the Conscience"

It is undisputed that the City jail's policy was to release every arrestee after 72 hours regardless of whether they paid bond.  Hanlon Pl. Mot. Decl., Ex. 50 (SUMF ¶ 63) (1/11/16 D. McDuffie Dep. Tr. at 79:23–25).  A fundamental question at issue in Count Three is the following:

if everyone held on a warrant would eventually be released upon a recognizance bond, *then why detain arrestees at all?*  The answer is simple: the City held arrestees—some for hours, and some for days—solely with the hope the detention would be so miserable that Warrant Class members would pay money to the City's cash-strapped coffers.

There is significant record evidence that the City's motivation for jailing was to extract as much money as possible in the form of bonds.  SUMF ¶¶ 64, 79–98.  There is record testimony of correctional officers saying things like "something is better than nothing," *Id.* ¶ 87, as they bargained with the class members or their families.  *Id.* ¶¶ 79–98, 347, 371–73, 376–77, 383–85, 392–94, 404, 436–38, 440–41, 462.  City correctional officers were instructed to, and did, simply take money that individuals had in their possession when arrested.  *Id*. ¶¶ 91–92, 347.

This system was part of the City's effort to compensate for budget deficiencies.  SUMF ¶¶ 1–36, 90–95, 203.  Head Court Clerk Mary Ann Twitty and other court and jail staff regularly updated Chief Jackson and City Manager John Shaw ("City Manager Shaw") with celebratory emails as they charged more and more individuals even higher bonds.  *Id.* ¶¶ 261–62.  This was with full knowledge of the consequences for indigent individuals.  Hanlon Pl. Mot. Decl., Ex. 151 (SUMF ¶ 265) 9/2/11 Email from J. Shaw to M. Twitty (City Manager Shaw asking about revenue from a warrant voucher program, noting "Good for us but bad for society?"), Hanlon Pl. Mot. Decl., Ex. 161 (SUMF ¶ 275), 8/29/12 Email from Councilmember K. Tihen to J. Shaw and others (noting that under the City's system "people that simply don't have the money to pay their fines from constantly being arrested and going to jail, only to be released and do it all over again").

### e.  These Disputes of Fact Create an Issue to Be Tried by a Jury

At the summary judgment stage, the City bears the burden of showing that there are no disputed facts upon which a jury could find the City's jailing scheme violated due process.  *See Bedford*, 880 F.3d at 996 (8th Cir. 2018) (stating the summary judgment standard).  Plaintiffs have

not moved for summary judgment on this Count because it is an issue that can and should be put before a jury. *See Young*, 249 F.3d at 736 (reviewing a jury's unanimous finding at trial that the jailers committed a due process violation and finding that the evidence of unnecessary jailing where "administrative foot-dragging took place, characterized by gross indignities" justified the jury award). A jury will see evidence that Plaintiffs were held for extended periods for the purpose of financial profiteering, without any chance that they would ever be brought to court or any procedural protections to ensure their due process rights, in physical conditions that violated their constitutional rights. These detentions imperilled Warrant Class members' jobs, interrupted their sources of income, and impaired their family relationships. This is sufficient for a reasonable jury to find in favor of Plaintiffs on Count Three. As such, the City has not met its evidentiary burden and is not entitled to summary judgment as to Count Three.

### D.  The City Is Not Entitled to Summary Judgment on Count Four

Count Four seeks compensation for Plaintiffs' exposure to the deplorable conditions in the City's Jail, which violated the Fourteenth Amendment's Due Process Clause and constituted impermissible punishment under the Eighth Amendment. FAC ¶¶ 240–41.

The City misstates and misapplies the Eighth Circuit standard for evaluating conditions of confinement by focusing on each condition in isolation, particularly overemphasizing the length of the confinement. The record contains evidence from which a jury could reasonably infer that the totality of the circumstances of confinement violated the Eighth and Fourteenth Amendments.

#### 1.  The City Misapplies the Totality of the Circumstances Standard by Considering the Length of the Conditions in Isolation

Under the Eighth and Fourteenth Amendment, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535, (1979). Pretrial detainees are entitled to at least as great protection of their minimal necessities

under the Fourteenth Amendment's Due Process Clause as that given to convicted prisoners under the Eighth Amendment.  *See Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010).  Punishment that "deprives inmates of the minimal civilized measures of life's necessities is unconstitutional." *Owens v. Scott Cnty. Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003).  Therefore, a pretrial detainee's constitutional rights are violated when their conditions of confinement amount to punishment.  *See Morris*, 601 F.3d at 809 (citing *Bell*, 441 U.S. at 535).  To determine whether conditions amount to punishment, the Eighth Circuit examines the totality of the circumstances of an inmate's confinement.  *See Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014).  The Court must also decide whether the governmental entity imposed the deprivation for the purpose of punishment or whether it is incidental to another legitimate governmental purpose.  *See Bell,* 441 U.S. at 537–38.

The City misstates and misapplies the Eighth Circuit standard for evaluating conditions of confinement by overemphasizing the length of confinement in isolation as a dispositive factor.  In so doing, the City blatantly ignores the clearly established Eighth Circuit standard that "when considered separately and in isolation, [a pretrial detainee]'s allegations of the unsanitary conditions of [confinement], the degree of discomfort experienced by [a pretrial detainee], or the humiliation and degradation suffered by [a pretrial detainee] may not appear to state a constitutional violation.  *But [a pretrial detainee] did not experience these conditions in isolation.*" *Morris*, 601 F.3d at 810 (emphasis added).

The City's own cases support this standard.  For example, in *Stearns v. Inmate Servs. Corp.*, the court warns parties that conducting a "piecemeal analysis of the conditions . . . miss[es] the point."  957 F.3d 902, 909 (8th Cir. 2020) (quoting *Morris*, 601 F.3d at 810) (internal citations omitted) (reversing summary judgment in favor of the detention facility where a jury could reasonably conclude that the conditions were arbitrary or excessive as compared to the

government's perceived legitimate purpose) (cited in Def. Mot. at 41).

The City asks this Court to impose a requirement that only detentions of a certain number of days can result in unconstitutional conditions.  *See, e.g.*, Def. Mot. at 42–43.  This is unsupported by the case law.  In analyzing the totality of the circumstances, courts consider the nature of the conditions and the inmate's length of confinement on a sliding scale, among other things.  *See Owens*, 328 F.3d at 1027.  For example, in the context of unsanitary conditions, as the level of filthiness increases, the length of time required for the conditions to be unconstitutional decreases.  *Id*.  However, courts are clear that conditions should not be considered in isolation.  *See Stearns*, 957 F.3d at 909–10.  Yet, the City incorrectly states that the "Eighth Circuit has repeatedly found no constitutional violation where alleged unsanitary conditions lasted fewer than four days."  Def. Mot. at 43.  Indeed, the two cases the City cites for this proposition both conduct a "totality of the circumstances" analysis and do not make a finding based on the length of the condition in isolation.  *See Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (noting that "[detainee] was offered an opportunity to flush the toilet and to clean up the mess but he declined"); *see also Williams v. Delo*, 49 F.3d 442, 446 (8th Cir. 1995) (noting that inmate was violent, which supported the finding that the deprivation of his personal property served the legitimate goal of preventing injury "to the inmate, corrections officials, and damage to the facility").

## 2.  The City Misstates Plaintiffs' Burden of Proof

The City asserts incorrectly that Plaintiffs must show an actual injury to prevail on an Eighth Amendment claim. Def. Mot. at 42.  First, the City's own authority contradicts such a requirement. S*ee Beaulieu v. Ludeman*, 690 F.3d 1017, 1045–46 (8th Cir. 2012) (stating that plaintiffs must show that "[the conditions of their confinement] posed a substantial risk of serious harm") (internal citations omitted).  The court in *Beaulieu* found that the plaintiffs had failed to put forth evidence that the guards had been deliberately indifferent to the unsanitary conditions of confinement and

that cleaning supplies were available to them—which is not the case here.  *Id*. at 1045.  The court's comment that there is "no . . . record of any patients becoming sick because of bodily wastes in the toilets or showers" was incidental to its decision.  *Id*. at 1044.  Second, that fact that the Eighth Amendment protects not only actual injury, but also the potential for future harm, "is not a novel proposition."  *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993) (finding that detainee stated a cause of action, where defendants had "exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health").  As *Helling* succinctly states: "a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery."  *Id.* at 33.  This is particularly true here, where Plaintiffs allege a substantial risk of serious harm resulting from the City's policies and practices that created the confinement conditions—experienced in tandem and not in isolation by Plaintiffs—all exacerbated by the overcrowding in the jails.  *See, e.g.*, *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("[E]very inmate suffers exactly the same constitutional injury when he is exposed to a single . . . policy or practice that creates a substantial risk of serious harm[.]").  Therefore, Plaintiffs do not need to show actual injury to prevail on their Eighth Amendment claim.

### 3. Factual Disputes Remain as to Whether Conditions in the City's Jail Created a Substantial Risk of Injury

The City attempts to construe Plaintiffs' evidence in support of the conditions claim as limited to the testimony of the class representatives, even though testimony from the Plaintiffs, the City officials, and records from the City all demonstrate persistent, unresolved issues with the jail.  The City also focuses on the number of days the Plaintiffs were in jail despite seeming to acknowledge (as it must) that the Plaintiffs were jailed on different days at different times over multiple years, and yet all still recount the same issues, including conditions that the City seeks to downplay as "transitory."  *See, e.g.*, Def. Mot. at 44.  As such, the record evidence belies the City's

suggestion that the conditions in the jail were "transitory" or "sporadic." *See* SAMF ¶¶ 43–74.

There is sufficient evidence on the record from which a jury could reasonably infer that the City held more inmates than it had capacity for in its jail, and Jail-Conditions Class members therefore suffered from overcrowding. SAMF ¶¶ 43–49. The evidence of this is not limited to Plaintiffs' memories, but includes acknowledgments by a detention officer and City Council Members. *Id.* ¶¶ 46–49. Therefore, the evidence as to overcrowding is at least disputed, and requires the drawing of inferences and credibility determinations—classically within the purview of the jury. *See, e.g.*, *Ziesmer v. Hagen*, 785 F.3d 1233, 1238 (8th Cir. 2015) (noting that a credibility determination is inappropriate at the summary judgment stage).

Multiple class representatives (who again, were in the jail on different days, times, and years) testified to unsanitary conditions and a lack of hygiene products and services in the City's jail. SAMF ¶¶ 50–61. Inmates were not provided hygiene products nor were they allowed to clean themselves, their clothes, nor their bedding. *Id.* ¶¶ 56–60. The City incorrectly states that there "is simply no evidence that any of these conditions posed any substantial risk of serious harm." Def. Mot. at 45. Plaintiffs' expert on jail conditions, Eldon Vail[26] testified that "the conditions in the cells in the City of Ferguson jails created a substantial risk of harm," ECF No. 441-1 ¶ 70, "the conditions . . . failed to meet the Missouri Core Jail Standards," *id.* 69, and were in direct violation of multiple other correctional standards, *id.* ¶¶ 62–64.

The City has failed to meet its burden of establishing that there are no genuine disputes of fact that the lack of access to clean water and the inadequate diet in the City's jail could pose a substantial risk of injury. SAMF ¶¶ 62–71; s*ee Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (noting that prisoners have a right to nutritionally adequate food); *see also Bader v. Schaaf*,

---

[26] Eldon Vail worked for nearly 35 years in and administered adult and juvenile correctional facilities.

2018 WL 6831168, at *3 (E.D. Mo. Dec. 27, 2018) (noting that allegations that detainees were served 800 calories per day were sufficient to state an Eighth Amendment claim).

The record also shows that inmates did not have access to clean water and as a result, many of the inmates suffered through multiple days and sometimes weeks of thirst because they were afraid to drink the water and were not given other drinks.  SAMF ¶¶ 62–64.  The City incredibly argues that Mr. Carter's testimony that he would get a sore throat and upset stomach every time he drank the water is improper opinion testimony.  Def's Mot. at 43.  This is incorrect.  Mr. Carter is testifying as to his own personal experience and symptoms.  SAMF ¶ 64.  Courts have also found that access to a sufficient quality and quantity of drinking water is a minimal life necessity.  *See Bader*, 2018 WL 6831168, at *4 (holding that "plaintiff ha[d] stated a plausible claim that access to only contaminated drinking water, which has caused him to become ill, deprives him the minimal civilized measure of life's necessities").

### 4. The Corrections Officers and the Correctional Supervisors, Including the Police Chief, Were Deliberately Indifferent to the Squalid Jail Conditions

The evidence shows that the corrections officers knew of and were deliberately indifferent to the jail conditions issues described above.[27]  A pretrial detainee must show the defendant official was deliberately indifferent to the conditions of confinement and the detainees' rights to establish an Eighth Amendment violation.  *See Walton*, 752 F.3d at 1117.

The City's corrections officers were aware of the deplorable conditions in the cells.[28]  SAMF ¶¶ 72–74.  Despite having knowledge about the aforementioned conditions, the corrections supervisors and the Police Chief did not take any steps to remedy them.  SAMF ¶ 74.  Therefore,

---

[27] The City does not challenge whether the City can be liable for the poor conditions in the jail under Count Four, unlike the other counts.

[28] Emails from the City's officers show that when a toilet was blocked with feces and bloody pads, and when the inmate asked to use a different one, she was denied.  SAMF ¶ 54.

corrections officers were deliberately indifferent to the inmates' complaints about jail conditions.

The City has not advanced any legitimate government purpose for these jail conditions because there is none.   There were many available alternatives to prevent or minimize the deplorable conditions, yet no action was taken to improve the jail.  *See Morris*, 601 F.3d at 810 (finding a violation where alternatives were easily available but not considered).  As such, the City has not met its evidentiary burden and is not entitled to Summary Judgment as to Count Four.

### E.    The City is Not Entitled to Summary Judgment on Count Five

Count Five alleges that the City violated the Post-Judgment Class members' equal protection rights by using its police and jail system to collect debt owed to the City—in the form of municipal fines, fees, surcharges, and costs ("City debt")—by unduly harsh and punitive means forbidden to private creditors.   Plaintiffs do not challenge the assessment of their debts or the judgments underlying them.   Instead they challenge the unconstitutional methods—including jailing, threats of imprisonment, and bogus fees and surcharges—City officials deployed to collect those debts for months and years.  *See* FAC at 55–56.

The City mistakenly argues (1) that Plaintiffs must, but cannot, prove they were indigent in order to recover on Count Five; (2) that City judgment debtors were not similarly situated to private debtors, because they were "criminal"; and (3) that they were only ever jailed for failing to *appear* "multiple times," and then only on the orders of the municipal judge.  Def. Mot. at 46–50. Plaintiffs elaborate its responses to the City's arguments below.

### 1.    Plaintiffs' Initial Inability to Pay May Explain How They *Became* City Debtors but Is Not an Element of the Equal Protection Violation They Suffered as City Debtors

Citing *James v. Strange*, 407 U.S. 128 (1972), the City claims that Post-Judgment Class members cannot recover on Count Five unless they were indigent.  Def. Mot. at 46, 49–50.  But in *James*, the term "indigents" served as shorthand for the debtors affected by the recoupment statute,

which sought to recoup defense costs from people who had had counsel appointed for them based on their "indigence" at the time of prosecution.  407 U.S. at 128–29.  By analogy, the people subject to the City's debt-collection practices were those who had a judgment issued against them on a City ordinance violation;[29] had fines, fees, and costs assessed in connection with that judgment; and were ordered to pay in monthly installments of a preset amount because they could not afford to pay the full amount assessed.  *See* SUMF ¶ 105.[30]  In both cases, the singled-out debtors were unable to pay at the time they incurred their debt (in *James*, by receiving state-appointed defense services; here, by having fines, fees, and costs imposed at judgment).

But this inability to pay merely explains how Plaintiffs *became* government debtors; it is not an essential element of the unequal treatment they suffered *as* government debtors.  Similar to *James*, the basis for the equal protection violation is not differential treatment *based on indigence*, but rather one's status as a government debtor versus a private one.  *See* 407 U.S. at 138 (holding that the government may not "impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than to a private creditor").[31]  In being jailed for nonpayment, the City's judgment debtors were subject to its discriminatory collection practices.

### 2.   Plaintiffs Were Civil Judgment Debtors, Not Criminal Ones

The City contends that its judgment debtors are not similarly situated to private judgment debtors ,because "the judgments were entered by the Municipal Court on municipal offenses" and

---

[29] *See* SAMF ¶ 113 (explaining that all members of the *Bearden* Class, of which the Post-Judgment Class bringing Count Five is a subclass, have arrests including either "FTA" warrant charges or other ordinance violation charges, or both).

[30] Mr. Brockmeyer testified that this so-called "payment docket" was in place when his tenure began in 2003.  SAMF ¶ 97.

[31] The Post-Judgment Class is defined as "[a]ll persons who have, at any time since February 8, 2010, been jailed by the City of Ferguson because of their non-payment in connection with a prior judgment (Counts Two, Five, and Six)."  Class Cert Order at 35.

the City wrongly supposes that this makes them "criminal fines," citing *United States v. Cunningham,* 866 F. Supp. 2d 1050, 1058 (S.D. Iowa 2012).[32]  Def. Mot. at 48–49.[33]  *Cunningham* is distinguishable.  The municipal judgments at issue were civil, not criminal, thus putting them on a par with other civil judgment debtors for equal protection purposes.

Missouri courts have long held that "a violation of a city ordinance is not a criminal offense" and therefore does not result in a "criminal conviction."  *Lewis v. Wahl*, 842 S.W.2d 82, 95 (Mo. 1992) (en banc) (Thomas, J., concurring in part) (noting "the long line of cases in this state" holding as much); *State ex rel. Kansas City v. Meyers*, 513 S.W.2d 414, 416 (Mo. 1974) (en banc) (same); *State v. Muir*, 164 Mo. 610 (Mo. 1901) (same); *Kansas City v. Neal*, 122 Mo. 232 (Mo. 1894) (same).  Although Missouri extends to ordinance violations certain procedural protections associated with criminal proceedings,[34] the judgments issued in municipal cases are civil ones with civil judgment debtors.  As such, they are protected by the Fourteenth Amendment from being subject, without good reason, to harsher collection methods than apply to private civil judgment debtors.

*Cunningham* is distinguishable.  First, it compared *criminal* judgment debtors with civil ones.  Cunningham had been criminally convicted and ordered to pay restitution under a federal law that denied her certain state-law property exemptions applicable to civil judgment debtors.

---

[32] Repeating a failed argument from its first motion to dismiss eight years ago, ECF No. 21 at 2–3, the City claims that "Missouri law regards these judgments not as 'debts,' but criminal fines," Def. Mot. at 47 (citing *City of Stanberry v. O'Neal*, 150 S.W. 1104, 1105 (1912)).  But as Plaintiffs noted back in 2015, ECF No. 23 at 3 n.6, *O'Neal* explicitly misreads the very Supreme Court of Missouri holding that it cites on this point, *Ex parte Hollwedell*, 74 Mo. 395, 400 (Mo. 1881) (holding instead that proceedings for violations of municipal ordinances were "civil" but "*quasi* criminal" in nature and stating that a monetary judgment on such a violation is "a debt for a fine").

[33] The City erroneously attributes this quotation to a differently worded passage in ECF No. 27 at 5 (this Court's reconsideration of ECF No. 19).

[34] *See, e.g.*, *City of Dexter v. McClain*, 345 S.W.3d 883, 885 (Mo. App. 2011) (applying reasonable doubt standard).

*See* 866 F. Supp. 2d at 1057.  The court concluded that the federal government's penal interest in restitution justified its discrimination against criminal debtors.  *See id.* at 1058.  The City has no such interest in the civil fines its debtors owed, let alone in the separately assessed fees, costs, and surcharges bundled with them.  Second, *Cunningham* compared two classes (civil and criminal) of government debtors (*id.* at 1057–58), and thus, one of the central principles animating *James*— that the government should not employ its unique powers over liberty and property to collect debts by harsher means merely because those debts are owed "to the public treasury rather than to a private creditor"—was not at stake in *Cunningham*.  Here, by contrast, that principle was fully at risk, as the City employed debt-collection measures "that would never be tolerated if utilized against a private civil judgment debtor."  *Baker v. City of Florissant*, 2017 WL 6316736, at *8 (E.D. Mo. Dec. 11, 2017).

### 3.   The City Chose to Jail Its Debtors for Nonpayment

The City closes its discussion of Count Five with a series of baseless factual claims in an ad hoc declaration by Mr. Brockmeyer and crafted to create the impression that the City only ever jailed its debtors at its judge's behest after they failed to appear in court "multiple times."  Def. Mot. at 50.  Insofar as Mr. Brockmeyer's belated declaration contradicts his prior deposition testimony, it should not be credited here.  As explained in Section III.F., until 2015, City judgment debtors were expressly told not to attend court but rather to make payments to the City at its police department.  Pl. Mot. at 8.  There was no hearing for the individuals to appear at.  Instead, if the person did not pay $100 on the first Friday of the month, they were arrested.  SUMF ¶ 121.  The City's chosen practice of holding its judgment debtors after arrest—until City officers extracted money from them or decided arbitrarily to let them out for free—was an unduly harsh and punitive method of debt-collection (thankfully) unknown to private debtors in Missouri.  As the City can

do no more than attempt to dispute these established facts, it is not entitled to summary judgment on Count Five.

### F.    The City Is Not Entitled to Summary Judgment on Count Six

Count Six concerns the City's practice of automatically seeking and issuing arrest warrants based solely on nonpayment, without probable cause, in violation of the Fourth Amendment.  *See* FAC ¶¶ 244–45.  In addition to misconstruing the claim, the City incorrectly argues that these were proper bench warrants obviating the need for probable-cause determinations.  Def. Mot. at 51–52.

There were two types of warrants issued for FTAs in the City of Ferguson.  The City focuses on the first—that after an individual with a pending case had failed to appear for two consecutive court dates, the City clerks would issue an FTA warrant.  SUMF ¶¶ 117, 171.  Those warrants are not the basis of Plaintiffs' claims in Count Six, which is brought only on behalf of the Post-Judgment Class in connection with the second type of warrant, which were issued after individuals were assessed monetary sums as a sentence.  *See* FAC ¶ 245; SUMF ¶ 117.  For these warrants, the process was substantially different than what the City describes.[35]  The testimony is undisputed that after Mr. Brockmeyer set an assessed sum for a person to pay, there were no more court dates.  SUMF ¶¶ 118–20.  Instead, the person was given a date by which to pay on the "Payment Docket"—which Mr. Brockmeyer himself noted had no judicial involvement.  Pl. Mot. Ex. 30 (SUMF ¶ 118) at 79:6–13 ("A. I wasn't there on the payment docket.  There was no payment docket.  There was a payment schedule to appear at the clerk's office to make your payment. . . . Q. So on this payment schedule date, you were not present?  A. No, of course not."); SUMF ¶¶ 119–24.  If the City's employees did not enter a payment by that date, the computer system would automatically generate an arrest warrant, which City personnel (without any involvement from Mr.

---

[35] Again, the City relies solely on the declaration of Mr. Brockmeyer.  Def. Mot. at 52.

Brockmeyer) would rubberstamp and issue.[36]  These warrants were systematically deficient.  As demonstrated herein, at most, there is a genuine dispute of material fact regarding the process and deficiencies of warrants issued for Post-Judgment Class members, and the City is not entitled to summary judgment on the violations alleged in Count Six.

### 1.  Contrary to the City's Claims, FTA Warrants Were Not Valid Bench Warrants That Replaced a Finding of Probable Cause

The Fourth Amendment provides, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation," (U.S. Const. Amend. IV.) and is incorporated against the states through the Fourteenth Amendment.[37]  *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  Findings must be made by "a neutral and detached magistrate," *Johnson v. United States*, 333 U.S. 10, 14 (1948), and supported by "oath or affirmation" of probable cause in a sworn statement.  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).  A "[r]ecital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp . . . ."  *United States v. Ventresca*, 380 U.S. 102, 109 (1965).  This is "not to be cavalierly brushed aside as an empty formality."  *Dow v. Baird*, 389 F.2d 882, 884 (10th Cir. 1968).

The City's claim that the requirement of probable cause for FTA warrants was satisfied solely because they were "bench warrants" is not supported by the law or the facts in this case.  Def. Mot. at 51.  If the suspected offense is the failure to appear for a hearing and the failure must be purposeful, probable cause for arrest requires sworn evidence of a purposeful failure to appear.  *Cf. Myers v. Becker Cnty.*, 833 F. Supp. 1424, 1434 (D. Minn. 1993) ("It is axiomatic that Myers

---

[36] This was true for class representatives, Ms. Fant, Mr. Carter, Ms. Nelson, Mr. Nelson, Jr., Ms. Thomas, Mr. Morris, Ms. Morris, and others in the Post-Judgment Class.  *See* SUMF ¶¶ 132–34, 332–509.

[37] The City incorrectly frames Count Six as partially sounding in equal protection doctrine, when it is based on the City's due process violations of issuing warrants without findings of probable cause.  *See* Def. Mot. at 51 n.55; FAC ¶ 145.

cannot be charged . . . for not appearing at a hearing of which she did not have prior notice. . . . [T]here was absolutely no basis to objectively believe that probable cause existed to arrest Myers for failure to appear.").  As shown below, there was no hearing to fail to appear at.  If the suspected offense is a failure to make a timely payment on a debt from a prior judgment (as all of the "Failures to Appear" were here), sworn evidence of willful nonpayment is required.  *See supra* Section III.A. Absent evidence for willful nonpayment—such as evidence that the suspect had the ability to pay the required sum—there will not be probable cause for arrest.

Here, no such finding could possibly be made by the City officials, who simply allowed a computer to auto-generate warrants if it did not record payment by a certain date.  As such, the City cannot escape liability by simply arguing that the issuance of "bench warrants" is a *judicial* function.  Def. Mot. at 51.  Plaintiffs agree with that much.  If the warrants had actually been bench warrants, their issuance *would* have been a judicial function.  But the facts instead show that City staff caused the warrants to be generated automatically without the judge's involvement.  The warrants were therefore *not* bench warrants at all.[38]

### 2. Contrary to the City's Claims, There Is Evidence of a Widespread City Practice of Issuing and Seeking Arrest Warrants Without Probable Cause

The FTA warrants issued by the City when people failed to make timely payments on debts owed from prior judgments were constitutionally deficient for numerous reasons.

---

[38] *Wood v. Wooten*, which the City cites to support its claim that "a valid bench warrant provides probable cause of an arrest" (Def. Mot. at 51), is inapposite, as in that case, the validity of the underlying warrant was undisputed, which is not true here.  986 F.3d 1079, 1081 (8th Cir. 2021).  The City then cites *Ward v. Acoustiseal, Inc*., an employment compensation case that neither discusses the validity of bench warrants at all, nor supports the City's assertion that the FTA warrants it issued were valid.  *See* 129 S.W. 3d 392, 394 (Mo. App. W.D. 2004).  Finally, the City cites *United States v. Spencer*, a Second Circuit case that finds only that a valid bench warrant could substitute the requisite finding of probable cause for a warrant if it is properly reviewed and issued by a judge.  *See* 684 F. 2d 220, 223 (2d Cir. 1982).  As demonstrated below, no such review occurred here.

### a.   The City Admits Warrants Issued Without Sworn Affidavits

The City admits FTA warrants were issued without sworn affidavits from City officers: "Warrants relative to any failure to appear . . . were not sworn on an affidavit but were made solely by the Court upon its own determinations." Def. Mot. at 52.  The City "cavalierly brushed aside" review of sworn support "as an empty formality." *Dow*, 389 F.2d at 884.  As shown below, the municipal court's "determinations" were removed from the City's judge and left in the hands of court clerks.

### b.   Warrants Issued Automatically When Post-Judgment Class Members Missed Payments on Debt Owed to the City from Prior Judgments, Without Review by the Municipal Judge

Municipal debtors were set to make payments by a certain day, called the "payment docket."  SUMF ¶¶ 117–23.  The City would give individuals a document that said "If your payments are not paid as agreed a warrant will be issued for your arrest and additional charges will be added to your fines."  Pl. Mot. Ex. 89 (SUMF ¶ 122), Bates Nos. 021758–022161 at 021936 (6/18/08 Notice given to S. Morris), 022087 (8/19/06 Notice given to K. Fant).   As Mr. Brockmeyer testified, it was not a docket at all, but simply a deadline to pay, with no opportunity or ability to see the judge.  SUMF ¶ 118.  This program, administered by court clerks, automatically generated FTA warrants when a person did not make a timely payment.  SUMF ¶¶ 131–32, 149. After arrest warrants generated, court clerks stamped them with the City's judge's signature and entered them.  SUMF ¶¶ 134, 136, 139, 219.[39]  The Missouri State Auditor found "there was no independent review of the documents stamped" by the court clerks.  Pl. Mot. Ex. 28 (SUMF ¶ 136)

---

[39] The City cites *Hamilton v. City of Hayti* to support its claim that the issuance of warrants is a judicial function (Def. Mot. at 51); however, in that case, the court noted, "the warrant was not issued by Judge Ragland but by court clerk Overbey exercising authority delegated by Judge Ragland, including use of his signature stamp. *This delegation likely made the warrant invalid* because Overbey was not a neutral and detached magistrate who could make a constitutionally proper probable cause finding . . . ." 948 F.3d at 926 (emphasis added).

at 40:9–41:2.

These facts are completely at odds with the City's assertion, based on a new declaration from its former judge, that he was "solely responsible for issuing arrest/bench warrants," and "[a]ll warrants for failure to appear were issued upon my determination that the municipal offender was apprised of his/her court date and nevertheless failed to appear."  Def. Mot. at 51; SOF ¶ 24.  Mr. Brockmeyer previously testified that he did not issue warrants at all—court clerks did.  SUMF ¶ 139.  Mr. Brockmeyer's belated declaration is also contrary to his testimony (and the City's designated 30(b)(6) testimony) that he had no involvement with the so-called "payment docket," and his involvement was limited to court night appearances.  SUMF ¶ 118.  Given 30(b)(6) testimony that the judge was not present for "payment docket" dates, it is impossible for him to claim individuals missing payment dates did not appear in court.  *Id.*  It strains credulity that Mr. Brockmeyer now seeks to testify (in a new declaration) that he was in fact present and involved in issuing tens of thousands of warrants for missed payments.  Pl. Mot. Ex. 168 (SUMF ¶¶ 300–03) at OSCA_000055, OSCA_000149, OSCA_000169, OSCA_000197.

In sum, Mr. Brockmeyer's new and contradictory statements that he "directly issued" warrants constitute, at most, an issue of fact for the jury.

### c.  Warrants Issued Without Probable Cause for One or More Key Elements of Suspected Offenses

Insofar as the charged FTA offense was an actual failure to *appear*, there was no probable cause for a magistrate to find, because (as explained above) there was no actual court proceeding at which a Post-Judgment Class member *could* appear.  *See supra* Section III.A.  If the warrants also encompassed a failure to *pay*, there was still no probable cause for arrest, as there was no probable cause that a debtor's nonpayment had been *willful*.  *See id*.  Court clerks who sought the warrants through a computer system, generating them for rubberstamping, had no process for

gathering evidence as to the reason for nonpayment.  SUMF ¶¶ 134–40.  Indeed, even when people paid monetary sums a day late, or attempted to talk to court clerks about their inability to make a payment, court clerks would still issue the warrants.  SUMF ¶¶ 127-129.

Here, City officials processed FTA warrants without attempting to ascertain the purposeful nonappearance or willful nonpayment (despite evidence *disproving* those elements), and thus recklessly (or deliberately) sought warrants without necessary evidence (SUMF ¶¶ 133–35), in violation of the Fourth Amendment.  *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) ("[W]here the defendant makes a substantial preliminary showing that a false statement . . . with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."); *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011) ("Recklessness . . . may be inferred from the fact of omission of information from an affidavit . . . when the material omitted would have been clearly critical to the finding of probable cause." (internal quotations omitted)).  Had nonpayment instead triggered a process of affording the debtor a hearing concerning their ability to pay, with the findings and procedural protections required under *Bearden* and *Turner*, there would then have been evidence as to whether the nonpayment had been willful.  Instead, nonpayment triggered an arrest warrant, after which the person would be arrested, held until the City could extract some money in the form of bond, and then released to start the process all over again.

The City is thus not entitled to summary judgment on the violations alleged in Count Six.  At most, there is a genuine dispute of material fact regarding the process and deficiencies for warrants issued for Post-Judgment Class members.

### G.    The City Is Not Entitled to Summary Judgment on Count Seven

The City is liable on Count Seven for choosing to hold warrantless arrestees in its jail even

though it knew—and here concedes—that there was absolutely no process whereby they could receive judicial determinations of probable cause to justify their continued detention.  *See* Def. Mot. at 56–57.  The City contends that its prolonged detention of *Gerstein* Class members was (1) presumably reasonable for up to 48 hours under *Riverside*, and is therefore immune to systemic challenge; (2) excused by Missouri law; and (3) attributable solely to the City's judge.  Def. Mot. at 53–57.  On the contrary, *Riverside*'s 48 hour presumption of reasonable delay does not apply where there is no prospect of a judicial probable-cause determination, and no Missouri law or ruling by the City's judge allowed or required the City's unlawful detention practices.

### 1. *Riverside*'s Presumption Does Not Apply Where There Is No Prospect of a Probable-Cause Determination

To set a constitutional guideline for states and local governments, the Supreme Court held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest . . . will be immune from systemic challenges."  *Riverside*, 500 U.S. at 56.  In other words, *if* a jurisdiction systematically provides requisite probable-cause determinations within 48 hours, detentions of warrantless arrestees are presumed to be reasonably prolonged for that purpose under the Fourth Amendment, and arrestees challenging their detentions bear the burden to rebut that presumption by showing they were "held for reasons unrelated to the arrangement of the probable-cause determination or completion of the steps incident to arrest."  Class Cert Order at 29.

The City misreads this presumption as precluding class actions challenging *Gerstein* violations.  *See* Def. Mot. at 54 (asserting that "[t]he 48-hour standard was established to *immunize states and counties from systematic challenges*" such as this one).  Its reading is belied by *Riverside* itself, in which the Court held that, because the County did *not* systematically provide judicial probable-cause determinations within 48 hours, it was "*not* immune from systemic challenges, such as this class action."  500 U.S. at 59 (emphasis added).  The City concedes that *Gerstein* Class

members likewise sat in its jail with no prospect of receiving judicial determinations of probable cause.  Def. Mot. at 56–57 ("As with initial appearances, Judge Brockmeyer did not make probable-cause determinations while individuals were incarcerated. . . .  [T]here was no Court practice of reviewing charges for probable cause and, thus, no avenue available to obtain such review."); *see also* SUMF at ¶¶ 45–46, 61, 66, 241.

It follows that the City is not "immune from systemic challenges" like the one brought here.  *Riverside*, 500 U.S. at 56.  Since the City never planned to present warrantless arrestees to a magistrate for probable-cause determinations, "*Riverside*'s '48-hour burden-shifting approach does not apply.'"  Class Cert Order at 28–29 (quoting *Portis v. City of Chicago*, 613 F.3d 702, 704 (7th Cir. 2010)).  As there was no process in place by which Plaintiffs could *ever* receive judicial determinations of probable cause, their detentions after arrest were unreasonably prolonged.  *See Webb v. City of Maplewood,* 340 F.R.D. 124, 142 (E.D. Mo. 2021) (finding "one hour after booking, 7 hours, or 47 hours and 59 minutes" constitutes unreasonable "delay . . . merely for delay's sake"); *Johnson v. Bd. of Police Comm'rs*, 370 F. Supp. 2d 892, 903 (E.D. Mo. 2005) ("Plaintiffs' allegation that they were confined without a warrant or any intention to obtain a warrant implies that their detention was unreasonably delayed for ill will or delay's sake."); *cf. United States v. Davis*, 174 F.3d 941, 945 (8th Cir. 1999) (holding that a detention of less than three hours was unreasonably prolonged where the arresting officer made no effort to process the arrestee for purposes of presenting her to a magistrate for a probable-cause determination but instead used that time for investigation).[40]  Plaintiffs have shown that the post-arrest detention of *Gerstein* Class members was unreasonably prolonged as a matter of law because they were held

---

[40] The City correctly notes that it can be reasonable for a suspect to be "merely processed and released." Def. Mot. at 54.  But the *Gerstein* Class members *were not* merely processed and released.  They were held in the City's jail until they either came up with enough money to satisfy City officers or were eventually released on recognizance.

despite the utter and systematic lack of judicial probable-cause determinations.  Pl. Mot. at 25–30.

The City cannot absolve itself of these wrongful detentions by showing—or simply proclaiming—that "if probable cause hearings had been held, it would not have resulted in release from incarceration."  Def. Mot. at 57 (wrongly inferring class members are limited to nominal damages "for the failure to receive [a] hearing").[41]  And contrary to the City's unsupported claims, class-wide claims for damages on systemic *Gerstein* violations are appropriate.  *See Brown v. City of Detroit,* 2012 WL 4470433, at *20 (E.D. Mich. Sept. 27, 2012); *Long v. Madison Cnty. Sheriff,* 2020 WL 1876142, at *1 (S.D. Ind. Apr. 15, 2020).[42]  Even if the outcome of a hypothetical probable-cause determination were relevant to Plaintiffs' recoverable damages on Count Seven, it would not affect the City's liability.  *See* ECF No. 469 (Reply in Support of Class Certification) at 21–22 (explaining that the City would bear the burden to establish any such counterfactual during claims-administration).

### 2.   Missouri Law Does Not Excuse the City's Unlawful Detention Practices

The City suggests that throughout the Class period, Missouri law authorized the detention of warrantless arrestees for 24 hours, and for even longer if there was a bail schedule.  *See* Def. Mot. at 55 (citing Mo. St. § 544.170 and a prior version of Mo. Sup. Ct. Rule 37.17).  This would

---

[41] The City cites nothing to support the idea that warrantless arrestees held without any chance of a judicial probable-cause determination are limited to nominal damages, nor anything to support the idea that the categories of available damages is before the Court at the dispositive motion stage.  In *Goldman v. Forbus*, the only case cited by the City, Def. Mot. at 57, the court found the plaintiff had not shown a deprivation of liberty justifying compensatory damages because he ultimately appeared before "a judge [who had] found that probable cause supported the arrest," and there was no allegation that warrantless arrestees in the jurisdiction were systematically denied judicial determinations of probable-cause.  *See* 17 Fed. Appx. 487 (8th Cir. 2001).  By contrast, the City never presented a single arrestee for a probable-cause determination and acknowledges that every arrestee could have been immediately released with an initial appearance court date already set, weeks—if not months—in the future.  As this Court has found, "reasonableness in this case does not turn on whether class members were held for too long (as in *County of Riverside* and *Portis*) but whether they were held for reasons unrelated to the arrangement of the probable-cause determination or completion of the steps incident to arrest."  Class Cert Order at 29.

be irrelevant even if it were true, because municipal liability is not precluded by state law that *authorizes* but does not *require* unlawful conduct.  *See supra* n.18.  But the City's characterization of state law is simply mistaken.  "Section 544.170 does not provide any authority to arrest persons without a warrant and hold them in custody for twenty[-four] hours."  *Mitchell v. Shearrer*, 2012 WL 918803, at *7–8 (E.D. Mo. Mar. 19, 2012) (citing *United States v. Oropesa,* 316 F.3d 762, 769 (8th Cir. 2003) (internal quotations omitted).  "[Section 544.170] is not a sword in the hands of the police, but rather a shield for the citizen."  *United States v. Roberts*, 928 F. Supp. 910, 932–33 (W.D. Mo. 1996).

Building on its misreading of § 544.170, applying to arrestees confined "without warrant or other process," the City claims, without support, that until January 1, 2019, Missouri Supreme Court Rule 37.17 "contemplated that a bond schedule may provide such 'other process' (rendering the 24 hour limit inapplicable)."  Def. Mot. at 55.  But Rule 37.17 merely authorized the acceptance of bond in accordance with a lawfully set bail schedule.[43]  It did not license, much less *require*, any period of detention for warrantless arrestees, much less a period exceeding the 24-hour limit set by § 544.170.[44]

The City has cited no Missouri law authorizing the detention of warrantless arrestees

---

[43] Rule 37.17 stated: "When an arrest is made without a warrant, the peace officer may accept bond in accordance with a bail schedule furnished by the court having jurisdiction."

[44] The City asserts that "Plaintiffs' theory does not even permit the . . . current iteration of the rule, providing: 'When an arrest is made without a warrant, the peace officer may accept bond within 24 hours of arrest in accordance with a bond schedule furnished by the court having jurisdiction.  If the judge has not issued an arrest warrant within 24 hours of arrest, the peace officer shall release the defendant from custody.'"  Def. Mot. at 55 n.60 (quoting Mo. Sup. Ct. R. 37.17 (2023)).  But the first sentence of the current rule merely authorizes the acceptance of bond in certain circumstances, and the second sentence merely limits how long an arrestee can be held without a warrant.  Rule 37.17 does not give cities a free pass to hold people without a warrant for some length of time regardless of whether there is some process in place for obtaining judicial probable-cause determinations.

without any prospect of a judicial probable-cause determination.[45]

### 3. No Municipal Judge Ruling Required the City's Unlawful Detention Practices

The City argues that it cannot be liable on Count Seven because "[s]etting conditions of release" and "[m]aking neutral probable-cause determinations after warrantless arrest" are judicial functions.  Def. Mot. at 56.  But Plaintiffs need not show the City to be liable for the utter lack of probable-cause determinations;[46] it is enough to show, as they have, that the City is liable for its prolonged *detention* of warrantless arrestees *given* the utter lack of such determinations.  *See* Pl. Mot. at 25–36, 40–46, 50–53.  As the Eighth Circuit recognized over thirty years ago in *Wayland*, "even if appellees were not responsible for the delay in the arraignment they still may be answerable for the constitutional violation.  The Springdale police . . . were under no obligation to continue to hold [the plaintiff]. . . . When the delay exceeds the time necessary to process the arrest, and the delay is no longer reasonable, the arrestee must be released."  933 F.2d at 670 (citing *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028 (1987) (when administrative steps incident to arrest are complete, "the police must take the suspect before a magistrate to establish probable cause, or they must let him go")).[47]

---

[45] The City insists that the unconstitutionality of its warrantless detention practices was not clearly established "in the pre-SB 5 era."  Def. Mot. at 55.  That is woefully mistaken.  *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 117 (1975) (finding that a procedure whereby a person arrested without a warrant and charged by information may be jailed or subjected to other restraints pending trial without any opportunity for probable-cause determination is unconstitutional); *Wayland v. City of Springdale*, 933 F.2d 668, 670 (8th Cir. 1991) ("A defendant may be detained only for as long as it takes to process 'the administrative steps incident to arrest.'" (quoting *Gerstein*, 420 U.S. at 114)).

[46] Nonetheless Plaintiffs *have* shown that because the City had the power under state and local law to "enact[] an ordinance instituting a procedure for affording prompt judicial determinations of probable cause for warrantless arrests," it is also liable for acquiescing in its municipal judge's practice of not affording them.  Pl. Mot. at 58–60.

[47] In fact, the Court in *Riverside* explicitly noted that police officers are responsible for arrestees being jailed without probable-cause hearings.  500 U.S. at 58 ("Everyone agrees that *the police* should make every attempt to minimize the time a presumptively innocent individual spends in jail.  One way to do so is to provide a judicial determination of probable cause immediately upon completing the administrative steps incident to arrest.")(emphasis added).

The City clouds this issue by claiming that "[Mr.] Brockmeyer *directed* that those who could not post bond *should* be held up to 72-hours (later 12-hours) and then released." Def. Mot. at 57 (emphases added). The City's false inference that City officers were powerless to release such arrestees earlier is contradicted by the record. The "72-hour" rule was a *limit* on the length of detention, not a "direction" that indigent people be held for 72 hours and then released. SUMF ¶¶ 61, 63, 167. According to the City's General Orders and Mr. Brockmeyer's previous testimony, City officers could release arrestees immediately after arrest, without payment, for any reason. Pl. Mot. at 19–20; SUMF ¶ 79. The practice of holding people who could not pay bond after arrest— for purposes unrelated to arranging a probable-cause determination, given that none was forthcoming—was the City's own.

The City's policies placed the responsibility on the City's jailers and the police for Count Seven violations. Section 417.23 of the City's General Orders, entitled "PRISONER HOLDING, TIME LIMITS" states, "[i]f an arrest is made without a warrant and a warrant is not issued within twenty-four hours, the prisoner must be released at or prior to the twenty-four hour mark." Hanlon Pl. Mot. Decl., Ex. 36 (SUMF ¶ 42), 4/8/10 General Order § 417.13 at 8. Indeed, this language aligns with the relevant Missouri statute, 544.170, which holds that the *jailer* who holds a warrantless arrestee beyond 24 hours is guilty of a misdemeanor. RSMo 544.170(3).

For the reasons stated above and in Plaintiffs' memorandum, it is Plaintiffs, not the City, who are entitled to summary judgment on Count Seven.

## IV.   THE CITY IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT FOR THE PERIOD AFTER JUNE 30, 2015

In the alternative, the City asserts that "all practices of which Plaintiffs complain had ceased by June 30, 2015," Def. Mot. at 57, and asks the Court to grant it partial summary judgment on "all claims accruing after" that date, *id.* at 59. The City's evidence is limited to a certification

signed by Donald McCullin, who took over as municipal judge in June 2015, and two reports from the Office of State Courts Administrator ("OSCA"). Neither show that all of the violations had ceased by the end of June 2015.

The first OSCA Report, dated April 13, 2015, hardly bears on Plaintiffs' claims. *See* ECF No. 604–15 ("Def. Ex.[48] O"). For example, though the report states that there has been a written bond schedule, Def. Ex. O at 7, there is no mention of bond review hearings, who sets bond, whether those bond-settings involve any determination of ability to pay, or even whether and how the bond schedule is followed in practice.

The second OSCA Report, dated May 11, 2015, provides more detail but still does not answer these questions. For example, Roy Richter, judge of the Eastern District, Missouri Court of Appeals from 2006 to 2020, states in the Report that it is the municipal court policy not to issue warrants simply for nonpayment. *See* ECF No. 604-16 ("Def. Ex. P") at 4. Yet, the Report also states: "Court administration experts note that the section of the online vendor payment system for partial payments states that payments must be at least $100 or a defendant's case will be placed into warrant status." Def. Ex. P at 7. Crucially, the Report limits its discussion of changed bond practices primarily to the issuance of a new bond schedule and does not mention the provision of any bond review hearings. *See id.* at 12–13. And, neither OSCA Report explains any new procedure by which a judge would make a probable-cause determination for warrantless arrestees.

Similarly inconclusive is Mr. McCullin's certification of "full compliance with the requirements of the newly enacted Senate Bill 5." Def. Mot. at 58. Although it states that "[d]efendants in custody pursuant to an initial arrest warrant by the municipal court have an opportunity to be heard by a judge . . . as soon as practicable and not later than forty-eight hours

---

[48] References to "Def. Ex." are to the March 13, 2023 exhibits filed by Defendant in its Statement of Facts ("SOF") in Support of its Motion for Summary Judgment ("Def. Mot."). ECF No. 586.

on minor traffic violations and not later than seventy-two hours on other violations,"  ECF No. 604-17 ("Def. Ex. Q") at ¶ 1,  and that "[d]efendants in municipal custody shall not be held more than twenty-four hours without a warrant after arrest," *id.* at ¶ 2, the certification provides no evidence of any process or procedure by which arrestees could ever receive such initial hearings or probable-cause determinations, much less any evidence that they actually took place.

Instead, the City presents evidence that, through an order drafted by the City and signed by Mr. Brockmeyer, it announced a twelve-hour maximum hold time in the City's jail.  Plaintiffs have already presented evidence that despite this announcement, the City continued to hold some individuals for longer than twelve hours.  *See* SUMF ¶ 180; SAMF ¶ 114 (252 individuals held for over twelve hours between June 30, 2015 and September 30, 2017).  In fact, Defendant concedes as much.  *See* Def. Mot. at 59.[49]

Thus, the City has presented no evidence that the arrestees it held for nonpayment of a secured monetary bond after June 2015 had any prospect of ability-to-pay hearings or judicial determinations of probable cause.  For the reasons Plaintiffs have explained above and in their memorandum in support of their Motion for Summary Judgment, inasmuch as these processes remained systematically unavailable, the City still had no constitutional ground on which to detain people after arrest.

What the City is really arguing is not that it had finally developed a system for providing the missing legal process, but instead that it had begun releasing people quickly enough that it believed no process was due.  This is the same, failed argument the City levied against class

---

[49] The data also shows that individuals with the same charge were released upon different sums of monetary bond, that individuals were released upon the payment of random, small amounts of money, and that bond was taken for charges not on the bond schedule, indicating that in practice, jailers continued to set bond based on their judgment. *See* SAMF ¶¶ 116–18.  And Ferguson continued to hold people upon the payment of a monetary sum, only to release them eventually after they did not pay that sum.  *See* SUMF ¶ 180.

certification and rehashes as to the entire Class period in its present motion.  *See Webb*, 340 F.R.D. at 141–42 (even detention of one hour is not "reasonable" if "the delay in releasing these persons was merely for delay's sake.").  The smaller number of prolonged, post-arrest detentions from June 30, 2015, through the closure of the City's jail in 2017 (the end of the class period), may indicate that fewer class members were affected during that time, and for fewer hours on average. But it does not show that their detention was constitutional.

At most, then, the City has raised questions of fact as to which of its practices changed, when they changed, and how (or if) those changes brought a stop to its constitutional violations.[50] That does not suffice for the partial summary judgment it seeks.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully ask this Court to deny the City's Motion.

---

[50] If the Court finds that the purported policy changes described by the City raise issues of material fact after June 30, 2015, Plaintiffs ask the Court to grant their Motion for Partial Summary Judgment prior to that date and allow the remaining issues of fact to be resolved by the factfinder at trial.  *Cf., e.g.*, *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 265, 272–74 (D.D.C. June 24, 2011) (granting summary judgment for plaintiffs for a portion of a certified class period when defendant presented evidence of policy reforms for the later portions of the certified class period that raised issues of fact); *Ford v. City of Boston*, 154 F. Supp. 2d 131, 133–50 (D. Mass. 2001) (analyzing summary judgment arguments for certified class period in two parts after defendant presented evidence of reforms within the certified class period, granting summary judgment for plaintiffs for the pre-reform period and finding issues of fact remained in the post-reform period).

Dated: April 19, 2023

**WHITE & CASE LLP**

By: */s/ Angela Daker*
Angela Daker (*pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Phone: 305-371-2700
Email: adaker@whitecase.com

J. Frank Hogue (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
Phone: 202-626-3623
Email: fhogue@whitecase.com

Ross E. Elfand (*pro hac vice*)
Iva Popa (*pro hac vice*)
Hafsa S. Mansoor (*pro hac vice*)
Luke J. Miller (*pro hac vice*)
Chloe R. Edmonds (*pro hac vice*)
Ariell D. Branson (Law Clerk—not barred)
Fabiola Alvelais Aldana (*pro hac vice*
pending)
1221 Avenue of the Americas
New York, NY 10020
Phone: 212-819-7670
Email: relfand@whitecase.com

Respectfully submitted,

**ARCHCITY DEFENDERS**

Maureen Hanlon, #70990MO
Blake A. Strode, #68422MO
John M. Waldron, #70401MO
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
Phone: 855-724-2489
Email: mhanlon@archcitydefenders.org

—and—

**CIVIL RIGHTS CORPS**

Marco Lopez (*pro hac vice*)
Ryan Downer (*pro hac vice*)
1601 Connecticut Avenue NW, Suite 800
Washington, DC 20009
Phone: 202-844-4975
Email: marco@civilrightscorps.org

—and—

**SLU LAW CLINIC**

Brendan Roediger (MBE #6287213IL)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
Phone: 314-977-2778
Email: brendan.roediger@slu.edu

***ATTORNEYS FOR PLAINTIFFS***