**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KEILEE FANT, ROELIF CARTER, ALLISON NELSON, HERBERT NELSON JR., ALFRED MORRIS, ANTHONY KIMBLE, DONYALE THOMAS, SHAMEIKA MORRIS, RONNIE TUCKER, et al., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:15-CV-00253-AGF |
| THE CITY OF FERGUSON, | ) ) | |
| Defendant. | ) ) ) | (Class Action) |

**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO THE CITY'S LIABILITY ON COUNTS ONE, TWO, AND SEVEN**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 1

I. Plaintiffs Remain Entitled to Summary Judgment on Count One ..................... 1

   A. The City Misreads the Applicable Fourteenth Amendment Law ................... 4

   B. *Bearden* Class Members Can Recover Damages from the City ....................... 7

   C. The City's Judge Did Not Mandate Its Procedurally Hopeless Detention of *Bearden* Class Members ......................................................................... 10

II. Plaintiffs Remain Entitled to Summary Judgment on the Due Process Claim in Count Two 11

   A. What Count Two Asserts .............................................................................. 12

   B. Plaintiffs Have Not Moved for Summary Judgment on Their Sixth Amendment Claim in Count Two .................................................................. 13

   C. Post-Judgement Class Members Were Jailed on Warrants Issued for Nonpayment ........ 14

   D. The City Is Liable on Count Two Both for Its Jailing Practices and for Acquiescing in the Failures of Its Municipal Judge................................................ 16

III. Plaintiffs Remain Entitled to Summary Judgment on Count Seven ........................................ 17

   A. The Fourth Amendment Prohibits Detaining a Warrantless Arrestee Without Any Prospect of a Judicial Determination of Probable Cause, and the City Misrepresents the Law to Support its Opposition ............................................................. 17

   B. *Gerstein* Class Members Were Detained After Warrantless Arrests Without Any Prospect of a Judicial Determination of Probable Cause, and the Reasonableness of Their Detentions Following Arrest is a Legal Issue .................................................. 19

   C. Plaintiffs do not Concede There was Probable Cause to Detain Each and Every *Gerstein* Class Member ...................................................................... 21

   D. City is Liable for Choosing to Detain Warrantless Arrestees in the Total Absence of Judicial Probable-Cause Determinations ......................................... 23

IV. The City Remains Liable for the Violations Under Counts One, Two, and Seven ............... 24

   A. The Police Chief, City Manager, and City Council are Final Policymakers Regarding the City's Jailing Practices............................................................ 24

      1. *The Police Chief*.................................................................................... 24

      2. *The City Manager* ................................................................................ 26

      3. *The City Council* .................................................................................. 27

   B. Plaintiffs Were Not Required to Plead Delegation in the Complaint ............................... 28

V. Plaintiffs' Motion Satisfies the Requirements of Rule 56 .................................................... 29

A. Plaintiffs' Evidence Supports Material Facts ...................................................... 30

B. The City Fails to Establish a Genuine Issue of Material Fact........................................... 31

C. The City Misstates the Standard for Partial Summary Judgment and Fails to Explain Why Plaintiffs' Alternative Motion Should Not Be Granted ...................................................... 35

CONCLUSION............................................................................................................................ 35

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Alabama v. Shelton*, 535 U.S. 654 (2002) ..................................................................13

*Atkinson v. City of Mt. View*, 709 F.3d 1201 (8th Cir. 2013) .......................................25

*Baker v. City of Florissant*, 2023 WL 1434261 (E.D. Mo. 2023) ..................................9

*Barber v. C1 Truck Driver Training*, 656 F.3d 782 (8th Cir. 2011) ............................33

*Barone v. City of Springfield, Or.*, 902 F.3d 1091 (9th Cir. 2018) ..............................27

*Bearden v. Georgia*, 461 U.S. 660 (1983) ........................................................... passim

*Betances v. Fischer*, 403 F. Supp. 3d 212 (S.D.N.Y. 2019) ...........................................8

*Bolderson v. City of Wentzville*, 840 F.3d 982 (8th Cir. 2016) ....................................28

*Brown v. City of Detroit,* 2012 WL 4470433 (E.D. Mich. Sept. 27, 2012) ...................22

*Caddell v. Campbell*, 2020 WL 703951 (S.D. Ohio Feb. 12, 2020) .............................23

*Cain v. City of New Orleans*, 327 F.R.D. 111 (E.D. La. 2018) ......................................2

*Caliste v. Cantrell*, 329 F. Supp. 3d 296 (E.D. La. 2018), *aff'd*, 937 F.3d 525 (5th Cir. 2019) ......6

*Carey v. Piphus*, 435 U.S. 247 (1978) ............................................................................8

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ..............................................24, 26

*Conolly v. Clark*, 457 F.3d 872 (8th Cir. 2006) ..........................................................33

*Corelink v. Phygen, LLC*, 2014 WL 7140442 (E.D. Mo. Dec. 12, 2014) ....................27

*Covington v. Byrd, et al.*, 2:12-cv-00123-DPM (E.D. Ark. Mar. 3, 2015) ....................9

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ........................................18, 23

*Dellums v. Powell*, 566 F.2d 167 ...................................................................................8

*Davison v. City of Minneapolis*, 490 F.3d 648 (8th Cir. 2007) ....................................24

*Diamonds Plus, Inc. v. Klober*, 960 F.2d 765 (8th Cir. 1992) ......................................27

*Doe ex. Rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605 (8th Cir. 2003) ..........28

iv

*Duhe v. City of Little Rock*, 2017 WL 1536231 (E.D. Ark. Apr. 27, 2017) ...................................19

*Edwards v. City of Florissant*, 58 F.4th 372 (8th Cir. 2023) ..........................................................29

*Farr v. Paikowski*, 2013 WL 1288041 (E.D. Wis. Mar. 25, 2013) ...............................................19

*Flanagan v. Munger*, 890 F.2d 1557 (10th Cir. 1989) ...................................................................26

*Goldman v. Forbus*, 17 Fed. Appx. 487 (8th Cir. 2001)................................................................22

*Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028 (1987)............................................................................................................................................23

*Greensboro Profess. Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962 (4th Cir. 1995)....................................................................................................................................24

*Hess v. Ables*, 714 F.3d 1048 (8th Cir. 2013) ........................................................................28, 29

*Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624 (1988)............................................................14

*Hudak v. Clark*, 2018 WL 1785865 (M.D. Pa. Apr. 13, 2018) ....................................................35

*In re San Luis & Rio Grande R.R., Inc.*, 634 B.R. 599 (Bankr. D. Colo. 2021)...........................35

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)................................14

*Jenkins v. Mabus*, 646 F.3d 1023 (8th Cir. 2011).........................................................................31

*Johnson v. Bd. of Police Comm'rs*, 370 F. Supp. 2d 892 (E.D. Mo. 2005)..................................20

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) ...............................................................8

*Koepplinger v. Seterus, Inc.*, 2020 WL 2063416 (M.D.N.C. Apr. 29, 2020)...............................35

*Long v. Madison Cnty. Sheriff,* 2020 WL 1876142 (S.D. Ind. Apr. 15, 2020).............................22

*Mabry v. Cty. of Kalamazoo*, 626 F. Supp. 912 (W.D. Mich. 1986) ...........................................23

*Mader v. United States*, 654 F.3d 794 (8th Cir. 2011)..................................................................29

*Mitchell v. Shearrer*, 2012 WL 918803 (E.D. Mo. Mar. 19, 2012)..............................................18

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) .....................................7

*Moore v. City of Ferguson, Mo.*, 213 F. Supp. 3d 1138 (E.D. Mo. 2016).....................................25

*Pattie v. AT&T*, 2012 WL 1070031 (W.D. Pa. 2012)...................................................................35

*Pierce v. Pemiscot Mem'l Health Sys.*, 25 F. Supp. 3d 1198 (E.D. Mo. 2014).............................8

*Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010)...............................................................18

*Pugh v. Rainwater*, 572 F.2d (5th Cir. 1978)...........................................................................2, 7

*Rodriguez v. Providence Community Corrections, Inc*., Case No. 3:15-cv-01048 (M.D. Tenn. Oct. 1, 2015) ..............................................................................................................................9

*Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941 (8th Cir. 2017) ...........................................28

*Sylvan Beach v. Koch*, 140 F.2d 852 (8th Cir. 1944)...................................................................29

*Turner v. Rogers*, 564 U.S. 431 (2011)................................................................................6, 11

*United States v. Davis*, 174 F.3d 941 (8th Cir. 1999)...........................................................19, 20

*United States v. Perez-Macias*, 335 F.3d 421 (5th Cir. 2003) ....................................................13

*United States v. Pollard*, 389 F.3d 101 (4th Cir. 2004) .............................................................13

*United States v. Roberts*, 928 F. Supp. 910 (W.D. Mo. 1996).....................................................18

*Wayland v. City of Springdale*, 933 F.2d 668 (8th Cir. 1991) ................................................19, 23

*Webb v. City of Maplewood*, 340 F.R.D. 124 (E.D. Mo. 2021)............................................9, 18, 20

## STATUTES AND RULES

42 U.S.C. § 1983......................................................................................................... passim

Ferguson Code of Ordinances § 4.4.....................................................................................25, 26

Ferguson Code of Ordinances § 33-18 ................................................................................24, 25

Mo. St. § 544.170............................................................................................................18, 19

Mo. Sup. Ct. Rule 37.17 ...................................................................................................18, 19

**INTRODUCTION**

In their opening memorandum of law, ECF No. 597 ("Pl. Mot."), Plaintiffs established that they were held unconstitutionally in the Ferguson Jail as alleged in Counts One, Two, and Seven. *Bearden* Class members were jailed for nonpayment without hope of an inquiry into their ability to pay.  Pl. Mot. at 20–28.  Post-Judgment Class members were jailed as a result of debt-collection proceedings in which they had no access to counsel.  *Id*. at 28–33.  And *Gerstein* Class members were held in the City's jail without any chance of receiving a judicial determination of probable cause.  *Id*. at 33–38.  Plaintiffs further demonstrated that the City's policymakers were deliberately indifferent to the risk of these violations and thus that the City was liable for them under 42 U.S.C. § 1983.  *Id*. at 38–68.

The City's opposition, ECF No. 613 ("Def. Opp."), does little more than repeat select misstatements of law and fact from its own motion, ECF No. 586 ("Def. Mot.").  Repeatedly, the City insists that the Missouri state judiciary was solely responsible for the violations and that Plaintiffs cannot establish liability class-wide.  Neither this tired refrain nor any of the scattered verses the City adds in opposition counter Plaintiffs' showing that the uncontroverted material facts entitle them to judgment as a matter of law on Counts One, Two, and Seven.[1]

**ARGUMENT**

I.      **Plaintiffs Remain Entitled to Summary Judgment on Count One**

The members of the *Bearden* Class are entitled to summary judgment on Count One because the City jailed them for failing to pay a monetary sum without any hope of an inquiry into their ability to pay.  Pl. Mot. at 20–28.  As in its own motion, the City argues in opposition to Plaintiffs' Motion (a) indigence is required for violations under Count One, Def. Opp. at 33–34;

---

[1] Plaintiffs reiterate their request for this Court to hear oral argument on summary judgment.  *See* ECF589 at 2.

1

(b) that the City's judge, acting solely for the Missouri state judiciary, was responsible for the violations, *id.* at 34–36; and (c) that the violations depend on a standard of reasonableness that cannot be adjudicated on a class-wide basis, *id.* at 36–38.[2]

Plaintiffs refuted these arguments in their opposition to the City's motion, ECF No. 618 ("Pl. Opp."). Contrary to (a), the "right to an ability-to-pay inquiry does not depend on indigence; the procedural protections required by the Supreme Court . . . apply equally to indigent and non-indigent individuals." *Cain v. City of New Orleans*, 327 F.R.D. 111, 124 (E.D. La. 2018); *see also* Pl. Opp. at 24–29[3]. It is incoherent on its face and inconsistent with blackletter law to maintain, as the City does, that each Class member's right to a protective procedure depended on the outcome of that procedure. *Id.* Protections against wealth-based detention apply to both the destitute, and "the indigent whose money bail is set in an amount higher than they can provide." *Pugh v. Rainwater*, 572 F.2d, 1053, 1057 (5th Cir. 1978). As such, Count One is not limited to the indigent. Pl. Opp. at 24–29.

Contrary to (b), Count One does not challenge the court's failure to afford ability-to-pay hearings, but challenges the City's detention practices lacking *Bearden* Class members had no hope of such proceedings. *Id.* at 30–31. City employees had the power to release *Bearden* Class members after arrest but maintained a policy and practice of holding them in its jail until they managed to scrounge together enough money to satisfy City officers. *Id.* at 32–34. No ruling by the City's judge stood in its way or forced its hand. *Id.*

---

[2] Arguments (a), (b), and (c) appear in Def. Mot. at 17–24, 24–31, and 31–38, respectively.
[3] The City mischaracterizes Count One as "an equal protection claim brought on behalf of indigent plaintiffs" and claims that "the due process clause is necessarily incidental to that claim" without citing any authority for this assertion. Def. Opp. at 26. Not only does Count One not depend on indigence, but similar to *Bearden*, is a Fourteenth Amendment claim where "[d]ue process and equal protection principles converge" to protect people from wealth-based imprisonment. *Bearden*, 461 U.S. at 665; *see also* Pl. Opp. at 14–15.

Contrary to (c), the City's post-arrest detention of *Bearden* Class members was uniformly unreasonable because there was absolutely no chance that any of them would receive the requisite post-arrest process.  *Id.* at 29–31.  First, the City mistakes that the Fourteenth Amendment analysis applies to the *Bearden* Class's lack of ability-to-pay hearings in a similar manner as it does to the *Gerstein* Class's lack of judicial determinations of probable cause,  Def. Mot,. at 23, when in fact it does not.  *See* ECF No. 519 ("Class Cert Order") at 21–22 ("The City's reliance on Fourth Amendment case law regarding prompt determinations of probable cause after warrantless arrests is . . . inapposite.").  Second, post-arrest detention of *Bearden* Class members without any hope of an ability-to-pay inquiry is unreasonable, given the City held arrestees for as long as it took for arrestees to conjure up some amount of money to secure their release.  Pl. Opp. at 29–30.

The City further contends that only people detained after arrest (i.e., beyond booking) can recover on Count One, that Plaintiffs concede as much, and that there is no way to identify such people.  Def. Opp. at 37–38 & n.29.  Plaintiffs made no such concession.  Plaintiffs did note that the Fourth Amendment doctrine the City proposed to import into this Fourteenth Amendment context would allow for some time to complete an arrest, and that two hours would provide a workable (if generous to the City) estimate, based on representative evidence reported by their expert, Dr. Demuth.  ECF No. 469 at 14–15 ("To conservatively estimate the size of the Class and to demonstrate one way in which damages can be determined on a class-wide basis, Plaintiffs' expert, "[r]ecognizing that a reasonable amount of time might be required to release any person arrested, . . . subtracted 2 hours from the detention time of each arrest based on the median detention time for arrests in the 2015–2019 time period that qualified for the [*Bearden*] Class.' . . . To determine liability and measure damages on a class-wide basis, this Court can employ Dr. Demuth's estimate—which is based on the median detention time during a period in which,

according to the City, there was no undue delay—as representative evidence of the time it took to complete the administrative steps incident to arrest during the Class period."). Given the City's failure to fulfill its constitutional duty to obtain findings (or create records) regarding Plaintiffs' ability to pay, this Court concluded that the use of such representative evidence would be appropriate, if necessary. Class Cert Order at 25–26.

In addition to the City's recycled summary judgment arguments, they rely on two errors of law and a misstatement of fact. The first legal error (addressed in Section A below) is the City's misreading of *Bearden* as based on a substantive finding that the defendant made bona fide efforts to pay. Def. Opp. at 25. This may illuminate why the City misrepresents the Fourteenth Amendment right against wealth-based detention as providing procedural protection only to the indigent. The second legal error (Section B) stems from the City's confusion about the relief available under Count One. *Id.* at 24, 29–30, 32. Untangling this confusion illustrates why Plaintiffs can recover damages and why the City cannot deflect blame onto its judge. Finally, the misstatement of fact (Section C)— more egregious in the City's opposition than in its opening brief—is that the City's judge, Ronald Brockmeyer ("Mr. Brockmeyer"), ordered City officers to hold arrestees on unpaid bond for 72 hours before releasing them. *Id.* at 35. This is contrary to Mr. Brockmeyer's own testimony and belied by the uncontroverted facts showing the City had authority to release *Bearden* Class members on their own recognizance immediately after arrest.

### A.    The City Misreads the Applicable Fourteenth Amendment Law

In Plaintiffs' opening brief, they establish that *Bearden v. Georgia*, 461 U.S. 660 (1983) shows that jailing Plaintiffs without an ability-to-pay-inquiry violated the Fourteenth Amendment. *See* Pl. Mot. at 21–26. The City mistakenly argues that it is only when an *indigent* person faces imprisonment for nonpayment that the Fourteenth Amendment requires an inquiry and findings

4

concerning the reasons for their nonpayment.  *See, e.g.*, Def. Opp. at 23–25.[4]  In an attempt to reconcile this view with the Supreme Court's reasoning in *Bearden* itself, the City writes, "As *the defendant* [Bearden] *was jailed despite bona fide efforts to pay*, the Supreme Court determined that the sole justification for his imprisonment was not contempt, but indigence, and the failure to hold a hearing and consider alternative *forms of punishment* violated due process" *id.* at 25 (first emphasis added) (citing *Bearden*, 461 U.S. at 662).  Here the City suggests that the need for an inquiry followed from a substantive finding that Bearden had made bona fide efforts to pay, such that, had he *not* made bona fide efforts, the failure to hold a hearing would not have violated the Fourteenth Amendment.  *See id.* at 25.[5]  The City appears to reason (incorrectly) that a defendant's indigence triggers a right to an inquiry into whether he has made bona fide efforts (and, if he is found to have made such efforts, a right to consideration of alternatives to imprisonment).

But contrary to the City's self-serving characterization, the Supreme Court did *not* find that Bearden had made bona fide efforts to pay.  Rather, it noted that the state court *had not found a lack of bona fide efforts* (*i.e.*, failed to inquire).  *See Bearden*, 461 U.S. at 673 ("While the sentencing court commented on the availability of odd jobs such as lawn-mowing, it made no finding that the petitioner had not made sufficient bona fide efforts to find work . . . ."); *id.* at 673–74 ("In the absence of a determination that the petitioner did not make sufficient bona fide efforts to pay or to obtain employment in order to pay, we cannot read the opinion of the sentencing court as reflecting such a finding.").

This lack of a *finding* violated Bearden's Fourteenth Amendment rights *irrespective of his ability to pay*.  As it happens, the Supreme Court appeared to accept that Bearden had been unable

---

[4] The City also contends that this requirement applies only in certain post-judgment contexts.  *See id.* at 25–27.  But Plaintiffs have already refuted that contention.  *See* Pl. Mot. at 31–35; Pl. Opp. at 24 & n.11.

[5] The City cites no authority finding Bearden inapplicable or that contests the plethora of case law Plaintiffs have cited.  *See* Def. Opp. at 25–26; Pl. Mot. at 20–28.

to pay.  *See id.* at 674.  As it happens, the Supreme Court appeared to accept that Bearden had been unable to pay.  *See id*. at 674.  But that was not a precondition for his right to an inquiry into the reasons for his nonpayment.  As the Court made clear, the critical question is whether a defendant is "somehow responsible for the failure" to pay, *see id.* at 665, or, to put it another way, "at fault in his failure to pay," *id*. at 668 n.7.  There are two basic ways a defendant can be so at fault: "willfully refus[ing] to pay . . . when he has the means to pay," and "fail[ing] to make sufficient bona fide efforts" to gain the money to pay.  *Id.*  Neither is the case here, where nonpayment alone is involved.

The City's insistence that the *Bearden* right protects only the indigent may stem from its conflation of indigence and pennilessness, which Plaintiffs addressed in their opposition, Pl. Opp. at 25–28,[6] or the City's failure to recognize that the right to a procedure cannot depend on what the outcome of that procedure would be, which Plaintiffs also addressed, Pl. Opp. at 25.

The City's opposition also addresses *Turner v. Rogers*, 564 U.S. 431 (2011) for the first time, denying that it "categorically require[s] an ability to pay inquiry before an arrest and imposition of bond."  Def. Opp. at 27.  Plaintiffs do not rely on *Turner* for that.  For the purposes of Count One, *Turner* merely illustrates procedural safeguards that can help ensure "fundamental fairness" for a person imprisoned for nonpayment.  *See* 564 U.S. at 448.  And the case has been used to derive adequate safeguards in the context of unaffordable bail.  *See, e.g.*, *Caliste v. Cantrell*, 329 F. Supp. 3d 296, 311–12 (E.D. La. 2018), *aff'd*, 937 F.3d 525 (5th Cir. 2019).  But

---

[6] *Bearden* itself makes clear that indigence is not pennilessness.  *See* 461 U.S. at 666 n.8 ("[A] defendant's level of financial resources is a point on a spectrum rather than a classification.").  Indeed, the *Bearden* Court used this very fact to explain why the right against wealth-based detention cannot be analyzed purely in terms of equal protection. *See id.* ("Since indigency in this context is a relative term rather than a classification, fitting the problem of this case into an equal protection framework is a task too Procrustean to be rationally accomplished." (quotation marks omitted)).  *Bearden* thus makes clear that the City is doubly wrong when it asserts that "Count I is an equal protection claim brought solely by allegedly indigent Plaintiffs," Def. Mot. at 22; *see also* Def. Opp. at 26.

*Turner* does not bear directly on Count One here, because there was no ability-to-pay inquiry, and thus no process to be evaluated under *Turner*.

**B.** ***Bearden* Class Members Can Recover Damages from the City**

In a confused attempt to distinguish this case from the many cases in which courts have granted prospective relief on *Bearden* claims similar to Count One, the City suggests that, although non-indigent detainees cannot, in its view, recover *damages* for a *Bearden* violation, they *may* be able to obtain *injunctive* relief.  Def. Opp. at 24; *id.* n.20 (noting that the voluntary dismissal of Plaintiffs' prospective claims is pending).  The City continues: "Where . . . an ability-to-pay inquiry [] requires the inclusion of the non-indigent, i.e., where the process is necessary to identify the indigent whose rights are at stake, injunctive relief may be available."  *Id.* (citing *Rainwater*, 572 F.2d at 1057).[7]

In general, whenever a plaintiff can seek prospective relief against a municipality under § 1983 to stop or prevent the deprivation of a federal right, they can also seek damages from that municipality for past deprivations of that right (within the statute of limitations).  *Cf. Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978) ("Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements" a policy or custom of theirs).  So given the City's correct suggestion that a non-indigent detainee can obtain prospective relief against a

---

[7] The City offers no reason why a non-indigent detainee would be able to obtain an injunction to stop or prevent a *Bearden* violation but unable to obtain damages for a past violation.  If the defendant were a state enforcement actor sued under *Ex parte Young*'s "exception" to Eleventh Amendment sovereign immunity, then injunctive relief for ongoing or impending violations would be available yet damages for past violations would not be.  Here, not only is the defendant a municipality, but also the Eleventh Amendment would render damages unavailable to indigent and non-indigent detainees alike.  *See* Def. Opp. at 24 n.21 (implying that "indigent co-class members" would be able to seek substantial damages).

municipality to address ongoing or impending *Bearden* violations, it follows that they can also

obtain damages to redress past violations (in a timely suit), as Plaintiffs seek to do here.[8]

Ultimately the City retreats to the claim that only indigent members of the *Bearden* Class

can recover *substantial* (compensatory) damages for their procedurally hopeless detention, and

that any non-indigent members are limited to nominal damages. *See* Def. Opp. at 24 n.21, 29–30.

As Plaintiffs have explained in connection with the City's analogous claim as to Count Seven, Pl.

Opp. at 54 & n.41, the City cites nothing to support this limitation where, as here, Plaintiffs were

held without any prospect of the requisite process, and in any event this is a question of damages

that does not affect the City's liability at issue in Plaintiffs' motion.

Although prospective challenges to wealth-based detention may be more common than

suits for damages, the City cites nothing suggesting that damages are unavailable. As a general

matter, of course, § 1983 actions can seek both nominal and compensatory damages for

constitutional violations. *See, e.g.*, *Carey v. Piphus*, 435 U.S. 247 (1978). And the City offers no

reason to distinguish this case from others in which Plaintiffs have recovered damages for

constitutional violations. *See, e.g.*, *Pierce v. Pemiscot Mem'l Health Sys.*, 25 F. Supp. 3d 1198,

1208 (E.D. Mo. 2014) ("Compensatory damages may be available for . . . the period spent in

wrongful confinement."); *Kerman v. City of New York*, 374 F.3d 93, 125–26 (2d Cir. 2004)

("[E]ven absent such other injuries, an award of several thousand dollars may be appropriate

simply for several hours' loss of liberty."); *Betances v. Fischer*, 403 F. Supp. 3d 212, 238

(S.D.N.Y. 2019) (holding that "a class-wide daily damages value may be assessed for each day of

incarceration or other restraint of liberty."); *Dellums v. Powell*, 566 F.2d 167, 174 n.6, 188 n.56

---

[8] Though the City is right that a non-indigent detainee can obtain injunctive relief to address a municipality's violation of *Bearden*, this fact contradicts the City's claim, repeated throughout its briefs, that only indigent people can suffer *Bearden* violations in the first place.

(D.C. Cir. 1977) (damages in mass arrest case tried and determined "for the class as a whole or by subclass" based on number of hours or days in custody).[9]

Though the many injunctions against wealth-based detention schemes noted by the City do nothing to preclude damages here, they do provide examples of *Bearden* violations not blamed on *judges*.  *Cf.* Def. Opp. at 29–31.   Under § 1983, injunctive relief cannot issue against judicial officers acting in their judicial capacity "unless a declaratory decree was violated or declaratory relief was unavailable," *id.*, a situation that almost never arises.   In effect, then, every injunction issued on a claim challenging wealth-based detention represents the absence of a finding of the sort the City invites here: a finding that some judicial act absolves the enjoined party of its own Fourteenth Amendment violations.   As in those cases, so too here.   The City's judge did not force it to hold *Bearden* Class members in its jail after arrest without hope of the requisite process.  *See* Pl. Opp. at 42–44.

---

[9] Indeed, other courts (including courts in this district) have certified similar classes seeking compensatory damages and approved settlements based on fixed monetary rates applied to the lengths of unconstitutional detentions.  *See, e.g.*, *Webb v. City of Maplewood*, 340 F.R.D. 124, 142–43 (E.D. Mo. 2021) ("[P]laintiffs proffer common proof of the value of being free from detention on an hourly basis.  Accordingly, although individual class members may be entitled to a different amount of damages, the damages can be measured using common means."); *Baker v. City of Florissant*, 2023 WL 1434261 at *19 (E.D. Mo. 2023) ("Damages can also be determined using a common method of analyzing municipal court records.  Plaintiffs' expert can narrow the class as described above and utilize the records to show the amount of fines paid by these persons."); *Rodriguez v. Providence Community Corrections, Inc.*, Case No. 3:15-cv-01048 (M.D. Tenn. Oct. 1, 2015), Order Granting Final Approval of Class Settlement, dated July 18, 2018 (ECF No. 229) at 4 (paying "each class member whose probation ended before October 1, 2014 125% of the amount that he or she actually paid to PCC for fees from October 1, 2011 to October 1, 2014, as well as 125% of any fees paid by the class member for an offense committed before October 1, 2011," with excess funds disbursed pro rata); *Covington v. Byrd*, et al., 2:12-cv-00123-DPM (E.D. Ark. Mar. 3, 2015) Doc. 188 (approving class of over-detained individuals seeking damages at approximately $600 per day).

## C.    The City's Judge Did Not Mandate Its Procedurally Hopeless Detention of *Bearden* Class Members

In its opposition, the City claims that Mr. Brockmeyer "confirmed that he, and he alone, was responsible for the practices employed by the Court," which absolves them of responsibility. Def. Opp. at 34.[10]  But the City misconstrues the record.

In its opening brief, the City first claimed that "[Mr.] Brockmeyer directed that those who could not post bond should be held up to 72-hours (later 12-hours) and then released."  Def. Mot. at 57 (emphases added).  This implies that Mr. Brockmeyer had ordered City officers to hold certain arrestees—those who could not afford bond—for 72 hours (or, under a later directive, for 12 hours) and then release them, leaving the officers powerless to release them earlier.  Though the City provided no citation for its claim, similar—but crucially different—language appeared in an ad hoc declaration the City obtained from Mr. Brockmeyer a few weeks before filing for summary judgment.  *See* ECF No. 604-12 ("Brockmeyer Dec.") ¶ 12 ("*I established maximum permissible incarceration terms as follows*: From some point prior to February 1, 2010 through December 18, 2014, *I directed the Police Department to hold jail inmates for a maximum of 72-hours*." (emphases added)). [11]  Even according to the declaration, then, the "72-hour" rule was a limit on the length of detention, not a direction that indigent people be held for 72 hours and then released.  SUMF ¶¶ 61, 63, 167. Despite this, the City's opposition presents an even more distorted

---

[10] The City also claims that Mr. Brockmeyer was responsible for the issuance of all warrant and bond amounts; that no warrants were issued for nonpayment.  Def. Opp. at 21 n.16, 35.  For the reasons explained below and in Plaintiffs' Reply to Statement of Uncontroverted Material Fact, there is no genuine record support for either.  But also, neither are material to Plaintiffs' *Bearden* claim.  Whatever the source of the monetary sum, the City does not contest that class members were being held upon nonpayment of that sum and that there was no ability to pay determination.

[11] Mr. Brockmeyer's declaration that he originated the 72-hour limit contradicts the City's prior admissions, in its interrogatory responses and in 30(b)(6) testimony, that the rule was set by Chief Jackson and codified in City Orders.  SUMF ¶¶ 60–63.  But the origin of the limit is immaterial to Count One.  Neither party disputes that the City detained arrestees indefinitely until 2010, after which its Chief of Police issued a written General Order requiring that detention in the Ferguson jail not exceed 72 hours.  *See* Pl. Mot. at 15 n.5.  Years later, on December 18, 2014, then-Judge Brockmeyer issued a new bond schedule, which set a 12-hour limit for detention at the urging of the DOJ and the City.  Id. at 11.

view of Mr. Brockmeyer's declaration testimony to suggest that he *mandated* 72-hour holds.  *See* Def. Opp. at 35 ("[F]or most of his tenure, [Brockmeyer] directed the City's Corrections Officers that individuals *were to be held* up to 72 hours and thereafter released if they did not post bond." (emphasis added) (citing Brockmeyer Dec. ¶ 12)).

Indeed, according to the City's General Orders and Mr. Brockmeyer's previous testimony, City officers could release arrestees immediately after arrest, without payment.  Pl. Mot. at 37–38; SUMF ¶ 79.  To the extent this declaration (or the City's misleading citation of it) could be read to imply that Ferguson officers were cabined to only certain, court-directed reasons to release individuals prior to 72 hours, this is controverted by the record.  In designated 30(b)(6) testimony, City officials stated they were never given "any guidance in making those [bond reduction] decisions." Pl. Mot. Ex. 58 (testimony of W. Ballard at 29:17–23).  Mr. Brockmeyer's actual testimony is simply that Ferguson officers made the decision to lower bond amounts or to release immediately if they so chose, not that the officers could only release if there was some kind of exigent circumstance.  *See* Pl. Mot. Ex, 30, 2/21/20 R. Brockmeyer Dep. Tr. 106:6–16 ("Q. So whatever they could pay, if they could pay something? A. Anything reasonable."); 215:11–15 ("Q. And they could release him within 12 hours?  A Fifteen minutes.").  This independent ability to release based on the day-of decisions of the officers on duty is exactly what is set out in the City's General Orders, emails, and testimony from officers.  SUMF ¶¶ 64, 74, 80, 83, 86–87, 93.  The practice of holding people who could not pay bond after arrest—for purposes necessarily unrelated to arranging a probable-cause determination (as none was forthcoming)—was the City's own.

## II.  Plaintiffs Remain Entitled to Summary Judgment on the Due Process Claim in Count Two

Due process provides a right to counsel prior to incarceration for nonpayment absent procedural safeguards concerning a debtor's ability to pay.  Pl. Mot. at 29–30 (citing *Turner*, 564

U.S. at 449).[12]   The members of the Post-Judgment Class are entitled to summary judgment on Count Two's due process claim because the undisputed facts demonstrate that the City had a policy and practice of jailing them when they failed to make a timely debt payment, despite receiving "neither counsel nor the benefit of alternative procedures" prior to their incarceration.  *See* Pl. Mot. at 30–33, 38–68.

The City argues (a) that Count Two is "hopelessly vague," Def. Opp. at 39, (b) that the *Sixth* Amendment right to counsel is not implicated here, *id.* at 41–42, (c) that no due process right to counsel attaches because Post-Judgment Class Members were jailed for failure to *appear* rather than failure to *pay*, *id.* at 39–41, and (d) that the City cannot be liable because appointing counsel is an exclusively judicial function, *id.* at 42–43.

These arguments fail because (a) the City's questions about Count Two have ready answers; (b) although the Sixth Amendment claim in Count Two continues to have merit, Plaintiffs do not seek summary judgment on it; (c) the undisputed facts show that, despite their name, "failure to appear" warrants were issued against Post-Judgment Class members automatically upon nonpayment, with no court proceeding at which they could have failed to appear; and (d) the City is liable both for *jailing* Plaintiffs in violation of their due process right to counsel and for failing to direct its municipal judge to appoint counsel in the absence of procedural alternatives.

## A.     What Count Two Asserts

To support the assertion that Count Two is "hopelessly vague," the City poses four questions about its content.  Def. Opp. at 39 (citing the Complaint, ECF No. 53 at ¶ 237).  Without conceding that these questions are material, Plaintiffs can answer them readily as follows.  (1) The proceedings at which Post-Judgment Class members were ordered imprisoned were the debt-

---

[12] *Cf. id.* at 448 (holding that those procedural safeguards include "adequate notice of the importance of ability to pay, fair opportunity to present, and to dispute, relevant information, and court findings").

collection proceedings that began with the automatic seeking of arrest warrants upon nonpayment and continued through Class members' eventual detention on those warrants, including any bond negotiations with City officers in the Ferguson Jail. *See* Pl. Mot. at 30. (2) Though the initial *arrests* were purportedly "ordered" by the City's municipal judge (via rubberstamped warrants automatically generated by court clerks), *see id.* at 31–32 & n.15, the *imprisonment* (post-arrest detention behind bars) was ordered by City officers who chose to jail debtors who did not immediately pay the bond amounts on the warrants, *see id.* at 27–28. Thus (3) both the arrests and the imprisonment were ordered based on nonpayment.

In addition to the debt-collection proceedings relevant to Count Two's due process claim, there were proceedings from which the debts arose—proceedings resulting in judgments and assessments of fines and fees, which resulted in Class members' payment plans. These are relevant to the *Sixth* Amendment claim (not at issue in Plaintiffs' motion) in Count Two insofar as that provision prohibits jailing people for violating conditions imposed in previous cases where they lacked counsel.[13]

### B. Plaintiffs Have Not Moved for Summary Judgment on Their Sixth Amendment Claim in Count Two

The City argues that the imposition of a fine alone does not trigger a right to counsel under the Sixth Amendment. *See* Def. Opp. at 41–42. But Plaintiffs do not claim as much.[14] The City's Sixth Amendment violations were at least twofold. First, it jailed Plaintiffs for allegedly violating payment plans arising from underlying cases in which they had been unrepresented. *See supra*

---

[13] *See, e.g.*, *Alabama v. Shelton*, 535 U.S. 654, 658 (2002); *United States v. Pollard*, 389 F.3d 101, 105 (4th Cir. 2004); *United States v. Perez-Macias*, 335 F.3d 421, 428 (5th Cir. 2003).

[14] Plaintiffs have in fact outlined how Sixth Amendment case law cited by the City further supports a constitutional right to counsel when persons are *actually* deprived of their liberty through jailing. *See* Pl. Opp. at 35–37.

n.13.  Second, by automatically adding a fine for that alleged nonpayment to Plaintiffs' existing

debts, SUMF ¶ 153 the City punished them as criminal contemnors without access to counsel.[15]

More importantly, the City's Sixth Amendment arguments are irrelevant here because

Plaintiffs have not moved for summary judgment on their Sixth Amendment claim in Count Two.

As the Court explained in its earlier order, there is a distinct question whether jailing individuals

for nonpayment who are "also not afforded any hearing, inquiry into ability to pay, or alternative

procedural safeguards in connection with their incarceration" violated Plaintiffs' *due process*

rights.  ECF No. 19 at 25.  That is the claim at issue here.  Plaintiffs' opening brief demonstrates

how the City violated due process by systematically jailing Post-Judgment Class members for

nonpayment without access to counsel and without *any* inquiry into their ability to pay.  Pl. Mot.

at 28–33.

### C.    Post-Judgement Class Members Were Jailed on Warrants Issued for Nonpayment

The City argues that arrest warrants issued were for failing to "appear for a required Court

appearance" rather than for failing to *pay*, such that the lack of procedures concerning their ability

to pay triggered no due process right to counsel.  Def. Opp. at 39–41.  But the City can point to no

"required Court appearance" at which Class members could have failed to appear.  The City states

that Class members who did not pay on time were sent a letter giving them a "new court date,"[16]

---

[15] *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) ("Thus, a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance."); *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 635 n.7 (1988) ("The critical feature that determines whether the remedy is civil or criminal in nature is . . . whether the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order.").

[16] In a telling omission, the City refers to this alleged "new court date" without ever having mentioned an *original* court date.  *See* Def. Opp. at 39.  Even in this story, what the City calls a "court date" is no more than a payment due date.

and that only after missing that "appearance" did a warrant issue.  *Id.*  Record evidence from the City's own documents and witnesses refutes this.  SUMF ¶¶ 123–27.

Plaintiffs have detailed the process by which the City issued so-called "FTA" warrants and jailed Plaintiffs for nonpayment.  Pl. Mot. at 47–48, 56–58; SUMF ¶¶ 130–58.  Individuals who had a fine assessed were set on a "payment docket" which was a deadline to make payment at the City police department with no way to speak to a judge.  SUMF ¶¶ 117–19.  Indeed, class members were given a paper stating: "Your payment is due by the first Friday of each month. . . . **<u>DO NOT ATTEND COURT</u>**.  You must pay at the Ferguson Police Department. . . . Any late payments are subject to additional fines and/or a warrant being issued for your arrest."  SUMF ¶ 121.

The uniform testimony from every single court clerk is that if individuals did not make a payment, a warrant was issued.  *See* Pl. Reply to Def. Resp., SUMF ¶ 108.  In the words of Court Clerk Ciaravino, "A. I guess it was called a failure to appear when he didn't — when the person didn't appear to make the payment."  Ex. 67, 2/25/20 M. Ciaravino Dep. Tr. at 74:24–75:2.  In fact, both Court Clerks Lanfersieck and Ciaravino testified explicitly that there were *no steps* taken after nonpayment before a warrant was issued: Ex. 52, 3/12/2021 C. Lanfersieck Dep. Tr. at 109:3–16 ("A There really wasn't necessarily any steps. I mean, we did – you know, after the weekend, we checked to see if it was dropped in the drop box, you know, . . . they would typically have a warrant issued."); Ex. 67, 2/25/20 M. Ciaravino Dep. Tr. Ex. 67 at 38:19–25 ("Q. Would they have an opportunity to talk to the judge before that, before they went to warrant?  A. No.").  Instead, the system would generate a warrant for any individuals for whom a payment was not recorded, and the City's court clerks (without oversight) would stamp the judge's signature to issue. Ex. 52, 3/12/2021 C. Lanfersieck Dep. Tr. at 39:18–40:5, 75:8–20; SUMF ¶ 136.

The City attempts to escape this clear testimony from its own employees by citing Mr. Brockmeyer's declaration that, "[i]f an individual was unable to make a payment when due, he/she was apprised of a new court date."  The City offers not a single example of any communication to individuals before 2015 that sets a court date to explain nonpayment before a warrant is issued. Moreover, Mr. Brockmeyer's involvement in the Ferguson Municipal Court is limited to appearances at dockets.  SAMF ¶ 91.  The City cannot establish a genuine dispute of material fact by simply substituting a declaration (not based on personal knowledge or from someone carrying out the alleged actions) making a vague, conclusory statement about a supposed process where the testimony from the clerks themselves is that no such process existed.[17]

### D. The City Is Liable on Count Two Both for Its Jailing Practices and for Acquiescing in the Failures of Its Municipal Judge

The City observes that appointing counsel is traditionally a judicial function.  Def. Opp. at 42–43.  But this is no obstacle to summary judgment for Plaintiffs on Count Two.  First, Plaintiffs have established the City's responsibility for *jailing* Post-Judgment Class members in violation of their due process right to counsel.  Pl. Mot. at 28–33, 38–68.  Given the City's knowledge that— from the moment its debt-collection process began (with the automatic issuance of a warrant) until a debtor arrestee was eventually released from its jail—neither counsel nor ability-to-pay hearings would ever be in the offing, its decision to hold them in its jail rendered it liable.  *See* SUMF ¶¶ 79–98, 159–65.  Second, Plaintiffs have also shown that the City had the power under state and

---

[17] Notably, the written court procedures for the collection of fines, fees, and bonds include none by which a person could inform the court that they were unable to pay.  SUMF ¶ 125.  And they make no mention of a 'show cause letter' or a second "court date."  *Id.*  The City cites testimony from Court Clerk Twitty stating that if someone missed a payment, a clerk would send a letter saying "you did not make a payment, if you do not make it by this next date then a warrant would be issued."  Twitty Dep. Tr. at 74:6–75:4.  No such letter survives in the record notwithstanding that *thousands* of them would have to have been sent on Twitty's account.  At any rate, her statement can *at most* show that debtors were given another mere due date for a payment, not an actual "court appearance."  And the City does not even *assert* that the alleged letters met the procedural standards that, under *Turner*, they would need to have met in order to obviate the requirement of counsel.

16

local law to prevent the municipal judge's failures to appoint counsel where necessary (for example, by enacting an ordinance requiring the appointment or waiver of counsel before debtors are jailed for nonpayment).  Pl. Mot. at 66–68; Pl. Opp. at 21–23, 32–33.  The City is therefore liable for acquiescing in its municipal judge's failure to appoint counsel or obtain waivers.

## III.    Plaintiffs Remain Entitled to Summary Judgment on Count Seven

Count Seven alleges that the City's policy and practice of jailing warrantless arrestees without any prospect of a probable cause determination, violated the Fourth Amendment.

The City concedes the basic facts underlying Plaintiffs claim: *Gerstein* Class members sat in its jail with no prospect of receiving judicial determinations of probable cause.  Def. Mot. at 63–64; *see also* Def. Opp. at 46; SUMF at ¶¶ 45–46, 61, 66, 241.  In an attempt to escape liability, the City misrepresents the holdings of *Gerstein* and its progeny, and incorrectly contends that: (1) there is an issue of fact as to whether every *Gerstein* class member was detained for an unreasonable period of time; (2) there was probable cause for every *Gerstein* Class member's arrest and any *hypothetical* probable cause determination would not have resulted in a release from custody; and (3) as probable cause determinations *should be* a judicial function, the City's practice of jailing individuals without such determinations is somehow attributable to an entity with no control over its jail or corrections officers.  *Gerstein*, 420 U.S. 103; Def. Opp. at 43.  These arguments all fail, and Plaintiffs are entitled to summary judgment on Count Seven.

### A.    The Fourth Amendment Prohibits Detaining a Warrantless Arrestee Without Any Prospect of a Judicial Determination of Probable Cause, and the City Misrepresents the Law to Support its Opposition

The City misrepresents the central holdings of *Gerstein* and its progeny in an attempt to avoid liability.  First, the City focuses exclusively on presumptions of reasonableness based on duration of detention, Def. Opp. at 44, omitting that "the 48-hour burden-shifting approach [of *Riverside*] does not apply when *the police* don't plan to present the suspect to a magistrate for a

17

probable-cause hearing." *Portis v. City of Chicago*, 613 F.3d 702, 704 (7th Cir. 2010) (emphasis added).  If a municipality and its police have no process by which *any* warrantless arrestee could *ever* receive a judicial determination of probable cause, delay of release is unreasonable.  *See Webb v. City of Maplewood*, 340 F.R.D. 124, 142 (E.D. Mo. 2021) (finding "one hour after booking, 7 hours, or 47 hours and 59 minutes" is unreasonable "delay . . . merely for delay's sake" if no probable cause determination process exists for those arrested without a warrant); Pl. Mot. at 35.  Second, the City incorrectly suggests that *Riverside* stands for the proposition that municipalities are "immunized" from systematic challenges.  Def. Opp. at 44; Def. Mot. at 61.  This is belied by *Riverside* itself, in which the Court held that, as the county systematically *did not* provide judicial probable-cause determinations within 48 hours, it was "*not* immune from systemic challenges, such as this class action."  500 U.S. at 59 (emphasis added); Pl. Opp. at 62–64.

The City then suggests that Missouri law authorized detentions of warrantless arrestees for 24 hours—or longer if there was a bail schedule.  *See* Def. Opp. at 45–46 (citing Mo. St. § 544.170 and a prior version of Mo. Sup. Ct. Rule 37.17); Def. Mot. at 62 (same).  Applying this misreading of § 544.170, and applying it to arrestees confined "without warrant or other process," the City claims again, without support, that until January 1, 2019, Missouri Supreme Court Rule 37.17 "contemplated that a bond schedule may provide such 'other process' (rendering the 24 hour limit inapplicable)."  Def. Mot. at 62.  As Plaintiffs have already explained in their opposition brief, this characterization of state law is mistaken.[18]  It did not license or *require* any period of detention for

---

[18] "Section 544.170 does not provide any authority to arrest persons without a warrant and hold them in custody for twenty[-four] hours."  *Mitchell v. Shearrer*, 2012 WL 918803, at *7–8 (E.D. Mo. Mar. 19, 2012) (internal quotations and citations omitted).  "[Section 544.170] is not a sword in the hands of the police, but rather a shield for the citizen." *United States v. Roberts*, 928 F. Supp. 910, 932–33 (W.D. Mo. 1996).   Rule 37.17 *authorized* the acceptance of bond in accordance with a lawfully set bail schedule.  Rule 37.17 stated: "When an arrest is made without a warrant, the peace officer may accept bond in accordance with a bail schedule furnished by the court having jurisdiction."

warrantless arrestees, much less a period exceeding the 24-hour limit set by § 544.170.[19] The City

has thus cited no applicable Missouri Law to excuse its actions.[20]  *See* Pl. Opp. at 64–66.

**B.**  ***Gerstein* Class Members Were Detained After Warrantless Arrests Without Any Prospect of a Judicial Determination of Probable Cause, and the Reasonableness of Their Detentions Following Arrest is a Legal Issue**

The undisputed facts show that City officers detained *Gerstein* Class members after a

warrantless arrest without any hope of a finding of probable cause, and the City shows nothing to

the contrary.  The City claims "whether every class member was detained for an unreasonable

period of time" is an issue of fact.  Def. Opp. at 43.  However, here, the reasonableness of *Gerstein*

class members' arrests is a legal inquiry, given the admitted complete absence of probable cause

hearings in the City.  *United States v. Davis*, 174 F.3d 941, 946 (8th Cir. 1999) (finding for a

detention of over two hours with no prospect of a probable cause hearing, "the district court did

not err . . . in finding . . . a Fourth Amendment violation" when plaintiff "established that her

probable cause determination was unreasonably delayed."); *Duhe v. City of Little Rock*, 2017 WL

1536231, at *23 (E.D. Ark. Apr. 27, 2017) ("It is not the length of detention that determines

whether a constitutional violation has occurred, it is whether the detention was unjustifiably

prolonged.");  *Farr v. Paikowski*, 2013 WL 1288041, at *1 (E.D. Wis. Mar. 25, 2013) (finding a

"detention *per se* unreasonable under *Gerstein*" when the purpose for arrest was interrogation).

---

[19] The City asserts that even its current rule would be impermissible under "Plaintiffs' theory." Def. Mot. at 62 n.60 (quoting Mo. Sup. Ct. R. 37.17 (2023)).  However, the current rule *authorizes* acceptance of bond in certain circumstances and limits how long an arrestee can be held without a warrant.  It is not a free pass to hold people without warrants without a process in place for obtaining judicial probable-cause determinations.

[20] The City insists that the unconstitutionality of its warrantless detention practices was not clearly established "in the pre-SB 5 era," Def. Mot. at 62, which is woefully mistaken.  *See, e.g.*, *Gerstein*, 420 U.S. at 117 (finding a procedure whereby a person arrested without a warrant and charged by information may be jailed or subjected to other restraints pending trial without any opportunity for probable-cause determination is unconstitutional); *Wayland v. City of Springdale*, 933 F.2d 668, 670 (8th Cir. 1991) ("A defendant may be detained only for as long as it takes to process 'the administrative steps incident to arrest.'" (quoting *Gerstein*, 420 U.S. at 114)).

As Plaintiffs have shown, and the City has admitted (Def. Mot. at 63; Def. Opp. at 46), the City had no process in place by which arrested *Gerstein* Class members could receive judicial determinations of probable cause, and it detained warrantless arrestees for the sole improper purpose of extracting money from them in the form of bonds, so all detentions after arrest were unreasonably prolonged as a matter of law.  *See Webb*, 340 F.R.D. at 142 (E.D. Mo. 2021); *Johnson v. Bd. of Police Comm'rs*, 370 F. Supp. 2d 892, 903 (E.D. Mo. 2005) ("Plaintiffs' allegation that they were confined without a warrant or any intention to obtain a warrant implies that their detention was unreasonably delayed for ill will or delay's sake."); *cf. Davis*, 174 F.3d at 945 (8th Cir. 1999); *see also* Section III.C *supra*.

The City's claim that "Judge Brockmeyer deferred probable cause determinations until a municipal defendant's initial court appearance," indicating the detentions were not unreasonable is also flawed.  Def. Opp. at 47. The City implicitly concedes that the purpose of such detentions was not to present individuals for nonexistent probable cause hearings.  Def. Mot. at 63; Def. Opp. at 46.[21]  Thus, even if such hearings were eventually provided, it would not absolve the City of detaining individuals without warrants beyond booking in the first instance.

Finally, the City puts forth an unconvincing assertion (without legal or factual support) that, on average, it took ***four hours*** to book an individual in its small municipal jail and that any detainees held under that threshold were "booked-and-released."  Def. Opp. at 47–48.[22]  The City's

---

[21] For example, *Gerstein* Class member Ms. Kaniqua Wilson was arrested without a warrant for disorderly conduct on August 5, 2014 and held by the City for 209.4 hours until August 14, 2014; her court appearance for this arrest was on September 18, 2014, more than one month after her initial, nine-day detention.  Hanlon Reply Decl. ("Pl. Reply Ex."), Ex. 1, Demuth Supplemental Report Exs. A, B, C (filtered).  The purpose of the City's jailing of Ms. Wilson—and all others in the *Gerstein* class—could not possibly have been for determination of probable cause because from the moment she was jailed, the City officials knew she would be released without one.

[22] Even if the Court adopted the City's generous booking time estimate, it would still indicate 75% of qualifying *Gerstein* arrests lasted beyond initial booking.  Demuth Supplemental Report, Exs. A & B (filtered).  If the Court were to adopt a more realistic estimate of the booking time in the City's jail—for example, the conservative estimate provided by Dr. Stephen Demuth of two hours—it would indicate 86% of qualifying *Gerstein* arrests lasted beyond initial booking.  *Id.*; *see also* ECF No. 469 at 21–22; Section I. supra.  The small number of arrest hours the City

municipal jail contained only ten cells with capacities of one to two individuals per cell.  Pl. Mot., Ex. 28 at 61:3–62:5; Pl. Reply, Ex. 2, 1/11/16 D. McDuffie Dep. Tr. at 43:21–44:1.  The City jail's processing area could only seat three to four individuals at one time.  Pl. Mot., Ex. 28 at 62:12–25.  A City jail officer testified that the maximum number of individuals he ever saw in the City's jail was 28, with an average daily maximum of "about 16 people"  Pl. Opp., Ex. 11 at 96:20–97:15.  The booking process for these individuals consisted of entering their basic personal information and charges into a computer system and then putting them in a cell.  Hanlon Decl., Ex. 3,7/21/21 J. Motzkus Dep. Tr. at 34:13–35:13 ("Q. Walk me through the process of processing a prisoner.  A. Prisoner is brought in . . . you book them, put them in a cell.  Q. How did you book them?  A. Through a computer system. . . . Q.  . . .generally what kind of information would you input?  A. Name, date of birth, race, sex, height, weight, eye color, hair color.  Q. Anything else?  A. Whatever they're being charged with.").  The uncontroverted record shows that the majority of *Gerstein* Class members were held for over 12, 24, and even 48 hours.[23]

### C.    Plaintiffs do not Concede There was Probable Cause to Detain Each and Every *Gerstein* Class Member

The City erroneously asserts, without citing any supporting evidence or pleading, that "Plaintiffs do not challenge that there was, in fact, probable cause for every charge at issue."  Def. Opp. at 43.  Plaintiffs do not—and have never—conceded that there was a proper finding of probable cause for every *Gerstein* Class member.  This is a baseless assertion constructed by the City in an attempt to excuse its own unconstitutional conduct.

---

highlights to suggest an individual may have been merely booked and released does not preclude the City from liability nor undermine the commonality of the *Gerstein* Class, who were all subject to the same lack of opportunity for a probable cause determination, regardless of their detention times.

[23] The City's arrest data shows that 54% of arrests qualifying for the *Gerstein* Class during the Class Period lasted longer than 12 hours; 30% of those arrests lasted over 24 hours, and 10% (nearly 550) of those arrests lasted longer than 48 hours.  Demuth Supplemental Report at 12, Table 8.

The City then goes on to claim, hypothetically and without support, that any "receipt of a probable cause determination by the Municipal Judge would not have resulted in release from custody." Def. Opp. at 43. But the City would have no way of knowing the result of a probable cause determination before it took place. The jailing of individuals paired with the total lack of process *is* the constitutional violation at issue here. The City held individuals to extract bonds from them while never presenting a single detainee for a probable-cause determination. As this Court has found, "reasonableness in this case does not turn on whether class members were held for too long (as in *County of Riverside* and *Portis*) but whether they were held for reasons unrelated to the arrangement of the probable-cause determination or completion of the steps incident to arrest." Class Cert Order at 29. Chief Jackson testified that every arrestee could have been immediately released with an initial appearance court date set, weeks—if not months—in the future. SUMF ¶¶ 62, 64.

The City again makes conclusory statements without any rule of law from a Court to infer that class members are limited to nominal damages. Def. Opp. At 49.[24] However, other courts have found class-wide claims for damages on systemic *Gerstein* violations are appropriate. *See Brown v. City of Detroit,* 2012 WL 4470433, at *20 (E.D. Mich. Sept. 27, 2012); *Long v. Madison Cnty. Sheriff,* 2020 WL 1876142, at *1 (S.D. Ind. Apr. 15, 2020). Finally, even if the outcome of a hypothetical probable-cause determination were relevant to Plaintiffs' damages on Count Seven, it would not affect the City's liability, as the City would bear the burden to establish any such

---

[24] The City cites nothing to support the idea that categories of available damages is before the Court at the dispositive motion stage. *Goldman v. Forbus,* the only case cited by the City, Def. Opp. at 49, is a case analyzing the claim of an individual plaintiff who ultimately appeared before "a judge [who had] found that probable cause supported the arrest." *See* 17 Fed. Appx. 487, 489 (8th Cir. 2001). But in *Goldman,* there was no allegation that warrantless arrestees were systematically denied judicial determinations of probable cause. *Id.*

counterfactual during claims-administration.   *See* ECF No. 469 (Reply in Support of Class Certification) at 28–29.

> D.      **City is Liable for Choosing to Detain Warrantless Arrestees in the Total Absence of Judicial Probable-Cause Determinations**

The City places the blame for the violations alleged in Count Seven on Mr. Brockmeyer, arguing that neutral probable cause determinations are a judicial function and that not providing them until weeks or months after an incarceration was "Judge Brockmeyer's policy, not one of the City." Def. Opp. at 50.[25]

As laid out in Pl. Opp., this argument from the City flies in the face of established precedent, which finds the *police* are responsible for *detentions* without probable cause determinations once an individual is in custody.  *See* ECF No. 618 at 56–57 (citing *Riverside*, 500 U.S. at 58; *Wayland*, 933 F.2d at 670; *Gramenos v. Jewel Companies, Inc*., 797 F.2d 432, 437 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028 (1987); *see also Caddell v. Campbell*, 2020 WL 703951, at *7 (S.D. Ohio Feb. 12, 2020) ("[O]nce a person arrested without a warrant is delivered to a detention facility, the requirement to bring that person before a magistrate for a probable cause determination clearly falls to detaining officials."); *Mabry v. Cty. of Kalamazoo*, 626 F. Supp. 912, 915 (W.D. Mich. 1986) ("The onus is then on the arresting and holding officers to ensure that the suspect receives a prompt determination of probable cause.").  Here, the City was arresting and detaining individuals without warrants and holding them with no process or possibility of a probable cause determination, so the City and the policymakers in charge of its jail and police force are thus liable for these violations.  SUMF ¶¶ 37–46; CSUMF ¶¶ 53–54.

---

[25] As an initial matter, Plaintiffs note that the City's contract with Mr. Brockmeyer—which the City Council itself approved—limited the scope of his engagement with the City to only three to four dockets a month.  SUMF ¶ 191; SAMF ¶ 91.  This was thus not "Brockmeyer's policy," as the City erroneously claims, as the City itself set the limitations on Mr. Brockmeyer's scope of work, including his availability to provide probable cause hearings to individuals detained in the City's jail without warrants.  Def. Opp. at 50.

IV.     **The City Remains Liable for the Violations Under Counts One, Two, and Seven**

A.      **The Police Chief, City Manager, and City Council are Final Policymakers Regarding the City's Jailing Practices**

The City argues at length and in vain that the only relevant policymaker is its City Council.[26]  Plaintiffs have shown that the Police Chief, City Manager, and City Council had final policymaking authority over the City's jailing practices according to positive law and custom.  *See* Pl. Mot. at 42–44.  Nothing in the City's Reply shows otherwise.[27]

1. **The Police Chief**

The Police Chief was a final policymaker for the City's jail and jailing practices based on the City's ordinances and the unchecked authority that the City Council and the City Manager delegated to him.  *See* Pl. Mot. at 41–42, 46, 52–54, 56, 58.  Plaintiffs have established that the Police Chief was granted original authority by the Ferguson Code of Ordinances.  The City claims that the powers and duties enumerated in the ordinance are limited by a provision noting that "[t]he chief of police shall perform all additional duties required of by the city manager or the city council[.]"  Ferguson Code of Ordinances § 33-18(e).  The City claims that the reference to "additional duties" and "as required by city council" are somehow evidence of his necessary deference to the City Council. Def. Opp. at 19.  This defies any reasonable approach to statutory interpretation.  The provision the City cites is called "Additional Duties," meaning these are duties in addition to ***and separate from*** the powers conferred on the Police Chief by other provisions.

---

[26] Puzzlingly, however, the City provides no real argument and certainly no evidence rebutting Plaintiffs' showing that the City Council itself was deliberately indifferent to the widespread constitutional violations that harmed Plaintiffs.

[27] Blackletter law recognizes the possibility of multiple policymakers even in the same area.  The law is clear that policymaking authority can be delegated and, in other cases, shared.  *See, e.g.*, *City of St. Louis v. Praprotnik*, 485 U.S. 112,126 (1988) ("policy decisions made by the mayor and alderman or by the Commission" are sufficient); *see also Davison v. City of Minneapolis*, 490 F.3d 648, 661 (8th Cir. 2007) (finding the City Coordinator and the Civil Service Commission were both final policymakers in a City governed by Charter); *Greensboro Profess. Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 965 (4th Cir. 1995) (finding City Manager and City Council were both final policymakers).

The City also denies that the Police Chief had final policymaking authority by arguing that the City Charter precludes it.  Def. Opp. at 19.  The City claims that the ordinance is in conflict with the City Charter because the latter grants all powers of the City in the council, "[e]xcept as this charter provides otherwise."  Def. Opp. at 15, 19.  However, the City Charter itself provides for powers to be granted by ordinance.  *See e.g.*, § 4.4(c) (stating that the City Manager has the power to "prescribe the powers and duties of officers and employees of the city ***not otherwise prescribed by this charter or by ordinance***") (emphasis added).  Additionally, under Missouri state law, "[w]here its language will permit an ordinance should be construed so as to uphold its validity against a construction which would invalidate it."  *Kansas City v. LaRose*, 524 S.W.2d 112, 117 (Mo. banc 1975).  The ordinance should be read as consistent with the City Charter where its language permits, as here.[28]

Moreover, this Circuit's cases make clear that courts look at local custom and usage when determining who has policymaker power.  *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1215–16 (8th Cir. 2013).  The City does not even attempt to address that the Police Chief set jail and police policies by drafting and authorizing General Orders.  *See* Pl. Mot. at 41.  Nor does it present evidence to rebut Chief Jackson's supervisory authority over jail personnel and facilities.  *Id.*

Indeed, another court in this district has already found that the Police Chief in Ferguson is the relevant policymaker, citing the Code of Ordinances: "defendant Chief Jackson was the individual designated by the Mayor and City Council to 'have general supervision and control of the police department, including the enforcement of discipline among the members thereof and the instruction of the members in their duties.'" *Moore v. City of Ferguson*, *Mo.*, 213 F. Supp. 3d 1138, 1148 (E.D. Mo. 2016) (quoting City of Ferguson Code of Ordinances, § 33-18).  This logic is

---

[28] The City attempts, fruitlessly, to capitalize on an inadvertent reference to the "Charter" when that was meant to reference the "City's ordinances."  Def. Opp. at 16.

persuasive here given that Chief Jackson's department, under the City's organizational structure during the peak period of incarceration here, included both the jail and municipal court.  Pl. SUMF at ¶ 195.

The City cannot shield itself from liability by proffering a meaningless retention of review over the Police Chief.  *See* Def. Opp. at 20; *Praprotnik*, 485 U.S. at 126 ("If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose."); *Flanagan v. Munger*, 890 F.2d 1557, 1569 (10th Cir. 1989) (finding that Police Chief had final authority over department discipline because "[a]lthough the City argues that departmental decisions may ultimately be reviewed by the City Manager or City Council, for all intents and purposes the Chief's discipline decisions are final, and any meaningful administrative review is illusory").

### 2.  The City Manager

The City Manager was also a final policymaker for the City's jail and jailing practices based on the City Charter as well as the City's practices and customs.  *See* Pl. Mot. at 42–43.  The City incorrectly claims that the "City Manager is an administrator" and that "[h]is role is one of ultimate deference to the City Council."  Def. Opp. at 20.  The express language of the Charter dictates the City Manager has final policymaking authority in certain areas.  *See* Pl. Mot. at 42–43 (discussing the powers granted to the City Manager by the City Charter).  The City does not explain why it alleges that the Charter can grant policymaking authority to the City Council but only administrative authority to the City Manager.  Instead, the City claims that because the City Manager has to perform duties "required by the council" that he must ultimately defer to the City Council on all issues.  Def. Opp. at 19.  Not so.  That provision of the Charter specifies that the City Manager shall "[p]erform all other duties prescribed by this chapter or required by the council, ***if not inconsistent with this charter***."  Charter § 4.4(i) (emphasis added).  Therefore, the plain

26

language of the Charter is that the City Manager's authority comes first from the Charter and the Charter's authority is paramount to any deference to the City Council.

And the City fails to cite evidence of the City Council exercising review or requiring the City Manager to defer to it as to jailing.[29]  As City Councilmember Byrne testified, "[a]rguably . . . the two main responsibilities of the [City Council], is we can hire and fire the City Manager and the City Clerk. And that was, in essence, it." Pl. Mot. at 43  (quoting Hanlon Decl., Ex. 29 (SUMF ¶ 184), 2/17/21 M. Byrne Dep. Tr. at 31:4–16; *see also id.* at 34:34:9–10 (saying of the City Manager: "He runs the City.").  Therefore, the City has failed to rebut Plaintiffs' evidence that the City Manager was a policymaker regarding the City's jail and jailing practices.  And the City does not even attempt to rebut Plaintiffs' evidence showing that the City Manager also had policymaking authority by virtue of custom.  *See* Pl. Mot. at 43.

### 3.  The City Council

The City does not contest the City Council's policymaking authority but appears to take issue with Plaintiffs' citing the statements or actions of individual City Council members. Def. Opp. at 22.[30]  Plaintiffs do not attempt to vest "any one" council member with final policymaking authority, but rather use evidence of the council members' knowledge to establish the Council's knowledge.  *See* Pl. Mot. at 57–60.  The City fails to rebut the extensive evidence Plaintiffs have presented establishing that its final policymakers, including the City Council, had notice of these

---

[29] As in *Barone v. City of Springfield, Or.*, 902 F.3d 1091, 1108 (9th Cir. 2018), the City Manager's final policymaking authority originated from the Charter.

[30] The City does not actually cite any specific parts of Plaintiffs' showing on this point, making its argument difficult to understand.  But the majority of Plaintiffs' evidence is either: (a) deposition testimony from City Council members; or (b) emails from City Council members in their official capacity as members of City Council, often to the Council as a whole. *See* SUMF ¶¶ 182–279.  Both are routinely deemed admissible.  *See e.g., Diamonds Plus, Inc. v. Klober*, 960 F.2d 765, 767 (8th Cir. 1992) ("[A] deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible"); *Corelink v. Phygen, LLC*, 2014 WL 7140442, at *2 (E.D. Mo. Dec. 12, 2014) ("Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent.").

unconstitutional practices and in fact encouraged or allowed these policies and practices in order

to raise revenue. *See* Pl. Mot. at 41–58. The majority of Plaintiffs' evidence is either: (a)

deposition testimony from City Council members; or (b) emails from City Council members in

their official capacity as members of City Council, often to the Council as a whole. *See* SUMF ¶¶

182–279. The fact that the City is governed by Charter is not dispositive, as illustrated by the

aforementioned cases. The City also fails to address Plaintiffs' demonstration that its City Council

could have enacted ordinances to prevent the constitutional violations under Counts One, Two,

and Seven. Pl. Mot. at 65–70.

### B.    Plaintiffs Were Not Required to Plead Delegation in the Complaint

The City argues that "[t]o state a viable §1983 claim based on delegation of authority, the

complaint must include facts supporting a delegation of authority." Def. Opp. at 16. But there is

no such requirement. *See e.g., Bolderson v. City of Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016)

(evaluating the sufficiency of a plaintiff's argument of delegation at summary judgment that was

not pled in the complaint). The Eighth Circuit has affirmed that plaintiffs do not need to "plead

the specific instance of an unconstitutional policy or custom." *Doe ex. Rel. Doe v. Sch. Dist. of*

*City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003) ("When a complaint is filed, a plaintiff may not

be privy to the facts necessary to accurately describe or identify any policies or customs which

may have caused the deprivation of a constitutional right."). And this Court held that Plaintiffs

did not need to identify the final policymakers in their complaint. ECF No. 173 at 4 (citing *Soltesz*

*v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017)). Plaintiffs can hardly be required

to plead *delegation* to the relevant policymakers before they have even had to determine who the

relevant policymakers *are.*

The cases cited by the City do not show otherwise. The court in *Hess v. Ables* did note that

the complaint had not attributed policymaking authority to the relevant official. *See* 714 F.3d

1048, 1054 (8th Cir. 2013).  But in *Hess*, the court was looking at a summary judgment record.

*Id.*  The reason the omission mattered was not that a plaintiff must specify a policymaker, much

less a particular theory of *Monell* liability, in the complaint, but rather that the summary judgment

record *also* contained no evidence that the relevant official was a policymaker, giving the plaintiff

"the benefit of all reasonable factual inferences to be drawn from the allegations in her complaint"

was not enough.   *Id.*   The district court's unpublished opinion in *A.J. ex rel. Dixon v. Tanksley*,

2014 WL 1648790, at *7 (E.D. Mo. Apr. 24, 2014) relies on a misreading of *Hess* to require facts

supporting an inference of delegation, but still addresses only the adequacy of allegations at the

pleading stage.   And *Edwards v. City of Florissant*, dismissed a complaint for "fail[ing] to

plausibly allege a constitutional violation" *and* for failing to plead facts plausibly alleging a

municipal decision maker had been involved given that the *only* facts in the complaint were about

specific actions of individual officers.  58 F.4th 372, 378 (8th Cir. 2023).[31]  By contrast, Plaintiffs

First Amended Complaint is replete with explanations of how the constitutional violations were

done as part of City policy and practice.  First Amended Complaint, ECF No. 53 ¶ 7, 9–14, 164–

65, 172–75, 183–85, 186, 202–03, 215.[32]

## V.      Plaintiffs' Motion Satisfies the Requirements of Rule 56

The City's Opposition misstates the requirements for summary judgment under Rule 56.

The City misconstrues the abundance of Plaintiffs' evidence in support of summary judgment as

somehow supporting the existence of a genuine dispute of material fact, misstates the standard for

---

[31] Should this Court conclude that *Edwards* conflicts with the earlier (and more directly on point) *Soltesz*, (which it does not), Eighth Circuit case law makes *Soltesz* the binding panel opinion.  *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[W]hen faced with conflicting panel opinions, the earliest opinion must be followed 'as it should have controlled the subsequent panels that created the conflict.'")

[32] Contrary to the City, Plaintiffs do not seek a judgment against it for conduct not pleaded.  Def. Opp. at 16–17 (citing *Sylvan Beach v. Koch*, 140 F.2d 852 (8th Cir. 1944)).  First, all *Sylvan Beach* stands for is that to recover on a *claim* a party must have asserted it in the pleadings.  140 F.2d at 861–62.  Clearly Plaintiffs claims are all contained in the complaint.  FAC at ¶¶ 234–47.

partial summary judgment under Rule 56, and misrepresents the applicable case law, as courts routinely grant partial summary judgment on the issue of constitutional or other violations of the law that do not entirely dispose of the issue of liability.

### A. Plaintiffs' Evidence Supports Material Facts

The City asserts that Plaintiffs' opening brief is supported by an "excess of 500 'facts,' the vast majority of which is not material to the claims upon which the Plaintiffs move for judgment; they are there simply to vilify the City."  Def. Opp. at 10.  But, the reason Plaintiffs cite so much evidence in their motion is that the record is teeming with facts that support their claims.  The City points to only one category of evidence—its "Revenue-Generating Scheme from Fines and Fees: 2008 through 2014"—that it claims is intended only to "vilify" it.[33]  Def. Opp. at 10.  This Court has already held such evidence is relevant to the City's motive.[34]  In any event, Plaintiffs do not rely on evidence of the City's revenue-generating scheme only for purposes of showing the City's motive.  This scheme also informs the City's ***notice of and failure to act on*** its unconstitutional practices.  This evidence shows that City officials were not only aware of the policies and practices that led to these constitutional violations but were deliberately indifferent to them *because* these policies and practices increased the City's bottom line.  *See* Pl. Mot. at 68.

Finally, the City takes issue with Plaintiffs' "recitations of how a witness testified" on the ground that "such recitations of evidence . . . are not material facts."  Def. Opp. at 10.  Deposition testimony on issues that are material—especially when the bulk of it involves admissions by the

---

[33] Notably, this section contains only 36 of the 509 paragraphs in Plaintiffs' SUMF.

[34] *See* ECF No. 342 (Order granting Plaintiffs' Motion to Compel certain City budget and financial documents); July 22, 2020, Hr'g Tr. at 35:21–36:2 ("I do not accept the proposition that the [budget and policy] documents as a whole are irrelevant. First of all, that's like arguing that in a particular case a party's motive for doing something is irrelevant. Typically it's not.  It may not be one of the elements of the claim but it's not irrelevant.  And I think even if the pleadings were not as they were, the motive would be relevant.");  *see also* ECF No. 562 at 4–5 (permitting Dr. Marlowe to opine on "the City's conduct [being] consistent with revenue maximization, or [having] the effect of maximizing revenue," as such evidence "could be relevant to determining an individual or entity's intent").

City's own employees—is exactly the type of evidence that courts rely on when granting summary judgment. Fed. R. Civ. P. 56(c)(1)(A); *see also Jenkins v. Mabus*, 646 F.3d 1023, 1026 (8th Cir. 2011) (statements in depositions, court pleadings and EEOC submissions are binding admissions and cannot be denied). And, the City fails to present any actual evidence of its own to support any other interpretation of the evidence that would establish a genuine dispute of material fact.[35] *See* Plaintiffs' Reply to Defendant's Response and Objections to Plaintiffs' Statement of Uncontroverted Material Facts in Support of Plaintiffs' Motion for Summary Judgment as to the City's Liability of Counts One, Two, and Seven ("RSUMF").[36]

### B.     The City Fails to Establish a Genuine Issue of Material Fact

The City claims Plaintiffs' motion relies on facts that are "obviously" in dispute, Def. Opp. at 11, but fails to set forth evidence that would create a genuine dispute of material fact. Indeed, after 105 pages of briefing in their opening motion and opposition, the City has offered no evidence to contradict—and, in large part, appears not to contest—the following core facts underlying Plaintiffs' claims:

- From the minute an individual was taken into custody in the City's jail after arrest on a municipal ordinance violation or warrant, City officers had the power to release the individual either on recognizance or on any sum of bond they chose.
- Every member of the *Bearden* Class was in jail because they had not paid a sum of money for their release.
- The City held those who had not paid for their release without access to counsel.
- The City was not holding any *Bearden* Class member for a purported public safety reason; indeed, it would release each person within days (usually at or before 72 hours).
- While the City held these people in jail, at no point did any of them have any chance of being brought before a judge or receiving any kind of probable cause determination

---

[35] The City's baseless arguments about the credibility of Plaintiffs' testimony are especially egregious given that they rely almost wholly on an ad hoc, last-minute declaration of Mr. Brockmeyer. Def. Ex. L. Plaintiffs are moving to strike the City's use of this declaration because it constitutes highly improper and inadmissible evidence. First, several statements in the declaration are directly contrary to his prior deposition testimony. Second, the declaration makes statements as to matters of which Mr. Brockmeyer can have no personal knowledge.

[36] For the Court's reference, the RSUMF is organized and the paragraphs are numbered to correspond with Plaintiffs' SUMF (ECF No. 608-1), and for each SUMF paragraph, repeats the language from the SUMF, the City's responses and objections to that SUMF paragraph (ECF No. 612), and Plaintiffs' reply to the City's objections in bold below the corresponding objection.

justifying their detention.  Every member of the *Gerstein* Class would eventually be released without such a probable-cause determination.

*See generally* Def. Mot.; SOF.  Having dispatched the City's attempts to manufacture disputes on other matters, it is worth establishing that it does not, and cannot, dispute these core facts either.

The City fails in its few attempts to dispute Plaintiffs' record.  It presents a declaration signed by Mr. Brockmeyer, replete with broad, conclusory statements that do not refute any of the core facts above: by its own terms, it agrees that City jailers could decide to release or lower bonds without any approval from the City's judge; it does not deny that people were held in the City's jail because they could not pay a sum of money (and not for a public safety need) or that people were jailed without access to an attorney; and it agrees that warrantless arrestees would be held and released with no probable-cause determination.  ECF No. 604-12.[37]  Mr. Brockmeyer's declaration thus does not create a dispute of *material* fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("The *mere* existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.").

Further, Mr. Brockmeyer's declaration itself does not suffice, on its own, to create a *genuine* dispute of fact: key paragraphs are directly contradicted by Mr. Brockmeyer's own prior testimony; other statements badly contradict the City's own interrogatory admissions; and finally, other statements are outside of Mr. Brockmeyer's personal knowledge.[38]

In sum, Plaintiffs have presented documentary evidence, testimony, and emails from the City's employees; admissions of policymakers; and the City's own interrogatory answers and Rule 30(b)(6) testimony to support their claims, *see generally* SUMF, CSUMF, RSUMF, while the City

---

[37] Importantly, Mr. Brockmeyer's declaration is the first instance where Mr. Brockmeyer implies that there is a limited rationale for release – something he did not opine on in his deposition testimony.  *See* ECF No. 604-12 at ¶12.

[38] *See* Plaintiffs' Motion to Strike Portions of Defendant's Statement of Facts, Mr. Brockmeyer's New Declaration, and Statements from the Expert Report of Douglas Beach.  Plaintiffs contemporaneously file this motion to strike and incorporate those arguments herewith.

relies on a last-minute declaration that attempts to conjure up evidence to create a dispute of fact. Courts can grant summary judgment where, as here, one party offers an overwhelming amount of evidence that the other party seeks to "contradict" with a "mere scintilla of evidence." *See, e.g.*, *Witte v. Culton*, 2013 U.S. Dist. LEXIS 124205, at *11–12, n.3 (E.D. Mo. Aug. 30, 2013) (granting summary judgment where the movant cited multiple instances in the record whereas the opposition only cited its own "self-serving deposition testimony," which the court found "insufficient to defeat [summary judgment]" having "fail[ed] to create a genuine dispute of material fact" further noting that "[a] mere scintilla of evidence is insufficient to avoid summary judgment.").[39]

Finally, the City asserts, without explanation, that Plaintiffs have offered "no evidence" of the control the City Council exercised over its municipal court. *See* Def. Opp. at 11. Plaintiffs need not prove such control in order to prevail: the unconstitutional actions performed and directed by indisputably *City* actors suffice to render the City liable. Pl. Opp. at 17–21. It happens, however, that Plaintiffs' abundant record evidence also demonstrates an unprecedented degree of control exerted by the City over its court, quite unlike the traditional relationship between municipalities and local courts in jurisdictions where powers are properly separated. Plaintiffs have provided ample evidence of this relationship in the form of communications among City Councilmembers, documentary evidence, deposition testimony from City officials, and positive law. *See* Pl. Mot. at 40–44, 64–66, 68–70; SUMF at ¶¶ 182–279.

---

[39] *See also Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) (finding affidavit testimony did not create a genuine dispute because "a properly supported motion for summary judgment is not defeated by self-serving affidavits"); *Barber v. C1 Truck Driver Training*, 656 F.3d 782, 801 (8th Cir. 2011) ("To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy").

This evidence goes far beyond the City Council hiring the municipal judge.[40]  The City Council met to review monthly reports on the amount of revenue brought in by the court, SUMF ¶¶ 248–49, and asked the City's Judge to justify his employment through reports on how he was acting to "increase revenue."  SUMF ¶ 203.  The City Manager and the Police Chief observed and met with the City's Judge to handle issues and comment on court processes.  *See, e.g.,* SUMF ¶ 203 (email from Mr. Brockmeyer asking to meet with Chief Jackson about monetary amounts coming from prosecutorial recommendations: "I would like to meet with the chief, mr shaw, her, you, and bret").  And the City completely controlled the court clerks who were City employees, reported to the City, and were managed by the Police Chief.  SUMF ¶¶202–20; *id.* at ¶ 213 (quoting Mr. Brockmeyer's deposition testimony that "I believe [the court clerks] work for the City, not for me").  To quote a press release from Mr. Brockmeyer's firm announcing his resignation, "the court clerk, who is employed under the police chief's supervision, plays the most significant role in managing the court and exercises broad discretion . . .  the court clerk and assistant clerks routinely performed duties that are, for all practical purposes, judicial.'"  SAMF ¶ 107; *see also* SUMF ¶¶ 213–16.

The City offers no significant evidence in rebuttal.  *See* RSUMF ¶¶ 182–279.  It merely insists, over and over, that municipalities do not direct courts.  But whether or not the City Council, City Manager, and Police Chief were supposed to exert control over the Ferguson Municipal Court, they clearly did.

---

[40] Though it is worth noting that the City Council deliberately set up a limited contract in which, despite jailing tens of thousands of individuals for days at a time, the City had only one judge available three to four nights a month, a judge who never held dockets to see those confined.  SAMF ¶¶ 91–92.

**C.      The City Misstates the Standard for Partial Summary Judgment and Fails to Explain Why Plaintiffs' Alternative Motion Should Not Be Granted**

In the event the Court finds Plaintiffs have suffered one or more of the constitutional violations alleged but concludes there is a genuine dispute of material fact concerning the City's liability, Plaintiffs have moved in the alternative for partial summary judgment as to the violations alone.  The City mischaracterizes this as an improper request for an advisory opinion.  Def. Opp. at 14.  Rule 56(a) states that a party may move for partial summary judgment as to "part of each claim or defense."  Fed. R. Civ. P. 56(a).[41]  And indeed, courts now routinely grant such judgments on "parts of claims" while reserving other issues for trial.  *See, e.g.*, *Hudak v. Clark*, 2018 WL 1785865, at *2–3 (M.D. Pa. Apr. 13, 2018) (noting that "since [Rule 56 was revised in] 2010, federal courts have repeatedly found that they are permitted to consider a motion for summary judgment on only a part of a claim," granting partial summary judgment "as to the element of probable cause" and explaining that "[t]rial in this matter will be limited to the other elements necessary for [the p]laintiff to establish his claim and for [the d]efendants to establish any affirmative defenses they may raise"); *Pattie v. AT&T*, 2012 WL 1070031, at *5 (W.D. Pa. 2012); *Koepplinger v. Seterus, Inc.*, 2020 WL 2063416, at *34 (M.D.N.C. Apr. 29, 2020).[42]

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' Motion for Summary Judgment on Counts One, Two, and Seven.

---

[41] *See also* Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment ("The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or **part of a claim or defense**.").

[42] The only post-revision case the City cites, Def. Opp. at 14, is consistent with this trend.  *See In re San Luis & Rio Grande R.R., Inc.*, 634 B.R. 599, 613 (Bankr. D. Colo. 2021)(finding "[s]ummary judgment need not be an all-or-nothing exercise disposing of every cause of action" and granting summary judgment on the "discrete" issue of whether federal law prohibited the debtor's imposition of a tariff that would substantially offset claimant's recovery).

Dated: May 26, 2023

**WHITE & CASE LLP**

By: */s/ Angela Daker*
Angela Daker (*pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Phone: 305-371-2700
Email: adaker@whitecase.com

J. Frank Hogue (*pro hac vice*)
701 13th Street NW
Washington, DC 20005
Phone: 202-626-3623
Email: fhogue@whitecase.com

Ross E. Elfand (*pro hac vice*)
Iva Popa (*pro hac vice*)
Luke J. Miller (*pro hac vice*)
Chloe R. Edmonds (*pro hac vice*)
Fabiola Alvelais Aldana (*pro hac vice*)
Ariell D. Branson (Law Clerk—not barred)
1221 Avenue of the Americas
New York, NY 10020
Phone: 212-819-7670
Email: relfand@whitecase.com

Respectfully submitted,

**ARCHCITY DEFENDERS**

Maureen Hanlon, #70990MO
Blake A. Strode, #68422MO
John M. Waldron, #70401MO
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
Phone: 855-724-2489
Email: mhanlon@archcitydefenders.org

—and—

**CIVIL RIGHTS CORPS**

Marco Lopez (*pro hac vice*)
Ryan Downer (*pro hac vice*)
1601 Connecticut Avenue NW, Suite 800
Washington, DC 20009
Phone: 202-844-4975
Email: marco@civilrightscorps.org

—and—

**SLU LAW CLINIC**

Brendan Roediger (MBE #6287213IL)
100 N. Tucker Blvd.
Saint Louis, MO 63101-1930
Phone: 314-977-2778
Email: brendan.roediger@slu.edu

***ATTORNEYS FOR PLAINTIFFS***